**Nos. 23-15049, 23-15050, 23-15051**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

———————————

THERESA SWEET, et al.,
*Plaintiffs-Appellees,*
&
EVERGLADES COLLEGE, INC.; LINCOLN EDUCATIONAL SERVICES CORPORATION; and
AMERICAN NATIONAL UNIVERSITY,
*Intervenors-Appellants*
v.
MIGUEL A. CARDONA, Secretary of the United States Department of Education, and
U.S. DEPARTMENT OF EDUCATION,
*Defendants-Appellees.*

———————————

On Appeal from the United States District Court
for the Northern District of California

———————————

## RESPONSE TO EMERGENCY MOTION
## FOR A STAY PENDING APPEAL

———————————

SARAH E. HARRINGTON
  *Deputy Assistant Attorney General*
MARK B. STERN
JOSHUA M. SALZMAN
SEAN R. JANDA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ..........................................................................................1

STATEMENT .................................................................................................2

ARGUMENT ..................................................................................................5

A.     Intervenors Cannot Demonstrate Any Injury, Much Less Harm
Warranting A Stay .............................................................................5

B.     The Public Interest And Balance of Equities Weigh Against A Stay .................13

C.     Intervenors Are Unlikely To Prevail On The Merits ...............................14

D.     The Court Should Not Forgo Equitable Balancing ................................22

CONCLUSION .............................................................................................24

CERTIFICATE OF COMPLIANCE

# INTRODUCTION

After years of litigation, the Department of Education settled a massive class action brought by student loan borrowers challenging the Department's processing of class members' applications for relief under a rule that relieves borrowers of their repayment obligation when their school engaged in misconduct. The litigation arose from delays in addressing a backlog of applications that far exceeded the Department's adjudicative capacity. The settlement provides a rational and fair means of resolving the litigation and for eliminating that backlog. It calls for the Department to automatically grant full discharges to approximately 200,000 class members who borrowed to attend 151 specific schools, enabling the Department to adjudicate the remaining class members' claims on a specified timeline. The Department agreed to provide automatic relief to borrowers associated with the enumerated schools because it determined that there are threshold indications these borrowers would likely prevail on their claims if adjudicated and because alternative outcomes through continued litigation risked more arbitrary resolution of the claims as a whole. No class member maintains an objection to the settlement, and it was approved by the district court after a fairness hearing.[1]

---

[1] This settlement is unrelated to a separate Department initiative, repeatedly referenced by the intervenors, that provides one-time student loan relief to low- and middle-income borrowers. A.537.

Although all parties to the settlement are satisfied with this resolution, three of the 151 schools—whose students constitute less than 1% of the plaintiff class—intervened in an unsuccessful attempt to block the settlement in its entirety. They did so even though the settlement binds only the Department and the plaintiff class, providing neither the Department nor the plaintiffs with additional rights vis-à-vis the intervenors. The district court accordingly refused to stay the settlement pending the intervenors' appeal, explaining that the intervenors could not even "identify an injury to [them] arising from this settlement agreement (that they were not a party to) resolving this litigation (that did not involve them)." A.552. This Court should follow suit.

## STATEMENT

"Congress has allowed for the cancellation of federal student loans in certain cases of school misconduct" pursuant to a process known as borrower defense. *In re U.S. Dep't of Educ.*, 25 F.4th 692, 695 (9th Cir. 2022) (citing 20 U.S.C. § 1087e(h)). Borrowers may claim entitlement to borrower-defense relief if, for example, their school allegedly made material misrepresentations, and may submit applications for relief to the Department. *E.g.*, 34 C.F.R. §§ 685.206(e)(8), 685.222(e)(1)(i). When a borrower-defense application is submitted, the relevant school may generally respond to the allegations. A.542 (summarizing the regulations). If borrower-defense relief is granted, the Department may initiate a proceeding to recoup the discharged amounts from the school, in which case the school is entitled to a hearing and the opportunity

to litigate the issue de novo. 34 C.F.R. §§ 685.308(a)(3), 668.87(a)-(b). The Department may also seek to recover funds from schools that violate the Department's regulations in other circumstances. *Id.* § 685.308(a)(1)-(2).

Beginning in 2015, there was an unprecedented surge in borrower-defense requests, overwhelming the Department, which subsequently began to reconsider its borrower-defense policies. That resulted in a pause of adjudications and a backlog of hundreds of thousands of applications. A.468-69. In 2019, plaintiffs filed this class action seeking to compel the Department to resume adjudicating applications. A.469. Although the suit initially sought only procedural relief, over the course of the litigation, plaintiffs ultimately suggested that the Department should be ordered to show cause why every single class member's borrower-defense application should not be granted immediately. Dkt. No. 245, at 1.

After years of litigation, including a trip to this Court regarding a discovery dispute, *see U.S. Dep't of Educ.*, 25 F.4th 692, the parties reached a settlement that was the product of many months of arm's length negotiations, A.217. The settlement provides full, automatic relief to class members who received federal student loans to attend 151 schools identified in the settlement's Exhibit C and provides for the remaining class members to receive individualized adjudications using streamlined procedures to be completed on a specified timetable. A.471. The settlement also provides a deadline for the Department's adjudication of applications submitted after execution of the settlement but before final approval. A.471. The Department has

explained that providing automatic discharges to borrowers associated with the Exhibit C schools is critical to its ability to timely address other pending and future claims; that the Department does not consider an institution's inclusion on Exhibit C to constitute evidence that an institution engaged in misconduct; and that because the automatic discharges are made pursuant to the agency's settlement authority, not its borrower-defense regulations, affording relief to a borrower from an Exhibit C school "provides no basis to the Department for initiating a borrower defense recoupment proceeding against any institution identified on Exhibit C." A.375-76.

Four of the Exhibit C schools, including three who are appellants here, intervened to oppose the settlement. A.472. The district court rejected the intervenors' arguments and approved the settlement. A.467-91. The court concluded that the Department had authority to settle the litigation (A.472-80); that inclusion on Exhibit C "do[es] not impose any liability whatsoever on intervenors" (A.480); that the litigation had not become moot when the Department resumed adjudicating some borrower-defense claims (A.483-86); and that the settlement was fair and adequate (A.486-91).

Three intervenors noticed appeals and asked the district court for a stay of the settlement pending appeal. A.535. The district court denied the stay motion, rejecting intervenors' arguments that the settlement was, pursuant to its own terms, automatically stayed by the appeals (A.537-41); concluding that intervenors had not shown that a stay would avoid irreparable harm either to their procedural rights or

4

their reputations (A.541-51); finding that intervenors are unlikely to succeed on the merits (A.551-53); and determining that the public interest and balance of equities weigh against a stay (A.553-55). The court nonetheless granted a temporary stay of the discharge of loans of the small minority of class members who attended the appealing intervenors' own institutions to allow intervenors to seek a stay from this Court. A.555.

## ARGUMENT

In determining whether to grant a stay pending appeal, the Court considers "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 426 (2009) (quotation omitted). Intervenors have failed to carry their burden on each factor.

### A. Intervenors Cannot Demonstrate Any Injury, Much Less Harm Warranting A Stay

The district court correctly found that intervenors have suffered no cognizable injury from the settlement. A.552. Intervenors' lack of injury is relevant to the stay analysis for two distinct reasons. First, unless intervenors can demonstrate a cognizable injury (plus traceability and redressability) as required to establish standing, they have no likelihood of success on the merits. *See Diamond v. Charles*, 476 U.S. 54,

68 (1986) (recognizing that when an intervenor seeks to "continue a suit in the absence of the party on whose side intervention was permitted," the intervenor must demonstrate its own standing to appeal); *see also Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (describing the three requirements for standing). Second, if intervenors cannot show any injury, they cannot show that a stay is necessary to avoid irreparable harm.

There is no dispute that the settlement provides no predicate for the Department to seek to recoup the discharged loan amounts from the schools listed on Exhibit C, and intervenors indeed do not contend that the settlement will directly cause them any financial injury. Instead, they focus on purported "reputational injuries" stemming from their inclusion on Exhibit C (Mot. 29-30, 33-37), and the purported loss of "procedural protections available" to schools under the Borrower Defense regulations (Mot. 30, 31-32). Neither of those claimed harms suffices.

**1.** Intervenors' inclusion in Exhibit C does not cause them any concrete reputational injury, let alone reputational injury that would be redressed by a successful appeal on the merits or forestalled by a stay. By its terms, Exhibit C is merely a list of schools whose students will receive full, automatic settlement discharges. The Department has stated that inclusion in Exhibit C is not evidence that a school engaged in misconduct. A.272; A.300-03; A.375. Intervenors emphasize that the Department has explained that it selected the schools for inclusion in Exhibit C based on whether there were "strong indicia regarding substantial misconduct"

6

(A.220-21), but even the paragraph emphasized by intervenors makes clear that the Department had determined that actual misconduct was only "in some instances proven," while in others it was merely "credibly alleged." A.221. The Department also explained that it was providing "presumptive relief" because of "high rate[s] of class members with applications related to the listed schools" and because "[c]learing these claims through provision of expeditious upfront relief will significantly reduce the backlog of pending claims." A.221.

Intervenors also fall short of their obligation to "produce evidence that [their reputational] injury is concrete, not speculative." *Ezzell Trucking, Inc. v. FMCSA*, 309 F.3d 24, 26 (D.C. Cir. 2002). Two of the three intervenors fail to identify any concrete examples of reputational consequences from the settlement. And none of the examples put forward regarding the third intervenor, Lincoln, establishes the sort of "concrete" reputational harm—such as "present and future consequences for [Lincoln's] business" or "customers [who] have changed their business decisions"— required to satisfy Article III. *Id.* To the contrary, two of the examples involve isolated criticisms of Lincoln by "partisan activist groups" and by a high school teacher who refused to permit Lincoln's representative to present to the teacher's class. *See* Mot. 33, 35. And the final example involves Lincoln's having reported this litigation in its securities filings. Mot. 35-36. Although Lincoln suggests vague harms to "financial reporting and shareholder relations" from those filings (Mot. 36), Lincoln has not substantiated those suggestions with anything concrete; indeed, as the district court

explained, Lincoln's stock price has increased since Exhibit C was made public (A.550).

Moreover, intervenors cannot show that any perception that they engaged in misconduct is fairly traceable to the settlement or Exhibit C, as is required to establish standing. *See Lujan*, 504 U.S. at 560-61. Intervenors' own evidence shows that Lincoln was the subject of a consent judgment with the Massachusetts Attorney General to "resolve allegations that the school violated state consumer protection law" and that there were "numerous law enforcement inquiries" into Lincoln unconnected to the settlement or Exhibit C, including a new inquiry initiated by the Massachusetts Attorney General and inquiries conducted by the Department of Education's Inspector General and the Consumer Financial Protection Bureau. A.546-47 (quotation omitted). The other appealing intervenors have also separately settled, or been found liable in, consumer-protection lawsuits unrelated to the settlement at issue here. *See* Dkt. No. 288, at 18 n.4 (referencing cases where American National University was found liable in consumer-protection suit by Kentucky Attorney General and Everglades University settled claims of unfair trade practices brought by State of Florida). Intervenors thus fail to show that any damage to their reputations is traceable to their inclusion as three of 151 schools on Exhibit C, rather than to the other myriad legal issues the schools have faced.

Likewise, there is no reason to believe that damage to their reputations would be redressed by a favorable decision. *See Lujan*, 504 U.S. at 561. Intervenors' appeal

seeks an order reversing the approval of the settlement. But the reputational harm that intervenors allege stems from, in their words, "[b]eing publicly branded a presumptive wrongdoer." Mot. 33. Intervenors do not demonstrate how a determination by this Court that, for example, the settlement exceeds the Secretary's statutory authority would "rehabilitate [intervenors'] reputation," *McBryde v. Committee to Review Circuit Council Conduct & Disability Orders of Judicial Conference of U.S.*, 264 F.3d 52, 57 (D.C. Cir. 2001), even assuming that it was damaged by the settlement. The fact that intervenors were originally included on Exhibit C, and the original justification for their inclusion as relating to substantial indicia of misconduct, are matters of public record. Regardless of whether the settlement is implemented, "partisan activist groups" can still assert that Exhibit C constitutes a "government-approved list of bad actors." Mot. 33, 35; *see also Lujan*, 504 U.S. at 562 (noting the difficulty of establishing standing when the redressability of the alleged injury "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict" (quotation omitted)). Accordingly, intervenors' attempt to leverage any purported injury stemming from Exhibit C to seek disapproval of the settlement amounts to an end-run around the principle that "past injuries alone are insufficient" to establish jurisdiction for "forward-looking" relief. *NB ex rel. Peacock v. District of Columbia*, 682 F.3d 77, 82 (D.C. Cir. 2012) (quotation omitted).

For much the same reason that intervenors cannot establish reputational injury that would support standing, they also cannot show that a stay of the settlement pending appeal would shield them from any purported irreparable harm. Even if intervenors have suffered any reputational injury from the settlement, they fail to show that the injury is connected to whether the Department is allowed to begin implementing the agreement. Preventing the Department from discharging loans will do nothing to forestall the reputational consequences (if any) that result from the intervenors' inclusion in Exhibit C and, thus, is not a basis for a stay pending appeal. *See Al Otro Lado v. Wolf*, 952 F.3d 999, 1007 (9th Cir. 2020) (explaining that party seeking a stay must show that "irreparable injury is likely to occur during the period before the appeal is likely to be decided" and that "a stay is necessary to avoid" this irreparable injury).

**2.** The intervenors also briefly argue that the settlement inflicts a procedural injury by violating their right to participate in borrower-defense adjudications and by extending the statute of limitations for some claims. Mot. 30, 31-32. This argument misunderstands the basis under which the Department is discharging the loans of borrowers who attended Exhibit C schools. The Department has explained that these discharges are being effectuated "pursuant to the terms of the Settlement Agreement, not pursuant to the Department's borrower defense regulations." A.375. The stated purpose of the automatic discharges under Exhibit C is to avoid the need for individualized adjudications contemplated by the borrower-defense regulations, which

would likely take years. As the district court explained, the "settlement does not call for the Department to adjudicate the borrower defense applications of the group of class members to which Exhibit C applies." A.542 (quotation omitted). The intervenors are accordingly not being denied the opportunity to participate in borrower-defense adjudications specified by the Department's regulations because those adjudications are not occurring. Nowhere do intervenors cite any authority to support the idea that any concrete injury arises from the Department's choice to use its discretion to resolve borrower-defense claims through settlement rather than through borrower-defense adjudications.

Moreover, even if intervenors' procedural rights had been impaired in some way, "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). Here, the only concrete interest that the intervenors identify is an interest in not being subject to, or found liable in, future recoupment proceedings. *See* Mot. 31-32. But the Department is not currently pursuing any such recoupment proceedings against intervenors, and intervenors fail to provide any argument or evidence to suggest that the Department intends to pursue future recoupment proceedings related to any discharges effectuated under the settlement. Without any such suggestion, any injury that depends on such future hypothetical proceedings is not the sort of "certainly impending" injury required for standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). Any

suggestion that the Department will attempt recoupment is particularly speculative given the district court's finding that "no recoupment action could be initiated . . . as a result of the settlement." A.481. Thus, intervenors' procedural claim is unconnected from their alleged harm and does not support either their standing or their entitlement to a stay.

**3.** Intervenors' inability to demonstrate irreparable harm is underscored by the massive disconnect between their own alleged injury (the grant of relief to borrowers who attended their own schools) and the relief they have sought (a stay of the entire settlement). The class action settlement—the approval of which not a single class member has appealed—resolves the claims of hundreds of thousands of class members, including approximately 200,000 borrowers who attended one of the 151 schools listed in Exhibit C. A.534. As explained, intervenors have not demonstrated any harm from any component of the settlement. But even setting that aside, intervenors do not even attempt to explain how effectuating the settlement with respect to the 99% of class members who do not have loans associated with the intervenor schools could possibly harm them. To the contrary, intervenors aver that all they seek is "their removal from Exhibit C and the assurance that any [borrower-defense] claims against them will be adjudicated fairly" (Mot. 42)—neither of which relates in any way to the hundreds of thousands of settled claims unconnected to intervenors. Intervenors do not even attempt to justify their request for what even they appear to recognize to be a wildly overbroad stay. Mot. 41-42.

12

### B.    The Public Interest And Balance Of Equities Weigh Against A Stay

The intervenors' inability to show concrete injury from allowing the settlement to be implemented contrasts sharply with the tangible harm that would result from a stay. Accordingly, the district court correctly concluded that the balance of the equities and the public interest—two factors that "merge" when the government is a party, *Nken*, 556 U.S. at 435—"heavily weigh against a stay." A.553.

Any stay of the settlement agreement would substantially harm the Department, the plaintiffs, and the public. The Department is facing a crushing backlog of borrower-defense applications submitted by hundreds of thousands of class members in this case. *See* A.554. The Department thus has a strong interest in resolving this litigation and eliminating that backlog according to a schedule that is workable for the Department and that permits the Department to continue devoting appropriate resources to its other initiatives and priorities. And the public similarly has an interest in resolution of "this stubborn and burgeoning backlog." A.555. Moreover, by ensuring the Department's ability to provide timely borrower-defense relief where warranted, the settlement will provide substantial benefits to each of the hundreds of thousands of class members by removing a cloud of financial uncertainty. *Id.* The borrowers associated with intervenors' own schools share those interests fully.

Given the strong interest in moving forward, and consistent with the district court's order and the need to meet deadlines specified in the settlement, the

13

Department has already begun the process of effectuating the settlement by directing loan servicers to start processing Exhibit C discharges for schools other than intervenors, providing notices to class members, updating its own internal systems to reflect the rescission of previous denials, and beginning the adjudication process for those reopened cases through the settlement's streamlined procedures. *See* A.536 (describing the implementation process). The consequent whipsawing that will occur if the settlement is stayed, only for the stay to later be lifted if the intervenors are unsuccessful, will further cause confusion among the loan servicers, borrowers, and the public and undermine the agency's ability to effectively implement the borrower-defense program.

## C. Intervenors Are Unlikely To Prevail On The Merits

Because intervenors will be unable to establish standing, and because the other three stay factors weigh decisively against them, the Court need not consider the merits of intervenors' challenges to the settlement. But, regardless, intervenors are unlikely to prevail.[2]

**1.** Even were intervenors able to establish standing, their claims would still fail at the threshold because the settlement agreement between the Department and plaintiffs resolves litigation regarding a statutory framework designed to advance the

---

[2] As in district court, *see* Dkt. No. 362, at 2 n.1, the government does not address issues on which plaintiffs bear the burden of proof, including the district court's subject matter jurisdiction and the propriety of class certification.

interests of borrowers, not the intervenors. Under the Administrative Procedure Act, suit is precluded where the party's "interests are so marginally related to or inconsistent with the purposes implicit in the statute [being enforced] that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399 (1987).

Here, the intervenors do not fall within the zone of interests of the statutory and regulatory provisions they seek to enforce. The borrower-defense provisions are concerned with granting relief to defrauded borrowers; they are not designed to benefit the institutions that allegedly defrauded the borrowers. *See* 34 C.F.R. part 685, subpart B ("Borrower Provisions"); *see also id.* § 685.206 ("Borrower responsibilities and defenses"); *id.* § 685.22 (similar). Intervenors' interests are, instead, protected through the separate procedural and judicial review rights that institutions have in any recoupment proceedings. *See id.* part 668, subpart G (enforcement regulations); *see also id.* §§ 685.206(c)(3)-(4), (e)(16), 685.222(e)(7) (authorizing the Secretary to initiate recoupment proceedings under the enforcement regulations). It is only through that separate process, which is governed by separate regulations and which is not implicated by the settlement in this case, that any liabilities of the intervenors could be determined. Intervenors do not suggest that they would have any right of judicial review of a Department decision granting a borrower-defense claim by a borrower, and correspondingly, they have no right to challenge a Department decision to grant relief to those same borrowers through settlement. Nor is there any reason to believe

that Congress would have intended to empower intervenors to block the Department from exercising its discretion to settle long-running litigation through an agreement that neither binds nor confers rights on them.

**2.** Intervenors wrongly claim (Mot. 19-24) that the settlement represents an invalid exercise of the Secretary's and Attorney General's authority. However, the government has ample authority to enter into the settlement.

As an initial matter, the Attorney General has "plenary discretion" to "settle litigation to which the federal government is a party." *United States v. Carpenter*, 526 F.3d 1237, 1241 (9th Cir. 2008) (citing 28 U.S.C. §§ 516 and 519). That plenary authority cannot be exercised to approve a settlement requiring an agency to take action beyond its statutory authority, *see id.* at 1242, but there is no dispute that the Secretary has authority to provide discharges and refunds to borrowers who have made borrower-defense claims. That substantive authority, combined with the Attorney General's settlement authority, provides support for the settlement.

The Secretary also is empowered to compromise federal student loan debt. This case involves loans made under two programs—the Federal Family Education Loan (FFEL) program, governed by Part B of the relevant title of the Higher Education Act, and the Federal Direct Loan Program, governed by Part D. The Secretary has statutory authority with respect to Part B to "enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired." 20 U.S.C. § 1082(a)(6). And Congress has provided that "loans made to borrowers" under Part

D "shall have the same terms, conditions, and benefits" as loans made under Part B. *Id.* § 1087e(a)(1). Thus, as the district court concluded (A.473-80), the Secretary has authority to settle any claim relating to FFEL loans, and that same authority—which reflects a term, condition, and benefit of the loan—also attaches to claims related to Direct loans.

Intervenors dispute the Secretary's authority to settle claims related to Direct loans, contending that § 1087e(1) does not provide the Secretary any "functions, powers, [or] duties" relating to Direct loans but instead only speaks to terms and conditions of the loans. Mot. 20-21. But the Secretary's authority to compromise claims related to a loan is naturally construed as both a "term" and "condition" of the loan, as it is inextricably intertwined with the indisputable terms and conditions governing repayment. Intervenors' contrary suggestion also ignores that Congress intended the Direct Loan Program "to eventually replace the FFEL Program," which suggests a congressional intent to ensure "parity" between the two programs. A.474. And intervenors fail to locate any other statutory provision providing the Secretary with "functions, powers, or duties" related to Direct loans, meaning their construction would lead to the absurd proposition that the Secretary lacks any powers related to such loans.

The apparent implication of the intervenors' argument is that the Secretary has no authority at all to settle any claim related to any Direct loan. But that would make no sense. If the Secretary determines, even after initially denying (or failing to act on)

a claim, that a borrower may be entitled to relief and might prevail in pending litigation, it is entirely reasonable, efficient, and equitable for the Secretary to settle that claim in litigation by discharging the borrower's debt. Such a settlement avoids costly additional litigation and administrative procedures, which delay the relief that Congress intended for borrowers, impose costs on the government, and deplete the Department's resources for resolving other borrowers' claims. Intervenors have provided no persuasive reason to think that Congress intended to preclude the Secretary from ever settling such a claim.

Intervenors also contend that the power to "compromise" claims related to loans does not include "the power to grant blanket debt cancellation." Mot. 22. But contrary to intervenors' repeated assertions, the settlement does not reflect any *en masse* cancellation but is instead the compromise of specific claims that have been submitted to the Department pursuant to the statutorily authorized borrower-defense regulations, and which then became the subject of litigation. Intervenors do not and cannot deny that the Department has statutory authority to resolve claims alleging borrower defenses, including by discharging loans and refunding payments borrowers have made. The Department is not asserting a novel authority or claiming the ability to discharge its entire trillion-dollar loan portfolio; it is simply making a determination about how best to use its established authority so as to resolve long-running litigation, not involving intervenors, and to address a crippling backlog.

18

**3.** Intervenors next contend (Mot. 24-26) that the settlement violates the APA because it is allegedly both inconsistent with the agency's regulations and arbitrary. Intervenors are wrong in suggesting that the agency is violating its own regulations or amending them outside of notice-and-comment procedures. As the district court recognized, the "Secretary has not altered the borrower-defense procedures at all." A.479. To the contrary, "[t]hose regulations remain in place." *Id.* Instead, the settlement simply establishes a framework for resolving a discrete set of outstanding administrative adjudications—a framework that all parties whose rights are affected have now accepted. *Cf.* 5 U.S.C. § 551(4), (6) (contrasting an agency "rule" that has "future effect" with an agency "order" that resolves an adjudication); *id.* § 553 (providing notice-and-comment requirements for rules only).

Nor does the settlement violate the agency's regulations. As explained, the settlement does not purport to adjudicate plaintiffs' borrower-defense claims and, thus, there was no need for the agency to adhere to the procedures attendant to such adjudications. Taken to its logical conclusion, intervenors' position would suggest that agencies could never settle litigation challenging adjudications except perhaps by agreeing to a full re-do of the adjudication. But as this Court emphasized in rejecting similar arguments with respect to an agency consent decree, that result would undermine the substantial benefits that accompany compromise settlements and infringe the Attorney General's plenary statutory authority to settle litigation. *See Turtle Island Restoration Network v. U.S. Dep't of Commerce*, 672 F.3d 1160, 1167 (9th Cir. 2012).

Intervenors' argument that the settlement is arbitrary (Mot. 25-26) is similarly misplaced. As an initial matter, this argument, which goes to the adequacy of the agency's reasoning in entering into the settlement rather than the agency's authority for doing so, is squarely foreclosed by the Attorney General's "plenary discretion" to "settle litigation to which the federal government is a party." *Carpenter*, 526 F.3d at 1241. Intervenors identify no basis on which they could challenge the reasonableness or wisdom of the Attorney General's discretionary decision to settle litigation. *Cf.* 5 U.S.C. § 701(a)(2). Nor is there any support for their novel suggestion that a settlement must be accompanied by a reasoned explanation. Mot. 26. In any case, the Department has explained that it sought to "fully and finally resolve this litigation by providing negotiated relief to class members on a timeline that is operationally feasible for the Department." A.374.

**4.** Finally, intervenors briefly argue (Mot. 27-29) that the settlement strips them "of liberty and property interests without due process." But as the district court correctly recognized, that is incorrect. *See* A.481-82.

First, with respect to intervenors' claimed liberty interest in their reputation, intervenors have failed to demonstrate even a sufficiently concrete reputational injury to satisfy Article III. *See supra* pp. 5-10. But even if intervenors' asserted injuries are sufficient for Article III purposes, they cannot establish any harm to a protected liberty interest. As intervenors themselves recognize, such a "stigma-plus" due process claim requires demonstrating "stigma from governmental action plus alteration or

20

extinguishment of a right or status previously recognized by state law." *Fikre v. FBI*, 35 F.4th 762, 776 (9th Cir. 2022) (quotation omitted); *see* Mot. 29-30. Although intervenors speculate that their inclusion on Exhibit C could cause them to lose students or donations (Mot. 27), any such loss would be insufficient to support a due process claim because it would not involve the alteration or extinguishment of any protected right or status. And intervenors have not, in any event, provided any evidence to support their speculation.

Second, intervenors' claim that the settlement deprives them of property without due process fares no better. It is indisputable that the settlement itself does not deprive intervenors of any tangible property—it does not, for example, adjudicate any of their rights or require them to pay any penalties. Instead, intervenors' claim rests on suppositions that the settlement might result in the Department pursuing recoupment proceedings against them some day in the future. But "[a]ny hypothetical, future remedial action would proceed according to established regulations, which would provide the schools with full due process." A.482. And the Department "does not consider inclusion on Exhibit C" to "constitute evidence that could or would be considered in an action by the Department against a school." *Id.*; *see* A.376. And were a recoupment proceeding ever initiated, nothing in the settlement would bar intervenors from raising a due process defense at that time. In short, the settlement affects the rights of the Department and the class members vis-à-vis each other; it affects no rights of the intervenors.

### D.     The Court Should Not Forgo Equitable Balancing

Intervenors also briefly argue that the settlement agreement contains a self-executing stay provision and, thus, that this Court should grant a stay without regard to the equities. Mot. 12-13. But to even put the issue before the Court, intervenors would need to establish appellate standing, which they cannot. Intervenors also fail to explain the basis on which they are authorized to ask this Court to overrule the shared understanding of the settling parties and declare the proper interpretation of an agreement that confers no rights on them.

In any case, intervenors misread the settlement agreement. The agreement provides that it will take effect on the date that the judgment approving the settlement "becomes non-appealable, or, in the event of an appeal by a Class Member based upon a timely filed objection to this Agreement, upon the date of final resolution of said appeal." A.269. As the district court explained, the settlement became effective upon expiration of the period when *a class member* could notice a timely appeal—intervenors' own appeal does not extend the effective date. A.537-41. By specifying that appeals will extend the effective date of the settlement in one narrow circumstance, the parties presumptively excluded extensions based on other appeals. *Copeland v. Ryan*, 852 F.3d 900, 907 (9th Cir. 2017) (quotation omitted) (describing the *expressio unius* canon); *see also Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1234 (9th Cir. 2013) (applying that canon to contract interpretation). Moreover, if intervenors were correct that any pending appeal means the judgment remains "appealable" (and, thus,

not yet effective) there would have been no need to specify that certain pending appeals extend the effective date. *See United States v. Barraza-Lopez*, 659 F.3d 1216, 1220 (9th Cir. 2011) (describing the canon against surplusage).

Intervenors also misread a provision specifying that the agreement "shall be void if it is not approved as written by a final Court order not subject to any further review." A.291. That provision only explains the consequences of any ultimate decision, by the district court or on appeal, that the settlement should be rejected. It has nothing to say about when the settlement becomes effective in the first place.

In any case, any ambiguity should be resolved in favor of effectuating the shared intent of the settling parties. There can be no dispute that the parties, including hundreds of thousands of class members, wish to proceed with the settlement. They should be permitted to do so.

## CONCLUSION

For the foregoing reasons, the intervenors' motion should be denied.

Respectfully submitted,

SARAH E. HARRINGTON
 *Deputy Assistant Attorney General*

MARK B. STERN
JOSHUA M. SALZMAN

*/s/ Sean R. Janda*
SEAN R. JANDA
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7260*
 *U.S. Department of Justice*
 *950 Pennsylvania Avenue NW*
 *Washington, DC 20530*
 *(202) 514-3388*
 *sean.r.janda@usdoj.gov*

March 2023

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion complies with the type-volume limitation of Ninth Circuit Rules 27-1 and 32-3 because it contains 5,579 words. This Motion complies with the typeface and the type style requirements of Federal Rule of Appellate Procedure 27 because this brief has been prepared in a proportionally spaced typeface using Word 14-point Garamond typeface.

*/s/ Sean R. Janda*
SEAN R. JANDA