Nos. 23-15049, 23-15050, 23-15051 (consolidated)

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

THERESA SWEET, et al.,

*Plaintiffs-Appellees*,

&

EVERGLADES COLLEGE, INC., LINCOLN EDUCATIONAL SERVICES CORPORATION, and AMERICAN NATIONAL UNIVERSITY,

*Intervenors-Appellants*,

v.

MIGUEL CARDONA, et al.,

*Defendants-Appellees.*

On Appeal from the United States District Court
for the Northern District of California
No. 3:19-cv-3674 | Hon. William H. Alsup

## APPELLANTS' JOINT OPENING BRIEF

Jesse Panuccio
Jason Hilborn
BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd., Ste. 1200
Fort Lauderdale, FL 33301
(954) 356-0011
jpanuccio@bsfllp.com

*Counsel for Everglades College, Inc.*

John S. Moran
MCGUIREWOODS LLP
888 16th St. N.W., Suite 500
Black Lives Matter Plaza
Washington, D.C. 20036
(202) 828-2817
jmoran@mcguirewoods.com

*Counsel for American National University*

Lucas C. Townsend
Jeffrey Liu
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
(202) 955-8500
LTownsend@gibsondunn.com

James L. Zelenay, Jr.
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA 90071
(213) 229-7449

*Counsel for Lincoln Educ. Services Corp.*

***Additional Counsel Listed on Next Page***

Piper A. Waldron  
MCGUIREWOODS LLP  
1800 Century Park East, 8th Floor  
Los Angeles, CA 90067  
(310) 315-8250  

*Counsel for American National University*

Katherine Worden  
GIBSON, DUNN & CRUTCHER LLP  
555 Mission Street  
San Francisco, CA 94105  
(415) 393-8229  

*Counsel for Lincoln Educ. Services Corp.*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1:

1. Intervenor-Appellant Everglades College, Inc., states that it is a nonprofit corporation, that it does not have a parent corporation, and that no publicly traded company owns 10% or more of its stock.

2. Intervenor-Appellant Lincoln Educational Services Corporation states that it is a publicly traded corporation, that it does not have a parent corporation, and that no publicly traded company owns 10% or more of its stock.

3. Intervenor-Appellant American National University, Inc., states that it is wholly owned by National University Services, Inc., a privately held Virginia corporation, and that no publicly held corporation owns 10% or more of its stock.

**TABLE OF CONTENTS**

INTRODUCTION ...........................................................................................1

JURISDICTIONAL STATEMENT ..............................................................3

ISSUES PRESENTED.....................................................................................3

STATEMENT OF THE CASE.........................................................................4

    I.    Federal Student Loans And Borrower Defense.............................4

    II.    This Lawsuit ...................................................................................5

    III.    The Settlement................................................................................9

        A.    Subclass 1: "Automatic Relief Group" ..................................9

        B.    Subclass 2: "Decision Group"..............................................10

        C.    Subclass 3: "Post-Class Applicants Group"..........................11

    IV.    "Exhibit C" Schools Intervene And Object To Settlement......12

    V.    Harm To Schools From The Settlement......................................13

SUMMARY OF ARGUMENT .....................................................................15

STANDARD OF REVIEW ...........................................................................18

STANDING ..................................................................................................19

ARGUMENT ................................................................................................23

    I.    The District Court Lacked Jurisdiction To Approve The
        Settlement. ...................................................................................23

    II.    The Department Lacks Authority To Provide The Settlement
        Relief. ..........................................................................................25

        A.    The HEA Does Not Grant The Secretary Authority To Cancel
            Student-Loan Debt *En Masse*..............................................25

        B.    The Settlement Violates Administrative Law Principles And
            The Administrative Procedure Act.........................................37

    III.    The Final Approval Violated Rule 23. .....................................46

        A.    No Monetary Relief Class Was Ever Certified. ..................47

ii

B. The Settlement's Creation Of Multiple Subclasses Destroyed Commonality, Typicality, And Adequate Representation. .................53

C. The Inclusion Of Uninjured Class Members In The Settlement Renders The Certified Class Overbroad. ............................................55

D. The Claims Of "Post-Class Applicants" Were Never Certified. ........57

IV. The Settlement Violates Due Process. .......................................................59

A. The Settlement Defames And Impugns The Schools' Reputations Without Due Process....................................................59

B. The Settlement Impairs The Schools' Property Interests...................63

C. The Settlement Does Not Provide The Schools Constitutionally Required Process. ...............................................................................64

V. The District Court Erred In Denying Intervention Of Right....................66

CONCLUSION ...................................................................................................68

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Abramski v. United States,*
573 U.S. 169 (2014)....................................................................................37

*United States ex rel. Accardi v. Shaughnessy,*
347 U.S. 260 (1954)....................................................................................40

*Akina v. Hawaii,*
835 F.3d 1003 (9th Cir. 2016) ...................................................................25

*Ala. Ass'n of Realtors v. Dep't of Health & Hum. Servs.,*
141 S.Ct. 2485 (2021).................................................................................26

*Allen v. Bedolla,*
787 F.3d 1218 (9th Cir. 2015) .............................................................19, 47

*Alvarez v. Smith,*
558 U.S. 87 (2009)......................................................................................24

*Am. Hosp. Ass'n v. Price,*
867 F.3d 160 (D.C. Cir. 2017)....................................................................43

*Amchem Prods., Inc. v. Windsor,*
521 U.S. 591 (1997).............................................................49, 53, 55, 58

*Arizonans for Off. Eng. v. Arizona,*
520 U.S. 43 (1997)......................................................................................23

*Barnes v. Am. Tobacco Co.,*
161 F.3d 127 (3d Cir. 1998) .......................................................................47

*Bender v. Williamsport Area Sch. Dist.,*
475 U.S. 534 (1986)....................................................................................23

*Bittner v. United States,*
143 S.Ct. 713 (2023)..............................................................................28, 34

*Brown v. U.S. Dep't of Educ.,*
2022 WL 16858525 (N.D. Tex. Nov. 10, 2022) ..........................................2

*California v. Azar,*
911 F.3d 558 (9th Cir. 2018) ......................................................................21

*Campbell-Ewald Co. v. Gomez,*
577 U.S. 153 (2016)....................................................................................24

*Canatella v. California*,
404 F.3d 1106 (9th Cir. 2005) .............................................................19

*Carter v. Veterans Admin.*,
780 F.2d 1479 (9th Cir. 1986) .............................................................24

*Cent. Laborers' Pension Fund v. Heinz*,
541 U.S. 739 (2004)..............................................................................40

*CFTC v. Schor*,
478 U.S. 833 (1986)..............................................................................30

*Chauffeur's Training Sch., Inc. v. Riley*,
967 F. Supp. 719 (N.D.N.Y. 1997).....................................................63

*Cholakyan v. Mercedes-Benz, USA, LLC*,
281 F.R.D. 534 (C.D. Cal. 2012)........................................................51

*Chrysler Corp. v. Brown*,
441 U.S. 281 (1979)..............................................................................39

*Citizens for Balanced Use v. Mont. Wilderness Ass'n*,
647 F.3d 893 (9th Cir. 2011) ...............................................................67

*Conservation Nw. v. Sherman*,
715 F.3d 1181 (9th Cir. 2013) .............................................................39

*Corley v. United States*,
556 U.S. 303 (2009)........................................................................31, 34

*Council of Ins. Agents & Brokers v. Molasky-Arman*,
522 F.3d 925 (9th Cir. 2008) ...............................................................22

*Davidson v. O'Reilly Auto Enters., LLC*,
968 F.3d 955 (9th Cir. 2020) ...............................................................53

*Dewey v. Volkswagen Aktiengesellschaft*,
681 F.3d 170 (3d Cir. 2012) ................................................................55

*E. Bay Sanctuary Covenant v. Garland*,
994 F.3d 962 (9th Cir. 2020) ...............................................................45

*Ellis v. Costco Wholesale Corp.*,
657 F.3d 970 (9th Cir. 2011) .........................................50, 51, 54, 55

*Endy v. Cnty. of Los Angeles*,
975 F.3d 757 (9th Cir. 2020) ...............................................................59

*Exec. Bus. Media, Inc. v. U.S. Dep't of Def.*,
3 F.3d 759 (4th Cir. 1993) ...................................................................40

v

*Fikre v. FBI*,
  35 F.4th 762 (9th Cir. 2022) ...................................................................60

*Foretich v. United States*,
  351 F.3d 1198 (D.C. Cir. 2003) .........................................................22, 23

*Frank v. Gaos*,
  139 S.Ct. 1041 (2019) ........................................................................23, 25

*Genuine Parts Co. v. EPA*,
  890 F.3d 304 (D.C. Cir. 2018) ...............................................................45

*Hansberry v. Lee*,
  311 U.S. 32 (1940) ..................................................................................58

*Hart v. Parks*,
  450 F.3d 1059 (9th Cir. 2006) ................................................................59

*Harvey v. Morgan Stanley Smith Barney LLC*,
  2022 WL 3359174 (9th Cir. Aug. 15, 2022) ..........................................57

*Hewitt v. Grabicki*,
  794 F.2d 1373 (9th Cir. 1986) ................................................................59

*Idaho Farm Bureau Fed'n v. Babbitt*,
  58 F.3d 1392 (9th Cir. 1995) ..................................................................19

*Jamie S. v. Milwaukee Pub. Schs.*,
  668 F.3d 481 (7th Cir. 2012) ..................................................................51

*Jin v. Shanghai Original, Inc.*,
  990 F.3d 251 (2d Cir. 2021) ...................................................................46

*Kalbers v. U.S. Dep't of Just.*,
  22 F.4th 816 (9th Cir. 2021) ...................................................................67

*Kerley Indus., Inc. v. Pima Cnty.*,
  785 F.2d 1444 (9th Cir. 1986) ................................................................64

*Magadia v. Wal-Mart Assocs., Inc.*,
  999 F.3d 668 (9th Cir. 2021) ..................................................................56

*Marathon Oil Co. v. EPA*,
  564 F.2d 1253 (9th Cir. 1977) ................................................................65

*Martinez v. United States*,
  670 F.App'x 933 (9th Cir. 2016) ............................................................25

*McNamara v. Felderhof*,
  410 F.3d 277 (5th Cir. 2005) ..................................................................46

vi

*Meese v. Keene*,
   481 U.S. 465 (1987)................................................................22, 23

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.*
   *State Farm Mut. Auto. Ins. Co.*,
   463 U.S. 29 (1983).......................................................................44

*Nat'l Treasury Emps. Union v. Horner*,
   854 F.2d 490 (D.C. Cir. 1988).....................................................44

*Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*,
   631 F.2d 953 (D.C. Cir. 1980).....................................................59

*Ortiz v. Fibreboard Corp.*,
   527 U.S. 815 (1999).....................................................................49

*Pa. Higher Educ. Assistance Agency v. Perez*,
   416 F. Supp. 3d 75 (D. Conn. 2019)............................................29

*Panhandle E. Pipe Line Co. v. FERC*,
   613 F.2d 1120 (D.C. Cir. 1979)...................................................40

*Parsons v. U.S. Dep't of Just.*,
   801 F.3d 701 (6th Cir. 2015) ......................................................23

*Paul v. Davis*,
   424 U.S. 693 (1976).....................................................................63

*In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*,
   827 F.3d 223 (2d Cir. 2016) ..........................................49, 52, 59

*Perez v. Mortg. Bankers Ass'n*,
   575 U.S. 92 (2015).......................................................................39

*Phillips Petroleum Co. v. Shutts*,
   472 U.S. 797 (1985).....................................................................49

*Portland Gen. Elec. Co. v. Bonneville Power Admin.*,
   501 F.3d 1009 (9th Cir. 2007) ...............................38, 40, 41, 42, 43

*Pub. Serv. Comm'n of Ky. v. FERC*,
   397 F.3d 1004 (D.C. Cir. 2005)...................................................65

*Pulaski & Middleman, LLC v. Google, Inc.*,
   802 F.3d 979 (9th Cir. 2015) ......................................................19

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
   566 U.S. 639 (2012).....................................................................31

*Ralpho v. Bell*,
  569 F.2d 607 (D.C. Cir. 1977)...................................................................65

*Ramirez-Alejandre v. Ashcroft*,
  319 F.3d 365 (9th Cir. 2003) ..................................................................19

*Randall v. Rolls-Royce Corp.*,
  637 F.3d 818 (7th Cir. 2011) ..................................................................52

*Richards v. Delta Air Lines, Inc.*,
  453 F.3d 525 (D.C. Cir. 2006)................................................................52

*Robins v. Spokeo, Inc.*,
  867 F.3d 1108 (9th Cir. 2017) ................................................................20

*San Luis & Delta-Mendota Water Auth. v. Haugrud*,
  848 F.3d 1216 (9th Cir. 2017) ................................................................19

*Settles v. U.S. Parole Comm'n*,
  429 F.3d 1098 (D.C. Cir. 2005)..............................................................30

*Shalala v. Guernsey Mem'l Hosp.*,
  514 U.S. 87 (1995)..................................................................................39

*Sherman Coll. of Straight Chiropractic v. U.S. Comm'r of Educ.*,
  493 F. Supp. 976 (D.D.C. 1980)..............................................................60

*Thorn v. Jefferson-Pilot Life Ins. Co.*,
  445 F.3d 311 (4th Cir. 2006) .............................................................50, 52

*TransUnion LLC v. Ramirez*,
  141 S.Ct. 2190 (2021)........................................................................20, 56

*In re U.S. Dep't of Educ.*,
  25 F.4th 692 (9th Cir. 2022) ....................................................................8

*United States v. Carpenter*,
  526 F.3d 1237 (9th Cir. 2008)................................................................38

*Viking River Cruises, Inc. v. Moriana*,
  142 S.Ct. 1906 (2022)............................................................................58

*W. Morgan-E. Lawrence Water & Sewer Auth. v. 3M Co.*,
  737 F.App'x 457 (11th Cir. 2018)....................................................49, 50, 52

*W. Watersheds Project v. Haaland*,
  22 F.4th 828 (9th Cir. 2022) ..................................................................67

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011)..................................................................47, 48, 49, 50

*West Virginia v. EPA*,
142 S.Ct. 2587 (2022) ...............................................................2, 26, 31

*Williams v. U.S. Gen. Servs. Admin.*,
905 F.2d 308 (9th Cir. 1990) ................................................................18

**Statutes**

5 U.S.C. § 551 ...............................................................................................39

5 U.S.C. § 553 ...............................................................................................37

5 U.S.C. § 555 ...............................................................................................54

5 U.S.C. § 706 ..........................................................................6, 7, 44, 54

20 U.S.C. § 1070 ...........................................................................................4

20 U.S.C. § 1075 .........................................................................................33

20 U.S.C. § 1077 ...............................................................................28, 29, 33

20 U.S.C. § 1077a ......................................................................................29

20 U.S.C. § 1078 .........................................................................................33

20 U.S.C. § 1078-1 ....................................................................................34

20 U.S.C. § 1078-2 ....................................................................................28

20 U.S.C. § 1078-3 ....................................................................................29

20 U.S.C. § 1078-10 ..................................................................................32

20 U.S.C. § 1078-11 ..................................................................................32

20 U.S.C. § 1078-12 ..................................................................................32

20 U.S.C. § 1082 .................................. 3, 16, 27, 29, 30, 32, 33, 34, 43

20 U.S.C. § 1087 .........................................................................................32

20 U.S.C. § 1087a .......................................................................................36

20 U.S.C. § 1087e .............................. 3, 4, 16, 27, 29, 34, 35, 36, 39, 42, 43

20 U.S.C. § 1087j ........................................................................................34

20 U.S.C. § 1098a .................................................................................37, 39

20 U.S.C. § 1099c .......................................................................................13

28 U.S.C. § 516 ............................................................................................37

28 U.S.C. § 519 ............................................................................................37

28 U.S.C. § 1291 ...........................................................................................3

28 U.S.C. § 1331 ................................................................................3

**Rules**

9th Cir. R. 28-2.7 .............................................................................4

Fed. R. App. P. 4 ..............................................................................3

Fed. R. Civ. P. 23 ...........................................................................58

Fed. R. Civ. P. 24 ...........................................................................66

**Regulations**

34 C.F.R. § 668.15 ..........................................................................13

34 C.F.R. § 668.171 ........................................................................13

34 C.F.R. § 685.206 .......................................... 5, 20, 39, 60, 61, 62, 64

34 C.F.R. § 685.222 .......................................... 5, 20, 39, 60, 61, 62, 64

60 Fed. Reg. 37,768 (July 21, 1995) ...............................................4

81 Fed. Reg. 75,926 (Nov. 1, 2016) ................................................4

84 Fed. Reg. 49,788 (Sept. 23, 2019) ..................................4, 62, 66

87 Fed. Reg. 52,943 (Aug. 30, 2022) ............................................28

87 Fed. Reg. 65,904 (Nov. 1, 2022) ................................................4

**Other Authorities**

*Authority of the United States to Enter Settlements Limiting the Future Exercise of Executive Branch Discretion*, 23 Op. O.L.C. 126 (1999) ......................................................42

*Black's Law Dictionary* (11th ed. 2019) .......................................28

*Information on the* Sweet v. Cardona *Settlement*, Project on Predatory Student Lending, bit.ly/3oESRdk ...................20

Newberg on Class Actions (6th ed.) .............................................54

Press Release, *Durbin Warns Illinois Education Professionals to Sound the Alarm on For-Profit Colleges* (Apr. 21, 2023), https://www.durbin.senate.gov/newsroom/press-releases/durbin-warns-illinois-education-professionals-to-sound-the-alarm-on-for-profit-colleges ...............................................................14

x

Press Release, *Education Department Takes Steps to Hold Leaders of Risky Colleges Personally Liable*, Dep't of Educ. (Mar. 2, 2023), https://www.ed.gov/news/press-releases/education-department-takes-steps-hold-leaders-risky-colleges-personally-liable ................................13

Sweet v. Cardona *Settlement*, Federal Student Aid, bit.ly/41RfFVL .................................................................20

U.S. Dep't of Educ., Federal Student Aid Portfolio, Summary, https://studentaid.gov/sites/default/files/fsawg/datacenter/library/PortfolioSummary.xls .................................................................................27

U.S. Dep't of Educ., Federal Student Loan Portfolio, Summary, https://studentaid.gov/data-center/student/portfolio ..........................................26

**INTRODUCTION**

These appeals arise from a government settlement that has few, if any, analogues in American jurisprudence. Through a collusive settlement of a nationwide class action that merely sought to compel the Department of Education ("Department") to restart adjudication of applications for student-loan cancellation, the Department will instead ignore its regulations and governing statutes, forgo adjudication altogether, cancel billions in loans for hundreds of thousands of borrowers, and cut billions in refund checks from the Treasury without an appropriation from Congress. Specifically, the Department will cancel the debt and refund all past payments for individuals who attended any of 151 schools that the Department "determined"—in secret negotiations with Plaintiffs—engaged in "substantial misconduct." These schools have been given no opportunity to defend themselves and, in many instances, have not even received notice of the allegations for which they have been convicted. Appellants are three educational institutions that were named in the settlement, involuntarily, and intervened to protect their rights.

To explain this unprecedented sweeping settlement is to detail its illegality. It is based on a newly discovered and specious claim of statutory authority, under the Higher Education Act ("HEA"), that supposedly permits the Secretary of Education ("Secretary") to cancel, *en masse*, every student loan in the country. It has stripped

1

hundreds of institutions of due-process and Administrative Procedure Act ("APA") rights. And the Department has done all this in a class action that it says (1) is moot and (2) cannot maintain a certified class. Necessarily, this appeal presents several issues. But that is a function of just how far the district court and settling parties departed from legal norms. All of these issues, independently and together, require reversal.

To understand this settlement in context, it is necessary to consider the political forces that wrought it. The President directed the Department to implement a national program of blanket cancellation of student-loan debt. *See Brown v. U.S. Dep't of Educ.*, 2022 WL 16858525, at *2 (N.D. Tex. Nov. 10, 2022). The Department has complied by announcing two sweeping debt-cancellation programs. The first—a plan to cancel $10,000 of loans per debtor—proceeds under the Higher Education Relief Opportunities for Students Act of 2003 ("HEROES Act"). A federal court has vacated that program of "vast 'economic and political significance'" because it exceeds the Secretary's authority. *Id.* at *11-12 (quoting *West Virginia v. EPA*, 142 S.Ct. 2587, 2607-14 (2022)). The Supreme Court will address the issue this Term. *See Biden v. Nebraska*, No. 22-506 (U.S. Dec. 1, 2022); *Dep't of Educ. v. Brown*, No. 22-535 (U.S. Dec. 12, 2022). The second program— disguised as this settlement—is the subject of this appeal.

2

## JURISDICTIONAL STATEMENT

This is an appeal from the November 16, 2022 final judgment approving a class-action settlement between Plaintiffs and the Department of Education. 1-ER-28. The district court purported to exercise jurisdiction under 28 U.S.C. § 1331.

Appellants each timely filed notices of appeal on January 13, 2023. 5-ER-898-913; Fed. R. App. P. 4(a)(1)(B). This Court has jurisdiction under 28 U.S.C. § 1291.

## ISSUES PRESENTED

The issues presented in this appeal are:

1. Did the district court have jurisdiction to approve a class-action settlement in a case that was already moot?

2. Does the HEA, 20 U.S.C. §§ 1082(a)(6) and 1087e(a)(1), authorize the Secretary to cancel and refund federal student loans *en masse* and outside statutorily defined circumstances?

3. Did the Secretary violate the rulemaking requirements of the HEA and APA by establishing, outside formal rulemaking, new procedures for "review" of borrower-defense applications?

4. Did the district court err in approving a class-action settlement when the requirements of Rule 23 were no longer satisfied?

5. Does a class-action settlement violate the due-process rights of third parties

3

by constituting a federal regulator's "determination" of "substantial misconduct" by those third parties without notice and an opportunity to be heard?

6.  Did the district court err in denying intervention of right to educational institutions directly named in, and harmed by, a settlement by their federal regulator?

## STATUTORY PROVISIONS AND RULES

Pertinent materials are in the addendum.  *See* Cir. R. 28-2.7.

## STATEMENT OF THE CASE

**I.    FEDERAL STUDENT LOANS AND BORROWER DEFENSE**

Under Title IV of the HEA, 20 U.S.C. § 1070 *et seq.*, the Secretary administers the Direct Loan Program, which issues student loans from the federal government, and the Federal Family Education Loan ("FFEL") Program, which, until 2010, allowed students to obtain private loans guaranteed by the federal government.  For Direct Loans, the Secretary must "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment." *Id.* § 1087e(h).  The Department did so in 1995 (60 Fed. Reg. 37,768 (July 21, 1995)), in 2016 (81 Fed. Reg. 75,926 (Nov. 1, 2016)), in 2019 (84 Fed. Reg. 49,788 (Sept. 23, 2019), and in 2022 (87 Fed. Reg. 65,904 (Nov. 1, 2022)).  These regulations establish a "borrower-defense" ("BD") program allowing Direct Loan borrowers to obtain debt cancellation if they prove their school engaged in certain misconduct.

4

The borrower-defense process entails two steps. In Step One, the Department must notify the school of a BD claim. 34 C.F.R. §§ 685.206(c)(2) & (e)(10), 685.222(e)(3)(i). For loans issued before July 1, 2020, the Department must "consider[] … [a]ny response or submissions from the school." *Id.* § 685.222(e)(3)(i). A Department official then adjudicates the applications "through a fact-finding process" and issues a written decision. *Id.* § 685.222(e)(3)-(4). For loans issued after July 1, 2020, the Department must "provide a copy" of the application to the school, affirmatively "invite the school to respond and to submit evidence" in its defense, *id.* § 685.206(e)(10), and "consider[] the school's response," *id.* § 685.206(e)(11)-(12). The Department then must issue a reasoned written decision. *Id*. Step Two occurs only if—after a Step-One adjudication—the Department finds a school engaged in misconduct, grants a BD application, and discharges debt. The Department may then initiate proceedings to recover the discharged amount from the school. *See id.* §§ 685.206(c)(3) & (e)(16), 685.222(e)(7).

## II.   THIS LAWSUIT

In 2019, borrowers sued the Department, alleging a "policy of inaction" on their BD applications constituted "unlawfully withheld and unreasonably delayed

agency action" under 5 U.S.C. § 706(1). 4-ER-836, 890-93 ¶¶ 7, 377-404.[1]

Plaintiffs were explicit in describing the relief they sought (and did not seek):

> Plaintiffs … do not ask this Court to adjudicate their borrower defenses. Nor do they ask this Court to dictate how the Department should prioritize their pending borrower defenses. Their request is simple: they seek an order compelling the Department to start granting or denying their borrower defenses and vacating the Department's policy of withholding resolution.

4-ER-836-37 ¶ 10. In moving to certify a Rule 23(b)(2) class, Plaintiffs reiterated that they sought "a single injunction requiring the Department to start and to continue adjudicating borrower defenses." 4-ER-828. Because "the Department ha[d]"—at the time—"decided zero applications since June 2018," the district court certified a Rule 23(b)(2) class of:

> All people who borrowed a Direct Loan or FFEL loan to pay for a program of higher education, who have asserted a borrower defense to repayment to the U.S. Department of Education, whose borrower defense has not been granted or denied on the merits….

4-ER-815, 821. "This class definition," the district court held, "shall apply for all purposes, including settlement." 4-ER-821. The Class includes about 296,000 members, U.S. Stay Opp. 8-9, No. 22A867 (U.S. Apr. 12, 2023) ("U.S. Stay Opp."), who received more than $7.5 billion in loans, 3-ER-558.

After summary-judgment briefing, the parties executed a settlement, which would have required the Department to adjudicate pending BD applications and

---

[1] Plaintiffs' second count was dismissed. 4-ER-833.

issue final decisions on a timeline. 4-ER-776-800. The district preliminarily approved the settlement, 4-ER-772-75, and the Department issued BD decisions. Plaintiffs then moved for final approval of the settlement and to enforce it, claiming that certain denial notices violated the settlement by providing insufficient reasoning. 4-ER-743-71.

After a fairness hearing, at which Plaintiffs registered their complaints about the alleged "form denial notices," the district court withheld approval of the proposed settlement. 4-ER-720. The court noted it was "disappointed" because it had hoped to "get reasoned decisions, even if reasoned denials," 4-ER-721, adding that "[i]t is, after all, impossible to argue with an unreasoned decision," 4-ER-719. The court directed a "return to litigating the merits" and sua sponte ordered Plaintiffs to seek extra-record discovery from the Department, including depositions of Department officials. 4-ER-721. The court directed Plaintiffs to "move for summary judgment as to the lawfulness of the Secretary's delay and the lawfulness of the perfunctory denial notice." 4-ER-717-21, 726. "The merits," as the court outlined them, did not include deciding any BD application.

On March 28, 2021, Plaintiffs supplemented their complaint to add a claim that the Department had adopted an unlawful "presumption of denial" policy for BD applications in violation of 5 U.S.C. § 706(2). 4-ER-695-97 ¶¶ 436-55. Plaintiffs sought an order declaring that class members "are entitled to a decision on the

7

merits," declaring that the form denials are invalid, and compelling the Department "to lawfully adjudicate each and every borrower defense application."  4-ER-698-99.

Despite claiming that time was of the essence in litigating their APA case, Plaintiffs then spent seventeen months focused solely on obtaining a single deposition of the former Secretary of Education.  The district court ordered the deposition to proceed, but this Court granted a mandamus writ and ordered the district court to quash the subpoena.  *See In re U.S. Dep't of Educ.*, 25 F.4th 692 (9th Cir. 2022).

Notably, at oral argument in the mandamus proceeding, this Court asked counsel for Plaintiffs and the Department if, given the "new key players in place" at the Department, "the parties could settle again?"  Oral Arg. 39:25, *In re Dep't of Educ.*, No. 21-71108 (9th Cir. Oct. 6, 2021).  Both parties refused to get "into specifics of whether there are or are not settlement discussions."  *Id.* at 45:27.  Yet just ten days after this Court granted the writ, the "Parties reported [they are] in [the] process of finalizing settlement negotiations."  5-ER-950; *see also* 3-ER-617.

Six months later, on June 22, 2022, Plaintiffs and the Department filed a fully executed settlement agreement (the "Settlement") and jointly moved for preliminary approval.  3-ER-554-616.  Because the briefing schedule was still in force, the next day, on June 23, the Department filed a summary-judgment motion arguing that

because the Department had already resumed adjudicating BD applications, it "has already provided the very relief that Plaintiffs sued to obtain" and thus the case "is moot and must be dismissed." 3-ER-509-10 (cleaned up). The Department also argued there was no longer a basis for class-wide relief. 3-ER-510.

## III.   THE SETTLEMENT

Despite the court's certification of only an indivisible injunctive class seeking limited APA relief, the Settlement sweeps far more broadly, creating three subclasses and providing differentiated injunctive and monetary relief to each. The Settlement proceeds as follows:

### A.   Subclass 1: "Automatic Relief Group"

For Class Members who have debt "associated with the schools, programs, and School Groups listed" in Exhibit C to the Settlement, the Department will, within twelve months of final judgment, automatically: (i) "discharge" the debt, (ii) refund "all amounts … previously paid to the Department," and (iii) delete the credit tradeline associated with the debt. 3-ER-580, 582-83 (Definition "S"). If there is a "substantial question" as to whether debt "is associated with" a listed school, that "question will be resolved in favor of the Class Member (*i.e.*, in favor of granting relief)" without further inquiry, adjudication, or process provided to the school. 3-ER-583. Approximately 66% of the Class (196,000 borrowers) will

9

receive this automatic debt cancellation and refunds without individualized adjudication of their claims.  U.S. Stay Opp. 8-9.

Exhibit C originally listed 153 institutions.  3-ER-612-16.  The Settlement offers no explanation as to why any school is listed, but the preliminary-approval motion offered a single sentence of explanation:

> [B]ecause the Department has identified common evidence of institutional misconduct by the schools, programs, and school groups identified in Exhibit C to the Agreement, it has determined that every Class Member whose Relevant Loan Debt is associated with those schools should be provided presumptive relief under the settlement due to strong indicia regarding substantial misconduct by the listed schools, whether credibly alleged or in some instances proven, and the high rate of class members with applications related to the listed schools.

3-ER-573-74.  The final-approval motion added that the Exhibit C list "was created based on information available to the Department at the time the agreement was executed regarding demonstrated or credibly alleged misconduct, as well as a review of the comparative rate of Class Members with applications concerning the listed schools."  2-ER-271.  After preliminary approval, the parties removed four schools from Exhibit C that "were erroneously included" due to unexplained "clerical errors" and added a new school.  2-ER-283.

### B.    Subclass 2: "Decision Group"

For Class Members whose debt is not associated with an Exhibit C school—about 100,000 borrowers, 3-ER-559—the Settlement establishes a new "review" process not found in any operative BD rule.  The "review" requires a series of

presumptions that essentially guarantee a finding of wrongdoing by any accused school and, thereafter, debt cancellation and refunds. Under these presumptions, a borrower's claim cannot be denied for (1) false allegations, (2) insufficient evidence, (3) lack of reliance, or (4) untimeliness. 3-ER-584-85. Depending on when the BD application was submitted, the Department has six to thirty months to "issue a decision" on Decision Group applications. 3-ER-586-87.

### C. Subclass 3: "Post-Class Applicants Group"

Finally, the Settlement creates a third subclass of "Post-Class Applicants" who "submi[t] a borrower defense application after the Execution Date … but before the Final Approval Date." 3-ER-587. Thus, the Settlement created an avenue to encompass anyone with a federal student loan, and the settling parties spent months recruiting people to enter this subclass. *See* 2-ER-70-71 (detailing efforts by the federal government to solicit borrowers to "file your application"); 2-ER-273 ("Class Counsel did routinely undertake significant independent efforts to … reach borrowers whose circumstances warranted asserting" a BD claim). For Post-Class Applicants, the Settlement requires the Department to "review" their applications under the standards established in the 2016 Rule, even though the BD regulations normally require different standards for many of these applications. 3-ER-587. If the Department does not complete the "review" within thirty-six months, regardless of reason, it must cancel the applicant's debt and refund prior loan payments,

11

regardless of the application's merit. *Id*. In other words, within three years the Department can unilaterally cancel federal student-loan debt—and refund prior payments on student debt—by simply not acting. The Department has represented that this sub-class "consists of approximately 250,000 applications from approximately 206,000 borrowers who attended approximately 4,000 schools." 2-ER-58. That covers nearly three-quarters of institutions of higher education that receive Title IV funds. School Data, Federal Student Aid, bit.ly/3NwNfwu.

## IV. "EXHIBIT C" SCHOOLS INTERVENE AND OBJECT TO SETTLEMENT

After the settling parties lodged the Settlement, four educational institutions ("Intervenors") listed on Exhibit C moved to intervene of right or permissively. 3-ER-345-94, 434-98. The district court denied intervention of right but granted permissive intervention on the condition that Intervenors could not seek discovery. 1-ER-54-55.

The settling parties moved for final approval of the Settlement. 2-ER-251-81. Intervenors filed objections, arguing that the court could not approve the Settlement because: (1) the case was already moot; (2) class certification could no longer be maintained; (3) the Department did not have statutory authority to agree to the relief in the Settlement; (4) the Department would violate the APA by entering into and effectuating the Settlement; and (5) the Settlement violates Intervenors' due-process

rights. 2-ER-106-21, 136-53, 189-208. The court overruled all objections and granted final approval to the Settlement as written. 1-ER-29-53.

Three Intervenors (hereinafter, "Schools") timely appealed and this Court consolidated the appeals. The Schools were denied a stay of the judgment pending appeal.

## V. HARM TO SCHOOLS FROM THE SETTLEMENT

Throughout the final approval and stay proceedings, the Schools explained how the Settlement directly harms them. Beyond stripping them of their rights to defend themselves in BD adjudications, the Settlement immediately exposes the Schools to additional adverse government action. First, the Department may take the position that its "determination" of "substantial misconduct"—made during the secret Settlement process—is relevant to the Secretary's finding of "financial responsibility" needed for a school to participate in federal financial-aid programs. *See* 20 U.S.C. § 1099c(c); 34 C.F.R. §§ 668.15, 668.171. Indeed, after the Settlement was entered, activists cited it as a reason the Department should not have renewed Lincoln's Program Participation Agreement. 2-ER-83-85, 89-90.

Second, the Department recently announced "guidance" that "clarifies" "settlements … by the Department … involving federal student aid" will be a factor that the Department considers "when determining whether to pursue personal liability." Press Release, *Education Department Takes Steps to Hold Leaders of*

13

*Risky Colleges Personally Liable*, Dep't of Educ. (Mar. 2, 2023), https://www.ed.gov/news/press-releases/education-department-takes-steps-hold-leaders-risky-colleges-personally-liable. Among other harms, this will immediately make it more difficult for the Schools to recruit and retain officers and directors.

Third, the harm is not limited to Executive Branch decisionmaking. Plaintiffs' counsel has already used the Settlement to attempt to block a state university system from acquiring an Exhibit C school. *See* Berardinelli Decl. Ex. A at 1-2, ECF No. 17-4, No. 23-15050. And a United States Senator recently published a letter to high school teachers and administrators in Illinois touting this Settlement and its list of "151 predatory institutions," and urging school officials to "sound the alarm on for-profit colleges."[2]

Beyond adverse government action, the reputational harm from inclusion on Exhibit C negatively affects the Schools' community, business, and financial relationships. In their intervention motions, and at every point since, the Schools have explained the reputational harm and how its effects unfold over time. *See, e.g.*, 2-ER-71 ¶ 7; 2-ER-78 ¶ 14. For example, an ECI official explained that inclusion on Exhibit C "is already causing … reputational harm, as third parties are treating it

---

[2] *See* Press Release, *Durbin Warns Illinois Education Professionals to Sound the Alarm on For-Profit Colleges* (Apr. 21, 2023), https://www.durbin.senate.gov/newsroom/press-releases/durbin-warns-illinois-education-professionals-to-sound-the-alarm-on-for-profit-colleges.

14

like a finding of wrongdoing by the schools." 3-ER-461 ¶ 12. Sure enough, a few months later, another ECI official reported that "[s]ome lenders have expressed concern and begun inquiring about the Settlement as part of their due diligence, which has (1) required ECI to dedicate resources to addressing those questions and concerns, (2) delayed and/or increased the cost of financing, and (3) caused, in some instances, potential lenders not to provide financing." 2-ER-77 ¶ 13. Likewise, a Lincoln official explained that "Lincoln's unfounded inclusion on a list of purported wrongdoers is inflicting, and will continue to inflict, substantial reputational harms on Lincoln and its schools." 3-ER-495 ¶ 15. Sure enough, a few months later, a teacher at Centennial High School in Nevada—a community partner with Lincoln— disinvited Lincoln representatives from addressing a class specifically because "Lincoln Tech is on the U.S. Department of Ed's list of predatory schools." 2-ER-69-70 ¶¶ 4-5.

## SUMMARY OF ARGUMENT

The final judgment should be reversed and the case dismissed.

**I.** The district court lacked jurisdiction to enter the judgment because the case had become moot. Plaintiffs brought two APA claims: (1) they sought to end the Department's alleged "policy of inaction" on BD claims, and (2) they sought a rescission of alleged "form denials" of a subset of BD claims. As the Department

15

itself demonstrated, that relief had been granted by the time of the Settlement. The district court thus lacked jurisdiction and should have dismissed the case as moot.

**II.** Even if the district court had jurisdiction, the Secretary lacked authority to grant mass student-loan discharges through the guise of a settlement.

**A.** The Secretary relies on the HEA, 20 U.S.C. § 1082(a)(6), to assert an unlimited power to cancel student loans at any time for any reason. That is a $1.6 trillion power—and much more when the asserted refund authority is considered. But the few words of section 1082(a)(6) upon which the Secretary relies do not confer anything like the limitless loan-discharge authority the Secretary claims. First, section 1082(a)(6) governs FFEL Loans, not Direct Loans, which comprise most of the debt at issue. To reach Direct Loans, the Secretary relies on 20 U.S.C. § 1087e(a)(1), but that provision incorporates in the Direct Loan program only the "terms, conditions, and benefits" of FFEL Loans, not all of the Secretary's "functions, powers, and duties." Second, even if section 1082(a)(6) did apply to Direct Loans, it only grants the Secretary authority to "compromise" loans under carefully delineated circumstances. Far from the clear statement required by the major-questions doctrine, the plain language and context of the HEA affirmatively forecloses the Secretary's claimed power.

**B.** Independently, the Settlement violates the APA and principles of administrative law, which must be followed even in agency settlements. Here, the

16

Settlement ignores existing regulations and establishes new regulatory procedures for BD adjudications. That can be done only through formal rulemaking. Moreover, the Department's actions were arbitrary and capricious because they were unexplained and ignored contrary evidence.

**III.** The Settlement's final approval independently violated Rule 23.

**A.** The Class was certified under Rule 23(b)(2) on the theory that Plaintiffs sought only injunctive relief. Yet the Settlement awards billions in monetary relief. No monetary relief class was certified, or could have been certified, given myriad individualized issues among Class members. As the Department correctly argued below, the class should have been decertified.

**B.** The Settlement created three distinct sub-classes receiving differentiated relief. Accordingly, the Settlement destroyed commonality, typicality, and adequacy of representation required by Rule 23.

**C.** The Settlement is *defined* to include individuals who are ineligible for BD relief, and the Schools demonstrated that many Class members were in fact ineligible. The presence of significant percentages of uninjured members required decertification.

**D.** The Settlement includes 250,000 BD claims submitted *after* the class period ended. These claimants never received notice and were never certified as Class members. They should have been excluded from the class judgment.

17

**IV.** The Settlement flagrantly violates the Schools' due-process rights. It impugns and defames the Schools' reputations by including them on a federal regulator's list of supposed bad actors (now endorsed by a federal court), without providing any opportunity for the Schools to defend themselves. It strips the Schools of their rights to create an administrative record and receive a reasoned decision on each BD claim that implicates them and exposes them to recoupment liability and other negative consequences. The Settlement gives the Schools no opportunity to challenge the secret evidence the Department relied on for its "determination" of "substantial misconduct."

**V.** Finally, if this case continues, the district court's refusal to allow the Schools to intervene of right should be reversed. The Schools have a right to participate fully in the case, including any future settlement discussions.

## STANDARD OF REVIEW

The district court addressed the Schools' mootness objections at 1-ER-45-48. Mootness issues are reviewed de novo. *Williams v. U.S. Gen. Servs. Admin.*, 905 F.2d 308, 310 (9th Cir. 1990).

The district court addressed the Schools' objections to the Secretary's statutory settlement authority at 1-ER-34-42. This court "review[s] de novo a district court's interpretation and application of federal statutes," including "a

18

district court's application of the APA standards." *San Luis & Delta-Mendota Water Auth. v. Haugrud*, 848 F.3d 1216, 1227 (9th Cir. 2017) (cleaned up).

The district court addressed the Schools' due-process objections at 1-ER-42-45. The standard of review is de novo. *Ramirez-Alejandre v. Ashcroft*, 319 F.3d 365, 377 (9th Cir. 2003) (en banc).

The district court denied intervention of right at 1-ER-54-55. The standard of review is de novo. *Canatella v. California*, 404 F.3d 1106, 1112 (9th Cir. 2005).

The district court approved the class-action settlement and refused to decertify the class at 1-ER-48-53. This ruling is reviewed for abuse of discretion. *Allen v. Bedolla*, 787 F.3d 1218, 1222 (9th Cir. 2015); *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 984 (9th Cir. 2015). A court abuses its discretion when its rulings are based "on an erroneous view of the law." *Pulaski*, 802 F.3d at 984.

## STANDING

Standing to appeal requires the Schools to show "[1] a threat of injury [2] stemming from the order they seek to reverse" [3] that "would be redressed if they win on appeal." *Idaho Farm Bureau Fed'n v. Babbitt*, 58 F.3d 1392, 1399 (9th Cir. 1995). Although the district court questioned the Schools' standing to appeal, 1-ER-23, the Schools have standing for three reasons.

**1.** The Settlement strips the Schools of administrative rights to participate in pending BD adjudications, assert defenses, submit evidence, and receive decisions.

19

34 C.F.R. §§ 685.206(c)(1)–(2), (e)(10)–(11), 685.222(e)(3)(i). The Settlement automatically resolves pending BD claims against Exhibit C schools, and it changes legal standards by which all other pending or "post-class" BD claims will be decided. These types of injuries suffice for Article III standing in APA lawsuits every day.

**2.** The Settlement also inflicts a continuously expanding reputational injury that can only be redressed by reversing or vacating the judgment and the Department's unlawful "determin[ation]" of "substantial misconduct." 3-ER-573-74. Reputational injuries visited through widespread publication "bea[r] a close relationship to" the traditionally recognized "reputational harm associated with the tort of defamation" and suffice to show standing. *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2208-09 (2021). "[A] person is injured when a defamatory statement 'that would subject him to hatred, contempt, or ridicule' is published to a third party." *Id.*; *see also Robins v. Spokeo, Inc.*, 867 F.3d 1108, 1114-15 (9th Cir. 2017). Here, Exhibit C has been widely published—including by the settling parties themselves.[3] Moreover, the speaker here is the Schools' primary federal regulator, and the publication is a list of institutions that regulator supposedly "determined" to

---

[3] On their website, Plaintiffs' counsel editorializes about the Department's "determin[ation]" of "strong indicia regarding substantial misconduct" for Exhibit C schools. *Information on the* Sweet v. Cardona *Settlement*, Project on Predatory Student Lending, bit.ly/3oESRdk. The Department likewise publicizes Exhibit C. *See* Sweet v. Cardona *Settlement*, Federal Student Aid, bit.ly/41RfFVL.

have committed "substantial misconduct," which has been converted into a federal court's final judgment carrying the force of law. That is concrete injury.

Beyond publication, the record is replete with evidence of other concrete injuries traceable to Exhibit C. *See California v. Azar*, 911 F.3d 558, 572 (9th Cir. 2018) (economic harm of any magnitude supports standing). The Schools produced uncontroverted affidavits attesting (1) that ECI's financial partners have requested expanded diligence on the Settlement or refused to extend credit because of the Settlement, 2-ER-77; Berardinelli Decl. ¶ 8, ECF No. 17-4, No. 23-15050, and (2) that Lincoln has had to describe the Settlement as a material risk in securities reporting, 2-ER-72.

Exhibit C also inflicts serious programmatic harms. For example, six months after Exhibit C was released, a high school teacher at a school with which Lincoln has had a longstanding relationship denied Lincoln an opportunity to speak with a class about career opportunities specifically because of Exhibit C. The teacher's email stated:

> It is my understanding that Lincoln Tech is on the U.S. Department of Ed's list of predatory schools. I no longer feel comfortable taking class time to have your people talk to my students.

2-ER-69-70 ¶ 4. This email draws a direct connection between inclusion on Exhibit C and programmatic harm to schools—starkly demonstrating the concrete injury Exhibit C is inflicting here and now. 2-ER-70 ¶ 5.

Even while Plaintiffs and the government have argued (implausibly) that the Settlement does not harm the Schools, they have used the Settlement to inflict more harm. Berardinelli Decl. Ex. A at 1-2, ECF No. 17-4, No. 23-15050; 2-ER-70-71 ¶ 6; *see also* 2-ER-89-90; *supra* 13-14.

The Schools have thus adduced much more than the "identifiable trifle" necessary to show injury-in-fact. *Council of Ins. Agents & Brokers v. Molasky-Arman*, 522 F.3d 925, 932 (9th Cir. 2008) (citation omitted). Courts routinely find standing on far less evidence. *See, e.g.*, *Meese v. Keene*, 481 U.S. 465, 473-74 (1987) (affidavits establishing impact on conduct of government designation of films as "political propaganda" sufficed for standing); *Foretich v. United States*, 351 F.3d 1198, 1213 (D.C. Cir. 2003) (upholding standing based on "reputational injury [that] derives directly from an unexpired and unretracted government action").

Causation and redressability are easily satisfied. As noted, lenders and community partners have cited *the Settlement* as the basis for requesting additional diligence and forgoing business relations. Plaintiffs will argue that these harms have other root causes, but it is undisputed that the identified harms started immediately after Exhibit C was published—not before. Reversing or vacating the Settlement would redress these harms by depriving the Settlement of its legal force and signaling to interested parties that the Department's determination of "substantial misconduct" was unlawful. That "judicial determination" would undoubtedly

22

"provide a significant measure of redress for the harm to … reputation," because a party who prevails on a claim of harm to "reputation is in some sense relieved by that judgment." *Foretich*, 351 F.3d at 1214-16; *see also Parsons v. U.S. Dep't of Just.*, 801 F.3d 701, 716-17 (6th Cir. 2015) (order setting aside agency decision suffices to redress "reputational harm"); *Meese*, 481 U.S. at 476 (similar).

**3.** At minimum, this Court has jurisdiction "for the purpose of correcting the error of the lower court in entertaining the suit" after it became moot. *Arizonans for Off. Eng. v. Arizona*, 520 U.S. 43, 73 (1997) (citations omitted). This Court need not resolve standing to decide a question that "goes to the Article III jurisdiction of this Court and the courts below." *Id.* at 67. As explained below, the district court lacked jurisdiction to approve the Settlement because Plaintiffs' claims were moot when the parties settled. *See infra* 23-25. Courts have an inherent "obligation to 'satisfy [themselves] not only of [their] own jurisdiction, but also that of the lower courts in a cause under review.'" *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986) (citation omitted).

## ARGUMENT

**I. THE DISTRICT COURT LACKED JURISDICTION TO APPROVE THE SETTLEMENT.**

"A court is powerless to approve a proposed class settlement if it lacks jurisdiction over the dispute." *Frank v. Gaos*, 139 S.Ct. 1041, 1046 (2019). Here, the Department lodged its Settlement on June 22, 2022, and urged the court to

23

approve it. The next day, the Department moved for summary judgment, arguing that the case had already become moot *before* the Settlement was lodged. 3-ER-509, 519-21. Tellingly, the Department has never retreated from that position. *See* ECF No. 18, at 14 n.2, No. 23-15050. The Department was correct. The district court had no authority to approve the Settlement.

Plaintiffs sought only two forms of relief: (1) an end to the "policy of inaction" on BD claims, and (2) a rescission of alleged "form denials" of a subset of BD claims. *See* 4-ER-836 ¶ 7; 4-ER-624 ¶ 6. In support of the Department's assertion of mootness, Richard Cordray, Chief Operating Officer for Federal Student Aid, attested below that (1) "[o]ver the last approximately 18 months, … the Department ha[d] prioritized … adjudication of borrower defense applications," approving tens of thousands of them, and (2) "[a]ll applications … previously denied with a form denial notice will be reconsidered." 3-ER-541-43 ¶¶ 8-9. Thus, the Department provided Plaintiffs with "full redress for the injuries asserted in their complaint[]," mooting the case. *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 164 n.5 (2016). Because there was "no longer any actual controversy between the parties," the district court lacked authority to approve the Settlement and should have dismissed the case. *Alvarez v. Smith*, 558 U.S. 87, 92 (2009); *see Carter v. Veterans Admin.*, 780 F.2d 1479, 1481 (9th Cir. 1986) (complaint seeking injunctive relief directing a federal agency to take an action mooted by agency's taking that action);

24

*Martinez v. United States*, 670 F.App'x 933, 934 (9th Cir. 2016) (APA unlawful-delay claim moot because agency ended the delay).

The district court held the case was not moot because the Department had not adjudicated *every* Class member's BD application. 1-ER-47. But a claim for injunctive relief is moot when "a court can no longer grant any effective relief *sought in the injunction request.*" *Akina v. Hawaii*, 835 F.3d 1003, 1010 (9th Cir. 2016) (per curiam) (emphasis added). Plaintiffs were adamant in their Complaint that they "d[id] *not* ask" the court "to adjudicate their borrower defenses" or "to dictate how the Department should prioritize their pending borrower defenses." 4-ER-836-37 (emphasis added). "Their request [wa]s simple: they s[ought] an order compelling the Department *to start* granting or denying their borrower defenses and *vacating the Department's policy* of withholding resolution." *Id.* (emphases added).

Accordingly, the district court lacked jurisdiction to grant final approval and the final judgment must be reversed and the case dismissed. *Frank*, 139 S.Ct. at 1046.

## II. THE DEPARTMENT LACKS AUTHORITY TO PROVIDE THE SETTLEMENT RELIEF.

### A. The HEA Does Not Grant The Secretary Authority To Cancel Student-Loan Debt *En Masse*.

The Department and the district court both conceded that a federal agency cannot enter a settlement "requiring an agency to take substantive action clearly

beyond its statutory authority." U.S. Stay Opp. 28; *see also* 1-ER-35. Accordingly, the Secretary must identify a source of authority for the relief provided by the Settlement. The Secretary claims that the HEA grants him power to cancel student debt *en masse* and refund all prior payments on such debt without a specific appropriation. Critically, the Secretary's claimed authority is not cabined to this APA case or to settlements of BD claims pending before the agency. Instead, the Secretary's claimed authority would allow him to nullify *$1.6 trillion* in federal loans and to spend untold trillions more in refunding past payments on those loans.[4]

An agency's claim of power over an issue of such "vast economic and political significance" falls under the "major questions doctrine" and requires the government to show "clear congressional authorization." *West Virginia v. EPA*, 142 S.Ct. 2587, 2605, 2609 (2022) (citations omitted). Far from "clear" authorization here, the HEA's plain terms and context show the Secretary is not authorized to cancel any student loan, at any time, for any reason. That is why, for more than fifty years, no Secretary asserted the "breathtaking amount of authority," *Ala. Ass'n of Realtors v.*

---

[4] *See* U.S. Dep't of Educ., Federal Student Loan Portfolio, Summary, https://studentaid.gov/data-center/student/portfolio (in Q1 2023, 43.8 million borrowers owed $1.635 trillion in outstanding principal and interest on federal student loans). The Settlement itself encompasses a "staggering number" of borrowers, 1-ER-39, and at least $7.5 billion of debt owed to American taxpayers (an amount that probably doubled due to "Post-Class Applicants"), 3-ER-558.

*Dep't of Health & Hum. Servs.*, 141 S.Ct. 2485, 2489 (2021) (per curiam), the Secretary has now discovered in the HEA.

The Secretary has contended that two subsections of the HEA work in concert to vest him with the sweeping power to cancel federal student loans and refund prior payments on such loans. First, the Secretary has invoked section 1082(a)(6), which bears the heading "General [P]owers" and states: "In the performance of, and with respect to, the functions, powers, and duties, vested in him *by this part*, the Secretary may … enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption." 20 U.S.C. § 1082(a)(6) (emphasis added). Second—because "this part" is Part B of the HEA, *id.* §§ 1071–1087-4, which addresses only FFEL Loans and not Direct Loans (Part D)—the Secretary has invoked 20 U.S.C. § 1087e(a)(1).[5] Section 1087e(a)(1) states that Direct Loans "shall have the same terms, conditions, and benefits, and be available in the same amounts, as loans made to borrowers" under Part B. But these sections—read separately or together—do not grant the vast power the Secretary claims.

---

[5] "[T]he vast majority" of loans "at issue here" are "[D]irect [L]oans." 2-ER-303. Likewise, most of the Department's outstanding loans are Direct Loans, not FFEL Loans. *See* U.S. Dep't of Educ., Federal Student Aid Portfolio, Summary, https://studentaid.gov/sites/default/files/fsawg/datacenter/library/Portfolio Summary.xls (in Q1 2023, 38.3 million borrowers owed $1.4 trillion for Direct Loans, while 8.8 million borrowers owed $197 billion in FFEL loans).

### 1. Section 1087e(a)(1) Does Not Incorporate Section 1082(a)(6).

The Secretary has failed to explain how "the functions, powers, and duties, vested *in him*"—not in a loan contract—constitute "terms, conditions, or benefits" of "loans." These words are not equivalent, as their plain meaning confirms. In the contractual context, a "term" is a "stipulation"; a "condition" is a "stipulation or prerequisite"; and a "benefit" is the "advantage or privilege" the agreement confers. *Black's Law Dictionary* 1772, 366, 193 (11th ed. 2019). None of these terms is easily shoehorned into the "functions, powers, and duties" vested in a Cabinet secretary. Indeed, even during this litigation, the Department disclaimed the specious interpretation the Secretary now adopts. *See* Mem. from Principal Deputy Gen. Counsel, U.S. Dep't of Educ., to Sec'y of Educ. at 4 & n.3 (Jan. 12, 2021) ("the Secretary's general power to compromise or waive claims under the FFEL program is neither a term nor a condition nor a benefit of FFEL program loans").[6]

Moreover, the HEA itself specifically defines the "terms and conditions" of FFEL loans in *other* subsections of Part B. *E.g.*, 20 U.S.C. § 1077 ("terms of federally insured student loans"); *id.* § 1078-2(a)(2) ("Terms, conditions, and

---

[6] Although the Department conveniently rescinded this memorandum after Intervenors cited it, the Department did so based on disagreement with the memorandum's treatment of the HEROES Act, not the HEA. *See* 87 Fed. Reg. 52,943 (Aug. 30, 2022). Regardless, "when the government … speaks out of both sides of its mouth, no one should be surprised if its latest utterance isn't the most convincing one." *Bittner v. United States*, 143 S.Ct. 713, 722 n.5 (2023).

benefits" of Federal Plus Loans); *id.* § 1078-3(b)(4) ("Terms and conditions" of Consolidation Loans); *id.* § 1078-8(a) ("terms and conditions" of Unsubsidized Stafford Loans). These provisions include, among other things: specific terms and conditions addressing to whom loans can be made, *id.* § 1077(a)(1); how they can be made, *id.* § 1077(a)(2); how long they can last, *id.*; when repayment must begin, *id.* § 1077(a)(2)(B); minimum annual repayment amounts, *id.* § 1077(c); applicable interest rates, *id.* § 1077a; the option for graduated or income-sensitive repayment, *id.* § 1077(a)(2)(H); when "installments of principal need not be paid," *id.* § 1077(a)(2)(C); and how borrowers can pay early without penalty, *id.* § 1077(a)(2)(F).

These are the "[t]erms and conditions" incorporated into Part D by 20 U.S.C. § 1087e(a)(1), not the Secretary's "General powers." Indeed, if the Secretary's "General powers" in section 1082 were loan "terms," it would lead to absurd conclusions, including that the Secretary's "power[] … [to] prescribe … regulations," *id.* § 1082(a)(1), constitutes a loan "term." In short, the HEA simply has no "language incorporating into Part D the Secretary's 'general powers' … of Section 1082, from Part B." *Pa. Higher Educ. Assistance Agency v. Perez*, 416 F. Supp. 3d 75, 96 (D. Conn. 2019).

29

**2.** **If Section 1087e(a)(1) Does Incorporate Section 1082(a), Then The District Court Lacked Jurisdiction To Approve Injunctive Relief.**

If section 1082(a) is interpreted (wrongly) as "terms, conditions, and benefits" of Direct Loans, then section 1082(a)(2) is equally applicable—and it divested the court of jurisdiction to award injunctive relief against the Secretary. Section 1082(a)(2) provides, in part, that "district courts shall have jurisdiction of civil actions arising under this part without regard to the amount in controversy," subject to an important limitation: "no ... injunction ... shall be issued against the Secretary or property under the Secretary's control." 20 U.S.C. § 1082(a)(2). In this case, Plaintiffs and the Department settled this Rule 23(b)(2) class action on the premise that it awards only "injunctive relief" against the Department, which violates section 1082(a)(2). 1-ER-49.

The district court ignored the jurisdictional bar on the theory that the Department was "consenting" to the injunctive relief. 1-ER-40. But subject-matter jurisdiction cannot arise through party consent. *CFTC v. Schor*, 478 U.S. 833, 851 (1986). The Executive Branch cannot provide the Judicial Branch with more expansive jurisdiction than Congress provided. *See Settles v. U.S. Parole Comm'n*, 429 F.3d 1098, 1105 (D.C. Cir. 2005).

30

**3.** **Section 1082(a)(6) Is A General Provision That Must Be Read In The Context Of More Specific Authorizations And Does Not Grant Authority For Blanket Debt Cancellation.**

Even if section 1082(a)(6) is interpreted (wrongly) to apply to Direct Loans, it does not provide authority for blanket debt cancellation of Direct or FFEL Loans. "It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme." *West Virginia*, 142 S.Ct. at 2607. And "[i]t is a commonplace of statutory construction that the specific governs the general." *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). This canon applies "to statutes such as the one here," where "Congress has enacted a comprehensive scheme" in which "a general authorization" and "more limited, specific authorization[s] exist side-by-side." *Id.* In such a situation, the "general language of a statutory provision, although broad enough to include it, will not be held to apply to a matter specifically dealt with in another part of the same enactment." *Id.* at 646 (brackets omitted). This result "avoids … the superfluity of a specific provision that is swallowed by the general one," which would violate "the cardinal rule that, if possible, effect shall be given to every clause and part of a statute." *Id.* at 645; *see also Corley v. United States*, 556 U.S. 303, 314 (2009). The Secretary's reading of section 1082(a)(6) violates these cardinal rules of statutory interpretation.

31

*First*, section 1082(a)(6) is a summary grant of "General powers" tied to the Secretary's "performance of … the functions, powers, and duties, vested in him by this part." In other words, the Secretary's ability to compromise claims is limited to "the performance of … powers[] and duties[] vested in him by" Part B of the HEA. And Part B specifically delimits the circumstances under which the Secretary has the power or duty to cancel FFEL Loans. To read section 1082(a)(6) as providing the power to grant full discharge in *every* circumstance would render meaningless the specific authorizations provided in these sections. Specifically:

- Part B delineates only five circumstances in which the Secretary may discharge loans in full based on: (1) the borrower's death or total disability, 20 U.S.C. § 1087(a), (d); (2) the borrower's bankruptcy, *id.* § 1087(b); (3) the school's closure, *id.* § 1087(c); (4) the school's false certification of the student as student-loan eligible, *id.*; or (5) the school's failure to pay refunds to the lender, *id.*

- Part B authorizes *partial* discharge pursuant to carefully delineated terms, conditions, and amounts. *See, e.g.*, 20 U.S.C. § 1078-10(c)(1) ($5,000 for teachers broadly); *id.* § 1078-10(c)(3) ($17,500 for teachers in math, science, or special education); *id.* § 1078-11(b)(1)–(18) ($10,000 for, among others, early childhood educators, nurses, foreign-language specialists, librarians, "highly qualified" teachers, child-

32

welfare workers, speech-language pathologists and audiologists, school counselors, public-sector employees, nutrition professionals, and other health and educational professionals); *id.* § 1078-12(d)(3) ($40,000 for legal-aid attorneys).

• Part B also authorizes the Secretary to pay some interest payments for students who meet certain conditions, such as a school's documentation of their need for a loan based on various factors. *See* 20 U.S.C. § 1078.

The Secretary's claimed authority to provide not just $10,000, $17,500, or $40,000 in debt relief for some professions, or full relief in a handful of circumstances, but *full* discharge in *all circumstances*—and refunds of past payments—renders these carefully calibrated grants of specific authority impermissibly superfluous.

*Second*, Congress carefully planned for the delimited discharges it has authorized. Congress pledged "[t]he full faith and credit of the United States … to the payment of all amounts which may be required" under the full-discharge provisions of section 1087. 20 U.S.C. § 1075(b)(4). Congress appropriated funds for each of these full-discharge scenarios. *See id.* § 1071(b)(2). And Congress mandated that FFEL loans include terms allowing the Secretary to discharge them under section 1087. *See id.* § 1077(a)(2)(E). Congress did *none* of this for the boundless discharges the Secretary claims under section 1082(a)(6). The absence of such congressional planning indicates that no discharges were expected, or

33

authorized, beyond those specifically delineated in Part B. "When Congress includes particular language in one section of a statute but omits it from a neighbor," the Court "normally understand[s] that difference in language to convey a difference in meaning." *Bittner*, 143 S.Ct. at 720.

*Third*, the Secretary's interpretation also would render some Part B provisions "nonsensical." *Corley*, 556 U.S. at 314. Consider 20 U.S.C. § 1078-1. That section allows the Secretary to "waive or modify" certain requirements relating to the Department's agreements with loan-guaranty agencies, but explicitly directs that "the Secretary may not waive … any statutory requirement pertaining to the terms and conditions attached to student loans." *Id.* § 1078-1(a)(1)(A). This prohibition makes no sense if the Secretary can discharge those same loans under section 1082(a)(6). Or take 20 U.S.C. § 1082(i), which conditions the Secretary's authority to sell defaulted loans on his first exhausting "all other collection efforts." This condition is nonsensical if the Secretary may unconditionally discharge that same defaulted loan.

*Fourth*, Part D provides the Secretary specific, but limited, authority to discharge Direct Loans. *E.g.*, 20 U.S.C. § 1087e(m) (full discharge for public-service employees); *id.* § 1087j(c) ($5,000 for teachers broadly and $17,500 for math, science, and special-education teachers); *id.* § 1087e(*l*) (covering interest for active service members). As with Part B, the Secretary's reading of section

34

1082(a)(6)—through section 1087e(a)(1)—to authorize him to fully discharge *all* Direct Loans for *any* reason impermissibly renders these more specific Part-D discharge authorizations superfluous. And it creates other absurdities, purporting to allow, for example, the Secretary to cancel the underlying principal on Direct Loans while the Secretary can reduce interest rates on these loans only if "cost neutral" to the federal government, 20 U.S.C. § 1087e(b)(9)(A). Similarly, Congress has prevented the Secretary from buying or selling Direct Loans at a cost to the federal government, *id.* §§ 1087i, 1087i-1, but the Secretary's claimed authority would allow him to discharge those same loans for free. Other examples abound. *E.g.*, *id.* § 1087e(d)(4) (authorizing alternative repayment plans only if they do not "exceed the cost to the Federal Government" compared to normal plans); *id.* § 1087h(c) (prohibiting payment for administrative expenses without submitting to Congress "a detailed description of the specific activities for which" payments will be made).

*Fifth*, the Department's view of section 1082(a)(6) of the HEA cannot be squared with its view of the HEROES Act in *Nebraska* and *Brown*. There, the Secretary contends that the HEROES Act provides him with blanket debt-cancellation authority in cases of national emergency. Petrs. Br. 34-57, *Biden v. Nebraska*, No. 22-506 (U.S. Jan. 4, 2023). But if section 1082(a)(6) already authorized the Secretary to cancel loans *en masse* at *any time*, there was no need for Congress to authorize such power only during specific national emergencies, or for

35

the Secretary to have invoked the HEROES Act to "issu[e] waivers and modifications to the [death, bankruptcy, and school-closure] provisions of 20 U.S.C. 1087," JA 261, *Nebraska*, No. 22-506 (U.S. Jan. 4, 2023).

*Finally*, the district court's contrary considerations lack merit. The district court fretted that "Section 1082 is the only congressional authorization in the Higher Education Act for the Secretary to sue and be sued regarding student aid," 1-ER-36, but the Schools' plain-text reading does not leave the Secretary without "any powers related to" Direct Loans, U.S. Stay Opp. 30. Part D is replete with provisions granting the Secretary carefully defined powers over the Direct Loan program. *E.g.*, 20 U.S.C. § 1087a(a) (Secretary's authority to select "participating institutions" for Direct Loans); *id.* § 1087e(h) (borrower defense as prescribed in regulations); *id.* § 1087e(j)(2) (payment periods). As explained above, Part D provides specific authority to the Secretary for discharging Direct Loans in prescribed circumstances not present here.

At times, the Department tried to augment its claimed authority by referencing the Secretary's "statutory authorization to provide discharges and refunds to borrowers who have made borrower-defense claims." U.S. Stay Opp. 28 (citing 20 U.S.C. § 1087e(h)). But that authority can only be exercised "in regulations," and the government concedes that the program adopted here is "'effectuated pursuant to the terms of the Settlement Agreement, not pursuant to the Department's borrower

36

defense regulations.'" *Id.* at 22 (citation omitted); *id.* at 9-10 (similar for Subclasses 2 and 3). And, of course, other statutes also require formal rulemaking. *See* 5 U.S.C. § 553; 20 U.S.C. § 1098a(b)(2).

The Department also has sought refuge in the Attorney General's statutory authority to supervise litigation involving the United States, 28 U.S.C. §§ 516, 519, which purportedly gives the Attorney General "plenary" settlement authority. U.S. Stay Opp. 27-28. But this authority is not, in fact, "plenary" because the Attorney General concededly cannot "approve a settlement requiring an agency to take substantive action clearly beyond its statutory authority." *Id.* at 28. Pointing to the Attorney General's settlement authority merely begs the question whether any statute authorizes the *Secretary* to cancel loans *en masse*, cut refund checks from the Treasury, or adjudicate borrower-defense claims through extra-regulatory processes. As explained above, no statute does.

\*\*\*

Statutory text cannot be read "in a vacuum." *Abramski v. United States*, 573 U.S. 169, 179 (2014). When considered in relation to the rest of the HEA, the Department's claimed authority under section 1082(a)(6) to discharge any and all student debt must be rejected.

## B. The Settlement Violates Administrative Law Principles And The Administrative Procedure Act.

"[A]s a matter of general administrative law," it is "obvious" that "[a]

37

settlement agreement cannot be a means of bypassing congressionally mandated requirements." *Portland Gen. Elec. Co. v. Bonneville Power Admin.*, 501 F.3d 1009, 1030-31 (9th Cir. 2007). Consistent with that principle, the "decision to enter into [a] settlement agreement" must comply with the APA and established principles of administrative law. *United States v. Carpenter*, 526 F.3d 1237, 1241 (9th Cir. 2008). Here, the Settlement unlawfully forgoes rulemaking required by statute, bypasses existing rules governing the BD program, and is arbitrary and capricious.

**1.** The government admits that the Settlement establishes new "regulatory procedures" for "adjudicat[ing] [borrower-defense] applications." U.S. Stay Opp. 3-4, 10; *see also* ECF No. 18, at 19, No. 23-15050 (describing Settlement as new "framework" for "resolving" BD claims). For the Decision Group and Post-Class Applicants, this "framework" establishes an entirely new adjudication process, complete with borrower-friendly presumptions and resurrected standards from superseded rules. The new "framework" for the Automatic Relief Subclass was even more mysterious. It involved the Department engaging in secret, *ex parte* meetings with claimants' counsel, after which the Department "determined" that 151 schools (give or take, based on "clerical errors," 2-ER-283) engaged in "substantial misconduct" warranting immediate monetary relief. Even if the HEA granted the Secretary the authority to establish a program of *en masse* loan cancellation and

38

refunds, at minimum, creation of such a far-reaching, detail-laden program would require formal rulemaking.

Rulemaking is required three times over. First, the HEA requires the Secretary to "specify *in regulations*" the process for resolving BD claims. 20 U.S.C. § 1087e(h) (emphasis added). Second, under the HEA, negotiated rulemaking was required because the new "framework" is a regulation that "pertain[s]" to Title IV, the subchapter governing student loans. *Id.* § 1098a(b)(2). Third, under the APA, notice-and-comment rulemaking was required because the new "framework" is a legislative "rule." 5 U.S.C. § 551(4). Specifically, the "framework" has the "'force and effect of law,'" *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015), and "'affect[s] individual rights and obligations'" to repay debts, *Chrysler Corp. v. Brown*, 441 U.S. 281, 302 (1979). If the Department wishes to establish a new BD program, it must promulgate new rules. *See Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 100 (1995); *Conservation Nw. v. Sherman*, 715 F.3d 1181, 1187 (9th Cir. 2013).

**2.** The Secretary has exercised rulemaking authority under section 1087e(h) by promulgating extensive BD regulations. *See* 34 C.F.R. §§ 685.206, 685.222. Those regulations are binding and apply not just to the settling parties but also to the Schools. The Department's effort to "craft[]" a new "process for resolving the enormous backlog of claims," 1-ER-41, thus violates the

39

administrative law principle that an agency must follow its own regulations. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 267 (1954); *Cent. Laborers' Pension Fund v. Heinz*, 541 U.S. 739, 748 (2004).

But instead of adjudicating the "backlog" of BD claims under the process required by its regulations, the Department imposed "streamlined procedures," ECF No. 18, at 3, No. 23-15050, for hundreds of thousands of BD claims. Agencies may not "ignore" their rules in seeking "a quick way to reach a desired result." *Panhandle E. Pipe Line Co. v. FERC*, 613 F.2d 1120, 1135 (D.C. Cir. 1979).

It is well-settled that an agency's power to settle claims "does not include license to agree to settlement terms that would violate the civil laws governing the agency." *Exec. Bus. Media, Inc. v. U.S. Dep't of Def.*, 3 F.3d 759, 762 (4th Cir. 1993). This Court's decision in *Portland General* explains why—and highlights the Settlement's illegality. There, this Court considered whether the Bonneville Power Administration ("BPA") had unlawfully exercised its authority to "compromise or … settl[e]" claims arising under a subsidy program. 501 F.3d at 1013, 1026. Under the agency's organic statute, BPA was empowered to effectively "subsidiz[e] the cost" of certain "utilit[ies'] high-cost power" subject to statutory constraints, including the requirement that the agency adopt a formula in regulations for determining whether utilities were entitled to subsidies. *Id.* at 1027. After promulgating such regulations and administering the program for nearly two

40

decades, practical concerns led BPA to "enter into a new agreement for a global, long-term 'settlement' of [its] prospective … obligations" under the program. *Id.*; *see id.* at 1018-19 (noting that agency sought to "bypass" binding regulations deemed "impractical").

In a striking parallel to this case, BPA claimed an "essentially unlimited" authority to "compromise claims" "free from the constraints" imposed by statute. 501 F.3d at 1030-31. Like the Department here, BPA "took the position that the [settlement] agreement was governed only" by its authority to settle and compromise claims, not the statutory provisions establishing the subsidy program. *Id.* at 1027. BPA thus claimed a "broad," "otherwise unregulated authority … to enter into settlements" concerning the subsidy program, free from other statutory and regulatory constraints. *Id.* at 1025.

This Court invalidated the settlement, reasoning that the settlement of the agency's "[program] obligations must be grounded in the … program authorized by [statute] that creates the occasion for the settlement in the first place." 501 F.3d at 1031. That is because an agency's "power to compromise claims is not a substantive power," but a "facilitative power" that serves *other* "substantive grants of authority." *Id.* at 1030. The agency was "not excused" from following statutory requirements and its own binding regulations merely because it "call[ed] its actions … a …

41

'settlement.'" *Id.* at 1032; *see also id.* at 1035-36 ("Until [the agency] adopts new regulations, … [it] is bound by its [existing] regulations.").

Just so here. Like BPA, the Department has claimed authority to settle pending BD claims "independent" of the HEA's authorization of the BD program, 1-ER-40, which empowers the Department to establish such a program only "in regulations," 20 U.S.C. § 1087e(h). But "established administrative law principles" foreclose that claim. *Portland Gen.*, 501 F.3d at 1029. The settlement of the Department's BD "obligations must be grounded in the … program authorized by [the statute and regulations] that creat[e] the occasion for the settlement in the first place." *Id.* at 1030-31. Having promulgated regulations that govern the BD program, the Department is "bound" to follow them—or else undertake rulemaking to amend them. *Id.* at 1035. And by effectively committing the Department to implementing new "substantive rules, which normally may be promulgated only pursuant to notice and comment procedures," the Settlement "transgress[es] the APA's limitations on an agency's rulemaking authority." *Authority of the United States to Enter Settlements Limiting the Future Exercise of Executive Branch Discretion*, 23 Op. O.L.C. 126, 164 (1999).

Neither of the district court's grounds for rejecting this straightforward conclusion has merit. First, the court noted that the Settlement does not amend binding regulations because those "regulations remain in place." 1-ER-41. But the

42

Settlement is unlawful precisely *because* it "does not reflect the current [BD] program, as defined by [the Department's] own regulations," and the Department has settled the claims "as if it ha[s] changed its regulations, which it ha[s] not." *Portland Gen.*, 501 F.3d at 1036. Those regulations are meaningless if, in practice, they will be ignored and replaced by a new process. This "type of mass settlement" of BD claims is "illegal" because governing regulations do not permit the Department to cancel loans "regardless of the merit of those claims." *Am. Hosp. Ass'n v. Price*, 867 F.3d 160, 167 (D.C. Cir. 2017).

Second, the district court reasoned that requiring the Department to follow its BD regulations would unduly "limit" the Department's "broad discretion" to settle cases—and to invoke "independent sources of statutory authorization" *besides* the statute authorizing the BD program. 1-ER-40-41. But the underlying premise is wrong. "Settlement of [the Department's] [BD] obligations is … directly related to, and inextricably intertwined with, the authority conferred to [the Department] under [section 1087e(h)]." *Portland Gen.*, 501 F.3d at 1032. The Department's settlement authority—as a "facilitative power"—cannot be exercised "independent" of the more "traditional regulatory powers" it serves. *Id.* at 1030. The HEA's plain text confirms that the Secretary may "compromise" claims only "[i]n the performance of … the functions, powers, and duties, vested in him by this part." 20 U.S.C. § 1082(a)(6).

43

**3.** The Settlement independently violates the APA's prohibition on arbitrary action. 5 U.S.C. § 706(2)(A). The Department alternatively claims that its determination to automatically grant every BD application associated with 151 schools was based on "strong indicia," 3-ER-559, "sufficient indicia," 2-ER-264, or "certain indicia," 2-ER-266, of misconduct by listed schools—and "on information" it had "regarding demonstrated or credibly alleged misconduct" and "the comparative rate of Class Members with applications concerning the listed schools," 2-ER-271. The Department failed to specify any of the "indicia" of misconduct; what "information" it relied upon; and which schools made the list because of "demonstrated" misconduct, versus "credibly alleged misconduct," versus merely the "rate of … applications concerning the listed school[]"—much less to explain what constitutes "demonstrated," "credibly alleged," or a sufficiently high "comparative rate." The Department's vague, conclusory statements are the opposite of a "satisfactory explanation," *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983), that "present[s] … data" to justify an agency determination, *Nat'l Treasury Emps. Union v. Horner*, 854 F.2d 490, 492 (D.C. Cir. 1988).[7]

---

[7] After the district court preliminarily approved the Settlement, the settling parties admitted they had "erroneously" included some schools on Exhibit C and excluded another school. 2-ER-283. They provided no explanation for these "errors," further demonstrating the arbitrariness of the Department's highly consequential "determin[ation]."

44

Moreover, an agency "cannot ignore evidence that undercuts its judgment." *Genuine Parts Co. v. EPA*, 890 F.3d 304, 312 (D.C. Cir. 2018); *see E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 980 (9th Cir. 2020). Yet in the only record document related to ECI, the Department said it reviewed "a sample of 50 applications" and concluded it "has not identified evidence that suggests that [ECI] is participating in … activity that would support borrower defense discharges." 4-ER-703. The Department also submitted an exhibit to identify any "final determinations" that schools had "engaged in fraudulent conduct for which borrower defense relief may be granted," and identified "None" for Lincoln. 4-ER-740. Despite this *exculpatory* evidence, the Department "determined" without explanation that "substantial misconduct" occurred at ECI and Lincoln, 3-ER-573-74.

At times, Plaintiffs have argued that the number of BD claims against the Schools justified the Department's action. But Lincoln showed that the claims of which it was aware amounted to just a fraction of 1% of the more than 340,000 students who have enrolled in Lincoln's programs since 2005. 3-ER-494 ¶ 8; 2-ER-156 ¶ 2. The comparative rates thus cannot justify the Department's action.[8]

---

[8] Even the number of BD claims is inflated. Lincoln showed that 12% of claims submitted as a "group" claim consisted of individuals who had no Title IV loans associated with attendance at Lincoln's schools. 2-ER-156 ¶ 5.

Plaintiffs also have relied on the filing of lawsuits or investigations against listed schools. But Lincoln settled an investigation by the Massachusetts Attorney General in 2015 to avoid the costs of litigation, with no findings of wrongdoing and a commitment that the settlement would not be "evidence in any proceeding to prove any liability, any wrongdoing, or an admission on the part of Defendants by any individual or entity not a party hereto." 2-ER-168 § X. This, too, is not evidence of wrongdoing. *None* of the Schools has a judgment of wrongdoing against them. The Department's unexplained determination of sufficient "indicia" of "misconduct" is unsupported, arbitrary, and capricious.

The district court failed to grapple with this evidence or assess the rationality of the Department's actions. That is reason to reverse.

***

The Secretary has no authority to grant the sweeping relief provided in the Settlement. His claim that the HEA provides unlimited debt-cancellation authority finds no support in statutory text. And his failure to follow statutory and regulatory requirements is illegal. The judgment should therefore be reversed.

## III. THE FINAL APPROVAL VIOLATED RULE 23.

District courts "must ensure that a certified class satisfies Rule 23 throughout the litigation" and "alter or decertify the class if that is no longer the case." *Jin v. Shanghai Original, Inc.*, 990 F.3d 251, 262 (2d Cir. 2021); *see also McNamara v.*

46

*Felderhof*, 410 F.3d 277, 280 n.8 (5th Cir. 2005); *Barnes v. Am. Tobacco Co.*, 161 F.3d 127, 140 (3d Cir. 1998). This duty applies with special force to settlements, which "present unique due process concerns for absent class members, and [a] district court has a fiduciary duty to look after the interests of those absent class members." *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) (cleaned up).

The district court certified only one class in this case—a Rule 23(b)(2) injunctive-relief class consisting of "[a]ll people who borrowed a Direct Loan or FFEL loan … who have asserted a borrower defense to repayment" which "has not been granted or denied on the merits." 4-ER-812. By the time of the Settlement, certification was improper for several reasons: (A) the Settlement includes monetary relief; (B) developments in the litigation undermined commonality, typicality, and adequacy of representation; (C) the Settlement had no mechanism to exclude putative class members who were never injured by the challenged policies; and (D) the Settlement purported to bind "Post-Class Applicants" who were never certified as a class or represented by any named Plaintiff.

## A. No Monetary Relief Class Was Ever Certified.

Rule 23(b)(2) applies "only when a single injunction or declaratory judgment would provide relief to each member of the class," and it "does not authorize class certification when each class member would be entitled to an individualized award of monetary damages." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 360-61

47

(2011). "[I]ndividualized monetary claims belong in Rule 23(b)(3)." *Id.* at 362. Here, no Rule 23(b)(3) class was certified, yet the Settlement guarantees the Automatic Relief Subclass "a refund of all amounts the Class Member previously paid to the Department toward any Relevant Loan Debt." 3-ER-580. The other subclasses are also guaranteed money under certain circumstances. 3-ER-583-87 §§ IV.C.1.i, IV.C.8, IV.D.2. The Settlement itself confirms the monetary nature of the relief because it *releases* all claims for "monetary relief." 3-ER-597. And to the extent the Settlement provides genuine injunctive relief, it does not constitute "a *single* injunction or declaratory judgment [that] would provide relief to *each* member of the class," *Dukes*, 564 U.S. at 360 (emphases added), but instead provides multivariate relief that could be realized only through multiple injunctions applying to *de facto* subclasses.

This divergence between the class certified and the relief awarded by the Settlement required decertification. But the district court instead ruled that the 23(b)(2) class remained proper because (i) "a settlement can provide broader relief than a court could have awarded after a trial," and (ii) "refunds are restitution and fall within the relief available in an injunction/declaratory relief action." 1-ER-49. Both theories are erroneous.

*First*, the notion that a Rule 23(b)(2) settlement may provide relief that could not be obtained through a trial contradicts binding precedent holding that, apart from

48

trial-manageability concerns, Rule 23's requirements "demand undiluted, even heightened, attention in the settlement context." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *see also Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 849 (1999). There is "no basis for exempting settlements from the rule announced in *Dukes*." *W. Morgan-E. Lawrence Water & Sewer Auth. v. 3M Co.*, 737 F.App'x 457, 468 (11th Cir. 2018) (per curiam); *see also In re Payment Card Interchange Fee & Merch. Disc. Antitrust Litig.*, 827 F.3d 223, 241-42 (2d Cir. 2016) (Leval, J., concurring) ("*Dukes* did not involve a settlement agreement, but that does not make its precedent any less applicable ….").

Rule 23(b)(2)'s limitation to class-wide injunctive and declaratory relief *must* apply to settlements to avoid obvious constitutional problems. *See Ortiz*, 527 U.S. at 845 (applying "doctrine of constitutional avoidance" to Rule 23(b)). Rule 23(b)(2) classes are "mandatory classes: The Rule provides no opportunity for … class members to opt out, and does not even oblige the District Court to afford them notice of the action." *Dukes*, 564 U.S. at 362. But, when individualized monetary claims are at stake, opt-out rights are required by both due process and the Seventh Amendment. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 807, 811-12 (1985); *Ortiz*, 527 U.S. at 845-46. When an absentee declines to exercise an opt-out right, he may "be presumed to consent to being a member of the class"—and to waive his right to a jury in a settlement. *Shutts*, 472 U.S. at 813; *Ortiz*, 527 U.S. at

845-46. But because absentees have no right in a Rule 23(b)(2) class "to decide *for themselves* whether to tie their fates to the class representatives' or go it alone," *Dukes*, 564 U.S. at 364, binding absentees to a settlement of monetary damages is unconstitutional, which means the rule that injunctive-relief classes may not settle individualized claims for monetary damages cannot be abrogated by a settlement. "[P]arties may not accomplish through class settlement what they otherwise would be unable to accomplish through class litigation—precluding absent class members' individualized claims for monetary damages without providing notice and an opportunity to opt out." *3M*, 737 F.App'x at 469.

*Second*, refunds are not permissible under Rule 23(b)(2) simply because they might be categorized as "restitution." 1-ER-49. That most forms of restitution are equitable relief "may be true, but it is irrelevant" because "[t]he Rule does not speak of 'equitable' remedies generally but of injunctions and declaratory judgments," and a refund "is neither." *Dukes*, 564 U.S. at 365; *see also Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 330 (4th Cir. 2006) ("The text of Rule 23(b)(2) says nothing whatsoever about equitable relief."). If Rule 23(b)(2) "authorizes the class certification of monetary claims at all," *Dukes*, 564 U.S. at 360, the test is not whether the relief is equitable, but "whether the monetary relief could be granted absent individualized determinations" of each class member's "eligibility for [monetary damages]." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 986-87 (9th

50

Cir. 2011) (alteration in original; quotation marks omitted) (allowing any monetary relief in a 23(b)(2) class "has been called into doubt by the Supreme Court").

The Settlement's monetary relief is impermissible under this test. Processing refunds for the Automatic Relief Subclass will require the Department to award each borrower money based on individualized determinations that the borrower (i) has "Relevant Loan Debt" and asserted a borrower-defense claim; and (ii) made payments to the Department on that debt. 3-ER-582-83. For the other subclasses, the award will, at minimum, require the same individualized determinations and may require far more, such as determinations of all the facts presented by an individual application. 3-ER-583-87. Indeed, the settling parties admit that the processes established by the Settlement deal with "complicated matters" given the "differences among Class Members' circumstances." 2-ER-265-66. These determinations necessarily "focus on" the "individual characteristics of the plaintiffs" and not the "conduct of the defendant." *Ellis*, 657 F.3d at 987 (cleaned up). Plaintiffs cannot satisfy Rule 23(b)(2) by "'superficially structur[ing] their case around a claim for class-wide injunctive and declaratory relief" if "the relief sought would merely initiate a process through which highly individualized determinations of liability and remedy are made.'" *Cholakyan v. Mercedes-Benz USA, LLC*, 281 F.R.D. 534, 560 (C.D. Cal. 2012) (quoting *Jamie S. v. Milwaukee Pub. Schs.*, 668 F.3d 481, 499 (7th Cir. 2012)). Courts have repeatedly held that individualized refunds like this cannot

51

be obtained in a Rule 23(b)(2) action.[9]

The individual character of these claims is even more obvious under the release, which precludes parties "from prosecuting, any and all claims … for any injunctive, declaratory, and/or monetary relief, including but not limited to damages" and "debt relief." 3-ER-597. If the Class had been certified under Rule 23(b)(3), members of Subclasses 2 and 3 would be entitled to opt out and assert their own claims for immediate refunds and debt cancellation. But because the only class certified here was a Rule 23(b)(2) class, members of those subclasses were stripped of these claims by the Settlement. And "[i]f a class may not even be certified because of the risk that adjudication of its rights may violate the due process rights of its members by forcibly depriving them of claims, then necessarily an adjudication of a class's rights that in fact forcibly deprives the members of their claims is also unacceptable." *Payment Card Interchange*, 827 F.3d at 241-42 (Leval, J., concurring); *see also 3M*, 737 F.App'x at 469 (district court "abused its discretion by certifying a class under Rule 23(b)(2) and approving a settlement that released absent class members' individualized claims for monetary damages").

---

[9] *See, e.g., Randall v. Rolls-Royce Corp.*, 637 F.3d 818, 826 (7th Cir. 2011) (backpay impermissible); *Thorn*, 445 F.3d at 332 (restitution relief impermissible); *Richards v. Delta Air Lines, Inc.*, 453 F.3d 525, 531 (D.C. Cir. 2006) (refund program impermissible).

**B.    The Settlement's Creation Of Multiple Subclasses Destroyed Commonality, Typicality, And Adequate Representation.**

Under Rule 23(a), class certification may be maintained only if the requirements of commonality, typicality, and adequacy of representation are met. *Amchem*, 521 U.S. at 613-14.  Here, they are not.

*First*, the  district court certified the class on a single premise—that class-wide injunctive relief was appropriate because Plaintiffs "challenge[d] the [Department's] policy of inaction—to which each class member was subjected," 4-ER-819, and this policy could be corrected by a single order to "compel the Department to at least begin deciding applications again," 4-ER-809.  But by the time the Settlement was proposed, the Department had been "issuing decisions to class members *for 18 months*" and processed *tens of thousands* of claims.  3-ER-520 (emphasis added); *see also* 3-ER-542-46; 3-ER-550-52.   As the Department rightly noted in its summary-judgment brief, there was "no longer a delay common to all class members."  3-ER-520.  "If there is no evidence that the entire class was subject to the same [unlawful] practice, there is no question common to the class." *Davidson v. O'Reilly Auto Enters., LLC*, 968 F.3d 955, 967 (9th Cir. 2020) (alteration in original).  Tellingly, the settling parties did not rely on the theory that all Class members' claims were premised on unlawful delay in seeking settlement approval. Instead, they (improperly) reframed this suit as "challeng[ing] all aspects of the Department's process of adjudicating … pending BD applications," including "the

53

substance of … the decisions that the Department has rendered." 2-ER-277. The substance of individualized decisions is not common to, or typical of, every Class member.

*Second*, by the time of settlement, no named plaintiff was typical of the entire Class. "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Ellis*, 657 F.3d at 984 (cleaned up). All named Plaintiffs originally asserted claims that the "policy of delay" constituted unlawfully withheld agency action under 5 U.S.C. § 706(1), 4-ER-837-39. But by the time Plaintiffs filed their Supplemental Complaint, three named Plaintiffs had been issued "form denial notices," 4-ER-676 ¶ 354 (Sweet); 4-ER-681 ¶ 379 (Deegan); 4-ER-685 ¶ 402 (Jacobson), and one named Plaintiff's application had been partially *approved*, 4-ER-683 ¶ 395 (Davis). None of these Plaintiffs was subject to the "policy of delay" anymore, and those issued "form denial notices" had to rely on an entirely different claim—that the "form denials" were arbitrary and capricious under 5 U.S.C. § 706(2) and not accompanied by a "statement of the grounds for denial" under 5 U.S.C. § 555(e). *See* 7 Newberg on Class Actions § 23.21 (6th ed.) ("[T]ypicality will not be satisfied if the class representative is not a member of the class she purports to represent.").

*Third*, the Settlement's introduction of multiple relief subclasses resulted in "conflicts of interest with other class members." *Ellis*, 657 F.3d at 985. The settling parties recognized that the Settlement features a tradeoff between the relief for the Automatic Relief Subclass and the Decision Group Subclass. 2-ER-264; 2-ER-271 (noting that eighty-seven Class objectors "asked to have the schools they attended added to Exhibit C," and "[t]his was by far the most common objection"). Among the seven named Plaintiffs, five (Sweet, Archibald, Deegan, Hood, and Jacobson) allegedly attended Exhibit C schools. 4-ER-810-11. Because the Department was willing to grant immediate refunds to borrowers whose debt was associated with some—but not all—schools, these named Plaintiffs were able to negotiate for monetary relief for students who attended their schools, while excluding borrowers who attended other schools. Likewise, Class counsel—which was employed by Harvard University—was able to negotiate to keep Harvard off the Exhibit C list. 2-ER-271 n.7. When, as here, a settlement "divides a single class into … groups of plaintiffs that receive different benefits," "[t]he structure of the settlement agreement itself … supports the inference that the representative plaintiffs are inadequate." *Dewey v. Volkswagen Aktiengesellschaft*, 681 F.3d 170, 187 (3d Cir. 2012); *see also Amchem*, 521 U.S. at 627.

### C. The Inclusion Of Uninjured Class Members In The Settlement Renders The Certified Class Overbroad.

The subclasses also suffer from serious standing problems. "Every class

member must have Article III standing in order to recover individual damages." *TransUnion LLC v. Ramirez*, 141 S.Ct. 2190, 2208 (2021); *see also Magadia v. Wal-Mart Assocs., Inc.*, 999 F.3d 668, 680 (9th Cir. 2021). But the Settlement grants monetary relief to individuals who were never injured, either by the policies Plaintiffs challenged in their Complaint or by the alleged conduct in their BD applications.

*First*, by the time the Settlement was lodged, the Department had been processing applications for at least eighteen months and had agreed to issue "new decisions to each borrower who received" a "form denial notice" when the parties proposed the Settlement. 3-ER-541-43. But the Settlement grants monetary relief to any Class member who attended an Exhibit C school and submitted an application before the Execution Date—regardless of whether the application was filed too late for the borrower to have been affected by the challenged policies. 3-ER-582.

*Second*, by definition, the subclasses contain individuals who are not eligible for BD relief. 3-ER-582-83 § IV.A (automatic relief for Subclass 1); 3-ER-583 (any "substantial question" as to whether debt "is associated with" a listed school "will be resolved in favor of the Class Member (*i.e.*, in favor of granting relief)"); 3-ER-583-84 § IV.C.1 (relief for Subclass 2 regardless of truth of allegations, insufficiency of evidence, or untimeliness of claim); *see also* 4-ER-703-08 (Department finding that "sample of 50 allegations" against ECI were not "are not the type that would

warrant relief"); 2-ER-156 ¶ 5 (evidence that 12 percent of individuals in a group claim against Lincoln "had not received any Title IV federal student loans and therefore are ineligible for borrower defense relief"). Thus, even accepting the parties' fallacious assertion that this case now involves "the substance" of BD claims, 2-ER-277, there are subclass members with no Article III injury.

Accordingly, this Court "lack[s] assurance that every class member who would receive damages under the settlement suffered an actual injury from [defendant's] alleged … violations." *Harvey v. Morgan Stanley Smith Barney LLC*, 2022 WL 3359174, at *3 (9th Cir. Aug. 15, 2022). At minimum, this Court should "vacate the district court's approval of the settlement agreement and remand for the district court to assess Article III standing of the class members." *Id.*

### D. The Claims Of "Post-Class Applicants" Were Never Certified.

Finally, by compromising the claims of "Post-Class Applicants," the Settlement purports to bind individuals into a subclass that was never certified, who were not represented by any named Plaintiff, and who did not necessarily receive notice under Rule 23(c) and (e). According to the Settlement, the Class "consist[s] of all people who borrowed a Direct Loan or FFEL loan ... who have asserted a borrower defense to repayment to the Department, whose borrower defense has not been granted or denied on the merits." 3-ER-581 § III.A. This Class "closed as of the Execution Date," which was on or before June 22, 2022. 3-ER-579, 582 §§ II.L,

III.D. But the Settlement also provides relief to—and binds as "Plaintiffs"—any individual who "submit[ted] a borrower defense application after the Execution Date (*i.e.*, the date the class closes), but before the Final Approval Date" of November 16, 2022. 3-ER-580, 587 §§ II.U, IV.D.1.[10]

Because Subclass 3 bound individuals who submitted BD claims up until the moment of final approval, some members of that subclass necessarily never received the notice required by Rule 23(c) and (e) and never had the opportunity to object prior to the fairness hearing. 3-ER-599 §§ X.5-7. Moreover, by compromising the claims of absentees who were never certified as a class, the Settlement violates both Rule 23 and the due-process rights of absentees. Under Rule 23, individual plaintiffs have the authority to "sue ... as representative parties on behalf of all members only if" the requirements of 23(a) and (b) are satisfied. *See Viking River Cruises, Inc. v. Moriana*, 142 S.Ct. 1906, 1920 (2022) (individual plaintiff's assertion of absentees' claims, "of course, requires the certification of a class"); *Amchem*, 521 U.S. at 623 (similar). Under Rule 23 and the Due Process Clause, absentees may be bound by a class-action judgment only if they "are in fact adequately represented by parties who are present." *Hansberry v. Lee*, 311 U.S. 32, 43-44 (1940); *see also* Fed. R. Civ. P.

---

[10] There are approximately 206,000 Post-Class Applicants. U.S. Stay Opp. 10. The district court sidestepped this issue, reasoning that "the class certification order set no cut-off date for membership." 1-ER-50. But that definition is not the one used in the all-or-nothing Settlement, 3-ER-601 § XIII.A. It is *that* class definition that the court approved in the Final Judgment.

23(a)(4), (e)(2). The "Post-Class" Subclass received *no representation* at all, meaning "the settlement and release that resulted … are nullities." *Payment Card Interchange*, 827 F.3d at 236.

## IV. THE SETTLEMENT VIOLATES DUE PROCESS.

The Settlement strips the Schools of "liberty [and] property interest[s]" without constitutionally adequate process. *Hewitt v. Grabicki*, 794 F.2d 1373, 1380 (9th Cir. 1986). The Schools have (1) a protected liberty interest in their reputation, and (2) a property interest in Title IV funds. Exhibit C unconstitutionally impairs these interests. At a minimum, the Schools should be removed from the Settlement.

### A. The Settlement Defames And Impugns The Schools' Reputations Without Due Process.

The Schools have a protectable liberty interest in avoiding "stigmatizing governmental" action that has "an immediate and tangible effect on [their] ability to do business." *Old Dominion Dairy Prods., Inc. v. Sec'y of Def.*, 631 F.2d 953, 961 (D.C. Cir. 1980). It is well-settled that "[a] liberty interest may be implicated where a person's good name, reputation, honor, or integrity is at stake because of what the government is doing to him." *Endy v. Cnty. of Los Angeles*, 975 F.3d 757, 764 (9th Cir. 2020) (cleaned up). Government infliction of reputational harm deprives a person of a cognizable liberty interest when he is "stigmatized in connection with the denial of a more tangible interest." *Hart v. Parks*, 450 F.3d 1059, 1069 (9th Cir. 2006) (cleaned up). Under this "stigma-plus" test, "stigma from governmental

59

action plus alteration or extinguishment of a right … previously recognized" establishes a liberty interest. *Fikre v. FBI*, 35 F.4th 762, 776 (9th Cir. 2022) (cleaned up).

The "stigma" of inclusion on a list of wrongdoers "bearing the imprimatur of the [Department]" immediately affects the Schools' relationship with current and prospective students and can cause the Schools to "los[e] additional students to competitors," "los[e] donations," and suffer other consequences. *Sherman Coll. of Straight Chiropractic v. U.S. Comm'r of Educ.*, 493 F. Supp. 976, 978–79 (D.D.C. 1980). And there is another "tangible" plus factor, involving "extinguishment of a right … previously recognized," *Fikre*, 35 F.4th at 776 (cleaned up): By labeling the Schools presumptive wrongdoers, Exhibit C extinguishes the procedural rights guaranteed to schools by the BD regulations and impairs their right to defend themselves in any future recoupment proceedings. 34 C.F.R. § 685.206(c)(3), (c)(4), (e)(16); *id.* § 685.222(e)(7), (h)(1) (specifying procedures for recoupment).

Both the "stigma" and the "plus" factor are clear. First, the stigma: The Settlement has inflicted grievous reputational injuries against the Schools. *See supra* 13-15. Being publicly branded a presumptive wrongdoer by one's primary federal regulator based on undisclosed evidence (or no evidence at all) without any opportunity to defend oneself seriously damages a school's reputation and goodwill. The Schools have worked for decades to build relationships with secondary schools,

community leaders, employers, and business partners, and Exhibit C directly damages those relationships in ways that are difficult to repair. That harm is self-evident, but it is also amply supported by the record. *See, e.g.*, *supra* 13-15.

Second, the plus factor: Under the Settlement, the Schools are denied the administrative rights and defenses guaranteed by the Department's BD regulations. Not only will the Schools lose their rights to create an administrative record and receive a reasoned decision on each BD claim that implicates them, but the Schools will be exposed to potential liability to the Department for all BD claims that were summarily granted or may be granted under the new "review" framework. Given that Plaintiffs brought this litigation to *compel* reasoned BD decisions, they can hardly now claim that the absence of any reasoned decision for the 196,000 BD claims in Subclass 1 is inconsequential.

Under binding regulations, a school has a right to receive notice of a borrower-defense application that implicates the school, a right to submit evidence in the factfinding process that forms the administrative record, and a right to receive a reasoned decision from the Department. *See* 34 C.F.R. §§ 685.206(c)(1)–(2), (e)(10)–(11), 685.222(e)(3)(i). The regulations specify the grounds on which the Department can grant a borrower-defense claim based on, for example, an alleged "statement, act, or omission by an eligible school to a borrower that is false, misleading, or deceptive … and that directly and clearly relates to enrollment or

continuing enrollment at the institution or the provision of educational services for which the loan was made." *Id.* § 685.206(e)(3). To weed out unmeritorious and untimely claims, the regulations also specify grounds on which a BD claim shall *not* be granted and limitations periods. *Id.* § 685.206(e)(5)–(6). These regulations expressly grant rights and defenses to schools, and they are necessary steps in the administrative process. The same regulations that prescribe the BD adjudication process also permit the Department, if it grants a BD application, to seek "recoupment" for discharged funds from the implicated school. *See, e.g., id.* § 685.222(e)(7). As the Department itself has recognized, a school's ability to participate in the initial borrower-defense adjudication is an important right designed to "reduce the likelihood" that a school will later "be burdened by [an] unjustified clai[m]." 84 Fed. Reg. 49,788, 49,825 (Sept. 23, 2019). Schools, however, lose those rights under the Settlement; claims against them are resolved summarily. The Schools also will be subject to new regulatory standards in Subclass 3.

The district court gave short shrift to these obvious interests, but its reasons do not withstand scrutiny. First, the court appeared to suggest that Exhibit C does not implicate due process at all because it "does not carry the necessary legal significance" and "had no legally binding effect on the [Schools]." 1-ER-42-44. But the Settlement plainly implicates due process because it involves state action that impairs the Schools' interests. If a police flyer depicting a person as an "active

62

shoplifter" is subject to due-process scrutiny, *Paul v. Davis*, 424 U.S. 693, 698-700 (1976), then surely Exhibit C is as well. The Settlement *names* the Schools as bad actors, in a determination bearing the imprimatur of the Schools' primary regulator and the stamp of a federal court's approval.

Second, the district court minimized the loss of the Schools' procedural rights by relying on a carefully worded declaration submitted by the Department to rule that the Department "*cannot* recoup" loans summarily discharged under the Settlement. 1-ER-14; 3-ER-399 ¶ 9. But despite that declaration and the district court's ruling, the government has now represented that recoupment somehow "could occur." U.S. Stay Opp. 2. The Department's representation shows that the threat of recoupment liability is real and imminent—and confirms the importance of allowing the Schools to defend themselves in BD adjudications.

Accordingly, the Schools have a protectable liberty interest for due-process purposes.

### B.     The Settlement Impairs The Schools' Property Interests.

The Settlement also would deprive the Schools of constitutionally protected property interests in Title IV funds.

Schools have "a property interest in retaining the funds in [their] accounts" and thus possess a vested property interest in Title IV loans already received. *Chauffeur's Training Sch., Inc. v. Riley*, 967 F. Supp. 719, 729 (N.D.N.Y. 1997)

(holding that school has "a constitutionally protected property interest" under the FFEL program in loan proceeds "paid to [the school] by its students to cover the costs of those students' educations"). Even if Title IV funds are dispersed subject to the government's limited right of recoupment, that right is prescribed in regulations that set strict procedures and time limits. *See* 34 C.F.R. §§ 685.206, .222. Otherwise, schools' rights in Title IV funds become vested and are not subject to diminishment or recoupment.

The Settlement would retroactively and impermissibly diminish these property rights. BD claims are now time-barred for many of the loans at issue—as old as 1992, *see* 3-ER-494 ¶ 7—thus precluding any possibility of recoupment. Yet the Settlement grants discharges and refunds for these time-barred claims, creating a new threat of recoupment. The Settlement also will grant claims that are patently unmeritorious. *See, e.g.*, *supra* 45 & n.8. This squarely implicates due process. *Kerley Indus., Inc. v. Pima Cnty.*, 785 F.2d 1444, 1446 (9th Cir. 1986).

### C. The Settlement Does Not Provide The Schools Constitutionally Required Process.

Despite these liberty and property interests, the Schools have been offered *no* process to defend against their inclusion in Exhibit C (or in the new process for Post-Class Applicants). The Department has publicly branded every school on Exhibit C as engaging in "institutional" and "substantial misconduct," 3-ER-559, 573, without providing any notice to the schools that this determination process was occurring,

without any official finding of wrongdoing, and without any opportunity to rebut the allegation.

This absence of process is unconstitutional. "[A]dministrative decisions" that "closely resemble judicial determinations … require similar procedural protections," *Marathon Oil Co. v. EPA*, 564 F.2d 1253, 1261 (9th Cir. 1977), and "[a]n opportunity to meet and rebut evidence utilized by an administrative agency has long been regarded as a primary requisite of due process," *Ralpho v. Bell*, 569 F.2d 607, 628 (D.C. Cir. 1977). No such procedures were provided before the Department purported to "determin[e]" that there were "strong indicia regarding substantial misconduct." 3-ER-573-74.

It is no answer, as the district court reasoned, that this determination does not "impose any liability" against schools, "absent [recoupment] proceedings initiated specifically against them." 1-ER-42. The BD regulations provide schools notice and a right to meet and rebut evidence through *two* different steps: Step One—the lawful adjudication of a BD claim; and Step Two—recoupment or other related disciplinary proceeding. That the Settlement is silent as to Step Two proceedings does not cure the due-process violations inherent in eliminating Step One protections. *See Pub. Serv. Comm'n of Ky. v. FERC*, 397 F.3d 1004, 1012 (D.C. Cir. 2005) ("Considering petitioners' arguments" after the fact "is not the same thing as allowing them to present evidence on the issue"). Schools are losing important

65

procedural protections for their vested interests here and now—protections designed to "reduce the likelihood that … schools will be burdened by unjustified claims." 84 Fed. Reg. at 49,825.

***

The Department could have granted BD claims without specifically naming 151 non-party schools. In reality, Exhibit C was *designed* to defame and harm schools. It was collusively created by Plaintiffs' counsel and Department leadership, and included in the Settlement, to make a political statement and harm disfavored schools—based on no evidence of wrongdoing. The Department's process-free determination violates due process.

## V. THE DISTRICT COURT ERRED IN DENYING INTERVENTION OF RIGHT.

Although the district court permitted the Schools to intervene permissively, 1-ER-54, the court denied intervention of right on the ground that the Schools did not "have a property interest … at stake," 2-ER-341. That was error.[11]

To intervene by right under Federal Rule of Civil Procedure 24(a), a proposed intervenor must make a (1) "timely" motion showing (2) "that the would-be intervenor has a significantly protectable interest relating to ... the subject of the action," (3) "that the disposition of the action may as a practical matter impair or

---

[11] As permissive intervenors, the Schools were not permitted to take discovery or participate in settlement negotiations. If this case is remanded, intervention of right would ensure the Schools have full participation.

66

impede [the intervenor's] ability to protect that interest," and (4) "that such interest is inadequately represented by the parties to the action." *Kalbers v. U.S. Dep't of Just.*, 22 F.4th 816, 827 (9th Cir. 2021) (alterations in original). These requirements are "broadly interpreted in favor of intervention," *Citizens for Balanced Use v. Mont. Wilderness Ass'n*, 647 F.3d 893, 897 (9th Cir. 2011), and are satisfied here.

The district court correctly concluded that the Schools were timely because they filed their intervention motions just three weeks after learning that they had been named on Exhibit C and that their rights would be implicated. 1-ER-55. The Schools' interests also are not adequately represented by the settling parties; rather, their interests are diametrically opposed.

The district court denied intervention of right on the ground that the Schools lacked protectable interests in the Settlement, but that was wrong. As explained above, the Schools have "a property interest that is imperiled by this litigation." *W. Watersheds Project v. Haaland*, 22 F.4th 828, 842 (9th Cir. 2022). They have rights to participate in pending BD adjudications under binding regulations, and interests in safeguarding their reputations and avoiding exposure to recoupment. And the Settlement would revive time-barred BD claims, rendering vested interests in property contingent. The Settlement's unlawful deprivation of those rights warranted intervention of right, and the district court erred in holding otherwise.

67

**CONCLUSION**

The government could have settled this case lawfully. Instead, it awarded Plaintiffs an illegal bonanza and gratuitously maligned non-party schools to make a political statement. When the government violates the law and harms regulated parties, as it has here, courts should hold the government accountable. The final judgment should be reversed and the case dismissed.

Dated: May 4, 2023

Respectfully submitted,

*/s/ Jesse Panuccio*

Jesse Panuccio
Jason Hilborn
BOIES SCHILLER FLEXNER LLP
401 E. Las Olas Blvd., Ste. 1200
Fort Lauderdale, FL  33301
(954) 356-0011
jpanuccio@bsfllp.com

*Counsel for Everglades College, Inc.*

*/s/ John S. Moran*

John S. Moran
MCGUIREWOODS LLP
888 16th St. N.W., Suite 500
Black Lives Matter Plaza
Washington, D.C. 20006
(202) 828-2817
jmoran@mcguirewoods.com

Piper A. Waldron
MCGUIREWOODS LLP
1800 Century Park East, 8th Floor
Los Angeles, CA 90067
(310) 315-8250

*Counsel for American National University*

*/s/ Lucas C. Townsend*

Lucas C. Townsend
Jeffrey Liu
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C.  20036
(202) 887-3731
LTownsend@gibsondunn.com

James L. Zelenay, Jr.
GIBSON, DUNN & CRUTCHER LLP
333 South Grand Avenue
Los Angeles, CA  90071
(213) 229-7449

Katherine Worden
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street
San Francisco, CA   94105
(415) 393-8229

*Counsel for Lincoln Educational Services Corp.*

69

## STATEMENT OF RELATED CASES

Under Ninth Circuit Rule 28-2.6, Appellants state that they are not aware of any related cases pending before this Court.


Date: May 4, 2023                           /s/    *Lucas C. Townsend*
                                            Lucas C. Townsend

## CERTIFICATE OF COMPLIANCE

I certify that under Federal Rule of Appellate Procedure 32(a)(7)(B) and Ninth Circuit Rule 32-2(b), this joint brief submitted by separately represented parties is proportionately spaced, has a typeface of 14 points, and contains 15,395 words, excluding the portions excepted by Federal Rule of Appellate Procedure 32(f), according to the word-count feature of Microsoft Word used to generate this brief.


Date: May 4, 2023                           /s/    *Lucas C. Townsend*
                                                    Lucas C. Townsend

## CERTIFICATE OF SERVICE

I hereby certify that on this 4th day of May 2023, I electronically filed the foregoing brief and attached addendum with the Clerk of Court for the United States Court of Appeals for the Ninth Circuit by using the Court's CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


Date: May 4, 2023                                  /s/    *Lucas C. Townsend*
                                                           Lucas C. Townsend