Nos. 23-15049, 23-15050, 23-15051

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

| | | |
|---|---|---|
| THERESA SWEET, ET AL., | : | On Appeal from the |
|     Plaintiffs-Appellees, | : | United States District Court |
|     & | : | for the Northern District of |
| | : | California |
| EVERGLADES COLLEGE, INC., ET | : | |
| AL., | : | District Court Case No. |
|     Intervenors-Appellants, | : | 3:19-cv-3674 |
| v. | : | |
| | : | |
| MIGUEL CARDONA, ET AL., | : | |
|     Defendants-Appellants. | : | |

---

## BRIEF OF *AMICI CURIAE* OHIO, UTAH, ALABAMA, ALASKA, ARKANSAS, FLORIDA, GEORGIA, IDAHO, INDIANA, KANSAS, KENTUCKY, LOUISIANA, MISSISSIPPI, MONTANA, NORTH DAKOTA, OKLAHOMA, SOUTH CAROLINA, TEXAS, WEST VIRGINIA, AND WYOMING SUPPORTING APPELLANTS

---

SEAN D. REYES
Utah Attorney General

MELISSA HOYOAK
Utah Solicitor General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114
801-538-9600
melissaholyoak@agutah.gov

*Counsel for Amicus Curiae*
 *State of Utah*

DAVE YOST
Ohio Attorney General

BENJAMIN M. FLOWERS*
 *Counsel of Record*
Ohio Solicitor General
JANA M. BOSCH
Deputy Solicitor General
30 E. Broad St., 17th Fl.
Columbus, Ohio 43215
614-466-8980
benjamin.flowers@ohioago.gov

*Counsel for Amicus Curiae*
 *State of Ohio*

*Additional counsel listed alongside signature block*

# **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ............................................................................. ii

STATEMENT OF *AMICI* INTEREST AND SUMMARY OF ARGUMENT ....1

ARGUMENT....................................................................................................3

    I.    The Secretary has no legal authority to do what the settlement requires.  4

    II.    Strategic surrenders permit the executive branch to undermine the Constitution's structural protections. ................................................... 11

        A.    The Constitution and federal statutes limit the executive branch's policymaking power. .......................................................... 11

        B.    Strategic surrenders, including the one in this case, permit a dangerous concentration of power in a single branch. ......................16

    III.    The settlement fails to satisfy Rule 23. ...................................................23

CONCLUSION............................................................................................... 28

ADDITIONAL COUNSEL ............................................................................29

CERTIFICATE OF COMPLIANCE FOR BRIEFS ...........................................30

STATEMENT OF RELATED CASES ............................................................. 31

CERTIFICATE OF SERVICE..........................................................................32

i

# TABLE OF AUTHORITIES

**Cases**                                                                            **Page(s)**

*AMA v. Becerra*,
  141 S. Ct. 2170 (2021) ....................................................... 19

*AMA v. Cochran*,
  141 S. Ct. 1368 (2021) ....................................................18, 19

*Arizona v. City & Cnty. of San Francisco*,
  142 S. Ct. 1926 (2022)................................................ 17, 18, 21, 22

*Arizona v. Mayorkas*,
  143 S. Ct. 478 (2022) ....................................................... 19

*California v. Azar*,
  950 F.3d 1067 (9th Cir. 2020) (*en banc*)............................................. 18

*Chrysler Corp. v. Brown*,
  441 U.S. 281 (1979) ....................................................... 15

*City & Cnty. of San Francisco v. U.S. Citizenship and Immigration Servs.*,
  992 F.3d 742 (9th Cir. 2021) ............................................... 21

*Clinton v. City of New York*,
  524 U.S. 417 (1998)....................................................13, 21

*Cruz v. Dollar Tree Stores, Inc.*,
  No. 07-2050, 2009 U.S. Dist. LEXIS 62817 (N.D. Cal. July 2, 2009) ....................................................... 27

*Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*,
  138 S. Ct. 1061 (2018) ....................................................... 8

*In re Dry Max Pampers Litig.*,
  724 F.3d 713 (6th Cir. 2013) ............................................... 26

*Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*,
  561 U.S. 477 (2010)....................................................... 12

*Hamdan v. Rumsfeld*,
    548 U.S. 557 (2006) ........................................................................ 13

*Huisha-Huisha v. Mayorkas*,
    __ F.Supp.3d __, 2022 WL 16948610 (D.D.C. 2022) ......................20

*Huisha-Huisha v. Mayorkas*,
    27 F.4th 718 (D.C. Cir. 2022) ........................................................20

*Kendall v. United States ex rel. Stokes*,
    37 U.S. 524 (1838) ........................................................................ 13

*Louis v. U.S. Dep't of Lab.*,
    419 F.3d 970 (9th Cir. 2005) ........................................................ 15

*Louisiana v. CDC*,
    603 F.Supp.3d 406 (W.D. La. 2022) ............................................. 19

*Mayor of Baltimore v. Azar*,
    973 F.3d 258 (4th Cir. 2020) (*en banc*) ....................................... 18

*MCI Telecomms. Corp. v. FCC*,
    57 F.3d 1136 (D.C. Cir. 1995) ...................................................... 15

*In re MCP No. 165*,
    20 F.4th 264 (6th Cir. 2021) ..................................................... 3, 22

*Medellin v. Texas*,
    552 U.S. 491 (2008) ................................................................13, 14

*Merck, Sharp & Dohme Corp. v. Albrecht*,
    139 S. Ct. 1668 (2019) ................................................................. 14

*Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*,
    501 U.S. 252 (1991) ..................................................................... 12

*Morrison v. Olson*,
    487 U.S. 654 (1988) ................................................................3, 11

*Mullins v. Direct Digital, LLC*,
    795 F.3d 654 (7th Cir. 2015) ........................................................24

*NFIB v. OSHA*,
    142 S. Ct. 661 (2022) ............................................................... 10, 14, 21

*Noel v. Thrifty Payless, Inc.*,
    445 P.3d 626 (Cal. 2019) ...........................................................24

*Oregon v. Cochran*,
    141 S. Ct. 1369 (2021) ............................................................... 18

*Perez v. Mortg. Bankers Ass'n*,
    575 U.S. 92 (2015) ...........................................................16, 22, 23

*Roes, 1-2 v. SFBSC Mgmt., LLC*,
    944 F.3d 1035 (9th Cir. 2019) ...........................................23

*Shady Grove Orthopedic Assocs., P.A., v. Allstate Ins. Co.*,
    559 U.S. 393 (2010) ...........................................................26

*Sierra Club v. Trump*,
    929 F.3d 670 (9th Cir. 2019) ...........................................12

*United States v. Arthrex, Inc.*,
    141 S. Ct. 1970 (2021) ...........................................................6

*In re Wal-Mart Stores, Inc.*,
    No. 06-02069, 2008 U.S. Dist. LEXIS 109446 (N.D. Cal. May 2, 2008) ...........................................................27

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022) ...........................................................10, 11

*Williams v. Vukovich*,
    720 F.2d 909 (6th Cir. 1983) ...........................................23

*Youngstown Sheet & Tube Co. v. Sawyer*,
    343 U.S. 579 (1952) ............................................................... 12, 13, 21

*Zeisel v. Diamond Foods*,
    No. C 10-01192, 2011 U.S. Dist. LEXIS 113550 (N.D. Cal. Oct. 3, 2011) ...........................................................27

**Statutes, Rules, and Constitutional Provisions**

U.S. Const., art. II, §1 ............................................................. 13

U.S. Const., art. II, §3 ..........................................................13, 14

34 C.F.R. §685.206 ...............................................................5, 6

34 C.F.R. §685.308 ...................................................................6

84 Fed. Reg. 7714-01 (Mar. 4, 2019)......................................... 18

20 U.S.C. §1082 ................................................................ 7, 8, 9

20 U.S.C. §1087..............................................................5, 8, 9, 10

**Other Authorities**

Andrew Kent et al., *Faithful Execution and Article II*, 132 Harv. L. Rev.
   2111 (2019) ......................................................................... 14

Antonin Scalia, "In Praise of the Humdrum" in *The Essential Scalia:*
   *On the Constitution, the Courts, and the Rule of Law* (Sutton &
   Whelan, eds., 2020) ............................................................ 12

*Black's Law Dictionary* (5th ed. 1979) ........................................8

*Black's Law Dictionary* (11th ed. 2019) .....................................8

Brett M. Kavanaugh, *Our Anchor for 225 Years and Counting: The*
   *Enduring Significance of the Precise Text of the Constitution*, 89 Notre
   Dame L. Rev. 1907 (2014)............................................ 14, 17, 21

Evan D. Bernick, *Faithful Execution: Where Administrative Law Meets*
   *the Constitution*, 108 Geo. L.J. 1 (2019) ................................. 14

John F. Manning, *Constitutional Structure and Judicial Deference to*
   *Agency Interpretations of Agency Rules*, 96 Colum. L. Rev. 612 (1996) ............... 15

Josh Blackman, *The Constitutionality of DAPA Part II: Faithfully*
   *Executing the Law*, 19 Tex. Rev. L. & Pol. 213 (2015) ......................... 14

S. Rep. No. 109-14 (2005) ........................................................26

**STATEMENT OF *AMICI* INTEREST AND SUMMARY OF ARGUMENT**

This case involves the Secretary of Education's most recent plan for canceling billions of dollars in student debt. Under that plan, borrowers who accrued debt by attending any of about 150 schools will have their debt forgiven automatically. These borrowers will also receive a refund of amounts they already repaid. *See* 3-ER-580, 582–83. A second group, comprising tens of thousands of borrowers, may seek review of their federally held debt under a novel procedure that all but guarantees their debt will be forgiven. *See* 3-ER-583–85. A third group of borrowers, consisting of "approximately … 206,000 borrowers who attended approximately 4,000 schools," may seek forgiveness through yet another process. 2-ER-58. If their claims are not resolved within thirty-six months, their debt is canceled. 3-ER-587. The upshot is that the Secretary gets all the tools needed to forgive billions of dollars in debt—including debt accrued while earning elite credentials, like medical degrees from Johns Hopkins, law degrees from Harvard, and MBAs from Chicago.

Congress has never empowered the Secretary to adopt such a plan. So the Secretary employed a shortcut using a long-pending class-action case. The class sought to compel the Secretary to more-quickly adjudicate "borrower-defense" applications—applications filed by individuals seeking the forgiveness of federally held debt that borrowers claim to have incurred because of misconduct by the schools

1

they attended. For years, the Secretary defended against these class-action claims. But once the President decided to forgive student debt by executive fiat, the Secretary had a change of heart. Rather than pressing forward, the Secretary agreed to a settlement with the nominally adverse plaintiffs. That settlement showers class members and other borrowers with concessions and handouts beyond what the class members could have dreamt of winning after a trial. It does so by requiring the Secretary to pursue the President's debt-forgiveness goals through the terms outlined above.

In sum, by strategically surrendering the case, the Secretary seized immense power that Congress had never given him. This ill-gotten power enabled the Secretary to pursue the mass forgiveness of student loans, a policy that his principal had long promised but not yet convinced Congress to authorize.

Alas, the Secretary's strategic surrender is nothing new. For years now, the executive branch has collusively settled cases to make policy without having to satisfy constitutionally and congressionally imposed strictures. In essence, the executive branch has discovered a new, extralegal shortcut for making important policies. That ought to be alarming. "Shortcuts in furthering preferred policies, even urgent policies, rarely end well, and they always undermine, sometimes permanently, American vertical and horizontal separation of powers, the true mettle of the U.S.

2

Constitution, the true long-term guardian of liberty." *In re MCP No. 165*, 20 F.4th 264, 269 (6th Cir. 2021) (Sutton, C.J., dissenting from denial of initial hearing *en banc*).

Just so here. The Secretary, rather than fighting a meritless challenge that would not have resulted in mass debt forgiveness *even if* the plaintiffs had prevailed, agreed to a settlement that purported to vest the Secretary with immense new authority beyond the scope of anything Congress ever approved. If an executive branch actor can usurp power in this way, "the concept of a government of separate and coordinate powers no longer has meaning." *Morrison v. Olson*, 487 U.S. 654, 703 (1988) (Scalia, J., dissenting). In hopes of raising the alarm about this threat to our separation of powers, the States are filing this amicus brief under Rule 29(a)(2).

## ARGUMENT

This case presents the question whether the District Court erred by approving a class-action settlement that vested the Secretary of Education with novel power to forgive student debt. It did. Indeed, its errors are too extensive for an *amicus* brief to catalogue. Rather than attempting the impossible, the *amici* States write with more modest goals. First, the *amici* States show that the settlement is a strategic surrender—the Secretary of Education collusively settled this case on terms that enable him to evade limits on his power. Second, the States address the increased

frequency of strategic surrenders and the threat they pose to our constitutional structure. And third, the States demonstrate that the collusive settlement must be rejected because it fails to satisfy the Rule 23's demands concerning class-action settlements.

## I. The Secretary has no legal authority to do what the settlement requires.

The settlement in this case effects a major change in policy. First, it requires the Secretary to cancel—and to refund all past payments relating to—debt held by individuals who attended any of about 150 schools. *See* 3-ER-580, 582–83. Second, it creates a new, expedited process for resolving borrower-defense applications submitted by tens of thousands of other applicants. *See* 3-ER-559, 583–85. The expedited process permits only superficial review that all but guarantees relief; applications cannot be rejected even for insufficient evidence. *See id.*; *see also* Appellants' Joint Opening Brief at 10–11 ("Joint Op.Br."). Finally, the settlement requires the Secretary to employ yet another procedure for adjudicating borrower-defense applications submitted by non-class members who apply for relief after the settlement's execution but before final approval. *See* 3-ER-587–85. The settling parties apparently made "significant" efforts to recruit borrowers to file such applications, increasing the size of the group entitled to relief. 2-ER-273. For many of these borrowers, the process the settlement requires differs from that of a normal borrower-

4

defense proceeding. And the Department has just thirty-six months to resolve these claims. It must cancel borrowers' debt, and refund payments made on that debt, if their applications are not adjudicated within the thirty-six-month timeframe. *See* 3-ER-587.

The Secretary concedes that the federal government cannot enter "a settlement requiring an agency to take action beyond its statutory authority." Defendants-Appellees Response to Emergency Motion for a Stay Pending Appeal at 16 ("Sec. Stay Opp.") (citation omitted). That proves dispositive, because the settlement here requires the Secretary to act illegally.

**1.** Begin by considering the modest scope of the borrower-defense program itself. This program permits borrowers to submit applications asserting that, because of alleged misdeeds by their schools, they should be excused from having to pay back federally held debt. For example, a borrower might allege that he would not have taken on the debt but for the school's misleading statements about the quality of its educational offerings. *See, e.g.*, 34 C.F.R. §685.206(e)(2).

That program is a creature of regulation. Federal law empowers the Department to promulgate "regulations" specifying "which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment." 20 U.S.C. §1087e(h). Using this power, the Department promulgated the regulations

5

that compose the borrower-defense program. When presented with a borrower-defense application, the Department undertakes a fact-finding process in which the school is given an opportunity "to respond and to submit evidence" in its defense. §685.206(e)(10). If the Department verifies the misconduct, it may relieve the borrower of any obligation to pay, and the Department may then recoup the value of the loan from the school directly. *See* §685.308(a).

As this description shows, the borrower-defense program works on a case-by-case basis and affords due process to all interested parties. It does not permit the Secretary to grant the sort of mass cancelation the settlement envisions. Nor does any regulation permit borrower-default applications to be resolved through the expedited, quick-look processes the settlement creates for applications submitted by borrowers who did not attend one of the 150 disfavored institutions.

The Secretary tried to resist this conclusion in his stay-stage briefing, but his "heart [was] plainly not in it." *United States v. Arthrex, Inc.*, 141 S. Ct. 1970, 1982 (2021). He asserted, without any elaboration, "that the Secretary has authority to provide discharges and refunds to borrowers who have made borrower-defense claims." Sec. Stay Opp.16. That is true as far as it goes: the borrower-defense program permits the Secretary to provide discharges and refunds. But the Secretary can provide those discharges and refunds under the borrower-defense program *only*

where permitted to do so by the regulations that compose the program. As just discussed, those regulations do not permit the Secretary to provide the type of relief the settlement requires.

In sum, the borrower-defense regulations do not give the Secretary the power he will wield under the settlement.

**2.** The Secretary has also argued that the Higher Education Act permits him to forgive and issue refunds with respect to *all* the student debt at issue here, and thus permits him to do what the settlement requires. That is incorrect, and egregiously so.

The Higher Education Act applies to multiple types of loans. Relevant here, Part B of the Act governs loans made under the Federal Family Education Loan program. For loans made under Part B, the Secretary may "enforce, pay, compromise, waive, or release any right, title, claim, lien or demand, however acquired." 20 U.S.C. §1082(a)(6). Part D, on the other hand, governs the Federal Direct Loan Program. Part D contains no provision giving the Secretary power analogous to that which is conferred by §1082(a)(6).

The "vast majority" of the loans "at issue here" are "direct loans"—in other words, loans issued under and governed by Part D. 3-ER-303. So even if the Part B provision empowered the Secretary to cancel Part B loans *en masse*, *but see* Joint

Op.Br.25–37, that would not make the settlement here legal. While Congress gave the Secretary authority to "compromise" or "release" rights and claims pertaining to Part B loans, it gave the Secretary no such authority as to Part D loans. The Act "says what it says—or perhaps better put here, does not say what it does not say." *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1069 (2018).

The Secretary fights the text. Specifically, he points to 20 U.S.C. §1087e(a)(1), which says that Part D loans "shall have the same terms, conditions, and benefits … as loans made to borrowers" under Part B. The Secretary says that his power to "compromise, waive, [and] release" rights under §1082(a)(6) is a "term[], condition[], and benefit[]" of Part B loans that must be incorporated into Part D loans. Sec. Stay Opp.17 (quotations omitted).

The Secretary's argument falters because the power that §1082(a)(6) vests in the Secretary is not a "term[], condition[], or benefit[]" of Part B loans. §1087e(a)(1). In the lending context, a "term" is a "contractual stipulation," a "condition" is a "stipulation or prerequisite" in a contract, and a "benefit" is the "advantage or privilege" the agreement confers. *Black's Law Dictionary* 1772, 366, 193 (11th ed. 2019); *see also Black's Law Dictionary* 1318, 265, 143 (5th ed. 1979). The power conferred by §1082(a)(6) is none of these things. To the contrary, §1082(a)(6) confers statutory authority that the Secretary may exercise over Part B

loans *without regard to* the "terms, conditions, and benefits" of Part B loans. And nothing in the Higher Education Act suggests that Part B loans should include the Secretary's §1082(a)(6) power among their terms, conditions, or benefits. No doubt, a borrower may "benefit" from the Secretary's decision to compromise or waive rights under the power §1082(a)(6) confers. But the benefit stems from a combination of statutory authority and administrative discretion—it is not a benefit of the loan itself. Consider an analogy. The President has an unqualified power to pardon federal crimes. Would anyone describe the pardon power as a "term, condition, or benefit" of a plea bargain between a defendant and federal prosecutors? Of course not; the power exists independently of the plea bargain's terms, conditions, and benefits. The same logic applies here.

The Secretary's reading has yet another problem, which is that it results in statutory nonsense. Section 1082(a)(6) empowers the Secretary to waive rights "[i]n the performance of, and with respect to, the functions, powers, and duties vested in him *by this part*." (Emphasis added). The phrase "this part" refers to Part B, meaning that the power conferred is the power to waive rights associated with Part B loans. The language cannot be read to confer powers with respect to any other category of loans. It would make little sense to read §1087e(a)(1) in a way that makes this Part-B-specific power "a term[], condition[], or benefit[]" of Part D loans.

At bare minimum, Congress did not *clearly* empower the Secretary to cancel and refund all Part D loans. The absence of any clear grant of authority implies the absence of authority. "Extraordinary grants of regulatory authority are rarely accomplished through modest words, vague terms, or subtle devices." *West Virginia v. EPA*, 142 S. Ct. 2587, 2609 (2022) (quotation omitted, alteration accepted). "Nor does Congress typically use oblique or elliptical language to empower an agency to make a radical or fundamental change to a statutory scheme." *Id.*

Those principles apply with full force here. The Secretary's interpretation of federal law would vest him with immense power to burden the federal fisc. If the Secretary can wield the combined power to forgive and reimburse *any* Part D loans, then he can wield the same combined power to order the forgiveness and reimbursement of *all* Part D loans for any reason at all, individually or *en masse*. The power to forgive debt *en masse* in this way would qualify as a power "of vast economic and political significance"—precisely the sort of power one would expect Congress to confer clearly if that were what it intended to do. *NFIB v. OSHA*, 142 S. Ct. 661, 665 (2022) (*per curiam*) (quoting *Alabama Ass'n of Realtors v. HHS*, 141 S. Ct. 2485, 2489 (2021) (*per curiam*)). Yet the Secretary identifies nothing clearly conferring such a power. Instead, he argues that §1087e(a)(1), by implication and cross-reference, empowers the Secretary unilaterally to cost the country billions of dollars. To

10

embrace such a reading would contradict the presumption "that 'Congress intends to make major policy decisions itself, not leave those decisions to agencies.'" *West Virginia*, 142 S. Ct. at 2609 (quoting *United States Telecom Ass'n v. FCC*, 855 F.3d 381, 419 (D.C. Cir. 2017) (Kavanaugh, J, dissenting from denial of rehearing *en banc*)).

\*

In sum, the settlement "requir[es]" the Secretary "to take action beyond [his] statutory authority." Sec. Stay Opp.16. The settlement is therefore illegal.

## II.    Strategic surrenders permit the executive branch to undermine the Constitution's structural protections.

Many separation-of-powers cases come to the courts "clad, so to speak, in sheep's clothing"; only "careful and perceptive analysis" reveals the challenged practice's threat to "the equilibrium of power." *Morrison*, 487 U.S. at 699 (Scalia, J., dissenting.) "But this wolf comes as a wolf." *Id.* The Secretary's strategic surrender is no isolated event. To the contrary, it is only the latest instance in which the Department of Justice has collusively resolved a case so as to help the executive branch evade limits on its power.

### A.    The Constitution and federal statutes limit the executive branch's policymaking power.

**1.**  "The structure of our Government as conceived by the Framers of our Constitution disperses the federal power among the three branches—the

Legislative, the Executive, and the Judicial—placing both substantive and procedural limitations on each." *Metro. Wash. Airports Auth. v. Citizens for Abatement of Aircraft Noise, Inc.*, 501 U.S. 252, 272 (1991). This separation of powers "has as its aim the protection of individual rights and liberties—not merely separation for separation's sake." *Sierra Club v. Trump*, 929 F.3d 670, 704 (9th Cir. 2019). The Framers were not Pollyannaish; they understood that government officials could not be trusted to resist the all-too-human urge to exceed their lawful powers. Rather than wishing away this tendency, the Framers harnessed it. They allowed "ambition [to] counteract ambition" by vesting separate powers in each branch and by "giving each branch the necessary constitutional means … to resist encroachments of the others." *Free Enter. Fund v. Pub. Co. Acct. Oversight Bd.*, 561 U.S. 477, 501 (2010) (quotation and brackets omitted).

These means of resistance give rise to a system of "separateness but interdependence." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 635 (1952) (Jackson, J., concurring). No branch can do much without the others, and each branch has ample means of resisting the others' actions. This interdependence "make[s] it impossible for any element of government to obtain unchecked power." Antonin Scalia, "In Praise of the Humdrum" in *The Essential Scalia: On the Constitution, the Courts, and the Rule of Law* 35 (Sutton & Whelan, eds., 2020). The separation of

powers thus protects us from the "threat to liberty" that arises whenever power is concentrated "in the hands of a single branch." *Clinton v. City of New York*, 524 U.S. 417, 450 (1998) (Kennedy, J., concurring).

**2.** The constitutionally defined relationship between the legislative and executive branches is especially pertinent to this case.

The Constitution vests the "executive Power" in the President. U.S. Const., art. II, §1. The executive power includes the power to enforce federal law. *See generally Hamdan v. Rumsfeld*, 548 U.S. 557, 591 (2006) (quotation omitted). The Take Care Clause commands that the President exercise this power as a fiduciary of the American people; he "shall take Care that the Laws be faithfully executed." U.S. Const., art. II, §3; *see also Kendall v. United States ex rel. Stokes*, 37 U.S. 524, 612–13 (1838).

"In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker." *Youngstown*, 343 U.S. at 587; *accord Medellin v. Texas*, 552 U.S. 491, 526–27 (2008). "And the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute." *Youngstown*, 343 U.S. at 587. To the contrary, the "first section of the first article says that 'All legislative Powers herein granted shall be vested in a Congress of the United States.'" *Id.* at 588.

In short, "the power to make the necessary laws is in Congress; the power to execute in the President." *Medellin*, 552 U.S. at 526 (quoting *Hamdan*, 548 U.S. at 591) (brackets omitted). And the President must exercise his power faithfully. *See* U.S. Const., art. II, §3. Faithful execution entails *good-faith* execution. *See* Andrew Kent et al., *Faithful Execution and Article II*, 132 Harv. L. Rev. 2111, 2112 (2019); Josh Blackman, *The Constitutionality of DAPA Part II: Faithfully Executing the Law*, 19 Tex. Rev. L. & Pol. 213, 226, 229 (2015); Evan D. Bernick*, Faithful Execution: Where Administrative Law Meets the Constitution*, 108 Geo. L.J. 1, 34–35 (2019). Good-faith execution of law requires, at bare minimum, "follow[ing] laws regulating the executive branch." Brett M. Kavanaugh*, Our Anchor for 225 Years and Counting: The Enduring Significance of the Precise Text of the Constitution*, 89 Notre Dame L. Rev. 1907, 1911 (2014).

Among the "laws regulating the executive branch," *id.*, are those creating and defining the powers of executive agencies. These agencies "possess only the authority that Congress has provided" them. *NFIB*, 142 S. Ct. at 665. They "literally" have "no power to act … unless and until Congress confers power upon" them. *Merck, Sharp & Dohme Corp. v. Albrecht*, 139 S. Ct. 1668, 1679 (2019) (quotation omitted). Faithful execution requires adhering to these limits.

Along similar lines, even when agencies have the power to act, they must do so through congressionally prescribed means. Often, this requires complying with the Administrative Procedure Act, which governs the manner in which administrative rules are promulgated and rescinded. Compliance is often burdensome, and deliberately so. "In enacting the APA, Congress made a judgment that notions of fairness and informed administrative decisionmaking require that agency decisions be made only after affording interested persons notice and an opportunity to comment." *Chrysler Corp. v. Brown*, 441 U.S. 281, 316 (1979). These requirements slow down the process, and they introduce snares into which agencies can easily walk. *See, e.g.*, *Louis v. U.S. Dep't of Lab.*, 419 F.3d 970, 977 (9th Cir. 2005). But they also improve the decisionmaking process. The notice-and-comment process ensures that every agency has "before it the facts and information relevant to" the problem it aims to address. *MCI Telecomms. Corp. v. FCC*, 57 F.3d 1136, 1141 (D.C. Cir. 1995) (quotation omitted). And, just as the inefficiencies of bicameralism bring a "calming influence" to the legislative process, the APA's mandate to proceed cautiously reduces (in theory) regulators' susceptibility to "momentary passions." *See* John F. Manning, *Constitutional Structure and Judicial Deference to Agency Interpretations of Agency Rules*, 96 Colum. L. Rev. 612, 650 n.180 (1996).

If anything, the rulemaking process should be more burdensome than it is. "Although almost all rulemaking is today accomplished through informal notice and comment, the APA actually contemplated a much more formal process for most rule-making." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 128 n.5 (2015) (Thomas, J., concurring in judgment). "To that end, it provided for elaborate trial-like hearings in which proponents of particular rules would introduce evidence and bear the burden of proof in support of those proposed rules." *Id.* "Today, however, formal rule-making is the Yeti of administrative law. There are isolated sightings of it in the ratemaking context, but elsewhere it proves elusive." *Id.*

### B. Strategic surrenders, including the one in this case, permit a dangerous concentration of power in a single branch.

Strategic surrender—settling, dismissing, or otherwise resolving a case in a way that changes federal policy without resort to congressionally mandated procedures—undermines the structural protections laid out above.

**1.** First consider what the federal government can accomplish through strategic surrender. This case offers a prime example. Through a settlement agreement, the executive branch created a costly debt-forgiveness program that neither Congress, nor any agency proceeding under congressionally approved processes, had ever approved. In essence, the executive branch exercised legislative power—it

made new law, vesting itself with additional powers—through a court-approved agreement with class-action lawyers.

The settlement here is no isolated incident. To the contrary, the executive branch has adopted a pattern and practice of using strategic surrenders to claim new powers and to evade the "laws regulating the executive branch." Kavanaugh, *Our Anchor for 225 Years and Counting*, 89 Notre Dame L. Rev. at 1911. Consider, for example, the Department of Justice's machinations regarding a "regulation known as the Public Charge Rule." *Arizona v. City & Cnty. of San Francisco*, 142 S. Ct. 1926, 1927 (2022) (Roberts, C.J., concurring). President Trump's administration promulgated and defended the rule in suits filed across the country. President Biden's administration hoped to abolish it. That would have taken substantial time, because "a regulation originally promulgated using notice and comment (as the Public Charge Rule was) may only be repealed through notice and comment." *Id.* at 1928. But the Department of Justice found a shortcut: instead of repealing the rule, it would simply dismiss its then-pending appeal of a district-court order "vacating the Rule nationwide." *Id.* And in addition to dismissing its appeal, the Department sought (successfully) to prevent interested parties from intervening to defend the rule. *Id.* This resulted in "rulemaking-by-collective acquiescence"—the Department repealed the Public Charge Rule *not* through the congressionally mandated

notice-and-comment procedures, but instead by acquiescing in an adverse, nation-wide vacatur. *Id.* (quoting *City & Cnty. of San Francisco v. U.S. Citizenship and Immigration Servs.*, 992 F.3d 742, 744 (9th Cir. 2021) (VanDyke, J., dissenting)). And it did all this while at the same time urging the Supreme Court in other cases to hold that nationwide vacaturs are illegal. *Id.*

The Department of Justice took a similar tack with respect to the Trump Administration's Title X rule. *See* 84 Fed. Reg. 7714-01 (Mar. 4, 2019). Under President Trump, the Office of the Solicitor General petitioned for certiorari seeking review of *Mayor of Baltimore v. Azar*, 973 F.3d 258 (4th Cir. 2020) (*en banc*), a Fourth Circuit decision affirming an injunction against the Title X rule in its application to Maryland. At the same time, various parties petitioned for certiorari from a Ninth Circuit decision declining to enjoin the Title X rule. *See California v. Azar*, 950 F.3d 1067 (9th Cir. 2020) (*en banc*). The petitions were still pending when President Biden took office. His administration did not withdraw its petition, and the adverse parties in *California* did not withdraw theirs, either. The Supreme Court agreed to hear the cases. *See AMA v. Cochran*, 141 S. Ct. 1368 (2021); *Oregon v. Cochran*, 141 S. Ct. 1369 (2021); *Cochran v. Mayor of Baltimore*, 141 S. Ct. 1369 (2021).

At that point, various States moved to intervene, fearing that the federal government would not adequately defend the rule before this Court. *See* Motion of Ohio

18

and 18 Other States for Leave to Either Intervene or to Present Oral Argument as *Amici Curiae*, *AMA*, No. 20-429 (U.S. Mar. 8, 2021). The government validated these fears four days later, when it jointly stipulated with every adverse party to the dismissal of all the cases the Supreme Court had just agreed to hear. *See* Joint Stipulation to Dismiss, *AMA*, No. 20-429 (U.S. Mar 12, 2021). The Supreme Court, over three dissents, denied the States' motion to intervene, ending the case. *See AMA v. Becerra*, 141 S. Ct. 2170 (2021). In the end, the Office of the Solicitor General, rather than litigating the case it had just convinced the Supreme Court to hear, entered a collusive settlement with nominally adverse parties. In so doing, it left in place the Fourth Circuit's ruling, effectively repealing the Title X rule in its application to Maryland without having to go through the cumbersome notice-and-comment process.

More recently, the Department of Justice took a similar approach in litigation relating to the so-called "Title 42 policy," which restricted immigration on account of the COVID-19 pandemic. *Arizona v. Mayorkas*, 143 S. Ct. 478, 478 (2022) (order). In early 2022, the Department of Homeland Security issued an order terminating the policy. A district court preliminarily enjoined the termination order on the ground that the agency failed to proceed through notice-and-comment rulemaking. *See Louisiana v. CDC*, 603 F.Supp.3d 406 (W.D. La. 2022). But later, a different district

court vacated and enjoined the Title 42 policy. *Huisha-Huisha v. Mayorkas*, ___ F.Supp.3d ___, 2022 WL 16948610 (D.D.C. 2022). The Department of Justice treated its loss as a win; it recognized that, by acquiescing in the vacatur—more precisely, by appealing without seeking a stay, in hopes the policy would lapse or be repealed before the appeal's resolution—it could ensure the Title 42 policy's immediate repeal without proceeding through notice-and-comment rulemaking.

The agency did all this notwithstanding an earlier D.C. Circuit ruling that reversed (in relevant respects) the same district court's order preliminarily enjoining the very same policy. *See Huisha-Huisha v. Mayorkas*, 27 F.4th 718 (D.C. Cir. 2022). And when other parties attempted to intervene to seek a stay in hopes of forcing Homeland Security to proceed through notice-and-comment rulemaking rather than collective acquiescence, the agency opposed the intervention.

**2.** As these descriptions show, strategic surrender poses a serious threat to our constitutional order. Settlements like the one approved in this case permit executive agencies to exercise what amounts to legislative power since, using these settlements, agencies can assign themselves authority to take actions Congress never approved. And by acquiescing in orders vacating federal rules—by collusively dismissing cases and appeals, for example—the executive branch can change federal policy without proceeding through the rigorous notice-and-comment process that

Congress has required. "Leveraging a single judge's ruling into a mechanism to avoid the public participation in rule changes envisioned by the APA should trouble pretty much everyone." *San Francisco*, 992 F.3d at 749 (VanDyke, J., dissenting).

The effect of strategic surrender is to concentrate power "in the hands of a single branch." *Clinton*, 524 U.S. at 450 (Kennedy, J., concurring). Executive agencies can use these settlements to claim authority that Congress never gave them— this despite the fact that Congress alone has the power to legislate, *Youngstown*, 343 U.S. at 587–88, and despite the fact that executive agencies "possess only the authority that Congress has provided" them. *NFIB*, 142 S. Ct. at 665. Similarly, when agencies make federal policy using the "tactic of 'rulemaking-by-collective-acquiescence,'" *Arizona*, 142 S. Ct. at 1928 (Roberts, C.J, concurring) (quoting *San Francisco*, 992 F.3d at 744 (VanDyke, J., dissenting)), they evade the strictures of administrative law. Allowing the executive to claim those powers unilaterally means giving the executive what amounts to legislative power. And it means allowing executive-branch officials to aid and abet the President's violation of his duty to follow the "laws regulating the executive branch." Kavanaugh, *Our Anchor for 225 Years and Counting*, 89 Notre Dame L. Rev. at 1911.

But the genius of our system is that it gives the other branches, including the judiciary, the power to check executive abuses. In particular, the judiciary has the

tools it needs to thwart strategic surrenders. When the Department of Justice decides to take a fall, courts can and should allow parties injured by strategic surrenders to intervene and defend the challenged policies. *San Francisco*, 992 F.3d at 750–53 (VanDyke, J., dissenting). And when the executive branch attempts to gain new power through a settlement, courts can either refuse to approve the settlement (which is what the District Court should have done in this case) or else vacate the settlement on appeal (which is what this Court, and the Supreme Court if necessary, should do in this case.)

What the courts must not do is acquiesce in this abuse. To date, the courts have done little to mitigate the abuse of strategic surrenders. That is unfortunate. As Chief Judge Sutton recognized in a dissenting opinion the Supreme Court would later vindicate, "[s]hortcuts in furthering preferred policies, even urgent policies, rarely end well, and they always undermine, sometimes permanently," the "separation of powers." *MCP No. 165*, 20 F.4th at 269 (Sutton, C.J., dissenting from denial of initial hearing *en banc*). "The Framers expected Article III judges to" apply "the law as a 'check' on the excesses of both the Legislative and Executive Branches." *Perez*, 575 U.S. at 125 (Thomas, J., concurring). "Article III judges cannot opt out of exercising their check." *Id.* This means that courts, at bare minimum, must not

affirmatively cooperate in "an executive effort to extend a law beyond its meaning." *Id*. The appealed-from order does precisely that. It should be reversed.

## III. The settlement fails to satisfy Rule 23.

The federal government, like every other litigant, must comply with the Rules of Civil Procedure. That poses a problem for the Secretary. Even if strategic surrenders were somehow proper, the collusive settlement in this case relies on an overbroad class that fails to meet the requirements of Rule 23. The approval order should be reversed.

**1.** As an initial matter, the settlement must be rejected because the Secretary lacks authority to effectuate the debt relief program the settlement creates. "Judicial approval of a settlement agreement places the power and prestige of the court behind the compromise struck by the parties. Judicial approval, therefore, may not be obtained for an agreement which is illegal, a product of collusion, or contrary to the public interest." *Williams v. Vukovich*, 720 F.2d 909, 920 (6th Cir. 1983) (citation omitted); *cf. Roes, 1-2 v. SFBSC Mgmt., LLC*, 944 F.3d 1035, 1052 n.16 (9th Cir. 2019) (analyzing settlement on assumption that settlement relief was legal). A class action settlement cannot be used as a vehicle to accomplish that which the Secretary could not do legally outside the litigation.

**2.** The settlement approval must also be rejected because the District Court improperly included Post-Class Applicants (individuals who submit a borrower defense agreement before the final approval date) as part of the class when analyzing the fairness of the settlement.

A clear class definition is critical in assessing the fairness of a proposed settlement and whether the requirements of Rule 23 are satisfied. "A class definition framed in objective terms that make the identification of class members possible promotes due process in at least two ways." *Noel v. Thrifty Payless, Inc.*, 445 P.3d 626, 643 (Cal. 2019) (following *Mullins v. Direct Digital, LLC*, 795 F.3d 654 (7th Cir. 2015)). First, it gives class members notice for assessing the strength of the settlement in deciding whether to object, opt out, or do nothing. *Id.* Second, a clear definition "advances due process by supplying a concrete basis for determining who will and will not be bound by (or benefit from) any judgment." *Id.*

The District Court here certified a class (including for settlement purposes) as:

> All people who borrowed a Direct Loan or FFEL loan to pay for a program of higher education, *who have asserted a borrower defense* to repayment to the U.S. Department of Education, whose borrower defense has not been granted or denied on the merits, and who is not a class member in *Calvillo Manriquez v. DeVos*, No. 17-7106 (N.D. Cal.).

4-ER-821 (emphasis added). The settlement agreement, however, extends relief not just to those who *had* asserted a borrower defense, but to "Post-Class Applicants"— individuals who, by definition, would submit borrower defense applications *after* the settlement agreement's execution but before the "Final Approval Date" (the date the District Court issues final judgment approving the settlement). 3-ER-587.

When intervenors-appellants argued to the court that the Post-Class Applicants could not be part of the Rule 23 analysis, the district court rejected their argument, finding that "the class certification order set no cut-off date for membership, so *the class definition as recited in that order clearly encompasses all of these borrowers*." 1-ER-50 (emphasis added).

But the court's conclusion defies the settlement agreement and the settling parties' intentions. While the class definition did not, as the court observed, contain a specific cutoff date, it did define members as those who *had* asserted a borrower defense, thereby excluding Post-Class Applicants who *had not* yet asserted a borrower defense. More importantly, the settlement agreement specifically separated "Post-Class Applicants" from class members. 3-ER-579, 587. And the settling parties argued to the District Court that the Post-Class Applicants were *not* part of the class and did not release their claims as part of the settlement. 2-ER-267 n.3. Indeed, exclusion of the Post-Class Applicants from the class is consistent with the very

name of this group—*Post-Class* Applicants, or those individuals who sought relief *apart from* the class.

The District Court's error in including the Post-Class Applicants (non-class members) in its Rule 23 analysis requires reversal. "'The fairness of the settlement must be evaluated primarily based on how it compensates class members'—not on whether it provides relief to other people." *In re Dry Max Pampers Litig.*, 724 F.3d 713, 720 (6th Cir. 2013) (quoting *Synfuel Techs., Inc. v. DHL Express (USA), Inc.*, 463 F.3d 646, 654 (7th Cir. 2006)). That is because a class action is a procedural joinder device that combines *real* individuals with *real* claims. *Shady Grove Orthopedic Assocs., P.A., v. Allstate Ins. Co.*, 559 U.S. 393, 408 (2010) (class action is a "species" of joinder). Using class actions as "a 'private attorney general' or other enforcement purpose is illegal." S. Rep. No. 109-14, at 59 (2005). Class counsel is not a regulator in any sense. Certainly class counsel cannot use his position to do the Secretary's bidding and effectuate President Biden's unlawful loan-cancelation program. Thus, in analyzing the fairness of the settlement, the District Court should have excluded the Post-Class Applicants and considered only the relief for class members.

**3.** The District Court's finding that the class definition had no cut-off date is a bug, not a feature. Even if the District Court could properly include the Post-Class Applicants as part of the class, that would mean that the class would include

borrowers who became members *after* notice was delivered—depriving those class members of their Rule 23(e)(5) right to object.  This is why courts often deny certification for proposed classes with no fixed end date.  *See, e.g.*, *Zeisel v. Diamond Foods*, No. C 10-01192, 2011 U.S. Dist. LEXIS 113550, at *5 (N.D. Cal. Oct. 3, 2011); *Cruz v. Dollar Tree Stores, Inc.*, No. 07-2050, 2009 U.S. Dist. LEXIS 62817, at *3–5 (N.D. Cal. July 2, 2009); *In re Wal-Mart Stores, Inc.*, No. 06-02069, 2008 U.S. Dist. LEXIS 109446, at *15–16 (N.D. Cal. May 2, 2008).

The District Court erred by approving the settlement and failing to amend the class definition to include a fixed date of class membership before delivery of notice so that all class members would have an opportunity to object.

## CONCLUSION

The Court should reverse the judgment below.

SEAN D. REYES
Utah Attorney General

MELISSA HOYOAK
Utah Solicitor General
350 N. State Street, Suite 230
P.O. Box 142320
Salt Lake City, UT 84114
801-538-9600
melissaholyoak@agutah.gov

*Counsel for Amicus Curiae*
  *State of Utah*

DAVE YOST
Ohio Attorney General

*/s/ Benjamin M. Flowers*
BENJAMIN M. FLOWERS*
  *\*Counsel of Record*
Ohio Solicitor General
JANA M. BOSCH
Deputy Solicitor General
30 E. Broad St., 17th Fl.
Columbus, Ohio 43215
614-466-8980
benjamin.flowers@ohioago.gov

*Counsel for Amicus Curiae*
  *State of Ohio*

## ADDITIONAL COUNSEL

Steve Marshall
Alabama Attorney General

Treg Taylor
Alaska Attorney General

Tim Griffin
Arkansas Attorney General

Ashley Moody
Florida Attorney General

Christopher M. Carr
Georgia Attorney General

Raúl R. Labrador
Idaho Attorney General

Theodore E. Rokita
Indiana Attorney General

Kris Kobach
Kansas Attorney General

Daniel Cameron
Kentucky Attorney General

Jeff Landry
Louisiana Attorney General

Lynn Fitch
Mississippi Attorney General

Austin Knudsen
Montana Attorney General

Drew H. Wrigley
North Dakota Attorney General

Gentner Drummond
Oklahoma Attorney General

Alan Wilson
South Carolina Attorney General

Ken Paxton
Texas Attorney General

Patrick Morrisey
West Virginia Attorney General

Bridget Hill
Wyoming Attorney General

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## CERTIFICATE OF COMPLIANCE FOR BRIEFS

**9th Cir. Case Number(s)** 23-15049, 23-15050, 23-15051

I am the attorney or self-represented party.

**This brief contains** _____6,068_____ **words,** excluding the items exempted

by Fed. R. App. P. 32(f). The brief's type size and typeface comply with Fed. R. App.

P. 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[X] is an **amicus** brief and complies with the word limit of Fed. R. App. P. 29(a)(5),
Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:
[ ] it is a joint brief submitted by separately represented parties;
[ ] a party or parties are filing a single brief in response to multiple briefs; or
[ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[ ] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** s/ Benjamin M. Flowers _____ **Date** May 9, 2023 _____

30

## STATEMENT OF RELATED CASES

There are no related cases currently pending in this Court.

## CERTIFICATE OF SERVICE

I hereby certify that on May 9, 2023, the foregoing was filed electronically. Notice of this filing will be sent to all parties for whom counsel has entered an appearance by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

/s/ Benjamin M. Flowers
Benjamin M. Flowers
Ohio Solicitor General