Nos. 23-15049, 23-15050, 23-15051 (consolidated)

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

Theresa Sweet, et al.,
*Plaintiffs-Appellants*,
&

Everglades College, Inc., Lincoln Educational Services Corporation, and American
National University
*Intervenors-Appellants*,

v.

Miguel Cardona, et al.,
*Defendants-Appellees*.

On Appeal from the United States District Court
for the Norther District of California
Honorable William Alsup, District Judge

**Brief Of *Amicus Curiae*
Hamilton Lincoln Law Institute
In Support Of Intervenor Appellants
Filed With Consent Of All Parties**

HAMILTON LINCOLN LAW INSTITUTE
Neville S. Hedley
1629 K Street NW, Suite 300
Washington, DC 20006
(312) 342-6008
ned.hedley@hlli.org
*Attorney for* Amicus Curiae
   Hamilton Lincoln Law Institute

**Rule 26.1 Corporate Disclosure Statement**

Hamilton Lincoln Law Institute ("HLLI") is an IRS § 501(c)(3) non-profit corporation incorporated under the laws of Washington, D.C. HLLI does not issue stock and is neither owned by nor is the owner of any other corporate entity, in part or in whole. HLLI is operated by a volunteer board of directors.

# Table of Contents

Rule 26.1 Corporate Disclosure Statement ........................................................ i

Table of Contents ............................................................................................. ii

Table of Authorities ......................................................................................... iii

Interest of Amicus Curiae ................................................................................. 1

Federal Rule of Appellate Procedure 29 Statement ......................................... 1

Summary of Argument ...................................................................................... 2

Argument ........................................................................................................... 4

I.      The district court abused its discretion when it approved a settlement in which the parties ignored established statutory, regulatory and Rule 23 limitations ................................................................................................... 4

     A.      The parties' settlement has no statutory authority. .................................... 7

     B.      The settlement ignores existing borrower-defense regulations and creates a new procedure in violation of APA § 553 ................................. 11

     C.      The parties colluded to avoid Rule 23 certification problems. ................ 14

II.     The settlement undermines Constitutional separation of power limitations. ... 18

Conclusion ....................................................................................................... 25

Certificate of Compliance  Pursuant to 9th Circuit Rule 32-1 for Case Numbers 2315049, -15050, -15051 ............................................................................. 26

Proof of Service ............................................................................................... 27

# Table of Authorities

## Cases

*Addison v. Holly Hill Fruit Prods., Inc.,*
    322 U.S. 607 (1944) ................................................................. 20

*Alcantar v. Hobart Serv.,*
    800 F.3d 1047 (9th Cir. 2015) ............................................... 15

*Amchem Prods., Inc. v. Windsor.,*
    521 U.S. 591 (1997) ................................................................. 18

*Ark. Tchr. Ret. Sys. v. State St. Corp.,*
    25 F.4th 55 (1st Cir. 2022) ...................................................... 1

*Bittner v. United States,*
    143 S. Ct. 713 (2023) .............................................................. 18

*Briseño v. Henderson,*
    998 F.3d 1014 (9th Cir. 2021) ................................................. 6

*Carpenter v. United States,*
    526 F.3d 1237 (9th Cir. 2008) ............................................... 24

*Citizens for a Better Environment v. Gorsuch,*
    718 F.2d 1117 (D.C. Cir. 1983) ............................................. 13

*Clinton v. City of New York,*
    524 U.S. 417 (1998) ................................................................. 20

*Clinton v. Jones,*
    520 U.S. 681 (1997 ) ................................................................ 24

*Cohen v. Viray,*
    622 F.3d 188 (2d Cir. 2010) ................................................... 10

*Competitive Enter. Inst. v. FCC,*
    970 F.3d 372 (D.C. Cir. 2020) ............................................... 1

*Conservative Northwest v. Sherman,*
    715 F.3d 1181 (9th Cir. 2013) ............................................... 13

*Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*,
    138 S. Ct. 1061 (2018) ........................................................................ 10

*Dep't of Homeland Security v. MacLean*,
    574 U.S. 383 (2015) ........................................................................... 10

*Ellis v. Costco Wholesale Corp.*,
    657 F.3d 970 (9th Cir. 2011) ............................................................ 16

*Executive Bus. Media Inc. v. U.S. Dep't of Defense*,
    3 F.3d 759 (4th Cir. 1993) ................................................................ 24

*FDA v. Brown & Williamson Tobacco Corp.*,
    529 U.S. 120 (2000) ........................................................................... 11

*Firefighters Local Union No. 1784 v. Stotts*,
    467 U.S. 561 (1984) ............................................................................. 7

*Gooch v. Life Investors Ins. Co. of Am.*,
    672 F.3d 402 (6th Cir. 2012) ............................................................ 17

*Home Depot U.S.A., Inc. v. Jackson*,
    139 S. Ct. 1742 (2019) ...................................................................... 11

*In re Bluetooth Headset Liab. Litig.*,
    654 F.3d 935 (9th Cir. 2011) .............................................................. 6

*Marshall Field & Co. v. Clark*,
    143 U.S. 649 (1892) ........................................................................... 21

*McKinney-Drobins v. Oreshak*,
    16 F.4th 594 (9th Cir. 2022) ............................................................... 1

*Mt. St. Helens Mining & Recovery Ltd. P'ship v. United States*,
    384 F.3d 721 (9th Cir. 2004) ............................................................ 14

*NLRB v. Wyman-Gordon Co.*,
    394 U.S. 759 (1969) ........................................................................... 19

*Office of Pers. Mgmt. v. Richmond*,
    496 U.S. 414 (1990) ..................................................................... 20, 21

*Pigford v. Glickman*, 394
    206 F.3d 1212 (D.C. Cir. 2000) ................................................................ 6

*Portland GE Co. v. Booneville Power*,
    501 F.3d 1009 (9th Cir. 2007) ................................................................ 18

*United Black Firefighters Ass'n v. Akron*,
    976 F.2d 999 (6th Cir. 1992) ................................................................ 7

*United States v. Colorado*,
    937 F.2d 505 (10th Cir. 1991) ................................................................ 6

*United States v. North Carolina*,
    180 F.3d 574 (4th Cir. 1999) ................................................................ 6

*United States SEC v. Citigroup Global Mkts.*,
    752 F.3d 285 (2d Cir. 2014) ................................................................ 6

*Riffey v. Rauner*,
    910 F.3d 314 (7th Cir. 2017) ................................................................ 17

*Shalala v. Guernsey Mem'l Hosp.*,
    514 U.S. 87 (1995) ................................................................ 18

*Sierra Club, Inc. v. Elec Controls Design, Inc.*,
    909 F.2d 1350 (9th Cir. 1990) ................................................................ 10

*Southeastern Fed. Power Customers, Inc. v. Geren*,
    514 F.3d 1316 (D.C. Cir. 2008) ................................................................ 10, 11

*Sys. Fed'n No. 91, Rwy. Emp. Dep't v. Wright*,
    364 U.S. 642 (1961) ................................................................ 7

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2008) ................................................................ 15, 17

*Wang v. Chinese Daily News*,
    737 F.3d 538 (9th Cir. 2013) ................................................................ 17

*W. Virginia v. EPA*,
    142 S. Ct. 2587 (2022) ................................................................ 23

Rules and Statutes and Constitutional Provisions

U.S. Const. Art. I § 9 .................................................................. 20

U.S. Const. Art. II § 3 ................................................................. 19

Fed. R. Civ. P. 23 .............................................. 4, 5, 6, 14, 18, 23

Fed. R. Civ. P. 23(a) .................................................. 3, 15, 16, 17

Fed. R. Civ. P. 23(a)(2) ............................................................. 15

Fed. R. Civ. P. 23(a)(3) ............................................................. 15

Fed. R. Civ. P. 23(b)(2) ................................................ 7, 14, 15, 16, 17

Fed. R. Civ. P. 23(b)(3) ............................................................. 17

5 U.S.C. § 553 ................................................................... 11, 12

11 U.S.C. § 523(a)(8) ................................................................ 23

20 U.S.C. § 1077(a)(2)(B) .......................................................... 21

20 U.S.C. § 1078-10 .................................................................. 23

20 U.S.C. § 1078-10(c)(3) ........................................................... 23

20 U.S.C. § 1078-11 .................................................................. 23

20 U.S.C. § 1082 ...................................................................... 9

20 U.S.C. § 1082(a)(2) ............................................................ 9, 10

20 U.S.C. § 1082(a)(6) ................................................................. 9

20 U.S.C. § 1083(a)(1) ............................................................... 22

20 U.S.C. § 1087e(a)(1) ........................................................... 9, 10

20 U.S.C. § 1087e(h) ............................................ 7, 8, 12, 18, 23, 24

20 U.S.C. § 1087ee .................................................................. 23

20 U.S.C. § 1087hh .................................................................. 10

20 U.S.C. § 1087hh(2) ................................................................ 9

20 U.S.C. § 1087hh(3) ................................................................ 9

20 U.S.C. § 1098(d) ................................................................ 23

20 U.S.C. Chapter 28, Subchapter IV ................................................ 7

20 U.S.C. Chapter 28, Subchapter IV Part B (§§ 1071 – 1087-4) ..................... 8

20 U.S.C. Chapter 28, Subchapter IV Part D (§§ 1087a – 1087j) .................... 7

20 U.S.C. Chapter 28, Subchapter IV Part E (§§ 1087aa – 1087ii) ................. 8

20 U.S.C. Chapter 28, Subchapter IV Part G (§§ 1088 – 1098h) ..................... 8

20 U.S.C. Chapter 28, Subchapter IV Part G-1 (§§ 1098aa – 1099) ................. 8

31 U.S.C. § 3711(a)(1) ................................................................ 22

31 U.S.C. § 3711(a)(2) ................................................................ 22

31 U.S.C. § 3711(a)(3) ................................................................ 22

31 C.F.R. § 901.1(a) ................................................................ 22

31 C.F.R. § 902.2(a) ................................................................ 22

31 C.F.R. § 902.3(a) ................................................................ 22

34 C.F.R. § 685.207(a)(1) ............................................................ 22

34 C.F.R. § 685.212(k) ................................................................ 8

34 C.F.R. § 685.222 ................................................................ 22

34 C.F.R. § 685.222(c) ................................................................ 12

34 C.F.R. § 685.222(d) ................................................................ 12

<u>Legislative History</u>

H.R. 2034, 117th Cong. § 2 (2021) ................................................ 23

Pub. L. 103-66, § 4021, 107 Stat. 312 (Aug. 10, 1993) ..................................... 23

Pub. L. 109-8, § 220, 119 Stat. 23 (Apr. 20, 2005) ............................................ 23

S. 2235, 116th Cong. § 101 (2019) ..................................................................... 23

Other Authorities

Bernick, Evan, *Faithful Execution: Where Administrative Law Meets the Constitution*,
    108 GEO. L.J. 1 (2019) ............................................................................. 19

Criddle, Evan, *Fiduciary Foundations of Administrative Law*,
    54 U.C.L.A. L. REV. 117 (2006) .......................................................... 19, 20

Gifford, Donald G., *The Constitutional Bounding of Adjudication: A Full(ierian)
    Explanation for The Supreme Court's Mass Tort Jurisprudence*,
    44 ARIZ. ST. L.J. 1109 (2012) ................................................................... 18

Kavanaugh, Brett M., *Our Anchor for 225 Years and Counting: The Enduring
    Significance of the Precise Text of the Constitution*,
    89 NOTRE DAME L. REV. 1907 (2014) ...................................................... 21

Kent, Andrew, et al., *Faithful Execution and Article II*,
    132 HARV. L. REV. 2111 (2019) ............................................................... 19

Nagareda, Richard A., *Class Certification in the Age of Aggregate Proof*,
    84 N.Y.U. L. REV. 97 (2009) ................................................................... 17

Scalia, Antonin and Garner, Bryan, *Reading Law*, (2012) ................................. 11

*The Federalist* No. 47 (Madison) ..................................................................... 21

*The Federalist* No. 48 (Madison) ..................................................................... 21

## Interest of Amicus Curiae

Hamilton Lincoln Law Institute ("HLLI") is a public interest organization dedicated to protecting free markets, free speech, limited government, and separation of powers against regulatory abuse and rent-seeking. The Center for Class Action Fairness ("CCAF") is part of HLLI and its primary mission is to act as a check on abusive class-action litigation. HLLI, which is independent of the parties to this action, litigates subjects particularly relevant to this case, such as protecting against abusive and collusive class-action settlements, *see e.g., McKinney-Drobins v. Oreshack*, 16 F.4th 594, 609 (9th Cir. 2021) (representing objector challenging settlement that was the product of collusion); *Ark. Tchr. Ret. Sys. v. State St. Corp.*, 25 F.4th 55 (1st Cir. 2022) (appearing as amicus at request of court to defend district court's decision imposing sanctions on plaintiffs' counsel for misconduct); and challenging government overreach and regulatory abuse. *See Competitive Enter. Inst. v. FCC*, 970 F.3d 372 (D.C. Cir. 2020) (challenging regulatory action; HLLI was at the time part of CEI).

HLLI files this amicus brief in support of reversal of the district court's decision. Counsel for the parties to this appeal have consented to the filing.

## Federal Rule of Appellate Procedure 29 Statement

Pursuant to Federal Rule of Appellate Procedure 29(a)(4)(E), HLLI affirms that no counsel for a party authored this brief in whole or in part, no party or party's counsel contributed money that was intended to fund preparing or submitting the brief, and no person other than amicus, its members, or its counsel has made any monetary contributions intended to fund the preparation or submission of this brief.

## Summary of Argument

The district court erred when it rejected an earlier settlement in this case, thereby allowing the parties to negotiate a new agreement that amounts to legislation disguised as a judicial settlement. The new settlement transformed what had been a legitimate adversarial lawsuit into a joint effort by the parties to achieve a policy goal—*en masse* student debt relief—that otherwise would have been unattainable in the litigation as originally framed.

Unlike the original complaint and initial settlement, the settlement at issue created three subclasses: Group 1, the Automatic Relief Group, consists of 196,000 borrowers who attended one of the schools listed in Exhibit C of the settlement, and will receive full cancelation of outstanding student debt and complete refunds of amounts paid (3-ER-580, 582-83); Group 2, the Decision Group, will have borrower-defense ("BD") claims reviewed under a "new process" that presumes there is a valid claim on which the Secretary must act on within six to thirty months, thereby all but assuring full debt cancellation and refunds (3-ER-584-85); and Group 3, the "Post-class Applicant Group" who are borrowers that submitted a BD application *after* the execution of the settlement but prior to final approval. 3-ER-587. Group 3 consists of approximately 205,000 borrowers, largely because the parties spent months recruiting borrowers to become members. They too will benefit from a "streamlined" BD process and will be accorded full debt relief and refunds if the Secretary does not act on their applications within thirty-six months. 3-ER-587. No wonder that the district court labeled this settlement a "bonanza" and a "grand slam home run." 1-ER-34, 48.

The parties agreed to an unlawful settlement that: (1) ignores Congress's carefully crafted statutory structure regarding higher education financial assistance; (2) bypasses the statutorily prescribed BD regulations by creating a whole new process that avoided typical APA notice-and-comment requirements; and (3) failing to meet the class certification prerequisites under Rule 23(a) and (b)(2) by adding a new group of class members and incorporating individualized monetary relief for the Group 1 plaintiffs.

The district court abused its discretion when it approved this settlement that, by design, undermines the Constitution's separation of powers protections. In reaching the settlement the Secretary of the Department of Education ("Secretary" and "ED" respectively) disregarded his duty to faithfully follow statutory and regulatory responsibilities and, in doing so, the Secretary infringed on Congress's power of the purse. The current Secretary's management of the litigation stands in stark contrast to his predecessor who attempted to preserve the initial settlement and was committed to follow the procedures in the BD regulations and the terms of the initial settlement. 4-ER-716. Instead of acting as a restraint, the district court condoned this overreach by the Executive branch. Although the district court's aims in approving the settlement may have been laudable given the extreme backlog of claims and perceived resource constraints, 1-ER-39, the settlement violated an array of legal authorities and its approval was an abuse of discretion that cannot stand.

## Argument

I.   **The district court abused its discretion when it approved a settlement in which the parties ignored established statutory, regulatory and Rule 23 limitations.**

The original settlement had all the hallmarks of a typical consent order; it included the injunctive relief that the plaintiffs originally sought and included penalties for failure to act. 4-ER-780-82, 785-87. Had the parties and district court stopped there it is unlikely that this case would be before the Court. But the plaintiffs didn't like the rate at which the Secretary's predecessor was denying claims as it processed the backlog, and apparently neither did the district court.  4-ER-724.

The plaintiffs' original complaint simply sought to compel the Secretary to act on the backlog of BD claims. 4-ER-834, 892-94. To that end, the original settlement simply granted the class members the relief originally sought—action on the backlog of BD claims. It also included enforcement mechanisms if ED failed to act as promised in the settlement agreement. 4-ER-776, 780-787. When the district court learned of the form rejections it blew-up the agreement, stating that there had been no meeting of the minds, and re-opened the case.[1] 4-ER-711, 720. The district court could have responded by requiring ED to justify the denials with "explanatory details under the Department's own regulations, the Administrative Procedures Act, and due process."

---

[1]  The form rejection letters did not amount to a blanket denial of borrower-defense claims by the prior administration. Indeed, even the district court acknowledged that approximately 10% of claims had been resolved on the merits and had not been denied via a form letter. 4-ER-724.

4-ER-716. Indeed, this is what the plaintiffs originally requested. 4-ER-743, 755-69. And the prior administration attempted to preserve the original settlement, asserting that it disagreed with plaintiffs' "view" of agreement, but "would consent to approval of the settlement *as written*." 4-ER-716.

The district court's rejection of the original settlement, however, gave the plaintiffs an opening, and with the change in administration, they seized it by negotiating a revised settlement with a pliant Secretary who was willing to provide relief that far exceeded the relief requested in either the original or amended complaint. 3-ER-560 (noting that it was ED that agreed to extend relief to Group 3). This allowed the Secretary to achieve a political goal—*en masse* student debt relief. 3-ER-563; 2-ER-214, 217.

The revised settlement runs afoul of statutory provisions of the HEA, diverges from the relevant BD regulations while imposing a revised processes to resolve claims from three distinct groups of borrowers, and thereby fails Rule 23 class certification requirements.

Consequently, a simple class action case seeking declaratory relief that initially was resolved by a typical consent order, was transformed into a complete capitulation. The only thing that changed was a new administration that has been outspoken in its commitment to provide broad, blanket student debt relief. 2-ER-214, 227. While the prior Secretary litigated the case within the confines of Rule 23 and the relevant statutes and regulations, the new administration went out its way to facilitate a settlement that the district court labeled a "bonanza."

The district court was dismissive of the objections to the parties' collusion that resulted in the "bonanza" for class members, stating incorrectly that "the purpose of any such [collusion] objection is to protect absent class members from settlements that disproportionately reward named plaintiffs and their counsel at the expense of the class as a whole." 1-ER-52-53. True, collusion in the Rule 23 context typically arises when settling parties fail to adequately account for interests of absent class members, but the prohibition is not so unduly limited.[2] The "fair, reasonable, and adequate" standard of Rule 23 for approving class action settlements is similar to the standard district courts must apply when approving consent orders. But approval of a consent decree or similar settlement requires more. "[B]efore entering a consent decree the court must satisfy itself that the agreement is 'fair, adequate, and reasonable' and 'is not illegal, a product of collusion, or against the public interest.'" *United States v. North Carolina*, 180 F.3d 574, 581 (4th Cir. 1999) (quoting *United States v. Colorado*, 937 F.2d 505, 509 (10th Cir. 1991)); *see also United States SEC v. Citigroup Global Mkts.*, 752 F.3d 285, 295 (2d Cir. 2014) (district court must determine if settlement "is tainted by improper collusion or corruption of some kind"); *Pigford v. Glickman*, 206 F.3d 1212, 1215 (D.C. Cir. 2000) (applying Rule 23(e) to consent decree to determine if "the settlement is fair, adequate,

---

[2] Courts appropriately forbid settling counsel from self-dealing where "class counsel have allowed pursuit of their own self-interests . . . to infect the negotiations," which typically results in disproportionate attorney's fees compared to class relief. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011). Courts sometimes refer to self-dealing interchangeably with "collusion" (*Briseño v. Henderson*, 998 F.3d 1014, 1023 (9th Cir. 2021)), but self-dealing does not require the sort of party coordination evident in this case. At minimum, self-dealing is not the only form of "collusion" proscribed by Rule 23.

and reasonable and is not the product of collusion between the parties"); *United Black Firefighters Ass'n v. Akron*, 976 F.2d 999, 1004 (6th Cir. 1992) (holding in class action civil rights suit that "judicial approval may not be obtained for a consent decree that is illegal or is the product of collusion).

In approving the settlement, the district court had to buy into three distinct legal fictions adopted by the parties to reach the revised settlement. First, the parties determined to resolve BD claims brought under one provision of the HEA, 20 U.S.C. § 1087e(h), by relying upon totally separate HEA provisions unrelated to borrower-defense. Second, the parties purported to settle BD claims by "crafting a new process" rather than adhering to the statutorily mandated regulatory processes that had been vetted through the typical APA notice-and-comment procedures. Finally, the settlement transformed a case that initially sought straight-forward injunctive and declaratory relief under Rule 23(b)(2) into one where individualized monetary claims predominate and declaratory relief is an afterthought. The district court abused its discretion when it adopted these legal fictions.

## A.     The parties' settlement has no statutory authority.

The Supreme Court has not hesitated to set aside any consent decree or settlement that violates the statute under which the relief is granted. *See Firefighters Local Union No. 1784 v. Stotts*, 467 U.S. 561, 576 n.9 (1984); *Sys. Fed'n No. 91, Rwy. Emp. Dep't. v. Wright*, 364 U.S. 642, 652 (1961). Although this case was initially about the borrower-defense statute, the parties applied a tortured interpretation of other HEA provisions to justify the settlement. 2-ER-276-77.

A brief summary of the federal student assistance program of the HEA is necessary. *See* 20 U.S.C. Chapter 28, Subchapter IV. As of July 2010 all new federal student loans have been direct loans under the William D. Ford Direct Loan Program. 20 U.S.C. Chapter 28 Subchapter IV Part D (§§ 1087a – 1087j). Two other relevant federal student loan programs are the Federal Family Education Loan ("FFEL") Program and the Perkins Loan Program. 20 U.S.C. Chapter 28, Subchapter IV, Part B (§§ 1071 – 1087-4) and Part E (§§ 1087aa – 1087ii), respectively. FFEL loans are indirect loans in which a lender such as a commercial bank would fund the loan to the borrower. The loan was then guaranteed by a guaranty agency, typically a state agency or a non-for-profit. If a borrower defaulted on an FFEL loan, the guaranty agency would make whole the private lender for the outstanding balance and would then seek to rehabilitate the loan working with the borrower to resume payments. Perkins loans, which also have been discontinued, are student loans in which the college, rather than a private lender is the intermediary. Each of the financial aid programs are accorded a separate Part within Subchapter IV and each have their own administrative features and requirements. Subchapter IV also includes two Parts that apply across all loan programs: Part G, General Provisions Relating to Student Assistance Programs (§§ 1088 – 1098h); and Part G-1, Higher Education Relief Opportunities for Students (the HEROES Act; §§ 1098aa -1099).

The case and the original settlement concerned BD claims brought pursuant to 20 U.S.C. § 1087e(h). That provision applies to Direct Loans under Part D, and requires the Secretary to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under

this part." FFEL loans not converted to Direct Loans are not eligible for borrower-defense relief, since § 1087e(h) only applies to loans made under Part D, the Direct Loan program. 34 C.F.R. § 685.212(k). The parties conveniently disposed of this requirement with a waive of the hand. Dkt. 337 at 3 (Joint response by parties).

The original settlement provided the injunctive relief plaintiffs sought—compelling ED to act upon BD claims. 4-ER-780-85. The final settlement, however, does not rest upon the borrower-defense statute because it could not provide the "bonanza" relief the collusive settlement grants. Rather, the parties and the district court assert that the statutory basis for the settlement rests upon provision related to FFEL loans, 20 U.S.C § 1082(a)(6). 1-ER-35-38; 2-ER-276-77. That provision is a subsection of a statute listing the legal powers the Secretary has over loans made pursuant to the FFEL program. *See* 20 U.S.C. § 1082 (Legal Powers and Responsibilities). It grants the Secretary the authority to "compromise, waive, or release" a FFEL loan. The parties and the district court, however, through creative interpretation and cherry-picking across different Parts of Subchapter IV, incorporated § 1082(a)(6) into the Direct Loan Program.

To accomplish this the parties leaned on § 1087e(a)(1) which states that the "terms and conditions" of certain categories of FFEL loans apply to Direct Loans. But the legal powers and responsibilities enumerated in § 1082 are not "terms and conditions" of a loan, but rather are "General Powers" assigned to the Secretary and apply only to administration of FFEL loans. Had Congress wanted to incorporate all or part of § 1082 into the Direct Loan Program it would have done so like it did in Part E, the Perkins Loan Program. *See* 20 U.S.C. § 1087hh(3). That section specifically

incorporates by reference § 1082(a)(2). Moreover § 1087hh(2) contains identical "enforce, pay, compromise, waive, or release" language found in § 1082(a)(6). There is no similar language or provision anywhere to be found in Part D. Conversely, there is nothing in Subparts B or E that mention borrower-defense. This is not surprising; the lending contract for a FFEL or Perkins loan is between the student and a third-party, for which the government, as ultimate guarantor, might need to assume legal responsibility. The lending contract for Direct loans is between the borrower and the government.

A statute "says what it says—or perhaps better put here, does not say what it does not say." *Cyan, Inc. v. Beaver Cnty. Emps. Ret. Fund*, 138 S. Ct. 1061, 1069 (2018). The parties' and the district court's tortured reading of § 1087e(a)(1) ignores the compartmentalized statutory structure of Subchapter IV. The rights, responsibilities and administrative features of each of the federal loan programs are mutually exclusive unless otherwise specified like the § 1087hh reference to § 1082(a)(2). In the alternative, had Congress wished to apply the "compromise, waive, or release" to all loan programs it would have included it in Parts G or G-1. Congress did not, but rather only included that language in Parts B and E. "Congress generally acts intentionally when it uses particular language in one section of a statute but omits it in another." *Dep't of Homeland Security v. MacLean*, 574 U.S. 383, 391 (2015).

Hence, "the district court could hardly approve a settlement agreement that violates a statute." *Southeastern Fed Power Customers, Inc. v. Geren*, 514 F.3d 1316, 1321 (D.C. Cir. 2008) (citing *Sierra Club, Inc. v. Elec. Controls Design, Inc.*, 909 F.2d 1350, 1355 (9th Cir. 1990)); *see also Cohen v. Viray*, 622 F.3d 188, 194-95 (2d Cir. 2010) (rejecting

class action settlement that violated one provision of the Sarbanes-Oxley statute). In *Geren* the D.C. Circuit rejected a settlement that violated a statute that limited the Army Corps of Engineer's discretion to alter reservoir water storage and usage to only minor modifications. The court concluded that the settlement was a major operational change requiring Congressional approval per the statute, notwithstanding that the Corps was in a "difficult situation" and was trying to achieve a "creative solution." *Geren*, 514 F.3d at 1325. Similarly, the extreme backlog of BD claims cannot justify a settlement that is not supported by any of the provisions of the HEA the parties or the district court rely upon.

When reading an act like the HEA the relevant provisions must be construed "as a symmetrical and coherent regulatory scheme" that "fit, if possible, all parts into an harmonious whole." *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000). A statute must be read as whole, and the meaning of a particular provision's language depends on context. *Home Depot U.S.A., Inc. v. Jackson*, 139 S. Ct. 1742, 1748 (2019); Antonin Scalia & Bryan Garner, *Reading Law* 167 (2012). Here, the parties' interpretation of the HEA, adopted by the district court, violates the basic cannons of statutory interpretation.

## B. The settlement ignores existing borrower-defense regulations and creates a new procedure in violation of APA § 553.

The district court further abused its discretion when it allowed the parties to modify the BD process. The district court stated that the settlement "has not altered the borrower-defense procedures at all. Those regulations remain in place." 1-ER-41. But the district court undermines this brazen statement by conceding that the

settlement "crafted a process" and that it "streamlined procedures" and incorporated "a presumption of discharge and borrower-friendly procedures" for Groups 2 and 3. 1-ER-41, 50, 34. This "new process" runs roughshod over the existing BD regulations, and unlike the other iterations of the regulations, it bypassed the notice and comment requirements of 5 U.S.C. § 553.

Although the parties and the district court contend that the statutory basis for the settlement is unrelated to § 1087e(h), the settlement essentially re-writes the BD regulations to accomplish a political goal long sought by the current administration. Group 1 bypasses the regulation requiring adjudication and simply is awarded full relief. No decision on the merits; just blanket relief. The settlement modifies the BD process for Groups 2 and 3, but the practical effect of the settlement will be complete relief for those two subclasses because if ED doesn't act on a claim within allotted time, those Groups get the same full relief as Group 1.

A key element of the settlement that highlights the collusion of the parties is the treatment of Exhibit C, the list of schools attended by many the claimants, but not all of them. According to the parties' settlement, there is a presumption that the Exhibit C schools engaged in "substantial misconduct." 3-ER-559, 574. But according to the parties, the settlement "does not constitute a successful or approved borrower-defense claim" even for the borrowers who attended an Exhibit C school. 1-ER-43. This makes no sense. A finding of misconduct is a prerequisite to resolving favorably a BD claim. 34 C.F.R. § 685.222(c) and (d) (borrower may assert successful claim if school breached contract or made substantial misrepresentations). At the same time the parties represented that inclusion on Exhibit C has "no binding or official determination of

misconduct." 1-ER-44; 3-ER-360. By so stipulating the Secretary is essentially precluded from pursuing the schools to recoup losses under the BD regulations. 1-ER-43, 44. This was a transparent attempt by the parties to avoid intervention by the Exhibit C schools. *See Local No. 93*, *Int'l Assoc. of Firefighters v. Cleveland*, 478 U.S. 501, 529 (1986) (stating that "parties who choose to resolve litigation through settlement may not . . . impose duties or obligations on a third party without that party's agreement"). The parties did not want outside parties meddling with their "bonanza" settlement.

The settlement disregards the BD regulations creating a whole new process to resolve claims. Most egregiously, the settlement threw open the door to a whole new set of borrowers, Group 3, who: (1) applied for BD relief after execution of the settlement agreement on June 22, 2022; (2) need not have attended an Exhibit C school; (3) will have their claims reviewed under a streamlined version of the 2016 BD regulations regardless of whether those procedures are applicable to the borrower; and (4) will get full debt relief and refunds if ED fails to act within three years.

The district court gave short shrift to this Court's holding in *Conservation Northwest v. Sherman*, 715 F.3d 1181 (9th Cir. 2013). There this Court held a consent decree improper because it constituted a "substantial and permanent" amendment to an agency rule. That is exactly what transpired here.

The settlement is distinguishable from the *Turtle Island* case relied on by the district court because there the settlement preserved part of a new regulation, while restoring a portion of a prior rule to maintain the status quo. *Turtle Island Restoration Network v. United States DOC*, 672 F.3d 1160, 1168 (9th Cir. 2012). The settlement is also distinguishable from the landmark case of *Citizens for a Better Environment v. Gorsuch*, 718

F.2d 1117 (D.C. Cir. 1983). In that case the D.C. Circuit approved a settlement that simply compelled the EPA to draft a regulatory program that complied with the Clean Water Act. *Id.* at 1126. Here, rather than simply compelling the Secretary to adhere to the statutorily prescribed BD regulations—which is what the original settlement required—the district court joined with the parties to bypass those regulations and create a whole new process for resolving class member claims. The "new process" substantively resolves Group 1's claims (full debt forgiveness and refunds) and pre-ordains full relief for Groups 2 and 3 through revised procedures, presumptions of misconduct, and deadlines for action unlikely to be met. This is particularly shocking with respect to "post-class" Group 3 members. Those 205,000 claimants, who were neither part of the original class or settlement, were simply clever enough to rush to get a seat at the debt-forgiveness feeding frenzy before the doors closed. Now all they have to do is wait for the inevitable three-years of inaction and their debt will be forgiven and will get full refunds. Bonanza indeed! In approving the "new process" for Groups 2 and 3, which still rely to some degree on existing BD procedures, the district court joined with the parties to reach a desired result. But "the APA does not empower the district court to . . . order the agency to reach a particular result." *Mt. St. Helens Mining & Recovery Ltd. P'ship v. United States*, 384 F.3d 721, 728 (9th Cir. 2004).

### C.    The parties colluded to avoid Rule 23 certification problems.

The settlement also runs afoul of Rule 23 because it does not meet basic prerequisites under Rule 23(a). The parties premised the original settlement on a class certification pursuant to Rule 23(b)(2) because the initial relief sought by plaintiffs was

declaratory and injunctive—a demand that ED follow the BD regulations and act on claims that had been submitted. This is what the district court relied upon when it certified the class. 4-ER-808, 819-20.

The district court abused its discretion when it maintained a class certification that it rendered prior to the parties' collusive settlement. 1-ER-48. In doing so, the district court failed to perform the "rigorous analysis" of the Rule 23(a) prerequisites. *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 351 (2011). The parties collusive settlement fundamentally transformed the case from one that had been about alleged agency inaction and which sought declaratory and injunctive relief, into one in which individual monetary claims predominate and also includes a whole new subclass, Group 3. The addition of Group 3 is contrary to the commonality and typicality prerequisites to certification under Rule 23(a)(2) and (3). Likewise, mandating monetary relief to Group 1 runs afoul of Rule 23(b)(2) which was the premise of the initial certification. 4-ER-819-20.

The plaintiffs' initial and revised complaint alleged that ED failed to act on BD claims. The "common contention" of the initial class was the alleged prolonged inaction by ED on their BD claims, and for which they sought uniform declaratory and injunctive relief applicable across the class. 4-ER-893-94. But Group 3 has suffered no "inaction" harm that initially led plaintiffs to file the complaint and was the premise of the initial certification. Group 3 was invited to the debt-relief party after the parties colluded to settle the case. Hence there is no commonality between Group 3 and the other class members. *See Alcantar v. Hobart Serv.*, 800 F.3d 1047, 1053 (9th Cir. 2015)

(holding that party seeking certification must show a common contention capable of class-wide resolution).

Similarly, the addition of Group 3 is contrary to the typicality requirement under Rule 23(a)(3). "The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) (quotations omitted).

The parties attempt to elude the Rule 23(a) problem by framing the lawsuit as one that "challenged all aspects of [ED's] process of adjudicating . . . pending BD applications." 2-ER-277. But Group 3 claims, by definition, could not have been pending prior to settlement; they were invited to the party after the settlement was finalized, and thus are neither typical nor common to Groups 1 and 2. It was and remains impossible for Group 3 to have been harmed by either alleged ED inaction or by any of the BD adjudication procedures, including the ones crafted by the settlement. Hence, the district court abused its discretion when it certified the class and approved the settlement.

Moreover, the relief provided by the new settlement was far from the uniform declaratory relief initially sought by the plaintiffs and precluded certification under Rule 23(b)(2). The new settlement is primarily one about monetary claims, while the injunctive relief is an afterthought. Here the monetary claims at issue involve different amounts to be refunded and canceled depending on the individual borrower. Such "claims for individualized relief" cannot satisfy Rule 23(b)(2) because "the key to the

(b)(2) class is 'the indivisible nature of the injunctive or declaratory remedy warranted—the notion that the conduct is such that it can be enjoined or declared unlawful only as to all of the class members or as to none of them.'" *Dukes*, 564 U.S. at 360 (quoting Richard A. Nagareda, *Class Certification in the Age of Aggregate Proof*, 84 N.Y.U. L. Rev. 97, 132 (2009)).

The settlement carves the class into sub-groups. Arguably, Groups 2 and 3 could still be certified under Rule 23(b)(2) because on its face, the settlement only provides declaratory and injunctive relief—requiring ED to act upon BD claims and render a determination. Individualized monetary claims, however, predominate the relief for Group 1, and as the Court explained, "individualized monetary claims belong in Rule 23(b)(3)." *Dukes*, 564 U.S. at 362; *see also Riffey v. Rauner*, 910 F.3d 314, 318 (7th Cir. 2017) (noting that refunds of improperly collected union fees was an action for individualized damages that would have to satisfy Rule 23(b)(3)); *Wang v. Chinese Daily News*, 737 F.3d 538, 544-45 (9th Cir. 2013) (noting that a court could certify 23(b)(2) class for injunctive relief and a separate class for damages under 23(b)(3)); *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 427-28 (6th Cir. 2012) (approving two-step certification; one overall class seeking declaratory relief and a second, sub-class seeking restitution and damages). Hence, the district court abused its discretion when it maintained its earlier class certification relying on Rule 23(b)(2).

The Secretary was not oblivious to this problem. The government submitted a motion to decertify the class, noting that the requirements of Rule 23(a) and (b)(2) could no longer be satisfied because there was no uniform declaratory relief applicable across the class. 3-ER-499, 510, 520, 526. Simultaneously, it joined with the plaintiffs seeking

preliminary approval of the settlement omitting any reference to Rule 23(a) or (b), notwithstanding that standards for class certification at settlement are "undiluted, even heightened."[3] *Compare,* 3-ER-554, 568, *with Amchem Prods., Inc. v.. Windsor*, 521 U.S. 591, 620 (1997). Rule 23 certification doesn't depend on whether the settlement provides grand societal benefits—that's "a matter fit for legislative consideration." *Id.* at 623. Rule 23 does not countenance "judicial regulatory orders that more closely resemble legislative regulation than they do the outcomes of traditional adjudication." Donald G. Gifford, *The Constitutional Bounding of Adjudication: A Full(ierian) Explanation for the Supreme Court's Mass Tort Jurisprudence*, 44 Ariz. St. L.J. 1109, 1154 (2012).

## II. The settlement undermines Constitutional separation of power limitations.

"It is well settled than an agency is legally bound to respect its own regulations, and commits procedural error if it fails to abide by them." *Portland GE Co. v. Bonneville Power*, 501 F.3d 1009, 1036 (9th Cir. 2007) (citation omitted); *see also Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 110-11 (1995) (holding that agency is bound by the rules it promulgates and cannot circumvent them). The borrower-defense provision, § 1087e(h), is one of the few specified exceptions to Congress's expressed general intent that student loans are to be repaid. Congress delegated this limited authority to the Secretary to forgive student loans, but specifically required that it be done pursuant to regulations. "There is no warrant in law for [an agency] to replace the [APA's] statutory

---

[3] This inconsistency is glaring and courts should be skeptical "when the government (or any litigant) speaks out of both sides of its mouth." *Bittner v. United States*, 143 S. Ct. 713, 722 n.5 (2023).

scheme with a rule-making procedure of its own invention." *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 764 (1969). Here, the Secretary abandoned the regulations and colluded with the plaintiffs to invent a new process not grounded in statutory or regulatory authority in order to achieve a political goal of blanket student debt relief. In doing so the Secretary, in conjunction with the Attorney General, fell short of their Article II duty to "Take Care that the laws be faithfully executed." U.S. Const. Art. II § 3; *see* Evan Bernick, *Faithful Execution: Where Administrative Law Meets the Constitution*, 108 Geo. L.J. 1, 48 (2019) (noting that Take Care clause "does not allow agencies to abdicate their duty to implement the laws enacted by Congress"); Andrew Kent, et al., *Faithful Execution and Article II*, 132 Harv. L. Rev. 2111, 2186-87 (2019).

In negotiating the settlement, the Secretary repeatedly shirked his statutory and regulatory duties, most notably in asserting that FFEL borrowers need not consolidate their loans into direct loans to participate in the settlement, attaching limited significance to Exhibit C such that it provided no basis for recoupment (1-ER-43), only a justification for giving away billions of dollars, and then side-stepping the BD regulatory procedures, agreeing with plaintiffs to craft a whole new process to resolve the claims. 3-ER-554, 577-603. Such manipulative maneuvering and avoidance of legal accountability demonstrates a disregard to faithfully execute laws. *See* Evan Criddle, *Fiduciary Foundations of Administrative Law*, 54 U.C.L.A. L. Rev. 117, 128, 175 (2006). If the original inaction to resolve plaintiffs' BD claims was a breach of statutory and regulatory duties—which was the original impetus of the lawsuit—then it is equally a breach of the Secretary's statutory and regulatory responsibilities to capitulate and agree to a settlement that is outside the statutory and regulatory boundaries. Two wrongs

don't make a right. The settlement permits the Secretary to disregard the statutorily prescribed BD regulations, and play fast and loose with the carefully constructed statutory framework of the HEA, cherry-picking the provisions that appear to facilitate the agreement while ignoring the ones that don't. Carefully crafted statutory and regulatory schemes, such as the financial aid provisions of the HEA, do not vest agency officers with hidden "discretion for administrative relief." *Addison v. Holly Hill Fruit Prods., Inc.*, 322 U.S. 607, 616 (1944). "The federal government's regulatory role in areas ranging from education to natural resources to homeland security is made possible by the public's general acceptance of administrative agencies as fiduciary institutions capable of following legislative directives in good faith, suppressing self-interest, and resisting the distorting pressures of pork-barrel politics." Criddle, *supra* at 147. The Secretary's conduct fell short of that standard when negotiating this settlement.

Not only is the settlement a breach of the Secretary's duty to faithfully execute the law, but more egregiously, it usurps Congress's power of the purse under the Appropriations Clause. U.S. Const. Art. I § 9. Essentially the settlement allows the Secretary to steal Congress's keys to the Treasury and hand them to the plaintiff class, all with the district court's nodding approval.

The Appropriations Clause is intended "to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good, and not according to the individual favor of Government agents or the individual pleas of litigants." *Office of Pers. Mgmt. v. Richmond*, 496 U.S. 414, 428 (1990); *see also Clinton v. City of New York*, 524 U.S. 417, 451 (1998) (Kennedy, J., concurring) ("Money is the instrument of policy and policy affects the lives of citizens. The individual loses liberty

in a real sense if that instrument is not subject to traditional constitutional constraints."). An executive branch agency, whether or its own or acting in concert with private plaintiffs, does not have the authority to avoid the law in favor of its own desired political goal. *Richmond*, 496 U.S. at 435 (J. White, concurring) ("The Executive Branch does not have the dispensing power on its own . . . and should not be granted such a power by judicial authorization." (citation omitted)). The district court should have resisted the parties' usurpation of Congressional power because protecting the power of the purse is "vital to the integrity and maintenance of the system of government ordained by the Constitution." *Marshall Field & Co. v. Clark*, 143 U.S. 649, 692 (1892); *see also The Federalist* No. 48 (Madison) (noting that judicial branch must restrain the executive branch "from passing the limits assigned to it" under the Constitution).

The district court abused its discretion when it approved a settlement that breached the most basic separation of powers tenants. "The accumulation of all powers, legislative, executive, and judiciary, in the very same hands … may justly be pronounced the very definition of tyranny." *The Federalist* No. 47 (Madison). "The primary protection of individual liberty in our constitutional system comes from the separation of powers in the Constitution: the separation of the power to legislate from the power to enforce from the power to adjudicate." Brett M. Kavanaugh, *Our Anchor for 225 Years and Counting The Enduring Significance of the Precise Text of the Constitution*, 89 Notre Dame L. Rev. 1907, 1915 (2014). The parties' settlement blurs those lines of separation, if not outright wipes them away.

Congress has set forth explicit requirements that loans be made available to eligible borrowers with the very clear intention that they be repaid. See 20 U.S.C. §

1077(a)(2)(B) ("[A] loan by an eligible lender shall be insurable by the Secretary . . . [ if it is] evidenced by a note or other written agreement which . . . provides for repayment . . . of the principal amount of the loan in installments over a period of not less than 5 years . . . nor more than 10 years."); 20 U.S.C. § 1083(a)(1) ("Each eligible lender . . . shall provide thorough and accurate loan information . . . to the borrower . . . [including] a statement prominently and clearly displayed and in bold print that the borrower is receiving a loan that must be repaid."). The regulations tied to Direct Loans state that borrowers are expected to repay loans. 34 C.F.R. § 685.207(a)(1) ("A borrower is obligated to repay the full amount of a Direct Loan, including the principal balance, fees, any collection costs . . . and any interest . . . unless the borrower is relieved of the obligation to repay as provided in this part.").

More generally, the Federal Claims Collection Act obligates Executive agencies such as the ED and DOJ to "try to collect a claim of the United States Government for money . . . arising out of the activities of, or referred to, the agency." 31 U.S.C. § 3711(a)(1). An agency must "aggressively collect all debts" arising out of its activities, like issuing federally held student loans. 31 C.F.R. § 901.1(a). Arguably, this would also include an obligation by ED to follow the recoupment procedures in 34 C.F.R. § 685.222, but the settlement intentionally dodges this obligation. The law is also clear that agencies are only delegated limited authority to compromise claims of the Government. See 31 U.S.C. § 3711(a)(2)–(3) (discussing when an agency may compromise a claim of the Government); 31 C.F.R. § 902.2 (same); 31 C.F.R. § 902.3 (explaining that agencies may compromise a Government claim "if the agency's enforcement policy in terms of deterrence and securing compliance . . . will be

adequately served"). In this instance, deterrence is not served as demonstrated by the Secretary permitting Group 3 to participate in the settlement.

When Congress permits the Secretary to cancel student debt for a class of borrowers, it explicitly describes those groups. *E.g.*, 20 U.S.C. §1078-10 (teachers); 20 U.S.C. §1078-10(c)(3) (teachers in mathematics, science, or special education); 20 U.S.C. §1078-11 (service in areas of national need); 20 U.S.C. §1087ee (certain public service); 20 U.S.C. §1098(d) (disabled veterans).

True, BD claimants are a group that Congress saw fit to allow debt forgiveness, but it was a narrowly tailored delegation of authority to the Secretary. A claimant had to satisfy statutorily prescribed regulations to achieve relief and the Secretary may recoup losses from the offending schools. The settlement bypasses those regulations and goes far beyond the limited delegation of authority in § 1087e(h) to achieve mass debt cancelation, something Congress has "conspicuously and repeatedly declined to enact." *W. Virginia v. EPA*, 142 S. Ct. 2587, 2610 (2022); *see, e.g.*, S. 2235, 116th Cong. §101 (2019) (cancelling up to $50,000 of student loan debt for those who make under $100,000) (died without vote after being referred to committee); H.R. 2034, 117th Cong. § 2 (2021) (cancelling the outstanding balance on loans for all borrowers under a certain income cap) (died without vote after being referred to committee). Even after Congress added the borrower-defense provision (Pub. L. 103-66, § 4021, 107 Stat. 312 (Aug. 10, 1993), Congress made it harder, rather than easier, to cancel student-loan debt—for example, making it tougher to discharge federally guaranteed loans in bankruptcy. 11 U.S.C. § 523(a)(8); Pub. L. 109-8 § 220, 119 Stat. 23, 59 (Apr. 20, 2005).

Neither the Secretary nor the Attorney General was authorized to agree to the parties' settlement because it does not comport with the Constitution, the relevant statute and accompanying regulations, or Rule 23. "The Attorney General's authority to settle litigation for its government clients stops at the walls of illegality" and "does not include license to agree to settlement terms that would violate the civil laws governing the agency." *Carpenter v. United States*, 526 F.3d 1237, 1242 (9th Cir. 2008) (quoting *Executive Bus. Media, Inc. v. U.S. Dep't of Defense*, 3 F.3d 759, 761-62 (4th Cir. 1993)).

Instead of attempting to preserve the original settlement which did not run afoul of the Constitution's separation of powers, the district court abused its discretion when it approved the new settlement, thereby undermining the tripartite Federal system that was intended to act as "a self-executing safeguard against encroachment . . . of one branch at the expense of the other." *Clinton v. Jones*, 520 U.S. 681, 699 (1997). The plaintiffs initiated this case as a simple request to resolve BD claims under § 1087e(h). 4-ER-834, 893-94. The parties along with the district court allowed it to morph into something unmoored from the Constitution. Rather than approving the revised settlement, the district court should have been acting as a check on the Executive branch's failure to faithfully take care to follow the narrow statutory delegation contained in § 1087e(h) and not unilaterally appropriate billions of dollars to achieve a political goal. The unfortunate result is a settlement that runs afoul of Constitutional limitations.

## Conclusion

This Court should reverse the decision of the district court.

Dated:  May 10, 2023                    Respectfully submitted,

*/s/ Neville S. Hedley*
Neville S. Hedley
HAMILTON LINCOLN LAW INSTITUTE
1629 K Street NW, Suite 300
Washington, DC 20006
(312) 342-6008
ned.hedley@hlli.org
*Attorney for Amicus Curiae*
  *Hamilton Lincoln Law Institute*

**Certificate of Compliance**
**Pursuant to 9th Circuit Rule 32-1 for Case Numbers 2315049, -15050, -15051**

I certify that: This brief complies with the length limits permitted by Ninth Circuit Rule 32-1. The brief is 6898 words, excluding the portions exempted by Fed. R. App. P. 32(f), if applicable. The brief's type size and type face comply with Fed. R. App. P. 32(a)(5) and (6).

Executed on May 10, 2023.

*/s/ Neville S Hedley*
Neville S. Hedley

**Proof of Service**

I hereby certify that on May 10, 2023, I electronically filed the foregoing with the Clerk of the United States Court of Appeals for the Ninth Circuit using the CM/ECF system, which will provide notification of such filing to all who are ECF-registered filers.


*/s/Neville S. Hedley*
Neville S. Hedley