**Nos. 23-15049, 23-15050, 23-15051 (consolidated)**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

THERESA SWEET et al.,
*Plaintiffs-Appellees*,

v.

EVERGLADES COLLEGE, INC., LINCOLN EDUCATIONAL SERVICES
CORP., and AMERICAN NATIONAL UNIVERSITY,
*Intervenor-Appellants*,

v.

U.S. DEPARTMENT OF EDUCATION, MIGUEL A. CARDONA, in his official
capacity as Secretary of the U.S. Department of Education,
*Defendants-Appellees*

**On Appeal from the United States District Court for the
Northern District of California
Case No. 3:21-mc-80075-WHA, Hon. William Alsup**

**PLAINTIFF-APPELLEES' OPPOSITION BRIEF**

Joseph Jaramillo
HOUSING & ECONOMIC RIGHTS
ADVOCATES
3950 Broadway, Suite 200
Oakland, CA 94611
jjaramillo@heraca.org
Tel.: (510) 271-8443

*Attorneys for Plaintiff-Appellees Theresa
Sweet, Chenelle Archibald, Daniel Deegan,
Samuel Hood, Tresa Apodaca, Alicia Davis,
Jessica Jacobson, and all others similarly
situated*

Rebecca C. Ellis
Rebecca C. Eisenbrey
Eileen M. Connor
PROJECT ON PREDATORY
STUDENT LENDING
769 Centre Street, Suite 166
Jamaica Plain, MA 02130
rellis@ppsl.org
reisenbrey@ppsl.org
econnor@ppsl.org
Tel.: (617) 390-2669

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ........................................................... 1

STATEMENT OF THE ISSUES............................................................... 1

INTRODUCTION ................................................................................... 2

COUNTER-STATEMENT OF THE CASE ............................................ 4

    I.    Borrower Defense to Repayment ............................................ 4

    II.   The *Sweet* Litigation.............................................................. 5

    III.  The Settlement Agreement ..................................................... 9

    IV.  Intervenors' Attempts to Block the Settlement .................... 11

SUMMARY OF THE ARGUMENT ...................................................... 18

STANDARD OF REVIEW .................................................................... 21

ARGUMENT .......................................................................................... 22

    I.    Intervenor-Appellants Lack Standing to Appeal ................. 22

          A.    Appellants Have Not Suffered Any Injury-in-Fact Traceable to the Settlement.............................................. 23

                i.    Appellants' Asserted "Procedural" Rights Either Do Not Exist or Have Not Been Impaired ................................. 23

                ii.   Appellants' Claims of Reputational Harm Are Vague, Conclusory, and Unconnected to the Settlement............ 29

                iii.  Appellants Have No Property Interest at Stake ............. 36

          B.    Appellants' Claimed Injuries Could Not Be Redressed by a Favorable Ruling.................................................... 38

          C.    This Appeal Is Not Justiciable Under *Arizonans for Official English* ..................................................................... 41

i

D.     Appellants' Disagreement With the Intervention Ruling Does Not Create Appellate Jurisdiction.............................................45

II.     Appellants' Other Arguments, Even If Properly Raised, Would Fail .................................................................................................46

       A.     *Biden v. Nebraska* Does Not Apply Here .................................46

       B.     The Class Is Properly Certified.................................................49

           i.     Certification Is Proper Under Rule 23(b)(2). ................50

           ii.     The Class Meets the Requirements of Commonality, Typicality, and Adequacy.............................................54

           iii.     The Class Is Not Overbroad ..........................................56

           iv.     The Settlement Does Not Bind Individuals Outside of the Class.................................................................................57

CONCLUSION ......................................................................................57

# TABLE OF AUTHORITIES

## Cases

*Al Otro Lado, Inc. v. Mayorkas*, No. 3:17-cv-02366, 2022 WL 3135914 (S.D. Cal. Aug. 5, 2022) ........................................................................ 44, 53

*Arizonans for Official English v. Arizona*, 520 U.S. 43 (1997)................. 19, 41, 42

*Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534 (1986) ...............................42

*Biden v. Nebraska*, No. 22-506, slip op. (June 30, 2023)....................... 3, 20, 46-49

*California v. Azar*, 911 F.3d 558 (9th Cir. 2018) ....................................................31

*Campbell v. Facebook, Inc.*, 951 F.3d 1106 (9th Cir. 2020) ............................ 22, 56

*Cholakyan v. Mercedes-Benz USA, LLC*, 281 F.R.D. 534 (C.D. Cal. 2012) ..........51

*Conservation Northwest v. Sherman*, 715 F.3d 1181 (9th Cir. 2013) ............. 25, 52

*Council of Ins. Agents & Brokers v. Molasky-Arman*, 522 F.3d 925 (9th Cir. 2008) ............................................................................................................ 35, 36

*Department of Education v. Brown*, No. 22-535, slip op. (June 30, 2023) ..... passim

*DeVry Univ., Inc. v. Dep't of Educ.*, No. 22-cv-5549 (N.D. Ill. 2022) .................29

*Diamond v. Charles*, 476 U.S. 54 (1986) ..................................................... 4, 21, 46

*Didrickson v. U.S. Dep't of Interior*, 982 F.2d 1332 (9th Cir. 1992)....................21

*Doe #1 v. Trump*, 957 F.3d 1050 (9th Cir. 2020) ..................................................32

*Ellis v. Costco Wholesale Corp.*, 657 F.3d 970 (9th Cir. 2011) ............................55

*Everglades College v. Cardona*, No. 22A867 (U.S. S. Ct. 2023) ............. 17, 18, 40

*Fikre v. FBI*, 35 F.4th 762 (9th Cir. 2022)..............................................................36

*Filazapovich v. Dep't of State*, 560 F. Supp. 3d 203 (D.D.C. 2021).....................43

*Foretich v. United States*, 351 F.3d 1198 (D.C. Cir. 2003)........................ 14, 35, 36

*Fowler v. Guerin*, 899 F.3d 1112 (9th Cir. 2018)............................................ 50, 51

*Hanlon v. Chrysler Corp.*, 150 F.3d 1011 (9th Cir. 1998) .....................................22

*Hanon v. Dataproducts Corp.*, 976 F.2d 497 (9th Cir. 1992) ..................................55

*Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239 (9th Cir. 2013) ................................................................................................. 16, 31

*I.B. by & through Bohannon v. Facebook, Inc.*, 82 F. Supp. 3d 1115 (N.D. Cal. 2015) ..............................................................................................................51

*In re U.S. Dep't of Educ.*, 25 F.4th 692 (9th Cir. 2022) ...........................................8

*Laird v. Tatum*, 408 U.S. 1 (1972) ................................................................... 37, 38

*Local 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. Cleveland*, 478 U.S. 501 (1986) ............................................................................................... 38, 52

*Lujan v. Defenders of Wildlife*, 504 U.S. 555 (1992) ..................................... passim

*McHenry v. Comm'r of Internal Revenue*, 677 F.3d 214 (4th Cir. 2012) ..............36

*Meese v. Keene*, 481 U.S. 465 (1987)............................................................ 35, 36

*Mitchell v. Maurer*, 293 U.S. 237 (1934) ...............................................................42

*Nat'l Indus. v. Republic Nat'l Life Ins. Co.*, 677 F.2d 1258 (9th Cir. 1982)...........17

*Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615 (9th Cir. 1982) ...............................................................................22

*Pacharne v. DHS*, No. 1:21-cv-115, 2021 WL 4497481 (N.D. Miss. Sept. 30, 2021) ......................................................................................................44

*Parsons v. U.S. Dep't of Just.*, 801 F.3d 701 (6th Cir. 2015)................................39

*Paul v. Davis*, 424 U.S. 693 (1976) ......................................................................14

*Pizzuto v. Tewalt*, 997 F.3d 893 (9th Cir. 2021)....................................................44

*Portland General Electric Co. v. Bonneville Power Admin.*, 501 F.3d 1009 (9th Cir. 2007) ................................................................................................ 24, 25

*Przywieczerski v. Blinken*, No. 20-cv-02098, 2021 WL 2385822, at *4 (D.N.J. June 10, 2021) .............................................................................................37

*Rai v. Biden*, No. 21-cv-863, 2021 WL 4439074 (D.D.C. Sept. 27, 2021).............44

*Rosebrock v. Mathis*, 745 F.3d 963 (9th Cir. 2014) ......................................... 43, 45

iv

*Sherman College of Straight Chiropractic v. U.S. Commissioner of Education*, 493 F. Supp. 976 (D.D.C. 1980)........................................................... 32, 33

*Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26 (1976) ...........................22

*Spokeo, Inc. v. Robins*, 578 U.S. 330 (2016) ................................................. 21, 30

*Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370 (1987) .................45

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009)........................................28

*TransUnion LLC v. Ramirez*, 141 S. Ct. 2190 (2021) ......................................30

*United States v. AVX Corp.*, 962 F.2d 108 (1st Cir. 1992)....................................21

*Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011)............................... 22, 50, 53

*West Virginia v. EPA*, 597 U. S., at ___ (slip op.) (2022)  ......................................48

*Wittman v. Personhuballah*, 578 U.S. 539 (2016)...............................................1, 21

## Statutes

5 U.S.C. § 551 *et seq.*..........................................................................................5

5 U.S.C. § 555 ...............................................................................................8, 27

5 U.S.C. § 706 ....................................................................................................8

20 U.S.C. § 1082 ..................................................................................... 3, 23, 48

20 U.S.C. § 1087e ............................................................................. 3, 23, 24, 48

28 U.S.C. § 516 .......................................................................................... 23, 48

28 U.S.C § 519 ........................................................................................... 23, 48

## Regulations

34 C.F.R. § 668.87 ..............................................................................................5

34 C.F.R. § 685.206 ................................................................................... passim

34 C.F.R. § 685.212 .........................................................................................4, 5

34 C.F.R. § 685.222 .......................................................................................5, 50

59 Fed. Reg. 61,664-01 ......................................................................................26

v

81 Fed. Reg. 75,926-01 .................................................................. 26, 27, 29

84 Fed. Reg. 49,788 ........................................................................26

87 Fed. Reg. 65,904 ................................................................... 26, 27

**Other Authorities**

Fed. R. Civ. P. 23 ................................................................... passim

Fernanda Zamudio-Suarez, "Here Are the Programs That Failed the Gainful-Employment Rule," *Chron. of Higher Educ.* (Jan. 9, 2017), https://www.chronicle.com/article/here-are-the-programs-that-failed-the-gainful-employment-rule/ ................................................................33

Press Release, Durbin Warns Illinois Education Professionals to Sound the Alarm on For-Profit Colleges (Apr. 21, 2023), https://www.durbin.senate.gov/newsroom/press-releases/durbin-warns-illinois-education-professionals-to-sound-the-alarm-on-for-profit-colleges ................................................................34

# JURISDICTIONAL STATEMENT

For reasons explained *infra*, this Court lacks jurisdiction over this appeal because Appellants do not have independent Article III standing. *See Wittman v. Personhuballah*, 578 U.S. 539, 543–44 (2016).

# STATEMENT OF THE ISSUES

The issues presented by this appeal are the following:

(1)     Do Appellants have independent Article III standing to maintain this appeal where they have repeatedly failed to show that they have suffered or will suffer any cognizable legal injury from the parties' settlement?

(2)     Do Appellants have any legal basis to challenge a class action settlement that was approved as fair, reasonable, and adequate to the class under Fed. R. Civ. P. 23, where no class member has appealed and where Appellants are not bound by the settlement, have not raised any claims or defenses in the underlying litigation, and were afforded ample opportunity to express their opinions regarding the settlement during the final approval process?

**INTRODUCTION**

The underlying litigation here is, and has always been, between the federal student loan borrowers who constitute the Plaintiff Class ("Plaintiffs") and the U.S. Department of Education ("Department"). Class members submitted applications to the Department to have their student loans canceled based on misconduct by their schools, in a process known as borrower defense to repayment ("BD"). The Department then failed to take action on those applications—in some cases, for up to seven years. Plaintiffs brought this lawsuit to force the Department to issue lawful, timely decisions on their BD applications, alleging that the Department's actions and inactions with respect to the BD process violated the Administrative Procedure Act and the Due Process Clause. It is those claims, by borrowers against the Government, that the Settlement Agreement in this case (the "Settlement") resolves.

This case does not present, and has never presented, any claim by anyone against any educational institution. As such, the Settlement does not bind any educational institutions, nor impose any obligations on them, nor purport to resolve any legal claims by or against them. Yet the three Intervenor-Appellants sought to insert themselves into this litigation to object to the Settlement, claiming that it offended their due process rights and injured their reputations. The district court allowed permissive intervention for the Appellants to advance these arguments. After careful consideration, the court found, correctly, that none had merit, and

2

granted final approval of the Settlement. The matter should end there.

This case also does not present any issue relating to broad-based student loan forgiveness. Appellants assert that the Supreme Court's recent decision in *Biden v. Nebraska*, No. 22-506, slip op. (June 30, 2023), is "dispositive" here, Dkt. 44[1]—even though *Nebraska* concerned a different statute, a different type of administrative action, and a different set of claims than this case does. The Supreme Court did not opine at all on the Secretary of Education's authority to exercise the "settlement and compromise" authority granted to him by the Higher Education Act, 20 U.S.C. § 1082(a)(6), much less on the use of that authority, alongside the Attorney General's distinct settlement authority, to resolve long-running litigation brought by plaintiffs who applied to the Secretary for statutorily authorized relief. If anything, *Nebraska*'s companion case, *Department of Education v. Brown*, No. 22-535, slip op. (June 30, 2023), is the more relevant decision here, as it addressed a situation where the plaintiffs had suffered no injury fairly traceable to the government's conduct—and the Court held unanimously that the plaintiffs lacked standing.

Appellants are now in their *fifth* round of briefing essentially the same set of arguments. Despite having received an astounding amount of judicial process and

---

[1] Unless otherwise noted, all docket citations herein are to the document numbering in Case No. 23-15049.

consumed a vast amount of judicial resources, they still cannot identify any concrete injury to their protectable legal interests that is either traceable to the Settlement or redressable via the relief they seek—even though the Settlement has now been in effect for more than six months. What Appellants offer instead are thinly disguised policy disagreements with the Department's decision to settle this case (and with the administration's decisions with respect to separate, unrelated student loan policies). That is not sufficient to maintain standing to appeal. *See Diamond v. Charles*, 476 U.S. 54, 62 (1986) ("[T]he decision to seek review must be placed in the hands of those who have a direct stake in the outcome," not those "who will use it simply as a vehicle for the vindication of value interests."). And even if Appellants' arguments were properly before this Court, they would fail on the merits. The appeals should be dismissed.

## COUNTER-STATEMENT OF THE CASE

### I. Borrower Defense to Repayment

Under the Higher Education Act (HEA), borrowers of federal student loans may assert a defense to repayment of those loans based on misconduct by the school they attended. *See* 20 U.S.C. § 1087e(h); 34 C.F.R. §§ 685.206, 685.212. If the Department approves a borrower's BD application, it will discharge all or part of the remaining balance of the applicant's relevant federal student loans, and under certain circumstances will refund payments on those loans that the borrower previously

4

made to the Department. *See* 34 C.F.R. § 685.206(c)(1), (e)(12); *id.* § 685.222(i).

Although borrower defense rests on allegations of a school's misconduct, the Department's decision to grant a BD application does not impose liability on the school—it merely discharges the borrower's obligation to the government. *Id.* § 685.212(k). If the Department wishes to recoup any losses from a school that it believes committed misconduct, it must bring a separate proceeding against that school. *Id.* § 668.87(a)-(b). That proceeding affords the school several rights, including a right to notice of the "facts and law" upon which the Department relies, an opportunity to respond, and a hearing. *Id.*

Borrower defense has existed since the mid-1990s, but it was little used until 2015, when the Department faced an unprecedented influx of applications following the collapse of Corinthian Colleges, ITT Technical Institute, and other large for-profit chains. *See* ER-30. Then, despite a growing backlog of unresolved applications, the BD process came to an unlawful standstill in February 2017. *See* ER-31. It would remain there for the better part of five years.

## II. The *Sweet* Litigation

Plaintiffs initiated this suit in June 2019. *See generally* ER-834. In their complaint, Plaintiffs alleged that the Department's failure to adjudicate BD applications constituted agency action unlawfully withheld or unreasonably delayed under the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq. See* ER-890.

5

On October 30, 2019, the district court certified a class of, *inter alia*, "[a]ll people who borrowed a Direct Loan or FFEL loan to pay for a program of higher education, who have asserted a borrower defense to repayment to the U.S. Department of Education, whose borrower defense has not been granted or denied on the merits." ER-821.

On April 7, 2020, after Plaintiffs and the Department had briefed and argued motions for summary judgment, the parties executed their first attempt at a settlement agreement. Under this agreement, the Department would decide all pending BD claims within 18 months of final approval, and if it failed to meet that deadline it would discharge certain percentages of applicants' loans. ER-773–774. The district court granted preliminary approval on May 22, 2020. ER-772. Soon afterward, however, Plaintiffs' counsel became aware that increasing numbers of class members were receiving *pro forma* notices that denied their BD applications without any specific explanation of the reasons for the denial or the evidence on which the Department had relied (the "Form Denial Notices"). *See* ER-715–716. Upon questioning from the district court, the Department admitted that it had denied 94.4% of the applications from class members that it had considered over the previous nine months. *Id.* The parties disputed whether the Form Denial Notices were legally adequate and whether they violated the proposed settlement agreement. *See* ER-755–770.

6

The district court denied final approval of the settlement on October 19, 2020, finding that, given the parties' differing understandings of what the agreement required, there had been "no meeting of the minds." ER-720. Moreover, the court emphasized that class members were "entitled to a comprehensible answer" on their BD applications—yet instead they faced a "path forward [that] rings disturbingly Kafkaesque." ER-716, 718. The Department, the court found, had defended its long delay in processing BD applications based on the time and effort required to do so, only to turn around and "issu[e] perfunctory denial notices utterly devoid of meaningful explanation at a blistering pace"—including to borrowers who plainly met the standard for borrower defense. ER-724–725. Given this "strong showing of agency pretext," the court ordered the parties to conduct extra-record discovery to find out "what is really going on."[2] ER-725.

Based on materials adduced in discovery,[3] Plaintiffs filed a Supplemental

---

[2] The court also ordered the parties to show cause why the Form Denial Notices should not be enjoined. ER-725. In response, the Department agreed not to issue any more form denials—or to collect on the loans of borrowers who had received such denials—until the lawsuit concluded. *See* Plaintiffs' Supplemental Excerpts of Record ("PSER") at 2–3.

[3] During discovery, Plaintiffs sought to depose former Secretary of Education Elisabeth DeVos. The Department and private counsel for Ms. DeVos (the latter of whom included counsel for Appellant Everglades here) challenged Plaintiffs' deposition subpoena in two district courts and two Circuit Courts of Appeals over the course of a year, between February 2021 and February 2022. This Court

Complaint in May 2021 that significantly expanded the scope of the case. *See generally* ER-622–700. Plaintiffs alleged that the Department had adopted an unlawful "presumption of denial" policy for BD applications and issued thousands of unlawful Form Denial Notices pursuant to this policy, in violation of sections 706(2) and 555(e) of the APA and the Due Process Clause of the U.S. Constitution. *See* ER-695–697. In short, Plaintiffs alleged that the Department had implemented numerous policies that ensured the vast majority of BD applications would be summarily denied. *See generally* ER-636–667. For example, application reviewers were empowered to deny, but not approve, applications; they were given only minutes to review each one; and they were not permitted to credit borrowers' sworn statements, even where these statements were corroborated by other borrowers— sometimes hundreds of them. *See* ER-637–638, 640. The Department routinely denied applications even where the agency itself had—in non-BD-related proceedings—already concluded that the borrower's school committed misconduct. *See, e.g.*, ER-650–651, 654–656, 724.

———————————

ultimately issued a writ of mandamus that overturned the district court's order allowing Plaintiffs to take a three-hour deposition of Ms. DeVos. *See In re U.S. Dep't of Educ.*, 25 F.4th 692 (9th Cir. 2022). This process proceeded parallel to other events in the litigation, including the filing of Plaintiffs' supplemental complaint and the resolution of other discovery disputes. Appellants incorrectly describe this course of events as "seventeen months focused solely on" the former Secretary's efforts to avoid being deposed. Appellants' Opening Br. ("AOB") 8.

In the summer of 2021, after a change in presidential administrations, the Department began issuing some BD discharges, primarily to students from Corinthian Colleges and ITT Tech (the two school groups that had led to the influx of applications six years earlier). *See* PSER-18–19. These discharges, however, represented only a small fraction of the BD application backlog: as Plaintiffs explained in a February 2022 status update to the district court, over 86% of the backlog remained pending at that time, and more applications were arriving every day. PSER-19. Moreover, these discharges were strictly cabined to specific time periods and types of misstatements, did not address the Form Denial Notices, and did not set out any timeline or process for when the Department might issue any further decisions. PSER-19–20. In June 2022, Plaintiffs again moved for summary judgment, and sought an order to show cause why—given the Department's long delays and bad faith—each and every class member's BD application should not be granted immediately. See Government's Supplemental Excerpts of Record ("GovSER") at 73–77.

## III.    The Settlement Agreement

While Plaintiffs' second summary judgment motion was pending, the parties signed the Settlement Agreement at issue in these appeals. The parties moved for preliminary approval on June 22, 2022. *See* ER-554, 577. The Settlement—the

9

product of months of arms-length negotiations[4]—provides relief to three groups of people. The first group, the "automatic discharge group," is most relevant to these appeals. It consists of class members whose federal student loans relate to one (or more) of 151 schools listed in an attachment to the Settlement, referred to in the litigation as "Exhibit C." Class members who borrowed federal loans for the cost of attendance at these schools receive automatic relief under the Settlement, consisting of discharges of their relevant federal loans, refunds of amounts paid to the Department, and credit repair. *See* ER-580, 582, 612.

As the parties explained to the district court, "indicia of misconduct" at these schools, along with a high volume of BD applications from their former students, "led the Department to conclude that these Class Members were entitled to summary settlement relief without any further time-consuming individualized review process." ER-5. The Department has consistently stated (including under oath), and the district court found, that this conclusion does not lead to any regulatory consequences for the schools on the list: the Settlement will not, and indeed cannot, serve as a basis for the Department to seek recoupment or pursue any enforcement

---

[4] Appellants feign shock that the parties conducted their settlement negotiations confidentially, *see* AOB 1, 13, and that the Department took a different position in its adversarial briefing than it did in the Settlement Agreement, *see id.* at 9, 24. These are, of course, routine occurrences in litigation.

action against the schools. *See* ER-12–14, 44, 399–400; *see also infra* Part I.A.i. The Appellants' schools are included on the Exhibit C list.

The second settlement group (the "decision group") consists of class members whose loans do not relate to an Exhibit C school. Those class members will receive individual adjudication of their applications within specified periods of time depending on how long the application has been pending, and that review will be "streamlined" by applying certain presumptions in the applicant's favor. *See* ER-33. Both the automatic discharge group and the decision group consist of BD applicants who applied for borrower defense on or before the date the Settlement was executed; the third group (the "post-class applicant group") consists of those who filed BD applications between the date the Settlement was executed and the date of final approval. Post-class applicants will receive a decision on their applications within three years of the Settlement's effective date. *Id.* For both the decision group and the post-class applicant group, if the Department does not meet the Settlement's deadlines, the applicant will receive full settlement relief. ER-33–34.

## IV.    Intervenors' Attempts to Block the Settlement

Three weeks after the parties moved for preliminary approval, four educational institutions—including the three Appellants here—moved to intervene in the litigation. *See* ER-434, 463. They argued, in effect, that they had an interest in the case because they were named on Exhibit C, and that this asserted interest was

11

powerful enough to justify rejecting the Settlement.

At a hearing on August 4, 2022, the district court granted preliminary approval from the bench. ER-329, 337. The court explained that it might allow the putative intervenors to "oppose the settlement," ER-338, but the court was "not saying that any . . . intervenors have a property interest that's at stake," ER-341. Rather, the court was "inclined to let [intervenors] in . . . to keep the system honest" by "help[ing] [the court] see the opposing arguments." *Id.* The court requested, and received, assurance from counsel for all three of the Appellants that they did not need discovery in order to oppose the Settlement. ER-338–340; *see id.* at 340:10-12 ("THE COURT: . . . But are you going to go up on appeal and say 'He wouldn't let us have discovery?' MR. TOWNSEND: We can oppose without discovery."); ER-55 ("To be clear, intervenors have explicitly disclaimed . . . any further discovery in this litigation.").

On August 31, 2022, the court denied Appellants' motions to intervene as of right, but allowed them permissive intervention "for the sole and express purpose of objecting to and opposing the class action settlement." ER-55. Appellants did oppose final approval of the Settlement, *see* ER-91, 123, 176, and were heard at the fairness hearing, *see* PSER-104–139. The class, meanwhile, overwhelmingly supported the Settlement: the district court received over a thousand comments in favor of it and

less than 175 requesting changes to it,[5] out of approximately 264,000 class members. *See* ER-51.

On November 16, 2022, the district court granted final approval of the Settlement. ER-29. The final approval order addressed each of the arguments Appellants had raised—the same arguments they raise in these appeals—and explained in detail why those arguments did not prevail. *See generally* ER-34–50. In particular, the court held that the Settlement did not abrogate any of the schools' "procedural rights, nor has their status been altered." ER-44. The court explained that the Settlement resolves borrowers' claims *against the government*—it does "not impose any liability whatsoever on intervenors." ER-42. If the government wanted to bring recoupment claims against the schools, it would have to do so in separate proceedings, in which the schools would be "free to litigate *ab initio* the merits" of their conduct. ER-43. And the Department had made clear that inclusion on Exhibit C "does not constitute evidence that could or would be considered in" such an action. ER-44. The schools, therefore, retain "all of [their] due process protections." ER-43. In other words, "[n]o liberty or property interest" of the schools "has been

---

[5] As the district court explained, none of these comments constituted "meaningful objections to the settlement as a whole"; rather, they were "request[s] [for] further relief," such as adding more schools to Exhibit C or providing automatic discharge for post-class applicants. ER-51–52.

disturbed." ER-44.

To the extent Appellants argued that freestanding reputational harm to them was sufficient reason to reject the Settlement, the court explained that that argument was foreclosed by the Supreme Court's decision in *Paul v. Davis*, 424 U.S. 693 (1976), which held that "reputation alone, apart from some more tangible" liberty or property interest, is insufficient "to invoke the procedural protection of the Due Process Clause." ER-43 (quoting *Davis*, 424 U.S. at 701). Moreover, neither the Settlement itself nor any statement the Department had made in the litigation constituted a "binding or official determination of misconduct." ER-44 (comparing *Foretich v. United States*, 351 F.3d 1198, 1212–13 (D.C. Cir. 2003)).

The district court also held that the Secretary had authority to settle the class's claims against the government. ER-34. The Settlement, the court emphasized, has nothing to do with the "loan forgiveness plan [then] recently announced by President Biden." *Id.* Rather, it is rooted in the Attorney General's authority to settle claims, and the Department's statutory authority to discharge loans—authority the Department has exercised routinely across administrations. ER-36. If each borrower had sued the Department individually, the court explained, "the Department could have settled those individual actions one by one, and it could have done so using precisely the same criteria." ER-39. There was thus no reason, the court held, that the Department could not settle these claims as a group as part of this class action—

14

especially because, otherwise, the record showed that the Department likely would not clear the BD backlog for over twenty-five years. *See id.*

The court dismissed as a "strawman" the Appellants' argument that construing the Secretary's authority as encompassing the power to settle claims after litigation would somehow necessarily allow the Secretary to unilaterally discharge every student loan in America. ER-38. The authority to take the ordinary step of discharging loans in response to specific claims, the court explained, is nothing like a program of broad-based loan cancellation. *Id.* A ruling on the former simply does not implicate the latter. *See id.*

After concluding that the Settlement was "fair, reasonable, and adequate" to the class, the district court granted final approval. ER-48, 53. No class member appealed the final approval order. But on January 13, 2023—the final business day before the appeal deadline—the Appellants filed notices of appeal, along with a motion to stay the judgment pending appeal. *See* ER-6. Their motion raised arguments substantively identical to the ones in their briefs opposing final approval. *See* ER-23.

Following full briefing and argument, the district court denied Appellants' motion to stay on February 24, 2023, finding primarily that Appellants had failed to demonstrate that they would suffer irreparable injury if the Settlement were to take effect pending appeal. *See* ER-12–22. Regarding Appellants' allegations of

15

"regulatory" harm, the court reiterated its findings from the final approval order that Appellants' procedural rights were not impaired by the Settlement. ER-13. As to alleged reputational harm, the court concluded that, despite multiple opportunities to provide substantiation, "movants' assertions of reputational harm remain markedly speculative, 'grounded in platitudes rather than evidence.'" ER-16 (quoting *Herb Reed Enters., LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013)). Indeed, the court was "at a loss to identify an injury to movants arising from this settlement agreement (that they were not a party to) resolving this litigation (that did not involve them)." ER-23.

Though the failure to demonstrate irreparable injury was fatal to Appellants' stay motion, the district court nonetheless addressed Appellants' argument that they were likely to succeed on the merits of their appeals. While noting that the final approval order had already "attended to every legal argument that movants have repeated in their stay motion," ER-23, the court explained it would "not revisit these arguments because what tips the scales for this factor is a different issue—and a threshold one." *Id.* Namely, the court found it likely that Appellants lacked Article III standing to maintain an appeal, because they "have not identified an injury in fact, a 'legally protected interest' they have that the settlement affects in a sufficiently 'concrete and particularized' way." *Id.* (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)).

16

The court thus denied Appellants' motion and permitted the Department to begin effectuating settlement relief for the vast majority of the class. ER-26. As to Appellants' former students, the court granted a seven-day administrative stay of relief to give Appellants time to file a motion to stay in this Court.

Appellants filed such a motion on February 27, 2023, again repeating the same arguments they had made twice before in the district court. *See* Dkt. 13. Plaintiffs and the Department opposed, *see* Dkts. 14, 15, and Plaintiffs cross-moved for dismissal of the appeals for lack of jurisdiction, on the basis that Appellants lacked Article III standing, *see* Dkt. 15 at 13-21. On March 29, 2023, a panel of this Court denied Appellants' motion, finding that "Appellants fail to demonstrate a sufficient probability of irreparable harm to warrant a stay." Dkt. 19 at 3. The Court also denied Plaintiffs' cross-motion to dismiss, "without prejudice to renewing the arguments in the answering brief." *Id.* (citing *Nat'l Indus. v. Republic Nat'l Life Ins. Co.*, 677 F.2d 1258, 1262 (9th Cir. 1982)).

On April 4, 2023, Appellants sought a stay of the final approval order, or in the alternative a grant of certiorari before judgment, from the U.S. Supreme Court. *See Everglades College v. Cardona*, No. 22A867 (U.S. S. Ct. Apr. 4, 2023). Once again, Plaintiffs and the Department opposed, and on April 13, 2023, the full Court denied the application without opinion. *See* Order List: 598 U.S., Order in Pending Case 22A867 (Apr. 13, 2023).

17

While Appellants pursue these appeals, class members are receiving settlement relief. The district court determined that the effective date of the Settlement Agreement was January 28, 2023. ER-12. Accordingly, as required by the Settlement, the Department sent notice of relief to all class members in the automatic discharge group within 30 days of that date, and it notified federal loan servicers to begin the process of issuing discharges and refunds for these class members. As of May 30, 2023 (the last date for which Plaintiffs have data), approximately 106,000 class members had received discharges of their loans. This number includes at least 400 of Appellants' former students. *See* Federal Respondents' Opposition to Application to Stay at 16, *Everglades College v. Cardona*, No. 22A867 (Apr. 12, 2023).

## SUMMARY OF THE ARGUMENT

These appeals should be dismissed for lack of jurisdiction, because Appellants lack Article III standing. In the alternative, the district court's judgment should be affirmed.

**I.** Appellants have not experienced any cognizable legal injury as a result of the Settlement.

**A.** Appellants fail to establish any injury-in-fact traceable to the Settlement.

**i.** Appellants' asserted "administrative rights" either do not exist or have not actually been impaired. The BD regulations do not create any protectable interest on

18

behalf of schools in the adjudication process, and an alleged violation of a procedural right *in vacuo* is not sufficient for standing.

**ii.** Appellants' claims of reputational harm are vague, conclusory, and unconnected to the Settlement. They do not even identify any false or misleading statement, let alone negative material consequences flowing therefrom.

**iii.** Appellants have no property interest at stake in this case. They merely repeat the same allegations they cite for the proposition that they have suffered reputational harm—and for reasons explained, those allegations fall short in multiple respects.

**B.** Appellants also fail to satisfy the separate Article III requirement of redressability. Although Appellants claim that their harm stems from being included on Exhibit C, the relief they seek (reversing the final approval order) would not change what Exhibit C says, nor any of the Department's conclusions underlying it.

**C.** This appeal is not justiciable under *Arizonans for Official English v. Arizona*, 520 U.S. 43 (1997). Appellants proffer a fatally overbroad reading of that case. And regardless, the district court correctly concluded that this case is not moot.

**D.** Appellants cannot overcome their lack of standing by challenging the district court's decision to deny them intervention as of right. Such a decision is appealable only where a permissive intervention order materially limited an intervenor's participation—which the court's order in this case did not.

19

**II.** Appellants' other arguments, even if properly raised, would fail.

**A.** *Biden v. Nebraska* is not relevant here, let alone dispositive. *Nebraska* concerns the Secretary's statutory authority under the HEROES Act; it does not interpret any provisions of the HEA, the statute underlying this Settlement.

**B.** Appellants, as non–class members, have no basis to challenge the district court's decision to grant class certification under Rule 23(b). Nonetheless, their arguments as to why class certification was improper would fail on the merits.

**i.** Certification under Rule 23(b)(2) was appropriate. The monetary aspect of the Settlement is the natural result of unwinding the federal student loans over which class members asserted their defenses to repayment. This does not transform this case into one for "monetary damages."

**ii.** Plaintiffs satisfy the Rule 23(a) requirements of commonality, typicality, and adequacy. The structure of the Settlement is designed to work as a whole; the district court correctly found that the distinction between relief groups is logical, reasonable, and equitable.

**iii.** The class is not overbroad, and all class members have standing. All class members were affected by the Department's allegedly unlawful policies, regardless of when their BD claims were filed.

**iv.** The Settlement does not bind individuals outside the class.

20

**STANDARD OF REVIEW**

An intervenor who appeals a final judgment when neither of the original parties below have appealed must demonstrate independent Article III standing to maintain that appeal. *See Wittman v. Personhuballah*, 578 U.S. 539, 543–44 (2016); *Diamond v. Charles*, 476 U.S. 54, 68 (1986). The appellate court must make this jurisdictional determination in the first instance, as "[a]n interest strong enough to permit intervention is not necessarily a sufficient basis to pursue an appeal abandoned by the other parties." *Didrickson v. U.S. Dep't of Interior*, 982 F.2d 1332, 1338 (9th Cir. 1992). "The burden of adducing facts necessary to support standing rests squarely with the party seeking to avail itself of federal jurisdiction," including when that party is "an intervenor who proposes to prosecute an appeal singlehandedly." *United States v. AVX Corp.*, 962 F.2d 108, 114 (1st Cir. 1992) (citing *Diamond*, 476 U.S. at 68).

The familiar "irreducible constitutional minimum" of standing consists of three elements: the party "must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016) (quoting *Lujan*, 504 U.S. at 560–61). An "injury in fact" consists of "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560

21

(cleaned up). To satisfy redressability, "it must be 'likely,' as opposed to merely 'speculative,'" that a favorable decision from the court will ameliorate the alleged injury. *Id.* (quoting *Simon v. Eastern Ky. Welfare Rights Org.*, 426 U.S. 26, 38 (1976)).

Final approval of a class action settlement is appropriate where the district court finds the settlement is "fair, reasonable, and adequate" for class members. *Campbell v. Facebook, Inc.,* 951 F.3d 1106, 1120–21 (9th Cir. 2020). The decision to approve or reject a class action settlement is committed to the sound discretion of the trial judge, and is reversible on appeal (by a party with standing) only on "a strong showing that the district court's decision was a clear abuse of discretion." *Officers for Justice v. Civil Serv. Comm'n of City & Cnty. of San Francisco*, 688 F.2d 615, 626 (9th Cir. 1982); *see also Campbell*, 951 F.3d at 1121; *Hanlon v. Chrysler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), *overruled on other grounds by Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338 (2011).

## ARGUMENT

## I. Intervenor-Appellants Lack Standing to Appeal

Appellants have not shown that anything about the Settlement has caused or will cause them any cognizable legal injury. Despite ample opportunities, Appellants have repeatedly failed to demonstrate that they have the type of concrete interest at stake that is required for standing. They fail again to do so here.

Appellants identify three types of asserted harm that they argue confer standing: the denial of "administrative rights" in the BD process, AOB 19–20; "reputational" and/or "programmatic" injury stemming from their inclusion on Exhibit C, AOB 20–21; and financial harms from Exhibit C, AOB 21. In each of these instances, the rights Appellants are asserting either do not exist or have not actually been impaired. As the district court correctly concluded, there has been no "injury to [Appellants] arising from this settlement agreement (that they were not a party to) resolving this litigation (that did not involve them)." ER-23.

### A. Appellants Have Not Suffered Any Injury-in-Fact Traceable to the Settlement

#### i. Appellants' Asserted "Procedural" Rights Either Do Not Exist or Have Not Been Impaired

As the district court explained twice, Appellants' claims of procedural harm are rooted in fundamental misunderstandings of both the Settlement and the BD process. *See* ER-13–15; ER-39–44.

The Settlement is an exercise of the Attorney General's authority to settle litigation and the Secretary of Education's authority to compromise, waive, or release claims of the Department, including claims on student loan obligations. *See* 28 U.S.C. §§ 516, 519; 20 U.S.C. §§ 1082(a)(6), 1087e(a)(1); ER-35–37. The Secretary's "settlement and compromise" authority is plenary. As the district court detailed, the Secretary could have compromised the student loan debt of each class

23

member, one by one; doing so on a class basis via the Settlement does not alter the Secretary's authority or affect the legal rights of anyone outside the Class. *See* ER-39. Indeed, the Secretary has used the settlement and compromise authority to compromise student loan debt on a group basis repeatedly over the past four years.[6] *See* ER-38. For that reason, Appellants' complaints about being deprived of their procedural rights under the BD regulations, *see* AOB 19–20, 65, are entirely beside the point: the BD regulations do not govern Settlement relief. *See* ER-13.

**1.** Appellants attempt to resolve this contradiction by arguing that because the Settlement does not strictly apply the BD regulations, it somehow transmogrifies a litigation settlement into rulemaking, which the Department allegedly should have subjected to notice and comment procedures. *See* AOB 39. This argument rests on the incorrect premise that the Settlement falls outside the Secretary's settlement and compromise authority. Appellants overread *Portland General Electric Co. v.*

---

[6] Contrary to Appellants' contention, the administration's recent announcement that the Department will conduct rulemaking proceedings relating to broad-based debt cancellation has no bearing on this case. *See* No. 23-15050, Dkt. 49-1. The fact that the Department is considering establishing a new rule under 20 U.S.C. § 1082(a) does not reflect on the Secretary's exercise of his existing authority to settle or compromise loans—any more than, for instance, a decision by the Food and Drug Administration to create a novel pathway for the approval of new drugs would prevent the FDA from considering pending drug approval applications under its existing authority. Whatever new rule the Secretary may ultimately promulgate (if any) in future proceedings, it is well outside the scope of this case.

*Bonneville Power Administration*, 501 F.3d 1009 (9th Cir. 2007), a case that involved an explicit statutory restriction on an agency's authority to enter into and settle certain types of contracts. In *Portland General*, "Congress ha[d] plainly stated that [the agency's] settlement authority is subject to the constraints of" a provision of law that specified the circumstances and terms under which the agency could exchange power with certain utilities. *Id.* at 1028; *cf. id.* at 1031 (noting other cases in which the court had interpreted the BPA's authority broadly in the absence of clear congressional directives otherwise). There is no similar statutory restriction on the Secretary's settlement and compromise authority, and this plenary authority is not otherwise constrained by the BD regulations.[7]

Moreover, the Settlement here does not "permanently and substantially amend[] an agency rule." *Conservation Northwest v. Sherman*, 715 F.3d 1181, 1187 (9th Cir. 2013). Quite the opposite—it provides specific procedures to handle a discrete class of BD claims that were the subject of litigation. All BD claims not subject to the Settlement will be decided under rules that did go through full notice and comment procedures.[8]

---

[7] The court's analysis of the contracting and settlement provision in *Portland General* was further influenced by the agency's "charge to function as a business," 501 F.3d at 1029—clearly a concern inapplicable to the Department of Education.

[8] The Department promulgated a new final borrower defense rule on November 1,

**2.** Appellants are also wrong about what the BD regulations themselves require. There have been four different sets of BD regulations in force since former Corinthian students began applying for BD in significant numbers in 2015. *See* 59 Fed. Reg. 61,664-01 (1995 Final Rule); 81 Fed. Reg. 75,926-01 (2016 Final Rule); 84 Fed. Reg. 49,788 (2019 Final Rule); 87 Fed. Reg. 65,904 (2022 Final Rule).[9] While the particulars differ, no version of the regulations could create a property interest on behalf of schools.

The 1995 BD regulations—which, in the absence of the Department's unreasonable delay, would have governed most of the class's BD applications[10]— did not require that institutions receive *any* notice of BD claims. *See* 59 Fed. Reg. at *61,696. The 2016 regulations introduced the concept that the Department would provide schools with notice of BD applications—but a school's (optional) response to that notice was simply part of a fact-finding process, not a veto right. *See* 81 Fed. Reg. at *76,084. The 2020 regulations similarly required the Department to "invite

_____

2022, which recently became effective on July 1, 2023. *See* 87 Fed. Reg. 65,904 (Nov. 1, 2022). *Cf.* AOB 39 ("If the Department wishes to establish a new BD program, it must promulgate new rules.").

[9] Appellants have not raised any arguments based on the most recent set of regulations.

[10] *See* 34 C.F.R. § 685.206(c)(1) (1995 regulations applied to loans disbursed on or before July 1, 2017).

the school to respond and to submit evidence" regarding BD applications from their former students. 84 Fed. Reg. at *49,928.

The opportunity to respond does not mean (as Appellants seem to assume) that the Department will accept the school's version of events. But regardless, none of these procedures confer a protectable property interest because, as the district court pointed out, approval of a BD claim does not trigger any financial liability for the school. *See* ER-12–14; ER-42–44. The school's liability, if any, is determined separately, in recoupment proceedings that preserve full due process. *See id.*; 81 Fed. Reg. at *75,963.[11] If the Department were ever to initiate a recoupment proceeding related to class member loans—contrary to its statements under oath, *see* ER-12–14; ER-42–44—any purported deficiency in process or notice could be asserted then.

**3.** Appellants do not have a freestanding right to insert their opinions into the process of resolving Plaintiffs' claims. As the Supreme Court recently recognized in *Department of Education v. Brown*, the "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in*

---

[11] Likewise, while the 2020 regulations entitle the school to a copy of a written BD decision, the APA guarantees a "brief statement of the grounds" for such decision only in the event of a *denial* of the application, and then only to the "interested person" who made the application—not to a third party. 5 U.S.C. § 555(e). A BD grant is not a denial of any right of the school, and the school is thus not entitled to any detailed accounting of the Department's approval decision unless and until the Department initiates a separate recoupment action against the school.

*vacuo*—is insufficient to create Article III standing." No. 22-535, slip op. at 8 (quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)). In *Brown*, the Court declined to consider the plaintiffs' "argument that the Department failed to observe proper procedures in promulgating the" plan under review because plaintiffs had failed to show any direct causal relationship between the decision to adopt that plan and their alleged interests at stake. *Id.* at 6. In short, "the Department's decision to give other people relief under a different statutory scheme did not cause respondents not to obtain the benefits they want." *Id.* at 11.

So too here: Appellants argue that the Department cannot resolve the *Sweet* case via the Settlement because it deprives them of a chance to participate in adjudication of the class's BD applications. But even accepting, *arguendo*, that this constituted a procedural error (which it did not), that would not confer standing on Appellants. Providing class members with a resolution to their claims outside of the BD process—that is, via settlement and compromise—does not deprive Appellants of the benefit they ultimately seek—that is, to avoid recoupment proceedings.[12] As

———————

[12] Indeed, avoiding recoupment proceedings is all that Appellants *could* seek. Any interest that they claim in defending themselves from BD claims is illusory: as discussed *supra* Part I.A.ii.2, a school is not and never has been a party to BD adjudications. Even where the regulations provide for notice to institutions and for consideration of any evidence an institution may submit, they do so only in aid to the resolution of a process that is strictly and explicitly between the Department and

noted, the Settlement actually *improves* Appellants' position in this respect. As the district court correctly observed, Appellants are "the luckiest guy[s] in the room": they have "already gotten the money and [they] don't have to pay it back." ER-313.

Like in *Brown*, "the causal uncertainty" here concerns "whether the substantive decisions the Department has made" in settling the *Sweet* litigation have any "causal relationship with other substantive decisions respondents want the Department to make" regarding future recoupment proceedings. No. 22-535, slip op. at 12.[13] And here, like in *Brown*, "there is no precedent for tolerating this sort of causal uncertainty" in the standing inquiry. *Id.*

### ii. Appellants' Claims of Reputational Harm Are Vague, Conclusory, and Unconnected to the Settlement

Appellants' claims of reputational harm also fail to establish standing. As an initial matter, the primary line of cases upon which Appellants rely is inapposite. These cases stand for the proposition that an "injury [that] bears a 'close relationship' to a harm traditionally recognized as providing a basis for a lawsuit in American

---

the borrower. *See, e.g.*, 81 Fed. Reg. at *75,974 (in BD proceedings under the 2016 regulations, "a borrower will not be involved in an adversarial process against a school").

[13] Notably, the Department has initiated exactly one recoupment proceeding in the history of the BD program, and the very initiation of that proceeding—as opposed even to its outcome—is currently being challenged in federal court. *See generally DeVry Univ., Inc. v. Dep't of Educ.*, No. 22-cv-5549 (N.D. Ill. 2022).

courts—namely, the reputational harm associated with the tort of defamation"—can support standing. *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021) (quoting *Spokeo, Inc.*, 578 U.S. at 341). In *Ramirez*, a class of individuals alleged that TransUnion failed to use reasonable procedures to ensure the accuracy of their credit files, but the Supreme Court found that only about 20 percent of the class— those for whom TransUnion had actually provided misleading credit reports to third-party businesses—had standing. *See id.* at 2200. According to the Court, that portion of the class suffered actionable harm because being falsely labeled a "potential match" with terrorists and drug traffickers in the eyes of potential creditors was sufficiently similar to the harm caused by the tort of defamation. *Id*. at 2208–09.

Here, by contrast, there has been no false or misleading statement. The only statement that Appellants complain of is a statement of fact relating to the development of Exhibit C: *viz.*, "The Department has determined that attendance at one of [the Exhibit C] schools justifies presumptive relief, for purposes of this settlement, based on strong indicia regarding substantial misconduct by listed schools, whether credibly alleged or in some instances proven, and the high rate of class members with applications related to the listed schools."[14] ER-559. This is a

---

[14] Predictably, Appellants selectively and deceptively quote the Settlement in an attempt to bolster their case. Exhibit C is not "a list of institutions that [the

fair, qualified statement supported by significant evidence that is in the public domain and the record in this case; whatever harm it could theoretically cause, it bears no resemblance to that caused by defamation.

Further, Appellants fail to provide evidence that any harm has in fact befallen them as a result of the Settlement. As the district court found, Appellants' "assertions of reputational harm remain markedly speculative, 'grounded in platitudes rather than evidence.'" ER-16 (quoting *Herb Reed*, 736 F.3d at 1250). Although "[t]here is . . . no requirement that . . . economic harm be of a certain magnitude" to establish standing, a plaintiff must prove the existence of *some* economic harm through the presentation of evidence. *See California v. Azar*, 911 F.3d 558, 572–73 (9th Cir. 2018) (plaintiff states submitted analysis and declarations showing reasonable probability of millions of dollars in economic harm). Here, there is none.

Appellants complain that "ECI's financial partners have requested expanded diligence on the Settlement or refused to extend credit because of the Settlement," and that "Lincoln has had to describe the Settlement as a material risk in securities reporting." AOB 21. As to the latter, the district court explained the failure of this argument: Lincoln's stock price did not actually fall as a result of this disclosure.

---

Department] 'determined' to have committed 'substantial misconduct,'" AOB 20–21, and neither Plaintiffs nor the Department have ever represented it as such, *contra* AOB 20 n.3.

*See* ER-21 ("No harm, no foul."). And as to the former, Appellants' brief misrepresents the underlying evidence. ECI's declarant did not state that lenders have refused to extend credit *because of* the Settlement, but merely that lenders' due diligence—which allegedly included, but was not limited to, inquiring about the Settlement—has at times led to results that were not to ECI's liking. As the district court ably summarized:

> [W]ith respect to Mr. Berardinelli's assertions, they are simply too speculative. How is the undersigned (or Mr. Berardinelli, for that matter,) to know whether the "delayed financing" came about on account of "inquir[ies] about the Settlement"? . . . "[C]onclusory factual assertions and speculative arguments that are unsupported in the record" will not suffice.

ER-22 (quoting *Doe #1 v. Trump*, 957 F.3d 1050, 1059–60 (9th Cir. 2020)).

Appellants' claims regarding "programmatic" reputational harms fare no better. The one example given is a Lincoln representative's reported dis-invitation from a single classroom presentation. AOB 21. Besides being an apparently isolated incident that Appellants do not even attempt to connect to a decrease in applications or enrollment,[15] this event hardly "draws a direct connection" to inclusion on Exhibit

_____

[15] Appellants suggest that the mere *potential* for loss of students to competitors, loss of donations, and other similar consequences is sufficient injury. *See* AOB 60. This is false: in *Sherman College of Straight Chiropractic v. U.S. Commissioner of Education*, 493 F. Supp. 976 (D.D.C. 1980), the plaintiff school demonstrated that because of its federally recognized accreditor's actions, it *actually did* lose students

C. *See id*. As quoted, the cited email does not reference the Settlement, but rather "the U.S. Department of Ed's list of predatory schools." ER-70. Because Appellants declined to provide a copy of the alleged email or the name of any party involved,[16] Plaintiffs cannot determine whether the "list of predatory schools" was in fact the Exhibit C list or some other list of schools engaged in predatory conduct on which Lincoln has appeared, such as the list of programs and institutions that failed accountability standards for the Department's gainful-employment rule.[17]

Nor have Appellants shown that Plaintiffs or the Department have "used the Settlement to inflict more harm." AOB 22. Although the district court pointed out that Appellants were "not candid" in describing the context and content of the Federal Trade Commission's website, *see* ER-21, Appellants continue to present the same evidence in the same intentionally misleading way. Any reasonable reading of

---

to competitors, lose donations, and lose patients at its health clinic. *See id.* at 978–79. Appellants have not come close to making a similar showing.

[16] For the first time on appeal, Appellants have provided some identifying information about the relevant school. *See* AOB 15.

[17] *See, e.g.*, Fernanda Zamudio-Suarez, "Here Are the Programs That Failed the Gainful-Employment Rule," *Chron. of Higher Educ.* (Jan. 9, 2017), https://www.chronicle.com/article/here-are-the-programs-that-failed-the-gainful-employment-rule/. It is certainly not "undisputed" that alleged harms to Appellants' reputations "started immediately after Exhibit C was published—not before." AOB 22. Indeed, Plaintiffs have repeatedly argued that reported incidents of misconduct by Appellants were well known before the Settlement. *See, e.g.*, Dkt. 18-1 at 5-7; ER-17–18.

the FTC's website reveals that the Commission did not "expressly equate[] inclusion on Exhibit C with deceptive practices," ER-69 ¶ 6, but instead simply referred to its own prior enforcement actions against several schools that appear on the Exhibit C list—none of which are operated by Appellants, *see* ER-73–74. Appellants also repeat their complaint that an advocacy group that is not a party to this lawsuit criticized the Department *for having already approved* Lincoln's Program Participation Agreement to receive Title IV funds. *See* AOB 13, 22 (citing ER-89–90). Given this timing, the Department clearly did not take any adverse action against Lincoln based on public criticism regarding Exhibit C; indeed, quite the opposite.

As the district court pointed out, the advocacy group also identified numerous other law enforcement actions against Lincoln that are unrelated to the Settlement. *See* ER-17–18; *see also* ER-84–85, 89.[18] The same is true of the letter published by Senator Durbin, which notes that Lincoln is one of nine

> for-profit college companies and brands operating in Illinois or offering degrees exclusively online [that] are currently or have been the subject of investigations or lawsuits by state Attorneys General

_____

[18] The latter document, included in the record as Appellants' own exhibit, explains: "In 2015, Lincoln Tech agreed to pay $850,000 to resolve an investigation into allegations that the college violated Massachusetts consumer protection law. Since then, the institution has faced other federal and state inquiries . . . . For instance, the Consumer Financial Protection Bureau requested information last year about the school's 'extensions of credit' to its students. Around the same time, the Education Department's internal watchdog determined the college didn't follow federal requirements for coronavirus emergency relief programs." ER-89.

> and/or federal agencies, have recently paid millions as part of state and/or federal settlements for deceptive practices, or been found guilty of fraud in a court of law.

Press Release, Durbin Warns Illinois Education Professionals to Sound the Alarm on For-Profit Colleges (Apr. 21, 2023), https://www.durbin.senate.gov/newsroom/press-releases/durbin-warns-illinois-education-professionals-to-sound-the-alarm-on-for-profit-colleges; *see* AOB 14. "The relationship between alleged stigma and approved settlement is thereby strained," and Lincoln is merely trying to "make a scapegoat of the settlement here." ER-18.

Appellants have thus failed to show even an "identifiable trifle" of injury traceable to the Settlement. *Council of Ins. Agents & Brokers v. Molasky-Arman*, 522 F.3d 925, 932 (9th Cir. 2008) (citation omitted). Their claim that "[c]ourts routinely find standing on far less evidence" than they have presented, AOB 22, is wholly without merit. First, substantial evidence was submitted in both cases cited by Appellants. *See Meese v. Keene*, 481 U.S. 465, 473–74 (1987) ("detailed affidavits" showed that government's classification of plaintiff's speech "would substantially harm his chances for reelection and would adversely affect his reputation in the community"); *Foretich*, 351 F.3d at 1211 (affidavit showed that government's classification of plaintiff as an abuser "led to his harassment by the media, estrangement from his neighbors, and loss of business and professional opportunities"). Second, both cases combined reputational injury constituting only

an "identifiable trifle" with a separate "important interest." *See Molasky-Arman*, 522 F.3d at 932. In *Meese*, that "important interest" was the First Amendment right to freedom of speech; in *Foretich*, it was the constitutional protection against bills of attainder. *See Meese*, 481 U.S. at 473–74; *Foretich*, 351 F.3d at 1213. Here, Appellants cannot identify any similarly important interest: as discussed *supra* Part I.A.i, their due process rights are not implicated by the Settlement. There is neither damage to reputation nor denial of a more tangible interest—neither "stigma" nor "plus." *See Fikre v. FBI*, 35 F.4th 762, 776 (9th Cir. 2022).

### iii. Appellants Have No Property Interest at Stake

In denying Appellants' requests to intervene as of right, the district court found that Appellants lacked any property interest in the litigation. ER-341. The court merely allowed them permissive intervention to "keep the system honest" by "help[ing] [the court] see the opposing arguments," *id.*—in other words, essentially as amici. *Cf. McHenry v. Comm'r of Internal Revenue*, 677 F.3d 214, 227 (4th Cir. 2012) ("[A]llowing a proposed intervenor to file an amicus brief is an adequate alternative to permissive intervention."). The court repeated in its denial of Appellants' motion to stay that Appellants have no financial interest at stake in the litigation. *See* ER-12–13 ("[R]ecall, the settlement does not require any school to make any payment.").

Appellants contest this conclusion. *See* AOB 21. Yet all they offer in support

are the same allegations they cite for the proposition that they have suffered reputational harm—and for reasons explained, those allegations fall short in multiple respects.

Later, Appellants assert that the Settlement "would retroactively and impermissibly diminish" their assertedly vested right in previously received Title IV funds. AOB 64. But once again, the Settlement does not create any basis for recoupment of Title IV funds. *See supra* Part I.A.i. Any recoupment proceedings against any Appellant in the future will proceed under regulations that preserve full due process, will be brought on the basis of independent evidence that Appellants will have ample opportunity to contest, and will include an opportunity for Appellants to argue that the Department's claims are time-barred. The Settlement simply does not affect any of this.

\* \* \*

In sum, Appellants have not been able to identify a "legally protected interest" they have that the Settlement actually affects in a "concrete and particularized" way. *Lujan*, 504 U.S. at 560. Appellants' mere speculation that their inclusion on Exhibit C might, someday, somehow, cause them harm does not rise to the level of Article III injury. *See, e.g.*, *Laird v. Tatum*, 408 U.S. 1, 13 (1972); *Przwieczerski v. Blinken*, No. 20-cv-02098, 2021 WL 2385822, at \*4 (D.N.J. June 10, 2021) (finding plaintiff lacked standing where "there has been no action or threatened action by the

37

Government that could harm" him, and explaining that government's stated position in litigation "is not equivalent to a final adjudication of [plaintiff's] legal rights"). Appellants' "claim, simply stated, is that they disagree with the judgments made by the Executive Branch," and they have offered only "speculative apprehensiveness that [someone] may at some future date misuse the [Settlement] in some way that would cause direct harm." *Laird*, 408 U.S. at 13. That is not enough for Article III standing. *See id.*; *cf. Local 93, Int'l Ass'n of Firefighters, AFL-CIO C.L.C. v. Cleveland*, 478 U.S. 501, 529–30 (1986) (intervenor could not block consent decree where decree did not "bind [intervenor] to do or not to do anything," did not "impose[] [any] legal duties or obligations on [intervenor] at all," and did not "purport to resolve any claims [intervenor] might have" under applicable law).

### B. Appellants' Claimed Injuries Could Not Be Redressed by a Favorable Ruling

Even beyond the absence of injury, Appellants fail to satisfy the separate Article III requirement of redressability. Simply put, vacating the Settlement would not change anything for Appellants.

Appellants claim that their harm stems from being included on Exhibit C. But reversing the final approval order would not change what Exhibit C says, nor any of the Department's conclusions underlying it. Appellants assert that their reputational injury could be redressed by "reversing or vacating the judgment," AOB 20, because

this would allegedly "signal[] to interested parties that the Department's determination of 'substantial misconduct' was unlawful," AOB 22. Yet Appellants' arguments for vacatur hinge on the Secretary's statutory authority to settle the class's claims and the propriety of class certification—neither of which have anything to do with the decision of which schools to include on Exhibit C or with Exhibit C's existence at all. So even if Appellants were to get the exact result they ask for, that decision would not redress the harms they claim to have suffered. *See Brown*, No. 22-535, slip op. at 8 ("[R]espondents' merits theory appears to be in tension with the possibility that the Department could redress their injury.").

Even if reversal on appeal could constitute some kind of "signal," there is simply no evidence here that vacatur would change anyone's conduct toward Appellants. A speculative prospective benefit depending on actions of independent third parties is no redress. *See Parsons v. U.S. Dep't of Justice*, 801 F.3d 701, 715 (6th Cir. 2015). Moreover, that unsupported speculative benefit pales in comparison to the grossly overbroad harm it would impose on the class. Appellants ask this Court to invalidate the Settlement and dismiss the entire *Sweet* case. *See* AOB 68.[19] But

---

[19] In earlier proceedings, Appellants requested in the alternative that the district court carve the Intervenors out of the settlement. *See, e.g.*, PSER-118. Appellants appear to have abandoned that position now; in any event, Appellants have never identified, and Plaintiffs are not aware of, any precedent in which a stranger to a class settlement

BD applicants from Appellants' schools account for less than 1.5% of class members. *Compare* Federal Respondents' Opposition to Application to Stay at 16, *Everglades College v. Cardona*, No. 22A867 (Apr. 12, 2023) (3,800 class members from Appellants' schools), *with* ER-33 (264,000 class members total). Appellants plainly have no standing to ask for the other 98.5% of class members to be deprived of relief; they have not even attempted to explain how they could.

Finally, the relief that Appellants seek could very well *expose* Appellants to liability that they would *avoid* under the Settlement. As it stands, the Department cannot use the Settlement as a basis for recoupment proceedings. *See supra* Part I.A.i. But if this Court were to invalidate the Settlement and dismiss the case, then any BD grants to Appellants' former students would immediately become a basis to begin recoupment proceedings against Appellants and potentially recover the amounts discharged and/or refunded. *See* ER-42–43 (explaining recoupment regulations). Perversely, then, Appellants are suffering no harm from the Settlement now, but would willingly invite potential future harm upon themselves, simply to prove an ideological point. This cynical ploy turns Article III's redressability requirement on its head.

---

obtained a change to the class definition that deprived certain class members of relief to which they would otherwise be entitled.

### C. This Appeal Is Not Justiciable Under *Arizonans for Official English*

**1.** Appellants argue that even if they do not have standing, this Court may nonetheless entertain their appeals because "this Court has jurisdiction 'for the purpose of correcting the error of the lower court in entertaining the suit' after it became moot." AOB 23 (citing *Arizonans for Official English v. Arizona*, 520 U.S. 43, 73 (1997)). But *Arizonans* is a highly unusual—perhaps *sui generis*—case that has no application here.

*Arizonans* presented the Supreme Court with a complex procedural posture that involved a state governor and attorney general who disagreed on the validity of a state ballot initiative; an attempt by that attorney general to intervene in the case after he had been dismissed as a defendant; a separate intervention bid by the organization that sponsored the ballot initiative; and an individual state employee plaintiff who left her state employment while the case was on appeal. *See id.* at 50–59. This Court determined that the organizational intervenors possessed Article III standing and rejected the contention that the individual plaintiff's resignation pending appeal rendered the case moot. *See id.* at 58–60. Following remand and renewed cross-appeals, this Court allowed yet a different organization to intervene as a plaintiff-appellee, though without party status. *Id.* at 61. Faced with this morass and the attendant sensitive questions of federalism it raised, *see id.* at 75–77, the

41

Supreme Court bypassed the question of whether the organizational intervenors—the petitioners before the Court—had standing, and instead considered whether there was any "case or controversy" remaining at all, *see id.* at 66–67.

The fact pattern in *Arizonans* bears no resemblance to the case here, which is straightforward. The parties to the *Sweet* litigation entered into the Settlement, and strangers to the case did not like the terms of the Settlement. In four opportunities before three different courts, Appellants have never been able to show that they face any tangible harm from the Settlement. There are no thorny questions of federalism (or any other controversial legal principle) at stake. If there is ever a case for putting aside the fundamental question of Article III standing, this is not it.

Appellants argue, in essence, that an appeals court could *sua sponte* take up *any* case from a district court to correct any supposed jurisdictional error alleged by anyone (or no one). That is not how Article III works. Certainly, an appellate court can review whether a lower court had jurisdiction—so long as an appeal was properly taken. *See, e.g.*, *Bender v. Williamsport Area Sch. Dist.*, 475 U.S. 534, 541 (1986). But it has been long established that, before it examines a district court's decision, an appellate court will first "satisfy itself . . . of its own jurisdiction." *Id.* (quoting *Mitchell v. Maurer*, 293 U.S. 237, 244 (1934)).

**2.** In any event, as the district court correctly found, the case is not moot. *See* ER-46–47. The Department's grants of certain limited tranches of BD applications

42

prior to entering into the Settlement Agreement did not change its overall posture toward pending BD claims. Indeed, at the time of the Settlement, the Department had over 260,000 BD applications pending, *see* ER-33, and no policy to address whether or how these would be adjudicated in a timely or lawful manner, *see* PSER-18–20. There is no authority to support the position that "because an agency acts on some similarly situated applications, it cannot be sued for unreasonably delaying or unlawfully withholding other applications." *Filazapovich v. Dep't of State*, 560 F. Supp. 3d 203, 235 (D.D.C. 2021).[20]

Moreover, in their supplemental complaint Plaintiffs detailed how the Department's policy of delay had, in many respects, transformed into a "presumption of denial" policy—of which the unlawful Form Denial Notices were a product, and which also resulted in indefinite delays. *See generally* ER-632–674. Appellants conveniently ignore this pleading. *See, e.g.*, AOB 25, 54 (citing original

---

[20] Appellants' argument that the Department had rectified all alleged problems with the BD process relies for support solely on the Department's summary judgment briefing in this case—hardly an unbiased source. *See* AOB 24–25; *cf.* ER-47 ("Like all litigants . . . the Secretary can aggressively advocate for his position while simultaneously negotiating a settlement that will end the litigation without the risk of trial."). While the declaration in support of the Department's briefing suggested that at least some of the BD policies challenged by Plaintiffs were not being followed at the time, it did not assert or establish that they will not recur. *See* ER-541–543; *Rosebrock v. Mathis*, 745 F.3d 963, 971 (9th Cir. 2014) ("A policy change not reflected in statutory changes or even in changes in ordinances or regulations will not necessarily render a case moot." (citations omitted)).

complaint only). The "presumption of denial" policy continued to affect all class members through the time of settlement, because they were denied their right to a fair and timely decision on their BD applications. Even when a government policy has changed over time, class-based relief is still appropriate when the overall effect of the policy—however constituted at a particular moment—is to deny a right. *See, e.g.*, *Al Otro Lado, Inc. v. Mayorkas*, No. 3:17-cv-02366, 2022 WL 3135914, at *2–3 (S.D. Cal. Aug. 5, 2022) (entertaining class-wide arguments regarding future noncompliance and the need to remediate past harm where the government had rescinded the underlying, allegedly unlawful policies); *Pacharne v. DHS*, No. 1:21-cv-115, 2021 WL 4497481, at *12 (N.D. Miss. Sept. 30, 2021) (when administrative delay is "created and perpetuated by [an agency's] inefficiencies," and "has not been significantly reduced" under current policy, agency retains a duty to rectify that delay); *cf. Rai v. Biden*, No. 21-cv-863, 2021 WL 4439074, at *7 (D.D.C. Sept. 27, 2021) (although unlawful policy had been revoked, plaintiffs' claims were not moot because delay from policy had not been "completely or irrevocably eradicated" (citation omitted)).

Dismissal based on mootness "is justified only if it is absolutely clear that the litigant no longer has any need of the judicial protection that it sought." *Pizzuto v. Tewalt*, 997 F.3d 893, 903 (9th Cir. 2021) (cleaned up). The party asserting mootness has a "heavy burden of proving that the challenged conduct cannot reasonably be

expected to recur." *Rosebrock*, 745 F.3d at 972 (citations and quotations omitted). Appellants' deliberately blinkered arguments do not meet those high standards.

### D. Appellants' Disagreement With the Intervention Ruling Does Not Create Appellate Jurisdiction

Appellants imply that this Court could overlook their lack of standing because they separately challenge the district court's decision to deny them intervention as of right in favor of permissive intervention. *See* AOB 66. But such a decision is appealable only where a permissive intervention order materially limited an intervenor's participation. *See Stringfellow v. Concerned Neighbors in Action*, 480 U.S. 370, 379–80 (1987). Here, permissive intervention gave Appellants everything they purported to seek: *viz.*, an opportunity to object to final approval of the Settlement. *See* ER-55; ER-425. Appellants disavowed any desire to assert claims or defenses in the litigation. *See id.* And although they now complain that they had no opportunity to conduct discovery, they assured the district court that they did not need it. *See* ER-338–340; *supra* at 12. Even in the absence of discovery, Appellants still had multiple opportunities to attempt to demonstrate, by their own submission of evidence (including over Plaintiffs' objections, *see* ER-19–20), that the Settlement negatively affected their interests. *See, e.g.*, ER-60, ER-68, ER-75, ER-80, ER-155, ER-159, ER-211, ER-367, ER-459, ER-492 (declarations of Appellants' representatives). They never managed to do so.

Appellants are "impaired" by the district court's ruling on intervention only insofar as that ruling drives home the conclusion that they lack a significant protectable interest in the litigation and therefore lack standing. *See* ER-54; ER-341. The grant of permissive intervention did not prevent them from advancing the interests they claimed they had in the litigation, and that order therefore is not appealable now.[21]

## II. Appellants' Other Arguments, Even If Properly Raised, Would Fail

With Appellants having suffered no harm from the Settlement, what's left is a mish-mash of policy arguments that have no place in an appeal by an intervenor from an order approving a negotiated settlement. *See Diamond*, 476 U.S. at 62 (1986) ("[T]he decision to seek review must be placed in the hands of those who have a direct stake in the outcome," not those "who will use it simply as a vehicle for the vindication of value interests."). But even if Appellants had standing to raise any of these arguments, none would hold water.

### A. *Biden v. Nebraska* Does Not Apply Here

Appellants have made much of *Biden v. Nebraska*, going so far as to suggest that it is "dispositive" in this case. Dkt. 44 at 2; *see* AOB 2. To the contrary,

---

[21] As explained above, Appellants indeed have no protectable interest in this litigation, so the denial of intervention as of right was also correct on the merits.

*Nebraska* is not relevant here, let alone dispositive. That decision parses the statutory authority granted to the Secretary under the HEROES Act to "waive or modify" provisions of the HEA. *See* No. 22-506, slip op. at 13–18. It does not interpret any provisions of the HEA itself, because "HEROES Act loan relief and HEA loan relief function independently of each other." *Brown*, No. 22-535, slip op. at 13. Indeed, in *Nebraska*'s companion case, the Court specifically disclaimed any intention to interpret the HEA. *See id.* at 11 n.2 ("We do not opine on the substantive lawfulness of any action the Department might take under the HEA."). The scope of the Secretary's authority to "waive or modify" a statutory provision under the HEROES Act—a separate statute, relied on in support of a different administrative program, under entirely different circumstances—does not reflect upon what it means to "settle" or "compromise" a debt under the HEA.

In their (premature) Rule 28(j) letter citing the *Nebraska* decision, Dkt. 44 at 1, Appellants point to a passage in which the Court listed certain situations where the Secretary is specifically instructed to cancel student loans and characterized those situations as "limited." *Nebraska*, No. 22-506, slip op. at 2–3 (identifying cancellation provisions for Public Service Loan Forgiveness, total and permanent disability, bankruptcy, false certification of eligibility, and closed school discharge). But Appellants ignore the context of these citations. The Court was identifying the provisions of the HEA that the Secretary had purported to "modify" or "waive"

47

under the HEROES Act. *See id.* at 14. This is not, nor is it intended to be, a comprehensive list of all situations in which the Secretary may discharge a student loan debt. Notably, borrower defense is not even mentioned in this list. And as the district court recognized, the Secretary has used the settlement and compromise authority to discharge debts for groups of borrowers multiple times in recent years, without controversy. *See* ER-38.

Nor does the major questions doctrine apply here. To begin, the discussion of that doctrine in *Nebraska* is explicitly dicta. *See* No. 22-506, slip op. at 25 n.9; *accord id.*, Barrett, J., concurring, slip op. at 1. But regardless, the crux of the doctrine is whether a governmental actor has "clear congressional authorization" to act in a particular way. *See id.*, maj. opinion, slip op. at 25 (quoting *West Virginia v. EPA*, 597 U. S., at ___ (slip op. at 26) (2022)). That authorization is present here, in both the Attorney General's authority to settle litigation and the Secretary of Education's authority to compromise, waive, or release claims of the Department on student loan obligations. *See* 28 U.S.C. §§ 516, 519; 20 U.S.C. §§ 1082(a)(6), 1087e(a)(1). The Settlement is a typical exercise of those authorities, as it resolves the legal claims of a limited, circumscribed class of plaintiffs who affirmatively applied to the government for relief based on an existing statutory right to defense against repayment.

Ignoring this threshold bar, Appellants instead attack a straw man. They portray the Settlement as a "mass debt-cancellation" program that "attempt[s] to 'rewrite [the HEA] from the ground up.'" Dkt. 44 at 2 (quoting *Nebraska*, No. 22-506, slip. op. at 12). In seeking to expand the Settlement to meet this extraordinary definition, they insist that it claims the authority "to cancel, *en masse*, every student loan in the country." AOB 1. If the Secretary did indeed seek, by the Settlement, to cancel the entire $1.6 trillion federal student loan portfolio, it would be a major development—but that is plainly not the case.[22] Appellants cannot exploit public controversy regarding the *Nebraska* case to make the Settlement into something it is not.

### B. The Class Is Properly Certified

Because Appellants are not class members and are not in any way bound by the Settlement, they have no basis to challenge the district court's decision to grant class certification under Rule 23(b). Nonetheless, they advance several arguments

---

[22] Although the major questions doctrine is not merely a matter of measuring economic impact, the numbers here tell the story as well. The Department has calculated that relief under the Settlement will total approximately $6 billion to $7 billion, spread over 264,000 class members—a significant amount for those class members, to be sure, but less than the amount the Secretary has separately discharged using the settlement and compromise authority since 2019, *see* ER-38, and orders of magnitude less than the amount of cancellation estimated to accrue to approximately 44 million borrowers under the HEROES Act, *cf. Nebraska*, No. 22-506, slip op. at 21 (program estimated to cost $469 billion to $519 billion).

as to why class certification was allegedly improper. Were the Court to consider these improperly raised arguments, each would fail.

### i. Certification Is Proper Under Rule 23(b)(2).

The Settlement does not provide monetary relief that takes it out of the ambit of Rule 23(b)(2). *See* AOB 47–52. The relief provided by the Settlement is, by its terms, the negotiated resolution of pending or improperly denied BD applications. A BD claim is a statutory, regulatory, and contractually protected right of a borrower to nullify a federal student loan debt based on misconduct of a third party. The monetary aspect of the Settlement is the natural result of unwinding the federal student loans over which class members asserted their defenses to repayment—including a return of money already collected from the borrower, as would occur if their BD applications were granted outside of the Settlement. *See* 34 C.F.R. §§ 685.206(c)(1), 685.206(e)(12), 685.222(i).

This does not transform this case into one for "monetary damages" of the sort described in *Wal-Mart Stores, Inc. v. Dukes*—*i.e.*, damages that compensate for the harm caused by the Department's unlawful policies. *See* 564 U.S. at 360; *see also, e.g.*, *Fowler v. Guerin*, 899 F.3d 1112, 1120 (9th Cir. 2018) (reversing denial of class certification under Rule 23(b)(2) because "the relief of correcting the entire records system for" the class's pension accounts "is in the nature of injunctive relief," even where doing so would necessarily have the monetary effect of restoring funds to

class members' accounts). Because the monetary aspect of the Settlement is incidental to the injunctive relief—that is, the clearance of a backlog of BD applications—treatment under Rule 23(b)(2) is entirely appropriate. *See Fowler*, 899 F.3d at 1120; *cf. I.B. by & through Bohannon v. Facebook, Inc.*, 82 F. Supp. 3d 1115, 1132 (N.D. Cal. 2015) (declining certification of restitution claims where plaintiffs "have not shown how the monetary relief sought would be incidental to the injunctive or declaratory relief").

For the same reason, this is not a case in which "the relief sought would merely initiate a process through which highly individualized determinations of liability and remedy are made." AOB 51 (quoting *Cholakyan v. Mercedes-Benz USA, LLC*, 281 F.R.D. 534, 560 (C.D. Cal. 2012)). In *Cholakyan*, the court denied certification under Rule 23(b)(2) because the plaintiff sought "various forms of injunctive relief" that would require the defendant automobile manufacturer to create at least five different programs or policies, each of which would benefit a different, often overlapping, subset of the class. *See* 281 F.R.D. at 541. The court thus observed that "*none* of the remedies [plaintiff] seeks will result in classwide relief." *Id*. at 559. Here, by contrast, every member of the class has a pending BD application, and a single order requiring the Department to lawfully resolve those applications would apply to, and result in relief to, the entire class (regardless of individual outcome). Indeed, in its order granting class certification, the district court noted that while "the

51

requested relief of a single order compelling defendants to restart the processing of borrower defense claims" was sufficiently specific at the class certification stage, "[a] more specific remedy, such as a plan setting forth a timeline for resolving the backlog of applications, can be fashioned later in this litigation." ER-820. The Settlement provides that more specific, uniform remedy: a date certain for every member of the class by which their BD claim will be resolved. The specifics of the Settlement walk through the steps the Department will take to achieve that goal. It is a coherent resolution to the claims of the Rule 23(b)(2) class that was certified "for all purposes, including settlement." ER-821.

Appellants are likewise incorrect that the Settlement is outside the bounds of what Plaintiffs could have achieved by pursuing this case to judgment.[23] *See* AOB 48–49. In their motion for summary judgment, Plaintiffs cited record evidence showing the ongoing harms of the Department's unlawful policies and sought an order for Defendants to show cause why each class member's BD application should not be granted immediately. *See* GovSER-73. If the Department could not provide any supportable reason for continuing to withhold BD decisions, and could not

---

[23] Not that Plaintiffs had to restrict their bargaining as Appellants suggest: the district court correctly recognized that "a settlement agreement can provide broader relief than a court could have awarded after a trial." ER-46 (citing *Local 93*, 478 U.S. at 525; *Conservation Northwest*, 715 F.3d at 1185–86).

provide lawful decisions within a reasonable time, the Court would have been justified in ordering the Department to grant class members' applications as a form of relief. *See* GovSER-75–76 (citing cases); *Al Otro Lado, Inc.*, 2022 WL 3135914, at *5 ("[W]here the enjoined party has a history of noncompliance with prior orders, and particularly where the trial judge has years of experience with the case at hand, [district courts are given] a great deal of flexibility and discretion in choosing the remedy best suited to curing the violation.").

Finally, the waiver and release in the Settlement do not render Rule 23(b)(2) treatment inappropriate. Appellants assert that "[i]f the Class had been certified under Rule 23(b)(3), members of Subclasses 2 and 3 would be entitled to opt out and assert their own claims for immediate refunds and debt cancellation," and suggest that the Settlement "strip[s]" class members of those claims. AOB 52. This is false. The Settlement only releases claims *alleged in this action*—APA claims related to the Department's policies of delay and arbitrary denial, which the Settlement required the Department to abandon. *See* ER-597. As explained above, this case does not involve, and the Settlement does not resolve, any "individualized claim for money" as that term is used in *Dukes* and its progeny. If any class member has an individualized claim for monetary damages, whatever that may be, the Settlement does not release it.

### ii. The Class Meets the Requirements of Commonality, Typicality, and Adequacy.

Nothing has undermined Plaintiffs' satisfaction of the Rule 23(a) requirements of commonality, typicality, and adequacy. As the District Court explained in the final approval order:

> The class certification order . . . found "the Department's alleged policy of inaction applies to the proposed class as a whole." The order made clear that "whether a borrower defense claim has been pending for three years or three months, all claims were subject to the same alleged policy of inaction." As the litigation progressed, and the Secretary's practice of issuing form denials came to light, plaintiffs sought additional relief consistent with Rule 23(b)(2) to hold the Secretary accountable for further alleged ultra vires actions. All class members remain subject to the same delay and allegedly unlawful policies. A single judicial remedy directed at the Secretary's activities could provide class-wide relief in a single stroke. Commonality remains.

ER-48 (internal citations omitted). The Department's policies of delay and arbitrary denial created a backlog that affected all members of the class, regardless of when their applications were filed. Further, as detailed *supra* Part I.C.2, the fact that the Department had adjudicated a small percentage of BD claims by the time the Settlement was signed does not change anything. Those individuals whose applications were lawfully adjudicated before the Settlement was submitted to the district court are not class members, *see* ER-581 (defining the class to exclude any borrower "whose borrower defense has . . . been granted or denied on the merits"); the fact that their claims have been resolved therefore does not bear on commonality.

Appellants assert that the different factual bases of the Named Plaintiffs'

54

claims undermine typicality. *See* AOB 54. But "[t]ypicality refers to the nature of the claim or defense of the class representative, and not to the specific facts from which it arose." *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011) (quoting *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992)). "Plaintiffs' claims focus on the Department's policy of inaction, form denials, and presumption of denial. Typicality is still satisfied." ER-49.

Finally, the structure of the Settlement does not undermine adequacy. Contrary to Appellants' assertion, neither Plaintiffs nor the Department "recognize that the Settlement features a tradeoff between relief" for the automatic discharge group and the decision group. AOB 55. Far from it: as explained in the Joint Motion for Final Approval, the Settlement "is designed to work as a whole": "By granting automatic relief to Class Members who attended a listed school, the Department frees up its resources to provide the remaining Class Members with decisions more quickly than it would otherwise be able to do." ER-266. Put differently, the Department is only able to provide relief to the decision group because of the relief provided to the automatic discharge group. The district court found that the distinction between the two groups is logical and reasonable, and the difference in

relief is equitable. *See* ER-49. Class representation is therefore adequate.[24]

### iii.  The Class Is Not Overbroad

The class is not overbroad, and all class members have standing. As previously explained, all class members were affected by the Department's policies regardless of when their BD claims were filed—the policies created a backlog that, absent the Settlement, the Department likely could not clear for over 25 years. *See* ER-39. Further, the fact that some class members might ultimately be found ineligible for relief does not mean that the class includes individuals who suffered no injury. The injury that Plaintiffs have alleged is the harm they suffered from being subjected to the Department's allegedly unlawful treatment of BD applications. This harm is the direct result of the Department's conduct and will be redressed by the relief provided in the Settlement, which has restarted the BD process and will provide timely and lawful resolutions to the class. No more is required for standing. *See Lujan*, 504 U.S. at 560–61; *Campbell*, 951 F.3d at 1116 (applying standard *Lujan* analysis to final approval of class action settlement).

---

[24] Appellants' assertion that "[c]lass counsel—which was employed by Harvard University—was able to negotiate to keep Harvard off the Exhibit C list," AOB 55, is as baseless as it is offensive. Appellees explained, and the district court addressed, the lack of conflict below. *See* ER-52.

### iv. The Settlement Does Not Bind Individuals Outside of the Class

Finally, the Settlement neither binds nor purports to bind individuals "into a subclass that was never certified." AOB 57–58. The class as certified by the district court did not include any date restrictions. *See* ER-821. For purposes of the Settlement, the parties defined the "settlement class" as all members of the class as of the Settlement's execution date. ER-564. As the district court noted, the court-ordered class definition encompasses the post-class applicants. *See* ER-50. Thus, contrary to Appellants' willful misreading, post-class applicants are properly included in settlement relief even though they did not meet the parties' definition of the settlement class. Significantly, post-class applicants do not waive or release any claims under the Settlement. ER-564 n.4.

## CONCLUSION

For the reasons stated above, Appellants' appeals should be dismissed for lack of Article III jurisdiction, or in the alternative, the Court should affirm the Final Approval Order.

Dated: August 2, 2023

*Rebecca C. Ellis*

Rebecca C. Ellis
Rebecca C. Eisenbrey
Eileen M. Connor
PROJECT ON PREDATORY
STUDENT LENDING
769 Centre Street, Suite 166
Jamaica Plain, MA 02130
rellis@ppsl.org
reisenbrey@ppsl.org
econnor@ppsl.org
Tel.: (617) 390-2669

Joseph Jaramillo
HOUSING & ECONOMIC RIGHTS
ADVOCATES
3950 Broadway, Suite 200
Oakland, CA 94611
jjaramillo@heraca.org
Tel.: (510) 271-8443

*Attorneys for Plaintiff-Appellees
Theresa Sweet, Chenelle Archibald,
Daniel Deegan, Samuel Hood, Tresa
Apodaca, Alicia Davis, and Jessica
Jacobson and all others similarly
situated*

## CERTIFICATE OF COMPLIANCE

I HEREBY CERTIFY that this brief complies with the limits set forth in Fed. R. App. P. 32(a)(7)(B) and Ninth Circuit Rule 32-1(a) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), it contains 13,720 words.

This motion complies with the typeface requirements of Fed. R. App. P. 32(a)(5), and the type-style requirements of Fed. R. App. P. 32(a)(6), because this document has been prepared in a proportionally spaced typeface using Microsoft Word 2016 in 14-point Times New Roman font.

Dated: August 2, 2023

_Rebecca C. Ellis_
Rebecca C. Ellis

## CERTIFICATE OF SERVICE

I hereby certify that on August 2, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

Dated: August 2, 2023

_Rebecca C. Ellis_____

Rebecca C. Ellis