**Nos. 23-15049, 23-15050, 23-15051 (consolidated)**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

THERESA SWEET et al.,
*Plaintiffs-Appellees*,

v.

EVERGLADES COLLEGE, INC., LINCOLN EDUCATIONAL SERVICES
CORP., and AMERICAN NATIONAL UNIVERSITY,
*Intervenor-Appellants*,

v.

U.S. DEPARTMENT OF EDUCATION, MIGUEL A. CARDONA, in his official
capacity as Secretary of the U.S. Department of Education,
*Defendants-Appellees*

**On Appeal from the United States District Court for the
Northern District of California
Case No. 3:21-mc-80075-WHA, Hon. William Alsup**

**PLAINTIFF-APPELLEES'
SUPPLEMENTAL EXCERPTS OF RECORD**

Joseph Jaramillo
HOUSING & ECONOMIC RIGHTS
ADVOCATES
3950 Broadway, Suite 200
Oakland, CA 94611
jjaramillo@heraca.org
Tel.: (510) 271-8443

*Attorneys for Plaintiff-Appellees Theresa
Sweet, Chenelle Archibald, Daniel Deegan,
Samuel Hood, Tresa Apodaca, Alicia Davis,
Jessica Jacobson, and all others similarly
situated*

Rebecca C. Ellis
Rebecca C. Eisenbrey
Eileen M. Connor
PROJECT ON PREDATORY
STUDENT LENDING
769 Centre Street, Suite 166
Jamaica Plain, MA 02130
rellis@ppsl.org
reisenbrey@ppsl.org
econnor@ppsl.org
Tel.: (617) 390-2669

# INDEX

| Document | Date | ECF No. | Page |
|---|---|---|---|
| Defendants' Response to Oct. 19, 2020 Order to Show Cause | 10/30/2020 | 150 | PSER-3 |
| Plaintiffs' Response to Court Order Dated Jan. 27, 2022 | 02/24/2022 | 220 | PSER-8 |
| Transcript of Proceedings (Final Approval Hearing) | 11/09/2022 | - | PSER-84 |

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General
DAVID L. ANDERSON
United States Attorney
MARCIA BERMAN
Assistant Branch Director
KATHRYN C. DAVIS
Senior Trial Counsel
R. CHARLIE MERRITT
KEVIN P. HANCOCK
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20530
Telephone: (202) 616-8098
E-mail: robert.c.merritt@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THERESA SWEET, *et al.*,<br><br>            Plaintiffs,<br><br>    v.<br><br>ELISABETH DEVOS, in her official capacity as Secretary of Education, and the UNITED STATES DEPARTMENT OF EDUCATION<br><br>            Defendants. | No. 3:19-cv-03674-WHA<br><br>**DEFENDANTS' RESPONSE TO OCTOBER 19, 2020 ORDER TO SHOW CAUSE** |

On October 19, 2020, the Court ordered the parties to "show cause why the Secretary should not be enjoined from further denial of class members' borrower-defense applications until a ruling on that form of denial can be had." Order Denying Class Settlement, to Resume Discovery, and to Show Cause at 17, ECF No. 146 ("Show Cause Order"). Defendants, the United States Department of Education ("Department") and Secretary DeVos, in her official capacity, submit the following response.

A preliminary injunction is "an extraordinary and drastic remedy" that should not be granted "unless the movant, *by a clear showing*, carries the burden of persuasion." *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (citation omitted) (emphasis in original). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of the equities tips in his favor, and that an injunction is in the public interest." *Winter v. NRDC*, 555 U.S. 7, 20 (2008). Here, because the Court's order regarding a potential preliminary injunction requires simultaneous briefing, there is currently no motion from Plaintiffs attempting to satisfy these criteria to which Defendants could respond. As explained further below, if the Court is inclined to issue a preliminary injunction notwithstanding this filing, Defendants respectfully request the opportunity to respond to Plaintiffs' response to the Court's Show Cause Order.

As Defendants have previously argued, Plaintiffs cannot establish a likelihood of success on the merits of a claim challenging the sufficiency of the Department's denial notices because Plaintiffs pled no such claim and that issue is beyond the scope of the complaint and this case.[1] *See, e.g.*, Defs.' Opp'n to Pls.' Mot. to Enforce Settlement Agreement, ECF No. 140. Indeed, an injunction barring the issuance of borrower defense decisions is the exact opposite of the relief Plaintiffs sought in their complaint—*i.e.*, a "simple" order compelling the Department to "start granting or denying their borrower defenses." Compl. ¶ 10, ECF No. 1; *see also Pac. Radiation Oncology, LLC v. Queen's Med. Ctr.*, 810 F.3d 631, 636 (9th Cir. 2015) (holding that "there must be a relationship between the injury claimed in the motion for injunctive relief and the conduct asserted in the underlying complaint itself," and that such relationship is only "sufficiently strong where the preliminary injunction would grant 'relief of the same character as that which may be granted finally'" (citation omitted)).

Ultimately, however, the Court need not engage in the required preliminary injunction analysis because, effective October 21, 2020, the Department stopped "issuing further decisions

---

[1] Nor have Plaintiffs moved to amend their complaint to include new claims about the sufficiency of the Department's denial notices. The claim in their complaint thus remains the basis for determining the proper scope of the present litigation—including scope of discovery, class certification, and relief.

denying the borrower defense applications of class members," and it will continue to refrain from doing so until a ruling on that form of denial can be had.[2]  Decl. of Mark A. Brown ("Brown Decl.") ¶ 5, attached hereto as Exhibit A.  Moreover, the class members (including those who have already received denial notices), along with all borrowers of federal Department-held loans, are not currently required to make payments on their federal loans through at least December 31, 2020 under the terms of the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. 116-136, and a Presidential Memorandum.  Brown Decl. ¶¶ 6-7.  As a show of good faith and to ensure that no class member is required to make payments while the merits of this case are being litigated, the Department further represents that, if there is no general extension of the CARES Act protections for all federal student loan borrowers by January 1, 2021, the Department will take action to ensure that all of the class members are held in forbearance (or other appropriate repayment status), with no payments due, until the Court enters a final judgment on the merits.  *Id.* ¶ 7.  In light of these representations, there is no need for the Court to enjoin Defendants from taking action they have already agreed not to take.

Moreover, in light of the Department's voluntary actions, Plaintiffs cannot make the showing of irreparable harm that is "necessary" to their obtaining preliminary injunctive relief. *Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 n.6 (9th Cir. 2011).  "The Ninth Circuit considers cessation of alleged misconduct to be a relevant factor in determining whether the plaintiff has carried its burden of demonstrating a likelihood of irreparable harm." *SV3, LLC v. GG Distrib., Inc.*, Case No. EDCV 19-46 JGB (SPx), 2019 WL 1090772, at *3 (C.D. Cal. Feb. 6, 2019) (citing *Lofton v. Verizon Wireless LLC*, 586 F. App'x 420, 421 (9th Cir. 2014)).  Indeed, "such cessation weighs heavily in determining whether [a plaintiff] has established that it will suffer irreparable harm if an injunction is not entered." *JTH Tax, Inc. v. Its Fin., LLC*, Civil Case No. 2:08-cv-271, 2008 WL 11512368, at *3 (E.D. Va. Dec. 15, 2008); *see also Patrick v. Success Acad. Charter Schs., Inc.*, 17-CV-6846 (PKC) (RLM), 2017 WL 6557478, at *5 (E.D.N.Y. Dec.

_____

[2] In an effort to conserve the resources of the parties and the Court, undersigned counsel for Defendants notified counsel for Plaintiffs of this fact and raised the possibility of reaching an agreement that a preliminary injunction is unnecessary here.  Plaintiffs' counsel did not engage in negotiations on this topic.

22, 2017) (finding that voluntary action taken by the defendants weighed "heavily against" preliminary injunctive relief).

Here, Plaintiffs cannot claim irreparable harm from the Department's denial notices because, for the duration of these proceedings, the Department will not be issuing such notices and Plaintiffs will not be required to make any payments on their relevant federal loans,[3] regardless of whether they have already received such a denial notice. The Department's representations about this are "entitled to a presumption of good faith," *Planning & Conservation League v. U.S. Bureau of Reclamation*, No. C 05-3527 CW, 2006 WL 8459848, at *2 (N.D. Cal. May 15, 2006) (quoting *Calton v. Babbitt*, 147 F. Supp. 2d 4, 8 (D.D.C. 2001)), and are especially persuasive here where the Court has scheduled expedited proceedings such that the Department's voluntary forbearance would only need to span a matter of a few months, *cf. Kabbani v. Council House, Inc.*, 406 F. Supp. 2d 1189, 1192-93 (W.D. Wash. 2005) (finding that a defendant's "representation in this litigation" that it would not take certain action "substantially limit[ed] the likelihood" that the plaintiffs would suffer irreparable harm). No harm would accrue to Plaintiffs as a result of the Department's denial notices unless and until the Department resumes taking such action, which would only be subsequent to a ruling on the merits of this case. *See, e.g.*, *Henke v. Dep't of Interior*, 842 F. Supp. 2d 54, 59 (D.D.C. 2012) ("Injury that is hypothetical or speculative does not rise to the level of irreparable harm."); *In re Excel Innovations, Inc.*, 502 F.3d 1086, 1098 (9th Cir. 2007) ("Speculative injury cannot be the basis for a finding of irreparable harm.").

For these reasons, the Court's proposed preliminary injunction is neither necessary nor appropriate. Should Plaintiffs' brief in response to the Show Cause Order, due at the same time as this response brief, seek preliminary relief beyond that suggested by the Court's Show Cause Order (that is, enjoining the Secretary from "further denial of class members' borrower-defense applications until a ruling on that form of denial can be had"), Defendants respectfully request an opportunity to respond.

---

[3] And of course, "monetary harm does not constitute irreparable harm" in any event. *Tamburri v. Suntrust Mortg., Inc.*, No. C-11-2899 EMC, 2011 WL 2654093, at *2 (N.D. Cal. July 6, 2011) (quoting *Cal. Pharmacists Ass'n v. Maxwell-Jolly*, 563 F.3d 847, 851 (9th Cir. 2009)).

Dated: October 30, 2020

Respectfully submitted,

JEFFREY BOSSERT CLARK
Acting Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ R. Charlie Merritt*
KATHRYN C. DAVIS
Senior Trial Counsel
R. CHARLIE MERRITT (VA Bar # 89400)
KEVIN P. HANCOCK
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20530
Telephone: (202) 616-8098
E-mail: robert.c.merritt@usdoj.gov

*Attorneys for Defendants*

JOSEPH JARAMILLO (SBN 178566)
jjarmillo@heraca.org
HOUSING & ECONOMIC RIGHTS
ADVOCATES
3950 Broadway, Suite 200
Oakland, CA 94611
Tel.: (510) 271-8443
Fax: (510) 868-4521

EILEEN M. CONNOR (SBN 248856)
econnor@law.harvard.edu
MARGARET E. O'GRADY (*pro hac vice*)
mogrady@law.harvard.edu
REBECCA C. ELLIS (*pro hac vice*)
rellis@law.harvard.edu
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
Tel.: (617) 390-3003
Fax: (617) 522-0715

Attorneys for Plaintiffs

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, CHENELLE
ARCHIBALD, DANIEL DEEGAN, SAMUEL
HOOD, TRESA APODACA, ALICIA DAVIS,
and JESSICA JACOBSON on behalf of
themselves and all others similarly situated,

       *Plaintiffs*,

    v.

MIGUEL CARDONA, in his official capacity
as Secretary of the United States Department
of Education, and

THE UNITED STATES DEPARTMENT OF
EDUCATION,

       *Defendants*.

Case No. 19-cv-03674-WHA

**PLAINTIFFS' RESPONSE TO
COURT'S ORDER DATED
JANUARY 27, 2022**

(Class Action)
(Administrative Procedure Act Case)

1

Plaintiffs' Response to Jan. 27, 2022 Order
(Case No. 3:19-CV-03674-WHA)

On January 27, 2022, this Court notified the parties to this action that it had received a letter from a class member. ECF No. 214. The Court instructed "[l]ead counsel from both sides" to "investigate the merits and status of the [borrower] defense claimed by the letter and report in writing thereon to the Court." *Id.* The Court further instructed the parties to "[e]xplain specifically why it is taking so long to act on and resolve these applications." *Id.*

The letter that the Court appended to its January 27 Order was the fourth such letter sent by class members to the Court since November 2021. In each of these four letters, class members explained how their borrower defense applications had languished at the Department of Education ("Department") for years without a response. They questioned why the Department had not taken any action on their applications, even under the scrutiny of this lawsuit.

Counsel for Plaintiffs, quite simply, have the same questions. The Department has not provided a straight answer as to why it continues to delay decisions on tens of thousands of borrower defense applications[1]—many of them from schools for which there is ample public evidence of wrongdoing. *See, e.g.*, Plaintiffs' Response to the Court's Request Regarding Schools with Prior Findings of Fraud, ECF No. 142; Defendants' Response Regarding the Court's Request at the October 1, 2020 Class Hearing, Attachment 1, ECF No. 145-2. The narrow classes of approvals that the Department has announced since June 2021—accounting for less than 14% of unresolved applications[2]—are a drop in the bucket.

---

[1] For publicly available borrower defense data, *see* Borrower Defense to Repayment Loan Forgiveness Data, U.S. Dep't of Educ., https://studentaid.gov/data-center/student/loan-forgiveness/borrower-defense-data (last visited Feb. 23, 2022). The most recent set of this data is appended hereto as Exhibit A (hereinafter "Sept. 2021 BD Data").

[2] This calculation includes as "unresolved" all applications the Department reported as "pending" and "pending notification" as of September 30, 2021, plus 128,361 unlawful form denials. Plaintiffs calculate the number of unlawful form denials by subtracting the number of denials the Department had issued as of September 30, 2019 (the last report before the Department began sending form denial notices) from the total number of denials currently reported. *Compare* Ex. A, Sept. 2021 BD Data (listing 137,438 denied applications), *with* Borrower Defense to Repayment Loan Forgiveness Data – September 2019, https://studentaid.gov/data-center/student/loan-forgiveness/borrower-defense-data (listing 9,077 denied applications).

Also concerning is that the Department's publicly available data indicate that it *has adjudicated*—in other words, has already decided—over 45,000 applications, but has not yet informed applicants of those decisions. *See* Ex. A (Sept. 2021 BD Data). This statistic raises important questions about how these decisions were reached and why the Department is withholding notice of them. The Department has not provided any information about when these decisions were made, what criteria or processes were used to make them, what evidence was consulted, or what schools the borrowers attended.

Plaintiffs endeavor below to respond to the Court's Order to the best of their ability.

## I.     THE FOUR CLASS MEMBER CORRESPONDENTS

Although the Court's January 27 Order addressed one specific letter the Court received, Plaintiffs address here all four of the class member letters sent to the Court in recent months. Plaintiffs' counsel have spoken with each class member about their situation. Plaintiffs' counsel also sought information from the Department regarding the status of their applications, including by sending the Department written permission from the class members for the Department to share their borrower defense files with Plaintiffs' counsel. The Department, however, provided just a single document from one applicant's file, which did not reveal the current status of the application.

### A.     Tudor Neagu

The letter at issue in the January 27 Order was from Tudor Neagu, who filed an application with the Department asserting school misconduct as a basis for loan cancellation first in February 2016, and then again in 2017, with respect to his student loans from Villanova Law School.[3] Mr. Neagu has received no response to his application.

Mr. Neagu submitted written evidence in support of his application, including findings against Villanova Law School by the American Bar Association. He made that evidence available

---

[3] Mr. Neagu initially characterized his claim as one for false certification/ability to benefit, but it is Mr. Neagu's and counsel's understanding that his application ultimately was accepted and processed by the Department as one for borrower defense.

3

to the Court and counsel in this case via a link included in his letter to the Court. He also reported in that letter that he, along with others from his law school class, was approached about filing a lawsuit against the school, but they were "afraid to participate on account of the potential repercussions" to their legal careers, so the lawsuit was never filed.

It is counsel's understanding that the Department has reviewed Mr. Neagu's application, sought information from Villanova Law School, and received a response from the school. But, so far as counsel or Mr. Neagu knows, the Department has not taken the final step of determining whether borrower defense is warranted in his case based on the operative regulation. The Department has had more than four years to complete this process, yet neither Mr. Neagu nor Plaintiffs' counsel have any insight into why this application remains pending (or whether it is one of the over 45,000 applications that have been adjudicated with no notice to the applicant).

**B.      Yolande Walker**

Ms. Walker wrote to the Court on January 5, 2022, and the Court subsequently sent copies of her letter to counsel. *See* ECF No. 211. Ms. Walker attended DeVry University. She applied for borrower defense in 2017 and has received no response to her application.

Regarding the merits of Ms. Walker's claim, we know at least that she is far from alone. As of April 2020—the most recent count that Plaintiffs have available based on discovery produced in this case—the Department had received *over 16,000* applications from DeVry University borrowers. *See* CMN Cases By School Owner – Open – 2020 (DOE00003066), appended hereto as <u>Exhibit B</u>. That number is undoubtedly higher now. Some percentage of those borrowers received form denial notices between December 2019 and October 2020. *See, e.g.*, Supplemental Class Action Complaint for Declaratory and Injunctive Relief ¶¶ 379-388, ECF No. 198 (hereinafter "Supp. Compl."). There is no way for Plaintiffs to know whether Ms. Walker's borrower defense application was held for further evaluation at that time, or whether hers is among the over 45,000 applications that the Department has adjudicated without notice to the applicant.

In any case, there is ample evidence of DeVry's wrongdoing in the public record. For example, in 2015, the Department demanded that DeVry substantiate its widely advertised job

4

placement rate claims, and DeVry admitted it could not.[4] In 2016, the Federal Trade Commission brought a complaint against DeVry for these false advertisements. DeVry settled that complaint for $100 million, and the FTC sent restitution checks to over 173,000 students,[5] including Ms. Walker. *See Affidavit of Yolande Walker* (hereinafter "Walker Aff.") ¶¶ 11-12, appended hereto as Exhibit C. DeVry also settled separate complaints brought by the attorneys general of Massachusetts and New York,[6] and a 2018 report by the Department of Veterans Affairs likewise supported findings of false advertising.[7] In 2020, DeVry settled a private class action suit for nearly $45 million; the class in that case included approximately 323,000 members.[8]

Despite this voluminous record, the Department had not, until February 16, 2022, issued a *single borrower defense grant to* a DeVry borrower since the inception of the borrower defense

---

[4] *See* Merrit Kennedy, "DeVry University Agrees to Stop Ads Touting Grads' Job Success Without Proof," *NPR* (Oct. 14, 2016), https://www.npr.org/sections/thetwo-way/2016/10/14/497917516/devry-university-agrees-to-stop-ads-touting-grads-job-success-without-evidence.

[5] *See* Press Release, Fed. Trade Comm'n, DeVry University Agrees to $100 Million Settlement with FTC (Dec. 15, 2016), https://www.ftc.gov/news-events/press-releases/2016/12/devry-university-agrees-100-million-settlement-ftc; Bridget Small, "FTC Sends DeVry Refund Checks," *Fed. Trade Comm'n Consumer Information Blog* (July 5, 2017), https://www.consumer.ftc.gov/blog/2017/07/ftc-sends-devry-refund-checks.

[6] *See* Press Release, Office of Mass. Att'y Gen., AG Healey Secures $455,000 in Refunds for Students Deceived by Online For-profit School (July 5, 2017), https://www.mass.gov/news/ag-healey-secures-455000-in-refunds-for-students-deceived-by-online-for-profit-school; Press Release, Office of N.Y. Att'y Gen., A.G. Schneiderman Obtains Settlement With Devry University Providing $2.25 Million in Restitution for New York Graduates Who Were Misled About Employment and Salary Prospects After Graduation (Jan. 31, 2017), https://ag.ny.gov/press-release/2017/ag-schneiderman-obtains-settlement-devry-university-providing-225-million.

[7] *See* Dep't of Veterans' Affairs Office of Inspector Gen., "VA's Oversight of State Approving Agency Program Monitoring for Post-9/11 GI Bill Students" at 12-13 (Dec. 3, 2018), *available at* https://www.va.gov/oig/pubs/VAOIG-16-00862-179.pdf.

[8] *See* Settlement Agreement, *McCormick v. Adtalem Global Educ. Inc.*, No. 2018-CH-04872 (Ill. Cir. Ct. May 10, 2020), *available at* https://www.devryuniversitysettlement.com/home/400/DocumentHandler?docPath=/Documents/2020_05_11_McCormick_DeVry_Settlement_AgreementB.pdf.

program in 2015. Just eight days ago, the Department announced its first set of DeVry approvals—to 1,800 borrowers, or approximately 1% of the number of people who received refund checks under the FTC's settlement.[9] Ms. Walker has not received notice that her application is among this small number of approvals. *See* Ex. C, Walker Aff. ¶ 21.

Based on the available evidence, Plaintiffs believe Ms. Walker is eligible for borrower defense relief. Plaintiffs can offer no explanation for why her application has not been granted yet. Plaintiffs cannot discern any reason why the Department would have marked her application for denial, but if it has, the Department has not disclosed any reasoned basis for denying Ms. Walker's (or any other DeVry borrower's) application.

## C.   Joseph Mallon

Mr. Mallon wrote to the Court on December 10, 2021; copies of his letter were sent to counsel along with Ms. Walker's. *See* ECF No. 211. Mr. Mallon attended the University of Phoenix. He applied for borrower defense in 2017 but has yet to receive any response to his application.

As of April 2020, the Department had received *over 21,000* applications from University of Phoenix borrowers. *See* Ex. B. Again, that number has undoubtedly increased in the nearly two years since. As with DeVry, some percentage of those borrowers received form denial notices between December 2019 and October 2020. And, just as with Ms. Walker, there is no way for Plaintiffs to know whether Mr. Mallon's borrower defense application was held for further evaluation or has been denied without notice to Mr. Mallon.

University of Phoenix has engaged in widespread and widely reported misconduct. For example, the Federal Trade Commission brought a complaint against the school in 2019 alleging

---

[9] *See* Press Release, U.S. Dep't of Educ., Education Department Approves $415 Million in Borrower Defense Claims Including for Former DeVry University Students (Feb. 16, 2022), https://www.ed.gov/news/press-releases/education-department-approves-415-million-borrower-defense-claims-including-former-devry-university-students.

Plaintiffs' Response to Jan. 27, 2022 Order
(Case No. 3:19-CV-03674-WHA)

that it falsely advertised, among other things, employment partnerships with major companies. The university settled that complaint for $191 million—a record at the time—which included $50 million in direct payments to former students and $141 million in private loan cancellation.[10] The FTC distributed the payments to 147,000 students.[11] The University of Phoenix has also been investigated by the attorneys general of California, Delaware, Florida, and Massachusetts, and by the Department of Education's own Office of the Inspector General.[12] In 2009, the university settled a False Claims Act case related to its recruiting practices for $67.5 million.[13] In 2020, the Department of Veterans Affairs announced its intention to suspend GI Bill enrollments at University of Phoenix (among other for-profit schools) because of its deceptive advertising, sales, and enrollment practices.[14]

Despite these and other facts, the Department has not, to Plaintiffs' knowledge, issued a *single borrower defense grant* to a University of Phoenix borrower from 2015 through the present.

Based on the available evidence, Plaintiffs believe Mr. Mallon is eligible for borrower defense relief. Just as with Ms. Walker, if the Department has classified Mr. Mallon's application

---

[10] *See* Press Release, Fed. Trade Comm'n, FTC Obtains Record $191 Million Settlement from University of Phoenix to Resolve FTC Charges It Used Deceptive Advertising to Attract Prospective Students (Dec. 10, 2019), https://www.ftc.gov/news-events/press-releases/2019/12/ftc-obtains-record-191-million-settlement-university-phoenix.

[11] *See* Leslie Fair, "$50 Million in Refund Checks for University of Phoenix Students," *Fed. Trade Comm'n Business Blog* (Mar. 24, 2021), https://www.ftc.gov/news-events/blogs/business-blog/2021/03/50-million-refund-checks-university-phoenix-students.

[12] *See* David Halperin, "Law Enforcement Investigations and Actions Regarding For-Profit Colleges," *Republic Report*, https://www.republicreport.org/2014/law-enforcement-for-profit-colleges/ (last updated Jan. 20, 2022).

[13] *See* Press Release, U.S. Dep't of Justice, University of Phoenix Settles False Claims Act Lawsuit for $67.5 Million (Dec. 15, 2009), https://www.justice.gov/opa/pr/university-phoenix-settles-false-claims-act-lawsuit-675-million.

[14] *See* Press Release, U.S. Dep't of Veterans Affairs, VA Intends to Suspend Enrollment of New GI Bill Students at University of Phoenix, Career Education Corporation, Bellevue University and Temple University (Mar. 9, 2020), https://www.va.gov/opa/pressrel/pressrelease.cfm?id=5399. The VA later reversed this decision, however, concluding that the schools had taken sufficient corrective action. *See* "VA's Resolution of [§]3696 Violations by 5 Schools," *Veterans Education Success* (July 2, 2020), https://vetsedsuccess.org/vas-resolution-of-3696-violations-by-5-schools/.

7

Plaintiffs' Response to Jan. 27, 2022 Order
(Case No. 3:19-CV-03674-WHA)

as potentially eligible for relief, Plaintiffs cannot explain why it has not been granted yet; and if the Department has marked Mr. Mallon's or any other University of Phoenix borrower's application for denial, it has not provided a reasoned basis for doing so.

### D.  Steven Sullwold

Mr. Sullwold wrote to the Court in November 2021. *See* ECF No. 210. Per the Court's instructions, Plaintiffs reviewed Mr. Sullwold's letter *in camera* on December 2, 2021. Mr. Sullwold later sent the text of the letter via email to Plaintiffs' counsel. Mr. Sullwold borrowed federal student loans on behalf of his son, who attended Collins College (a Career Education Corp. school) in 2003-2004. Mr. Sullwold applied for borrower defense in 2016 and received a form denial notice in 2020. Mr. Sullwold has filed for reconsideration of that denial.

The Department's failure to either withdraw the form denial notice and adjudicate Mr. Sullwold's initial application or act on Mr. Sullwold's reconsideration application is, once again, wholly inexplicable. As of April 2020, the Department had received *over 12,000* applications from Career Education Corp. ("CEC") borrowers, including over 250 applications from Collins College. *See* Ex. B. Yet between December 2019 and October 2020, the Department denied a wide swath of these applications using its unlawful form denial notices, pursuant to a policy that excluded from relief any applicant whose loans dated from before January 1, 2008 or after January 1, 2013. *See* Supp. Compl. Exs. 29-30, ECF No. 198-7 (DOE00009550; DOE00009552). Plaintiffs believe that Mr. Sullwold's application was denied under this policy.

As Plaintiffs have detailed in their Supplemental Complaint, this policy was arbitrary and capricious, and resulted from an unlawful process that denied applicants their rights under the Administrative Procedure Act and the Due Process Clause. *See* Supp. Compl. ¶¶ 359-366; *see generally id.* ¶¶ 196-236, 258-288. At the time the Department instituted its policy of denying these CEC applications, there was evidence readily and publicly available demonstrating that its conclusion was inaccurate. For example, in 2019, CEC entered into an Assurance of Voluntary Compliance with 48 states and the District of Columbia—led by Mr. Sullwold's home state of Texas—that addressed CEC's alleged violations of state laws regarding its recruitment and

enrollment practices, including misrepresentations regarding the costs of enrollment, transferability of credits, program offerings, employment prospects, and job placement rates.[15] Among other provisions, the Assurance of Voluntary Compliance required CEC to forego collection on nearly $500 million in student debts, including for students who enrolled both before January 1, 2008 and after January 1, 2013.[16] In short, the Department's policy of rejecting CEC applications, including Mr. Sullwold's, rested on the flimsiest of pretenses.

The Department has come under new leadership since these CEC denials were issued, and in some cases it has disclaimed the unlawful policies of its predecessor.[17] Yet it has not announced any policy changes with respect to borrower defense applications from CEC borrowers, nor with respect to any borrower defense applications (from any school) that were subjected to the unlawful policies that resulted in mass denials.

The Department has likewise given no indication of the processes or timeline it will follow to adjudicate the reconsideration applications of borrowers like Mr. Sullwold. Plaintiffs have requested, but Defendants have thus far refused to provide, any information about how the reconsideration process is organized, what standards the Department is applying on reconsideration, and whether the Department has granted (or denied) any reconsideration application since the change in administration.

Based on the available evidence, Plaintiffs believe Mr. Sullwold is eligible for borrower defense relief. His denial should be vacated, and his application should be granted. Plaintiffs

---

[15] *See* Assurance of Voluntary Compliance, *In re State of Texas & Career Educ. Corp.*, No. D-1-GN-19-000017 (Tex. Dist. Ct. Travis Cty., 353d Jud. Dist., Jan. 2, 2019), *available at* https://www.texasattorneygeneral.gov/sites/default/files/images/admin/2019/Press/FINAL%20CEC%20AVC%20attached%20to%20Petition%20wCauseNo.pdf.

[16] For further evidence regarding CEC's wrongdoing, *see* sources cited in Supp. Compl. ¶¶ 362-364.

[17] *See, e.g.*, Press Release, U.S. Dep't of Educ., Department of Education Announces Action to Streamline Borrower Defense Relief Process (Mar. 18, 2021), https://www.ed.gov/news/press-releases/department-education-announces-action-streamline-borrower-defense-relief-process (rescinding partial relief methodology for approved borrower defense claims).

9

Plaintiffs' Response to Jan. 27, 2022 Order
(Case No. 3:19-CV-03674-WHA)

cannot offer any explanation for why the Department has not yet taken action to correct unlawful denials like Mr. Sullwold's that were issued by the previous administration.

## II.     THE ENTIRE CLASS

The four class members who wrote to the Court provide a clear and poignant window into the situations of more than 260,000 borrowers who currently have unresolved borrower defense applications before the Department.

### A.     The Current Extent of the Backlog

The Department's publicly available data report that, as of September 30, 2021, there were 87,747 pending borrower defense applications. *See* Ex. A (Sept. 2021 BD Data). Notably, this is *more* pending applications than there were as of the last month of the prior administration. *See* Borrower Defense to Repayment Loan Forgiveness Data – January 2021, https://studentaid.gov/data-center/student/loan-forgiveness/borrower-defense-data.

The Department's count of "pending" applications does not, however, include the approximately 128,000 borrowers who received form denial notices between December 2019 and October 2020. As Plaintiffs have alleged in this case, the manner of adjudication and the form of notification for these applications did not meet the minimum standards of due process and the Administrative Procedure Act. *See* Supp. Compl. ¶¶ 436-439. These applications cannot, therefore, be considered lawfully resolved.

Finally, as of September 2021, the Department reported that 45,782 borrower defense applications were "adjudicated" but "pending notification." *See* Ex. A. Plaintiffs have sought information from the Department to explain whether these decisions are approvals or denials, the bases on which they were decided (*i.e.*, under old protocols or not), and the reasons for withholding notice of these decisions from the applicants. The Department has, as of this writing, refused to provide that information. Regardless, from the perspective of borrowers, their applications are not resolved if they have not received notice of a decision from the Department.

In total, these three categories add up to more than 260,000 borrowers who are still waiting for a lawful decision on their borrower defense applications. That number grows every day.

10

PSER-17

1      This number might be larger still if the Department had not erected additional barriers to

2 the submission of a borrower defense application. Specifically, the Department's online portal to

3 apply for borrower defense has, since at least September 2021, been displaying confusing pop-up

4 messages that discourage applicants from completing their borrower defense applications.

5 Plaintiffs' counsel became aware of this problem when class member Dominic Bendijo contacted

6 counsel. Mr. Bendijo, a borrower from Brooks Institute (a CEC school), explained that when he

7 tried to apply for borrower defense in September 2021, a message appeared on the screen that read:

8 "Because you graduated or withdrew from your school more than three years ago, you are unable

9 to apply for reconsideration." *See* Affidavit of Dominic Bendijo ¶ 8, appended hereto as <u>Exhibit</u>

10 <u>D</u>. But Mr. Bendijo had not applied for reconsideration—this was his first attempt to file for

11 borrower defense. *Id.* ¶¶ 7, 9. The message left him confused about the status of his application.

12 *Id.* ¶ 10.

13      A similar situation arose when class member Andra Hatchell, a University of Phoenix

14 borrower, attempted to submit a borrower defense application in February 2022.  Ms. Hatchell

15 received a pop-up message that read: "It looks like you may not meet the statute of limitations for

16 this case." *See* Affidavit of Andra Hatchell ¶ 17, appended hereto as <u>Exhibit E</u>. Ms. Hatchell did

17 not understand this message and thought that it meant she could not continue her application for

18 borrower defense. *Id.* ¶ 18. Several days later, after speaking with Plaintiffs' counsel about the

19 problem, Ms. Hatchell tried again to apply for borrower defense; this time she was able to complete

20 her application, although the confusing pop-up message remained on the screen the entire time. *Id.*

21 ¶ 19. Because of this pop-up and other difficulties with the borrower defense website, Ms. Hatchell

22 is confused and frustrated by the borrower defense process, and fears that she will have her Social

23 Security garnished before the Department resolves her application. *Id.* ¶¶ 20-23.

24      Plaintiffs requested information from the Department about these messages, including why

25 the messages were being displayed, when the messages are typically displayed, and whether an

26 application for borrower defense will be accepted/processed after the applicant sees this message.

27 These messages are particularly concerning because it had been Plaintiffs' understanding that the

28

Plaintiffs' Response to Jan. 27, 2022 Order
(Case No. 3:19-CV-03674-WHA)

Department had not been applying any statute of limitations to deny borrower defense claims on the basis of timing. The Department, however, has not yet answered any of counsel's questions about these messages.

### B. The Reasons for the Delay

This litigation is *not* the cause for the Department's failure to resolve borrower defense applications lawfully and within a reasonable period of time. The Department is free at any time to approve borrower defense applications on an individual or group basis. Indeed, as discussed below, the Department has done just that three times over the past year. The Department is also free to, and indeed has an obligation to, give updates on the status of applications to the borrowers who submitted them. The only thing that the Department cannot do during the pendency of this litigation—by the Department's own voluntary agreement—is issue any more form denial letters to class members or enforce previously issued form denials against borrowers. *See* Defendants' Response to October 19, 2020 Order to Show Cause at 2-3, ECF No. 150.

The Department, however, has been giving class members false or misleading information about this simple fact. For example, Ms. Walker reported in her letter to the Court that when she called the Department's borrower defense hotline in December 2021, she was told that "as long as [the *Sweet* litigation] remains open and unresolved, Borrower Defense cannot review, work or give any type of updates until it's settled." This message was especially confusing to Ms. Walker given that during two previous phone calls with the borrower defense hotline, in January 2020 and July 2020, Ms. Walker had been told that her application was under review. *See* Ex. C, Walker Aff. ¶¶ 15-17. When she was told that this litigation was the cause of the delay, she was understandably enraged. *Id.* ¶ 19. But of course, the Department's statement was categorically false.

As another example, class member Sydney Andrade, an Art Institute borrower, applied for borrower defense in 2016 and received a form denial notice in August 2020. *See* Affidavit of Sydney Andrade ¶¶ 5-6, appended hereto as <u>Exhibit F</u>. Mr. Andrade contacted the Department on February 21, 2022, requesting that the Department re-open his case. *Id.* ¶ 7 & Exhibit A. He received a form response on February 23, 2022, which included, in bold type: "Your claim will

not be re-evaluated unless the court orders re-evaluations when *Sweet v Cardona* is decided. While the court case is pending a decision, your case will remain closed, unless you submit a request for reconsideration. While the case is pending, your loans do remain in the court ordered forbearance." *Id.* ¶¶ 8-9 & Exhibit B. Again, this statement provides borrowers with false information by telling them that the *Sweet* lawsuit prevents the Department from re-examining previously issued form denials. It does not.

Rather, the backlog is growing because the Department apparently lacks a lawful process to evaluate and resolve borrower defense applications within a reasonable timeframe. In the context of a persistent and growing backlog, the Department's limited borrower defense approvals since June 2021—including its surprise announcement of new grants just over a week ago, under the shadow of this status update—are mere drops in the bucket.

Since the parties last briefed the Court, the Department has approved the following tranches of borrower defense applications:

- June 2021: 18,000 applications from ITT Technical Institute.[18]
- July 2021: 1,800 applications from a combination of Westwood College, Marinello Schools of Beauty, and the Court Reporting Institute.[19]
- February 2022[20]:
    - 1,800 applications from DeVry University;

---

[18] *See* Press Release, U.S. Dep't of Educ., Department of Education Announces Approval of New Categories of Borrower Defense Claims Totaling $500 Million in Loan Relief to 18,000 Borrowers (June 16, 2021), https://www.ed.gov/news/press-releases/department-education-announces-approval-new-categories-borrower-defense-claims-totaling-500-million-loan-relief-18000-borrowers.

[19] *See* Press Release, U.S. Dep't of Educ., Department of Education Approves Borrower Defense Claims Related to Three Additional Institutions (July 9, 2021), https://www.ed.gov/news/press-releases/department-education-approves-borrower-defense-claims-related-three-additional-institutions.

[20] *See* Press Release (Feb. 16, 2022), *supra* n.9.

13

Plaintiffs' Response to Jan. 27, 2022 Order
(Case No. 3:19-CV-03674-WHA)

- o  1,600 applications from Westwood College;

- o  130 applications from ITT's Breckenridge School of Nursing;

- o  270 applications from Minnesota School of Business/Globe University[21]; and

- o  11,900 applications from a combination of schools based on earlier findings against them, including Corinthian Colleges, ITT Technical Institute, Marinello Schools of Beauty, Westwood College, and Court Reporting Institute.

These resolutions represent less than 14% of unresolved applications.[22] While Plaintiffs certainly welcome any action by the Department that provides full borrower defense relief to class members, the above cannot be considered anything approaching a fulsome, transparent borrower defense process. For one thing, each of the Department's decisions has limited borrower defense approvals to applicants who made allegations of specific misstatements during specific periods of time—even if the evidence indicates that the institution's misconduct was wide-ranging and widespread. For another, none of the Department's approval decisions have arrived with an explanation of why the Department chose to take action on that class of applicants at that time. Although the Department characterizes these as "new" findings against the schools,[23] its decisions

---

[21] Another 921 students from this school group received borrower defense discharges separately as part of the school's bankruptcy settlement. *See id.*

[22] The Department has not publicly stated whether borrower defense applicants who previously received unlawful form denial notices will receive relief under the approval "findings" it announced in 2021 and 2022. In other words, if a borrower—for example—attended Westwood College, and made borrower defense allegations of the sort described in the Department's July 2021 press release, but had her application denied in the 2020 form denial wave, will that borrower now have her denial rescinded and her application granted pursuant to the July 2021 findings? Plaintiffs have posed this precise question to the Department, but have not received an answer. The notice that Mr. Andrade received implies, however, that the answer is no. *See* Ex. F, Andrade Aff. ¶¶ 8-9 & Exhibit B.

[23] *See, e.g.*, Press Release (Feb. 16, 2022), *supra* n.9 (describing discharges as "following the approval of four new findings").

Plaintiffs' Response to Jan. 27, 2022 Order
(Case No. 3:19-CV-03674-WHA)

have uniformly been based on conduct that has been in the public record for years. At least some of the criteria for the June 2021 ITT approvals had been drafted by the Department in *January 2017*, only to be put into effect more than four years later.[24] As detailed above, DeVry settled its FTC suit in 2016 and has been paying settlements on that conduct ever since.

Nor has the Department set a timeline for when it expects to issue decisions relating to any other schools or school groups, or to other applicants within the school groups that have seen some discharges. This lack of a roadmap for borrowers or the public includes, but is certainly not limited to, the school groups that represent the majority of pending and unlawfully denied borrower defense claims (among them DeVry, CEC, and the University of Phoenix).[25]

The Department likewise has not set out any policies governing how long an individual borrower defense applicant can expect to wait until they get a decision on their application. To the contrary, as demonstrated by the class members who wrote to the Court, applications that have languished for *four years* or more do not appear to be getting priority in the decision-making queue. The Department also has not issued any new guidelines that could help borrowers discern what kinds of allegations or evidence will be considered by the Department to support an approval decision.

In short, Plaintiffs cannot offer any coherent explanation for "why it is taking so long to act on and resolve these applications." ECF No. 214.

---

[24] *See* Supp. Compl. Ex. 26, ECF No. 198-7 (DOE00009399) (memorandum dated January 10, 2017, recommending the Department grant borrower defense relief to ITT borrowers alleging misrepresentations about employment prospects).

[25] Other school groups with significant representation among unresolved claims include such infamous for-profit players as Corinthian Colleges, Kaplan, EDMC, Dream Center Education Holdings, Bridgepoint Education, Infilaw Holdings, and Vatterot Education. *See* Ex. B (DOE00003066). Further, even after two sets of approvals for ITT borrowers, Plaintiffs estimate that there are over 7,000 ITT applications still pending or unlawfully denied. *See id.* (as of April 2020, Department had received 30,874 applications from ITT borrowers).

Plaintiffs' Response to Jan. 27, 2022 Order
(Case No. 3:19-CV-03674-WHA)

1    Dated: February 24, 2022

2                              Respectfully submitted,

3                              /s/      Rebecca C. Ellis

4                              EILEEN M. CONNOR (SBN 248856)

5                              econnor@law.harvard.edu
MARGARET E. O'GRADY (*pro hac vice*)

6                              mogrady@law.harvard.edu
REBECCA C. ELLIS (*pro hac vice*)

7                              rellis@law.harvard.edu
LEGAL SERVICES CENTER OF

8                              HARVARD LAW SCHOOL

9                              122 Boylston Street
Jamaica Plain, MA 02130

10                            Tel.: (617) 390-3003
Fax: (617) 522-0715

11

12                            JOSEPH JARAMILLO (SBN 178566)
jjarmillo@heraca.org

13                            HOUSING & ECONOMIC RIGHTS
ADVOCATES

14                            3950 Broadway, Suite 200
Oakland, CA 94611

15                            Tel.: (510) 271-8443
Fax: (510) 868-4521

16

17                            *Attorneys for Plaintiffs*

18

19

20

21

22

23

24

25

26

27

28

Plaintiffs' Response to Jan. 27, 2022 Order
(Case No. 3:19-CV-03674-WHA)

# Exhibit A

Case: 23-15049, 08/02/2023, ID: 12766654, DktEntry: 50, Page 25 of 158

## Borrower Defense - Quarterly Report - for quarter end 9/30/2021*

| | | | |
|---|---|---|---|
| Total Received Applications | 399,259 | Total Amount Discharged** | $1,211,472,400 |
| Total Pending Applications, Awaiting Adjudication*** | 87,747 | Percentage of the total approved applications receiving partial discharge | 10.0% |
| Total Adjudicated Applications, Pending Notification | 45,782 | Percentage of the total approved Applications receiving 100% discharge | 90.0% |
| Total Approved Applications | 115,955 | Total dollar amount of outstanding debt prior to discharge | $1,425,693,856 |
| Total Denied Applications | 137,438 | Median dollar amount of outstanding debt prior to discharge | $10,166 |
| Total Closed Applications | 12,337 | Median loan debt remaining for applications receiving partial discharge | $8,574 |

### State Level Breakouts:

| Total Received Applications | | | Total Pending Applications, Awaiting Adjudication | | | Total Adjudicated Applications, Pending Notification | | | Total Approved Applications | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Borrower State of Residence | Application Count | Change since Last Month | Borrower State of Residence | Application Count | Change since Last Quarter | Borrower State of Residence | Application Count | Change since Last Quarter | Borrower State of Residence | Application Count | Change since Last Quarter |
| TOTAL | 399,259 | 13,577 | TOTAL | 87,747 | 13,837 | TOTAL | 45,782 | (8,685) | TOTAL | 115,955 | 21,171 |
| California | 76,104 | 2,293 | California | 11,843 | 1,533 | California | 9,099 | 205 | California | 30,804 | 2,786 |
| Florida | 35,128 | 1,352 | Texas | 7,826 | 1,342 | Florida | 4,331 | (583) | Florida | 9,220 | 1,823 |
| Texas | 33,111 | 1,157 | Florida | 7,007 | 1,308 | Texas | 3,916 | (657) | Texas | 8,463 | 1,623 |
| Illinois | 19,615 | 594 | Illinois | 4,778 | 654 | Illinois | 1,759 | (530) | Illinois | 5,263 | 1,061 |
| Georgia | 18,653 | 636 | Georgia | 4,318 | 790 | Georgia | 1,742 | (212) | Georgia | 5,066 | 621 |
| Ohio | 12,984 | 419 | Ohio | 3,686 | 443 | Ohio | 1,561 | (635) | Washington | 4,997 | 566 |
| New York | 12,414 | 411 | New York | 3,394 | 486 | Michigan | 1,378 | (606) | Massachusetts | 4,745 | 277 |
| Pennsylvania | 12,186 | 371 | Pennsylvania | 3,194 | 441 | Pennsylvania | 1,372 | (341) | Michigan | 3,963 | 1,030 |
| Washington | 11,904 | 274 | North Carolina | 2,871 | 504 | North Carolina | 1,298 | (287) | Ohio | 3,094 | 1,058 |
| Michigan | 11,164 | 387 | Arizona | 2,585 | 371 | New York | 1,272 | (190) | Virginia | 2,862 | 663 |
| North Carolina | 10,743 | 375 | New Jersey | 2,442 | 305 | Indiana | 1,208 | (408) | North Carolina | 2,808 | 511 |
| Virginia | 9,262 | 270 | Indiana | 2,170 | 230 | Virginia | 1,110 | (350) | Pennsylvania | 2,669 | 670 |
| Massachusetts | 8,753 | 138 | Michigan | 1,943 | 315 | Washington | 1,093 | (229) | New York | 2,181 | 496 |
| Arizona | 8,509 | 299 | Virginia | 1,880 | 302 | Tennessee | 1,046 | (431) | Missouri | 2,051 | 552 |
| Indiana | 8,295 | 263 | Colorado | 1,756 | 261 | Missouri | 1,019 | (312) | Oregon | 1,865 | 271 |
| Missouri | 7,849 | 261 | Washington | 1,697 | 228 | Arizona | 920 | (202) | Indiana | 1,860 | 696 |
| Tennessee | 6,949 | 317 | Missouri | 1,682 | 276 | Maryland | 907 | (269) | Colorado | 1,824 | 377 |
| Colorado | 6,927 | 235 | Tennessee | 1,682 | 345 | Minnesota | 867 | (76) | Hawaii | 1,601 | 51 |
| New Jersey | 6,818 | 271 | Maryland | 1,581 | 242 | Colorado | 760 | (107) | Tennessee | 1,423 | 713 |
| Maryland | 6,477 | 209 | Massachusetts | 1,575 | 134 | Wisconsin | 719 | (262) | Nevada | 1,398 | 377 |
| Minnesota | 6,069 | 140 | Kentucky | 1,551 | 144 | Nevada | 696 | (161) | Minnesota | 1,345 | 164 |
| Nevada | 5,604 | 191 | South Carolina | 1,549 | 281 | South Carolina | 675 | (171) | Maryland | 1,335 | 434 |
| Oregon | 5,467 | 154 | Minnesota | 1,468 | 209 | Alabama | 614 | (333) | Arizona | 1,267 | 474 |
| South Carolina | 5,376 | 237 | Alabama | 1,247 | 267 | Oklahoma | 566 | (107) | New Jersey | 1,254 | 134 |
| Alabama | 5,015 | 245 | Nevada | 1,242 | 192 | Oregon | 549 | (91) | Alabama | 1,194 | 519 |
| Wisconsin | 4,885 | 153 | Wisconsin | 1,097 | 145 | Massachusetts | 504 | (118) | South Carolina | 1,089 | 329 |
| Kentucky | 4,248 | 147 | Oregon | 889 | 129 | Kentucky | 466 | (257) | Mississippi | 1,056 | 84 |
| Louisiana | 3,730 | 140 | Louisiana | 796 | 170 | New Jersey | 465 | (45) | Wisconsin | 910 | 457 |
| Hawaii | 3,200 | 80 | Utah | 760 | 106 | Louisiana | 449 | (162) | Louisiana | 888 | 284 |
| Mississippi | 3,063 | 103 | Oklahoma | 679 | 159 | Kansas | 361 | (96) | Kentucky | 867 | 394 |
| Oklahoma | 2,861 | 136 | Connecticut | 651 | 148 | Utah | 309 | (140) | Utah | 678 | 231 |
| Utah | 2,692 | 93 | Kansas | 607 | 71 | Mississippi | 301 | (37) | West Virginia | 661 | 80 |
| Kansas | 2,311 | 73 | Iowa | 521 | 102 | Hawaii | 274 | 35 | Arkansas | 602 | 119 |
| Arkansas | 2,156 | 60 | Mississippi | 514 | 146 | Arkansas | 245 | (56) | Oklahoma | 513 | 216 |
| Connecticut | 2,030 | 78 | Idaho | 450 | 56 | Connecticut | 234 | - | Kansas | 446 | 157 |
| Iowa | 1,908 | 65 | New Mexico | 427 | 51 | Nebraska | 190 | (80) | Iowa | 404 | 105 |
| West Virginia | 1,818 | 54 | Arkansas | 382 | 83 | New Mexico | 188 | (114) | Idaho | 392 | 147 |
| New Mexico | 1,591 | 56 | West Virginia | 343 | 85 | Idaho | 187 | (77) | New Mexico | 357 | 181 |
| Idaho | 1,569 | 51 | Nebraska | 270 | 34 | Iowa | 171 | (68) | Nebraska | 323 | 129 |
| Nebraska | 1,273 | 32 | Delaware | 229 | 43 | West Virginia | 137 | (47) | Connecticut | 296 | 41 |
| District of Columbia | 922 | 29 | Hawaii | 224 | 52 | Delaware | 104 | (12) | District of Columbia | 221 | 39 |
| New Hampshire | 828 | 24 | New Hampshire | 192 | 39 | District of Columbia | 91 | (19) | Wyoming | 207 | 10 |

| | | |
|---|---|---|
| Delaware | 792 | 29 |
| Maine | 703 | 28 |
| Montana | 672 | 36 |
| Rhode Island | 581 | 25 |
| South Dakota | 530 | 11 |
| Wyoming | 504 | 11 |
| Alaska | 430 | 20 |
| North Dakota | 401 | 13 |
| Foreign Country | 256 | - |
| Vermont | 238 | - |
| Puerto Rico | 184 | - |
| US Virgin Islands | 98 | - |
| Armed Forces Europe | 88 | - |
| Armed Forces Pacific | 50 | - |
| Federated Micronesia | 48 | - |
| Guam | 31 | - |
| Less than 30 | 1,192 | 591 |

| | | |
|---|---|---|
| Maine | 189 | 45 |
| District of Columbia | 175 | 30 |
| Montana | 163 | 17 |
| South Dakota | 148 | 24 |
| Rhode Island | 146 | 32 |
| Wyoming | 104 | 17 |
| Alaska | 90 | 15 |
| North Dakota | 84 | 11 |
| Puerto Rico | 67 | 22 |
| Vermont | 45 | - |
| Less than 30 | 538 | 402 |

| | | |
|---|---|---|
| Rhode Island | 86 | (13) |
| Montana | 76 | - |
| New Hampshire | 68 | (14) |
| Maine | 65 | - |
| North Dakota | 56 | - |
| South Dakota | 47 | - |
| Wyoming | 40 | - |
| Vermont | 33 | - |
| Less than 30 | 117 | (20) |

| | | |
|---|---|---|
| New Hampshire | 203 | 39 |
| Montana | 174 | 38 |
| Delaware | 154 | 29 |
| Maine | 141 | 10 |
| Foreign Country | 129 | - |
| Alaska | 112 | - |
| North Dakota | 110 | 17 |
| South Dakota | 108 | - |
| Rhode Island | 96 | 20 |
| Vermont | 64 | - |
| US Virgin Islands | 42 | - |
| Armed Forces Euro | 34 | 34 |
| Less than 30 | 126 | 34 |

*NOTES

Enhanced functionality, now available in borrower defense system, Customer Engagement Management System (CEMS), allows the U.S. Department of Education (ED) to more quickly identify potential duplicate Applications. As a result, the methodology of this report Outstanding and remaining debt amounts exclude consolidation loans and loans previously paid off by consolidation.

As referenced in the letter submitted from ED regarding the 6/30/2018 Borrower Defense Quarterly Congressional report, data provided at the state level presents an inadvertent disclosure risk. Therefore, the state data for received applications has not been updated in the event that the borrower count has changed less than ten since the previous report. Application status counts by state have not been updated in the event the borrower count has changed less than ten or if the discharged dollar amount has changed less than $35,000. These changes are included in the bucket, "Less than 30" or "Less than $100,000" as to not impact the total numbers. These buckets also include those applications for which no borrower address is reported.

**Discharged dollar amounts, total dollar amount of outstanding debt prior to discharge, median dollar amount of outstanding debt prior to discharge and median loan debt for applications receiving partial discharge remaining reflect those approved applications for which a discharge has been processed. It typically takes 90-120 days from the approval notification until the borrower's discharge is processed.  This includes the values referenced: Total Amount Discharged, Total dollar amount of outstanding debt prior to discharge, Median dollar amount of outstanding debt prior to discharge, and Median loan debt remaining for applications receiving partial discharge. Discharge data is sourced from the Enterprise Data Warehouse and leverages the most recent address of the borrower, which could result in changes by state if a borrower relocates.

Data Descriptions:
Total Received Applications: Total count of individual applications received by ED that have passed initial intake reviews and deemed ready for further review and adjudication.
Total Pending Applications, Awaiting Adjudication: Total count of applications under review prior to a determination.
Total Adjudicated Applications, Pending Notification: Total count of applications for which a determination has been made, but the borrower notification has not been sent.    (Please note that the count includes approximately 37k applications which are pending court approval of relief methodology.)
Total Approved Applications: Total count of applications approved or preliminarily approved for discharge in which the borrower notification has been sent.
Total Denied Applications: Total count of applications denied for discharge in which the borrower notification has been sent.
Total Closed Applications: Total count of applications closed with no need for adjudication. (e.g. borrower requests that ED stop processing application or the borrower receives another benefit such as loan forgiveness or discharge.)
Total Amount of Discharges: Total dollar amount associated with approved applications for which the discharge has been processed.

Sources:
CEMS Borrower Defense System
Enterprise Data Warehouse (EDWA)

| Total Denied Applications | | |
|---|---|---|
| Borrower State of Residence | Application Count | Change since Last Quarter |
| **TOTAL** | **137,438** | **25** |
| California | 21200 | - |
| Florida | 13772 | - |
| Texas | 12000 | - |
| Illinois | 7289 | - |
| Georgia | 6908 | - |
| New York | 5190 | - |
| Pennsylvania | 4631 | - |
| Ohio | 4275 | - |
| Washington | 3815 | - |
| Michigan | 3616 | - |
| Arizona | 3548 | - |
| North Carolina | 3454 | - |
| Virginia | 3160 | - |
| Missouri | 2876 | - |
| Indiana | 2868 | - |
| Tennessee | 2648 | - |
| New Jersey | 2510 | - |
| Maryland | 2468 | - |
| Colorado | 2443 | - |
| Minnesota | 2216 | - |
| Nevada | 2119 | - |
| Wisconsin | 2024 | - |
| Oregon | 1994 | - |
| South Carolina | 1947 | - |
| Alabama | 1802 | - |
| Massachusetts | 1654 | - |
| Louisiana | 1505 | - |
| Kentucky | 1255 | - |
| Mississippi | 1049 | - |
| Oklahoma | 1020 | - |
| Utah | 888 | - |
| Arkansas | 851 | - |
| Hawaii | 850 | - |
| Kansas | 842 | - |
| Connecticut | 805 | - |
| Iowa | 754 | - |
| West Virginia | 622 | - |
| New Mexico | 594 | - |
| Idaho | 510 | - |
| Nebraska | 459 | - |
| District of Columbia | 403 | - |
| New Hampshire | 341 | - |

| Total Closed Applications | | |
|---|---|---|
| Borrower State of Residence | Application Count | Change since Last Quarter |
| **TOTAL** | **12,337** | **380** |
| California | 3,158 | 37 |
| Texas | 906 | 35 |
| Florida | 798 | 36 |
| Georgia | 619 | 20 |
| Illinois | 526 | 20 |
| New York | 377 | 17 |
| Ohio | 368 | 13 |
| Pennsylvania | 320 | - |
| North Carolina | 312 | 14 |
| Washington | 302 | - |
| Michigan | 264 | 15 |
| Hawaii | 251 | - |
| Virginia | 250 | 11 |
| Missouri | 221 | - |
| Arizona | 189 | 20 |
| Indiana | 189 | - |
| Maryland | 186 | 10 |
| Minnesota | 173 | - |
| Oregon | 170 | 16 |
| Alabama | 158 | - |
| Tennessee | 150 | - |
| Nevada | 149 | - |
| New Jersey | 147 | - |
| Colorado | 144 | 12 |
| Mississippi | 143 | - |
| Wisconsin | 135 | - |
| South Carolina | 116 | - |
| Kentucky | 109 | - |
| Louisiana | 92 | - |
| Oklahoma | 83 | - |
| Arkansas | 76 | - |
| Iowa | 58 | 13 |
| Utah | 57 | - |
| Kansas | 55 | 11 |
| West Virginia | 55 | - |
| Connecticut | 44 | - |
| District of Columbia | 32 | - |
| Nebraska | 31 | - |
| Idaho | 30 | 30 |
| Less than 30 | 619 | 50 |

| Total Amount Discharged** | | |
|---|---|---|
| Borrower State of Residence | Total Discharged | Change since Last Quarter |
| **Total Discharged** | **$ 1,211,472,400** | **$ 134,896,925** |
| California | $ 351,091,050 | $ 21,482,078 |
| Florida | $ 96,834,634 | $ 10,548,144 |
| Texas | $ 70,182,273 | $ 6,922,032 |
| Georgia | $ 51,854,669 | $ 2,544,036 |
| Washington | $ 47,291,631 | $ 3,840,921 |
| Massachusetts | $ 45,525,545 | $ 12,298,359 |
| Illinois | $ 42,562,966 | $ 7,738,822 |
| Michigan | $ 40,462,435 | $ 13,041,275 |
| North Carolina | $ 38,665,850 | $ 4,304,124 |
| Pennsylvania | $ 33,649,659 | $ 6,238,942 |
| Ohio | $ 28,974,671 | $ 3,821,545 |
| Virginia | $ 28,006,618 | $ 3,052,777 |
| New York | $ 25,633,548 | $ 1,741,718 |
| Missouri | $ 21,972,690 | $ 5,285,430 |
| Hawaii | $ 21,460,343 | $ 269,142 |
| Oregon | $ 21,174,304 | $ 890,590 |
| Nevada | $ 18,444,498 | $ 2,885,935 |
| Indiana | $ 18,016,232 | $ 2,005,344 |
| Colorado | $ 16,819,609 | $ 1,302,867 |
| South Carolina | $ 14,554,647 | $ 1,589,512 |
| New Jersey | $ 13,451,959 | $ 1,664,986 |
| Mississippi | $ 13,409,977 | $ 402,210 |
| Tennessee | $ 13,150,381 | $ 1,476,166 |
| Maryland | $ 12,936,872 | $ 1,712,596 |
| Minnesota | $ 12,011,499 | $ 2,046,622 |
| Arizona | $ 8,821,975 | $ 1,235,174 |
| Alabama | $ 8,578,982 | $ 758,931 |
| Louisiana | $ 8,521,439 | $ 534,423 |
| Wisconsin | $ 8,026,152 | $ 1,985,055 |
| Kentucky | $ 7,832,878 | $ 1,028,838 |
| Arkansas | $ 6,970,264 | $ 935,306 |
| Utah | $ 6,499,914 | $ 1,595,191 |
| West Virginia | $ 6,312,338 | $ 495,973 |
| Oklahoma | $ 5,176,837 | $ 1,176,985 |
| Kansas | $ 4,987,094 | $ 901,865 |
| Iowa | $ 4,036,946 | $ 364,672 |
| New Mexico | $ 3,611,152 | $ 1,181,317 |
| Idaho | $ 3,487,375 | $ 669,263 |
| Nebraska | $ 3,459,047 | $ 967,445 |
| Connecticut | $ 3,329,774 | $ 236,457 |
| Wyoming | $ 3,130,170 | $ 162,121 |
| Foreign Country | $ 3,060,882 | $ 71,031 |

PSER-27

| | | |
|---|---:|---:|
| Delaware | 286 | - |
| Maine | 284 | - |
| Montana | 243 | - |
| Rhode Island | 237 | - |
| South Dakota | 209 | - |
| Alaska | 155 | - |
| North Dakota | 146 | - |
| Wyoming | 135 | - |
| Vermont | 82 | - |
| Puerto Rico | 80 | - |
| Foreign Country | 73 | - |
| US Virgin Islands | 35 | - |
| Armed Forces Europe | 30 | - |
| Less than 30 | 268 | 25 |

| | | | | |
|---|---|---:|---|---:|
| New Hampshire | $ | 2,491,017 | $ | 482,042 |
| Montana | $ | 2,046,282 | $ | 69,042 |
| Maine | $ | 1,922,176 | $ | 273,223 |
| South Dakota | $ | 1,585,286 | $ | 83,618 |
| Delaware | $ | 1,537,722 | $ | 52,803 |
| Rhode Island | $ | 1,476,906 | $ | 259,409 |
| District of Columbia | $ | 1,403,767 | $ | - |
| North Dakota | $ | 1,281,781 | $ | - |
| Vermont | $ | 1,074,065 | $ | 182,394 |
| Alaska | $ | 990,422 | $ | 38,756 |
| US Virgin Islands | $ | 880,742 | $ | - |
| Guam | $ | 225,183 | $ | - |
| Puerto Rico | $ | 120,856 | $ | - |
| Less than $100,000 | $ | 454,616 | $ | 49,418 |

Case: 23-15049, 08/02/2023, ID: 12766654, DktEntry: 50, Page 28 of 158

# Exhibit B

Case: 23-15049, 08/02/2023, ID: 12766654, DktEntry: 50, Page 30 of 158

| Warning: | | This report had more results than could be exported (up to 100,000 rows). Summary totals include all rows. | |
|---|---|---|---|

## CMN Cases by School Owner - Open - 2020

As of 2020-04-16 15:24:44 Eastern Standard Time/EST • Generated by Colleen Nevin

Filtered By
Show: All cases
Units: Hours
Resolution Action not equal to Duplicate - Customer Requesting Information,Duplicate - Existing Application,Customer Inquiry - No Existing Case,Non-Customer Inquiry/Request,Spam
Line of Business equals BD
School Owner not equal to
Status equals 2.10 - Ready for EU Review, 2.11 - Narrative Needed, 2.20 - EU Review in Progress, 2.21 - Ready for Quality Control, 2.22 - Quality Control in Progress, 2.23 - Awaiting Evidence Check by ED Divisions, 2.30 - Final BD Review Complete, 2.32 - Awaiting Relief Implementation, 2.40 - Flagged for Approval - Confirm Loans, 2.50 - Ready for ED, 2.60 - Sent to ED

| Primary School ↓ | School Owner ↓ | Status ↑ | Record Count |
|---|---|---|---|
| ITT Technical Institute | ITT Educational Services, Inc. | 2.10 - Ready for EU Review | 25114 |
| | | 2.20 - EU Review in Progress | 804 |
| | | 2.21 - Ready for Quality Control | 21 |
| | | 2.22 - Quality Control in Progress | 63 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 23 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 4811 |
| | | 2.50 - Ready for ED | 37 |
| | | 2.60 - Sent to ED | 1 |
| | Subtotal | | 30874 |
| Subtotal | | | 30874 |
| University of Phoenix | Apollo Group, Inc (University Of Phoenix) | 2.10 - Ready for EU Review | 17291 |
| | | 2.11 - Narrative Needed | 3 |
| | | 2.20 - EU Review in Progress | 1001 |
| | | 2.21 - Ready for Quality Control | 18 |
| | | 2.22 - Quality Control in Progress | 6 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 31 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 2738 |
| | Subtotal | | 21088 |
| Subtotal | | | 21088 |
| DeVry University | Devry | 2.10 - Ready for EU Review | 16120 |
| | | 2.20 - EU Review in Progress | 17 |
| | Subtotal | | 16137 |
| Subtotal | | | 16137 |
| Sanford-Brown College | CEC | 2.10 - Ready for EU Review | 3134 |
| | | 2.20 - EU Review in Progress | 55 |
| | | 2.21 - Ready for Quality Control | 21 |
| | | 2.22 - Quality Control in Progress | 237 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 571 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 428 |
| | Subtotal | | 4446 |
| | EDMC | 2.10 - Ready for EU Review | 18 |
| | Subtotal | | 18 |
| Subtotal | | | 4464 |
| Purdue University Global | Graham Holdings Company (Kaplan) | 2.10 - Ready for EU Review | 3932 |
| | | 2.20 - EU Review in Progress | 1 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 1 |
| | Subtotal | | 3934 |
| Subtotal | | | 3934 |
| Heald College | Corinthian Colleges, Inc. | 2.10 - Ready for EU Review | 65 |
| | | 2.11 - Narrative Needed | 3 |
| | | 2.20 - EU Review in Progress | 82 |
| | | 2.21 - Ready for Quality Control | 6 |
| | | 2.22 - Quality Control in Progress | 46 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 194 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 2616 |
| | | 2.50 - Ready for ED | 581 |
| | | 2.60 - Sent to ED | 227 |
| | Subtotal | | 3820 |
| | Heald | 2.10 - Ready for EU Review | 11 |
| | Subtotal | | 11 |
| Subtotal | | | 3831 |
| Art Institute of Las Vegas (The) | EDMC | 2.10 - Ready for EU Review | 2257 |
| | | 2.20 - EU Review in Progress | 65 |
| | Subtotal | | 2322 |
| | Dream Center Education Holdings (DCEH) | 2.10 - Ready for EU Review | 368 |
| | Subtotal | | 368 |
| Subtotal | | | 2690 |
| Argosy University | Dream Center Education Holdings (DCEH) | 2.10 - Ready for EU Review | 1871 |
| | | 2.20 - EU Review in Progress | 3 |
| | Subtotal | | 1874 |
| | EDMC | 2.10 - Ready for EU Review | 736 |
| | | 2.20 - EU Review in Progress | 66 |
| | Subtotal | | 802 |
| Subtotal | | | 2676 |
| Le Cordon Bleu College of Culinary Arts | CEC | 2.10 - Ready for EU Review | 1773 |

Case: 23-15049, 08/02/2023, ID: 12766654, DktEntry: 50, Page 31 of 158

| | | | |
|---|---|---|---|
| | | 2.20 - EU Review in Progress | 23 |
| | | 2.21 - Ready for Quality Control | 1 |
| | | 2.22 - Quality Control in Progress | 37 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 181 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 305 |
| | Subtotal | | 2320 |
| Subtotal | | | 2320 |
| Art Institute of Pittsburgh (The) | Dream Center Education Holdings (DCEH) | 2.10 - Ready for EU Review | 2130 |
| | Subtotal | | 2130 |
| | EDMC | 2.10 - Ready for EU Review | 41 |
| | Subtotal | | 41 |
| Subtotal | | | 2171 |
| Brightwood College | Willis Stein & Partners III, L.P. | 2.10 - Ready for EU Review | 2143 |
| | | 2.20 - EU Review in Progress | 24 |
| | Subtotal | | 2167 |
| Subtotal | | | 2167 |
| Virginia College | Willis Stein & Partners III, L.P. | 2.10 - Ready for EU Review | 1943 |
| | | 2.20 - EU Review in Progress | 25 |
| | Subtotal | | 1968 |
| Subtotal | | | 1968 |
| Westwood College - Denver North | Westwood | 2.10 - Ready for EU Review | 1670 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 1 |
| | Subtotal | | 1671 |
| Subtotal | | | 1671 |
| Ashford University | Bridgepoint Education, Inc. | 2.10 - Ready for EU Review | 1632 |
| | | 2.20 - EU Review in Progress | 2 |
| | Subtotal | | 1634 |
| Subtotal | | | 1634 |
| American InterContinental University | CEC | 2.10 - Ready for EU Review | 1628 |
| | Subtotal | | 1628 |
| Subtotal | | | 1628 |
| Colorado Technical University | CEC | 2.10 - Ready for EU Review | 1565 |
| | Subtotal | | 1565 |
| Subtotal | | | 1565 |
| Minnesota School of Business | Globe University/Minnesota School Of Business | 2.10 - Ready for EU Review | 1428 |
| | | 2.20 - EU Review in Progress | 62 |
| | Subtotal | | 1490 |
| Subtotal | | | 1490 |
| Westwood College - Los Angeles | Westwood | 2.10 - Ready for EU Review | 1304 |
| | | 2.20 - EU Review in Progress | 1 |
| | | 2.60 - Sent to ED | 1 |
| | Subtotal | | 1306 |
| Subtotal | | | 1306 |
| Illinois Institute of Art (The) | EDMC | 2.10 - Ready for EU Review | 1205 |
| | Subtotal | | 1205 |
| Subtotal | | | 1205 |
| Altierus Career College | Corinthian Colleges, Inc. | 2.10 - Ready for EU Review | 10 |
| | | 2.11 - Narrative Needed | 5 |
| | | 2.20 - EU Review in Progress | 40 |
| | | 2.21 - Ready for Quality Control | 13 |
| | | 2.22 - Quality Control in Progress | 5 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 73 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 17 |
| | | 2.50 - Ready for ED | 506 |
| | | 2.60 - Sent to ED | 532 |
| | Subtotal | | 1201 |
| Subtotal | | | 1201 |
| Marinello School of Beauty | Marinello School Of Beauty | 2.10 - Ready for EU Review | 903 |
| | | 2.20 - EU Review in Progress | 21 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 1 |
| | | 2.50 - Ready for ED | 249 |
| | Subtotal | | 1174 |
| Subtotal | | | 1174 |
| Everest College | Corinthian Colleges, Inc. | 2.10 - Ready for EU Review | 43 |
| | | 2.11 - Narrative Needed | 1 |
| | | 2.20 - EU Review in Progress | 50 |
| | | 2.21 - Ready for Quality Control | 10 |
| | | 2.22 - Quality Control in Progress | 12 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 61 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 10 |
| | | 2.50 - Ready for ED | 306 |
| | | 2.60 - Sent to ED | 609 |
| | Subtotal | | 1102 |
| Subtotal | | | 1102 |
| Art Institute of Atlanta (The) | EDMC | 2.10 - Ready for EU Review | 887 |
| | | 2.20 - EU Review in Progress | 133 |
| | Subtotal | | 1020 |
| Subtotal | | | 1020 |
| Charlotte School of Law | Infilaw Holding, LLC | 2.10 - Ready for EU Review | 945 |
| | | 2.50 - Ready for ED | 26 |
| | Subtotal | | 971 |
| Subtotal | | | 971 |
| Walden University | Wengen Alberta, Limited Partnership (Laureate Education) | 2.10 - Ready for EU Review | 938 |

Case: 23-15049, 08/02/2023, ID: 12766654, DktEntry: 50, Page 32 of 158

| | | | |
|---|---|---|---|
| | Subtotal | | 938 |
| Subtotal | | | 938 |
| Art Institute of California - Los Angeles (The) | EDMC | 2.10 - Ready for EU Review | 872 |
| | Subtotal | | 872 |
| Subtotal | | | 872 |
| Vatterott College | Vatterott Education, Inc. | 2.10 - Ready for EU Review | 776 |
| | | 2.20 - EU Review in Progress | 55 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 1 |
| | Subtotal | | 832 |
| Subtotal | | | 832 |
| Globe University | Globe University/Minnesota School Of Business | 2.10 - Ready for EU Review | 801 |
| | | 2.20 - EU Review in Progress | 14 |
| | | 2.50 - Ready for ED | 1 |
| | Subtotal | | 816 |
| Subtotal | | | 816 |
| ATI Career Training Center | Ati Career Training | 2.10 - Ready for EU Review | 794 |
| | Subtotal | | 794 |
| Subtotal | | | 794 |
| Anthem College | Anthem College | 2.10 - Ready for EU Review | 785 |
| | | 2.20 - EU Review in Progress | 7 |
| | Subtotal | | 792 |
| Subtotal | | | 792 |
| Keller Graduate School of Management | Devry | 2.10 - Ready for EU Review | 791 |
| | Subtotal | | 791 |
| Subtotal | | | 791 |
| Everest Institute | Corinthian Colleges, Inc. | 2.10 - Ready for EU Review | 55 |
| | | 2.11 - Narrative Needed | 4 |
| | | 2.20 - EU Review in Progress | 62 |
| | | 2.21 - Ready for Quality Control | 5 |
| | | 2.22 - Quality Control in Progress | 3 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 47 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 6 |
| | | 2.50 - Ready for ED | 187 |
| | | 2.60 - Sent to ED | 378 |
| | Subtotal | | 747 |
| Subtotal | | | 747 |
| Brooks Institute | CEC | 2.10 - Ready for EU Review | 489 |
| | | 2.20 - EU Review in Progress | 10 |
| | | 2.21 - Ready for Quality Control | 15 |
| | | 2.22 - Quality Control in Progress | 80 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 101 |
| | Subtotal | | 695 |
| Subtotal | | | 695 |
| Capella University | Capella Education Company | 2.10 - Ready for EU Review | 679 |
| | Subtotal | | 679 |
| Subtotal | | | 679 |
| Art Institute of Philadelphia (The) | EDMC | 2.10 - Ready for EU Review | 675 |
| | Subtotal | | 675 |
| Subtotal | | | 675 |
| Art Institute of Fort Lauderdale (The) | EDMC | 2.10 - Ready for EU Review | 654 |
| | Subtotal | | 654 |
| Subtotal | | | 654 |
| WyoTech | Corinthian Colleges, Inc. | 2.10 - Ready for EU Review | 27 |
| | | 2.11 - Narrative Needed | 1 |
| | | 2.20 - EU Review in Progress | 69 |
| | | 2.21 - Ready for Quality Control | 9 |
| | | 2.22 - Quality Control in Progress | 19 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 77 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 14 |
| | | 2.50 - Ready for ED | 128 |
| | | 2.60 - Sent to ED | 305 |
| | Subtotal | | 649 |
| Subtotal | | | 649 |
| Universal Technical Institute | Universal Technical Institute | 2.10 - Ready for EU Review | 557 |
| | | 2.20 - EU Review in Progress | 75 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 1 |
| | Subtotal | | 633 |
| Subtotal | | | 633 |
| Star Career Academy | Star Career Academy | 2.10 - Ready for EU Review | 558 |
| | | 2.20 - EU Review in Progress | 48 |
| | Subtotal | | 606 |
| Subtotal | | | 606 |
| Lincoln Technical Institute | Lincoln Technical Institute, Inc. | 2.10 - Ready for EU Review | 17 |
| | | 2.20 - EU Review in Progress | 587 |
| | Subtotal | | 604 |
| Subtotal | | | 604 |
| United Education Institute | Sp/Palm Iec Holdings LLC (United Education Institute) | 2.10 - Ready for EU Review | 578 |
| | | 2.20 - EU Review in Progress | 25 |
| | Subtotal | | 603 |
| Subtotal | | | 603 |
| South University | EDMC | 2.10 - Ready for EU Review | 539 |
| | | 2.20 - EU Review in Progress | 53 |
| | Subtotal | | 592 |

Case: 23-15049, 08/02/2023, ID: 12766654, DktEntry: 50, Page 33 of 158

| | | | |
|---|---|---|---|
| Subtotal | | | 592 |
| Wright Career College | Wright Business School | 2.10 - Ready for EU Review | 24 |
| | | 2.30 - Final BD Review Complete | 1 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 214 |
| | | 2.50 - Ready for ED | 321 |
| | | 2.60 - Sent to ED | 10 |
| | Subtotal | | 570 |
| Subtotal | | | 570 |
| Everest University | Corinthian Colleges, Inc. | 2.10 - Ready for EU Review | 31 |
| | | 2.11 - Narrative Needed | 2 |
| | | 2.20 - EU Review in Progress | 49 |
| | | 2.21 - Ready for Quality Control | 4 |
| | | 2.22 - Quality Control in Progress | 6 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 30 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 9 |
| | | 2.50 - Ready for ED | 149 |
| | | 2.60 - Sent to ED | 282 |
| | Subtotal | | 562 |
| Subtotal | | | 562 |
| Westwood College - O'Hare Airport | Westwood | 2.10 - Ready for EU Review | 470 |
| | | 2.20 - EU Review in Progress | 85 |
| | Subtotal | | 555 |
| Subtotal | | | 555 |
| Art Institute of Colorado (The) | EDMC | 2.10 - Ready for EU Review | 549 |
| | | 2.20 - EU Review in Progress | 1 |
| | Subtotal | | 550 |
| Subtotal | | | 550 |
| Full Sail University | Full Sail Recorders, Inc. | 2.10 - Ready for EU Review | 545 |
| | Subtotal | | 545 |
| Subtotal | | | 545 |
| Grand Canyon University | Grand Canyon Education, Inc | 2.10 - Ready for EU Review | 536 |
| | | 2.20 - EU Review in Progress | 1 |
| | Subtotal | | 537 |
| Subtotal | | | 537 |
| Keiser University | Everglades College, Inc. | 2.10 - Ready for EU Review | 511 |
| | Subtotal | | 511 |
| Subtotal | | | 511 |
| Strayer University | Strayer Education Inc. | 2.10 - Ready for EU Review | 16 |
| | | 2.11 - Narrative Needed | 1 |
| | | 2.20 - EU Review in Progress | 1 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 492 |
| | Subtotal | | 510 |
| Subtotal | | | 510 |
| Westwood College - DuPage | Westwood | 2.10 - Ready for EU Review | 509 |
| | Subtotal | | 509 |
| Subtotal | | | 509 |
| Brown Mackie College-Cincinnati | EDMC | 2.10 - Ready for EU Review | 504 |
| | | 2.20 - EU Review in Progress | 1 |
| | Subtotal | | 505 |
| Subtotal | | | 505 |
| Fortis College | Fortis College | 2.10 - Ready for EU Review | 486 |
| | Subtotal | | 486 |
| Subtotal | | | 486 |
| Brightwood Career Institute | Willis Stein & Partners III, L.P. | 2.10 - Ready for EU Review | 445 |
| | | 2.20 - EU Review in Progress | 36 |
| | | 2.30 - Final BD Review Complete | 1 |
| | Subtotal | | 482 |
| Subtotal | | | 482 |
| ICDC College | International Career Development Center | 2.10 - Ready for EU Review | 452 |
| | | 2.20 - EU Review in Progress | 1 |
| | Subtotal | | 453 |
| Subtotal | | | 453 |
| Heritage College | Weston Educational, Inc. | 2.10 - Ready for EU Review | 403 |
| | | 2.20 - EU Review in Progress | 49 |
| | Subtotal | | 452 |
| Subtotal | | | 452 |
| Bryman School of Arizona (The) | Everest | 2.10 - Ready for EU Review | 73 |
| | | 2.20 - EU Review in Progress | 367 |
| | Subtotal | | 440 |
| Subtotal | | | 440 |
| Devry Institute of Technology | Devry | 2.10 - Ready for EU Review | 436 |
| | Subtotal | | 436 |
| Subtotal | | | 436 |
| Art Institute of California - San Diego | EDMC | 2.10 - Ready for EU Review | 434 |
| | Subtotal | | 434 |
| Subtotal | | | 434 |
| New England Institute of Art (The) | EDMC | 2.10 - Ready for EU Review | 427 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 1 |
| | Subtotal | | 428 |
| Subtotal | | | 428 |
| Career Point College | Career Point College | 2.10 - Ready for EU Review | 408 |
| | | 2.20 - EU Review in Progress | 19 |
| | Subtotal | | 427 |

Case: 23-15049, 08/02/2023, ID: 12766654, DktEntry: 50, Page 34 of 158

| | | | |
|---|---|---|---|
| Subtotal | | | 427 |
| Art Institute of Houston (The) | EDMC | 2.10 - Ready for EU Review | 418 |
| | Subtotal | | 418 |
| Subtotal | | | 418 |
| Lincoln College of Technology | Lincoln Technical Institute, Inc. | 2.10 - Ready for EU Review | 403 |
| | | 2.20 - EU Review in Progress | 8 |
| | Subtotal | | 411 |
| Subtotal | | | 411 |
| Medtech College | Jtc Education, Inc. | 2.10 - Ready for EU Review | 375 |
| | | 2.20 - EU Review in Progress | 33 |
| | Subtotal | | 408 |
| Subtotal | | | 408 |
| Miami International University of Art & Design | EDMC | 2.10 - Ready for EU Review | 402 |
| | Subtotal | | 402 |
| Subtotal | | | 402 |
| Academy of Art University | Academy Of Art University | 2.10 - Ready for EU Review | 399 |
| | Subtotal | | 399 |
| Subtotal | | | 399 |
| Carrington College | Devry | 2.10 - Ready for EU Review | 274 |
| | | 2.20 - EU Review in Progress | 112 |
| | Subtotal | | 386 |
| Subtotal | | | 386 |
| Westwood College - South Bay | Westwood | 2.10 - Ready for EU Review | 342 |
| | | 2.20 - EU Review in Progress | 31 |
| | Subtotal | | 373 |
| Subtotal | | | 373 |
| Art Institute of Seattle (The) | Dream Center Education Holdings (DCEH) | 2.10 - Ready for EU Review | 323 |
| | | 2.20 - EU Review in Progress | 46 |
| | Subtotal | | 369 |
| Subtotal | | | 369 |
| American College for Medical Careers | Premier Education Group L.P. | 2.10 - Ready for EU Review | 192 |
| | | 2.20 - EU Review in Progress | 167 |
| | Subtotal | | 359 |
| Subtotal | | | 359 |
| Art Institute of New York City (The) | EDMC | 2.10 - Ready for EU Review | 352 |
| | Subtotal | | 352 |
| Subtotal | | | 352 |
| Art Institutes International Minnesota (The) | EDMC | 2.10 - Ready for EU Review | 344 |
| | | 2.20 - EU Review in Progress | 2 |
| | Subtotal | | 346 |
| Subtotal | | | 346 |
| Florida Career College | Sp/Palm lec Holdings LLC (United Education Institute) | 2.10 - Ready for EU Review | 332 |
| | | 2.20 - EU Review in Progress | 10 |
| | Subtotal | | 342 |
| Subtotal | | | 342 |
| Regency Beauty Institute | Regency Corporation | 2.10 - Ready for EU Review | 341 |
| | Subtotal | | 341 |
| Subtotal | | | 341 |
| Daymar College | The Mark A. Gabis Revocable Inter Vivos Trust | 2.10 - Ready for EU Review | 322 |
| | | 2.50 - Ready for ED | 4 |
| | Subtotal | | 326 |
| Subtotal | | | 326 |
| Le Cordon Bleu Institute of Culinary Arts | CEC | 2.10 - Ready for EU Review | 207 |
| | | 2.20 - EU Review in Progress | 7 |
| | | 2.22 - Quality Control in Progress | 5 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 28 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 60 |
| | Subtotal | | 307 |
| Subtotal | | | 307 |
| Harrison College | Educational Management Corporation (Not Education Management Corp.) | 2.10 - Ready for EU Review | 304 |
| | Subtotal | | 304 |
| Subtotal | | | 304 |
| Art Institute of Charlotte (The) | EDMC | 2.10 - Ready for EU Review | 287 |
| | | 2.20 - EU Review in Progress | 1 |
| | Subtotal | | 288 |
| Subtotal | | | 288 |
| Brown Mackie College-South Bend | EDMC | 2.10 - Ready for EU Review | 286 |
| | Subtotal | | 286 |
| Subtotal | | | 286 |
| Art Institute of Portland (The) | EDMC | 2.10 - Ready for EU Review | 286 |
| | Subtotal | | 286 |
| Subtotal | | | 286 |
| Kaplan College | Willis Stein & Partners III, L.P. | 2.10 - Ready for EU Review | 143 |
| | | 2.20 - EU Review in Progress | 5 |
| | | 2.60 - Sent to ED | 19 |
| | Subtotal | | 167 |
| | Graham Holdings Company (Kaplan) | 2.10 - Ready for EU Review | 111 |
| | Subtotal | | 111 |
| Subtotal | | | 278 |
| Stevens Henager College | Collegeamerica Services, Inc. | 2.10 - Ready for EU Review | 272 |
| | Subtotal | | 272 |
| Subtotal | | | 272 |
| Dade Medical College | Dade Medical College | 2.10 - Ready for EU Review | 4 |

Case: 23-15049, 08/02/2023, ID: 12766654, DktEntry: 50, Page 35 of 158

| | | | |
|---|---|---|---|
| | | 2.11 - Narrative Needed | 21 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 241 |
| | Subtotal | | 266 |
| Subtotal | | | 266 |
| Brown Mackie College-Findlay | EDMC | 2.10 - Ready for EU Review | 260 |
| | Subtotal | | 260 |
| Subtotal | | | 260 |
| Briarcliffe College | CEC | 2.10 - Ready for EU Review | 165 |
| | | 2.20 - EU Review in Progress | 22 |
| | | 2.22 - Quality Control in Progress | 1 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 8 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 63 |
| | Subtotal | | 259 |
| Subtotal | | | 259 |
| Collins College | CEC | 2.10 - Ready for EU Review | 88 |
| | | 2.20 - EU Review in Progress | 8 |
| | | 2.21 - Ready for Quality Control | 4 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 15 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 139 |
| | Subtotal | | 254 |
| Subtotal | | | 254 |
| Branford Hall Career Institute | Premier Education Group L.P. | 2.10 - Ready for EU Review | 244 |
| | Subtotal | | 244 |
| Subtotal | | | 244 |
| Brown Mackie College (The) | EDMC | 2.10 - Ready for EU Review | 239 |
| | Subtotal | | 239 |
| Subtotal | | | 239 |
| ATI- Career Training Center | Ati Career Training | 2.10 - Ready for EU Review | 234 |
| | Subtotal | | 234 |
| Subtotal | | | 234 |
| Art Institute of California-Hollywood (The) | EDMC | 2.10 - Ready for EU Review | 228 |
| | Subtotal | | 228 |
| Subtotal | | | 228 |
| Le Cordon Bleu College of Culinary Arts in Chicago | CEC | 2.10 - Ready for EU Review | 158 |
| | | 2.20 - EU Review in Progress | 4 |
| | | 2.22 - Quality Control in Progress | 5 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 30 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 30 |
| | Subtotal | | 227 |
| Subtotal | | | 227 |
| American National University | American National University Group | 2.10 - Ready for EU Review | 41 |
| | | 2.20 - EU Review in Progress | 184 |
| | Subtotal | | 225 |
| Subtotal | | | 225 |
| Mountain State University | Mountain State University | 2.10 - Ready for EU Review | 91 |
| | | 2.20 - EU Review in Progress | 125 |
| | | 2.60 - Sent to ED | 1 |
| | Subtotal | | 217 |
| Subtotal | | | 217 |
| Career Colleges of America | Career Colleges Of America | 2.10 - Ready for EU Review | 89 |
| | | 2.20 - EU Review in Progress | 125 |
| | Subtotal | | 214 |
| Subtotal | | | 214 |
| ATI Technical Training Center | Ati Career Training | 2.10 - Ready for EU Review | 209 |
| | | 2.20 - EU Review in Progress | 1 |
| | Subtotal | | 210 |
| Subtotal | | | 210 |
| Miller - Motte Technical College | Delta Cec | 2.10 - Ready for EU Review | 165 |
| | | 2.20 - EU Review in Progress | 33 |
| | Subtotal | | 198 |
| Subtotal | | | 198 |
| Computer Systems Institute | Computer Systems Institute | 2.10 - Ready for EU Review | 196 |
| | Subtotal | | 196 |
| Subtotal | | | 196 |
| National American University | National American University Holdings, Inc. | 2.10 - Ready for EU Review | 33 |
| | | 2.20 - EU Review in Progress | 162 |
| | Subtotal | | 195 |
| Subtotal | | | 195 |
| Concorde Career College | Concorde Career Colleges, Inc. | 2.10 - Ready for EU Review | 119 |
| | | 2.20 - EU Review in Progress | 76 |
| | Subtotal | | 195 |
| Subtotal | | | 195 |
| McCann School of Business & Technology | Delta Cec | 2.10 - Ready for EU Review | 171 |
| | | 2.20 - EU Review in Progress | 21 |
| | Subtotal | | 192 |
| Subtotal | | | 192 |
| Heritage Institute | Weston Educational, Inc. | 2.10 - Ready for EU Review | 191 |
| | Subtotal | | 191 |
| Subtotal | | | 191 |
| Bryant & Stratton College | Bryant & Stratton College, Inc. | 2.10 - Ready for EU Review | 2 |
| | | 2.20 - EU Review in Progress | 120 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 69 |
| | Subtotal | | 191 |

| | | | |
|---|---|---|---:|
| | | Subtotal | 191 |
| Fortis Institute | Fortis College | 2.10 - Ready for EU Review | 189 |
| | | Subtotal | 189 |
| Subtotal | | | 189 |
| Altierus Career Education | Corinthian Colleges, Inc. | 2.11 - Narrative Needed | 1 |
| | | 2.20 - EU Review in Progress | 10 |
| | | 2.21 - Ready for Quality Control | 2 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 9 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 3 |
| | | 2.50 - Ready to ED | 45 |
| | | 2.60 - Sent to ED | 118 |
| | | Subtotal | 188 |
| Subtotal | | | 188 |
| Pittsburgh Career Institute | Career Education Corp. | 2.10 - Ready for EU Review | 26 |
| | | 2.20 - EU Review in Progress | 86 |
| | | 2.22 - Quality Control in Progress | 3 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 7 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 58 |
| | | Subtotal | 180 |
| Subtotal | | | 180 |
| Everest University - Pompano Beach | Corinthian Colleges, Inc. | 2.10 - Ready for EU Review | 14 |
| | | 2.20 - EU Review in Progress | 17 |
| | | 2.22 - Quality Control in Progress | 2 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 12 |
| | | 2.50 - Ready to ED | 44 |
| | | 2.60 - Sent to ED | 88 |
| | | Subtotal | 177 |
| Subtotal | | | 177 |
| Brooks College | Brooks College | 2.10 - Ready for EU Review | 162 |
| | | 2.22 - Quality Control in Progress | 8 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 5 |
| | | Subtotal | 175 |
| Subtotal | | | 175 |
| Business Career Training Institute | Business Career Training Institute | 2.10 - Ready for EU Review | 6 |
| | | 2.20 - EU Review in Progress | 166 |
| | | Subtotal | 172 |
| Subtotal | | | 172 |
| UEI College | Sp/Palm Iec Holdings LLC (United Education Institute) | 2.10 - Ready for EU Review | 103 |
| | | 2.20 - EU Review in Progress | 59 |
| | | Subtotal | 162 |
| Subtotal | | | 162 |
| Remington College | Remington College | 2.10 - Ready for EU Review | 117 |
| | | 2.20 - EU Review in Progress | 45 |
| | | Subtotal | 162 |
| Subtotal | | | 162 |
| Kaplan Career Institute | Willis Stein & Partners III, L.P. | 2.10 - Ready for EU Review | 100 |
| | | Subtotal | 100 |
| | Graham Holdings Company (Kaplan) | 2.10 - Ready for EU Review | 53 |
| | | Subtotal | 53 |
| Subtotal | | | 153 |
| Centura College | Employment Services, Inc. | 2.20 - EU Review in Progress | 150 |
| | | Subtotal | 150 |
| Subtotal | | | 150 |
| Art Institute of Dallas (The) | EDMC | 2.10 - Ready for EU Review | 149 |
| | | Subtotal | 149 |
| Subtotal | | | 149 |
| Sanford-Brown Institute | CEC | 2.10 - Ready for EU Review | 96 |
| | | 2.20 - EU Review in Progress | 8 |
| | | 2.22 - Quality Control in Progress | 16 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 9 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 16 |
| | | Subtotal | 145 |
| Subtotal | | | 145 |
| Mount Washington College | Graham Holdings Company (Kaplan) | 2.10 - Ready for EU Review | 142 |
| | | Subtotal | 142 |
| Subtotal | | | 142 |
| Rasmussen College | Rasmussen College, Inc. | 2.10 - Ready for EU Review | 136 |
| | | 2.20 - EU Review in Progress | 5 |
| | | Subtotal | 141 |
| Subtotal | | | 141 |
| Katharine Gibbs School | Gibbs College | 2.10 - Ready for EU Review | 123 |
| | | 2.20 - EU Review in Progress | 18 |
| | | Subtotal | 141 |
| Subtotal | | | 141 |
| Bryman College | Corinthian Colleges, Inc. | 2.10 - Ready for EU Review | 2 |
| | | 2.20 - EU Review in Progress | 10 |
| | | 2.21 - Ready for Quality Control | 4 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 7 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 2 |
| | | 2.50 - Ready to ED | 37 |
| | | 2.60 - Sent to ED | 79 |
| | | Subtotal | 141 |
| Subtotal | | | 141 |

Case: 23-15049, 08/02/2023, ID: 12766654, DktEntry: 50, Page 37 of 158

| School | Parent | Status | Count |
|---|---|---|---|
| SBI Campus - an affiliate of Sanford-Brown | CEC | 2.10 - Ready for EU Review | 100 |
| | | 2.20 - EU Review in Progress | 13 |
| | | 2.22 - Quality Control in Progress | 2 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 11 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 10 |
| | | Subtotal | 136 |
| Subtotal | | | 136 |
| Miller-Motte Technical College | Delta Career Education Corporation | 2.10 - Ready for EU Review | 83 |
| | | 2.20 - EU Review in Progress | 42 |
| | | Subtotal | 125 |
| Subtotal | | | 125 |
| Jones International University | Jones International University | 2.10 - Ready for EU Review | 121 |
| | | Subtotal | 121 |
| Subtotal | | | 121 |
| American Career Institute | ACI | 2.10 - Ready for EU Review | 121 |
| | | Subtotal | 121 |
| Subtotal | | | 121 |
| American Career College | David Pyle Trust | 2.10 - Ready for EU Review | 102 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 14 |
| | | Subtotal | 116 |
| Subtotal | | | 116 |
| Pima Medical Institute | Vocational Training Institute, Inc. | 2.10 - Ready for EU Review | 111 |
| | | Subtotal | 111 |
| Subtotal | | | 111 |
| Everest College Phoenix | Corinthian Colleges, Inc. | 2.10 - Ready for EU Review | 9 |
| | | 2.20 - EU Review in Progress | 5 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 13 |
| | | 2.50 - Ready for ED | 26 |
| | | 2.60 - Sent to ED | 54 |
| | | Subtotal | 107 |
| Subtotal | | | 107 |
| Western International University | Apollo Group, Inc (University Of Phoenix) | 2.10 - Ready for EU Review | 30 |
| | | 2.20 - EU Review in Progress | 76 |
| | | Subtotal | 106 |
| Subtotal | | | 106 |
| ATI College of Health | Ati Career Training | 2.10 - Ready for EU Review | 22 |
| | | 2.20 - EU Review in Progress | 84 |
| | | Subtotal | 106 |
| Subtotal | | | 106 |
| Arizona Summit Law School | Infilaw Holding, LLC | 2.10 - Ready for EU Review | 106 |
| | | Subtotal | 106 |
| Subtotal | | | 106 |
| ECPI University | Novateur Education, Inc. | 2.10 - Ready for EU Review | 12 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 73 |
| | | 2.60 - Sent to ED | 20 |
| | | Subtotal | 105 |
| Subtotal | | | 105 |
| Remington College - Tampa Campus | Remington College | 2.10 - Ready for EU Review | 101 |
| | | Subtotal | 101 |
| Subtotal | | | 101 |
| Missouri College | Weston Educational, Inc. | 2.10 - Ready for EU Review | 101 |
| | | Subtotal | 101 |
| Subtotal | | | 101 |
| Brown Mackie College | EDMC | 2.10 - Ready for EU Review | 100 |
| | | Subtotal | 100 |
| Subtotal | | | 100 |
| Art Institute of York (The) - Pennsylvania | EDMC | 2.10 - Ready for EU Review | 9 |
| | | 2.20 - EU Review in Progress | 91 |
| | | Subtotal | 100 |
| Subtotal | | | 100 |
| Harris School of Business | Premier Education Group L.P. | 2.10 - Ready for EU Review | 96 |
| | | 2.50 - Ready for ED | 2 |
| | | Subtotal | 98 |
| Subtotal | | | 98 |
| Westech College | Marinello School Of Beauty | 2.10 - Ready for EU Review | 3 |
| | | 2.50 - Ready for ED | 26 |
| | | 2.60 - Sent to ED | 68 |
| | | Subtotal | 97 |
| Subtotal | | | 97 |
| Fortis Institute - Towson | Fortis College | 2.10 - Ready for EU Review | 95 |
| | | Subtotal | 95 |
| Subtotal | | | 95 |
| Remington College - Mobile Campus | Remington College | 2.10 - Ready for EU Review | 90 |
| | | Subtotal | 90 |
| Subtotal | | | 90 |
| Milan Institute | Amarillo College Of Hairdressing, Inc. | 2.10 - Ready for EU Review | 14 |
| | | 2.20 - EU Review in Progress | 1 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 74 |
| | | 2.50 - Ready for ED | 1 |
| | | Subtotal | 90 |
| Subtotal | | | 90 |
| DeVry College of Technology | Devry | 2.10 - Ready for EU Review | 82 |
| | | Subtotal | 82 |

| School | Company | Status | Count |
|---|---|---|---|
| | | Subtotal | 82 |
| ASA College | Asa Inst Of Bus & Comptr Tech, Inc. | 2.10 - Ready for EU Review | 81 |
| | | Subtotal | 81 |
| | | Subtotal | 81 |
| Lehigh Valley College | CEC | 2.10 - Ready for EU Review | 30 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 3 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 47 |
| | | Subtotal | 80 |
| | | Subtotal | 80 |
| International Academy of Design and Technology | CEC | 2.10 - Ready for EU Review | 15 |
| | | 2.20 - EU Review in Progress | 4 |
| | | 2.21 - Ready for Quality Control | 4 |
| | | 2.22 - Quality Control in Progress | 6 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 17 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 33 |
| | | Subtotal | 79 |
| | | Subtotal | 79 |
| Chamberlain University | Devry | 2.10 - Ready for EU Review | 2 |
| | | 2.20 - EU Review in Progress | 72 |
| | | Subtotal | 74 |
| | | Subtotal | 74 |
| Berkeley College | Berkeley Educ. Serv. Of Ny, Inc. | 2.10 - Ready for EU Review | 73 |
| | | Subtotal | 73 |
| | | Subtotal | 73 |
| Gwinnett College | LTT Enterprises, Inc | 2.10 - Ready for EU Review | 70 |
| | | Subtotal | 70 |
| | | Subtotal | 70 |
| Gibbs College | Gibbs College | 2.10 - Ready for EU Review | 67 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 1 |
| | | 2.50 - Ready for ED | 2 |
| | | Subtotal | 70 |
| | | Subtotal | 70 |
| Spencerian College | Sullivan University Systems | 2.10 - Ready for EU Review | 11 |
| | | 2.20 - EU Review in Progress | 58 |
| | | Subtotal | 69 |
| | | Subtotal | 69 |
| Harrington College of Design | CEC | 2.10 - Ready for EU Review | 39 |
| | | 2.20 - EU Review in Progress | 1 |
| | | 2.21 - Ready for Quality Control | 4 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 1 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 24 |
| | | Subtotal | 69 |
| | | Subtotal | 69 |
| Platt College | Stvt-Aai Education Inc. | 2.10 - Ready for EU Review | 44 |
| | | Subtotal | 44 |
| | Caltius Equity Partners III, LP | 2.10 - Ready for EU Review | 24 |
| | | Subtotal | 24 |
| | | Subtotal | 68 |
| Sullivan University | Sullivan University Systems | 2.10 - Ready for EU Review | 7 |
| | | 2.20 - EU Review in Progress | 57 |
| | | Subtotal | 64 |
| | | Subtotal | 64 |
| Concorde Career Institute | Concorde Career Colleges, Inc. | 2.10 - Ready for EU Review | 14 |
| | | 2.20 - EU Review in Progress | 42 |
| | | Subtotal | 56 |
| | | Subtotal | 56 |
| Brown Mackie College-Merrillville | EDMC | 2.10 - Ready for EU Review | 55 |
| | | 2.20 - EU Review in Progress | 1 |
| | | Subtotal | 56 |
| | | Subtotal | 56 |
| Florida Coastal School of Law | Infilaw Holding, LLC | 2.20 - EU Review in Progress | 54 |
| | | 2.21 - Ready for Quality Control | 1 |
| | | Subtotal | 55 |
| | | Subtotal | 55 |
| FastTrain of Miami | Fasttrain | 2.10 - Ready for EU Review | 30 |
| | | 2.20 - EU Review in Progress | 23 |
| | | 2.50 - Ready for ED | 1 |
| | | Subtotal | 54 |
| | | Subtotal | 54 |
| Las Vegas College | Corinthian Colleges, Inc. | 2.10 - Ready for EU Review | 6 |
| | | 2.20 - EU Review in Progress | 6 |
| | | 2.22 - Quality Control in Progress | 2 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 2 |
| | | 2.50 - Ready for ED | 9 |
| | | 2.60 - Sent to ED | 28 |
| | | Subtotal | 53 |
| | | Subtotal | 53 |
| All-State Career | Fortis College | 2.10 - Ready for EU Review | 53 |
| | | Subtotal | 53 |
| | | Subtotal | 53 |
| Bryan University | Bryan College | 2.10 - Ready for EU Review | 52 |
| | | Subtotal | 52 |
| | | Subtotal | 52 |

| | | | |
|---|---|---|---|
| Court Reporting Institute of St Louis | Vatterott Education, Inc. | 2.10 - Ready for EU Review | 26 |
| | | 2.20 - EU Review in Progress | 24 |
| | Subtotal | | 50 |
| Subtotal | | | 50 |
| Northcentral University | Innova Management Group, Inc. | 2.10 - Ready for EU Review | 5 |
| | | 2.20 - EU Review in Progress | 43 |
| | Subtotal | | 48 |
| Subtotal | | | 48 |
| CollegeAmerica Denver | Collegeamerica Services, Inc. | 2.10 - Ready for EU Review | 24 |
| | | 2.20 - EU Review in Progress | 24 |
| | Subtotal | | 48 |
| Subtotal | | | 48 |
| University of the Rockies | Bridgepoint Education, Inc. | 2.10 - Ready for EU Review | 47 |
| | Subtotal | | 47 |
| Subtotal | | | 47 |
| Court Reporting Institute,Inc | Court Reporting Institute,Inc | 2.10 - Ready for EU Review | 41 |
| | | 2.20 - EU Review in Progress | 4 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 2 |
| | Subtotal | | 47 |
| Subtotal | | | 47 |
| Bryan College | Bryan College | 2.10 - Ready for EU Review | 5 |
| | | 2.20 - EU Review in Progress | 41 |
| | Subtotal | | 46 |
| Subtotal | | | 46 |
| Los Angeles Film School (The) | Phelps Education West, LLC | 2.10 - Ready for EU Review | 45 |
| | Subtotal | | 45 |
| Subtotal | | | 45 |
| Remington College - Lafayette Campus | Remington College | 2.10 - Ready for EU Review | 42 |
| | Subtotal | | 42 |
| Subtotal | | | 42 |
| Remington College - Cleveland Campus | Remington College | 2.10 - Ready for EU Review | 41 |
| | Subtotal | | 41 |
| Subtotal | | | 41 |
| FastTrain of Fort Lauderdale | Fasttrain | 2.10 - Ready for EU Review | 13 |
| | | 2.20 - EU Review in Progress | 28 |
| | Subtotal | | 41 |
| Subtotal | | | 41 |
| Thomas Jefferson School of Law | Thomas Jefferson School Of Law | 2.10 - Ready for EU Review | 6 |
| | | 2.20 - EU Review in Progress | 30 |
| | Subtotal | | 36 |
| Subtotal | | | 36 |
| Santa Fe University of Art and Design | Wengen Alberta, Limited Partnership (Laureate Education) | 2.10 - Ready for EU Review | 4 |
| | | 2.20 - EU Review in Progress | 31 |
| | Subtotal | | 35 |
| Subtotal | | | 35 |
| FastTrain of Tampa | Fasttrain | 2.10 - Ready for EU Review | 34 |
| | Subtotal | | 34 |
| Subtotal | | | 34 |
| FastTrain of Jacksonville | Fasttrain | 2.10 - Ready for EU Review | 32 |
| | Subtotal | | 32 |
| Subtotal | | | 32 |
| Beckfield College | Quad Partners III-A LP | 2.10 - Ready for EU Review | 26 |
| | | 2.50 - Ready for ED | 5 |
| | Subtotal | | 31 |
| Subtotal | | | 31 |
| Masters of Cosmetology College | Masters Of Cosmetology College | 2.10 - Ready for EU Review | 4 |
| | | 2.20 - EU Review in Progress | 26 |
| | Subtotal | | 30 |
| Subtotal | | | 30 |
| Chicago School of Professional Psychology | Tcs Education System | 2.10 - Ready for EU Review | 14 |
| | | 2.20 - EU Review in Progress | 11 |
| | | 2.60 - Sent to ED | 2 |
| | Subtotal | | 27 |
| Subtotal | | | 27 |
| Everglades University | Everglades College, Inc. | 2.10 - Ready for EU Review | 24 |
| | Subtotal | | 24 |
| Subtotal | | | 24 |
| ATI College | Ati Career Training | 2.10 - Ready for EU Review | 5 |
| | | 2.20 - EU Review in Progress | 19 |
| | Subtotal | | 24 |
| Subtotal | | | 24 |
| Tucson College | Delta Cec | 2.10 - Ready for EU Review | 4 |
| | | 2.20 - EU Review in Progress | 17 |
| | | 2.50 - Ready for ED | 2 |
| | Subtotal | | 23 |
| Subtotal | | | 23 |
| Ross University, School of Medicine | Devry | 2.10 - Ready for EU Review | 5 |
| | | 2.20 - EU Review in Progress | 3 |
| | | 2.30 - Final BD Review Complete | 4 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 11 |
| | Subtotal | | 23 |
| Subtotal | | | 23 |
| Herzing University | Herzing, Inc. | 2.10 - Ready for EU Review | 19 |

Case: 23-15049, 08/02/2023, ID: 12766654, DktEntry: 50, Page 40 of 158

| | | | |
|---|---|---|---|
| | | 2.20 - EU Review in Progress | 3 |
| | | 2.50 - Ready for ED | 1 |
| | Subtotal | | 23 |
| Subtotal | | | 23 |
| Bauder College | Graham Holdings Company (Kaplan) | 2.20 - EU Review in Progress | 19 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 3 |
| | Subtotal | | 22 |
| Subtotal | | | 22 |
| Remington College - San Diego Campus | Remington College | 2.10 - Ready for EU Review | 21 |
| | Subtotal | | 21 |
| Subtotal | | | 21 |
| National College | National College | 2.20 - EU Review in Progress | 4 |
| | | 2.30 - Final BD Review Complete | 1 |
| | | 2.60 - Sent to ED | 15 |
| | Subtotal | | 20 |
| Subtotal | | | 20 |
| Heald College, School of Business | Heald | 2.10 - Ready for EU Review | 20 |
| | Subtotal | | 20 |
| Subtotal | | | 20 |
| Lincoln Technical Institute - Hartford | Lincoln Technical Institute, Inc. | 2.20 - EU Review in Progress | 19 |
| | Subtotal | | 19 |
| Subtotal | | | 19 |
| Ross Medical Education Center | Ross Education, LLC | 2.10 - Ready for EU Review | 1 |
| | | 2.30 - Final BD Review Complete | 6 |
| | | 2.60 - Sent to ED | 11 |
| | Subtotal | | 18 |
| Subtotal | | | 18 |
| Heald Institute of Technology | Heald | 2.10 - Ready for EU Review | 18 |
| | Subtotal | | 18 |
| Subtotal | | | 18 |
| California College San Diego | Collegeamerica Services, Inc. | 2.10 - Ready for EU Review | 18 |
| | Subtotal | | 18 |
| Subtotal | | | 18 |
| Milan Institute of Cosmetology | Amarillo College Of Hairdressing, Inc. | 2.10 - Ready for EU Review | 3 |
| | | 2.40 - Flagged for Approval - Confirm Loans | 13 |
| | Subtotal | | 16 |
| Subtotal | | | 16 |
| Lincoln Technical Institute - East Windsor | Lincoln Technical Institute, Inc. | 2.20 - EU Review in Progress | 16 |
| | Subtotal | | 16 |
| Subtotal | | | 16 |
| Dowling College | Dowling College (Private) | 2.10 - Ready for EU Review | 7 |
| | | 2.20 - EU Review in Progress | 8 |
| | | 2.60 - Sent to ED | 1 |
| | Subtotal | | 16 |
| Subtotal | | | 16 |
| CollegeAmerica - Flagstaff | Collegeamerica Services, Inc. | 2.10 - Ready for EU Review | 2 |
| | | 2.20 - EU Review in Progress | 12 |
| | Subtotal | | 14 |
| Subtotal | | | 14 |
| American Public University System | American Public Education, Inc. | 2.10 - Ready for EU Review | 1 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 1 |
| | | 2.60 - Sent to ED | 12 |
| | Subtotal | | 14 |
| Subtotal | | | 14 |
| West Coast University | David Pyle Trust | 2.10 - Ready for EU Review | 5 |
| | | 2.20 - EU Review in Progress | 7 |
| | Subtotal | | 12 |
| Subtotal | | | 12 |
| South Texas Vocational Technical Institute | Stvt-Aai Education Inc. | 2.10 - Ready for EU Review | 12 |
| | Subtotal | | 12 |
| Subtotal | | | 12 |
| San Joaquin Valley College | San Joaquin Valley College, Inc | 2.10 - Ready for EU Review | 4 |
| | | 2.60 - Sent to ED | 8 |
| | Subtotal | | 12 |
| Subtotal | | | 12 |
| King's College | Bradford Schools, Inc. | 2.60 - Sent to ED | 11 |
| | Subtotal | | 11 |
| Subtotal | | | 11 |
| Globe Institute of Technology | Globe University/Minnesota School Of Business | 2.10 - Ready for EU Review | 2 |
| | | 2.20 - EU Review in Progress | 8 |
| | | 2.60 - Sent to ED | 1 |
| | Subtotal | | 11 |
| Subtotal | | | 11 |
| Fashion Institute of Design & Merchandising | Fashion Institute Of Design & Merchandising | 2.10 - Ready for EU Review | 10 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 1 |
| | Subtotal | | 11 |
| Subtotal | | | 11 |
| Wright Business School | Wright Business School | 2.40 - Flagged for Approval - Confirm Loans | 3 |
| | | 2.50 - Ready for ED | 6 |
| | | 2.60 - Sent to ED | 1 |
| | Subtotal | | 10 |
| Subtotal | | | 10 |
| Dorsey School of Business | Quad Partners III-A LP | 2.20 - EU Review in Progress | 9 |

Case: 23-15049, 08/02/2023, ID: 12766654, DktEntry: 50, Page 41 of 158

| | | | |
|---|---|---|---|
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 1 |
| | Subtotal | | 10 |
| Subtotal | | | 10 |
| All-State Career School | Education Affiliates, LLC | 2.10 - Ready for EU Review | 10 |
| | Subtotal | | 10 |
| Subtotal | | | 10 |
| Western State University College of Law | EDMC | 2.10 - Ready for EU Review | 2 |
| | | 2.20 - EU Review in Progress | 7 |
| | Subtotal | | 9 |
| Subtotal | | | 9 |
| Ross University School of Veterinary Medicine | Devry | 2.10 - Ready for EU Review | 8 |
| | | 2.20 - EU Review in Progress | 1 |
| | Subtotal | | 9 |
| Subtotal | | | 9 |
| Saybrook University | Tcs Education System | 2.60 - Sent to ED | 8 |
| | Subtotal | | 8 |
| Subtotal | | | 8 |
| National University | National University System | 2.10 - Ready for EU Review | 2 |
| | | 2.20 - EU Review in Progress | 6 |
| | Subtotal | | 8 |
| Subtotal | | | 8 |
| International Business College | Bradford Schools, Inc. | 2.10 - Ready for EU Review | 3 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 5 |
| | Subtotal | | 8 |
| Subtotal | | | 8 |
| Heald College-School of Business | Heald | 2.10 - Ready for EU Review | 8 |
| | Subtotal | | 8 |
| Subtotal | | | 8 |
| Remington College - New Orleans Campus | Remington College | 2.10 - Ready for EU Review | 1 |
| | | 2.20 - EU Review in Progress | 6 |
| | Subtotal | | 7 |
| Subtotal | | | 7 |
| Kendall College | Wengen Alberta, Limited Partnership (Laureate Education) | 2.20 - EU Review in Progress | 7 |
| | Subtotal | | 7 |
| Subtotal | | | 7 |
| Heald College-School of Technology | Heald | 2.10 - Ready for EU Review | 6 |
| | | 2.20 - EU Review in Progress | 1 |
| | Subtotal | | 7 |
| Subtotal | | | 7 |
| Charter College | Charter College | 2.10 - Ready for EU Review | 1 |
| | | 2.20 - EU Review in Progress | 3 |
| | | 2.21 - Ready for Quality Control | 3 |
| | Subtotal | | 7 |
| Subtotal | | | 7 |
| Centura Institute | Employment Services, Inc. | 2.20 - EU Review in Progress | 7 |
| | Subtotal | | 7 |
| Subtotal | | | 7 |
| Bradford School | Bradford Schools, Inc. | 2.10 - Ready for EU Review | 7 |
| | Subtotal | | 7 |
| Subtotal | | | 7 |
| American International College | CEC | 2.10 - Ready for EU Review | 1 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 6 |
| | Subtotal | | 7 |
| Subtotal | | | 7 |
| YTI Career Institute | The Porter And Chester Inst., Inc. | 2.20 - EU Review in Progress | 6 |
| | Subtotal | | 6 |
| Subtotal | | | 6 |
| Paul Mitchell the School Salt Lake City | John Paul Mitchell Systems | 2.20 - EU Review in Progress | 6 |
| | Subtotal | | 6 |
| Subtotal | | | 6 |
| National Aviation Academy - New England | Corinthian Colleges, Inc. | 2.20 - EU Review in Progress | 4 |
| | | 2.50 - Ready for ED | 1 |
| | | 2.60 - Sent to ED | 1 |
| | Subtotal | | 6 |
| Subtotal | | | 6 |
| Empire Beauty School | Regis Corp. | 2.20 - EU Review in Progress | 1 |
| | | 2.23 - Awaiting Evidence Check by ED Divisions | 4 |
| | Subtotal | | 5 |
| | Regis Corporation | 2.23 - Awaiting Evidence Check by ED Divisions | 1 |
| | Subtotal | | 1 |
| Subtotal | | | 6 |
| Cortiva Institute | Steiner Leisure Ltd. | 2.23 - Awaiting Evidence Check by ED Divisions | 6 |
| | Subtotal | | 6 |
| Subtotal | | | 6 |
| Art Institute of Tucson (The) | EDMC | 2.10 - Ready for EU Review | 1 |
| | | 2.20 - EU Review in Progress | 4 |
| | Subtotal | | 5 |
| Subtotal | | | 5 |
| International Technical Institute | Lincoln Technical Institute, Inc. | 2.10 - Ready for EU Review | 1 |
| | | 2.20 - EU Review in Progress | 3 |
| | Subtotal | | 4 |
| Subtotal | | | 4 |
| Columbia Southern University | Columbia Southern Education Group, Inc. | 2.40 - Flagged for Approval - Confirm Loans | 4 |

| | | | |
|---|---|---|---|
| | Subtotal | | 4 |
| Subtotal | | | 4 |
| Post University | Post University, Inc. | 2.10 - Ready for EU Review | 3 |
| Subtotal | | | 3 |
| Subtotal | | | 3 |
| Katherine Gibbs School | Gibbs College | 2.10 - Ready for EU Review | 3 |
| Subtotal | | | 3 |
| Subtotal | | | 3 |
| Florida Technical College | Leeds Equity Partners IV, L.P. | 2.10 - Ready for EU Review | 2 |
| | | 2.21 - Ready for Quality Control | 1 |
| | Subtotal | | 3 |
| Subtotal | | | 3 |
| American University of the Caribbean | Devry | 2.10 - Ready for EU Review | 1 |
| | | 2.20 - EU Review in Progress | 2 |
| | Subtotal | | 3 |
| Subtotal | | | 3 |
| Wood Tobe - Coburn School | Bradford Schools, Inc. | 2.10 - Ready for EU Review | 1 |
| | | 2.20 - EU Review in Progress | 1 |
| | Subtotal | | 2 |
| Subtotal | | | 2 |
| Seacoast Career Schools | Premier Education Group L.P. | 2.10 - Ready for EU Review | 2 |
| Subtotal | Subtotal | | 2 |
| | | | 2 |
| Sawyer College | Corinthian Colleges, Inc. | 2.60 - Sent to ED | 2 |
| Subtotal | Subtotal | | 2 |
| | | | 2 |
| Radians College | Jtc Education, Inc. | 2.10 - Ready for EU Review | 2 |
| Subtotal | Subtotal | | 2 |
| | | | 2 |
| Monroe College | Monroe College, Ltd. | 2.10 - Ready for EU Review | 2 |
| Subtotal | Subtotal | | 2 |
| | | | 2 |
| Instituto de Banca y Comercio | Leeds Equity Partners IV, L.P. | 2.10 - Ready for EU Review | 1 |
| | | 2.11 - Narrative Needed | 1 |
| | Subtotal | | 2 |
| Subtotal | | | 2 |
| City University of Seattle | National University System | 2.10 - Ready for EU Review | 2 |
| | Subtotal | | 2 |
| Subtotal | | | 2 |
| Vista College | Education Futures Management Co. | 2.10 - Ready for EU Review | 1 |
| | Subtotal | | 1 |
| Subtotal | | | 1 |
| Vet Tech Institute | Bradford Schools, Inc. | 2.10 - Ready for EU Review | 1 |
| | Subtotal | | 1 |
| Subtotal | | | 1 |
| St. Paul's School of Nursing | Education Affiliates, LLC | 2.23 - Awaiting Evidence Check by ED Divisions | 1 |
| | Subtotal | | 1 |
| Subtotal | | | 1 |
| St.  George's University, School of Medicine | St. George'S University, Ltd. | 2.10 - Ready for EU Review | 1 |
| | Subtotal | | 1 |
| Subtotal | | | 1 |
| Saba University School of Medicine | Equinox Eic Partners LLC | 2.10 - Ready for EU Review | 1 |
| | Subtotal | | 1 |
| Subtotal | | | 1 |
| Rocky Mountain College of Art + Design | Phelps Education West, LLC | 2.10 - Ready for EU Review | 1 |
| | Subtotal | | 1 |
| Subtotal | | | 1 |
| Porter and Chester Institute | The Porter And Chester Inst., Inc. | 2.10 - Ready for EU Review | 1 |
| | Subtotal | | 1 |
| Subtotal | | | 1 |
| Pacific Oaks College | Tcs Education System | 2.10 - Ready for EU Review | 1 |
| | Subtotal | | 1 |
| Subtotal | | | 1 |
| NewSchool of Architecture and Design | Wengen Alberta, Limited Partnership (Laureate Education) | 2.10 - Ready for EU Review | 1 |
| | Subtotal | | 1 |
| Subtotal | | | 1 |
| National Institute of Technology | Corinthian Colleges, Inc. | 2.20 - EU Review in Progress | 1 |
| | Subtotal | | 1 |
| Subtotal | | | 1 |
| Medical University of the Americas | Equinox Eic Partners LLC | 2.10 - Ready for EU Review | 1 |
| | Subtotal | | 1 |
| Subtotal | | | 1 |
| Jolie Hair and Beauty Academy | Pioneer Education, LLC | 2.21 - Ready for Quality Control | 1 |
| | Subtotal | | 1 |
| Subtotal | | | 1 |
| ITT Business Institute | ITT Educational Services, Inc. | 2.10 - Ready for EU Review | 1 |
| | Subtotal | | 1 |
| Subtotal | | | 1 |
| Indiana University - Purdue University Indianapolis | Indiana University | 2.10 - Ready for EU Review | 1 |
| | Subtotal | | 1 |
| Subtotal | | | 1 |
| Hondros College of Nursing | American Public Education, Inc. | 2.10 - Ready for EU Review | 1 |
| | Subtotal | | 1 |

| | | | |
|---|---|---|---|
| Subtotal | | | 1 |
| Gwinnett College-Sandy Springs | LTT Enterprises, Inc | 2.10 - Ready for EU Review | 1 |
| | Subtotal | | 1 |
| Subtotal | | | 1 |
| Galen Health Institutes | Isleworth Partners Inc. | 2.10 - Ready for EU Review | 1 |
| | Subtotal | | 1 |
| Subtotal | | | 1 |
| Denver College of Nursing | Education Affiliates, Inc. | 2.10 - Ready for EU Review | 1 |
| | Subtotal | | 1 |
| Subtotal | | | 1 |
| Dallas Nursing Institute | Tcs Education System | 2.10 - Ready for EU Review | 1 |
| | Subtotal | | 1 |
| Subtotal | | | 1 |
| Cortiva Institute - Scottsdale | Steiner Leisure Ltd. | 2.23 - Awaiting Evidence Check by ED Divisions | 1 |
| | Subtotal | | 1 |
| Subtotal | | | 1 |
| Antonelli Institute | Bradford Schools, Inc. | 2.30 - Final BD Review Complete | 1 |
| | Subtotal | | 1 |
| Subtotal | | | 1 |
| Total | | | 151613 |

Confidential Information - Do Not Distribute
Copyright © 2000-2020 salesforce.com, inc. All rights reserved.

# Exhibit C

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, CHENELLE ARCHIBALD, DANIEL DEEGAN, SAMUEL HOOD, TRESA APODACA, ALICIA DAVIS, and JESSICA JACOBSON on behalf of themselves and all others similarly situated, | Case No. 19-cv-03674-WHA |
| *Plaintiffs*, | |
| v. | **AFFIDAVIT OF YOLANDE WALKER** |
| MIGUEL CARDONA, in his official capacity as Secretary of the United States Department of Education, and | |
| THE UNITED STATES DEPARTMENT OF EDUCATION, | |
| *Defendants*. | |

I, Yolande Walker, state as follows:

1. I am submitting this affidavit in relation to the above-captioned case.

2. I borrowed federal student loans to attend DeVry University to pursue a Bachelor's degree in Technical Management.

3. I enrolled on April 9, 2009 and withdrew in June of 2012 at the end of my third year.

4. On October 31, 2017, I submitted a borrower defense application to the United States Department of Education by mail. That application is attached as Exhibit A.

5. I received by e-mail a confirmation of my submission shortly thereafter. This confirmation is attached as Exhibit B.

6. As detailed in my borrower defense application, DeVry lied to me about the employment prospects for a Technical Management degree, the cost of the degree, the graduation rate, the curriculum, and the available career counseling services. I relied on these misrepresentations and enrolled, thinking that a DeVry education would better

my career and financial prospects.  Instead, it left me with debt I cannot repay**,** ruined credit, an inability to qualify for a home loan, and limited job options.

7. When I was considering enrolling at DeVry, the recruiters told me that the Technical Management degree was respected in my field. This was a lie. Attending DeVry has not helped advance my career and has instead hampered my ability to change fields. The degree is not related to Information Technology and employers frequently questioned the title of the degree and what it represents. I am repeatedly passed over for job opportunities I am clearly qualified for based on years of experience. When I do attempt to apply with the DeVry program information on job applications I am immediately declined, which leaves me with a feeling of hopelessness, because even with years of experience and hard work in my industry, I cannot get my pay above a certain level.

8. DeVry claimed that their programs would be life changing with a "happily ever after" ending.  Their sales pitch was "how good is your life now and what have you got to lose?"  Students like me in truth had lot of money to lose, but that was not disclosed by any DeVry employees.

9. This entire experience has left me with feelings of being a failure, and all of this has given me a complete loss of faith in our educational and government systems.

10. My federal student loans for my enrollment at DeVry are over $70,000.  I struggled to make unsustainable, unrealistic monthly payments until October 31, 2017.  Now, with interest, I owe approximately $85,000 – more than the initial loan amount of $54,500.00 allotted for a Bachelor's degree in any program by Direct Loans.

11. I received a restitution check from the Federal Trade Commission's action against DeVry for $337.00 on October 3, 2017, and another check a few months later for approximately $89.00.

12. The letter from the FTC is attached as Exhibit C.  The letter states that the check is "your share of a settlement between DeVry University and the Federal Trade

Commission" based on findings that "DeVry ran advertisements between 2008 and 2015 that included deceptive claims about the (1) the likelihood that graduates would find jobs in their fields of study within six months of graduation, and (2) the average earnings of DeVry graduates…"

13. The notice also states that "This payment does not prevent you from seeking other relief that may be available under federal or state law" and includes a link to the webpage for the borrower defense application.

14. I have not yet received a notice regarding the outcome of my borrower defense application, despite having applied over 4 year ago. I receive more "payment resuming" emails than any status or communication regarding my borrower defense application.

15. I called the Department of Education's Borrower Defense Hotline (1-855-279-6207) on January 3, 2020, and spoke to a woman named Renee. She told me my application was being reviewed and that they were working on it. I was told this each time I called in the following months.

16. On July 2, 2020, I received the June 26, 2020 notice of the settlement in the *Sweet v. DeVos* case. Prior to receiving this notice, I had no knowledge of the lawsuit, and the Department of Education employees had not given me any information about it.

17. On July 6, 2020 I once again called the Department of Education's Borrower Defense Hotline, and was told by a man named Todd that my application is on file.

18. In December 2021, I once again called the Department of Education's Borrower Defense Hotline. I was told by a woman on the phone at the hotline that as long as the *Sweet v Cardona* (formerly the *Sweet v. DeVos)* litigation is open and unresolved, the Department of Education cannot give me any updates on my borrower defense application, nor review any complainants until the suit was resolved and settled by the court. They said that until then, by law they could not touch our cases.

19. On January 5, 2022, I wrote to the Clerk of Court in this matter to ask that the case be moved forward, so that my borrower defense application could be reviewed by the Department of Education, since the hotline representative had told me that my claim was being held up because of this lawsuit.

20. It is now my understanding that, contrary to what I was told when I called the Borrower Defense hotline, the Department of Education could make a decision on my application for borrower defense at any time. I was fed misinformation by the Department of Education.

21. I understand that on February 17, 2022, the Department of Education announced that 1,800 former DeVry students would be receiving loan discharges. I do not know if I am in that group because I have heard nothing from the Department of Education about my borrower defense application. However, they have the loan servicer repeatedly send email communications regarding borrower repayments resuming in May 2022. Any communications surrounding my application review status, or this very important recent announcement, have not been disclosed to me. I feel as if they are intentionally keeping me in the dark.

22. It is outrageous that I have had to wait for over 4 years for my borrower defense application to be processed. What is even more disturbing is that they are utilizing the *Sweet v. Cardona* (formerly *Sweet v. DeVos*) lawsuit as a means to avoid providing current details, or review my application. It seems like they hope that I will eventually withdraw my complaint against DeVry, and just "go away".

23. I have suffered severe personal, professional, and financial harm from the Department of Education's inaction, lack of honesty and truthfulness in communications, and extreme inability to effectively relay important updates.

24. In addition, it is distressing to think that the Department of Education has been derelict in its duties to properly audit for-profit colleges and universities to assure the loan program is not being misused or fraudulently exercised for financial gain. This has left

thousands of students like me worse off than when they began because we were lied to by our schools and now owe thousands of dollars we cannot repay for a worthless education.

Signed February 23, 2022

Yolande Walker

Affidavit of Yolande Walker
(Case No. 3:19-CV-03674-WHA)

# WALKER AFFIDAVIT
# EXHIBIT A



# UNITED STATES DEPARTMENT OF EDUCATION

## APPLICATION FOR BORROWER DEFENSE TO LOAN REPAYMENT

FORM APPROVED
OMB NO: 1845-0146
Exp 12/31/2019

If your school misled you or engaged in other misconduct, you may be eligible for "borrower defense to repayment," which is the forgiveness of some or all of your federal student loan debt.

**FORM INSTRUCTIONS:** To apply, you must complete, sign, and submit this form to the U.S. Department of Education for review.

You may attach additional documents, such as transcripts, enrollment agreements, and promotional materials from your school. Once completed, please submit this form and any additional documents you believe will help us review your application by email to FSAOperations@ed.gov or by mail to: U.S. Department of Education, PO Box 429060, San Francisco, CA 94142.

Fields marked with an asterisk (*) are required for your application to be considered complete.

## SECTION I: BORROWER INFORMATION

Please provide contact information for the borrower:

| *First Name: | Middle Name: | *Last Name: | *Date of Birth: |
|---|---|---|---|
| Yolande | | | |

**\*Social Security Number (XXX-XX-XXXXX):**     **\*Telephone Number:**     **\*Email Address:**

**\*Street Address:**     **\*State:**     **\*Zip Code:**

\*Are you a PARENT who took out a federal loan on behalf of the student? ☐ Yes ☒ No

\*If yes, please enter the full name of the student. (Last, First, Middle): 

\*If yes, please enter the student's Social Security Number (XXX-XX-XXXX): 

## SECTION II: SCHOOL INFORMATION

**\*School:** Devry University

**Campus (Including on-line campuses for distance education borrowers):** Long Beach, CA & Centennial, CO

**\*Location: City:** Centennial     **\*State:** CO

**\*Enrollment Dates at this School (MM/YY): \*FROM:** 4/1/2009 **\*TO:** 6/1/2012 ☐ Still Enrolled

☐ **Check if the enrollment dates are approximate, or if you are unsure of them.**

If your attendance at the school listed above was not or has not been continuous (for example, from October 2015 to March 2016, then again from August 2016 to November 2016), please describe all dates that you attended:

ED-EN-003 01

PSER-51

| CAMPUS PROGRAM | |
|---|---|
| **\*Program Name or Major** | **Credential** |
| Technical Management | Bachelors |

If you enrolled in multiple programs at the school listed above, please describe all programs that you were enrolled in:

\*Current Status at school listed above: ☐ **Attending**  ☑ **Withdrew**  ☐ **Transferred Out**  ☐ **Graduated**

## SECTION III: OTHER LOAN REDUCTION OR TUITION RECOVERY REQUESTS

\*Have you made any other requests to have your Federal loans forgiven (for example, under a closed school discharge or false certification discharge from the U.S. Department of Education)?

☐ Yes   ☑ No

\*If yes, please describe these other request(s), including the amount of any loan forgiveness that you received, and attach any documentation about the requests, if available:

\*Have you made any other requests to recover tuition amounts that you paid to your school (for example, a lawsuit against the school or a claim made to a tuition recovery program?

☐ Yes   ☑ No

\*If yes, please describe these other request(s), including the amount of the payment that you received (if any), and attach any documentation about the requests, if available:

ED-EN-001 1                                   PSER-52                              ED 075         Page 2 of 8

## SECTION IV: BASIS FOR BORROWER DEFENSE

Answer the questions for each section below that applies to you.

For each section below that applies to you, please provide a detailed description of why you believe you are entitled to borrower defense, including the following information:

1. What the school told you or failed to tell you.
2. How the school communicated with you, whether in a brochure, online, over the phone, by email or in person.
3. The name/title or people who you believe misled you (if known).
4. Why you believe you were misled.

Attach any related documents, such as transcripts, enrollment agreements, promotional materials from the school, emails with school officials or your school's manual, or course catalog.

**Note: You only need to provide information for the sections below that apply to you, but you must complete at least one section. If you are a Parent PLUS borrower, the word "you" in the following sections also refers to the student.**

If you need more space to complete any section, please attach additional pages to your application.

### EMPLOYMENT PROSPECTS

Did the school mislead you (or fail to tell you important information) about promises of future employment, likelihood of finding a job, eligibility for certification or licensure in your field of study, how many students graduate, and/or earnings after graduation?

■ Yes ☐ No

If yes, you must provide underlined detailed information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

> I was uncertain about earning a "Technical Mgmt." degree because I'd never heard of it & neither had any employer I was working for. To employers it sounded IT related. They took advantage of me during the Great Recession because I had no college education & only 9 college credits to my name from University of Phoenix from 2003, couldn't get a job to save my life because employers were demanding only candidates with degrees could apply, leaving everyone without one scrambling to go back to school to get one with a willingness to believe what we were told & to rake up the debt with promises that our new salary after earning the degree would be considerably higher. I'm still waiting for any of that education to payoff in some way other than my owing huge sums of money I can't pay back in my life time at 57.
> The degree means profit for Devry. A university this size should have a business admin program. To date they still don't. The degree is not recognized. On interviews I've been asked to explain what it entailed & meant. I was unable to do so because I don't understand what it's supposed represent. I worked with someone at a prior employer who paid almost $80K for this

*Did you choose to enroll in your school based in part on the issues describe above? ■ Yes ☐ No

### PROGRAM COST AND NATURE OF LOANS

Did the school mislead you (or fail to tell you important information) about how much your classes would cost, how you would pay for your education, the terms of loan repayment, and/or other issues about the cost of your education?

■ Yes ☐ No

If yes, you must provide underlined detailed information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

> They basically told me how much the hybrid classes would be - expensive & tried to justify it with how well I would be doing once I graduated financially that the student loan payments wouldn't be noticeable based on the money I'd be making. I barely make $82K annually, am saddled with $70K in student loan debt and other debts putting me at $150K total debts owed that my annual doesn't begin to support without a monthly deficit of $700+, that I have to figure out how to work around by doing bi-weekly pay day loans, costing me $45 per loan & is nothing more than a debt trap. I have 4 of them that I pay every pay period. I had to enter a debt relief program because my payments on everything was so high I couldn't sleep at night. I had to go to community college to cut out paying my student loan payments because I can't really afford them at this time. My situation due to this added debt has worsened. My employer doesn't give me more than 3% annual raise which pays the IRS not me. I'm in over my head & forget about buying a house. I've read enough articles to know that lenders will turn you down if you have

*Did you choose to enroll in your school based in part on the issues describe above? ■ Yes ☐ No

## TRANSFERRING CREDITS

Did the school mislead you (or fail to tell you important information) about transferring your credits from this school to other schools?

☐ Yes    ☑ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues describe above? ☐ Yes    ☐ No

## CAREER SERVICES

Did the school mislead you (or fail to tell you important information) about the availability or quality of job placement, career services assistance, or the school's connections to employers within your field of study?

☑ Yes    ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

They told me basically not to worry, they have a counseling dept. that is really good and helps students all of the time to find jobs once they graduate. They bragged about their 80+% falsified graduation success rate, stating they have had no issues with students not finding jobs because they partner with so many businesses on the curriculum that the employers know what they're getting. It was all hog wash!

Their success rates were falsified. A documentary came out years later citing them & a few other universities for falsifying graduation rates & over selling their curriculums. Sallie Mae who I also borrowed from was cited for lying to students, cheating them then harassing them for payments. Toward the end of my time at Devry Sallie Mae turned me down, then were rude about the reasons why.

$70K in student loan debt I cannot afford to pay back in my life time nor even monthly payments because I'm not enrolled in school full time anymore. I will have to steal from Peter to make sure I can pay the monthly student loan payments. That means something else will not get paid. My credit rating has taken a serious beating & I am not sure how I will recover from it or ever buy a house at 57 if I can never see my way clear of student loan debt. In addition, I still have no degree to show for the years of attending college along with the huge expense incurred to attend!

All done in person, very convincingly might I add. I really believed what they said. All lies!

Same as all the other sections

*Did you choose to enroll in your school based in part on the issues describe above? ☑ Yes    ☐ No

## EDUCATIONAL SERVICES

Did the school mislead you (or fail to tell you important information) about educational services, such as the availability of externships, qualifications of teachers, instructional methods, or other types of educational services?

☐ Yes  ☑ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

*Did you choose to enroll in your school based in part on the issues describe above? ☐ Yes  ☐ No

## ADMISSIONS AND URGENCY TO ENROLL

Did the school mislead you (or fail to tell you important information) about the importance of enrolling immediately, the consequences of failure to enroll, how difficult it was to be admitted, or anything else about the admittance process?

☑ Yes  ☐ No

If yes, you must provide <u>detailed</u> information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

I wanted to think it through before making a decision to attend especially given the shock of the hybrid costs per unit. They told me they were filling up fast, the scholarships wouldn't be available long, student loan FAFSA app & grant cutoffs would leave me waiting until certain times of the year to apply again, I would be that much further behind on my degree & graduating to move my career forward, that they could lend me money to attend in the interim which meant I'd have to pay them back immediately at the tune of $400 per month. I had no job at one point & that was not sustainable, another time I was working a job not paying me more than $43K annually & there was no way I could take on a huge monthly payment like that. I lost my car to repossession because I couldn't afford to make the $500+ per month payments on it during the Great Recession & after. There was no way I could take on a huge payment for a private school loan from the college. They just wanted to me to enroll & worry about the FAFSA for the next 8 weeks. There was no concern over my financial well being.
They made it seem like they were the Mercedes of private colleges & that University of Phoenix was inferior to them. They discouraged community college which would've cost me $1,000s less, asking if I really wanted to be uncomfortable around high school kids just starting out in life. They encouraged being in an adult learning environment.
$70K in student loan debt that I cannot afford to pay back in my life time at 57, no degree to show for it & possibly never experiencing home ownership due to the huge balances which has caused me to be turned down or approved for very low amounts on home loans. I've had to decline the loans because $200K will not buy me a house in the state of CA where homes are beginning in the low $600K's for town homes & condos. Therefore I'm stuck paying $2K+ per month for a 1+1 apartment. I don't see an out. If lose my job I will be bankrupt.
In person
Same as the other sections

*Did you choose to enroll in your school based in part on the issues describe above? ☑ Yes  ☐ No

## OTHER

Do you have any other reasons relating to your school that you believe qualify you for borrower defense, such as your school failing to perform its obligations under its contract with you, or that there is a judgment against your school in a Federal court, a State court, or in front of an administrative board or that you believe that you have a state law cause of action against the school? Is there some other reason you feel your school misled you? For more information about the basis for borrower defense relief, see StudentAid.ed.gov/borrower-defense.

If yes to any of the above, you must provide detailed information about how the school misled you. Please also describe any financial harm to you as a result of the school's conduct.

> They really promoted their quality of education to justify the outrageous costs. I shuddered & still wasn't convinced. It felt more like a police interrogation where they keep at you until you relent. By the time you do your tired, hungry & just want to go home especially after a long day! They really do work on wearing you down & make you feel really guilty if you don't sign up on the spot. Once you do they rush you to financial aid for more slick talking with confusing or unclear jargon to get you to sign right away. When I had bad experiences with my instructors who weren't communicating lesson plans clearly enough, I called Student Support only to be beat down & told I was the problem not the instructor & that I just needed to suck it up & do the work, for all the money I was being bilked out of. They could've cared less. In 1 of my business classes, they stress that you will be graded on spelling, grammar & a host of other things instilling fear in many that don't excel in those areas. They do it in all of

*Did you choose to enroll in your school based in part on the issues describe above? ■ Yes ☐ No

## SECTION V: FORBEARANCE/STOPPED COLLECTIONS

If you are not currently in default on your federal student loans, you may request to have them placed into **forbearance** status while your application is under review. **Forbearance means that you do not have to make loan payments and your loans will not go into default**. Forbearance will continue until the borrower defense review process of your application is completed. Your servicer will notify you when your loans have been placed into forbearance status.

If your federal student loans are in **default**, you may request to have debt collection on your loan stopped ("**stopped collections status**"). **This means that the federal government or debt collection companies will stop attempting to collect on the loans, including by not withholding money from your wages or income tax refunds.** Stopped collections status will continue until the borrower defense review process of your application is completed.

Please see the "Common Questions and Answers Regarding Forbearance/Stopped Collections" section on the Borrower Defense website (https://studentaid.ed.gov/borrower-defense) if you have any questions regarding choosing to enter forbearance or stopped collections.

**Note that interest will continue to accumulate on federal loans regardless of what status they are in, including subsidized loans. If your application for borrower defense is denied, or partially approved, the total amount you owe on those loans may be higher.**

**PLEASE NOTE:** You do not have to place your loans in forbearance or stopped collections to apply for borrower defense relief.

For the most current information with regard to your rights and obligations regarding forbearance and stopped collections, please visit the Borrower Defense website at https://studentaid.ed.gov/borrower-defense.

*Are you requesting forbearance/stopped collections?

■ **Yes, I want all of my federal loans currently in repayment to be placed in forbearance and for collections to stop on any loans in default while my borrower defense application is reviewed. During this time period, I understand that interest will continue to accrue.**

☐ **No, I do not want all of my federal loans currently in repayment to be placed in forbearance and for collections to stop on any loans in default while my borrower defense application is reviewed. During this time period, I understand that interest will continue to accrue and that I must continue to make loan payments.**

**If you do not select one of the options immediately above, your federal loans currently in repayment will automatically be placed into forbearance and collections will stop for any defaulted loans, and the Department will request forbearance for any commercially held Federal Family Education Loan (FFEL) program loans currently in repayment and for debt collection to stop for any defaulted, commercially held FFEL program loans that you have currently (as applicable).**

PSER-56

## SECTION VI: CERTIFICATION

By signing this attestation I certify that:

All of the information I provided is true and complete to the best of my knowledge. Upon request, I agree to provide to the U.S. Department of Education information that is reasonably available to me that will verify the accuracy of my completed attestation.

I agree to provide, upon request, testimony, a sworn statement, or other documentation reasonably available to me that demonstrates to the satisfaction of the U.S. Department of Education or its designee that I meet the qualifications for borrower defense.

I certify that I received proceeds of a federal loan, in whole or in part, to attend the school/campus identified in Section II (above).

I understand that if my application is approved and some or all of my loans are forgiven, I am assigning to the U.S. Department of Education any legal claim I have against the school for those forgiven loans. By assigning my claims, I am effectively transferring my interests in any claim that I could make against the school relating to the forgiven loans (including the ability to file a lawsuit over those forgiven loans and any money ultimately recovered in compensation for those forgiven loans in court or other legal proceedings) to the U.S. Department of Education. I am not assigning any claims I may have against the school for any other form of relief -- including injunctive relief or damages related to private loans, tuition paid out-of-pocket, unforgiven loans, or other losses.

I understand that the U.S. Department of Education has the authority to verify information reported on this application with other federal or state agencies or other entities. I authorize the U.S. Department of Education, along with its agents and contractors, to contact me regarding this request at the phone number above using automated dialing equipment or artificial or prerecorded voice or text messages.

I understand that any rights and obligations with regard to borrower defense to repayment are subject to the provisions currently in effect under Title 34 of the Code of Federal Regulations.

I understand that if I purposely provided false or misleading information on this application, I may be subject to the penalties specified in 18 U.S.C. § 1001, including fines. I understand that I may be asked to confirm the truthfulness of the statements in this application to the best of my knowledge under penalty of perjury.

**\*Signature:** _____  **Date:** 10/31/2017

**Privacy Act Notice.** *The Privacy Act of 1974 (5 U.S.C. 552a) requires that the following notice be provided to you  The authorities for collecting the requested information from and about you are §421 et seq., §451 et seq. and §461 et seq. of the Higher Education Act of 1965, as amended (20 U.S.C. 1071 et seq., 20 U.S.C. 1087a et seq., and 20 U.S.C. 1087aa et seq.) and the authorities for collecting and using your Social Security Number (SSN) are §§428B(f) and 484(a)(4) of the HEA (20 U.S.C. 1078-2(f) and 20 U.S.C. 1091(a)(4)) and 31 U.S.C. 7701(b). Participating in the William D. Ford Federal Direct Loan (Direct Loan) Program, the Federal Family Education Loan (FFEL) Program, or the Federal Perkins Loan (Perkins Loan) Program, and giving us your SSN are voluntary, but you must provide the requested information, including your SSN, to participate. The principal purposes for collecting the information on this form, including your SSN, are to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan (such as a deferment, forbearance, discharge, or forgiveness) under the Direct Loan Program, FFEL, or Perkins Loan Programs, to permit the servicing of your loans, and, if it becomes necessary, to locate you and to collect and report on your loans if your loans becomes delinquent or defaults. We also use your SSN as an account identifier and to permit you to access your account information electronically. The information in your file may be disclosed, on a case- by-case basis or under a computer matching program, to third parties as authorized under routine uses in the appropriate systems of records notices. The routine uses of this information include, but are not limited to, its disclosure to federal, state, or local agencies, to private parties such as relatives, present and former employers, business and personal associates, to consumer reporting agencies, to financial and educational institutions, and to guaranty agencies in order to verify your identity, to determine your eligibility to receive a loan or a benefit on a loan, to permit the servicing or collection of your loans, to enforce the terms of the loans, to investigate possible fraud and to verify compliance with federal student financial aid program regulations, or to locate you if you become delinquent in your loan payments or if you default. To provide default rate calculations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to state agencies. To provide financial aid history information, disclosures may be made to educational institutions. To assist program administrators with tracking refunds and cancellations, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal or state agencies. To provide a standardized method for educational institutions to efficiently submit student enrollment statuses, disclosures may be made to guaranty agencies or to financial and educational institutions. To counsel you in repayment efforts, disclosures may be made to guaranty agencies, to financial and educational institutions, or to federal, state, or local agencies. In the event of litigation, we may send records to the Department of Justice, a court, adjudicative body, counsel, party, or witness if the disclosure is relevant and necessary to the litigation. If this information, either alone or with other information, indicates a potential violation of law, we may send it to the appropriate authority for action. We may send information to members of Congress if you ask them to help you with federal student aid questions. In circumstances involving employment complaints, grievances, or disciplinary actions, we may disclose relevant records to adjudicate or investigate the issues. If provided for by a collective bargaining agreement, we may disclose records to a labor organization recognized under 5 U.S.C. Chapter 71. Disclosures may be made to our contractors for the purpose of performing any programmatic function that requires disclosure of records. Before making any such disclosure, we will require the contractor to maintain Privacy Act safeguards. Disclosures may also be made to qualified researchers under Privacy Act safeguards.*

**Paperwork Reduction Act Notice.** According to the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless such collection displays a valid OMB control number.  The valid OMB control number for this information collection is 1845-0146.  Public reporting burden for this collection of information is estimated to average 1 hour per response, including time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information.  The obligation to respond to this collection is required to obtain or retain a benefit (20 U.S.C. 1087e(h)).  If you have comments or concerns regarding the status of your individual submission of this application, please contact FSAOperations@ed.gov.

PSER-58

# WALKER AFFIDAVIT
# EXHIBIT B



# Confirmation

**We have received your Application for Borrower Defense to Loan Repayment.**
If the U.S. Department of Education needs to contact you, we will do so using the contact information you provided.

We recommend that you print and/or save an electronic copy of your application for your records. To save an electronic version, you can do so by clicking here: [Download Application](#).

If you have any questions regarding the status of your application, you may call our Borrower Defense hotline at (855) 279-6207. Representatives are available Monday through Friday from 8:00 a.m. to 8:00 p.m. Eastern time. If you have questions about Borrower Defense, you may also send an email to [FSAOperations@ed.gov](mailto:FSAOperations@ed.gov).

# WALKER AFFIDAVIT
# EXHIBIT C



UNITED STATES OF AMERICA
FEDERAL TRADE COMMISSION
WASHINGTON, DC 20580

**FTC v. DeVry University**



Rec'd
10/3/17

 DEV000BD8AA5A

Claim Number:

Dear Yolande Walker,

The enclosed check is your share of a settlement between DeVry University and the Federal Trade Commission (FTC). According to the FTC, DeVry ran advertisements between 2008 and 2015 that included deceptive claims about (1) the likelihood that graduates would find jobs in their fields of study within six months of graduating, and (2) the average earnings of DeVry graduates compared to those graduating with bachelor's degrees from other colleges or universities.

This payment does not prevent you from seeking other relief that may be available under federal or state law. For example, the Department of Education's Borrower Defense to Repayment program provides for loan forgiveness in certain circumstances. For more information about the program, visit https://studentaid.ed.gov/sa/repay-loans/forgiveness-cancellation/borrower-defense.

**Please cash the enclosed check by October 29, 2017.** After this date, your check could bounce and you could be charged a bank fee.

You can find additional information at: www.ftc.gov/devry.

Please call us toll-free at (844) 578-2645 if you have any questions.

Sincerely,

FTC Refund Administrator

---

THE FACE OF THIS CHECK IS PRINTED RED - THE BACK CONTAINS A SIMULATED WATERMARK

FTC v. DeVry University Qualified Settlement Fund
FTC Refund Administrator
PO Box 2008
Chanhassen, MN 55317-2008

**Huntington**
25-2 / 440

DATE OF CHECK
**September 29, 2017**

PAY EXACTLY:     THREE HUNDRED THIRTY-SEVEN AND 37 / 100 DOLLARS

$337.37

VOID AFTER 30 DAYS

DEV000BD8AA5A 

**PAY** to
the order of     YOLANDE WALKER



AUTHORIZED SIGNATURE

⑈0000669869⑈ ⑆044000024⑆ 89342111 2⑈

Case 3:19-cv-03674-WHA Document 264 Filed 02/24/22 Page 1 of 3

# Exhibit D

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, CHENELLE
ARCHIBALD, DANIEL DEEGAN, SAMUEL
HOOD, TRESA APODACA, ALICIA DAVIS,
and JESSICA JACOBSON on behalf of
themselves and all others similarly situated,

        *Plaintiffs*,

    v.

MIGUEL CARDONA, in his official capacity
as Secretary of the United States Department
of Education, and

THE UNITED STATES DEPARTMENT OF
EDUCATION,

        *Defendants*.

Case No. 19-cv-03674-WHA

**AFFIDAVIT OF DOMINIC BENDIJO**

I, Dominic Bendijo, state as follows:

1. I am submitting this affidavit in relation to the above-captioned case.

2. I borrowed federal student loans to attend Brooks Institute in Ventura, California, pursuing a BA in Cinematography and Film/Video Production.

3. I enrolled in July of 2003 and graduated in September of 2006.

4. As detailed in my borrower defense application, Brooks lied about the job placement services it would provide, as well as the job prospects for graduates. Brooks recruiters told me that I would earn anywhere between 100K-150K per year with a Brooks degree, and that the program was selective. I relied on these statements and enrolled. However, these statements turned out to be utter lies.

5. I took out federal and private loans to attend Brooks. My federal student loans were originally about $20,000.

1

PSER-64

6. In late 2006, I started paying back my loans. My original payments were $1800 a month. I consolidated my loans to drop the interest rates in 2007. My loans were first serviced by Sallie Mae, then Navient.

7. On September 14, 2021, I submitted a borrower defense application online to the United States Department of Education.

8. When I submitted the application, the following pop-up message appeared: "Because you graduated or withdrew from your school more than three years ago, you are unable to apply for reconsideration."

9. This pop-up message was extremely confusing to me. I had not applied for reconsideration.

10. I do not understand what this message meant or what the status of my borrower defense application is.

Signed February 23, 2022



Dominic Bendijo

2

Affidavit of Dominic Bendijo
(Case No. 3:19-CV-03674-WHA)

# Exhibit E

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, CHENELLE
ARCHIBALD, DANIEL DEEGAN, SAMUEL
HOOD, TRESA APODACA, ALICIA DAVIS,
and JESSICA JACOBSON on behalf of
themselves and all others similarly situated,

Case No. 19-cv-03674-WHA

            *Plaintiffs*,

    v.

**AFFIDAVIT OF ANDRA HATCHELL**

MIGUEL CARDONA, in his official capacity
as Secretary of the United States Department
of Education, and

THE UNITED STATES DEPARTMENT OF
EDUCATION,

            *Defendants*.

I, Andra Hatchell, state as follows:

1. I am submitting this affidavit in relation to the above-captioned case.

2. I borrowed federal student loans to attend Axia College of the University of Phoenix online. I completed an Associates Degree in Arts & Information Technology.

3. I enrolled in August of 2007 and completed my program in August of 2009.

4. I currently over $38,000 on loans that were originally $16,688. I have not been able to afford the payments due to the high cost of the program coupled with accumulated interest.

5. My tax refund was seized in 2019 for the tax year 2018.

6. I was in loan rehabilitation for some time making payments of approximately 5 dollars per month, after repeated forbearance, deferment, and default status.

7. Being unemployed after graduation for about 5 years, I was not able to make the payments. Even now that I am employed, I do not have the means to pay this debt.

8. As I understand it, my loans are currently in forbearance under CARES Act relief.

9. I consolidated two of my loans last year, while the other two loans are in default.

10. My nightmare with the University of Phoenix began in 2007. I clicked on an advertisement after I had lost my job. A recruiter called me and gave me a high-pressure sales pitch, promising me excellent job prospects and a high salary in the IT field.

11. I told the recruiter I did not want to take out any loans to pay for my education, and he assured me that I would be able to pay for school with Pell Grants alone. He explained that applying for loans was only a "formality" in case my "situation changed," for example, if I "married a millionaire." When I had to choose a lender, he told me to pick Sallie Mae. I was hesitant in doing this but he told me not to worry, and said, "it won't cost you a dime." I relied on these statements and enrolled. Fees for the program were included on a standard letter, but was of little importance to me since I was told the Pell Grant would take care of all it. I later realized I had been charged $90 more per general education class, $120 more per core class, and $5 more per resource fee than what was stated.

12. The recruiter also lied about the transferability of my credits. They only allowed 16 of my 28 credits to transfer from my previous college, Arkansas State University. Students transferring with less than 24 credits were required to complete a different version of the program in which 18 of the 45 general education credits had to be earned at the University of Phoenix, to students who transferred with 24 or more credits only had to complete 6 of the 45 credits at the University of Phoenix. This meant that I was roped into paying for more of their overpriced classes. I relied on these statements regarding transferability, and enrolled.

13. I learned later that recruiters were under extreme pressure to lie to unsuspecting people just to get them enrolled.

14. I wrote a letter to the university after I finished the two years expressing my disappointment in my education, because I could not find a job in the IT field. They replied with job statistics in my area.

15. I also learned that the University of Phoenix is not respected in any field. I started leaving the degree off of my resume, as I felt it was hurting me more than helping. I remained

unemployed for several years. My current job does not relate to my University of Phoenix degree.

16. I learned how ridiculously overpriced University of Phoenix was when I helped my niece enroll into a state school. Tuition at the State University, including associated costs, came to $1,089 to earn 12 credits in 2009. Everything was paid by a Pell Grant and she still got a refund for what was left over.  At the University of Phoenix, the same amount of credits cost me almost four times that amount.

17. In February, 2022 I attempted to apply for Borrower Defense online through the Federal Student Aid website.  Because I logged in, the application was linked to my loan accounts. The first thing I saw was a message regarding my loans.  The screenshot below shows the message.

 It looks like you may not meet the statute of limitations for this case.

18. Once I received this message, I stopped filling out my application. I thought the pop-up message meant that I could not continue my application and that I was not eligible for borrower defense due to the age of my loans.

19. Several days later, on or around February 8, 2022, I spoke to someone with the Project on Predatory Lending and was advised that the message might not prevent me from applying, and that I might still be able to submit the form.  I took the advice and I was finally able to complete my application. Each time I would log in, the message was always the first thing I saw.

20. I had tried several times before to complete the application that was not linked to my loan accounts, but I was not successful.  I found it quite frustrating.

21. I am 57 years old. I feel very depressed about what has happened. My credit is ruined. I will always have to rent, instead of purchase, a home. Rent is very high in this area.

22.  I fear that when I begin drawing my social security, my checks will be garnished for payment if I do not succeed in having loans discharged.  I need a solution and I don't know where to start.

23. I am frustrated and confused by the borrower defense process. The message I got upon logging in only delayed the submission even more. I do not know the status of my application or when or how it will be resolved.  I can only hope and pray that all of the wrongs are corrected for everyone who fell into this trap.

Signed February 24, 2022

Andra Hatchell

# Exhibit F

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, CHENELLE ARCHIBALD, DANIEL DEEGAN, SAMUEL HOOD, TRESA APODACA, ALICIA DAVIS, and JESSICA JACOBSON on behalf of themselves and all others similarly situated,

    *Plaintiffs*,

  v.

MIGUEL CARDONA, in his official capacity as Secretary of the United States Department of Education, and

THE UNITED STATES DEPARTMENT OF EDUCATION,

    *Defendants*.

Case No. 19-cv-03674-WHA

**AFFIDAVIT OF SYDNEY ANDRADE**

I, Sydney Andrade, state as follows:

1. I am submitting this affidavit in relation to the above-captioned case.

2. I borrowed federal student loans to attend Art Institute schools in Fort Lauderdale (2006-2007) and Tampa (2007-2011). In 2011, I earned my Bachelor's Degree in Fine Arts in Game Design from AI.

3. The Art Institute lied to me about employment prospects, the cost of the program, the quality of the program, career services, and the transferability of credits. I relied on these lies and enrolled.

4. I currently owe over $35,000, which does not include related Parent Plus loans.

5. I filed for Borrower Defense in May 2016.

6. On August 6, 2020, I received a form denial notice.

7. On February 21, 2022, I wrote to borrowerdefense@ed.gov requesting that my application be put back into review. That email, which includes the form denial notice, is attached as Exhibit A.

PSER-72

8. On February 23, I received an email from Borrower Defense telling me to request reconsideration. This email is attached as Exhibit B.

9. Notably, this email states that "Your claim will not be re-evaluated unless the court orders re-evaluations when *Sweet v Cardona* is decided. While the court case is pending a decision, your case will remain closed, unless you submit a request for reconsideration."

10. I am aware of several other people who received this message when they contacted the Department of Education about their applications, including my fiancé.

11. I do not understand why the Department of Education is telling borrower defense applicants that their claims will not be "re-evaluated unless the court orders re-evaluation when *Sweet v. Cardona* is decided." I do not understand why the Department of Education cannot evaluate my claim now.

12. I have waited almost six years for a lawful decision on my borrower defense application. This delay is unconscionable and has caused me and other borrowers like me extensive harm.

Signed February 24, 2022

Sydney Andrade

# ANDRADE AFFIDAVIT
# EXHIBIT A

## Request for Reconsideration [ ref:_00Dt0Gyiq._500t0DPHok:ref ]

From: Sydney Andrade

To: borrowerdefense@ed.gov

Date: Monday, February 21, 2022, 11:46 AM CST

Hello.
My Borrowers Defense to Repayment application was denied in August of 2020.
It is important that this application be put back into review.

As per case *Sweet v. Cardona*, No. 19-cv-3674 (formerly *Sweet v. DeVos*) , I am a member of this class based on the following case item:
- You submitted a borrower defense application about any school and have not received a decision, or received a form denial in or after December 2019

Please put my application back into review as per the case.
**borrower defense application**

Here is a link to the case details on Harvards site. Sweet v. DeVos Class Members | Predatory Student Lending



**Sweet v. DeVos Class Members | Predatory Student Lending**

If you submitted a borrower defense application and have not received a decision, you are automatically a member...

Thank you.
Sydney Andrade

On Monday, February 21, 2022, 11 41 56 AM CST, Federal Student Aid Information Center <customerservice@studentaid.gov> wrote:

PSER-75



8/6/2020

Borrower Defense Application #:

Dear Sydney Andrade:

The U.S. Department of Education (ED) has completed its review of your application under the applicable Borrower Defense to Repayment regulations for discharge of your William D. Ford Federal Direct Loans (Direct Loans) made in connection with your or your child's enrollment at Miami International University of Art & Design. "You" as used here should be read to include your child if you are a Direct PLUS Loan borrower who requested a discharge for loans taken out to pay for a child's enrollment at Miami International University of Art & Design  ED has determined that your application is ineligible for relief based on review of the facts of your claim and the regulatory criteria for relief; this decision means that your Direct Loans will not be discharged. ED explains the reasons below

## Applicable Law

For Direct Loans first disbursed prior to July 1, 2017, a borrower may be eligible for a discharge (forgiveness) of part or all of one or more Direct Loans if the borrower's school engaged in acts or omissions that would give rise to a cause of action against the school under applicable state law. See § 455(h) of the Higher Education Act of 1965, as amended, 20 U S C § 1087e(h), and 34 C.F.R. § 685.206(c) and 685.222 (the Borrower Defense regulations)  ED recognizes a borrower's defense to repayment of a Direct Loan only if the cause of action directly relates to the Direct Loan or to the school's provision of educational services for which the Direct Loan was provided. 34 C.F.R. §§685.206(c)(1), 685.222(a)(5); U.S. Department of Education, Notice of Interpretation, 60 Fed  Reg  37,769 (Jul. 21, 1995).

## Why was my application determined to be ineligible?

ED reviewed your borrower defense claims based on any evidence submitted by you in support of your application, your loan data from National Student Loan Data System (NSLDS®), and evidence provided by other borrowers

Allegation 1: Employment Prospects

PSER-76

You allege that Miami International University of Art & Design engaged in misconduct related to Employment Prospects. This allegation fails for the following reason(s): Insufficient Evidence

Your claim for relief on this basis therefore is denied

### Allegation 2: Program Cost and Nature of Loan

You allege that Miami International University of Art & Design engaged in misconduct related to Program Cost and Nature of Loan. This allegation fails for the following reason(s): Insufficient Evidence

Your claim for relief on this basis therefore is denied.

### Allegation 3  Career Services

You allege that Miami International University of Art & Design engaged in misconduct related to Career Services  This allegation fails for the following reason(s)  Insufficient Evidence

Your claim for relief on this basis therefore is denied.

### Allegation 4: Educational Services

You allege that Miami International University of Art & Design engaged in misconduct related to Educational Services. This allegation fails for the following reason(s):Failure to State a Legal Claim

Your claim for relief on this basis therefore is denied.

### Allegation 5: Transferring Credits

You allege that Miami International University of Art & Design engaged in misconduct related to Transferring Credits. This allegation fails for the following reason(s): Insufficient Evidence

Your claim for relief on this basis therefore is denied.

**What evidence was considered in determining my application's ineligibility?**

We reviewed evidence provided by you and other borrowers who attended your school. Additionally, we considered evidence gathered from the following sources:

- IA Attorney General's Office
- IL Attorney General's Office
- CO Attorney General's Office
- Evidence obtained by the Department in conjunction with its regular oversight activities
- Senate Hearing Testimony of EDMC career services adviser before the Committee on Health, Education, Labor, and Pensions (September 30, 2010)
- Materials, including publicly available securities filings, prepared by Education Management Corporation

**What if I do not agree with thi  deci ion?**

If you disagree with this decision, you may ask ED to reconsider your application. To submit a request for reconsideration, please send an email with the subject line "Request for Recon ideration [ ref  00Dt0Gyiq  500t0DPHok ref ]" to BorrowerDefen e@ed gov or mail your reque t to U S Department of Education, P.O. Box 1854, Monticello, KY 42633. In your Request for Reconsideration, please provide the following information:

1  Which allegation(  ) you believe that ED incorrectly decided;

2. Why you believe that ED incorrectly decided your borrower defense to repayment application; and

3. Identify and provide any evidence that demonstrates why ED should approve your borrower defense to repayment claim under the applicable law set forth above.

ED will not accept any Reque t for Recon ideration that include  new allegation  If you wi h to a  ert allegation  that were not included in your application, please see the following section. Additionally, your loans will not be placed into forbearance unless your request for reconsideration is accepted and your case is reopened. Failure to begin or resume repayment will result in collection activity, including administrative wage garnishment, offset of state and federal payment  you may be owed, and litigation  For more information about the recon ideration proce  , plea e contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. Eastern time (ET) on Monday through Friday.

**Can I apply for borrower defense if I have additional claims?**

If you wish to file a new application regarding acts or omissions by the school other than those described in borrower defense application [Case Number], please submit an application at StudentAid.gov/borrower-defense. In the new application, you should explain in the relevant section(s) the basis for any new borrower defense claim(s) and submit all  upporting evidence

**What should I do now?**

Becau e your borrower defen e to repayment application wa  found to be ineligible, you are re pon ible for repayment of your loans. ED will notify your servicer(s) of the decision on your borrower defense to repayment application within the next 15 calendar days, and your servicer will contact you within the next 30 to 60 calendar days to inform you of your loan balance. Further, if any loan balance remains, the loans will return to their status prior to the submission of your application  If your loan  were in forbearance a  a re ult of your borrower defen e to repayment application, the  ervicer will remove those loans from forbearance. **\*See COVID-19 Note below.**

If your loans are in default and are currently in stopped collections, your loans will be removed from stopped collections. Failure to begin or re ume repayment could re ult in collection activity  uch a  admini trative wage garni hment, off et of state and federal payments that you may be owed, and litigation. **\*See COVID-19 Note below.**

While normally interest would not be waived for unsuccessful borrower defense applications, given the extended period of time it took ED to complete the review of thi  application, the Secretary i  waiving any intere t that accrued on your Direct Loans from the date of the filing of your borrower defense application to the date of this notification. Your servicer will provide additional information in the coming months regarding the specific amount of interest adjusted. **\*See COVID-19 Note below.**

*COVID-19 Note:* On March 27, 2020, the president signed the *CARES Act,* which, among other things, provides broad relief in response to the coronavirus disease 2019 (COVID-19) for federal student loan borrowers whose loans are owned by ED  For the period March 13, 2020, through September 30, 2020, the intere t rate on the loan  will be 0% and no payments will be required. During this same period for defaulted borrowers, all proactive collection activities, wage garnishments, and Treasury offsets will be stopped. Your federal loan servicer will answer any questions you have about your specific situation. In addition, Federal Student Aid's COVID-19 information page for students, borrowers, and parent  i  located at StudentAid gov/coronaviru   Plea e vi it the page regularly for update

**What if I have another pending borrower defense application?**

If you have additional pending borrower defen e to repayment application , thi  information applie  to you

- If your loan  a ociated with an additional borrower defen e to repayment application that i    till pending are in forbearance or another status that does not require you to make payments, your loans will remain in forbearance or that other status. Similarly, if your loans associated with that borrower defense application are in default and you are currently in stopped collections, those loans will remain in stopped collections.

- If you are unsure if you have additional pending applications, or if you would like to check on the status of your loan  a  ociated with an additional application, contact our borrower defen e hotline at 1 855 279 6207 from 8 a.m. to 8 p.m. ET on Monday through Friday.

ED offers a variety of loan repayment options, including the standard 10-year repayment plan, as well as extended repayment, graduated repayment, and income-driven repayment plans. For more information about student loan repayment options, visit StudentAid.gov/plans. If you have questions about the status of your loans or questions about repayment option , plea e contact your  ervicer( )  If you do not know the name of your federal loan  ervicer, you may go to StudentAid.gov to find your servicer and view your federal loan information.

Sincerely,

U.S. Department of Education
Federal Student Aid



830 First Street, NE, Washington, D.C. 20202
StudentAid.gov/borrower-defense

CONFIDENTIALITY NOTICE  Thi  e mail me  age, including any attachment , i  for the  ole u e of the intended recipient and may contain confidential and privileged information. Any unauthorized review, use, disclosure or distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

# ANDRADE AFFIDAVIT
# EXHIBIT B

## Here are the borrower defense reconsideration request instructions [ ref: 00Dt0Gyiq. 500t0DPHok:ref ]

From: Borrower Defense (borrowerdefense@ed.gov)

To:

Date: Wednesday, February 23, 2022, 01:53 PM CST



2/23/2022

Borrower Defense Application #

Dear Sydney Andrade:

You recently contacted our borrower defense hotline about your disagreement with the U.S. Department of Education's decision about your borrower defense application 01317088  Here are the two ways you can ask us to reconsider that decision:

- Send a new email with the subject line "Request for Reconsideration" to BorrowerDefense@ed.gov. Include the number that appears with the words "Request for Reconsideration" in the "What if I don't agree with this decision?" section of your notification email.

    OR

- Mail your request to U.S. Department of Education, P.O. Box 1854, Monticello, KY 42633

In your request for reconsideration, provide the following information:

    1)   What you think was decided incorrectly

    2)   Why you believe the decision was incorrect

    3)   Any evidence that you believe establishes that you are eligible for a different decision

We will not accept any request for reconsideration that includes new allegations of misconduct by your school. If you include new allegations of misconduct by your school in your reconsideration request, the request will be rejected. You must file a new application regarding acts or omissions by your school other than those described in borrower defense

PSER-81

application 01317088 by submitting an application at
[StudentAid.gov/borrower-defense](StudentAid.gov/borrower-defense). In the new application, you should
explain in the relevant sections the basis for any new borrower defense
claims and submit all supporting evidence.

We will not place your federal student loans into forbearance or stopped
collection activity when you file a request for reconsideration. In addition, if
your borrower defense claim was approved, we will not begin our review of
your request for reconsideration until your federal loan servicer notifies you
that the discharge has been completed  As a reminder, discharge
completion is expected to occur within 90-120 days after the date of your
discharge notification email

**Your claim will not be re evaluated unless the court orders re
evaluations when Sweet v Cardona is decided. While the court case
is pending a decision, your case will remain closed, unless you
submit a request for reconsideration. While the case is pending, your
loans do remain in the court ordered forbearance.**

**What if I have questions about this letter?**

We're available to help you understand the information in this letter  You
can contact our borrower defense hotline at 1?855?279?6207 from 8 a.m.
to 8 p m  Eastern time on Monday through Friday

Sincerely,

U S  Department of Education

Federal Student Aid



An OFFICE of the U.S. DEPARTMENT of EDUCATION

830 First Street, NE, Washington, D.C. 20202
[StudentAid.gov/borrower-defense](StudentAid.gov/borrower-defense)

ref:_00Dt0Gyiq._500t0DPHok:ref

CONFIDENTIALITY NOTICE: This e-mail message, including any attachments, is for the sole use of the intended
recipient and may contain confidential and privileged information. Any unauthorized review, use, disclosure or

PSER-82

distribution is prohibited. If you are not the intended recipient, please contact the sender by reply e-mail and destroy all copies of the original message.

Pages 1 - 75

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William Alsup, Judge

```
THERESA SWEET, on behalf of      )
themselves and all others        )
similarly situated, et al.,      )
                                 )
          Plaintiffs,            )
                                 )
  VS.                            )   NO. C 19-03674-WHA
                                 )
MIGUEL CARDONA, Secretary of     )
the United States Department     )
of Education, et al.,            )
                                 )
          Defendants.            )
_____)
```

San Francisco, California
Wednesday, November 9, 2022

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

PROJECT ON PREDATORY STUDENT LENDING
769 Centre Street, Suite 166
Jamaica Plain, Massachusetts 02130
BY: **REBECCA C. ELLIS, ATTORNEY AT LAW**
**EILEEN CONNOR, ATTORNEY AT LAW**
**REBECCA C. EISENBREY, ATTORNEY AT LAW**

HOUSING AND ECONOMIC RIGHTS ADVOCATES
3950 Broadway, Suite 200
Oakland, California 94611
BY: **JOSEPH E. JARAMILLO, ATTORNEY AT LAW**

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

REPORTED BY: Ana M. Dub, RDR, RMR, CRR, CCRR, CRG, CCG
CSR No. 7445, Official United States Reporter

**APPEARANCES**:  (CONTINUED)

For Defendants:

                    U.S. DEPARTMENT OF JUSTICE
                    Civil Division, Federal Programs Branch
                    219 South Dearborn, Fifth Floor
                    Chicago, Illinois 60604
        BY:  **R. CHARLIE MERRITT, ATTORNEY AT LAW**
            **STUART ROBINSON, ATTORNEY AT LAW**


For Intervenor American National University:
                    McGUIREWOODS LLP
                    888 16th Street N.W., Suite 500
                    Washington, D.C. 20006
        BY:  **JOHN S. MORAN, ATTORNEY AT LAW**


For Intervenor Chicago School of Professional Psychology:
                    ALSTON & BIRD LLP
                    One Atlantic Center
                    1201 West Peachtree Street
                    Atlanta, Georgia 30309
        BY:  **TERANCE A. GONSALVES, ATTORNEY AT LAW**

                    ALSTON & BIRD LLP
                    333 South Hope Street, 16th Floor
                    Los Angeles, California 90071-3004
        BY:  **ALEXANDER AKERMAN, ATTORNEY AT LAW**


For Intervenor Lincoln Educational Services Corporation:
                    GIBSON, DUNN & CRUTCHER LLP
                    1050 Connecticut Avenue, NW
                    Washington, D.C. 20036
        BY:  **LUCAS TOWNSEND, ATTORNEY AT LAW**

                    GIBSON, DUNN & CRUTCHER LLP
                    555 Mission Street, Suite 3000
                    San Francisco, California 94105
        BY:  **KATHERINE M. WORDEN, ATTORNEY AT LAW**


      **(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

```
 1   APPEARANCES:   (CONTINUED)

 2   For Intervenor Everglades College, Inc.:
                         BOIES, SCHILLER & FLEXNER LLP
 3                       1401 New York Avenue, NW
                         Washington, D.C. 20005
 4               BY:   JESSE M. PANUCCIO, ATTORNEY AT LAW

 5                       BOIES, SCHILLER & FLEXNER LLP
                         401 East Las Olas Boulevard, Suite 1200
 6                       Fort Lauderdale, Florida 33301
                 BY:   JASON HILBORN, ATTORNEY AT LAW
 7

 8   Also Present:     Theresa Sweet
                       Alicia Davis
 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    **<u>Wednesday, November 9, 2022</u>**                              **<u>1:00 p.m.</u>**

2                               **<u>P R O C E E D I N G S</u>**

3                                    ---o0o---

4        **THE CLERK:**  Calling Civil Action 19-3674, Sweet, et al.

5    vs. Cardona, et al.

6        Counsel, please approach the podium and state your

7    appearances for the record, beginning with counsel for

8    plaintiffs.

9        **MS. ELLIS:**  Good afternoon, Your Honor.  I'm Rebecca Ellis

10   from the Project On Predatory Student Lending for the

11   plaintiffs.  And with me is Eileen Connor, also from PPSL,

12   Rebecca Eisenbrey from PPSL, and Joe Jaramillo from Housing and

13   Economic Rights Advocates.

14       **THE COURT:**  Great.  Welcome to all of you.

15       And who else?

16       **MR. MERRITT:**  Good afternoon, Your Honor.  Charlie Merritt

17   from the United States Department of Justice on behalf of the

18   defendants.  With me at counsel's table is Stuart Robinson.

19       **THE COURT:**  Who is Stuart Robinson?

20       **MR. ROBINSON:**  Good afternoon, Your Honor.

21       **THE COURT:**  Okay.  Good afternoon.  Welcome to all of you.

22       Now, so everybody over there has been introduced?  Anyone

23   not yet introduced?

24       **MS. ELLIS:**  Also at counsel table are two of the named

25   plaintiffs, Theresa Sweet and Alicia Davis.

 1          **THE COURT:**  Welcome to you two.  Thank you for coming.

 2          Okay.  Over here on this side of the room, who do we have?

 3          **MR. GONSALVES:**  Good afternoon, Your Honor.  Terance

 4     Gonsalves on behalf of the Chicago School of Professional

 5     Psychology.

 6          **THE COURT:**  Got it.  Thank you.

 7          **MR. AKERMAN:**  Good afternoon, Your Honor.  Alexander

 8     Akerman, also on behalf of the Chicago School.

 9          **THE COURT:**  Thank you.

10          **MR. MORAN:**  John Moran on behalf of American National

11     University.

12          **THE COURT:**  Okay.

13          **MR. PANUCCIO:**  Good afternoon, Your Honor.  Jesse Panuccio

14     on behalf of Everglades College.  With me at counsel's table is

15     Jason Hilborn.

16          **THE COURT:**  Thank you.

17          **MR. TOWNSEND:**  Good afternoon, Your Honor.  My name is

18     Lucas Townsend.  I'm with Gibson Dunn.  I represent Lincoln

19     Educational Services Corporation.  And with me at counsel's

20     table is Katherine Worden.

21          **THE COURT:**  Your name again?

22          **MR. TOWNSEND:**  Lucas Townsend.

23          **THE COURT:**  Okay.  Got it.

24          So Katherine Worden is where?

25                    (Ms. Worden raises her hand.)

1        **THE COURT:**  Okay.  Welcome to you too.

2        All right.  Everyone over here been introduced?

3        Thank you.

4        When you're speaking at the lectern, you can take your

5    mask off so I can hear you better.  I may even take mine off at

6    times if I think I'm going to be speaking enough.  But it's

7    just so we can all hear you better.

8        We're here on a hearing on final approval of a

9    class action settlement.  And I think the first thing that is

10   in order is for plaintiffs to summarize, in two minutes or

11   less, what the settlement actually is.

12       And I want to acknowledge before you get started -- my

13   apologies -- there are, I don't know, maybe 40 people back

14   there -- not that many -- 30 people, I would say, in the

15   gallery.  It looks like they're waving their hands and wearing

16   red shirts.  So red, I guess, is the color for today's hearing.

17       Welcome to all of you.  Thank you for coming.

18       And I understand there are people on the telephone.

19       **THE CLERK:**  Your Honor, there are attendees that are

20   listening.

21       **THE COURT:**  One?  Ten?  How many?

22       **THE CLERK:**  1,000.

23       **THE COURT:**  1,000?

24                              (Laughter.)

25       **THE COURT:**  Are you making that number up?

 1          **THE CLERK:**  No.

 2          **THE COURT:**  Okay.  1,000 on the telephone.  So, good for

 3   you, to get so many people.

 4          Now, I don't know if I'm going to let any of you speak.  I

 5   want to hear mainly from the lawyers.  But I'm glad you're

 6   here, and thank you for coming.

 7          All right.  Now, please summarize the settlement.

 8          **MS. ELLIS:**  Thank you, Your Honor.

 9          Under the settlement, about 75 percent of the class in

10   this case will receive automatic cancellation of their federal

11   student loans relating to their borrower defense applications,

12   they'll receive refunds on any amounts they paid to the

13   Department of Education on those loans, and they'll receive

14   removal of the lines for those loans from their credit report.

15   That's what we've been calling the Automatic Relief Group, and

16   those are people whose borrower defense applications relate to

17   one of the schools on Exhibit C to the settlement.

18          The other 25 percent of the class is in what we've been

19   calling the Decision Group.  Those are class members whose

20   applications relate to other schools not on Exhibit C.  And

21   they will receive a decision on their borrower defense

22   application within a set timeline that corresponds to how long

23   their applications have been pending.  So the people whose

24   applications have been pending longest will receive a decision

25   within six months; the next longest, within 12 months,

1    et cetera.

2         And their applications will be evaluated using a

3    settlement-specific set of a streamlined procedure under which

4    the Department will make certain presumptions; for instance, a

5    presumption that they relied on any misrepresentations they

6    described and a presumption that the allegations in the

7    application are sufficient evidence without needing to look to

8    extrinsic evidence.

9         And then, if you're in the Decision Group and your

10   application is approved, you'll get full settlement relief, so

11   the same as the Automatic Relief Group.  If your application is

12   not approved on that first pass, you'll get an opportunity to

13   revise and resubmit your application after the Department sends

14   a notice to explain what your application was missing,

15   essentially why it didn't meet the standard.  And if you do

16   getting a denial even after revise and resubmit, you can

17   challenge that denial in the district court.

18        The settlement, finally, contains certain provisions for

19   what we've called post-class applicants.  So the groups I've

20   just described apply to people who met the class definition as

21   of the date the settlement was signed, June 22nd, 2022.  For

22   people who've applied after that date and up until the date

23   that the agreement receives final approval, if it does, they

24   will have their applications decided within three years of the

25   effective date of this settlement, 36 months.  And that's

1    basically one step longer than the longest in the Decision

2    Group.  And if the Department doesn't meet that deadline,

3    they'll receive full settlement relief.

4         **THE COURT:**  On the Decision Group, did you say that's one

5    quarter of the class?

6         **MS. ELLIS:**  Approximately, yes, Your Honor.

7         **THE COURT:**  Okay.  All right.  Now, on the people who are

8    in the -- what'd you call the first group?

9         **MS. ELLIS:**  The Automatic Relief Group.

10        **THE COURT:**  -- in the Automatic Relief Group, will they

11   receive some kind of written confirmation in the mail or by

12   e-mail from the Government that says, "You have been

13   discharged"?

14        The reason I ask is, I try to imagine, if I was one of

15   those people out there and this gets approved, how will you

16   tell the rest of the world that you no longer owe this money

17   unless there's something in writing you can hold up?  So what's

18   going to happen on that front?

19        **MS. ELLIS:**  Yes, Your Honor.  They should receive notice

20   that their loans will be discharged, and the actual discharge

21   process --

22        **THE COURT:**  No, not -- will be or has been?

23        **MS. ELLIS:**  Well --

24        **THE COURT:**  Those are different.  "Has been" is what they

25   need.

1    **MS. ELLIS:** I see. Yes.

2    I don't believe the settlement agreement specifies that

3    they will receive written confirmation that the loans have been

4    discharged. I think that's something --

5    **THE COURT:** Well, do you see my point, that if some bank

6    or some collection agency or some processing agent comes to a

7    class member and says, "Okay. You missed the last payment";

8    they say, "Well, wait a minute, wait a minute. I'm a member of

9    the class"; and they say, "Well, too bad. We're foreclosing on

10   your car," they take the car?

11   So don't those people need a statement saying, "This loan

12   has been discharged in full"?

13   **MS. ELLIS:** I understand, Your Honor, yes.

14   What the Department has done in other discharges, for

15   instance, the Corinthian Colleges general discharge that was

16   announced earlier this year, is send people notice that their

17   loans are going to be discharged. And I think the reason for

18   that is because the actual behind-the-scenes discharge process

19   can take some time.

20   My colleague from DOJ might be better able to address what

21   the Department's able to do in terms of notice.

22   **THE COURT:** Well, maybe we'll get that comment in

23   a minute.

24   There's nothing wrong with doing both.

25   **MS. ELLIS:** I agree.

1          **THE COURT:**  Number one, "is going to be"; and number two,

2   "has been."

3          I've got a different question for you, though.  What are

4   the tax implications for forgiveness of debt?

5          **MS. ELLIS:**  For federal taxes, Your Honor, there is a

6   provision that -- I want to say it was in the American Rescue

7   Plan Act, although it may have been in one of the earlier

8   coronavirus relief acts -- that says that student loan

9   discharges won't be taxed through 2025.  So any relief under

10  the class settlement up until January 1st, 2026, is exempt from

11  federal income taxes.

12         On the state level, I believe that's a state-by-state

13  determination.  My understanding is that it's a minority of

14  states that tax student loan discharges.

15         But in terms of whether that raises a fairness issue,

16  I think the important --

17         **THE COURT:**  No, it does not raise a fairness issue.

18         **MS. ELLIS:**  Okay.

19         **THE COURT:**  I'm raising this so -- I would be worried if a

20  class member went out and celebrated, assuming we approve this,

21  and then only a couple of years later, find out that they're in

22  trouble with, say, the Franchise Tax Board for not having

23  reported the forgiveness.

24         And how are you going to solve -- you don't want to put

25  those class members in that mess.  So don't they need to be

1   advised in some way that maybe there are tax consequences?

2       **MS. ELLIS:**  On our FAQ on our website right now,

3   Your Honor, we do include an FAQ about taxation, where we

4   suggest that they consult a tax expert in their state or a

5   legal aid attorney who has some experience with taxes.

6       We're not tax attorneys.  That's about the best we can do.

7       I don't know if there's something else you envisioned the

8   Department might do.

9       **THE COURT:**  Well, I don't know if that's -- I mean, that's

10  what lawyers do, is they kick the can down the road and put a

11  FAQ on the website.  But I think maybe some kind of a better

12  notice than that should be considered.  I'm not requiring that.

13  I'm not even sure yet whether to approve this, but that was

14  a -- that was an issue.

15      All right.  You did a great job summarizing it.  Let me

16  hear the Government's summary.

17      Before I let you go -- I'm sorry -- there's one -- I

18  suspect there's some members of the press and maybe even

19  members of the class that are here who could have confusion

20  over one point.  I think it's worth saying this.

21      As I understand this settlement, this settlement is

22  independent and apart from the broader student loan forgiveness

23  plan that President Biden has announced.  This is separate from

24  that.  Am I right about that?

25      **MS. ELLIS:**  Yes, that's correct, Your Honor.

1    **THE COURT:**  So even if that plan -- and this one is under

2    different statutory authority than the President Biden plan.

3    Am I right about that?

4        **MS. ELLIS:**  Yes.

5        **THE COURT:**  All right.  So even though this does involve a

6    lot of money, $6 billion -- that's a huge amount -- it is

7    separate from the $30 billion that President Biden is talking

8    about; and this settlement does not turn one way or the other

9    on what happens with the litigation involving President Biden's

10   plan.  Am I right on that?

11       **MS. ELLIS:**  Yes, that's all correct.

12       **THE COURT:**  All right.  I want to get other views on that

13   point from the intervenors too, but I -- that's the way I see

14   it and I have been analyzing it.

15       All right.  With that having been said, let's hear from

16   the Government on -- I know you want the settlement, but what

17   else would you like to say by way of setting the stage for the

18   main issues we need to address today?

19       **MR. MERRITT:**  Certainly, Your Honor.

20       I won't rehash the details of the settlement agreement

21   itself.  I would just, of course, add that we believe the

22   settlement agreement should be approved under the standards set

23   forth in Rule 23.  We think that should be the Court's primary

24   focus.

25       **THE COURT:**  You're Charlie Merritt?

1    **MR. MERRITT:** Yes, Your Honor.

2    **THE COURT:** Right. Okay.

3    **MR. MERRITT:** I apologize.

4    **THE COURT:** Yes. Okay.

5    **MR. MERRITT:** Charlie Merritt for the United States.

6    The Court's primary focus should be on the factors set

7    forth in Rule 23. The parties' briefing explains why those are

8    met here.

9    The class responded favorably overall to the notice of

10   preliminary approval. And we think that looking at the

11   Rule 23(e) factors, the Hanlon Factors, everything the Court is

12   to look at when approving a class action settlement justifies

13   approval in this case.

14   I will address, because it's an issue Your Honor has

15   raised and has been discussed in this case, the Government's

16   authority to enter into the settlement agreement and carry out

17   the obligations set forth for the Department of Education

18   therein.

19   And just a starting point, we are not claiming

20   unreviewable authority here because the settlement agreement

21   has been effectuated pursuant to the Attorney General's

22   settlement authority. We cited case law that says that

23   settlement authority is presumptively unreviewable and that

24   it -- but that it can be subject to challenge in limited

25   circumstances, as the Ninth Circuit stated in the *Carpenter*

1   case; but that should be limited to allegations that the Agency

2   exceeded its legal authority, acted unconstitutionally, or

3   failed to follow its regulations.

4        And as we cite in the briefs, the Attorney General's

5   plenary authority over settling cases involving the

6   United States can be overcome only by a clear statutory

7   directive saying that the actions set forth in the settlement

8   agreement are not allowed.

9        So that is not the case here.  There is clear statutory

10  authority for the relief being provided in the settlement

11  agreement, and that's set forth at 20 U.S.C. 1082(a)(6), which

12  grants the Secretary the authority to compromise, waive, or

13  release any right, claim, or demand, however acquired, in his

14  administration of the federal student loan programs.  That

15  extends to waiving and releasing his right to collect repayment

16  from federal student loan debts, including by discharging those

17  loans, and to determine repayment obligations on the terms

18  outlined according to the Secretary and as set forth in the

19  settlement agreement here.

20       That has often been used to settle individual cases in

21  litigation, as we noted in today's supplemental filing in

22  response to the Friday order; but it has also been used,

23  especially recently, to provide broader group discharges.  And

24  that is applicable here based on the determination of how to

25  deal with a larger problem of a large number of pending

1  borrower defense applications, given the litigation context

2  that we find ourselves in and the Government's assessment of

3  litigation risk as to what would have happened had the case

4  proceeded to judgment.

5      **THE COURT:**  Let me ask you a question about that very

6  point.

7      As of now, or as of your most recent information, how many

8  evaluators or hearing officers, or whatever the right term is,

9  are there in the BDU, the Borrower Defense Unit, at the

10  Department of Education?

11      **MR. MERRITT:**  I don't have that information available

12  today, Your Honor.

13      **THE COURT:**  Okay.

14      **MR. MERRITT:**  I can tell you that the Department has --

15  this was a carefully negotiated settlement that took into

16  account resource constraints at the Department and its best

17  estimates based on its current review of the evidence before it

18  and the nature of the group of pending applications.

19      The timeline set forth in this agreement and the

20  procedures for accomplishing those timelines are something that

21  the Department believes it can accomplish, and it is committed

22  to allocating the necessary resources to providing the relief

23  in the settlement if Your Honor approves it.

24      **THE COURT:**  All right.  But there's a big table with lots

25  of lawyers.  Maybe one of them can send an e-mail -- is your

1    client here, by the way, the Department of Education, somewhere

2    out there?

3        **MR. MERRITT:**  My client is not here, Your Honor, no.

4        **THE COURT:**  Okay.  Maybe somebody on your side could

5    e-mail a representative of the Department of Education and find

6    out, while this hearing is underway, how many lawyers,

7    decision-makers, whatever their role is, are there in the BDU.

8    I'm talking about the people who actually process the borrower

9    defense claims.

10       **MR. MERRITT:**  That would be in charge of reviewing claims

11   according to the procedures set forth in the settlement

12   agreement?

13       **THE COURT:**  No, no.

14       **MR. MERRITT:**  More generally?

15       **THE COURT:**  I'm talking about before the settlement

16   agreement.  Let's say as of May 1 or as of June 1.  So I want

17   to know how many there were at that point.

18       **MR. MERRITT:**  Prior to the settlement agreement being --

19       **THE COURT:**  Yeah.  I think it's in the neighborhood of

20   eight.  Somewhere I read eight, but that may be old

21   information.

22       **MR. MERRITT:**  I think there may be old information about

23   that in the case.  My understanding is there had been more

24   hiring over time in that office.  More than eight.  I don't

25   want to commit to a number --

1    **THE COURT:** Okay. Well, then --

2    **MR. MERRITT:** -- right here.

3    **THE COURT:** -- can you see if you can find out?

4    **MR. MERRITT:** We'll see what we can do.

5    **THE COURT:** All right. Thank you.

6    Okay. Did you finish your argument on the authority?

7    **MR. MERRITT:** I can be brief. I just had a couple other

8    points.

9    I did just want to say, you know, acknowledge that the

10   statutory authority that we cited to appears in Part B of the

11   Higher Education Act, which is applicable specifically to

12   FFEL loans.

13   But there's a separate provision of the Higher Education

14   Act at 20 U.S.C. 1087e(a)(1) that provides that loans made to

15   borrowers under the Direct Loan Program, Part D, shall have the

16   same terms, conditions, and benefits and be available in the

17   same amounts as loans made to borrowers under Part B, which

18   addresses FFEL loans.

19   So under what is referred to as the parallel terms and

20   conditions statute, the Secretary's authority, settlement and

21   compromise authority, applies equally to direct loans as

22   FFEL loans. That's a long-standing interpretation of

23   the Secretary, as it stated in the preamble to the

24   2016 Borrower Defense Rule cited in our briefs, recognized by

25   the D.D.C. decision in the *Weingarten* case. And, you know,

1   the Secretary's authority to waive or release the right to

2   repayment is certainly a term, condition, or benefit of a

3   direct loan.

4          THE COURT:  All right.

5          MR. MERRITT:  I think that's the main issue of the

6   statutory authority.

7          Intervenors have raised other arguments that we don't

8   believe are relevant to the Court's consideration of the final

9   approval here.

10         THE COURT:  I'm going to give you a --

11         MR. MERRITT:  Happy to address them.

12         THE COURT:  -- rebuttal -- I'll give you a rebuttal after

13  we hear from the intervenors.

14         But before we go to the intervenors, I want to give

15  Ms. Ellis a chance.

16         Did you want to have one of your plaintiffs, like

17  Ms. Sweet, say anything briefly?  Yes or no?

18         MS. ELLIS:  Yes, Your Honor, we would.

19         THE COURT:  Who is that going to be?

20         MS. ELLIS:  That'll be --

21         MS. SWEET:  That'll be me.

22         THE COURT:  Come up here.

23         MS. ELLIS:  -- Theresa Sweet, Your Honor.

24         THE COURT:  Well, she should come up here and not speak

25  from way back there.

1      Please come up here to the lecturn.  Speak into the

2  microphone so everyone can hear you.  Welcome to the Court.

3      **MS. SWEET:**  Thank you.

4      **THE COURT:**  Tell us -- start with, what is your name?

5      **MS. SWEET:**  My name is Theresa Sweet, and I'm a named

6  plaintiff in this case.

7      **THE COURT:**  Great.  And would you adjust the mic so it's a

8  little closer to your voice so that it picks your voice up.

9      All right.  How long do you need?

10     **MS. SWEET:**  Under two minutes.

11     **THE COURT:**  Go ahead.

12     **MS. SWEET:**  Okay.  So in the nearly two decades since I

13  graduated from the now-shuttered Brooks Institute, I have been

14  fighting for some measure of justice --

15     **THE COURT:**  Take three minutes, but go slower.

16     **MS. SWEET:**  Okay.

17                     (Laughter.)

18     **MS. SWEET:**  Sorry.  I rehearsed it to make sure it was

19  short.

20     Okay.  In the nearly two decades since I graduated from

21  the now-shuttered Brooks Institute, I have been fighting for

22  some measure of justice for the education fraud that I and

23  thousands of others experienced.

24     For more than a decade, I approached hundreds of attorneys

25  and had door after door slammed in my face.  Many times these

1   attorneys told me that they knew I had a case but they were

2   unwilling to go up against the massive corporation that owned

3   my school.

4        When borrower defense was seemingly resurrected from the

5   minutia of education regulations, I knew that it was probably

6   our only chance to end this nightmare.

7        When it became clear that Betsy DeVos would be appointed

8   Secretary of Education, that sense of hope immediately

9   transformed into a sense of absolute dread.  Sure enough, she

10  surrounded herself with for-profit education cronies and did

11  her level best to rob us of justice, going so far as to

12  negotiate, in bad faith, a settlement in the case that bears my

13  name.  Seemingly without conscience, she denied us our right to

14  due process.

15       Too often in this country regular people can only sit on

16  the sidelines and watch in horror as our rights are trampled by

17  corporations with big pockets and shifty government officials

18  with dollar signs in their eyes.  These companies, such as

19  those trying to intervene in this settlement, aren't truly

20  afraid for their rights.  They're afraid that we, like my

21  friends, finally got a seat at the table.

22       Approval of the settlement would serve to show that it is

23  possible for people like us to fight back, that we can hold

24  government agencies accountable, and that people are more

25  important than greedy corporations.

1    So respectfully, I do ask and hope very much that you will

2  approve the settlement.

3    **THE COURT:**  What do you do for a living now?

4    **MS. SWEET:**  Normally, I'm a nursing assistant, but I

5  injured my back a couple of years ago and I've been off on

6  workers' comp disability ever since.

7    **THE COURT:**  What city do you live in?

8    **MS. SWEET:**  Right now, I live in Oakland.

9    **THE COURT:**  Okay.  Well, thank you, Ms. Sweet, for that

10  statement.

11    All right.  To set the stage -- what we're about to do is

12  hear from the intervenors -- I want to say a few things about

13  the settlement which are really the obvious.

14    This is not your ordinary settlement of a class action.

15  In the ordinary case, it's a different setup.  The ordinary

16  case may be, I have a job to make sure the class members are

17  not cheated in the settlement.

18    And sometimes that actually does happen.  There might be a

19  class action settlement where you get 35 cents as a class

20  member for a claim that's worth a thousand dollars but the

21  lawyer gets a huge fee.  Now, thankfully, that doesn't happen

22  too often; but it happens often enough that the rules require

23  me to make sure the settlement is fair to the class members and

24  not just to the lawyer.

25    This case, there's no doubt that this is a good settlement

1  for the class.  In fact, last time I referred to it as a grand

2  slam home run.  When the lawsuit started, it was just to get a

3  hearing, and that would have been getting to first base.  Well,

4  the settlement provides not only do you get to first base, but

5  for at least three-fourths of the class, you get a grand slam

6  home run.  Everybody gets knocked in.  So there's no way that

7  this is not good for the class.  This is good for the class.

8      But a settlement has to be within the statutory authority

9  of the agency.  I'll give you an obvious example.  Let's say

10  that the FTC were to settle a lawsuit and give some company

11  permission to sell a drug, a new pharmaceutical drug.  Well,

12  that might sound good and it might be a grand slam home run for

13  the pharmaceutical company, but the FTC doesn't have that

14  authority.  That's a different agency.  That's called the FDA,

15  Food and Drug Administration.  So there has to be authority for

16  the agency to do what it's doing.  It can't settle a case by

17  giving away things it doesn't have the right to give away.

18      Now, in this case, the Government contends that there is

19  authority to settle lawsuits and there is authority to cancel

20  loans.  The intervenors disagree with that and say:  No, there

21  is not authority.

22      Now, I want to give -- who's going to speak for the

23  intervenors?  One of you, or -- I hope it's just one of you.

24      **MR. MORAN:**  I think we've tried to make sure we're not

25  overlapping with one another, but if you allow it, we'd each

1    appreciate the opportunity.

2        **THE COURT:**  Well, how much time do you need?  Three

3    minutes?  The other side got three minutes.  I'll give you

4    time.  You should have time to make your point.  I've read all

5    your briefs.  But there's too many of you over there.  I just

6    don't have time to give everybody a long-winded presentation

7    because I know what you're going to say anyway, but I want to

8    give you a chance to say it.  But then I've got to give the

9    other side a rebuttal.

10       So please come forward and make your point.  I do not want

11   to hear any argument on mootness or standing.  You're totally

12   wrong on that, and that will not be argued.  You're wasting

13   your time on that.  So "no" on that.  But I will let you argue

14   about statutory authority.

15       So whoever wants to speak to that, please go ahead.

16       **MR. MORAN:**  Good afternoon, Your Honor.  John Moran for

17   American National University.

18       If I may briefly, before I get specifically to statutory

19   authority, you know, the Court raised at the last preliminary

20   approval hearing the question of why are we here.  And,

21   you know, I think the Court said:  You're the luckiest guy in

22   the room.  You've already gotten the money, and you don't have

23   to pay it back.

24       And so I'd just like to briefly address why the intervenor

25   schools have good reason not to be as sanguine about their

1   position under the settlement as the Court.

2        This settlement is just one of several actions that the

3   Department of Education is taking to target for-profit private

4   institutions of higher education that make it harder, if not

5   impossible, for them to stay open in some instances.

6        Under Secretary James Kvaal has publicly described this

7   sector as not just a few bad apples but as a rotten orchard.

8        The Department is putting out new regulations, including

9   brand-new borrower defense to repayment regulations, in recent

10  weeks that make it easier to assert claims against schools

11  while making it harder for schools to defend themselves.

12       And we have groups like the student -- or the Project On

13  Predatory Student Lending, whose very name makes clear what

14  they think about these institutions.  And to be clear, they

15  don't think that the predatory lending is perpetrated by the

16  United States, who's the one that actually makes the loans,

17  sets their terms and interest rates.  They're leveling that

18  accusation against the schools who accept students who come to

19  them seeking an education and bring their Title IV money with

20  them.

21       So I hope the Court will forgive the schools if we don't

22  view it as we're the luckiest person in the room that the

23  Department has pursued this settlement.

24       And I think the thing I'd like to focus on --

25       **THE COURT:**  But you haven't made a single point yet about

1    authority.  You're just making a political speech about how

2    great the schools are without -- they have authority.  They

3    have cited authority to me to do this settlement.  So why

4    shouldn't I just say, "Fine, go ahead"?

5        Now, your brief makes a point that you think they don't

6    have authority under the major questions rule in *EPA vs.*

7    *West Virginia*.  I would be interested to hear that kind of an

8    argument.  That's something I'm interested in.  But a political

9    speech?  No.  I'm sorry.  That doesn't cut mustard with me.

10       **MR. MORAN:**  Your Honor, I apologize.  I wasn't trying to

11   waste the Court's time, but I think it frames why we're here.

12   And we don't view it as a windfall for the schools.

13       So to address -- I'm happy to address the point about --

14       **THE COURT:**  Please, go ahead.  I'd like to hear about

15   *EPA vs. West Virginia*.

16       **MR. MORAN:**  Yes.  So under *West Virginia vs. EPA*, the

17   Supreme Court articulated the major questions doctrine, which

18   is that the -- that when federal agencies attempt to acquire

19   from themselves broad authority that has significant effects on

20   the American economy based on vague, limited, or otherwise

21   unclear statutory language, that the Court presumes that

22   Congress did not intend to give them that authority.

23       And I think here, the most salient point is that this

24   entire regime of not only having a borrower defense to

25   repayment, but allowing the Department of Education to actually

adjudicate the claims and discharge it, hangs on one sentence in the Higher Education Act which gives the Secretary of Education the authority to promulgate by regulation what shall be a defense to repayment of a loan.

It says nothing about the Department receiving applications, adjudicating those applications, discharging loans en masse, let alone individually, other than the very specific context where, for example, before the Department can refer someone to the IRS for garnishment and collection to repay the loan, they have to consider whether or not they have a valid borrower defense to repayment.

So even before we get to the authority of the Department of Justice to compromise the claims, we have to recognize that this entire regime, to the extent it purportedly allows the Department of Education to adjudicate applications and forgive loans, rests on this single sentence that says that they can declare by regulation what defenses will be available.

And I think under *West Virginia vs. EPA*, it's clear that you can't do that; that the Department cannot declare for itself that broad authority that has $6 billion of economic impact in this case, but certainly more if it were applied more broadly, based on a single sentence in the Higher Education Act.

**THE COURT:**  Well, let me ask you a question about that.

In 2019, the Department -- this was back in the prior

1    administration.  In 2019, the Department had a mass settlement

2    covering 7,400 borrowers related to an institution called

3    Dream Center Education.  So under your argument, that was

4    illegal?

5        **MR. MORAN:**  Well, Your Honor, yes.  Under that view, this

6    entire regime, since 1995 when the Department promulgated these

7    regulations, has been in excess of its statutory authority.

8    But like a lot of things, this is the fraud that was boiled in

9    the slow-burning pot.

10       We started in 1995 with the first set of borrower defense

11   regulations that were rarely used and that provided that if a

12   student borrower would have a claim against their school under

13   state law, then they could -- then they would also have a

14   defense to repayment of their federal student loans.

15       And until the 2016 rule in the second term of the Obama

16   Administration, as others have acknowledged today, this was a

17   largely dormant provision that was not viewed as a basis for

18   the Department to adjudicate and grant debt relief to students

19   who filed claims in front of --

20       **THE COURT:**  Well, all right.  Let's say that -- I've

21   forgotten the number.  I've forgotten how many students are

22   involved in our case, but it's a lot.  Is it 500,000?  How

23   many?  Just give me --

24       **MS. ELLIS:**  260,000 in the class.

25       **THE COURT:**  260 in the class?  Okay.  So let's say -- that

1   means there are 260,000 applications pending.

2       All right.  So let's say that instead of doing it on a

3   mass basis, the Agency decided to adjudicate these on an

4   individual basis.

5       So then let's say they get to the first case.  And the

6   first -- and then the first case, they're litigating it away in

7   front of the -- whoever's in the Borrower Defense Unit; and

8   the Government lawyer decides "Hey, you know what?  It's just

9   easier and better.  We're going to lose this case.  We're going

10  to settle it."  So they settle that one.

11      **MR. MORAN:**  Well, Your Honor --

12      **THE COURT:**  You say they can't even --

13      **MR. MORAN:**  -- I defer to Mr. Merritt, but I believe the

14  United States has expressly disclaimed the position that

15  they're compromising the underlying borrower defense

16  application.

17      Instead, they claim that they're compromising the

18  procedural claims that were brought here in the *Sweet*

19  litigation.  And, again, he can correct me if he thinks I'm

20  wrong, but that they've disavowed that they're actually

21  compromising the underlying borrower defense claim.

22      **THE COURT:**  Let's take it on those terms, then.  That's

23  all the better.

24      Let's say that they're in the middle of it and then

25  the Government lawyer says, "You know, they've got all these

1   procedural rights.  Let's just skip over that and give them

2   the -- discharge the entire loan."

3        But it's just for one person, for one borrower.  Are you

4   saying that the Government could not do even that?

5        **MR. MORAN:**  Well, Your Honor, again, there's a question

6   about the scope of the authority, depending on what the context

7   is.  But I think one notable difference that that hypothetical

8   highlights is that there are different sets of borrower defense

9   rules that would apply to that procedure, depending on when the

10  loan was taken out and what would govern the relief in this

11  case.

12       And so the other aspect of the settlement that circumvents

13  that is that for the Decision Group that we talked about a few

14  minutes ago, either in the pre-settlement Decision Group, the

15  Department and the plaintiffs have created their own new set of

16  streamlined borrower defense rules that they're going to apply

17  in lieu of the actual regulatory rules, and for the

18  post-settlement Decision Group, they say that those will be

19  adjudicated under the 2016 borrower defense regulations.

20       And you might ask:  Well, why would they choose the 2016?

21  Because there are actually now -- we now have four different

22  sets of borrower defense regulations that exist.  There was the

23  1995 regulations that were in place for a long time; there were

24  the 2016 regulations that were implemented during the second

25  term of the Obama Administration; there was the 2019 rule that

1    was implemented during the Trump Administration; and then

2    there's -- just this past two weeks, there was the new

3    2022 Borrower Defense Rule.

4         And the reason that they picked the 2016 Borrower Defense

5    Rule we think is clear, is because it makes it -- of the three

6    that are not the brand-new one, it's the easiest to bring a

7    claim and it provides the least process and rights for the

8    schools that are involved.  Because under the 2019 rules, the

9    schools would get notice of the application; they would get an

10   opportunity to review and comment on the information that was

11   submitted about their alleged misconduct in conjunction with

12   the application, and that would be formalized under those

13   regulations.

14        And so when they -- you know, they didn't pick 2016 out of

15   a hat.  They said, we're effectively going to amend the

16   regulations without going through the rulemaking process by

17   saying, under the terms of this alleged compromise, that --

18   they're going to pick which regulations they want to apply.

19        Now, normally, the regulations apply to the loans that

20   were issued in the years that those regulations were in effect.

21   So the 2016 regulations started into effect in 2017.  And so

22   for loans that were issued between 2017 and the effective date

23   of the 2019 rule, that's three years' worth of loans that would

24   be governed by the 2016 rule, although now the new rule

25   purports to spring it back into effect.  But that is, you know,

1    likely to be challenged, and that will play out in the courts

2    over time.

3          But they've taken what should be a rule that only governs

4    applications that were filed in a three-year window and said

5    we're just going to apply this to everything, again, because it

6    sets the lowest threshold for what counts as a borrower defense

7    claim and it sets the lowest threshold for the rights that are

8    afforded to schools under the process.

9          And I don't think they've offered a satisfactory

10   explanation as to how the right to compromise claims gives them

11   the right to rewrite the regulations and pick and choose which

12   regulations they're going to apply to adjudicate those

13   applications.

14         And I guess the one last point, Your Honor, with your

15   indulgence, that I would ask is that if the Court does -- we've

16   talked a lot in the briefing about the declaration from

17   Deputy Under Secretary Ben Miller, who made representations in

18   the intervention stage about what the Department would or would

19   not do vis-à-vis schools based on their inclusion on Exhibit C.

20         And so the one request I would make is that if the Court

21   ultimately does decide, based on that declaration, that the

22   schools don't have -- you know, that this will not affect the

23   schools and so they shouldn't be, you know, complaining about

24   that, that it incorporates those key terms into its findings of

25   fact and conclusions of law in approving the settlement and not

1    just leave them buried in a declaration that's an attachment to

2    the opposition --

3         **THE COURT:**  What's the name --

4         **MR. MORAN:**  -- to the motion to intervene.

5         **THE COURT:**  What's the name of that person?

6         **MR. MORAN:**  Ben Miller.  The declaration is ECF

7    Number 288-1.  It's Exhibit E to the United States' opposition

8    to our motion to intervene.

9         And I think there are four key paragraphs in that

10   declaration that set out the arguments that the parties have

11   relied on to oppose at least a good chunk of our position.

12        Paragraph 9, which says that (as read):

13             "Providing a class member with Full Settlement

14        Relief . . . does not constitute the granting or

15        adjudication of a borrower defense pursuant to the

16        Borrower Defense Regulations, and therefore provides

17        no basis to the Department for initiating a borrower

18        defense recoupment proceeding against any institution

19        identified on Exhibit C to the Settlement . . . ."

20        Paragraph 11, which has two provisions (as read):

21             "The fact of an institution's inclusion on

22        Exhibit C . . . does not constitute evidence that can

23        or will be considered by the Department in bringing

24        any Subpart G Proceeding, including a borrower

25        defense recoupment proceeding, against an

1    institution."

2    And then later in the same paragraph (as read):

3         ". . . any institution on Exhibit C against whom

4    the Department might bring a Subpart G Proceeding in

5    the future would have all the due process rights that

6    any institution would be entitled to under

7    Subpart G . . . ."

8    Paragraph 13 (as read):

9         "The fact of an institution's inclusion on

10   Exhibit C to the Settlement . . . does not constitute

11   evidence that can or will be considered by the

12   Department in making Program Findings or establishing

13   Program Liabilities against an institution."

14   And paragraph 14 (as read):

15        "The fact of an institution's inclusion on

16   Exhibit C will be used by the Department solely for

17   purposes of effectuating its obligations under the

18   Settlement Agreement to award Full Settlement Relief

19   to certain class members.  In any action or

20   proceeding that the Department might take in the

21   future against an institution . . . the fact that an

22   institution is included on Exhibit C to the

23   Settlement . . . does not itself provide any

24   evidentiary support or basis for initiating any such

25   action against any of the listed institutions.  If

1          the Department were to initiate any such actions or

2          proceedings . . . it will comply with all applicable

3          regulations without any reliance on the fact of an

4          institution's inclusion on Exhibit C and each

5          institution would be afforded all due process and

6          opportunities to defend itself to which it would

7          otherwise be entitled in any such action or

8          proceeding."

9          And so I think --

10         **THE COURT:**  Wait, wait.  Pause there.

11         Mr. Merritt, can the Court rely upon Mr. Miller's sworn

12    statement, or are you going to backtrack?

13         **MR. MERRITT:**  Yes, you can rely on the statement.

14         I think we would have to discuss and have something to say

15    about whether that should be incorporated explicitly into the

16    settlement agreement.  But yes, it's a sworn statement of a --

17         **THE COURT:**  Not into the settlement --

18         **MR. MERRITT:**  -- government official.

19         **THE COURT:**  -- agreement.

20         **MR. MERRITT:**  I'm sorry?

21         **THE COURT:**  He's saying into my order.

22         **MR. MERRITT:**  Yeah.  Sorry.  Into your order.

23         **THE COURT:**  Look, the Government has got to keep its word.

24         **MR. MERRITT:**  I'm not --

25         **THE COURT:**  You have to keep your word.  You can't give me

1  a declaration for one -- at one early point and then wiggle off

2  of it later on.

3      **MR. MERRITT:**  I'm not trying to wiggle off, Your Honor.

4  It's a sworn statement by the Department of Education.  We

5  stand by it.

6      **THE COURT:**  That's what you need to say.

7      **MR. MERRITT:**  It's in the record in this case.

8      **THE COURT:**  Thank you.  That's all you need to say.

9      All right.  Can I let another intervenor speak?

10     **MR. MORAN:**  Sure, Your Honor.  Thank you for your time.

11     **THE COURT:**  Anyone else?

12     **MR. PANUCCIO:**  Good afternoon again, Your Honor.  Jesse

13  Panuccio for Everglades and Kaiser Universities --

14     **THE COURT:**  Great.

15     **MR. PANUCCIO:**  -- non-profit intervenors in this case.

16     **THE COURT:**  Welcome.  How can you help me?

17     **MR. PANUCCIO:**  Thank you.

18     I want to make one pragmatic point, and then I want to try

19  to address the authority issues that Your Honor is interested

20  in.

21     The first pragmatic point I just want to make is, there

22  are 150 schools on the Exhibit C list.

23     **THE COURT:**  151.

24     **MR. PANUCCIO:**  151.  Well, they changed the list after the

25  fact but --

1      **THE COURT:**  Oh, they did?  Okay.

2      **MR. PANUCCIO:**  Yes.  So I believe it might be --

3      **THE COURT:**  Just 150.

4      **MR. PANUCCIO:**  -- 150, 151, and that underscores some of

5  our points.

6      But here, as intervenors -- and you gave plenty of time

7  for schools to intervene.  There are only four.  So one

8  prag- -- and we all have, we think, very serious objections,

9  and those objections may play out over time if anyone wants to

10  appeal.

11      But one pragmatic way for the Court to deal with this

12  would simply be to carve these four schools out and ask the

13  parties to agree.  And that would mean no Exhibit C, no

14  secondary path, no Path 3 with these post- -- these undefined

15  post-class applicants, but simply say these four schools have

16  raised significant objections.

17      If you want to move forward, one easy way is you can move

18  forward with 146 other schools; and as for us, we will have the

19  lawful process that is in regulations.  Those claims can still

20  be adjudicated.  And that is all we've ever asked for.  We just

21  want the law to apply to us as it's written in the federal

22  regulations.

23      So that's just one pragmatic point that I would ask

24  the Court to consider.

25      **THE COURT:**  I ask the audience.  I know there are a

1    thousand people on the phone but they can't speak.  Raise your

2    hand if you went to one of these four schools.

3        You better read out who the four schools are.  Tell us.

4    They need to know who they are.

5        **MR. PANUCCIO:**  I believe it's -- I represent Everglades

6    University and Kaiser University.

7        American National University.

8        The -- I won't get the full -- Chicago School of

9    Professional --

10       **MR. GONSALVES:**  Psychology.

11       **MR. PANUCCIO:**  -- Psychology.

12       And then Lincoln --

13       **MR. TOWNSEND:**  Educational Services.

14       **MR. PANUCCIO:**  -- Educational Services.

15       **THE COURT:**  Anybody go to any of those four?

16                      (No response.)

17       **THE COURT:**  Okay.  No one's raising their hand here, but I

18   suspect on the telephone, there are some.

19       Have you totaled up how many people -- how many student

20   loans there are for those four?

21       **MR. PANUCCIO:**  We haven't, Your Honor.

22       As for my client, we haven't even received notice from the

23   Department that there are BD applications.  They haven't even

24   followed their regulations with respect to our client and

25   anyone in this class to this point.  So it is impossible for us

1   to even know, which is another reason why we should not be

2   included, because rights are being compromised the way things

3   are happening.  There's never even been proper notice to the

4   institution under any of the regulations.  And my point is just

5   pragmatically, the Court can deal with this by keeping us out

6   of it.

7       And all we're asking for is the law, Your Honor.  We're

8   not asking for anything different.

9       **THE COURT:**  When a lawyer says "all we're asking for" --

10      **MR. PANUCCIO:**  Well, but, truthfully, Your Honor, there

11  are regulations.

12      **THE COURT:**  -- it's usually a pretty big thing.

13      **MR. PANUCCIO:**  We're not say- -- we're not saying that

14  these claims shouldn't be processed in the normal course.  And

15  the Department has sworn, in the Cordray declaration, that they

16  have restarted their process, that they have the resources to

17  do it.  This is all in their summary judgment papers, which

18  were filed after the proposed settlement.

19      And all we want is that.  We want the lawful BDR process

20  to apply.  We don't want this transmogrified different process

21  that they have set out in a settlement agreement to apply

22  because it's not the law.

23      And if I may, Your Honor, in terms of the objections, I

24  know you don't want to hear about mootness, so I'll stand on

25  our briefs on that, and on standing, although we think those

1  are very serious and the Court has to have subject-matter

2  jurisdiction.  And I'll just note one point on that.

3      The United States' current position before this Court is

4  that the Court does not currently have subject-matter

5  jurisdiction.  That is the last filing it submitted.  It has

6  not changed its position.  If it believes the settlement is

7  fair and reasonable, it ought to be put to its paces on

8  the Court's current subject-matter jurisdiction.

9      Also true, you didn't mention this so I don't know if

10  the Court wants to hear about it, Your Honor, but class

11  certification is very significant at this point.  The

12  Supreme Court has made clear, the Ninth Circuit has made clear

13  that the class must be certifiable at all points of the

14  litigation.  And Your Honor's own order, when you certified the

15  (b)(2) class, you were very careful, Your Honor, to point out

16  why you were certifying a (b)(2) class and that that class

17  definition would apply all the way through settlement.

18      There is no way the plaintiffs can maintain a (b)(2) class

19  at this point with the settlement they are proposing.  It is no

20  longer --

21      **THE COURT:**  Give me just one good reason.

22      **MR. PANUCCIO:**  Well, one good reason is they cannot

23  satisfy typicality and commonality under just Rule 23(a) at

24  this point.

25      Now, let's just take, for example, what they call the

1    post-class applicants; we call it Path 3.  Post-class

2    applicants are not in Your Honor's definition of the class.

3    This is a class that they made up for settlement purposes.

4    These are people who had not filed BD applications until the

5    day after they filed the settlement.

6        So they have an ever-expanding class that has never been

7    reviewed by this Court for typicality or commonality or any of

8    the other requirements.  It is not in the Court's class

9    definition.  There is just no way --

10       **THE COURT:**  What is the "it" that you're referring to

11   that's not?  Which group?

12       **MR. PANUCCIO:**  This would be what they call post-class

13   applicants.

14       So what they've said is:  If you file -- from the day

15   after we lodge the proposed settlement up until the day

16   the Court provides final approval, if you file a borrower

17   defense application, you will be subsumed within the

18   settlement, even though none of those people were ever part of

19   the class definition and cannot be, because the class

20   definition was set, it was set for people who had filed claims

21   up until the time Your Honor certified the class.  And now

22   they're making a new class.

23       So what are the problems with that?  Well, one,

24   the Court's never done the Rule 23 analysis.  Two, there is no

25   named plaintiff that represents that class by definition.  All

1   of those people come after the named plaintiffs.

2        None of the named plaintiffs are similarly situated as

3   those people because those are new -- remember what this case

4   began as, Your Honor.  This was a case challenging an alleged

5   policy of delay and then later they said an alleged policy of

6   form denials.

7        Mr. Cordray has put in a sworn declaration to this Court

8   saying that those policies no longer exist.  So the people who

9   are applying, just by way of example, as post-class applicants

10  cannot possibly be affected by the policies that no longer

11  exist.

12       So that is just one example of how this case was about one

13  thing when it started and, only upon the lodging of the

14  settlement, became about something completely, completely

15  different.  I mean, it's worth Your Honor going back to their

16  complaint.

17       **THE COURT:**  I know what it says.  It's to get a hearing.

18       **MR. PANUCCIO:**  Yeah.  I mean, it's --

19       **THE COURT:**  To get a decision.  It's to get a decision.

20       **MR. PANUCCIO:**  It says more than that.  They said -- this

21  is what they said in paragraph 10 of their complaint, still

22  operative (as read):

23            "[Plaintiffs] do not ask this Court to

24        adjudicate their borrower defenses.  Nor do they ask

25        this Court to dictate how the Department should

1          prioritize their pending borrower defenses.  Their

2          request is simple:  They seek an order compelling the

3          Department to start granting or denying . . . ."

4          The settlement does all of the things that they told

5     this Court repeatedly in the complaint to get class

6     certification, it does all of the things that they said they

7     weren't asking the Court to do.

8          So the Court never engaged in a Rule 23 analysis about

9     whether a class is a sufficient vehicle for dealing with all

10    these things they've now put in the settlement.  So we think

11    the Rule 23 analysis is significantly important and must be

12    conducted before the Court can approve this settlement.

13         In terms of authority --

14    **THE COURT:**  Well, even for the -- you're saying that's

15    true for even the decision class?  The decision --

16    **MR. PANUCCIO:**  Yeah.

17    **THE COURT:**  Why would that be, though?  Those class

18    members wanted the Agency to hurry up and make up its mind one

19    way or the other and wanted me to order them to do that.  Okay.

20    But instead, they have leaped over that and gone straight to

21    grand slam home run.  But why doesn't that give them even more

22    relief?  And how could that possibly not be certifiable?

23    **MR. PANUCCIO:**  This goes back to the *Wal-Mart* case in the

24    Supreme Court, Your Honor.  (b)(2) is a very specific and

25    narrow class certification provision.  It has to be a single

1  policy that is being challenged that applies to the entire

2  class, and the relief has to be dealt with by a single

3  injunction that can solve everyone's problem, not multivariate

4  relief.

5      And the very fact that they have to have three different

6  classes that they've now made up for settlement purposes -- not

7  the class the Court certified, but three new classes -- shows

8  that there is no single injunction.  They're asking for

9  multivariate relief.  And that multivariate relief is quite

10  individualized, which a (b)(2) class cannot be seeking

11  individualized relief.

12      So let's take what they call the Automatic -- I think the

13  Automatic Relief class.  We call it Pathway 1.  So they've got

14  150, 151 schools on a list, and the Department says:  We've

15  made 150 or 151 individualized determinations about alleged

16  wrongdoing by those schools.

17      That cannot possibly be the predicate for a (b)(2) class.

18  That is individualized determinations.  And so they need to

19  show that they have plaintiffs that represent each of those

20  schools.

21      And I think it's very significant that you asked,

22  Your Honor, is there anyone even in the courtroom that,

23  you know, is a class member who relates to any of these schools

24  and no hands went up.  They certainly don't have a named

25  plaintiff that relates to any of these schools, Your Honor.

1    And so that's extremely significant that they cannot maintain

2    the (b)(2) class.  That's the only class that exists in this

3    case.

4        **THE COURT:**  Just on this point, my Deputy here, Clerk said

5    that when I asked that question, no one in the room raised

6    their hand, but six people raised their hands on the phone.  I

7    don't know how you do that on the phone, but there's a way to

8    do that.  And so six people raised their hands on the phone.

9        **MR. PANUCCIO:**  And, Your Honor, a robust Rule 23 analysis,

10   we would have to see who those people are.

11       We're all separately represented.  These are all separate

12   schools here.  We're not a group.  We just were grouped in by

13   the Department together.

14       But a Rule 23 analysis would have to see who those people

15   are.  Do they have class representatives?  Are their

16   circumstances typical and common such that there could be class

17   certification?  None of that has been done.  The only class

18   certification analysis the Court did related to a very

19   different case, not the case they are attempting to settle

20   today.

21       **THE COURT:**  All right.  You're repeating yourself.

22       **MR. PANUCCIO:**  Okay.

23       **THE COURT:**  All right.  Let me hear from another

24   intervenor.

25       **MR. PANUCCIO:**  Thank you, Your Honor.

1     **THE COURT:**  Okay.

2     **MR. TOWNSEND:**  Good afternoon, Your Honor.  Lucas Townsend

3  on behalf of intervenor Lincoln.

4     We agree with the points that have been made so far.  I

5  won't repeat them.

6     On the authority question, we're told that authority is

7  rooted in 20 U.S.C. Section 1082(a)(6), the Secretary's

8  authority to compromise litigation.

9     That authority can't be viewed without considering what is

10  the claim that is being compromised here.  The claim is a claim

11  under 5 U.S.C. 706, Subsection 1, to compel agency action

12  unlawfully withheld or unreasonably delayed.

13     This case was about getting a hearing.  Getting a hearing

14  is the home run.  It isn't first base.  It's the home run on

15  that claim.

16     This settlement is a home run and a touchdown.  It is

17  something --

18     **THE COURT:**  Well, I called it a grand slam.

19     **MR. TOWNSEND:**  It is a grand --

20     **THE COURT:**  You don't like my --

21     **MR. TOWNSEND:**  -- slam and a touchdown and Super Bowl on

22  top of it.  It is settling something else than what is before

23  the Court.

24     The borrower defense claims are before the Agency, before

25  the Department of Education, in an administrative process that

1   the Department has exclusive jurisdiction over.  They're not in

2   this proceeding.

3       The claim that is in this proceeding before this Court is

4   a claim for a hearing.  And we're told that the parties are

5   compromising that claim.  A claim -- a compromise implies each

6   party gives up something and the parties meet in the middle.

7   This is far beyond what the plaintiffs could have obtained by

8   litigating their claim successfully to a final judgment.

9       And the leading case on this question is

10  *Norton v. Southern Utah Wilderness Alliance*, 542 U.S. 55-65,

11  and here's the relevant quote (as read):

12          ". . . when an agency is compelled by law to act

13          within a certain time period, but the manner of its

14          action is left to the agency's discretion, a court

15          can compel the agency to act, but has no power to

16          specify what the action must be."

17      This settlement determines what the action will be on

18  hundreds of thousands of bor- --

19  **THE COURT:**  But it's not the judge -- it's not the judge

20  forcing that on the Agency.  The Agency wants to do that.  So

21  the Agency has made that determination that you say is within

22  the Agency's -- I agree with you.  I couldn't -- if it went the

23  original way, the most I could do would be to say:  You've got

24  to make a decision one way or the other.

25      And so now the Agency is saying:  Okay.  We're going to

1   make a decision, and we're giving -- we're giving up.  They all

2   win.

3        So why is that so out of line with what was requested in

4   this case?

5        **MR. TOWNSEND:**  Well, Your Honor, I would say two things.

6        Those claims are not in front of the Court.  They are

7   still in front of the Agency.

8        There is no example that we've been cited or that I'm

9   aware of of an agency in court settling litigation,

10  compromising litigation that includes hundreds of thousands of

11  rights outside of court.

12       **THE COURT:**  Well, no.  The Corinthian -- I thought the

13  Corinthian case just recently in our own Court was 560,000

14  borrowers and $5.8 billion.  Same kind of thing, wasn't it?

15       **MR. TOWNSEND:**  Well, I am not sure that that forgiveness

16  was in court.  But Corinthian no longer exists.  There's no one

17  to challenge the authority in that case.  So I really can't --

18  I'm not in a position to defend that settlement.  That was

19  something that I think the Department did unilaterally in

20  another case and it wasn't challenged.

21       And I would not cite that as authority for -- in fact,

22  every one of the schools in the list that was submitted today

23  in response is no longer in business.  There's no one to

24  challenge any of those.  This is the first instance in which

25  anyone is challenging this assertion of settlement authority,

1    and we're not cited any prior instance of this happening.

2        So it's settling things that -- claims that are not in

3    court, claims that are committed to the Agency's exclusive

4    jurisdiction.

5        In fact, this settlement is deciding issues, claims that

6    hadn't even been asserted at the time that the settlement was

7    filed in this Court in June.  179,000 post-class claims have

8    been filed since then, and this settlement is asserting all of

9    those rights.

10       Again, this settlement qualifies as a rule under the

11   Administrative Procedure Act.  A rule is defined as a statement

12   of general or particular applicability that has future effect,

13   5 U.S.C. -- U.S.C. Section 551(4).  And that's exactly what

14   this settlement does.  It has general effect because it applies

15   to class members and non-class members and it applies well into

16   the future.

17       And there is Ninth Circuit authority that says judicial

18   acts in approving consent decrees and settlements can

19   constitute rules.

20       **THE COURT:**  Give me a decision that says that.

21       **MR. TOWNSEND:**  *Conservation Northwest vs. Sherman*,

22   715 F.3d at page 1187.  And the Ninth Circuit held that the

23   settlement authority in that case does not authorize

24   effectively creating a new substantive rule.

25       That's exactly what this settlement would do.  It would

1    create a new framework applying into the future, binding

2    the Secretary in the future, governing claims that hadn't been

3    filed at the time the settlement was announced.  It's a rule.

4    It has to be -- it has to comply with the Administrative

5    Procedure Act.  And moreover, it can't -- a settlement can't

6    violate other substantive law.

7        There's no authority under the Higher Education Act or the

8    Department's own rules, legislative rules, passed -- enact- --

9    or promulgated through notice and comment rulemaking for

10   granting borrower defense claims without any regard to the

11   merits of those claims.  But that is exactly what this

12   settlement would do.

13       So it is violating the Agency's own regulations, which

14   have the force and effect of law.  So --

15       **THE COURT:**  But it would only be binding on the Agency as

16   to those people who are members of the class.  It would not be

17   binding on even you four.  You're recoupment rights are fully

18   preserved.  And any other class member would not -- not class

19   member, but any other future borrower or past borrower would

20   not get the -- have any entitlement to have the benefit of this

21   settlement.  That's the way I see it.

22       So why is this a -- why does this extend beyond the four

23   corners of the class such that notice and comment would be

24   required?

25       **MR. TOWNSEND:**  Well, the first point I would make is that

1  the judgment would cover members, individuals who are not

2  members of the class, all of the post-class applicants,

3  179,000, we're told, as of late September when the parties

4  filed their final motion.  So it does bind individuals outside

5  of the class.

6      But we do also believe -- we're very concerned that being

7  on List C, Schedule C, would have an effect on schools going

8  forward.  The Agency has to have consistent adjudicative

9  processes.  Future borrower defense claims might be filed after

10 a final judgment.  What justification is the Agency going to

11 give for denying borrower defense claims filed by any person

12 who attended a school on Schedule C after the judgment but

13 automatically granting all of them before the judgment?

14     It does have an effect on agency decision-making

15 processes.  It would be an unfair process.  And the

16 decision-maker is not an ALJ.  It's not a judge.  It's not

17 someone who's neutral.  It is someone who works for

18 the Secretary, the Secretary who is in court telling this Court

19 that there is a list of presumptive wrongdoers.  How can

20 schools possibly get a fair shake in such a process?

21     So a settlement of this nature, the settlement that the

22 parties are asking for, does have an effect on outside parties

23 and non-class members.

24     **THE COURT:**  All right.  Any other intervenor wish to be

25 heard?

1    It's your choice, but you can take your mask off, if you

2  wish.

3        **MR. GONSALVES:**  I would love to.

4        **THE COURT:**  There you go.

5        **MR. GONSALVES:**  Terance Gonzales, Your Honor, on behalf of

6  the Chicago School of Professional Psychology.

7        My client is here in the courtroom today.

8        **THE COURT:**  Raise your hand, please.

9                        (A hand is raised.)

10       **THE COURT:**  Okay.  Welcome.

11       **MR. GONSALVES:**  It's the general counsel for the Chicago

12  School.  It's the largest non-profit school of professional

13  psychology in the country.

14       Judge, I want to touch on a couple of things with respect

15  to the authority.

16       The Department points to 1082(a)(6) as their authority to

17  enter into this $6 billion settlement.  They would have you

18  believe that that provision, read in isolation, gives the

19  Department the authority to settle any claim for any reason for

20  any amount so long as the Department sees fit.  But that

21  provision cannot be read or looked at in isolation.  It has to

22  be read in context with the other regulations.

23       So, for example, Judge, 1082 -- 20 U.S.C. 1082(b) imposes

24  a $1 million cap on the Secretary's authority to settle

25  litigation unless she gets approval from the Attorney General

1  of the United States.  That cap that is in 1082(b) is also

2  listed in 34 CFR 30.70(e)(1), where it again describes the cap

3  on her authority to settle claims absent approval from the

4  Attorney General of the United States.

5      **THE COURT:**  Do they have that approval?

6      **MR. GONSALVES:**  Well, we don't know, Judge.

7      Now, Mr. Merritt may step up and say:  Yes, we do have

8  that approval.

9      The plaintiffs may step up and say:  You know, that

10  provision doesn't apply to this particular settlement.

11      I'm aware of a letter from plaintiffs' counsel to Senator

12  Elizabeth Warren, dated September 14th, 2020, advocating on

13  behalf of mass student debt relief, where she discusses this

14  $1 million cap on the Secretary's authority.  And I have a copy

15  of that letter if you'd like to see it, Your Honor.

16      The point here, Judge, is not whether they have the

17  authority or whether it applies.  It's that 1082(a)(6) cannot

18  be looked at in a vacuum.  It must be read in conjunction with

19  the other regulations and the other statutes, including the

20  borrower defense regulations.

21      It is our position that any settlement cannot exceed what

22  those regulations provide for.

23      By way of example, Judge, the borrower defense regulations

24  require an offset of any amount discharged through those

25  regulations; and that offset must be reduced -- or any relief

1    must be reduced by the amount of any refund, reimbursement,

2    indemnification, restitution, compensatory damages, settlement,

3    debt forgiveness, et cetera.

4         This settlement that's before Your Honor doesn't provide

5    for any sort of offset to those class members who have already

6    received relief from other class action settlements or other

7    federal government regulatory investigations, such as

8    settlements with the FTC.

9         So those class members who have already received full or

10   partial relief are going to have a great day, an even better

11   day than a grand slam because they are going to be unjustly

12   enriched because they've already had their compensation -- or

13   partial compensation from those other settlements.

14        And this settlement agreement provides no mechanism --

15        **THE COURT:** Just give me a hypothetical concrete example

16   of how somebody could be benefited like that.  I just am not

17   following your point about offsets.

18        **MR. GONSALVES:** So there is -- if -- there have been

19   consumer class actions brought against some schools, such as my

20   client's school -- okay? -- where there was a class action

21   filed and it was settled, and each one of those students who

22   were in that class received $90,000.

23        If they did not use that money to repay their loans and

24   they have filed a borrower defense application -- and of the 37

25   that we are aware of that's pending against my client, four of

1    them were in that prior class, that *Truitt* class -- if they

2    didn't use that money to repay their loans and filed a borrower

3    defense application, like we know four did, they're going to

4    get an extra benefit because they got the 90,000, plus now

5    they're going to get all of their loans discharged.  And

6    there's no mechanism in the settlement agreement to account for

7    that.

8           **THE COURT:**  Okay.

9           **MR. GONSALVES:**  The other point that I'd like to make,

10   Your Honor, is with respect to the filing from the Department

11   today about when has 1082(a)(6) been used as authority to

12   discharge group debt, group loans.

13          And they have a list of six or seven cases here, but when

14   you go back and look at the press releases that the Department

15   released about those discharges, the press release says those

16   were done pursuant to the borrower defense regulations, not

17   pursuant to 1082(a)(6).

18          So, for example, one of them that's listed here is the

19   Marinello Schools of Beauty, April 28th, 2022, 28,000 people.

20          Give me one minute, Judge.

21                         (Pause in proceedings.)

22          **MR. GONSALVES:**  Well, let me skip that one.

23          Let me go to the Minnesota School of Business, Judge,

24   where that one was June 15th.  And the press release says, with

25   respect to the Minnesota School and Westwood -- both of them

1    are on this list -- (as read):

2            "Borrowers will receive $415 million in borrower

3        defense to repayment discharges."

4        That's a different provision, Judge.  Those are the

5    borrower defense regulations.  Those are not under 1082(a)(6).

6        And so I'm not sure -- and we can look at these other

7    press releases.  Marinello School of Beauty, that $238 million

8    group discharge, that was based on borrower defense findings.

9        For Corinthian --

10        **THE COURT:**  But does it refer in any way to any other

11    statutory authority, those press releases?

12        **MR. GONSALVES:**  The only thing these press releases -- and

13    for each one of these schools where there was a press release,

14    the only thing they refer to is the borrower defense

15    regulations.  They don't refer to any other authority.

16        Now, we don't know what --

17        **THE COURT:**  How about the settlements in court?  Did they

18    refer to -- weren't they settlements in court, or not?

19        **MR. GONSALVES:**  These were not, Judge.

20        **THE COURT:**  Okay.  These were --

21        **MR. GONSALVES:**  They have one listed here, the *Weingarten*

22    case; but these other cases were instances in which the

23    Department had received large volumes of borrower defense

24    applications.  Some of these were for closed schools.

25        Corinthian, for example, there were discharges pursuant to

1   the borrower defense regulations; and then there may have been

2   some of them that were discharged even though they had not

3   submitted a borrower defense.

4       But we -- under your order, we're not allowed discovery.

5   We don't know what the basis was for those settlements, and we

6   only got this today.

7       I can only tell you what I was able to find off of the

8   press releases that all of us have been following for many

9   years of watching these regulations play out.

10      **THE COURT:**  Okay.  Thank you.

11      **MR. GONSALVES:**  The last -- one last point, Judge.

12      **THE COURT:**  All right.

13      **MR. GONSALVES:**  And that is the question of whether

14  1082(a)(6) applies to the direct loans.  This is referenced in

15  the briefing.

16      1086 -- I'm sorry.  1082(a)(6) applies to FFEL.  The

17  Department says it also applies to direct loans.  I don't know

18  that that is a settled proposition, and I think it's something

19  that the Court should take a hard look at.

20      The Government points to 20 U.S.C. 1087e(a)(1) as the

21  basis, which says they have the same terms, conditions, and

22  benefits as FFEL loans.  But those are very different than

23  functions, powers, and duties that are provided for under

24  1082(a)(6).

25      I'd like to draw the Court's attention to *Pennsylvania*

1   *Higher Education Assistance vs. Perez*, 416 F.Supp. 3d 75, where

2   the Court concludes there is no language incorporating

3   the Secretary's general powers from Part B into Part D.

4       The statute is very specific about functions, powers, and

5   duties when it comes to debt cancellation, Judge, and we're not

6   quite sure that *Weingarten*, the case that has sort of, in

7   dicta, that they apply to both, answers the Court's question as

8   to whether 1082(a)(6) applies to both FFEL and direct loans.

9       **THE COURT:**  Thank you.

10      Let me ask my reporter.  Are you doing okay?  Can you keep

11  going?

12      **THE OFFICIAL REPORTER:**  Yes.

13      **THE COURT:**  All right.  Mr. Merritt, what do you say to

14  the $1 million cap and the Attorney General?

15      **MR. MERRITT:**  I think, like a lot of things we just heard,

16  that is an inaccurate statement of the statute.

17      20 U.S.C. 1082(b) requires settlements of over a million

18  dollars to be referred to the Attorney General for his review,

19  but not approved specifically.  There's nothing in the statute

20  that says it has to be approved.  It just has to be reviewed by

21  the Attorney General.

22      Of course here, the Attorney General, through his

23  delegated officials at the Department of Justice, has approved

24  the settlement agreement; so there's no issue there.

25      I want to address a few points about the statutory

 1  authority because we heard a few things about what it is and
 2  what it does.
 3       So 20 U.S.C. 1082(a)(6) makes no reference to litigation.
 4  It's not specific to litigation.  It just discusses the
 5  Department's ability to waive or right or -- waive, release, or
 6  compromise loan debts that are owed to it.
 7       So what we're talking about here is a settlement
 8  agreement.  And what the Department is doing pursuant to that
 9  settlement agreement is discharging loans or setting up
10  streamlined procedures for the review of borrower defense
11  applications, ultimately potentially resulting in the discharge
12  of loans or not, however that process goes.
13       But it's all specific -- none of that is specific to a
14  case having to be in litigation.  So I would just stress that
15  when the -- in most of the cases that we cited in today's
16  filing, they did not involve cases in litigation.
17       You referenced Corinthian.  There is a case with Judge Kim
18  involving Corinthian, but that discharge that happened earlier
19  this year was not through the litigation or specific to that
20  litigation.
21       So this authority is foundational to the Secretary's
22  ability to administer the student loans and is not specific to
23  litigation, though litigation can obviously influence
24  the Secretary's judgment about the benefits, the drawbacks of a
25  particular exercise of the authority, as it has here.

1      You know, there's been a lot of talk today about how

2  the -- what the case was originally set out to do and how it

3  was about just 706(1) and getting decisions quickly.

4      After discovery and after the prior rejection of the

5  settlement agreement, there were new claims added to that that

6  attacked really all aspects of the Department's process for

7  adjudicating borrower defense claims and challenged the

8  substance and content of denial letters.

9      So in determining whether to resolve this case and provide

10  for the discharges that the settlement agreement provides for,

11  there was an assessment -- you know, litigation risk assessment

12  of what was likely to happen if the case proceeded to judgment.

13  And, obviously, that would be up to the Court.  But there was

14  more to it than just a request to provide timelines for

15  decisions, implicating the procedures the Department had in

16  place to review claims, implicating what the denial notices

17  would say.

18      **THE COURT:**  What about the post-settlement class?  The

19  class that I certified obviously didn't include them.  So do I

20  need to go through a Rule 23 process?

21      **MR. MERRITT:**  Your Honor, I think this issue is mostly

22  best addressed to plaintiffs' counsel.

23      But I will just note that the class was not certi- -- was

24  not closed as of the date of your certification order.  The

25  class was defined as anyone who had filed a borrower defense

1   application; so it was, by definition, open-ended.

2        And the parties, as part of their settlement negotiations,

3   had to -- you know, have, in the interest of efficiency and

4   providing known timelines to the Department to carry out its

5   obligations, decided a date to close the class.  But by

6   definition, the class was defined in an open-ended way.

7        And, of course, we opposed class certification in this

8   case and don't need to get into, you know, all of our views on

9   that.  But -- and, again, I think those can be presented by

10  plaintiff.  But that is an important way of -- point to make

11  about what the actual class definition is here.

12       I did just want to make a couple other points.

13  **THE COURT:**  Yeah, go ahead, but I've got some -- I've got

14  one or two other questions for you.  Please, go ahead with your

15  list.

16  **MR. MERRITT:**  Okay.  On the issue of double recovery or

17  class members getting a windfall in some way, in our filing

18  that we filed today in answer to the Court's third question

19  having to do with the separate loan forgiveness plan recently

20  announced by the President, there are specific federal statutes

21  and regulations set forth that make clear that a borrower

22  cannot recover -- or that any settlement relief in this case or

23  any relief that the borrower receives from the Department

24  cannot exceed the combined amount federal student loan debt

25  owed to and collected by the Secretary; so, essentially, more

1    than the original disbursement of the loan.

2        **THE COURT:**  Well, but what do you say to the different

3    hypothetical of these students who each got $90,000 in a prior

4    settlement directly against the school, and how is that 90,000

5    going to be factored in?  Because we don't know how the

6    student -- the student may not have given that money to the

7    bank.

8        **MR. MERRITT:**  Those are different things; right?  I mean,

9    all the Department can do is discharge outstanding loan debt

10   the Department holds or provide refunds for amounts previously

11   collected, and there is no chance that there will be kind of

12   windfall recovery within that context.

13       You know, we have no way of knowing what recoveries might

14   have been made in other contexts, and I don't think that's

15   relevant to Your Honor's consideration here.

16       Just on the point of the list that was filed today about

17   examples of group discharges, you know, the Department of

18   Education doesn't make policy through press releases.  That's

19   not official government documents as to, like, the source of

20   the authority for any of those particular discharges.

21       What you have in front of you is our, you know, court

22   filing today where we stated what the source of authority was

23   for each of those discharges, and it was the settlement and

24   compromise authority.

25       It shouldn't be surprising, necessarily, that authority

1    isn't always cited.  It's a foundational authority the

2    Department has to administer debts, to release debts, to not

3    always require repayment.  It's not, as we noted, not

4    necessarily always citing it or tracking it.  But, you know,

5    the Court filing here should control over a press release.

6         A quick note about the *Perez* case from the District of

7    Connecticut having -- that was raised on the issue of whether

8    the 1082(a)(6) authority applies to direct loans.  The Court in

9    that case made clear that it was addressing arguments that were

10   raised in a footnote, and just barely.  The Court said that.

11   And specifically what it was talking about was the Secretary's

12   authority to sue and be sued.

13        So we don't agree with that decision.  But whether

14   the Secretary can sue or be sued in district court is different

15   than the Secretary's authority to waive, compromise, or release

16   loan -- amounts of loans that are owed to the Secretary, which

17   clearly is a condition, term, or benefit of the underlying

18   loan.

19        I'll make just a couple -- if Your Honor has questions, I

20   was just going to address a quick rebuttal to the major

21   questions doctrine issue.

22        **THE COURT:**  Please, go ahead.

23        **MR. MERRITT:**  So, again, we need to focus on the correct

24   statute here.  There's reference made to the statute governing

25   borrower defense and what that says and, you know, statements

1    about the settlement and compromise authority only applying to

2    litigation.

3         But what we have in front of us is 20 U.S.C. 1082(a)(6),

4    the settlement and compromise authority which clearly, by its

5    text, authorizes the relief provided for in the settlement

6    agreement.  The major questions doctrine is a departure from

7    normal principles of statutory interpretation.  It tells --

8    it's reserved for extraordinary cases because it tells a court

9    to not give effect to the clear statutory language.

10        This is not that kind of case.  We are not dealing with a

11   novel reading of a long-standing statute for an unexpected

12   purpose.  Again, we're talking about the Secretary of Education

13   administering and determining repayment obligations for student

14   loans that the Secretary, for the most part, holds and that are

15   owed to the Secretary.

16        This is not the kind of case involving regulation of

17   private parties or broad swaths of the economy like some of the

18   times that the major questions doctrine has been invoked,

19   recently, in the *West Virginia* case that involved an EPA rule

20   applying to private power plants, certain types of emitters.

21        There was recently the case in the OSHA vaccine-or-test

22   case where it involved an agency rule requiring -- extending

23   into the employer employment relationship, where employers were

24   requiring their employees -- or, sorry -- the rule required

25   employers to require their employees to either vaccinate

1  against COVID-19 or test, or the *Alabama Association of*

2  *Realtors* case which involved restrictions on private landlords'

3  ability to evict tenants.

4  Nothing like that is at issue here.  It's a

5  well-established statutory authority that the Secretary has

6  often invoked and for clear statutory purposes and consistent

7  with general powers under the HEA pursuant to which there are

8  many options for the Secretary to reduce or eliminate student

9  repayment obligations, including putting borrowers into

10  deferment, forbearance, income-driven repayment plans, and

11  providing loan forgiveness under multiple types -- multiple

12  different statutory sources of authority.

13  So bottom line, there's no reason for Your Honor to apply

14  any skepticism to the actual text of the statute here; and even

15  if you did, the text is clear.

16  **THE COURT:**  What do you say to the point that this should

17  have -- this broad policy decision, even if it's within

18  the Agency's authority, should -- because it should have gone

19  through notice and comment?

20  **MR. MERRITT:**  Well, a couple things.

21  The settlement agreement itself, there's no authority

22  suggesting that a settlement agreement itself should have to go

23  through notice and comment.

24  If there are rare cases -- if the settlement agreement

25  itself were to provide, for example, for the Department to

1  actually promulgate a rule that had application outside of this

2  case to parties who are not class members or post-class

3  applicants to find in a certain way here, as was the issue in

4  the *Sherman* case that was cited, that just simply said parties

5  cannot do a settlement agreement, agree to actually amend

6  regulations.  That's not what's at issue here, Your Honor.

7       The Department recently did go through the process of

8  amending its borrower defense regulations.  A new rule was

9  promulgated last week.  That'll be applied -- or, sorry -- on

10 November 1st.  That will be applied to anyone who is not in the

11 settlement agreement.

12      And what happens through the settlement agreement has no

13 impact or effect on any parties, any individuals who are not

14 parties to this case.  It won't determine, you know, rules or

15 precedents the Department would have to follow outside of this

16 context.

17      So it's certainly not the type of situation where an

18 agency was actually trying to promulgate a rule.  We know that

19 when the Department promulgates borrower defense rules, it goes

20 through notice and comment.

21      **THE COURT:**  All right.  Thank you.

22      Did the plaintiffs wish to say anything more?

23      **MS. ELLIS:**  Yes, Your Honor.

24      Your Honor, if I may, I'd like to begin by talking about

25 what a borrower defense is, because the intervenors threw a lot

1    of things out there about what is the claim, what claims are

2    being settled and by who, and I'm hoping to provide a bit of

3    clarity on that.

4        The Higher Education Act specifically provides that a

5    federal student loan borrower can assert a defense to repayment

6    of their federal student loans based on the misconduct of their

7    school.  The borrower defense rules implement this statutory

8    authority that the Higher Education Act gives to the Secretary.

9        They essentially -- what the borrower defense rules

10   essentially do is they say:  Here is how you assert your

11   defense to repayment.  You do it by filling out this

12   application.  The application will be reviewed, et cetera.

13       And --

14       **THE COURT:**  Do those borrower defense rules -- first,

15   they're legislative regulations -- am I correct on that?

16       **MS. ELLIS:**  Yes.  They go through --

17       **THE COURT:**  -- as opposed to interpretive?

18       **MS. ELLIS:**  -- notice and comment.

19       **THE COURT:**  All right.  So they're not interpretive;

20   they're legislative.  Correct?

21       **MS. ELLIS:**  Yes.

22       **THE COURT:**  All right.  So then do those legislative rules

23   say what the criteria will be for invalidating or forgiving a

24   loan, discharging it?

25       **MS. ELLIS:**  They do set out certain criteria, and this has

1  varied across the different versions of the rule.  But the

2  2016, 2019, and 2022 rules, for instance, say, you know, here

3  are examples of what is a misrepresentation that could give

4  rise to a borrower defense claim.

5       There is other subregulatory guidance that borrower

6  defense adjudicators use.  We know this because of discovery in

7  this case, and much of it we challenged as violating the APA.

8  We don't know exactly what of that is still in place right now.

9       But the basics for how you assert your defense to

10  repayment through a borrower defense application are addressed

11  in these legislative rules.

12       And when the plaintiffs filed this lawsuit in 2019, their

13  claim under the Administrative Procedure Act was that the

14  Department had not lawfully handled their assertion of a

15  defense to repayment because the Department was simply not

16  making decisions, and the plaintiffs were owed a decision in a

17  reasonable period of time.

18       Now that, obviously, evolved.  We learned more about what

19  was going on behind the scenes.  And so in our supplemental

20  complaint, we further alleged that the defenses to repayment

21  had not been handled properly because of the presumption of

22  denial policy, as we called it, which led to the form denial

23  notices.

24       So what's happening now in the settlement agreement is

25  that the Secretary is exercising his authority under

1    Section 1082(a)(6) to compromise the claims against -- to

2    compromise the defense to repayment claims that the class has.

3    He's doing that by, for many people, canceling their loans and,

4    for other people, providing them with this streamlined

5    procedure and specific timelines.

6        And by using his authority to provide redress to the

7    plaintiffs, that settles our APA claims through this negotiated

8    settlement with Ed's lawyers at the Department of Justice.

9        **THE COURT:**  All right.  Did anyone figure out how many

10   people are in the BDU unit while we've been here?

11       Mr. Merritt, did you?

12       **MR. MERRITT:**  Yes.

13       **THE COURT:**  What's the answer?

14       **MR. MERRITT:**  The point I made that I forgot to tell you.

15   33 total employees as of May/June 2022.  That includes 28

16   initial reviewers of claims and five supervisors.

17       I'm told that there have been additional hires since then

18   that we can track numbers on, but as of the time you asked for,

19   those are the numbers.

20       **THE COURT:**  What was the total again?  33?

21       **MR. MERRITT:**  33, yes.

22       **THE COURT:**  Okay.  Thank you.  Good.

23       All right.  Please continue.

24       **MS. ELLIS:**  Thank you, Your Honor.

25       I'll also continue by noting that this is not the first

```
 1   case to address the Secretary's settlement and compromise
 2   authority.  That was addressed in the *Weingarten v. DeVos* case,
 3   which was listed in the filing this morning.
 4        That was a case in sort of the opposite posture, where the
 5   plaintiffs had -- had tried to compel the Secretary to use the
 6   settlement and compromise authority to discharge their debts.
 7   This was a case that had to do with the Public Service Loan
 8   Forgiveness program.
 9        And what the District of Columbia found in the *Weingarten*
10   case is that matters concerning the Secretary's settlement and
11   compromise authority are discretionary.  The Secretary's
12   decision not to exercise such authority or to exercise it in a
13   particular way is committed to her absolute discretion.
14        And so that is just some background.  I believe it was
15   counsel for Lincoln who said this hasn't been addressed, and it
16   has.
17        Counsel for the Chicago School also noted that we should
18   read this authority in conjunction with other authorities.  And
19   some of the important authorities in that respect are in 34 CFR
20   30.70, in Subsection (e)(1).
21        Regulations implementing, in part, the settlement and
22   compromise authority specifically state that this encompasses
23   debt arising under the FFEL program authorized under Title IV,
24   Part B, of the HEA or the William D. Ford Federal Direct Loan
25   Program authorized under Title IV, Part D, of the HEA.
```

1        So that's additional authority, first of all, for the

2    point that the authority applies equally to direct and to

3    FFEL loans.

4        Then, furthermore, in this 34 CFR 30.70(e)(1), it states

5    that the Secretary can look to 31 CFR, Part 902 or 903, in

6    deciding whether to compromise a federal student loan.

7        And Section 902 enumerates some potential bases for

8    compromise, one of which is significant doubt concerning

9    the Government's ability to prove its case in court.

10       And we would submit that the class members' assertion of

11   their defenses to repayment does raise a significant doubt

12   about whether the Department could overcome that defense

13   against the validity of the loan in any future collection

14   proceeding.  And that does provide a strong reason to

15   compromise the debt.

16       **THE COURT:**  All right.  Anything more?

17       **MS. ELLIS:**  Excuse me?

18       **THE COURT:**  I'll let you make one more point.  Then we're

19   going to bring it to a close.

20       **MS. ELLIS:**  Yes, Your Honor.

21       I want to address counsel for Everglade's point about

22   class certification under Rule 23(b).

23       And the fact that some class members will receive monetary

24   relief as part of the settlement does not convert this into a

25   damages action.  It's not a case as in *Wal-Mart v. Dukes* where

1  you have individualized damages.  A defense to repayment is not

2  a claim for damages.  It is a claim that you do not have to

3  repay your loan.

4       And in terms of the relief that the settlement agreement

5  provides, it is, in its essence, injunctive relief.  What it

6  does is tell the Department:  You have to resolve these

7  people's defenses to repayment within a set timeline.

8       And then the details of it aren't creating separate

9  subclasses or anything like that.  It's simply going through

10 the steps of how is the Government going to satisfy this

11 obligation to resolve all of the backlog of BD claims by a date

12 certain.

13      And as to the post-class applicants, I would just build

14 slightly on what Mr. Merritt said, which is that if we had not,

15 in the settlement, agreed to close the class as of the

16 execution date, everyone who is called a post-class applicant

17 in the settlement would be a class member.

18      And so even though we are not including them in the

19 settlement class, even though we are not actually settling any

20 claims that they may have, we wanted to include provisions that

21 would make sure that they're treated fairly and that there

22 wasn't a recurrence of the problems --

23      **THE COURT:**  What relief will the post-settlement

24 individuals get?

25      **MS. ELLIS:**  They have a guarantee that their claims will

1  be decided within 36 months -- sorry -- that their BD

2  applications will be decided within 36 months of the effective

3  date of the settlement.

4       And if the Department doesn't meet that deadline, they'll

5  get settlement relief.  And that's all.

6       The post-class doesn't have the streamlined procedures.

7  Exhibit C does not apply to the post-class applicants.  They

8  get a firm timeline.

9       **THE COURT:**  Okay.  Thank you very much.

10      All right.  We've been going an hour and 35 minutes.

11      This is a very interesting problem.  I'm going to bring it

12 to a close unless there's some procedural, something like -- I

13 don't know.

14      Is there any procedural point anyone wants to bring up

15 that can be said in one minute or less?

16                        (No response.)

17      **THE COURT:**  No.

18      Yes?  Okay.

19      **MR. TOWNSEND:**  Your Honor, I would just point out -- Lucas

20 Townsend for Lincoln -- that we just heard that this was

21 actually an action for an injunction -- excuse me -- an

22 injunction, that a borrower defense claim is an injunctive

23 claim.

24      20 U.S.C. 1082(a)(2) bars injunctions against

25 the Secretary.  This is relief that could not have been

1    obtained through litigating these claims to a final judgment.

2          **THE COURT:**  Okay.

3          **MS. ELLIS:**  Your Honor, may I?

4          **THE COURT:**  Okay.  You get 15 seconds.

5          **MS. ELLIS:**  First, I -- well, first of all, I don't

6    believe that's a procedural point in the sense Your Honor

7    meant.

8          **THE COURT:**  No, it's not.  But go ahead.  If you want to

9    argue about it, I'll give you equal time.

10         **MS. ELLIS:**  The question of the anti-injunction provision

11   was one that was actively litigated in this case in both the

12   first and second rounds of summary judgment briefing.

13         Plaintiffs argued why the anti-injunction provision does

14   not bar these claims.  So it's not as open and shut of a

15   situation.

16         We believe that the relief ultimately would have been

17   permitted by the HEA and would have been appropriate.

18         **THE COURT:**  All right.  Time to move on.

19         So you members of the audience, again, I thank you for

20   your attendance, and those people on the phone.

21         Just so you'll know what the score is, I am not making a

22   decision right now.  I need to study this a bit.  And in about

23   a few days to a week, I will get an order out that will be in

24   writing that will explain who wins and who loses.

25         And so you have to stay tuned is, I guess, what I'm trying

1    to say.

2          I want to thank all of the lawyers on both sides for the

3    excellent presentations.

4          Okay.  We're in recess.

5          **THE CLERK:**  Court is adjourned.

6                  (Proceedings adjourned at 2:39 p.m.)

7                          ---o0o---

8

9                      <u>**CERTIFICATE OF REPORTER**</u>

10          I certify that the foregoing is a correct transcript

11   from the record of proceedings in the above-entitled matter.

12

13   DATE:  Friday, November 11, 2022

14

15                     *Ana M. Dub*

16   _____

17          Ana M. Dub, CSR No. 7445, RDR, RMR, CRR, CCRR, CRG, CCG
                    Official United States Reporter
18

19

20

21

22

23

24

25