**Nos. 23-15049, 23-15050, 23-15051**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

―――――――――

THERESA SWEET, et al.,
*Plaintiffs-Appellees,*
&
EVERGLADES COLLEGE, INC.; LINCOLN EDUCATIONAL SERVICES CORPORATION; and
AMERICAN NATIONAL UNIVERSITY,
*Intervenors-Appellants*
v.
MIGUEL A. CARDONA, Secretary of the United States Department of Education, and
U.S. DEPARTMENT OF EDUCATION,
*Defendants-Appellees.*

―――――――――

On Appeal from the United States District Court
for the Northern District of California

―――――――――

## BRIEF FOR DEFENDANTS-APPELLEES

―――――――――

*Of Counsel:*

LISA BROWN
*General Counsel*

JOHN PATRICK BAILEY
*Senior Counsel*

BRIAN SIEGEL
*Assistant General Counsel for Postsecondary Education*

KAREN KARAS
*Attorney*
*U.S. Department of Education*
*400 Maryland Avenue SW*
*Washington, DC 20202*

SARAH E. HARRINGTON
*Deputy Assistant Attorney General*

ISMAIL J. RAMSEY
*United States Attorney*

MARK B. STERN
JOSHUA M. SALZMAN
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................... 1

STATEMENT OF JURISDICTION ....................................................... 3

STATEMENT OF THE ISSUES ............................................................. 3

PERTINENT STATUTES AND REGULATIONS .............................. 3

STATEMENT OF THE CASE ................................................................ 4

      A.    Legal Background ...................................................... 4

      B.    Factual and Procedural Background ............................. 6

SUMMARY OF ARGUMENT .............................................................. 15

STANDARD OF REVIEW ................................................................... 18

ARGUMENT ......................................................................................... 19

I.     Intervenors Lack Standing to Challenge the Settlement ..................... 19

II.    Intervenors' Claims That the Settlement Violates the APA Fail ....... 29

      A.    Intervenors' APA Claims Are Not Cognizable ............................ 29

      B.    The Settlement Falls Within the Government's Statutory
           Authority ..................................................................... 30

      C.    The Settlement Does Not Violate the APA's Requirements .......... 38

III.   The Settlement Does Not Violate Intervenors' Due Process Rights ..... 43

IV.   Intervenors' Remaining Arguments Are Similarly Unavailing ........... 45

      A.    Intervenors Have No Basis for Challenging the District Court's
           Approval of the Settlement .............................................. 45

B.      The District Court's Denial of Intervention as of Right Was
        Correct and Any Error Was Harmless ........................................................48

CONCLUSION ............................................................................................. 51

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

ADDENDUM

# TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Allen v. Bedolla,*
   787 F.3d 1218 (9th Cir. 2015) ........................................... 19

*Arizonans for Official English v. Arizona,*
   520 U.S. 43 (1997) ................................................. 28, 29

*Bauer v. DeVos,*
   332 F. Supp. 3d 181 (D.D.C. 2018) ................................. 7

*Biden v. Nebraska,*
   143 S. Ct. 2355 (2023) ................................................ 36

*Bothke v. Fluor Eng'rs & Constructors, Inc.,*
   834 F.2d 804 (9th Cir. 1987) ....................................... 19

*California Ass'n of Private Postsecondary Sch. v. DeVos,*
   344 F. Supp. 3d 158 (D.D.C. 2018) ............................... 7

*Calvillo Manriquez v. DeVos,*
   345 F. Supp. 3d 1077 (N.D. Cal. 2018) ......................... 7

*Canatella v. California,*
   404 F.3d 1106 (9th Cir. 2005) ..................................... 19

*Clapper v. Amnesty Int'l USA,*
   568 U.S. 398 (2013) .................................................... 21

*Clarke v. Securities Indus. Ass'n,*
   479 U.S. 388 (1987) .............................................. 29, 46

*Class Plaintiffs v. City of Seattle,*
   955 F.2d 1268 (9th Cir. 1992) ..................................... 48

*Diamond v. Charles,*
   476 U.S. 54 (1986) .............................................. 19, 49

*Donaldson v. United States,*
   400 U.S. 517 (1971) ........................................... 48, 49

*Ezzell Trucking, Inc. v. FMCSA,*
   309 F.3d 24 (D.C. Cir. 2002) ................................. 23, 24

*Fikre v. FBI*,
    35 F.4th 762 (9th Cir. 2022) ........................................................ 43

*Foretich v. United States*,
    351 F.3d 1198 (D.C. Cir. 2003) .................................................. 25

*Guerrero v. Clinton*,
    157 F.3d 1190 (9th Cir. 1998) .................................................... 23

*Haaland v. Brackeen*,
    143 S. Ct. 1609 (2023) ................................................................ 28

*Lujan v. Defenders of Wildlife*,
    504 U.S. 555 (1992) .............................................................. 26, 27

*McBryde v. Committee to Review Circuit Council Conduct & Disability Orders*
    *of Judicial Conference of U.S.*,
    264 F.3d 52 (D.C. Cir. 2001) ..................................................... 27

*McMorris v. Carlos Lopez & Assocs., LLC*,
    995 F.3d 295 (2d Cir. 2021) ...................................................... 27

*Meese v. Keene*,
    481 U.S. 465 (1987) .................................................................. 25

*National Urban League v. Ross*,
    977 F.3d 770 (9th Cir. 2020) .................................................... 42

*Parra v. Bashas', Inc.*,
    536 F.3d 975 (9th Cir. 2008) .................................................... 19

*Portland Gen. Elec. Co. v. Bonneville Power Admin.*,
    501 F.3d 1009 (9th Cir. 2007) .................................................. 40

*Prete v. Bradbury*,
    438 F.3d 949 (9th Cir. 2006) .................................................... 50

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
    566 U.S. 639 (2012) .................................................................. 37

*Ramirez-Alejandre v. Ashcroft*,
    319 F.3d 365 (9th Cir. 2003) .................................................... 19

*San Luis & Delta-Mendota Water Auth. v. Haugrud*,
    848 F.3d 1216 (9th Cir. 2017) .................................................. 19

*Spokeo, Inc. v. Robins,*
    578 U.S. 330 (2016) ........................................................................ 19

*Springfield Hosp., Inc. v. Guzman,*
    28 F.4th 403 (2d Cir. 2022) ........................................................... 32

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ................................................................ 16, 20

*Syncor ERISA Litig., In re,*
    516 F.3d 1095 (9th Cir. 2008) ....................................................... 34

*Thorpe Insulation Co., In re,*
    677 F.3d 869 (9th Cir. 2012) ..................................................... 18-19

*Tiffany Fine Arts, Inc. v. United States,*
    469 U.S. 310 (1985) ....................................................................... 49

*TransUnion LLC v. Ramirez,*
    141 S. Ct. 2190 (2021) .............................................................. 22, 23

*U.S. Dep't of Educ., In re,*
    25 F.4th 692 (9th Cir. 2022) ...................................................... 4, 7, 9

*United States v. Carpenter,*
    526 F.3d 1237 (9th Cir. 2008) ....................................... 18, 31, 33, 40, 45

*United States v. Oregon,*
    913 F.2d 576 (9th Cir. 1990) ......................................................... 48

*Yesler Terrace Cmty. Council v. Cisneros,*
    37 F.3d 442 (9th Cir. 1994) ........................................................... 38

**Statutes:**

Administrative Procedure Act (APA):
    5 U.S.C. § 551(4) ........................................................................ 38
    5 U.S.C. § 553 ............................................................................. 38
    5 U.S.C. § 701(a)(2) ..................................................................... 40
    5 U.S.C. § 701(b)(1)(B) ................................................................ 45
    5 U.S.C. § 702 ............................................................................. 45

Higher Education Act of 1965:
    20 U.S.C. § 1070 *et seq.* ................................................................ 4

20 U.S.C. § 1077 ................................................................. 35
20 U.S.C. § 1078-2(a)(2) ................................................... 35
20 U.S.C. § 1078-3(b)(4) ................................................... 35
20 U.S.C. § 1078-8(a) ........................................................ 35
20 U.S.C. § 1078-10 ........................................................... 37
20 U.S.C. § 1082(a)(2) ....................................................... 32
20 U.S.C. § 1082(a)(6) ............................................. 12, 32, 34
20 U.S.C. § 1087a(a) .......................................................... 35
20 U.S.C. § 1087e(a)(1) ............................................... 32, 34
20 U.S.C. § 1087e(h) ...................................................... 4, 31
20 U.S.C. § 1098a(b)(2) ..................................................... 38
20 U.S.C. § 1098bb(a)(1) ................................................... 36

28 U.S.C. § 516 ......................................................... 12, 17, 31

28 U.S.C. § 519 ......................................................... 12, 17, 31

28 U.S.C. § 1291 ................................................................... 3

28 U.S.C. § 1331 ................................................................... 3

**Regulations:**

28 C.F.R. §§ 0.160-0.161 ................................................. 31

34 C.F.R. pt. 668, subpart G .......................................... 30

34 C.F.R. § 668.125 ...................................................... 6, 44

34 C.F.R. § 685.206(c)(3)-(4) ....................................... 6, 30

34 C.F.R. § 685.206(e)(8) ................................................... 5

34 C.F.R. § 685.206(e)(12) ................................................. 5

34 C.F.R. § 685.206(e)(16) ............................................... 30

34 C.F.R. § 685.222(e)(1)(i) ............................................... 5

34 C.F.R. § 685.222(e)(3) ................................................... 5

34 C.F.R. § 685.222(e)(7) .............................................. 6, 30

34 C.F.R. § 685.222(f)-(h) ................................................... 6

34 C.F.R. § 685.308(a)(3) .................................................................. 6, 44

**Rules:**

Fed. R. Civ. P. 23 ............................................................................... 14

Fed. R. Civ. P. 23(b)(2) ....................................................................... 7

Fed. R. Civ. P. 23(e)(2) ...................................................................... 43

Fed. R. Civ. P. 23(e)(5) ...................................................................... 46

Fed. R. Civ. P. 24(a)(2) ...................................................................... 48

**Other Authorities:**

*Authority of the United States to Enter Settlements Limiting the Future Exercise*
    *of Executive Branch Discretion,*
    23 Op. O.L.C. 126 (1999) ........................................................... 31

59 Fed. Reg. 61,664 (Dec. 1, 1994) ..................................................... 4

81 Fed. Reg. 39,330 (June 16, 2016) ............................................... 6, 7

81 Fed. Reg. 75,926 (Nov. 1, 2016) ..................................................... 4

84 Fed. Reg. 49,788 (Sept. 23, 2019) .................................................. 4

87 Fed. Reg. 65,904 (Nov. 1, 2022) ................................................ 4, 5

Order, *Career Colls. & Sch. of Tex. v. Department of Educ.,*
    No. 23-50491 (5th Cir. July 28, 2023) ......................................... 5

Order, *Everglades Coll., Inc. v. Cardona,*
    No. 22A867 (U.S. Apr. 13, 2023) ............................................... 15

U.S. Dep't of Educ., *Department of Education and Attorney General*
    *Kamal Harris Announce Findings from Investigation of Wyotech and*
    *Everest Programs* (Nov. 17, 2015), https://perma.cc/W837-KBHL .............. 6

## INTRODUCTION

After years of litigation, the Department of Education settled a massive class action brought by student loan borrowers challenging the Department's processing of class members' applications for relief under a program that relieves borrowers of their repayment obligation when their school engaged in misconduct. The litigation arose from a crushing backlog of applications that far exceeded the Department's adjudicative capacity. The settlement provides a rational and fair means of resolving the litigation and for eliminating that backlog. It calls for the Department to grant full discharges to approximately 196,000 plaintiffs who borrowed to attend 151 specific schools, which in turn enables the Department to adjudicate the remaining class members' claims on a specified timeline. The Department agreed to provide such relief to borrowers associated with the enumerated schools because of "strong indicia regarding substantial misconduct by the listed schools, whether credibly alleged or in some instances proven, and the high rate of class members with applications related to the listed schools," 3-ER-573-74, and because continued litigation risked arbitrary resolution of the claims as a whole. No class member maintains an objection to the settlement, and it was approved by the district court after a fairness hearing.

Although all parties to the underlying litigation are satisfied with this resolution, three of the 151 schools—whose students constitute less than 1% of the plaintiff class—intervened in an unsuccessful attempt to block the settlement in its entirety. The settlement binds only the Department and the plaintiff class, providing neither

the Department nor plaintiffs with additional rights vis-à-vis intervenors, but intervenors claim that the settlement damages their reputations and undermines asserted procedural rights to participate in borrower-defense adjudications. The district court properly rejected intervenors' attempt to challenge the settlement, and this Court should do the same.

As a threshold matter, intervenors lack standing to maintain an appeal; the settlement does not adjudicate any of their rights, and their claims of reputational and procedural harm fail at each step of the standing analysis. In any event, intervenors' claims fail on the merits. The settlement falls well within the Attorney General's and the Secretary of Education's statutory authorities to settle litigation and provide relief to borrowers who allege school misconduct. Nor does anything in the settlement infringe on intervenors' protected liberty or property interests.

Intervenors also argue at length that, in their view, the settlement was not reasonable and that the district court that oversaw the lengthy litigation should not have approved it. This Court has held that in limited circumstances an intervenor may assert a cause of action to challenge a settlement agreement. But that cause of action does not permit a third party to reopen a general inquiry into all aspects of the resolution of class-action litigation, and permitting such challenges would impermissibly undermine Rule 23 and the judicial policy favoring settlement of complex class actions.

## STATEMENT OF JURISDICTION

The district court entered final judgment on November 16, 2022. 1-ER-28.

Intervenors-appellants filed timely notices of appeal on January 13, 2023. 5-ER-898-

913. The district court had jurisdiction over the underlying suit under 28 U.S.C.

§ 1331. As is explained below, *see infra* pp. 19-29, this Court lacks jurisdiction because

intervenors do not have standing to appeal. Otherwise, this Court would have

jurisdiction under 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

The issues presented are:

1. Whether intervenors have standing to appeal.

2. Whether the settlement exceeded the government's statutory authority,
   violated the Administrative Procedure Act's (APA) notice-and-comment
   requirement, or infringed intervenors' due process right.

3. Whether intervenors have a cause of action to maintain challenges to the
   wisdom of the settlement or to the district court's decision to approve the
   settlement.

4. Whether the district court properly denied intervenors' motion to intervene
   as of right.

## PERTINENT STATUTES AND REGULATIONS

Pertinent statutes and regulations are reproduced in the addendum to this brief.

3

## STATEMENT OF THE CASE

### A.      Legal Background

Under Title IV of the Higher Education Act of 1965, 20 U.S.C. § 1070 *et seq.*,
the Secretary of Education is charged with administering certain student loan
programs, including the William D. Ford Federal Direct Loan Program, which allows
students to receive Direct Loans from the federal government to pay for educational
expenses, and the Federal Family Education Loan Program, which discontinued
making new loans in 2010 but under which students obtained private loans that were
subsidized and guaranteed by the federal government.

"Congress has allowed for the cancellation of federal student loans in certain
cases of school misconduct" pursuant to a process known as borrower defense. *In re
U.S. Dep't of Educ.*, 25 F.4th 692, 695 (9th Cir. 2022) (citing 20 U.S.C. § 1087e(h)).
Borrowers may claim entitlement to borrower-defense relief if their institution
engaged in actionable misconduct, such as by providing prospective students with
materially false information to induce their attendance.

Pursuant to that statutory authority, the Secretary has promulgated several
different regulations specifying the particular misconduct that can give rise to a
borrower-defense claim and the relevant administrative procedures for adjudicating
such claims; as a result, loans disbursed at different times are subject to different
procedures. *See* 59 Fed. Reg. 61,664 (Dec. 1, 1994); 81 Fed. Reg. 75,926 (Nov. 1,
2016); 84 Fed. Reg. 49,788 (Sept. 23, 2019); 87 Fed. Reg. 65,904 (Nov. 1, 2022).

4

At a high level of generality, however, the process generally works as follows: First, to raise a borrower-defense claim, a borrower submits an application to the Department. *E.g.*, 34 C.F.R. §§ 685.206(e)(8), 685.222(e)(1)(i).[1] In adjudicating that application, the Department is generally required first to determine whether the borrower has established that the institution engaged in actionable misconduct. In doing so, the Department reviews evidence submitted with the application and other available evidence. The Department also notifies the institution of the application and considers any evidence that the institution submits in response. *E.g.*, *id.* §§ 685.206(e)(8)-(10), 685.222(e)(3).

If the Department determines that the borrower has established actionable misconduct, the Department determines what relief is appropriate. Such relief may include forgiving outstanding loan balances and reimbursing the borrower for loan payments already made to the Department. *E.g.*, 34 C.F.R. § 685.206(e)(12). In addition, if it grants a borrower-defense application, the Department may initiate a separate administrative proceeding to recoup discharged amounts from the school. If the Department undertakes such a proceeding, the school is entitled to a hearing and

---

[1] Many of the relevant regulatory provisions were recently updated by a rule that generally took effect on July 1, 2023, *see* 87 Fed. Reg. 65,904, but whose implementation has been administratively stayed as to a handful of schools, including at least one operated by intervenor Lincoln Educational Services, *see* Order, *Career Colls. & Sch. of Tex. v. Department of Educ.*, No. 23-50491 (5th Cir. July 28, 2023). For ease of reference, and because the government does not believe those regulatory changes are material to the issues in this appeal, the government cites to the current generally applicable versions of the regulations.

5

the opportunity to litigate the issue. *See id.* §§ 668.125, 685.308(a)(3); *see also id.*
§§ 685.206(c)(3)-(4), 685.222(e)(7).

In addition to adjudicating individual borrower-defense applications, the
Department has also established processes to permit the group adjudication of claims.
Generally speaking, under those regulations, the Department may, for example, group
together applications that present "common facts and claims." *E.g.*, 34 C.F.R.
§ 685.222(f)-(h). The Department has previously relied on group adjudications as a
critical mechanism to efficiently resolve large groups of applications alleging
misconduct by the same institution, which may include tens or hundreds of thousands
of borrowers, without unduly diverting the Department's limited resources away from
adjudicating remaining applications on a case-by-case basis. *See, e.g.*, U.S. Dep't of
Educ., *Department of Education and Attorney General Kamal Harris Announce Findings from
Investigation of Wyotech and Everest Programs* (Nov. 17, 2015), https://perma.cc/W837-
KBHL (announcing findings of misconduct for two programs that served
approximately 85,000 students).

### B.    Factual and Procedural Background

1. Before 2015, the borrower-defense process was "rarely used." 81 Fed. Reg.
39,330, 39,330 (June 16, 2016). That year, however, Corinthian Colleges, Inc., a for-
profit company that operated postsecondary schools with a collective enrollment of
more than 70,000 students, filed for bankruptcy; that filing resulted in a "flood" of

borrower-defense claims submitted by Corinthian students. *See id.* at 39,330-31,

39,335. Over the following four years, the Department revised its regulations twice (in

2016 and 2019) and worked to develop internal processes and infrastructure to allow

the consistent and timely adjudication of claims, all while responding to multiple

district court decisions, some of which required the implementation of different

borrower-defense regulations or enjoined established procedures. *See Calvillo*

*Manriquez v. DeVos*, 345 F. Supp. 3d 1077 (N.D. Cal. 2018); *Bauer v. DeVos*, 332 F.

Supp. 3d 181 (D.D.C. 2018); *California Ass'n of Private Postsecondary Sch. v. DeVos*, 344 F.

Supp. 3d 158 (D.D.C. 2018). Throughout that time, the Department was unable to

adjudicate applications at the rate that they were being filed and, eventually, paused

the issuance of final decisions while it worked to develop a methodology to govern

adjudications. *See U.S. Dep't of Educ.*, 25 F.4th at 695-96.

By the time this suit was filed in June 2019, the Department's backlog had

grown to more than 210,000 pending applications. *See U.S. Dep't of Educ.*, 25 F.4th at

696. Plaintiffs—borrowers with pending borrower-defense applications—alleged that

the Department had unlawfully withheld, or was unreasonably delaying, adjudications.

The district court certified a class under Federal Rule of Civil Procedure 23(b)(2)

consisting of "[a]ll people who borrowed a Direct Loan or [Family Education] loan to

pay for a program of higher education, who have asserted a borrower defense to

repayment to the U.S. Department of Education, whose borrower defense has not

7

been granted or denied on the merits, and who is not a class member in" another suit seeking borrower-defense relief in connection with a particular set of schools. 4-ER-821.

From an early point in the litigation, the parties explored resolution of the dispute through settlement. In May 2020, the district court granted preliminary approval for a proposed settlement that contemplated a timeline for the Secretary to resolve pending claims. *See* 4-ER-772-74.

That settlement, however, was never finally approved. When the Department resumed adjudication of borrower-defense claims and sought to clear the enormous backlog, many claims were resolved through "form denial letters" containing "standardized justifications based on common deficiencies that the Department has identified across thousands of applications, such as a failure to plead actionable misconduct or failure to provide evidence to support the claim." *See* GovSER-12. In plaintiffs' view, these denial letters failed to provide adequate explanations for the Department's determinations. *See* GovSER-4. Based on those concerns, the district court denied final approval of the parties' class-action settlement, concluding that there had been "no meeting of the minds" with respect to the detail required in such decision letters. *See* 4-ER-717-20. Plaintiffs then filed a supplemental complaint that added claims challenging the adequacy of the form denial notices under the APA and the Due Process Clause. *See* 4-ER-695-97.

2. After the district court denied approval of the settlement, the parties spent nearly two years engaged in discovery—including a trip to this Court on mandamus to halt the deposition of the former Secretary of Education, *see U.S. Dep't of Educ.*, 25 F.4th 692—and litigating the merits of plaintiffs' claims.

Following the close of discovery, the parties filed cross-motions for summary judgment. Plaintiffs requested not only relief requiring the Department to adjudicate pending applications but also requested that the district court order the Department to show cause "why each and every class member's [borrower-defense] application should not be granted immediately." GovSER-41. The Department's motion vigorously contested plaintiffs' claims, both on threshold issues—including mootness, class certification, and the propriety of the relief sought—and on the merits. *See* 3-ER-509-10.

Against the backdrop of those still pending cross-motions, and following many months of arm's length negotiations, the plaintiff class and the Department reached a settlement in June 2022. The settlement provided a framework for comprehensively addressing the backlog of hundreds of thousands of borrower-defense applications by dividing applicants into three groups.

Group One comprises the approximately 196,000 class members who received federal student loans to attend one of the 151 schools identified in the settlement's Exhibit C. *See* 3-ER-564. As explained to the district court, this provision of the settlement reflects the parties' determination that borrowers "associated with those

9

schools should be provided presumptive relief under the settlement due to strong indicia regarding substantial misconduct by the listed schools, whether credibly alleged or in some instances proven, and the high rate of class members with applications related to the listed schools." 3-ER-573-74. Under the settlement, these class members are entitled to both a discharge of their remaining student loans associated with the relevant school as well as a refund of amounts already paid to the Department toward those loans and credit reporting relief. *See* 3-ER-565.

Group Two consists of the remaining approximately 100,000 class members who submitted borrower-defense claims on or before the settlement's execution. The settlement provides that these class members will receive a streamlined adjudication within set timeframes and with certain presumptions in the borrower's favor. *See* 3-ER-565-66. The settlement also provides that if the Department fails to meet the negotiated timetable for resolution of an application, it will provide that applicant full relief (including both a discharge of remaining balances and a refund of past payments made to the Department). *See* 3-ER-564-66.

Group Three consists of approximately 206,000 borrowers who submitted borrower-defense applications after the settlement's execution but before the district court's final approval. The settlement provides that these applications will be adjudicated within three years of the settlement's effective date, using normal adjudication procedures. But to avoid the logistical complications created by the different sets of potentially applicable regulatory procedures, the settlement provides

10

that the Department will adjudicate the applications under the borrower-defense regulations applicable to loans disbursed between 2017 and 2020. As with Group Two deadlines, if an application is not adjudicated within the three-year period, the applicant will receive full relief. *See* 3-ER-587.

As the Department has explained, the overall structure of the settlement was critical to ensuring the Department's ability to address efficiently both pending and future borrower-defense applications. The Department has made clear that it does not consider an institution's inclusion on Exhibit C to constitute evidence, much less a finding that could be used against a school, that the institution engaged in misconduct, *see* 1-ER-44, but it has determined that the applications related to the listed schools were sufficiently numerous and accompanied by sufficient indicia of misconduct to presumptively warrant relief. "Clearing these claims through provision of expeditious upfront relief" is necessary to "significantly reduce the backlog of pending claims" and to permit the Department to more quickly "make individualized determinations of entitlement to relief for all members of" Groups Two and Three. *See* 3-ER-573-74.

3. Four of the Exhibit C schools—including three who are appellants here— moved to intervene for purposes of opposing the settlement. *See* 1-ER-54. The schools objected to their inclusion on Exhibit C, which they claimed had caused them reputational harm. 1-ER-55. The district court concluded that the schools had not

11

met the requirements to justify intervention as of right, but it granted the schools permissive intervention for the purpose of opposing the settlement. *See* 1-ER-54-55.

After a fairness hearing in which the plaintiffs, the Department, and the intervening schools were heard, the district court approved the class-action settlement and entered final judgment. *See* 1-ER-28. At the outset, the court concluded that the government had statutory authority to enter into the settlement, citing the Attorney General's plenary settlement authority under 28 U.S.C. §§ 516 and 519 as well as the Secretary's authority to compromise claims under 20 U.S.C. § 1082(a)(6). *See* 1-ER-35-37. The court recognized that the Attorney General and the Secretary could not use that authority to settle litigation on terms exceeding the Secretary's substantive authority. *See* 1-ER-35. The court also recognized, however, that the settlement requires the Secretary only to provide forms of relief, discharges and refunds, that he could already provide under the statutorily authorized borrower-defense program. *See* 1-ER-38-39. The court similarly rejected intervenors' arguments that the settlement implicated the major questions doctrine. The court explained that there was "nothing unusual about the Secretary exercising his discretion to discharge student-loan debt" and that the relief in question was "limited to the metes and bounds of this federal class-action litigation." 1-ER-37-38.

In rejecting intervenors' circumscribed understanding of the government's settlement authority, and in finding the settlement fair and adequate, the district court also emphasized the massive scale of the problem confronting the Department. *See* 1-

12

ER-39; *see also* 1-ER-50-51. The court noted that the borrower-defense system had "devolved into an impossible quagmire" that had lasted across three Administrations. 1-ER-39. Indeed, in light of the 443,000 then-pending applications and the Department's limited resources, "it would take the Department *more than twenty-five years* to get through the backlog" if each application were individually adjudicated. *Id.* The court further explained that if each class member had sued the Department in an individual suit, "the Department could have settled those individual actions one by one, and it could have done so using precisely the same criteria set forth for Exhibit C." *Id.*

Next, the district court determined that the settlement did not prejudice intervenors' rights. 1-ER-42-45. The court explained that Exhibit C does "not impose any liability whatsoever on intervenors," because inclusion on the list simply requires the Department to forgive loans from borrowers affiliated with those schools pursuant to the settlement. 1-ER-42-43. The court also rejected intervenors' contention that the settlement undermined the procedural protections they are entitled to receive before the Department may recoup funds from them. The court explained that "the settlement does not constitute a successful or approved borrower-defense claim" and, thus, that "no recoupment action could be initiated" based on the settlement. 1-ER-43. In addition, relying on the sworn declaration of a Department official, the court reiterated that the Department "does not consider inclusion on Exhibit C a finding of misconduct" and that such "inclusion does not constitute

13

evidence that could or would be considered" in any future action, including a recoupment proceeding, by the Department against a school. 1-ER-44. And the court recognized that should the Department ever attempt recoupment from the Exhibit C schools based on some predicate besides the settlement, "[a]ny hypothetical, future remedial action would proceed according to established regulations, which would provide the schools with full due process." 1-ER-43-44.

Finally, the district court rejected intervenors' various other challenges to the settlement, including their suggestions that the case was moot, that the class did not meet the standards of Federal Rule of Civil Procedure 23, and that the settlement's refund relief could not be effectuated in connection with a Rule 23(b)(2) class. *See* 1-ER-45-50.

4. No class member appealed the district court's approval of the settlement, and the settlement thus took effect once the time to appeal had run. *See* 1-ER-12. Three of the four intervenors appealed, however, and sought to stay the entire settlement pending resolution of their appeals. The district court denied that motion. Echoing its earlier analysis, the court found that intervenors could not demonstrate any injury—either procedural or reputational—from the settlement. *See* 1-ER-13-22. And it explained that intervenors likely lacked Article III appellate standing to challenge the "settlement agreement (that they were not a party to) resolving this litigation (that did not involve them)." *See* 1-ER-23.

Although the district court denied intervenors' stay motion, it entered a brief administrative stay prohibiting discharges for the borrowers associated with intervenors' schools to enable intervenors to seek a stay in this Court. *See* 1-ER-26-27. Intervenors then moved for a stay pending appeal in this Court; that motion was denied by a unanimous panel, which noted that intervenors had "fail[ed] to demonstrate a sufficient probability of irreparable harm to warrant a stay." *See* Order 3, Nos. 23-15049, 23-15050, 23-15051 (9th Cir. Mar. 29, 2023). Intervenors' application to the Supreme Court for a stay pending appeal was denied with no noted dissents. *See* Order, *Everglades Coll., Inc. v. Cardona*, No. 22A867 (U.S. Apr. 13, 2023). Thereafter, the Department began implementing the settlement—including granting discharges of loans—for class members who had attended one of the appealing intervenor schools, as it had previously done for the class members who had attended other Exhibit C schools.

## SUMMARY OF ARGUMENT

Intervenors seek to challenge the district court's approval of a class-action settlement in hard-fought litigation conducted over more than three years. The court found that the settlement was well within the government's authority, fair and equitable to plaintiffs, and crucial to the Department's ability to address hundreds of thousands of then-pending applications. The settlement does not purport to resolve the rights of intervenors, who lack standing and have failed to state a cognizable claim of any kind.

**I.** Intervenors have failed to establish standing to challenge the settlement, which resolves claims between the Department and plaintiffs and imposes no obligations on intervenors, who were non-parties at the time of the settlement.

Intervenors contend that the settlement infringes a purported procedural right to participate in pending borrower-defense administrative proceedings. But as the name suggests, borrower defense is a protection for borrowers—not schools. Schools suffer no injury when the Department determines that a borrower should be excused from repayment of their student loan at government expense. A school's interests are implicated only if the government then seeks to recoup the written-off amounts from the school. But the Department has explained that the settlement is not itself a valid predicate for a recoupment action. Intervenors do not allege that the Department has initiated recoupment against them or is likely to do so. And were the Department to do so, intervenors would be entitled to a new determination of the asserted liability, including the right to an administrative hearing, an appeal to the Secretary, and judicial review. Intervenors' assertion that they have been denied the opportunity to participate in adjudications of borrowers' rights is, at most, a deprivation of "a procedural right *in vacuo*," which is insufficient to establish standing. *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).

Intervenors also contend that their inclusion on Exhibit C inflicts reputational injury. Group One borrowers who attended the institutions listed on Exhibit C are entitled to relief under the settlement. But the Department has made clear that

16

inclusion on Exhibit C does not constitute evidence—much less a determination that could be used against a school—that any school engaged in misconduct. Intervenors also fail to demonstrate that any public perception that they have engaged in misconduct would be traceable to the settlement rather than to consumer protection litigation involving each intervenor that they have settled or been found liable in.

**II.** Intervenors lack cognizable APA claims because they are outside the zone of interest of the substantive statutory framework that they seek to enforce, which is designed to protect the interests of borrowers, not the interests of intervenors. Instead, a wholly separate statutory and regulatory framework, not implicated in this case, protects the rights of schools in the recoupment context.

In any event, as the district court correctly concluded, the settlement fits comfortably within the government's statutory authority. Like other parties, the United States can compromise claims in litigation, and Congress has conferred the authority to do so on the Attorney General. *See* 28 U.S.C. §§ 516, 519. And it is undisputed that the Secretary of Education has the substantive authority to provide relief, including discharges and refunds as contemplated in the settlement, to borrower-defense applicants, and also separate authority to compromise claims.

The settlement likewise does not violate the APA's procedural or substantive requirements. The settlement resolves a discrete set of claims and therefore was not subject to notice-and-comment procedures. Nor can intervenors challenge the settlement as arbitrary and capricious, as the Attorney General has "plenary

17

discretion" to settle litigation. *United States v. Carpenter*, 526 F.3d 1237, 1241 (9th Cir. 2008). In any event, the district court and the government have explained why the settlement was entirely reasonable.

**III.** Intervenors' due process claims fare no better. Intervenors assert that the settlement infringes on a constitutionally protected liberty interest. But they fail to demonstrate that their asserted reputational injuries either constitute "stigma" necessary to establish a liberty interest or are accompanied by the requisite alteration of a protected right. Intervenors similarly fail to show impairment of any property interest. Before the Secretary could recoup any funds from intervenors, they would be entitled to full process, including review of the asserted liability and a hearing, appeal to the Secretary, and judicial review.

**IV.** Intervenors have no cause of action to attack the district court's jurisdiction and its approval of the class settlement. The APA does not authorize a litigant to challenge actions of a court, as opposed to those of an agency. The impropriety of intervenors' interference in the resolution of this litigation is highlighted by Rule 23, which provides for court approval of class action settlements only to ensure that those settlements protect the rights of absent class members, not to allow non-parties to upend settlements.

## STANDARD OF REVIEW

This Court reviews jurisdictional questions, including intervenors' standing to appeal and any mootness questions properly before the Court, *de novo*. *In re Thorpe*

18

*Insulation Co.*, 677 F.3d 869, 879 (9th Cir. 2012). In addition, this Court reviews *de novo* intervenors' claims that the settlement was unconstitutional and violated the APA, as well as the district court's rejection of intervenors' motion to intervene as of right. *See San Luis & Delta-Mendota Water Auth. v. Haugrud*, 848 F.3d 1216, 1227 (9th Cir. 2017); *Canatella v. California*, 404 F.3d 1106, 1112 (9th Cir. 2005); *Ramirez-Alejandre v. Ashcroft*, 319 F.3d 365, 377 (9th Cir. 2003) (en banc). As is explained below, intervenors lack a cause of action to challenge the district court's decision to approve the settlement. This Court reviews the question whether a cause of action exists *de novo*, *see Bothke v. Fluor Eng'rs & Constructors, Inc.*, 834 F.2d 804, 814 (9th Cir. 1987) (Beezer, J., concurring), but would review the district court's approval of the settlement and class certification for abuse of discretion, *see Allen v. Bedolla*, 787 F.3d 1218, 1222 (9th Cir. 2015); *Parra v. Bashas', Inc.*, 536 F.3d 975, 977 (9th Cir. 2008).

## ARGUMENT

## I. Intervenors Lack Standing to Challenge the Settlement

To establish standing, a party must demonstrate that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct," and "(3) that is likely to be redressed by a favorable" decision. *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016). When an intervenor seeks to "continue a suit in the absence of the party on whose side intervention was permitted," the intervenor must demonstrate its own standing to appeal. *Diamond v. Charles*, 476 U.S. 54, 68 (1986).

It is undisputed that the settlement neither imposes liability on intervenors nor provides a predicate for the Department to seek to recoup discharged loan amounts from Exhibit C schools. Intervenors thus suffer no injury from the resolution of this litigation in which they are not a party.

1. Intervenors contend that the settlement inflicts a procedural injury because it does not provide them an opportunity to participate in borrower-defense adjudications. Br. 19-20. But intervenors fail to establish any independent interest in whether a borrower receives borrower-defense relief, the cost of which is borne by the Department. Intervenors insist that they have a right to present evidence that a given borrower's claim should be rejected. But intervenors suffer no injury from a grant of relief and, at most, allege the "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*— [that] is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009).

Intervenors underscore their misunderstanding of the settlement when they urge that the "Settlement automatically resolves pending [borrower-defense] claims *against* Exhibit C schools." Br. 20 (emphasis added). The settlement resolves class members' rights vis-à-vis the Department. And the Department has unambiguously and repeatedly made clear that the settlement is not a determination of a borrower-defense claim that could serve as a predicate for adverse action against a school. A Department declarant explained that "an institution's inclusion on Exhibit C to the

20

Settlement Agreement does not constitute evidence that can or will be considered by the Department in bringing . . . a borrower defense recoupment proceeding." 3-ER-399-400. The Department has also reiterated that were it ever to seek recoupment against an Exhibit C school, "there would have to be a basis to do so other than the mere fact that institution is included on Exhibit C," and that the institution would then have full due process rights. 3-ER-400. As the district court explained, "no recoupment action could be initiated . . . as a result of the settlement." 1-ER-43.

At a minimum, any interest intervenors may have in avoiding recoupment, or even the initiation of recoupment proceedings, is not the sort of "certainly impending" injury required for standing. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013). The Department is not currently pursuing any recoupment proceedings against intervenors, and intervenors fail to provide any argument or evidence to suggest that the Department intends to pursue future recoupment proceedings related to any discharges effectuated under the settlement.

2. Intervenors also fail to identify any concrete reputational injury that could support standing, let alone an injury traceable to the settlement or that would be redressed by the relief that they seek.

a. As an initial matter, intervenors misunderstand the import of Exhibit C. Inclusion on Exhibit C does not constitute an "unlawful determination of substantial misconduct." Br. 20 (alteration and quotation omitted). Exhibit C is simply a list of schools whose former students will receive loan relief under the settlement without

further inquiry. And the Department has made clear that inclusion in Exhibit C is not evidence—much less a determination that could be used against a school—that a school engaged in misconduct. *See* 3-ER-400. The Department has explained that in determining settlement procedures, it included institutions on Exhibit C that had a large volume of applications and for which there were sufficiently "strong indicia regarding substantial misconduct" to warrant presumptive relief. 3-ER-559. But the Department has also explained that actual misconduct was only "in some instances proven," while in others it was merely "credibly alleged." *Id.* And the Department has explained that it was providing "presumptive relief" because of "high rate[s] of class members with applications related to the listed schools" and because "[c]learing these claims through provision of expeditious upfront relief will significantly reduce the backlog of pending claims." 3-ER-559, 574.

Intervenors insist that their assertion that "Exhibit C has been widely published" suffices to demonstrate reputational injury, citing the Supreme Court's statement that injury occurs "when a defamatory statement 'that would subject [a party] to hatred, contempt, or ridicule' is published to a third party." Br. 20 (quoting *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2208 (2021)). But that suggestion improperly asks this Court to assume the relevant conclusion—that inclusion on Exhibit C constitutes "a defamatory statement that would subject [intervenors] to hatred, contempt, or ridicule."

22

Intervenors' inclusion on Exhibit C is far removed from the sort of defamatory statement, such as being falsely designated a "potential terrorist," that courts have found sufficiently injurious to support standing without proof of further concrete harm. *See TransUnion*, 141 S. Ct. at 2209. Exhibit C of the settlement is simply a list of 151 schools whose former students are among the group of class members that will receive discharges of their student loans. *See* 3-ER-582-83, 612-16. Nothing in Exhibit C, or any other portion of the settlement, specifically disparages the identified institutions. Intervenors' inability to demonstrate reputational harm from the settlement is apparent from their reliance not on any statement in Exhibit C or the settlement itself, but rather plaintiffs' and defendants' joint motion to approve the settlement, which explains the criteria used in determining which schools to include on Exhibit C. *See* Br. 20-21 (citing 3-ER-573-74). But as is explained in more detail below, intervenors' APA cause of action permits them to challenge only the settlement (and, even then, only on limited grounds); they cannot—and do not seek to—challenge the Department's ancillary statements in court filings. *Cf. Guerrero v. Clinton*, 157 F.3d 1190, 1195 (9th Cir. 1998) (holding that an agency report submitted to Congress did not constitute final agency action because "no legal consequences flow[ed]" from it and it was instead "purely informational").

Under the circumstances, intervenors had to "produce evidence that [their reputational] injury is concrete, not speculative." *Ezzell Trucking, Inc. v. FMCSA*, 309 F.3d 24, 26 (D.C. Cir. 2002). None of the three specific examples of purported

injuries identified by intervenors (Br. 21) establishes the sort of "concrete" reputational harm—such as "present and future consequences for [intervenors'] business" or "customers [who] have changed their business decisions"—generally required to satisfy Article III. *Ezzell Trucking*, 309 F.3d at 26. Intervenors cite a single instance in which a high school teacher refused to permit Lincoln's representative to make a presentation to the teacher's class, which does not establish any concrete, more than de minimis harm. And Lincoln also notes that it has reported this litigation in its securities filings, but Lincoln has not established any actual harms from that reporting; indeed, as the district court explained, Lincoln's stock price has increased since Exhibit C was made public. 1-ER-21.

The third example involves Everglades' assertion that its financial partners have recently requested additional diligence or refused to extend the institution credit. Everglades identifies no concrete harm resulting from its partners' requests for additional diligence. And as the district court explained, Everglades proffers nothing more than speculation that its financial partners' ultimate decisions regarding whether to extend credit turn on the settlement. 1-ER-21. To the contrary, Everglades' statements that its partners are requesting additional information before making lending decisions suggests that those partners are not making decisions based solely on the fact of the settlement.

Intervenors' failure to identify any concrete injury is highlighted by the two cases they describe as finding standing "on far less evidence." Br. 22. In one, which

24

involved (unlike this case) the chilling of First Amendment-protected speech, the plaintiff, a member of the California State Senate, established standing to challenge the government's designation of certain films as "political propaganda." *Meese v. Keene*, 481 U.S. 465, 473-74 (1987). To do so, he relied on "detailed affidavits, including one describing the results of an opinion poll and another containing the views of an experienced political analyst, supporting that conclusion" that exhibiting the films "would substantially harm his chances for reelection and would adversely affect his reputation in the community." *Id.* (footnotes omitted). And in the other case, a parent established standing to challenge Congress's enactment of a law seemingly predicated on a congressional finding that he had sexually abused his daughter. *See Foretich v. United States*, 351 F.3d 1198, 1205-08 (D.C. Cir. 2003). To establish his standing, the plaintiff relied not only on the obvious stigma of Congress' apparent judgment that he had abused his daughter but also submitted evidence that the statute led to his being "continually harassed by the media and reminded by strangers that Congress considered him a danger to his daughter," resulted in "a 30% decline" to his business, caused him to be "denied a position at a North Carolina university," and led him to be "asked to resign his position as Regent of the American College of Oral and Maxillofacial Surgeons." *Id.* at 1209. Intervenors make no such showing.

b. Even if intervenors could show some concrete injury from a perception that they engaged in misconduct, they cannot show that any such perception is traceable to

the conduct that they challenge—the settlement—as would be required to establish standing. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).

Instead, it is at least equally plausible that any such perception is attributable to unrelated legal issues and news coverage. For example, intervenors' own evidence shows that Lincoln was the subject of a consent judgment with the Massachusetts Attorney General to "resolve allegations that the school violated state consumer protection law" and that there were "numerous law enforcement inquiries" into Lincoln unconnected to the settlement or Exhibit C, including a new inquiry initiated by the Massachusetts Attorney General and inquiries conducted by the Department of Education's Inspector General and the Consumer Financial Protection Bureau. 2-ER-84-85. And the other appealing intervenors have also separately settled, or been found liable in, consumer-protection lawsuits unrelated to the settlement at issue here. *See* GovSER-101 n.4 (referencing cases where American National University was found liable in consumer-protection suit brought by the Kentucky Attorney General and Everglades University settled claims of unfair trade practices brought by the State of Florida).

c. Finally, there is no reason to believe any damage to intervenors' reputations would be redressed by a favorable decision. *See Lujan*, 504 U.S. at 561. Intervenors' appeal seeks an order reversing the approval of the settlement. But intervenors fail to demonstrate how a determination by this Court that, for example, the settlement exceeds the Secretary's statutory authority or the district court erroneously certified

26

the class would "rehabilitate [intervenors'] reputation[s]," *McBryde v. Committee to Review Circuit Council Conduct & Disability Orders of Judicial Conference of U.S.*, 264 F.3d 52, 57 (D.C. Cir. 2001), even assuming that they were damaged by the settlement.

The fact that intervenors were included on Exhibit C, and the original justification for their inclusion as relating to borrower-defense application volume and indicia of misconduct, are matters of public record. Regardless of whether the settlement is implemented, various third parties may still, for example, request additional diligence from Everglades or refuse to permit Lincoln to present to their students, particularly in light of intervenors' unrelated legal issues. *See also Lujan*, 504 U.S. at 562 (noting the difficulty of establishing standing when the redressability of the alleged injury "depends on the unfettered choices made by independent actors not before the courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict" (quotation omitted)).

Intervenors claim (Br. 22-23), in a single paragraph, that redressability is "easily satisfied" because some other cases have found redressability where a court may overturn a legislative or agency decision from which reputational harm stems. But "determining standing is an inherently fact-specific inquiry," *McMorris v. Carlos Lopez & Assocs., LLC*, 995 F.3d 295, 302 (2d Cir. 2021), and intervenors fail to engage in any such fact-specific analysis about the relationship between their specific claims and their alleged injury.

Moreover, intervenors' failure to carry their burden is underscored by the Supreme Court's recent admonition that "redressability requires that the court be able to afford relief through the exercise of its power, not through the persuasive or even awe-inspiring effect of the opinion explaining the exercise of its power." *Haaland v. Brackeen*, 143 S. Ct. 1609, 1639 (2023) (quotation, alteration, and emphasis omitted). And here, nothing about a judgment reversing approval of the settlement—as divorced from an opinion explaining that judgment—could redress whatever reputational harm the government's explanation of the settlement might have inflicted. Thus, even if intervenors were correct that third parties might interpret an opinion in their favor as casting doubt on the underlying decision to include them on Exhibit C, their "hope for nothing more than an opinion" casting such doubt does not "satisfy Article III." *Id.* at 1640.

3. Finally, intervenors briefly contend (Br. 23) that they need not establish standing for this Court to consider their claim that the suit became moot before the district court entered judgment. As an initial matter, this argument is limited to intervenors' mootness claim—and, as explained below, *see infra* pp. 45-48, intervenors lack any ability to bring that claim.

In any event, nothing in *Arizonans for Official English v. Arizona*, 520 U.S. 43 (1997), suggests that this Court must resolve the question of the district court's jurisdiction before resolving the question of appellate standing. To the contrary, the Supreme Court there emphasized that in the ordinary case, the "decision to seek

review is not to be placed in the hands of concerned bystanders" but must be made by parties with Article III standing to appeal. *Id.* at 64-65 (quotation omitted). The Supreme Court's decision to depart from that principle in *Official English* is properly understood in the unusual context of that case, where a panel of the court of appeals had invalidated a state constitutional provision after refusing to obtain an authoritative construction of the provision from the state Supreme Court. Given the strong policy against "premature adjudication of constitutional questions," which "bear[s] heightened attention when a federal court is asked to invalidate a State's law," the Supreme Court opted to address the jurisdictional issues in a sequence that would avoid the "risks [of] friction-generating error" that can result when a federal court "endeavors to construe a novel state Act not yet reviewed by the State's highest court." *Id.* at 79. In this case, by contrast, no such unique circumstances exist that would militate in favor of bypassing the usual rule of ensuring that appellants maintain standing to seek this Court's review.

## II. Intervenors' Claims That the Settlement Violates the APA Fail

### A. Intervenors' APA Claims Are Not Cognizable

Intervenors maintain that the Department's agreement to the settlement contravenes the APA. But the APA does not authorize suit by a party whose "interests are so marginally related to or inconsistent with the purposes implicit in the statute [being enforced] that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke v. Securities Indus. Ass'n*, 479 U.S. 388, 399 (1987). Here,

intervenors do not fall within the zone of interests of the statutory and regulatory provisions they seek to enforce. The borrower-defense provisions are concerned with granting relief to defrauded borrowers; they are not designed to benefit the institutions that allegedly defrauded the borrowers. Intervenors' interests are, instead, protected through the separate procedural and judicial review rights that institutions have in any recoupment proceedings. *See* 34 C.F.R pt. 668, subpart G (enforcement regulations); *see also* 34 C.F.R. §§ 685.206(c)(3)-(4), (e)(16), 685.222(e)(7) (authorizing the Secretary to initiate recoupment proceedings under the enforcement regulations). It is only through that separate process, which is governed by separate regulations and not implicated in the settlement, that any rights of intervenors could be determined.

Intervenors do not suggest that they would have any right of judicial review from a Department decision granting a borrower-defense claim, and correspondingly, they have no right to seek to overturn a Department decision to grant relief to allegedly defrauded borrowers. Nor is there any reason to believe that Congress would have intended to empower intervenors to block the Department from exercising its discretion to settle long-running litigation through an agreement that neither binds nor confers rights on them.

## B. The Settlement Falls Within the Government's Statutory Authority

1. In any case, the government had ample statutory authority to enter into the settlement. As an initial matter, the United States, like other parties, has the ability to

compromise claims in litigation. Congress has expressly conferred upon the Attorney General the "plenary discretion" to "settle litigation to which the federal government is a party." *United States v. Carpenter*, 526 F.3d 1237, 1241 (9th Cir. 2008) (citing 28 U.S.C. §§ 516, 519).[2] As the district court recognized, *see* 1-ER-35, that settlement authority may not be used to require an agency to take substantive action that exceeds its statutory power. *See also Authority of the United States to Enter Settlements Limiting the Future Exercise of Executive Branch Discretion*, 23 Op. O.L.C. 126, 136-38 (1999). But here, there is no dispute that the Secretary has statutory authority to provide borrower-defense applicants with the substantive relief—discharges and refunds—required by the settlement. *See* 20 U.S.C. § 1087e(h). That substantive authority, combined with the Attorney General's settlement authority, suffices to provide support for the settlement.

The government's ability to enter into the settlement is underscored by the Secretary's separate and additional authority to compromise and settle student loan claims, including by waiving or releasing rights to repayment. This case involves loans made under two programs—the Federal Family Education Loan Program, governed by Part B of title IV of the Higher Education Act of 1965, as amended, and the Federal Direct Loan Program, governed by Part D. Congress has granted the

---

[2] Pursuant to 28 C.F.R. §§ 0.160-0.161, the authority of the Attorney General to accept offers in compromise has been delegated to certain other officials within the Department of Justice, as appropriate.

Secretary authority to "enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired." 20 U.S.C. § 1082(a)(6). Although that provision applies by its terms to Part B, Congress has also provided that Direct Loans "shall have the same terms, conditions, and benefits" as Family Education Loans. *Id.* § 1087e(a)(1).[3] Thus, as the district court correctly concluded, *see* 1-ER-35-37, the Secretary has authority to settle claims related to Family Education Loans, and that same authority—which reflects terms, conditions, and benefits of the loans—attaches to claims related to Direct Loans. Those authorities provide additional support for the settlement here.

2. a. Intervenors barely address the Attorney General's settlement authority or the Secretary's express statutory authority to provide substantive relief, including discharges and refunds, to borrower-defense applicants. They contend only (at 36-37) that those authorities do not support the settlement because, in their view, the Attorney General's settlement authority is bounded by the Secretary's substantive

---

[3] Intervenors briefly suggest (at 30) that if § 1082(a)(6) applies to Direct Loans, then so must § 1082(a)(2), which provides that, in actions arising under Part D, "no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Secretary." 20 U.S.C. § 1082(a)(2). Thus, intervenors contend, the district court lacked jurisdiction to approve the settlement here. But intervenors cite no authority for the proposition that a provision designed to protect the agency from injunctions ties the agency's hands and precludes it from entering into voluntary settlements to the extent that they require court approval. Nor have intervenors shown that the § 1082(a)(2) deprived the district court of Article III jurisdiction to approve the settlement. *Cf. Springfield Hosp., Inc. v. Guzman*, 28 F.4th 403, 415-17 (2d Cir. 2022) (concluding that similar provision did not deprive court of Article III jurisdiction).

authority and the Secretary's authority may only be exercised to grant borrower-defense applications through administrative adjudications as specified in regulations (not through settlement of litigation). But that cramped view of the Attorney General's and the Secretary's authorities is unsupported.

It is undisputed that the Secretary has the substantive authority to grant borrower-defense applications and to provide applicants with the relief contemplated by the settlement, including discharges and refunds. It is that substantive authority that bounds the Attorney General's "plenary discretion" to settle litigation. *Carpenter*, 526 F.3d at 1241. In the circumstances here, the procedures the Secretary has adopted for adjudicating claims do not constrain the Secretary's ability to award statutorily authorized relief to applicants in settlement of litigation on terms approved by the Attorney General. Intervenors cite no authority for the remarkable proposition that when an applicant for governmental benefits brings suit, the Attorney General cannot settle the suit by agreeing to an award of substantive relief and is constrained to offering only a re-adjudication of the plaintiff's claim under the agency's generally applicable procedures. Nothing in logic, practice, or precedent supports such a constraint on the Attorney General's authority.

The implication of intervenors' position is that the Secretary and Attorney General have no authority to settle in litigation any claim related to a borrower-defense application. But that would make no sense. As explained, the relevant provisions of these statutes reflect a Congressional recognition that borrowers may

33

sometimes deserve relief from their student loan debt, including when they were defrauded by schools. And to the extent that the Secretary determines after initially denying (or failing to act on) a claim that a borrower should be provided relief under those provisions, the efficient and equitable way to proceed is for the Secretary and Attorney General to settle that claim in litigation. Such a settlement avoids costly additional litigation and administrative procedures, which delay the relief that Congress intended for borrowers, impose costs on the government, and detract from the Department's ability to expend resources resolving other borrowers' claims. Indeed, for similar reasons, this Court has long recognized a "strong judicial policy that favors settlements, particularly where complex class action litigation is concerned." *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th Cir. 2008).

b. As explained, the Attorney General's authority to settle litigation and the Secretary's substantive authority to grant borrower-defense claims together suffice to support the settlement here. Thus, the court need not even address intervenors' lengthy, and ultimately irrelevant, attacks on the Secretary's separate authority to compromise claims pursuant to 20 U.S.C. § 1082(a)(6). But those attacks are, in any event, equally without merit.

At the outset, intervenors erroneously contend (at 27-29) that the Secretary's authority to compromise or settle claims does not extend to Direct Loans. But the Secretary's authority to compromise claims related to a loan is naturally construed as both a "term[]" and "condition[]" of the loan, 20 U.S.C. § 1087e(a)(1), because it

necessarily affects the terms and conditions governing repayment. And although intervenors further contend (at 28-29) that the relevant terms and conditions are contained in a variety of other sections in Part B, including 20 U.S.C. §§ 1077, 1078-2(a)(2), 1078-3(b)(4), and 1078-8(a), none of those sections purports to set out the exclusive list of "terms and conditions" for Family Education Loans.

Intervenors' contrary argument is not only inconsistent with the plain meaning of the statutory language, but it also disregards Congress's understanding that the Direct Loan Program should "eventually replace" the Family Education Loan Program, which demonstrates a congressional intent to ensure "parity" between the two. 1-ER-36. Moreover, intervenors fail to locate any other statutory provision providing the Secretary with general "functions, powers, or duties"—including any power to sue or be sued—related to Direct Loans; instead, they point (at 36) only to limited specific authorities, such as the authority to select "participating institutions," 20 U.S.C. § 1087a(a). Their construction would therefore lead to the absurd proposition that the Secretary lacks the general powers that Congress determined necessary to effectively implement the Family Education Loan Program with respect to the Direct Loan Program.

Separately, intervenors also argue (at 30-36) that it would be improper to construe § 1082(a)(6)'s general compromise-and-waive authority to permit the discharge of student loan debt because Congress has provided separately for discharges in particular circumstances. But intervenors proffer no alternative

construction of § 1082(a)(6)'s plain text; they do not even attempt to explain how the authority to "compromise . . . any . . . claim" does not at least encompass the power to settle the borrower-defense claims at issue here. Nor do they explain how the power to "waive" or "release" any claim—such as the Department's claim to repayment of loans—could be reasonably understood not to encompass the authority exercised here.

In a post-briefing letter, intervenors maintain that the Supreme Court's decision in *Biden v. Nebraska*, 143 S. Ct. 2355 (2023), is "dispositive" and forecloses reliance on § 1082(a)(6) as a source of authority for the settlement here. Dkt. No. 44, at 2 (July 13, 2023). But *Nebraska* did not consider the agency's authority to compromise and release claims under the Higher Education Act. Instead, that case involved the different question of whether the Secretary's authority under the Higher Education Relief Opportunities for Students Act of 2003 to waive or modify "any statutory or regulatory provision" provided statutory authority for a comprehensive student loan forgiveness program. *Biden*, 143 S. Ct. at 2363 (quoting 20 U.S.C. § 1098bb(a)(1)). The Supreme Court did not address the distinct and differently worded authority at issue here—particularly the authority to "compromise" claims. And nothing in the case speaks to the Secretary's authority to settle a discrete universe of claims that are the subject of litigation.

Intervenors' other arguments similarly lack merit. Intervenors generally misunderstand the specific-controls-the-general principle. That canon provides that

where "a general authorization and a more limited, specific authorization exist side-by-side," it is generally true that the "terms of the specific authorization" govern when assessing "a matter specifically dealt with in" the specific authorization. *RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645-46 (2012) (quotation omitted). Thus, for example, Congress has provided specific authorization—subject to certain limitations and other requirements—for the Secretary to implement a loan-forgiveness program for certain teachers. *See* 20 U.S.C. § 1078-10. At most, then, *RadLAX* might suggest that the Secretary could not rely on the general authorization in § 1082(a)(6) to implement a loan-forgiveness program for teachers that circumvented the limitations contained in § 1078-10's more specific authorization. But intervenors identify no such limited-discharge provision applicable in circumstances similar to those here; to the contrary, it is undisputed that the relevant borrower-defense provisions permit the Secretary to discharge loans in full. Thus, the terms of the general authorization control in these circumstances.

Finally, intervenors suggest (at 26-27) that the Secretary is improperly claiming the authority to cancel the entire student loan portfolio. The settlement does not reflect any *en masse* cancellation; it is instead the compromise of claims that have been submitted to the Department pursuant to the statutorily authorized borrower-defense regulations, and which then became the subject of protracted litigation. Intervenors do not dispute that the Department has statutory authority to resolve claims alleging borrower defenses, including by discharging loans and refunding payments borrowers

37

have made. The Department is not asserting any novel authority; it is simply making a determination about how best to use its established authority so as to compromise and resolve long-running litigation, not involving intervenors, and to address a crippling backlog.

### C. The Settlement Does Not Violate the APA's Requirements

Intervenors assert an array of other arguments that the settlement violates the APA's procedural and substantive requirements. Br. 38-46. None has merit.

1. Contrary to intervenors' claims (at 38-42), the settlement was not subject to statutory notice-and-comment requirements, because it is not a rule. Under the APA (and under the Higher Education Act, *see* 20 U.S.C. § 1098a(b)(2)), notice and comment are required only when an agency promulgates a "rule"—that is, a statement of "future effect designed to implement, interpret, or prescribe law or policy," 5 U.S.C. § 551(4)—and not when an agency is engaged in adjudication. *See id.* § 553. As this Court has explained, "[t]wo principal characteristics distinguish rulemaking from adjudication." *Yesler Terrace Cmty. Council v. Cisneros*, 37 F.3d 442, 448 (9th Cir. 1994). "First, adjudications resolve disputes among specific individuals in specific cases, whereas rulemaking affects the rights of broad classes of unspecified individuals." *Id.* And second, "because adjudications involve concrete disputes, they have an immediate effect on specific individuals (those involved in the dispute)," whereas rules are "prospective" and have an "effect on individuals only after [they] subsequently [are] applied." *Id.*

38

Here, the settlement has no general prospective effect. Instead, it resolves a specific dispute between the Department and a defined universe of borrower-defense applicants, and it has effect only as to the discrete set of pending administrative adjudications involving those applicants. For claims submitted after the date of the district court's approval of the settlement, the borrower-defense regulations will continue to govern. Thus, as the district court correctly explained, the settlement "has not altered the borrower-defense procedures at all. Those regulations remain in place." 1-ER-41.

Intervenors offer no support for their contention that any agreed-upon resolution of specific disputes other than through preexisting regulatory processes must go through notice and comment. Like their other arguments, it would impermissibly preclude settling an individual's challenge to an adjudication except by first adopting new regulations covering that individual or agreeing to fully re-do the underlying adjudication. Indeed, intervenors' argument (at 42-43) that the settlement impermissibly violates governing procedural regulations would further suggest that even within the confines of an adjudication, the parties could not agree to alter the governing procedures. They could not, for example, agree to waive time limits or other procedural constraints. But as explained, the APA sensibly distinguishes between such bilateral adjudications and rulemakings of general effect, and intervenors cite no authority endorsing the novel and illogical results of their proposed view of the scope of notice-and-comment requirements.

Intervenors' repeated reliance on *Portland General Electric Co. v. Bonneville Power Administration*, 501 F.3d 1009 (9th Cir. 2007), underscores the error in their position. That case involved an attempt to use a settlement to achieve a substantive result (imposing higher costs on a group of preference utilities that Congress had sought to protect) that could not otherwise lawfully be achieved under the governing statutes and regulations. By contrast, the settlement here represents a valid exercise of broad statutory authority, both to settle claims and to provide substantive borrower-defense relief, and does not conflict with any statutory provisions.

2. Intervenors' arbitrary-and-capricious claim is equally unavailing. At the outset, such a claim is not cognizable in this context, where a party seeks to challenge a litigation settlement. As explained, the Attorney General has "plenary discretion" to "settle litigation to which the federal government is a party." *Carpenter*, 526 F.3d at 1241. This Court has held in the settlement context that "a decision that is discretionary is not rendered unreviewable in all circumstances," *id.*, but judicial review of such discretionary decisions is highly circumscribed. Assuming there are no other barriers to review, courts have "power to review allegations that an agency exceeded its legal authority, acted unconstitutionally, or failed to follow its own regulations." *Id.* (quotation omitted). Courts do not, however, have authority to second-guess the reasonableness or wisdom of the Attorney General's discretionary decision to settle litigation. *Cf.* 5 U.S.C. § 701(a)(2). Intervenors' arbitrary-and-

capricious claim, which seeks to do exactly that, does not provide any basis to invalidate the settlement.

In any event, as the district court's decision reflects, the Department has adequately explained its decision to enter into the settlement. As an initial matter, intervenors do not appear to contest that the Department's decision to enter into the settlement was, as a general matter, reasonable. As explained, by the time the Department entered into the settlement with plaintiffs, the "borrower-defense program set up by Congress ha[d] devolved into an impossible quagmire," with delays stretching across three Administrations that had led to hundreds of thousands of outstanding applications. 1-ER-39. As the district court calculated, if the Department "had all 33 of its claim adjudicators working 40 hours a week, 52 weeks a year (no holidays or vacation)," it would have taken "the Department more than twenty-five years to get through the backlog." *Id.* (emphasis omitted).

Faced with that impossible situation, the Department determined that the general framework of the settlement constituted a reasonable resolution of the dispute. As explained, under the settlement, some class members will receive relief based on their attendance at one of 151 specified schools. The Department "determined that attendance at one of these schools justifies presumptive relief, for purposes of th[e] settlement, based on strong indicia regarding substantial misconduct by listed schools, whether credibly alleged or in some instances proven, and the high rate of class members with applications related to the listed schools." 3-ER-559.

41

Providing expeditious relief to those class members will, in turn, permit the Department to focus its resources on adjudicating—using streamlined procedures and on a specified timeline—the applications of the remaining class members, for whose schools the Department did not determine there was a sufficiently strong basis to justify presumptive relief on a group basis.

Intervenors challenge not the general reasonableness of the settlement but instead urge (at 44-46) that the settlement failed to detail the evidence supporting the inclusion of each of the 151 schools listed in Exhibit C. But an agency need not comprehensively detail a justification for the many aspects of a settlement agreement. Intervenors cite no authority to support the remarkable proposition that an agency settlement must incorporate the same detailed consideration of evidence and explanation as would a rulemaking or adjudication. Even when a court reviews agency action outside the settlement context, the APA's requirements are highly context-specific and an agency's obligations "turn[] on what the relevant substantive statute makes important." *National Urban League v. Ross*, 977 F.3d 770, 777 (9th Cir. 2020) (quotation and alteration omitted). Here, the agency reasonably explained the general criteria that it used in determining whether a school should be included within Exhibit C—"namely, indicia of misconduct and the volume of claims associated with a given school." 1-ER-39.

Moreover, to the extent that any explanation is required in this context, the Department provided substantial explanation of the reasons for the settlement in

moving the district court to approve it, and the district court indeed agreed with the Department and plaintiffs that the settlement is "fair, reasonable, and adequate," Fed. R. Civ. P. 23(e)(2).

## III. The Settlement Does Not Violate Intervenors' Due Process Rights

Intervenors are on no firmer ground in contending that the settlement violated their due process rights. To establish a procedural due process claim, intervenors must demonstrate "(1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; and (3) lack of process." *Fikre v. FBI*, 35 F.4th 762, 776 (9th Cir. 2022) (quotation and alteration omitted). Here, intervenors' claims fail at the outset: they cannot establish any protected liberty or property interest implicated—much less deprived—by the settlement.

1. Intervenors fail to establish any protected liberty interest in their reputation. As discussed above, intervenors' asserted liberty interests are insufficient to demonstrate standing. *See supra* pp. 21-28. At a minimum, however, their contentions do not describe the violation of a liberty interest protected by the Due Process Clause, which requires a showing of "stigma from governmental action plus alteration or extinguishment of a right or status previously recognized by state law." *Fikre*, 35 F.4th at 776 (9th Cir. 2022) (quotation omitted); *see* Br. 59-60.

As discussed, the settlement does not resolve borrower-defense claims against intervenors and, accordingly, intervenors cannot complain of the loss of the purely procedural opportunity to participate in borrower-defense adjudications. *See supra* pp.

43

20-21. In an attempt to make their procedural injury more concrete, intervenors suggest (at 61-62) that their participation rights are important to prevent future potential recoupments against the school. But that is just another way of framing their claim to a property interest in avoiding recoupment, and it fails for the same reasons as discussed below.

2. Intervenors' claim (at 63-64) that the settlement impairs their protected property interest in avoiding recoupment fares no better. It is indisputable that the settlement itself does not deprive intervenors of any tangible property—it does not, for example, adjudicate any of their rights or require them to pay any penalties. Instead, intervenors' claim rests on supposition that the settlement might result in the Department pursuing recoupment proceedings against them at some future point.

This claim rests on two mistaken premises. First, contrary to intervenors' misapprehension, the settlement "cannot be the predicate for the Department to initiate proceedings against [intervenors] for recoupment." 1-ER-14. Second, "[a]ny hypothetical, future remedial action would proceed according to established regulations, which would provide the schools with full due process," 1-ER-44, including the opportunity to have an administrative hearing and to litigate liability, 34 C.F.R. §§ 685.308(a)(3), 668.125. In any case, if the Department were ever to initiate a recoupment proceeding against intervenors, and if intervenors believed that those proceedings for some reason failed to provide constitutionally adequate process, they would be free to assert such a claim during those administrative proceedings.

44

## IV.   Intervenors' Remaining Arguments Are Similarly Unavailing

### A.   Intervenors Have No Basis for Challenging the District Court's Approval of the Settlement

Intervenors challenge (at 23-25) the district court's jurisdiction to approve the settlement and argue (at 46-49) that the district court's approval of the settlement violated Rule 23. As in district court, *see* GovSER-112 n.1, the government does not address the merits of these issues, on which plaintiffs bear the burden of proof. As explained below, the merits of these unresolved issues do not affect the district court's authority to approve the settlement.

As an initial matter, intervenors fail to identify any cause of action that would permit them to challenge the district court's approval of the settlement. In *Carpenter*, this Court held that an agency "decision to enter [a] settlement agreement" is judicially reviewable "agency action" under the APA. 526 F.3d at 1241; *see also* 5 U.S.C. § 702 (providing a cause of action to a plaintiff "adversely affected or aggrieved by agency action"). A party may thus bring APA claims that challenge, for example, the agency's statutory authority to enter into a settlement. But that same cause of action does not encompass the district court's approval of the settlement, as distinct from the agency's decision to enter into the settlement. The APA expressly excludes "the courts of the United States" from its definition of "agency," *see* 5 U.S.C. § 701(b)(1)(B), and the court's approval of the settlement is therefore not "agency action" that intervenors may challenge under the APA. And intervenors fail to identify any other cause of

action that might encompass their claims challenging the district court's approval of the settlement.

Intervenors' inability to challenge the district court's approval on these grounds is underscored by Rule 23, which provides that "[a]ny class member may object" to a settlement proposal that requires court approval, and the rule does not generally limit the sort of objection that a class member—who would be bound by the judgment—may maintain. *See* Fed. R. Civ. P. 23(e)(5). Here, of course, no class member maintains any such objection. Nothing in Rule 23 provides for non-class members, such as intervenors, to challenge the approval of a settlement or the certification of a class; such objections are meant to be pursued only by the class members who have a direct stake in the fairness and adequacy of the class settlement. The settlement here was only subject to court approval because Rule 23 requires such approval in the class action context to protect the rights of absent class members. That procedural protection does not afford an opportunity for third parties like intervenors to challenge the settlement's approval. *Cf. Securities Indus. Ass'n*, 479 U.S. at 399 (providing that parties may not invoke even the APA's expansive cause of action if their interests are unrelated to the interests that the underlying law seeks to protect).

Intervenors further err in urging that the validity of the settlement depends on whether this Court would have ultimately rejected various jurisdictional defenses the Department raised during the litigation. In many instances, the government—like any other litigant—may settle cases where it had reasonable defenses, including

46

jurisdictional defenses, but wished to avoid the risk inherent in litigation. A settlement cannot properly be rendered invalid anytime a non-party intervenes and argues that the government would have prevailed on its jurisdictional defenses had they been litigated to final judgment.

Here, although the government pursued objections both to the certification of the class and to the district court's jurisdiction, *see, e.g.*, 3-ER-499-537 (motion for summary judgment and to decertify class), the district court repeatedly rejected those arguments, *see, e.g.*, 1-ER-45-53. The prospect that this Court might eventually affirm the district court's conclusions on those issues fully justified the government's agreement to provide through settlement some of the relief plaintiffs sought. And as part of the settlement, plaintiffs gave up their request that the court enter an order requiring the government to show cause why all pending borrower-defense applications should not be immediately granted. *See* GovSER-41. In explaining that decision to the district court, plaintiffs explained that they "acknowledge[d] that their positions are not without legal risk" and that even if they "succeeded on the merits at the trial court, there is considerable uncertainty about the appropriate remedy" and about "the possibility of appeal." 2-ER-265.

There is no jurisdictional defect in a court approving a settlement reached under such legal uncertainty. As this Court has explained, settlements—even when memorialized in court orders such as consent decrees—are "not a decision on the merits or the achievement of the optimal outcome for all parties, but [are] the product

47

of negotiation and compromise." *United States v. Oregon*, 913 F.2d 576, 580 (9th Cir.

1990). Permitting third parties to come into court after the fact and pursue an ultimate

resolution of the very issues the parties elected not to pursue is inherently inconsistent

with the very nature of settlement. And allowing such post hoc litigation would

undermine "the strong judicial policy that favors settlements." *Class Plaintiffs v. City of

Seattle*, 955 F.2d 1268, 1276 (9th Cir. 1992).

## B. The District Court's Denial of Intervention as of Right Was Correct and Any Error Was Harmless

The district court correctly concluded that intervenors failed to meet the

requirements for intervention as of right, and, in any event, the court's decision to

grant them permissive intervention rendered harmless any erroneous denial of

intervention as of right.

To support a request for intervention as of right, a prospective intervenor

needs to demonstrate, among other things, a "significantly protectable interest" at

stake in the litigation. *Donaldson v. United States*, 400 U.S. 517, 531 (1971); *see also* Fed.

R. Civ. P. 24(a)(2). Although intervenors claim (at 67) such an interest based on

asserted injury to their reputations and their property rights, those claims are

insufficient even to support Article III standing. *See supra* pp. 19-20.

But even if intervenors could clear Article III's barrier, those asserted harms

would not rise to the level of a "significantly protectable interest." As the Supreme

Court has made clear, Rule 24(a)(2) requires that a prospective intervenor do more

48

than articulate some asserted harm or interest related to the action; instead, the intervenor must demonstrate that the interest in question is "legally protectible." *Tiffany Fine Arts, Inc. v. United States*, 469 U.S. 310, 315 (1985). Thus, for example, in *Donaldson*, the government sought to enforce administrative summonses issued by the IRS to Donaldson's former employer and its accountant for records related to Donaldson's tax liability. 400 U.S. at 518-20. The Supreme Court rejected Donaldson's argument that he could intervene in that suit as of right. Although the employer's and accountant's disclosure of records potentially establishing Donaldson's tax liability surely would have injured him in an Article III sense, the Court concluded that Donaldson's claimed interest "cannot be the kind contemplated by Rule 24(a)(2)" because it was not independently legally protected. *See id.* at 530-31; *see Diamond*, 476 U.S. at 75 (O'Connor, J., concurring in part and concurring in the judgment) ("Clearly, *Donaldson*'s requirement of a 'significantly protectable interest' calls for a direct and concrete interest that is accorded some degree of legal protection."). Similarly here, even if intervenors' assertions of reputational or property harm are credited and satisfy Article III's requirements, those harms would not support intervention as of right because they do not reflect any legally protected interest under substantive law that intervenors could assert in the context of a dispute between plaintiffs and the government.

In any event, any error in denying intervention as of right was harmless. This Court does not reverse a district court's intervention order "unless th[e] error affected

the substantial rights of the parties." *Prete v. Bradbury*, 438 F.3d 949, 959-60 (9th Cir. 2006) (quotation omitted). The district court's grant of permissive intervention allowed intervenors to advance the same arguments against approval of the settlement that they would have asserted if they were granted intervention as of right. Intervenors suggest in a footnote that they would have been "permitted to take discovery" and to "participate in settlement negotiations" if they had been granted intervention as of right (but that they were not as permissive intervenors). Br. 66 n.11. But settlement negotiations had already concluded by that time. And intervenors explicitly disclaimed any intent to engage in discovery at the hearing on their motion to intervene: when asked by the district court "[A]re you going to go up on appeal and say 'He wouldn't let us have discovery'?", intervenors made clear that they were content to "oppose [the settlement] without discovery." 2-ER-340. The district court relied on that explicit disclaimer in concluding that intervenors' motions were timely, explaining that limited intervention for purposes of opposing the settlement "will not result in any undue delay that will prejudice the parties." 1-ER-55; *see also id.* ("To be clear, intervenors have explicitly disclaimed, and this order explicitly prohibits, any further discovery in this litigation."). The court's reliance on that statement was particularly significant because the motions to intervene came after three years of litigation over a claim of unlawful delay of agency action.

In any event, intervenors do not explain how additional discovery or other procedures would have inured to their benefit—as explained, the claims that a third

party may raise to challenge an agency settlement are limited to claims regarding statutory authority and constitutionality. But as this case demonstrates, those are purely legal claims, for which no discovery is required.

## CONCLUSION

For the foregoing reasons, the appeal should be dismissed or, alternatively, the judgment of the district court should be affirmed.

Respectfully submitted,

*Of Counsel:*

LISA BROWN
   *General Counsel*

JOHN PATRICK BAILEY
   *Senior Counsel*

BRIAN SIEGEL
   *Assistant General Counsel for Postsecondary*
   *Education*

KAREN KARAS
   *Attorney*
   *U.S. Department of Education*
   *400 Maryland Avenue SW*
   *Washington, DC 20202*

SARAH E. HARRINGTON
   *Deputy Assistant Attorney General*

ISMAIL J. RAMSEY
   *United States Attorney*

MARK B. STERN
JOSHUA M. SALZMAN

 s/ *Sean R. Janda*
SEAN R. JANDA
   *Attorneys, Appellate Staff*
   *Civil Division, Room 7260*
   *U.S. Department of Justice*
   *950 Pennsylvania Avenue NW*
   *Washington, DC 20530*
   *(202) 514-3388*
   *sean.r.janda@usdoj.gov*

August 2023

## STATEMENT OF RELATED CASES

Pursuant to Ninth Circuit Rule 28-2.6, defendants-appellees state that they know of no related case pending in this Court.

*s/ Sean R. Janda*
Sean R. Janda

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 12,261 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Sean R. Janda*
Sean R. Janda

**ADDENDUM**

# TABLE OF CONTENTS

20 U.S.C. § 1082(a) ............................................................................................A1

20 U.S.C. § 1087e(a)(1), (h) ...........................................................................A3

34 C.F.R. § 668.125 ...........................................................................................A4

34 C.F.R. § 685.206(c), (e) ...............................................................................A6

34 C.F.R. § 685.222(e)-(h) ............................................................................ A17

34 C.F.R. § 685.308 ........................................................................................ A24

**20 U.S.C. § 1082**

**§ 1082. Legal powers and responsibilities**

**(a) General powers**

In the performance of, and with respect to, the functions, powers, and duties, vested in him by this part, the Secretary may—

(1) prescribe such regulations as may be necessary to carry out the purposes of this part, including regulations applicable to third party servicers (including regulations concerning financial responsibility standards for, and the assessment of liabilities for program violations against, such servicers) to establish minimum standards with respect to sound management and accountability of programs under this part, except that in no case shall damages be assessed against the United States for the actions or inactions of such servicers;

(2) sue and be sued in any court of record of a State having general jurisdiction or in any district court of the United States, and such district courts shall have jurisdiction of civil actions arising under this part without regard to the amount in controversy, and action instituted under this subsection by or against the Secretary shall survive notwithstanding any change in the person occupying the office of Secretary or any vacancy in that office; but no attachment, injunction, garnishment, or other similar process, mesne or final, shall be issued against the Secretary or property under the Secretary's control and nothing herein shall be construed to except litigation arising out of activities under this part from the application of sections 509, 517, 547, and 2679 of title 28;

(3) include in any contract for Federal loan insurance such terms, conditions, and covenants relating to repayment of principal and payment of interest, relating to the Secretary's obligations and rights to those of eligible lenders, and borrowers in case of default, and relating to such other matters as the Secretary determines to be necessary to assure that the purposes of this part will be achieved; and any term, condition, and covenant made pursuant to this paragraph or pursuant to any other provision of this part may be modified by the Secretary, after notice and opportunity for a hearing, if the Secretary finds that the modification is necessary to protect the United States from the risk of unreasonable loss;

(4) subject to the specific limitations in this part, consent to modification, with respect to rate of interest, time of payment of any installment of principal and interest or any portion thereof, or any other provision of any note or other instrument evidencing a loan which has been insured by the Secretary under this part;

(5) enforce, pay, or compromise, any claim on, or arising because of, any such insurance or any guaranty agreement under section 1078(c) of this title; and

(6) enforce, pay, compromise, waive, or release any right, title, claim, lien, or demand, however acquired, including any equity or any right of redemption.

**20 U.S.C. § 1087e**

**§ 1087e. Terms and conditions of loan**

**(a) In general**

**(1) Parallel terms, conditions, benefits, and amounts**

Unless otherwise specified in this part, loans made to borrowers under this part shall have the same terms, conditions, and benefits, and be available in the same amounts, as loans made to borrowers, and first disbursed on June 30, 2010, under sections 1078, 1078–2, 1078–3, and 1078–8 of this title.

. . .

**(h) Borrower defenses**

Notwithstanding any other provision of State or Federal law, the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part, except that in no event may a borrower recover from the Secretary, in any action arising from or relating to a loan made under this part, an amount in excess of the amount such borrower has repaid on such loan.

A3

**34 C.F.R. § 668.125**

## § 668.125. Proceedings to recover liabilities owed related to approved borrower defense claims

**(a)** If the Department determines that the institution is liable for any amounts discharged or reimbursed to borrowers under the discharge process described in § 685.408, it will provide the institution with written notice of the determination and the amount and basis of the liability.

**(b)** An institution may request review of the determination that it is liable for the amounts discharged or reimbursed by filing a written request for review with the designated department official no later than 45 days from the date that the institution receives the written notice.

**(c)** Upon receipt of an institution's request for review, the designated official arranges for a hearing before a hearing official.

**(d)** Except as provided in this section, the proceedings will be conducted in accordance with §§ 668.115 to 668.124 of this subpart. For purposes of this section references in §§ 668.115 to 668.124 to a final audit determination or a final program review determination will be read to refer to the written notice provided under paragraph (a) of this section.

**(e)** In place of the provisions in § 668.116(d), the following requirements shall apply:

**(1)** The Department has the burden of production to demonstrate that loans made to students to attend the institution were discharged on the basis of a borrower defense to repayment claim.

**(2)** The institution has the burden of proof to demonstrate that the decision to discharge the loans was incorrect or inconsistent with law and that the institution is not liable for the loan amounts discharged or reimbursed.

**(3)** A party may submit as evidence to the hearing official only materials within one or more of the following categories:

(i) Materials submitted to the Department during the process of adjudicating claims by borrowers relating to alleged acts or omissions of the institution, including materials submitted by the borrowers, the institution or any third parties;

(ii) Any material on which the Department relied in adjudicating claims by borrowers relating to alleged acts or omissions of the institution and provided by the Department to the institution; and

(iii) The institution may submit any other relevant documentary evidence that relates to the bases cited by the Department in approving the borrower defense claims and pursuing recoupment from the institution.

**34 C.F.R. § 685.206**

**§ 685.206. Borrower responsibilities and defenses**

. . .

**(c)** *Borrower defense to repayment for loans first disbursed prior to July 1, 2017.*

**(1)** For loans first disbursed prior to July 1, 2017, the borrower may assert a borrower defense under this paragraph. A "borrower defense" refers to any act or omission of the school attended by the student that relates to the making of the loan for enrollment at the school or the provision of educational services for which the loan was provided that would give rise to a cause of action against the school under applicable State law, and includes one or both of the following:

(i) A defense to repayment of amounts owed to the Secretary on a Direct Loan, in whole or in part.

(ii) A claim to recover amounts previously collected by the Secretary on the Direct Loan, in whole or in part.

**(2)** The order of objections for defaulted Direct Loans are as described in § 685.222(a)(6). A borrower defense claim under this section must be asserted, and will be resolved, under the procedures in § 685.222(e) to (k).

**(3)** For an approved borrower defense under this section, except as provided in paragraph (c)(4) of this section, the Secretary may initiate an appropriate proceeding to collect from the school whose act or omission resulted in the borrower defense the amount of relief arising from the borrower defense, within the later of –

(i) Three years from the end of the last award year in which the student attended the institution; or

(ii) The limitation period that State law would apply to an action by the borrower to recover on the cause of action on which the borrower defense is based.

**(4)** The Secretary may initiate a proceeding to collect at any time if the institution received notice of the claim before the end of the later of the periods described in paragraph (c)(3) of this section. For purposes of this paragraph, notice includes receipt of –

(i) Actual notice from the borrower, from a representative of the borrower, or from the Department;

(ii) A class action complaint asserting relief for a class that may include the borrower; and

A6

(iii) Written notice, including a civil investigative demand or other written demand for information, from a Federal or State agency that has power to initiate an investigation into conduct of the school relating to specific programs, periods, or practices that may have affected the borrower.

. . .

**(e) *Borrower defense to repayment for loans first disbursed on or after July 1, 2020, and before July 1, 2023.*** This paragraph (e) applies to borrower defense to repayment for loans first disbursed on or after July 1, 2020, and before July 1, 2023.

**(1)** *Definitions.* For the purposes of this paragraph (e), the following definitions apply:

(i) A "Direct Loan" under this paragraph (e) means a Direct Subsidized Loan, a Direct Unsubsidized Loan, or a Direct PLUS Loan.

(ii) "Borrower" means:

(A) The borrower; and

(B) In the case of a Direct PLUS Loan, any endorsers, and for a Direct PLUS Loan made to a parent, the student on whose behalf the parent borrowed.

(iii) A "borrower defense to repayment" under this paragraph (e) includes—

(A) A defense to repayment of amounts owed to the Secretary on a Direct Loan, or a Direct Consolidation Loan that was used to repay a Direct Loan, FFEL Program Loan, Federal Perkins Loan, Health Professions Student Loan, Loan for Disadvantaged Students under subpart II of part A of title VII of the Public Health Service Act, Health Education Assistance Loan, or Nursing Loan made under part E of the Public Health Service Act; and

(B) Any accompanying request for reimbursement of payments previously made to the Secretary on the Direct Loan or on a loan repaid by the Direct Consolidation Loan.

(iv) The term "provision of educational services" under this paragraph (e) refers to the educational resources provided by the institution that are required by an accreditation agency or a State licensing or authorizing agency for the completion of the student's educational program.

(v) The terms "school" and "institution" under this paragraph (e) may be used interchangeably and include an eligible institution, one of its representatives, or any ineligible institution, organization, or person with whom the eligible institution has an agreement to provide educational programs, or to provide marketing, advertising, recruiting, or admissions services.

**(2)** *Federal standard for loans first disbursed on or after July 1, 2020, and before July 1, 2023.* For a Direct Loan or Direct Consolidation Loan first disbursed on or after July 1, 2020, and before July 1, 2023, a borrower may assert a defense to repayment under this paragraph (e), if the borrower establishes by a preponderance of the evidence that—

(i) The institution at which the borrower enrolled made a misrepresentation, as defined in § 685.206(e)(3), of material fact upon which the borrower reasonably relied in deciding to obtain a Direct Loan, or a loan repaid by a Direct Consolidation Loan, and that directly and clearly relates to:

(A) Enrollment or continuing enrollment at the institution or

(B) The provision of educational services for which the loan was made; and

(ii) The borrower was financially harmed by the misrepresentation.

**(3)** *Misrepresentation.* A "misrepresentation," for purposes of this paragraph (e), is a statement, act, or omission by an eligible school to a borrower that is false, misleading, or deceptive; that was made with knowledge of its false, misleading, or deceptive nature or with a reckless disregard for the truth; and that directly and clearly relates to enrollment or continuing enrollment at the institution or the provision of educational services for which the loan was made. Evidence that a misrepresentation defined in this paragraph (e) may have occurred includes, but is not limited to:

(i) Actual licensure passage rates materially different from those included in the institution's marketing materials, website, or other communications made to the student;

(ii) Actual employment rates materially different from those included in the institution's marketing materials, website, or other communications made to the student;

(iii) Actual institutional selectivity rates or rankings, student admission profiles, or institutional rankings that are materially different from those included in the institution's marketing materials, website, or other communications made to the student or provided by the institution to national ranking organizations;

(iv) The inclusion in the institution's marketing materials, website, or other communication made to the student of specialized, programmatic, or institutional certifications, accreditation, or approvals not actually obtained, or the failure to remove within a reasonable period of time such certifications or approvals from marketing materials, website, or other communication when revoked or withdrawn;

A8

(v) The inclusion in the institution's marketing materials, website, or other communication made to the student of representations regarding the widespread or general transferability of credits that are only transferrable to limited types of programs or institutions or the transferability of credits to a specific program or institution when no reciprocal agreement exists with another institution, or such agreement is materially different than what was represented;

(vi) A representation regarding the employability or specific earnings of graduates without an agreement between the institution and another entity for such employment data, or sufficient evidence of past employment or earnings to justify such a representation, or without citing appropriate national, State, or regional data for earnings in the same field as provided by an appropriate Federal agency that provides such data. (In the event that national data are used, institutions should include a written, plain language disclaimer that national averages may not accurately reflect the earnings of workers in particular parts of the country and may include earners at all stages of their career and not just entry level wages for recent graduates.);

(vii) A representation regarding the availability, amount, or nature of any financial assistance available to students from the institution or any other entity to pay the costs of attendance at the institution that is materially different in availability, amount, or nature from the actual financial assistance available to the borrower from the institution or any other entity to pay the costs of attendance at the institution after enrollment;

(viii) A representation regarding the amount, method, or timing of payment of tuition and fees that the student would be charged for the program that is materially different in amount, method, or timing of payment from the actual tuition and fees charged to the student;

(ix) A representation that the institution, its courses, or programs are endorsed by vocational counselors, high schools, colleges, educational organizations, employment agencies, members of a particular industry, students, former students, governmental officials, Federal or State agencies, the United States Armed Forces, or other individuals or entities when the institution has no permission or is not otherwise authorized to make or use such an endorsement;

(x) A representation regarding the educational resources provided by the institution that are required for the completion of the student's educational program that are materially different from the institution's actual circumstances at the time the representation is made, such as representations regarding the institution's size; location; facilities; training equipment; or the number, availability, or qualifications of its personnel; and

(xi) A representation regarding the nature or extent of prerequisites for enrollment in a course or program offered by the institution that are materially different from the institution's actual circumstances at the time the representation is made, or that the institution knows will be materially different during the student's anticipated enrollment at the institution.

**(4)** *Financial harm.* Under this paragraph (e), financial harm is the amount of monetary loss that a borrower incurs as a consequence of a misrepresentation, as defined in paragraph (e)(3) of this section. Financial harm does not include damages for nonmonetary loss, such as personal injury, inconvenience, aggravation, emotional distress, pain and suffering, punitive damages, or opportunity costs. The Department does not consider the act of taking out a Direct Loan or a loan repaid by a Direct Consolidation Loan, alone, as evidence of financial harm to the borrower. Financial harm is such monetary loss that is not predominantly due to intervening local, regional, or national economic or labor market conditions as demonstrated by evidence before the Secretary or provided to the Secretary by the borrower or the school. Financial harm cannot arise from the borrower's voluntary decision to pursue less than full-time work or not to work or result from a voluntary change in occupation. Evidence of financial harm may include, but is not limited to, the following circumstances:

(i) Periods of unemployment upon graduating from the school's programs that are unrelated to national or local economic recessions;

(ii) A significant difference between the amount or nature of the tuition and fees that the institution represented to the borrower that the institution would charge or was charging, and the actual amount or nature of the tuition and fees charged by the institution for which the Direct Loan was disbursed or for which a loan repaid by the Direct Consolidation Loan was disbursed;

(iii) The borrower's inability to secure employment in the field of study for which the institution expressly guaranteed employment; and

(iv) The borrower's inability to complete the program because the institution no longer offers a requirement necessary for completion of the program in which the borrower enrolled and the institution did not provide for an acceptable alternative requirement to enable completion of the program.

**(5)** *Exclusions.* The Secretary will not accept the following as a basis for a borrower defense to repayment under this paragraph (e)—

(i) A violation by the institution of a requirement of the Act or the Department's regulations for a borrower defense to repayment under paragraph (c) or (d) of this section or under § 685.222, unless the violation would otherwise constitute the basis for a successful borrower defense to repayment under this paragraph (e); or

(ii) A claim that does not directly and clearly relate to enrollment or continuing enrollment at the institution or the provision of educational services for which the loan was made, including, but not limited to—

(A) Personal injury;

(B) Sexual harassment;

(C) A violation of civil rights;

(D) Slander or defamation;

(E) Property damage;

(F) The general quality of the student's education or the reasonableness of an educator's conduct in providing educational services;

(G) Informal communication from other students;

(H) Academic disputes and disciplinary matters; and

(I) Breach of contract unless the school's act or omission would otherwise constitute the basis for a successful defense to repayment under this paragraph (e).

**(6)** *Limitations period.* A borrower must assert a defense to repayment under this paragraph (e) within 3 years from the date the student is no longer enrolled at the institution. A borrower may only assert a defense to repayment under this paragraph (e) within the timeframes set forth in this paragraph (e)(6) and paragraph (e)(7) of this section.

**(7)** *Extension of limitation periods and reopening of applications.* For loans first disbursed on or after July 1, 2020, and before July 1, 2023, the Secretary may extend the time period when a borrower may assert a defense to repayment under § 685.206(e)(6) or may reopen a borrower's defense to repayment application to consider evidence that was not previously considered only if there is:

(i) A final, non-default judgment on the merits by a State or Federal Court that has not been appealed or that is not subject to further appeal and that establishes the institution made a misrepresentation, as defined in paragraph (e)(3) of this section; or

(ii) A final decision by a duly appointed arbitrator or arbitration panel that establishes that the institution made a misrepresentation, as defined in paragraph (e)(3) of this section.

**(8)** *Application and forbearance.* To assert a defense to repayment under this paragraph (e), a borrower must submit an application under penalty of perjury on a form

approved by the Secretary and sign a waiver permitting the institution to provide the Department with items from the borrower's education record relevant to the defense to repayment claim. The form will note that pursuant to § 685.205(b)(6)(i), if the borrower is not in default on the loan for which a borrower defense has been asserted, the Secretary will grant forbearance and notify the borrower of the option to decline forbearance. The application requires the borrower to—

(i) Certify that the borrower received the proceeds of a loan, in whole or in part, to attend the named institution;

(ii) Provide evidence that supports the borrower defense to repayment application;

(iii) State whether the borrower has made a claim with any other third party, such as the holder of a performance bond, a public fund, or a tuition recovery program, based on the same act or omission of the institution on which the borrower defense to repayment is based;

(iv) State the amount of any payment received by the borrower or credited to the borrower's loan obligation through the third party, in connection with a borrower defense to repayment described in paragraph (e)(2) of this section;

(v) State the financial harm, as defined in paragraph (e)(4) of this section, that the borrower alleges to have been caused and provide any information relevant to assessing whether the borrower incurred financial harm, including providing documentation that the borrower actively pursued employment in the field for which the borrower's education prepared the borrower if the borrower is a recent graduate (failure to provide such information results in a presumption that the borrower failed to actively pursue employment in the field); whether the borrower was terminated or removed for performance reasons from a position in the field for which the borrower's education prepared the borrower, or in a related field; and whether the borrower failed to meet other requirements of or qualifications for employment in such field for reasons unrelated to the school's misrepresentation underlying the borrower defense to repayment, such as the borrower's ability to pass a drug test, satisfy driving record requirements, and meet any health qualifications; and

(vi) State that the borrower understands that in the event that the borrower receives a 100 percent discharge of the balance of the loan for which the defense to repayment application has been submitted, the institution may, if allowed or not prohibited by other applicable law, refuse to verify or to provide an official transcript that verifies the borrower's completion of credits or a credential associated with the discharged loan.

**(9)** *Consideration of order of objections and of evidence in possession of the Secretary under this paragraph (e).*

(i) If the borrower asserts both a borrower defense to repayment and any other objection to an action of the Secretary with regard to a Direct Loan or a loan repaid by a Direct Consolidation Loan under this paragraph (e), the order in which the Secretary will consider objections, including a borrower defense to repayment under this paragraph (e), will be determined as appropriate under the circumstances.

(ii) With respect to the borrower defense to repayment application submitted under this paragraph (e), the Secretary may consider evidence otherwise in the possession of the Secretary, including from the Department's internal records or other relevant evidence obtained by the Secretary, as practicable, provided that the Secretary permits the institution and the borrower to review and respond to this evidence and to submit additional evidence.

**(10)** *School response and borrower reply under this paragraph (e).*

(i) Upon receipt of a borrower defense to repayment application under this paragraph (e), the Department will notify the school of the pending application and provide a copy of the borrower's request and any supporting documents, a copy of any evidence otherwise in the possession of the Secretary, and a waiver signed by the student permitting the institution to provide the Department with items from the student's education record relevant to the defense to repayment claim to the school, and invite the school to respond and to submit evidence, within the specified timeframe included in the notice, which will be no less than 60 days.

(ii) Upon receipt of the school's response, the Department will provide the borrower a copy of the school's submission as well as any evidence otherwise in possession of the Secretary, which was provided to the school, and will give the borrower an opportunity to submit a reply within a specified timeframe, which will be no less than 60 days. The borrower's reply must be limited to issues and evidence raised in the school's submission and any evidence otherwise in the possession of the Secretary.

(iii) The Department will provide the school a copy of the borrower's reply.

(iv) There will be no other submissions by the borrower or the school to the Secretary unless the Secretary requests further clarifying information.

**(11)** *Written decision under this paragraph (e).*

(i) After considering the borrower's application and all applicable evidence under this paragraph (e), the Secretary issues a written decision—

A13

(A) Notifying the borrower and the school of the decision on the borrower defense to repayment under this paragraph (e);

(B) Providing the reasons for the decision; and

(C) Informing the borrower and the school of the relief, if any, that the borrower will receive, consistent with paragraph (e)(12) of this section and specifying the relief determination.

(ii) If the Department receives a borrower defense to repayment application that is incomplete and is within the limitations period in paragraph (e)(6) or (7) of this section, the Department will not issue a written decision on the application and instead will notify the borrower in writing that the application is incomplete and will return the application to the borrower.

**(12)** *Borrower defense to repayment relief under this paragraph (e).*

(i) If the Secretary grants the borrower's request for relief based on a borrower defense to repayment under this paragraph (e), the Secretary notifies the borrower and the school that the borrower is relieved of the obligation to repay all or part of the loan and associated costs and fees that the borrower would otherwise be obligated to pay or will be reimbursed for amounts paid toward the loan voluntarily or through enforced collection. The amount of relief that a borrower receives under this paragraph (e) may exceed the amount of financial harm, as defined in paragraph (e)(4) of this section, that the borrower alleges in the application pursuant to paragraph (e)(8)(v) of this section. The Secretary determines the amount of relief and awards relief limited to the monetary loss that a borrower incurred as a consequence of a misrepresentation, as defined in paragraph (e)(3) of this section. The amount of relief cannot exceed the amount of the loan and any associated costs and fees and will be reduced by the amount of refund, reimbursement, indemnification, restitution, compensatory damages, settlement, debt forgiveness, discharge, cancellation, compromise, or any other financial benefit received by, or on behalf of, the borrower that was related to the borrower defense to repayment under this paragraph (e). In awarding relief under this paragraph (e), the Secretary considers the borrower's application, as described in paragraph (e)(8) of this section, which includes information about any payments received by the borrower and the financial harm alleged by the borrower. In awarding relief under this paragraph (e), the Secretary also considers the school's response, the borrower's reply, and any evidence otherwise in the possession of the Secretary, which was previously provided to the borrower and the school, as described in paragraph (e)(10) of this section. The Secretary also updates reports to consumer reporting agencies to which the Secretary previously

made adverse credit reports with regard to the borrower's Direct Loan or loans repaid by the borrower's Direct Consolidation Loan under this paragraph (e).

(ii) The Secretary affords the borrower such further relief as the Secretary determines is appropriate under the circumstances. Further relief may include determining that the borrower is not in default on the loan and is eligible to receive assistance under title IV of the Act.

**(13)** *Finality of borrower defense to repayment decisions under this paragraph (e).* The determination of a borrower's defense to repayment by the Department included in the written decision referenced in paragraph (e)(11) of this section is the final decision of the Department and is not subject to appeal within the Department.

**(14)** *Cooperation by the borrower under this paragraph (e).* The Secretary may revoke any relief granted to a borrower under this section who refuses to cooperate with the Secretary in any proceeding under this paragraph (e) or under part 668, subpart G. Such cooperation includes, but is not limited to—

(i) Providing testimony regarding any representation made by the borrower to support a successful borrower defense to repayment under this paragraph (e); and

(ii) Producing, within timeframes established by the Secretary, any documentation reasonably available to the borrower with respect to those representations and any sworn statement required by the Secretary with respect to those representations and documents.

**(15)** *Transfer to the Secretary of the borrower's right of recovery against third parties under this paragraph (e).*

(i) Upon the grant of any relief under this paragraph (e), the borrower is deemed to have assigned to, and relinquished in favor of, the Secretary any right to a loan refund (up to the amount discharged) that the borrower may have by contract or applicable law with respect to the loan or the provision of educational services for which the loan was received, against the school, its principals, its affiliates and their successors, or its sureties, and any private fund, including the portion of a public fund that represents funds received from a private party. If the borrower asserts a claim to, and recovers from, a public fund, the Secretary may reinstate the borrower's obligation to repay on the loan an amount based on the amount recovered from the public fund, if the Secretary determines that the borrower's recovery from the public fund was based on the same borrower defense to repayment and for the same loan for which the discharge was granted under this section.

(ii) The provisions of this paragraph (e)(15) apply notwithstanding any provision of State law that would otherwise restrict transfer of those rights by the borrower,

limit or prevent a transferee from exercising those rights, or establish procedures or a scheme of distribution that would prejudice the Secretary's ability to recover on those rights.

(iii) Nothing in this paragraph (e)(15) limits or forecloses the borrower's right to pursue legal and equitable relief arising under applicable law against a party described in this paragraph (e)(15) for recovery of any portion of a claim exceeding that assigned to the Secretary or any other claims arising from matters unrelated to the claim on which the loan is discharged.

**(16)** *Recovery from the school under this paragraph (e).*

(i) The Secretary may initiate an appropriate proceeding to require the school whose misrepresentation resulted in the borrower's successful borrower defense to repayment under this paragraph (e) to pay to the Secretary the amount of the loan to which the defense applies in accordance with part 668, subpart G. This paragraph (e)(16) would also be applicable for provisionally certified institutions.

(ii) Under this paragraph (e), the Secretary will not initiate such a proceeding more than 5 years after the date of the final determination included in the written decision referenced in paragraph (e)(11) of this section. The Department will notify the school of the borrower defense to repayment application within 60 days of the date of the Department's receipt of the borrower's application.

**34 C.F.R. § 685.222**

**§ 685.222. Borrower defenses and procedures for loans first disbursed on or after July 1, 2017, and before July 1, 2020, and procedures for loans first disbursed prior to July 1, 2017.**

. . .

**(e)** *Procedure for an individual borrower.*

**(1)** To assert a borrower defense under this section, an individual borrower must—

(i) Submit an application to the Secretary, on a form approved by the Secretary—

(A) Certifying that the borrower received the proceeds of a loan, in whole or in part, to attend the named school;

(B) Providing evidence that supports the borrower defense; and

(C) Indicating whether the borrower has made a claim with respect to the information underlying the borrower defense with any third party, such as the holder of a performance bond or a tuition recovery program, and, if so, the amount of any payment received by the borrower or credited to the borrower's loan obligation; and

(ii) Provide any other information or supporting documentation reasonably requested by the Secretary.

**(2)** Upon receipt of a borrower's application submitted under this section, the Secretary—

(i) If the borrower is not in default on the loan for which a borrower defense has been asserted, grants forbearance and—

(A) Notifies the borrower of the option to decline the forbearance and to continue making payments on the loan; and

(B) Provides the borrower with information about the availability of the income-contingent repayment plans under §685.209 and the income-based repayment plan under §685.221; or

(ii) If the borrower is in default on the loan for which a borrower defense has been asserted—

(A) Suspends collection activity on the loan until the Secretary issues a decision on the borrower's claim;

(B) Notifies the borrower of the suspension of collection activity and explains that collection activity will resume if the Secretary determines that the borrower does not qualify for a full discharge; and

A17

(C) Notifies the borrower of the option to continue making payments under a rehabilitation agreement or other repayment agreement on the defaulted loan.

**(3)** The Secretary designates a Department official to review the borrower's application submitted under this section to determine whether the application states a basis for a borrower defense, and resolves the claim through a fact-finding process conducted by the Department official.

(i) As part of the fact-finding process, the Department official notifies the school of the borrower defense application and considers any evidence or argument presented by the borrower and also any additional information, including—

(A) Department records;

(B) Any response or submissions from the school; and

(C) Any additional information or argument that may be obtained by the Department official.

(ii) For borrower defense applications under this section, upon the borrower's request, the Department official identifies to the borrower the records the Department official considers relevant to the borrower defense. The Secretary provides to the borrower any of the identified records upon reasonable request of the borrower.

**(4)** At the conclusion of the fact-finding process under this section, the Department official issues a written decision as follows:

(i) If the Department official approves the borrower defense in full or in part, the Department official notifies the borrower in writing of that determination and of the relief provided as described in paragraph (i) of this section.

(ii) If the Department official denies the borrower defense in full or in part, the Department official notifies the borrower of the reasons for the denial, the evidence that was relied upon, any portion of the loan that is due and payable to the Secretary, and whether the Secretary will reimburse any amounts previously collected, and informs the borrower that if any balance remains on the loan, the loan will return to its status prior to the borrower's submission of the application. The Department official also informs the borrower of the opportunity to request reconsideration of the claim based on new evidence pursuant to paragraph (e)(5)(i) of this section.

**(5)** The decision of the Department official under this section is final as to the merits of the claim and any relief that may be granted on the claim. Notwithstanding the foregoing—

A18

(i) If the borrower defense is denied in full or in part, the borrower may request that the Secretary reconsider the borrower defense upon the identification of new evidence in support of the borrower's claim. "New evidence" is relevant evidence that the borrower did not previously provide and that was not identified in the final decision as evidence that was relied upon for the final decision. If accepted for reconsideration by the Secretary, the Secretary follows the procedure in paragraph (e)(2) of this section for granting forbearance and for defaulted loans; and

(ii) The Secretary may reopen a borrower defense application at any time to consider evidence that was not considered in making the previous decision. If a borrower defense application is reopened by the Secretary, the Secretary follows the procedure paragraph (e)(2) of this section for granting forbearance and for defaulted loans.

**(6)** The Secretary may consolidate applications filed under this paragraph (e) that have common facts and claims, and resolve the borrowers' borrower defense claims as provided in paragraphs (f), (g), and (h) of this section.

**(7)** The Secretary may initiate a proceeding to collect from the school the amount of relief resulting from a borrower defense under this section—

(i) Within the six-year period applicable to the borrower defense under paragraph (c) or (d) of this section;

(ii) At any time, for a borrower defense under paragraph (b) of this section; or

(iii) At any time if during the period described in paragraph (e)(7)(i) of this section, the institution received notice of the claim. For purposes of this paragraph, notice includes receipt of—

(A) Actual notice from the borrower, a representative of the borrower, or the Department of a claim, including notice of an application filed pursuant to this section or §685.206(c);

(B) A class action complaint asserting relief for a class that may include the borrower for underlying facts that may form the basis of a claim under this section or §685.206(c);

(C) Written notice, including a civil investigative demand or other written demand for information, from a Federal or State agency that has power to initiate an investigation into conduct of the school relating to specific programs, periods, or practices that may have affected the borrower, for underlying facts that may form the basis of a claim under this section or §685.206(c).

**(f)** ***Group process for borrower defense, generally.***

**(1)** Upon consideration of factors including, but not limited to, common facts and claims, fiscal impact, and the promotion of compliance by the school or other title IV, HEA program participant, the Secretary may initiate a process to determine whether a group of borrowers, identified by the Secretary, has a borrower defense under this section.

(i) The members of the group may be identified by the Secretary from individually filed applications pursuant to paragraph (e)(6) of this section or from any other source.

(ii) If the Secretary determines that there are common facts and claims that apply to borrowers who have not filed an application under paragraph (e) of this section, the Secretary may identify such borrowers as members of a group.

**(2)** Upon the identification of a group of borrowers under paragraph (f)(1) of this section, the Secretary—

(i) Designates a Department official to present the group's claim in the fact-finding process described in paragraph (g) or (h) of this section, as applicable;

(ii) Provides each identified member of the group with notice that allows the borrower to opt out of the proceeding;

(iii) If identified members of the group are borrowers who have not filed an application under paragraph (f)(1)(ii) of this section, follows the procedures in paragraph (e)(2) of this section for granting forbearance and for defaulted loans for such identified members of the group, unless an optout by such a member of the group is received; and

(iv) Notifies the school of the basis of the group's borrower defense, the initiation of the fact-finding process described in paragraph (g) or (h) of this section, and of any procedure by which the school may request records and respond. No notice will be provided if notice is impossible or irrelevant due to a school's closure.

**(3)** For a group of borrowers identified by the Secretary, for which the Secretary determines that there may be a borrower defense under paragraph (d) of this section based upon a substantial misrepresentation that has been widely disseminated, there is a rebuttable presumption that each member reasonably relied on the misrepresentation.

**(g)** ***Procedures for group process for borrower defenses with respect to loans made to attend a closed school.*** For groups identified by the Secretary under paragraph (f) of this section, for which the borrower defense under this section is asserted with respect to a Direct Loan to attend a school that has closed and has

provided no financial protection currently available to the Secretary from which to recover any losses arising from borrower defenses, and for which there is no appropriate entity from which the Secretary can otherwise practicably recover such losses—

**(1)** A hearing official resolves the borrower defense under this section through a fact-finding process. As part of the fact-finding process, the hearing official considers any evidence and argument presented by the Department official on behalf of the group and, as necessary to determine any claims at issue, on behalf of individual members of the group. The hearing official also considers any additional information the Department official considers necessary, including any Department records or response from the school or a person affiliated with the school as described in §668.174(b), if practicable. The hearing official issues a written decision as follows:

(i) If the hearing official approves the borrower defense in full or in part, the written decision states that determination and the relief provided on the basis of that claim as determined under paragraph (i) of this section.

(ii) If the hearing official denies the borrower defense in full or in part, the written decision states the reasons for the denial, the evidence that was relied upon, the portion of the loans that are due and payable to the Secretary, and whether reimbursement of amounts previously collected is granted, and informs the borrowers that if any balance remains on the loan, the loan will return to its status prior to the group claim process.

(iii) The Secretary provides copies of the written decision to the members of the group and, as practicable, to the school.

**(2)** The decision of the hearing official is final as to the merits of the group borrower defense and any relief that may be granted on the group claim.

**(3)** After a final decision has been issued, if relief for the group has been denied in full or in part pursuant to paragraph (g)(1)(ii) of this section, an individual borrower may file a claim for relief pursuant to paragraph (e)(5)(i) of this section.

**(4)** The Secretary may reopen a borrower defense application at any time to consider evidence that was not considered in making the previous decision. If a borrower defense application is reopened by the Secretary, the Secretary follows the procedure in paragraph (e)(2) of this section for granting forbearance and for defaulted loans.

**(h)** ***Procedures for group process for borrower defenses with respect to loans made to attend an open school.*** For groups identified by the Secretary under paragraph (f) of this section, for which the borrower defense under this section is

asserted with respect to Direct Loans to attend a school that is not covered by paragraph (g) of this section, the claim is resolved in accordance with the procedures in this paragraph (h).

**(1)** A hearing official resolves the borrower defense and determines any liability of the school through a factfinding process. As part of the factfinding process, the hearing official considers any evidence and argument presented by the school and the Department official on behalf of the group and, as necessary to determine any claims at issue, on behalf of individual members of the group. The hearing official issues a written decision as follows:

(i) If the hearing official approves the borrower defense in full or in part, the written decision establishes the basis for the determination, notifies the members of the group of the relief as described in paragraph (i) of this section, and notifies the school of any liability to the Secretary for the amounts discharged and reimbursed.

(ii) If the hearing official denies the borrower defense for the group in full or in part, the written decision states the reasons for the denial, the evidence that was relied upon, the portion of the loans that are due and payable to the Secretary, and whether reimbursement of amounts previously collected is granted, and informs the borrowers that their loans will return to their statuses prior to the group borrower defense process. The decision notifies the school of any liability to the Secretary for any amounts discharged or reimbursed.

(iii) The Secretary provides copies of the written decision to the members of the group, the Department official, and the school.

**(2)** The decision of the hearing official becomes final as to the merits of the group borrower defense and any relief that may be granted on the group borrower defense within 30 days after the decision is issued and received by the Department official and the school unless, within that 30-day period, the school or the Department official appeals the decision to the Secretary. In the case of an appeal—

(i) The decision of the hearing official does not take effect pending the appeal; and

(ii) The Secretary renders a final decision.

**(3)** After a final decision has been issued, if relief for the group has been denied in full or in part pursuant to paragraph (h)(1)(ii) of this section, an individual borrower may file a claim for relief pursuant to paragraph (e)(5)(i) of this section.

**(4)** The Secretary may reopen a borrower defense application at any time to consider evidence that was not considered in making the previous decision. If a borrower

defense application is reopened by the Secretary, the Secretary follows the procedure in paragraph (e)(2) of this section for granting forbearance and for defaulted loans.

**(5)** (i) The Secretary collects from the school any liability to the Secretary for any amounts discharged or reimbursed to borrowers under this paragraph (h).

(ii) For a borrower defense under paragraph (b) of this section, the Secretary may initiate a proceeding to collect at any time.

(iii) For a borrower defense under paragraph (c) or (d) of this section, the Secretary may initiate a proceeding to collect within the limitation period that would apply to the borrower defense, provided that the Secretary may bring an action to collect at any time if, within the limitation period, the school received notice of the borrower's borrower defense claim. For purposes of this paragraph, the school receives notice of the borrower's claim by receipt of—

(A) Actual notice of the claim from the borrower, a representative of the borrower, or the Department, including notice of an application filed pursuant to this section or §685.206(c);

(B) A class action complaint asserting relief for a class that may include the borrower for underlying facts that may form the basis of a claim under this section or §685.206(c); or

(C) Written notice, including a civil investigative demand or other written demand for information, from a Federal or State agency that has power to initiate an investigation into conduct of the school relating to specific programs, periods, or practices that may have affected the borrower, of underlying facts that may form the basis of a claim under this section or §685.206(c).

A23

**34 C.F.R. § 685.308**

**§ 685.308. Remedial actions.**

. . .

**(a)** ***General.*** The Secretary may require the repayment of funds and the purchase of loans by the school if the Secretary determines that the school is liable as a result of—

**(1)** The school's violation of a Federal statute or regulation;

**(2)** The school's negligent or willful false certification under §685.215; or

**(3)** The school's actions that gave rise to a successful claim for which the Secretary discharged a loan, in whole or in part, pursuant to §§ 685.206, 685.214, 685.216, 685.222, or subpart D of this part.

**(b)** In requiring a school to repay funds to the Secretary or to purchase loans from the Secretary in connection with an audit or program review, the Secretary follows the procedures described in 34 CFR part 668, subpart H.

**(c)** The Secretary may impose a fine or take an emergency action against a school or limit, suspend, or terminate a school's participation in the Direct Loan Program in accordance with 34 CFR part 668, subpart G.