**Nos. 23-15049, 23-15050, 23-15051**

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

_____

THERESA SWEET, et al.,
*Plaintiffs-Appellees,*

&

EVERGLADES COLLEGE, INC.; LINCOLN EDUCATIONAL SERVICES CORPORATION; and
AMERICAN NATIONAL UNIVERSITY,
*Intervenors-Appellants*

v.

MIGUEL A. CARDONA, Secretary of the United States Department of Education, and
U.S. DEPARTMENT OF EDUCATION,
*Defendants-Appellees.*

_____

On Appeal from the United States District Court
for the Northern District of California

_____

### DEFENDANTS-APPELLEES' SUPPLEMENTAL
### EXCERPTS OF RECORD

_____

*Of Counsel:*

LISA BROWN
*General Counsel*

JOHN BAILEY
*Senior Counsel*

BRIAN SIEGEL
*Assistant General Counsel for Postsecondary
Education*

KAREN KARAS
*Attorney*
*U.S. Department of Education*
*400 Maryland Avenue SW*
*Washington, DC 20202*

SARAH E. HARRINGTON
*Deputy Assistant Attorney General*

ISMAIL J. RAMSEY
*United States Attorney*

MARK B. STERN
JOSHUA M. SALZMAN
SEAN R. JANDA
*Attorneys, Appellate Staff*
*Civil Division, Room 7260*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 514-3388*

# INDEX

**Page**

Motion for a Subsequent Case Management Conference
(Aug. 20, 2020), Dkt. No. 108 ..............................................................GovSER-003

Defendants' Response to August 31, 2020 Order with Exhibits
(Sept. 4, 2020), Dkt. Nos. 116 to 116-4 ...............................................GovSER-009

Plaintiffs' Motion for Summary Judgment
(June 9, 2022), Dkt. No. 245.................................................................GovSER-034

Defendants' Consolidated Opposition to Motions for Intervention
(July 25, 2022), Dkt. No. 288................................................................GovSER-078

Defendants' Opposition to Intervenors' Motion for Stay Pending Appeal
(Jan. 27, 2023), Dkt. No. 362................................................................GovSER-106

1  JOSEPH JARAMILLO (SBN 178566)
   jjaramillo@heraca.org                    EILEEN M. CONNOR (SBN 248856)
2  NATALIE LYONS (SBN 293026)               econnor@law.harvard.edu
   nlyons@heraca.org                        TOBY R. MERRILL
3  CLAIRE TORCHIANA (SBN 330232)            (*Pro Hac Vice*)
   ctorchiana@heraca.org                    tmerrill@law.harvard.edu
4  HOUSING & ECONOMIC RIGHTS                LEGAL SERVICES CENTER OF
   ADVOCATES                                HARVARD LAW SCHOOL
5  1814 Franklin Street, Suite 1040         122 Boylston Street
   Oakland, CA 94612                        Jamaica Plain, MA 02130
6  Tel.: (510) 271-8443                     Tel.: (617) 390-3003
   Fax: (510) 868-4521                      Fax: (617) 522-0715
7
8
9  Attorneys for Plaintiffs

10              **UNITED STATES DISTRICT COURT**
             **NORTHERN DISTRICT OF CALIFORNIA**
11

12  THERESA SWEET, CHENELLE            Case No.: 19-cv-03674-WHA
    ARCHIBALD, DANIEL DEEGAN, SAMUEL
13  HOOD, TRESA APODACA, ALICIA DAVIS,
    and JESSICA JACOBSON on behalf of
14  themselves and all others similarly situated,

15              *Plaintiffs*,              **MOTION FOR A SUBSEQUENT CASE
                                          MANAGEMENT CONFERENCE**
16       v.

17
    ELISABETH DEVOS, in her official
18  capacity as Secretary of the United States
    Department of Education,
19
    And
20
21  THE UNITED STATES DEPARTMENT OF
    EDUCATION,
22
                *Defendants*.
23

24

25

26

27

28
    MOTION FOR A SUBSEQUENT
    CASE MANAGEMENT CONFERENCE

                                          Case No: 19-cv-03674-WHA

The Plaintiffs request a subsequent case management conference in this matter, based on the following:

1.      On May 22, 2020, the Court granted preliminary approval of a settlement agreement between the parties. ECF No. 103. The settlement agreement, which was executed on April 7, 2020, ECF No. 97-2, commits Defendants to a timeline for issuing a "final decision" on the merits of each class member's borrower defense claim, ECF No. 97-2 at 5-7, or else be required to cancel a portion of the borrower's student loans, *id.* at 11-13. In the agreement, ED represents and confirms that it "issues written decisions as required by the Department's 2016 Borrower Defense Regulation." *Id.* at 10.

2.      The deadline for objections and comments to the settlement is August 20, 2020. ECF No. 105. The parties' replies are due September 3, 2020, and the parties must move for final approval of the Agreement by September 17, 2020. *Id.*

3.      On July 24, 2020, counsel for Plaintiffs wrote to Defendants identifying a concern that arose since such time as the Court granted preliminary approval to the settlement agreement, and seeking additional information. Declaration of Eileen Connor (Connor Decl.) Ex. A.

4.      Counsel for Defendants replied by letter on August 10, 2020. Connor Decl. Ex. B.

5.      On August 12, 2020, counsel conferred by phone. In short, Plaintiffs expressed a concern that the Defendants have made substantial progress towards clearing the backlog of borrower defense claims by issuing denials using boilerplate and conclusory language that does not provide any rationale for the decision.

6.      Plaintiffs' position is that these denials are not final decisions on the merits as contemplated by the settlement agreement because they do not comply with the Department's regulation, nor do they comply with the basic requirements of administrative decisionmaking as set forth in the Administrative Procedure Act, particularly section 555(e) thereof.

7.      That provision requires that, in issuing a denial, the agency provide prompt notice "accompanied by a brief statement of the grounds for denial." *Id.*

MOTION FOR A SUBSEQUENT
CASE MANAGEMENT CONFERENCE

Case No: 19-cv-03674-WHA

GovSER-004

8. Since December 2019, the Department has denied over 45,000 of the class members' applications for borrower defense. (Publicly available data is current through May 31, 2020.)

9. Undersigned counsel has reviewed hundreds of notifications of denial send by the Department to members of the class. Connor Decl. In each, the Department's language is formulaic and gives no indication that the Department has connected the evidence submitted by the borrower or otherwise possessed by the Department with its ultimate determination. For the Court's convenience, filed herewith are affidavits from fifteen class members, including three named plaintiffs in this action. The affidavits include as exhibits the individual's application and denial notice. *See* Affidavits of Alison Wright, Benjamin Thompson, Bobby Vang, Charlene Espada, Clarissa Martinez, Daniel Deegan, Ernst Mutchnick, Jennifer Howell, Jessica Jacobson, John Long, Roland Cardoza, Rudolph Howell, Sean Doe, Theresa Sweet, and Yvette Colon.

10. The reasons for denial ("failure to state a legal claim," "failure to state a legal claim under borrower defense regulation," "insufficient evidence," "outside coverage date," and "other") are undefined and conclusory. There is no way for an applicant or a reviewing court to determine whether the Department's decision was reasoned. Some denials are nonsensical. *See, e.g.,* Aff. of Rudolph Howard ("You allege that ITT Technical Institute engaged in misconduct related to Educational Services. This allegation fails for the following reason(s): Educational Services.").

11. There is no link between the evidence submitted by the borrower and the decision reached. In some instances, borrowers are denied for claims that they did not assert. *See, e.g.,* Aff. of Jennifer Howell. The denials reference a slate of materials as "evidence considered" in what appears to be a standard template for each school or school group. This evidence is not provided, nor is it identified as relevant to any particular claim. When one borrower emailed the Borrower Defense Unit with a request for all the documents and evidence showing and supporting the Department's decision, he was told, "Our office does not have access to this documentation, we just have access to the letter that was sent to you. If you wanting [sic] that

2

MOTION FOR A SUBSEQUENT
CASE MANAGEMENT CONFERENCE

Case No: 19-cv-03674-WHA

documentation you would need to fill [sic] a Freedom of Information Act on FOIA.gov." Aff. of Sean Doe.

12.     Moreover, the denials state that eligibility for relief depends on whether "the borrower's school engaged in acts or omissions that would give rise to a cause of action against the school under applicable state law." However, the Department fails to identify *which* state law it has applied, making it impossible for a borrower to determine whether the decision was a reasoned one. The notices simply parrot back the governing regulation without explaining *why* the evidence failed to state a cause of action.

13.     The notices advise of an option for borrowers to seek reconsideration based on evidence not already submitted or considered—but borrowers have no guidance from the Department as to why their evidence was insufficient, and how.

14.     The notices do not apprise recipients of the ability to challenge the denial of their borrower defense claim in federal district court under the APA. This fact alone throws into question whether the parties agree upon the meaning of the term "final decision" as it is contained in the settlement agreement.

15.     Plaintiffs have serious concerns at present about the Defendants' good faith and fair dealing in its performance of its obligations under the settlement agreement.

16.     The attached class member affidavits show that the Department has denied, in cursory fashion, the claims of borrowers who have received restitution from enforcement actions based on the consumer fraud of Sanford-Brown and DeVry. *See* Affs. of Benjamin Thompson, Jennifer Howell, Yvette Colon.

17.     The Department has denied, likewise in cursory fashion, the claims of borrowers who submitted lengthy applications with affidavits, exhibits, and legal argumentation. *See* Affs. of Charlene Espada, Ernst Muthcnick, Jessica Jacobson, Yvette Colon.

18.     The Department has denied, again in cursory fashion, the applications of class members who seemingly qualify for approval under existing Department memoranda concerning ITT and Corinthian. *See* Affs. of Alison Wright, Bobby Vang, Roland Cardoza, Rudolph Howell.

MOTION FOR A SUBSEQUENT
CASE MANAGEMENT CONFERENCE

Case No: 19-cv-03674-WHA

GovSER-006

19.     The Department has denied in the same cursory fashion applications that were submitted in 2015 and were under consideration for more than five years, *see* Affs. of Jessica Jacobson, Yvette Colon, as those that were submitted in March 2020 and were under consideration for less than ten weeks, *see* Aff. of John Long.

20.     As a result, at present, Defendants' actions raise questions regarding their performance of the agreement, should it be granted final approval by the Court, that will require judicial resolution.

21.     Plaintiffs are mindful of the need to conserve judicial resources, as well as the role of the Court in granting approval to class action settlements under Federal Rule of Civil Procedure 23(e)(2)(a).  For that reason, Plaintiffs seek a case management conference in order to fully air the issues identified by Plaintiffs and seek guidance from the Court as to the best mechanism for resolving the issues.

22.     Plaintiffs request that a case management conference be held prior to September 3, 2020, the deadline for responding to objections or, in the alternative, that the Court expand the time for such responses until after a conference is held.

23.     Defendants take no position with respect to Plaintiffs' request for a case management conference. *See* Connor Decl.


Respectfully submitted,

/s *Eileen M. Connor*


Joseph Jaramillo (SBN 178566)
Natalie Lyons (SBN 293026)
Claire Torchiana (SBN 330232)
HOUSING & ECONOMIC RIGHTS
ADVOCATES
1814 Franklin Street, Suite 1040
Oakland, CA 94612
Tel: (510) 271-8443
Fax: (510) 280-2448

4

MOTION FOR A SUBSEQUENT
CASE MANAGEMENT CONFERENCE

Case No: 19-cv-03674-WHA

Eileen M. Connor (SBN 248856)
Toby R. Merrill (*Pro Hac Vice*)
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
Tel.: (617) 390-3003
Fax: (617) 522-0715


*Attorneys for Plaintiffs*

5

MOTION FOR A SUBSEQUENT
CASE MANAGEMENT CONFERENCE

Case No: 19-cv-03674-WHA

ETHAN P. DAVIS
Acting Assistant Attorney General

DAVID L. ANDERSON
United States Attorney

MARCIA BERMAN
Assistant Branch Director

R. CHARLIE MERRITT
KATHRYN C. DAVIS
KEVIN P. HANCOCK
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
919 East Main Street, Suite 1900
Richmond, VA 23219
Telephone: (202) 616-8098
Fax: (804) 819-7417
E-mail: robert.c.merritt@usdoj.gov

*Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| THERESA SWEET, *et al.*,<br><br>     Plaintiffs,<br><br>          v.<br><br>ELISABETH DEVOS, in her official capacity as Secretary of Education, and the UNITED STATES DEPARTMENT OF EDUCATION<br><br>     Defendants. | No. 3:19-cv-03674-WHA<br><br>**DEFENDANTS' RESPONSE TO AUGUST 31, 2020 ORDER** |

On August 20, 2020, Plaintiffs moved the Court for a case management conference to address their concerns with the substantive borrower defense decisions that some members of the Plaintiff class have received.  ECF No. 108.  The Court granted the motion and held a case management conference on August 31, 2020, after which it entered an Order requiring that Defendants file "information regarding statistics of the at-issue denials," as discussed during the conference.  ECF No. 115.

<u>Statistics on Claims Adjudication Since December 2019</u>

Since the Department resumed issuing final borrower defense decisions in December 2019, it has issued final decisions on approximately 131,800 applications  The Department has approved (*i.e.*, determined that they are eligible for relief) approximately 13,500 of these applications and denied (*i.e.*, determined that they are ineligible for relief) approximately 118,300 applications.

The individuals covered by the substantive provisions of the parties' settlement agreement are those who had pending borrower defense claims as of the April 7, 2020 date on which the parties executed their agreement.  *See* Proposed Settlement Agreement § IV, ECF No. 97-2 (Agreement).  Approximately 162,000 individuals met the class definition on that date, comprising approximately 168,000 borrower defense applications.  As of August 24, 2020, the Department had adjudicated approximately 90,000 of these applications and issued approximately 78,400 final decisions (the rest are in various stages of quality control and processing).  Of those final decisions, approximately 4,400 were approvals and 74,000 were denials.

The Court requested statistics from the period before the parties executed their settlement agreement on April 7.  During that period, while the parties were negotiating the settlement agreement, Plaintiffs were on notice, via a declaration filed with Defendants' merits briefing on January 9, 2020, that the Department had issued 16,045 final decisions since the announcement of its new relief methodology, approving 789 claims and denying 15,256 claims.  *See* Defs.' Opp'n to Pls.' Mot. for Summ. J. & Reply in Supp. of Defs.' Mot. for Summ. J. at 3-4, ECF No. 72.  As of April 7, 2020, the Department had issued decisions on approximately 8,800 eligible applications and approximately 36,200 applications that it determined were ineligible.

These statistics show that the Department is approving some borrower defense claims and denying others – and that it is plainly not operating under a blanket policy of summarily denying all borrower defense claims. The fact that the number of denials has been relatively high in comparison to the number of approvals should be no cause for concern. As Defendants have previously explained, the Department has, in an effort to maximize its efficiency in reducing the massive claims backlog, prioritized deciding borrower defense applications that, based on facial deficiencies, can be most quickly denied. *See* Admin. R. 351, ECF No. 56 (Decl. of Collen Nevin ¶ 66, Nov. 14, 2019). These include "applications from borrowers who did not provide any evidence and who attended schools for which [the Borrower Defense Unit] is not aware of any evidence that would support approval," *id.*, and claims involving no allegations that a misrepresentation (or other conduct made actionable by the governing regulations) was directed to the borrower or that otherwise fail to allege a claim for borrower defense relief, *see* Exhibit B to Decl. of Eileen Connor, ECF No. 108-2 (Letter From Kathryn C. Davis to Eileen Connor at 3, Aug. 10, 2020). At the same time, the Department continues its review of evidence related to additional schools beyond those for which it has so far approved claims. As it develops review protocols and eligibility criteria based on this common evidence, the Department anticipates that the ratio of approvals to denials could increase with respect to the more than 75,000 applications that are covered by the settlement agreement and that have not yet been adjudicated. *See id.*

<u>Form of Denial Letters Utilized by the Department since December 2019</u>

The Court also requested information about the form of the Department's denial letters. Since December 2019, the Department has used four standard letter templates to notify borrowers of its decisions to deny their claims. *See* Exhibits A-D, attached hereto. These vary depending on the type of claim asserted: (1) Corinthian borrowers who assert only job placement rate claims but who do not meet the eligibility criteria for such a claim (sample attached as Exhibit A); (2) Corinthian borrowers who assert other claims in addition to job placement rate claims (sample attached as Exhibit B); (3) non-Corinthian borrowers who attended schools for which the Department does not have any common evidence in its possession (sample attached as Exhibit C); and (4) non-Corinthian borrowers who attended schools for which the Department does have

common evidence in its possession (sample attached as Exhibit D). The letters have varying amounts of detail – for example, the Corinthian letters incorporate the Department's eligibility criteria for claims based on Corinthian's misleading job placement rates and provide an accounting of the borrower's failure to meet those criteria – but Plaintiffs primarily direct their complaints at the fourth category of letter. Although that specific form (Exhibit D) has only been utilized after the date the parties executed their settlement agreement, it is nearly identical to the third form listed above (Exhibit C), which the Department used throughout the period between December 2019 and April 7, 2020, when the parties executed the settlement agreement.

The use of these form denial letters is entirely appropriate and unsurprising here. The letters provide standardized justifications based on common deficiencies that the Department has identified across thousands of applications, such as a failure to plead actionable misconduct or failure to provide evidence to support the claim. As the record in this case makes clear, the Department has faced a very large backlog of borrower defense claims, including more than 168,000 that would be subject to the timelines set forth in the Agreement. In a federal program of that scope, it is not realistic to expect the Department to issue detailed, personalized decisions in every case. Indeed, the Administrative Procedure Act (APA) imposes only a "minimal" burden on agencies to explain their decisions to deny an application. *See Butte Cnty. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010).

Most importantly, the Department would not have agreed to clear the backlog of more than 168,000 cases in 18 months if that meant issuing the type of personalized, detailed decisions Plaintiffs now suggest are required. The Department is committed to complying with its regulations and the APA in adjudicating borrower defense claims and notifying borrowers of final decisions. It will not, however, move for final approval of the settlement agreement if Plaintiffs continue to press their interpretation, since there clearly would not be a meeting of the minds by the parties on whether the agreement governs the content or substance of borrower defense decisions. *Cf., e.g.*, *Tai Ham v. Selectron Int'l Optronics*, LLC, 324 F. App'x 583, 584 (9th Cir. 2009) (affirming denial of motion to enforce settlement agreement where parties had no "meeting of the minds" as to the meaning of a "material term"). The Department's understanding that it

would continue to utilize the types of form denial letters that it had been using for as many as four months prior to executing the Agreement—including during the course of this litigation and the parties' lengthy settlement negotiations—was an important factor in the Department's determination of the amount of time that is necessary to issue decisions on all class members' claims and, ultimately, the timeline it would commit to in any settlement agreement.

Consistent with the Department's understanding, the parties' settlement agreement requires only that borrower defense decisions be issued according to prescribed timelines, not what any particular decision must say about the merits of the claim. *E.g.*, Agreement § IV.A.1.i (defining the "final decision" that must be issued to each class member as a "decision by Defendants resolving a borrower defense application, including a determination of how much relief the claimant is entitled to, if any"). The Agreement also expressly recognizes that, if any plaintiff has a dispute regarding the Department's decision to deny their borrower defense claim, they retain the right to challenge that decision, as the Court pointed out in granting preliminary approval. *See* Order Granting Prelim. Settlement Approval at 3, ECF No. 103. Plaintiffs can also seek reconsideration from the Department. All of this is consistent with the fact that this case is, and has always been, solely about the Department's obligation to restart the conveyor belt of deciding borrower defense claims, not the substance of those decisions or the process for issuing them. *See, e.g.*, Compl., Prayer for Relief, ECF No. 1; Class Notice, ECF No. 97-2 at 27 ("The lawsuit is ONLY about the fact that final decisions were not issued during that period of time, NOT whether those applications should results in loan cancellation or not."); Pls.' Reply in Supp. of Mot. for Class Certification at 5, ECF No. 42 (Plaintiffs do "not ask the [C]ourt to opine on the substance or process for adjudicating their individual borrower defenses"); Order Granting Mot. for Class Certification at 12, ECF No. 46 (granting class certification based on the fact that this lawsuit was filed "to ultimately obtain *a* decision" – not to dictate "the outcome of each application").[1]

---

[1] Even if the Court were nonetheless inclined to agree with Plaintiffs that the parties' agreement *should* govern the content or substance of borrower defense decisions, it is "not permitted to modify settlement terms or in any manner to rewrite agreements reached by parties." *Jeff D. v. Andrus*, 899 F.2d 753, 758 (9th Cir. 1989); *see also In re Anthem, Inc. Data Breach Litig.*, 327 F.R.D. 299, 326 (N.D. Cal. 2018) (noting that a court "may grant or deny approval of [a class action settlement], not revise its terms").

Dated:  September 4, 2020

Respectfully submitted,

ETHAN P. DAVIS
Acting Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ R. Charlie Merritt*
R. CHARLIE MERRITT (VA Bar # 89400)
KATHRYN C. DAVIS
KEVIN P. HANCOCK
Trial Attorneys
Civil Division, Federal Programs Branch
U.S. Department of Justice
919 East Main Street, Suite 1900
Richmond, VA 23219
Telephone: (202) 616-8098
Fax: (804) 819-7417
E-mail: robert.c.merritt@usdoj.gov

*Attorneys for Defendants*

**GovSER-014**

**Exhibit A**

GovSER-015

**Subject for email:** Borrower defense discharge ineligibility information for you


DATE

Borrower Defense Application#: [Case Number]

Dear [Primary Contact Name]:

The U.S. Department of Education (ED) has completed its review of your application under the applicable Borrower Defense to Repayment regulations for discharge of your William D. Ford Federal Direct Loans (Direct Loans) made in connection with your or your child's enrollment at a school operated by Corinthian Colleges, Inc. (CCI), including Everest Institute, Everest College, Everest University, Heald College, and WyoTech. ED has determined that your application is ineligible for relief based on review of the facts of your claim and the regulatory criteria for relief; this decision means that your Direct Loans will not be discharged. ED explains the reasons below.

**Applicable Law**

For Direct Loans first disbursed prior to July 1, 2017, a borrower may be eligible for a discharge (forgiveness) of part or all of one or more Direct Loans if the borrower's school engaged in acts or omissions that would give rise to a cause of action against the school under applicable state law. *See* § 455(h) of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1087e(h), and 34 C.F.R. § 685.206(c) and 685.222 (the Borrower Defense regulations). ED recognizes a borrower's defense to repayment of a Direct Loan only if the cause of action directly relates to the Direct Loan or to the school's provision of educational services for which the Direct Loan was provided. 34 C.F.R. §§685.206(c)(1), 685.222(a)(5); U.S. Department of Education, Notice of Interpretation, 60 Fed. Reg. 37,769 (Jul. 21, 1995).

**Borrower Defense Claims Based on CCI Job Placement Rates**

ED has determined that students who first enrolled in certain programs at certain schools operated by CCI between 2010 and 2014 have borrower defense claims arising from the publication of misleading job placement rates for many of their programs of study and are eligible for a discharge of part or all of their loans under ED's Borrower Defense regulation. Lists of covered programs and time periods are available online at these links for Everest/WyoTech and Heald, respectively: StudentAid.gov/ev-wy-findings and StudentAid.gov/heald-findings (the "covered programs").

In order to have a successful borrower defense claim based on ED's Corinthian Colleges, Inc. findings, you must have enrolled in one of the covered programs during a listed time period. ED has established a process for the review of borrower defense to repayment claims for job placement rates asserted by borrowers enrolled in the covered programs at CCI schools during the eligibility period. Each CCI borrower's application is reviewed under the same process to determine whether the borrower qualifies for borrower defense to payment relief based on a CCI school job placement rate claim.

**Why was my application determined to be ineligible?**

ED reviewed your application regarding the campus(es) you attended, the program(s) in which you enrolled, and the date(s) that you enrolled. ED also reviewed data from the National Student Loan Data System (NSLDS®) and, if available, school-provided data regarding your program(s) and enrollment date(s), in addition to the enrollment information on any official school documents that you provided with

your application. "You" as used here should be read to include your child if you are a Direct PLUS Loan borrower who requested a discharge for loans taken out to pay for a child's enrollment at a CCI-operated institution.

Based on that review, ED has determined that you did not enroll in a covered program at a CCI school during the eligibility period. Either (a) the initial enrollment date(s) or program(s) you provided in your application fell outside the eligibility period for a covered program(s) at one or more of the CCI campuses or (b) both NSLDS data and the school's data demonstrated that you were not enrolled in a covered program at one or more of the CCI schools during the eligibility period.

Moreover, your borrower defense application did not describe any other act or omission by the CCI schools that related to the making of your Direct Loan(s) for enrollment or the provision of educational services for which the Direct Loan(s) was made and that would be actionable under state law. Accordingly, ED has determined that your borrower defense to repayment application is ineligible and will not discharge your Direct Loan(s).

Your borrower defense application was evaluated based on California state law and the following circumstances: [Decision Reason].

**What if I do not agree with this decision?**

If you disagree with this decision, you may ask ED to reconsider your application. To submit a request for reconsideration, please send an email with the subject line "Request for Reconsideration [Reference ID]" to BorrowerDefense@ed.gov or mail your request to U.S. Department of Education, P.O. Box 1854, Monticello, KY 42633. In your Request for Reconsideration, please provide the following information:

1. Why you believe that ED decided incorrectly your CCI job placement rate borrower defense to repayment claim; and

2. Identify and provide any evidence that demonstrates why ED should approve your CCI job placement rate borrower defense to repayment claim under the applicable law set forth above.

ED will not accept any Request for Reconsideration that includes new allegations. If you wish to assert allegations that were not included in your application, please see the following section. Additionally, your loans will not be placed into forbearance during the reconsideration process. Failure to begin or resume repayment will result in collection activity, including administrative wage garnishment, offset of state and federal payments you may be owed, and litigation. For more information about the reconsideration process, please contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. Eastern time (ET) on Monday through Friday.

**Can I apply for borrower defense if I have additional claims?**

If you wish to file a new application regarding acts or omissions by the school other than those described in borrower defense application [Case Number], please submit an application at StudentAid.gov/borrower-defense. In the new application, you should explain in the relevant section(s) the basis for any new borrower defense claim(s) and submit all supporting evidence.

**What should I do now?**

Because your borrower defense to repayment application was found to be ineligible, you are responsible for repayment of your loans. ED will notify your servicer(s) of the decision on your

borrower defense to repayment application within the next 15 calendar days, and your servicer will contact you within the next 30 to 60 calendar days to inform you of your loan balance. Further, if any loan balance remains, the loans will return to their status prior to the submission of your application. If your loans were in forbearance as a result of your borrower defense to repayment application, the servicer will remove those loans from forbearance. **\*See COVID-19 Note below.**

If your loans are in default and are currently in stopped collections, your loans will be removed from stopped collections. Failure to begin or resume repayment could result in collection activity such as administrative wage garnishment, offset of state and federal payments that you may be owed, and litigation. **\*See COVID-19 Note below.**

While normally interest would not be waived for unsuccessful borrower defense applications, given the extended period of time it took ED to complete the review of this application, the Secretary is waiving any interest that accrued on your Direct Loans from the date of the filing of your borrower defense application to the date of this notification. Your servicer will provide additional information in the coming months regarding the specific amount of interest adjusted. **\*See COVID-19 Note below.**

**\*COVID-19 Note:** On March 27, 2020, the president signed the *CARES Act,* which, among other things, provides broad relief in response to the coronavirus disease 2019 (COVID-19) for federal student loan borrowers whose loans are owned by ED. For the period March 13, 2020, through September 30, 2020, the interest rate on the loans will be 0% and no payments will be required. During this same period for defaulted borrowers, all proactive collection activities, wage garnishments, and Treasury offsets will be stopped. Your federal loan servicer will answer any questions you have about your specific situation. In addition, Federal Student Aid's COVID-19 information page for students, borrowers, and parents is located at StudentAid.gov/coronavirus. Please visit the page regularly for updates.

**What if I have another pending borrower defense application?**

If you have additional pending borrower defense to repayment applications, this information applies to you:

- If your loans associated with an additional borrower defense to repayment application that is still pending are in forbearance or another status that does not require you to make payments, your loans will remain in forbearance or that other status. Similarly, if your loans associated with that borrower defense application are in default and you are currently in stopped collections, those loans will remain in stopped collections.

- If you are unsure if you have additional pending applications, or if you would like to check on the status of your loans associated with an additional application, contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. ET on Monday through Friday.

ED offers a variety of loan repayment options, including the standard 10-year repayment plan, as well as extended repayment, graduated repayment, and income-driven repayment plans. For more information about student loan repayment options, visit StudentAid.gov/plans. If you have questions about the status of your loans or questions about repayment options, please contact your servicer(s). If you do not know

the name of your federal loan servicer, you may go to [StudentAid.gov](StudentAid.gov) to find your servicer and view your federal loan information.

Sincerely,

U.S. Department of Education
Federal Student Aid

**Exhibit B**

**Subject for email:** Borrower defense discharge ineligibility information for you

DATE

Borrower Defense Application#: [Case Number]

Dear [Primary Contact Name]:

The U.S. Department of Education (ED) has completed its review of your application under the applicable Borrower Defense to Repayment regulations for discharge of your William D. Ford Federal Direct Loans (Direct Loans) made in connection with your or your child's enrollment at a school operated by Corinthian Colleges, Inc. (CCI), including Everest Institute, Everest College, Everest University, Heald College, and WyoTech. "You" as used here should be read to include your child if you are a Direct PLUS Loan borrower who requested a discharge for loans taken out to pay for a child's enrollment at a CCI-operated institution. ED has determined that your application is ineligible for relief based on review of the facts of your claim and the regulatory criteria for relief; this decision means that your Direct Loans will not be discharged. ED explains the reasons below.

**Applicable Law**

For Direct Loans first disbursed prior to July 1, 2017, a borrower may be eligible for a discharge (forgiveness) of part or all of one or more Direct Loans if the borrower's school engaged in acts or omissions that would give rise to a cause of action against the school under applicable state law. *See* § 455(h) of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1087e(h), and 34 C.F.R. § 685.206(c) and 685.222 (the Borrower Defense regulations). ED recognizes a borrower's defense to repayment of a Direct Loan only if the cause of action directly relates to the Direct Loan or to the school's provision of educational services for which the Direct Loan was provided. 34 C.F.R. §§685.206(c)(1), 685.222(a)(5); U.S. Department of Education, Notice of Interpretation, 60 Fed. Reg. 37,769 (Jul. 21, 1995).

**Borrower Defense Claims Based on CCI Job Placement Rates**

ED has determined that students who enrolled in certain programs at certain schools operated by CCI between 2010 and 2014 have borrower defense claims arising from the publication of misleading job placement rates for many of their programs of study and are eligible for a discharge of part or all of their loans under ED's Borrower Defense regulation. Lists of covered programs and time periods are available online at these links for Everest/WyoTech and Heald, respectively: StudentAid.gov/ev-wy-findings and StudentAid.gov/heald-findings (the "covered programs").

In order to have a successful borrower defense claim based on ED's CCI findings, you must have enrolled in one of the covered programs during a listed time period. ED has established a process for the review of borrower defense to repayment claims for job placement rates asserted by borrowers enrolled in the covered programs at CCI schools during the eligibility period. Each CCI borrower's application is reviewed under the same process to determine whether the borrower qualifies for borrower defense to payment relief based on a CCI school job placement rate claim.

**Why was my application determined to be ineligible for CCI Job Placement Rates?**

ED reviewed your application regarding the campus(es) you attended, the program(s) in which you enrolled, and the date(s) that you enrolled. ED also reviewed data from the National Student Loan Data

**GovSER-021**

System (NSLDS®) and, if available, school-provided data regarding your program(s) and enrollment date(s), in addition to the enrollment information on any official school documents that you provided with your application.

Based on that review, ED has determined that you did not enroll in a covered program at a CCI school during the eligibility period. Either (a) the initial enrollment date(s) or program(s) you provided in your application fell outside the eligibility period for a covered program(s) at one or more of the CCI campuses or (b) both NSLDS data and the school's data demonstrated that you were not enrolled in a covered program at one or more of the CCI schools during the eligibility period.

Accordingly, based upon our review of your job placement rate allegation, ED has determined that your borrower defense to repayment application is ineligible and will not discharge your Direct Loan(s).

**Why was my application determined to be ineligible for other allegations?**

In addition, ED reviewed your other borrower defense claims based on any evidence submitted by you in support of your application, your loan data from NSLDS, and evidence provided by other borrowers.

Allegation 1: [Allegation Type]

You allege that [Primary School] engaged in misconduct related to [Allegation Type]. This allegation fails for the following reason(s): [Review Recommendation Reason].

Your claim for relief on this basis therefore is denied.

Allegation 2: [Allegation Type]

You allege that [Primary School] engaged in misconduct related to [Allegation Type]. This allegation fails for the following reason(s): [Review Recommendation Reason].

Your claim for relief on this basis therefore is denied.

[Allegation X: Repeat as needed]

**What evidence was considered in determining my application's ineligibility for other allegations?**

We reviewed evidence provided by you, other borrowers, and the school. Additionally, we considered evidence gathered from the following sources:

**[INSERT EVIDENCE CONSIDERED SET A for applicants whose primary school name begins with Everest, Las Vegas, Bryman, Altierus, or WyoTech]**

1.  Documents from the Illinois, California, Massachusetts and Wisconsin Attorneys General

2.  Data from National Center for Education Statistics

3.  *Transfer Credit Practices of Designated Educational Institutions*, American Association of Collegiate Registrars and Admissions Officers (the 1994-1996, 1996-1998, 1998-2000, 2006, 2009, 2012, and 2015 editions.)

4.  Government Accountability Office report, *Transfer Students Postsecondary Institutions Could Promote More Consistent Consideration of Coursework by Not Basing Determinations on Accreditation* (GAO-06-22, October 2005)

5.  Statements from former Corinthian Colleges Inc., executive Mark Pelesh

6.  Heald Fine Letter. *See* https://www.ed.gov/news/press-releases/us-department-education-fines-corinthian-colleges-30-million-misrepresentation.

**OR**

**[INSERT Evidence Considered Set B for applicants whose primary school begins with Heald]**

1.  Documents from the California and Massachusetts Attorneys General

2.  "Heald College Transfer Guide," Student Guide to Transfer, 10/14/14 (Aug. 23, 2016); Heald College Academic Catalog, Effective July 2014

3.  California State University transfer policies

4.  *Transfer Credit Practices of Designated Educational Institutions*, American Association of Collegiate Registrars and Admissions Officers (the 2012 and 2015 editions)

5.  Heald Fine Letter. *See* https://www.ed.gov/news/press-releases/us-department-education-fines-corinthian-colleges-30-million-misrepresentation.

**What if I do not agree with this decision?**

If you disagree with this decision, you may ask ED to reconsider your application. To submit a request for reconsideration, please send an email with the subject line "Request for Reconsideration [Reference ID]" to BorrowerDefense@ed.gov or mail your request to U.S. Department of Education, P.O. Box 1854, Monticello, KY 42633. In your Request for Reconsideration, please provide the following information:

1.  Which allegation(s) you believe that ED incorrectly decided;

2.  Why you believe that ED incorrectly decided your borrower defense to repayment application; and

3.  Identify and provide any evidence that demonstrates why ED should approve your borrower defense to repayment claim under the applicable law set forth above.

ED will not accept any Request for Reconsideration that includes new allegations. If you wish to assert allegations that were not included in your application, please see the following section. Additionally, your loans will not be placed into forbearance during the reconsideration process. Failure to begin or resume repayment will result in collection activity, including administrative wage garnishment, offset of state and federal payments you may be owed, and litigation. For more information about the reconsideration process, please contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. Eastern time (ET) on Monday through Friday.

**Can I apply for borrower defense if I have additional claims?**

If you wish to file a new application regarding acts or omissions by the school other than those described in borrower defense application [Case Number], please submit an application at StudentAid.gov/borrower-defense. In the new application, you should explain in the relevant section(s) the basis for any new borrower defense claim(s) and submit all supporting evidence.

**What should I do now?**

Because your borrower defense to repayment application was found to be ineligible, you are responsible for repayment of your loans. ED will notify your servicer(s) of the decision on your borrower defense to repayment application within the next 15 calendar days, and your servicer will contact you within the next 30 to 60 calendar days to inform you of your loan balance. Further, if any loan balance remains, the loans will return to their status prior to the submission of your application. If your loans were in forbearance as a result of your borrower defense to repayment application, the servicer will remove those loans from forbearance. **\*See COVID-19 Note below.**

If your loans are in default and are currently in stopped collections, your loans will be removed from stopped collections. Failure to begin or resume repayment could result in collection activity such as administrative wage garnishment, offset of state and federal payments that you may be owed, and litigation. **\*See COVID-19 Note below.**

While normally interest would not be waived for unsuccessful borrower defense applications, given the extended period of time it took ED to complete the review of this application, the Secretary is waiving any interest that accrued on your Direct Loans from the date of the filing of your borrower defense application to the date of this notification. Your servicer will provide additional information in the coming months regarding the specific amount of interest adjusted. **\*See COVID-19 Note below.**

**\*COVID-19 Note:** On March 27, 2020, the president signed the *CARES Act,* which, among other things, provides broad relief in response to the coronavirus disease 2019 (COVID-19) for federal student loan borrowers whose loans are owned by ED. For the period March 13, 2020, through September 30, 2020, the interest rate on the loans will be 0% and no payments will be required. During this same period for defaulted borrowers, all proactive collection activities, wage garnishments, and Treasury offsets will be stopped. Your federal loan servicer will answer any questions you have about your specific situation. In addition, Federal Student Aid's COVID-19 information page for students, borrowers, and parents is located at StudentAid.gov/coronavirus. Please visit the page regularly for updates.

**What if I have another pending borrower defense application?**

If you have additional pending borrower defense to repayment applications, this information applies to you:

- If your loans associated with an additional borrower defense to repayment application that is still pending are in forbearance or another status that does not require you to make payments, your loans will remain in forbearance or that other status. Similarly, if your loans associated with that borrower defense application are in default and you are currently in stopped collections, those loans will remain in stopped collections.

- If you are unsure if you have additional pending applications, or if you would like to check on the status of your loans associated with an additional application, contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. ET on Monday through Friday.

ED offers a variety of loan repayment options, including the standard 10-year repayment plan, as well as extended repayment, graduated repayment, and income-driven repayment plans. For more information about student loan repayment options, visit StudentAid.gov/plans. If you have questions about the status of your loans or questions about repayment options, please contact your servicer(s). If you do not know the name of your federal loan servicer, you may go to StudentAid.gov to find your servicer and view your federal loan information.

Sincerely,

U.S. Department of Education
Federal Student Aid

**Exhibit C**

**Subject for email:** Borrower defense discharge ineligibility information for you


DATE

Borrower Defense Application #: [Case Number]

Dear [Primary Contact Name]:

The U.S. Department of Education (ED) has completed its review of your application under the applicable Borrower Defense to Repayment regulations for discharge of your William D. Ford Federal Direct Loans (Direct Loans) made in connection with your or your child's enrollment at [Primary School]. ED has determined that your application is ineligible for relief based on review of the facts of your claim and the regulatory criteria for relief; this decision means that your Direct Loans will not be discharged. ED explains the reasons below.

**Applicable Law**

For Direct Loans first disbursed prior to July 1, 2017, a borrower may be eligible for a discharge (forgiveness) of part or all of one or more Direct Loans if the borrower's school engaged in acts or omissions that would give rise to a cause of action against the school under applicable state law. *See* § 455(h) of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1087e(h), and 34 C.F.R. § 685.206(c) and 685.222 (the Borrower Defense regulations). ED recognizes a borrower's defense to repayment of a Direct Loan only if the cause of action directly relates to the Direct Loan or to the school's provision of educational services for which the Direct Loan was provided. 34 C.F.R. §§685.206(c)(1), 685.222(a)(5); U.S. Department of Education, Notice of Interpretation, 60 Fed. Reg. 37,769 (Jul. 21, 1995).

**Why was my application determined to be ineligible?**

ED reviewed your borrower defense claim based on any evidence submitted by you in support of your application, your loan data from the National Student Loan Data System (NSLDS®), and evidence provided by other borrowers.

<u>Allegation 1: [Allegation Type]</u>

You allege that [Primary School] engaged in misconduct related to [Allegation Type]. This claim fails for the following reason(s): [Review Recommendation Reason].

Your claim for relief on this basis therefore is denied.

<u>Allegation 2: [Allegation Type]</u>

You allege that [Primary School] engaged in misconduct related to [Allegation Type]. This claim fails for the following reason(s): [Review Recommendation Reason].

Your claim for relief on this basis therefore is denied.

[Allegation X: Repeat as needed]

**What if I do not agree with this decision?**

If you disagree with this decision, you may ask ED to reconsider your application. To submit a request for reconsideration, please send an email with the subject line "Request for Reconsideration [Reference ID]" to BorrowerDefense@ed.gov or mail your request to U.S. Department of Education, P.O. Box 1854, Monticello, KY 42633. In your Request for Reconsideration, please provide the following information:

1. Why you believe that ED decided incorrectly your borrower defense to repayment claim; and

2. Identify and provide any evidence that demonstrates why ED should approve your borrower defense to repayment claim under the applicable law set forth above.

ED will not accept any Request for Reconsideration that includes new allegations. If you wish to assert allegations that were not included in your application, please see the following section. Additionally, your loans will not be placed into forbearance during the reconsideration process. Failure to begin or resume repayment will result in collection activity, including administrative wage garnishment, offset of state and federal payments you may be owed, and litigation. For more information about the reconsideration process, please contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. Eastern time (ET) on Monday through Friday.

**Can I apply for borrower defense if I have additional claims?**

If you wish to file a new application regarding acts or omissions by the school other than those described in borrower defense application [Case Number], please submit an application at StudentAid.gov/borrower-defense. In the new application, you should explain in the relevant section(s) the basis for any new borrower defense claim(s) and submit all supporting evidence.

**What should I do now?**

Because your borrower defense to repayment application was found to be ineligible, you are responsible for repayment of your loans. ED will notify your servicer(s) of the decision on your borrower defense to repayment application within the next 15 calendar days, and your servicer will contact you within the next 30 to 60 calendar days to inform you of your loan balance. Further, if any loan balance remains, the loans will return to their status prior to the submission of your application. If your loans were in forbearance as a result of your borrower defense to repayment application, the servicer will remove those loans from forbearance. **\*See COVID-19 Note below.**

If your loans are in default and are currently in stopped collections, your loans will be removed from stopped collections. Failure to begin or resume repayment could result in collection activity such as administrative wage garnishment, offset of state and federal payments that you may be owed, and litigation. **\*See COVID-19 Note below.**

While normally interest would not be waived for unsuccessful borrower defense applications, given the extended period of time it took ED to complete the review of this application, the Secretary is waiving any interest that accrued on your Direct Loans from the date of the filing of your borrower defense application to the date of this notification. Your servicer will provide additional information in the coming months regarding the specific amount of interest adjusted. **\*See COVID-19 Note below.**

**\*COVID-19 Note:** On March 27, 2020, the president signed the *CARES Act,* which, among other things, provides broad relief in response to the coronavirus disease 2019 (COVID-19) for federal student loan borrowers whose loans are owned by ED. For the period March 13, 2020, through September 30, 2020, the interest rate on the loans will be 0% and no payments will be required. During this same period for defaulted borrowers, all proactive collection activities, wage garnishments, and Treasury offsets will be stopped. Your federal loan servicer will answer any questions you have about your specific situation. In addition, Federal Student Aid's COVID-19 information page for students, borrowers, and parents is located at StudentAid.gov/coronavirus. Please visit the page regularly for updates.

**What if I have another pending borrower defense application?**

If you have additional pending borrower defense to repayment applications, this information applies to you:

- If your loans associated with an additional borrower defense to repayment application that is still pending are in forbearance or another status that does not require you to make payments, your loans will remain in forbearance or that other status. Similarly, if your loans associated with that borrower defense application are in default and you are currently in stopped collections, those loans will remain in stopped collections.

- If you are unsure if you have additional pending applications, or if you would like to check on the status of your loans associated with an additional application, contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. ET on Monday through Friday.

ED offers a variety of loan repayment options, including the standard 10-year repayment plan, as well as extended repayment, graduated repayment, and income-driven repayment plans. For more information about student loan repayment options, visit StudentAid.gov/plans. If you have questions about the status of your loans or questions about repayment options, please contact your servicer(s). If you do not know the name of your federal loan servicer, you may go to StudentAid.gov to find your servicer and view your federal loan information.

Sincerely,

U.S. Department of Education
Federal Student Aid

**Exhibit D**

**Subject for email:** Borrower defense discharge ineligibility information for you

DATE

Borrower Defense Application#: [Case Number]

Dear [Primary Contact Name]:

The U.S. Department of Education (ED) has completed its review of your application under the applicable Borrower Defense to Repayment regulations for discharge of your William D. Ford Federal Direct Loans (Direct Loans) made in connection with your or your child's enrollment at [Primary School]. "You" as used here should be read to include your child if you are a Direct PLUS Loan borrower who requested a discharge for loans taken out to pay for a child's enrollment at [Primary School]. ED has determined that your application is ineligible for relief based on review of the facts of your claim and the regulatory criteria for relief; this decision means that your Direct Loans will not be discharged. ED explains the reasons below.

**Applicable Law**

For Direct Loans first disbursed prior to July 1, 2017, a borrower may be eligible for a discharge (forgiveness) of part or all of one or more Direct Loans if the borrower's school engaged in acts or omissions that would give rise to a cause of action against the school under applicable state law. *See* § 455(h) of the Higher Education Act of 1965, as amended, 20 U.S.C. § 1087e(h), and 34 C.F.R. § 685.206(c) and 685.222 (the Borrower Defense regulations). ED recognizes a borrower's defense to repayment of a Direct Loan only if the cause of action directly relates to the Direct Loan or to the school's provision of educational services for which the Direct Loan was provided. 34 C.F.R. §§685.206(c)(1), 685.222(a)(5); U.S. Department of Education, Notice of Interpretation, 60 Fed. Reg. 37,769 (Jul. 21, 1995).

**Why was my application determined to be ineligible?**

ED reviewed your borrower defense claims based on any evidence submitted by you in support of your application, your loan data from National Student Loan Data System (NSLDS®), and evidence provided by other borrowers.

<u>Allegation 1: [Allegation Type]</u>

You allege that [Primary School] engaged in misconduct related to [Allegation Type]. This allegation fails for the following reason(s): [Review Recommendation Reason].

Your claim for relief on this basis therefore is denied.

<u>Allegation 2: [Allegation Type]</u>

You allege that [Primary School] engaged in misconduct related to [Allegation Type]. This allegation fails for the following reason(s): [Review Recommendation Reason].

Your claim for relief on this basis therefore is denied.

[Allegation X: Repeat as needed]

**What evidence was considered in determining my application's ineligibility?**

We reviewed evidence provided by you and other borrowers who attended your school. Additionally, we considered evidence gathered from the following sources:

[Evidence Considered]

**What if I do not agree with this decision?**

If you disagree with this decision, you may ask ED to reconsider your application. To submit a request for reconsideration, please send an email with the subject line "Request for Reconsideration [Reference ID]" to BorrowerDefense@ed.gov or mail your request to U.S. Department of Education, P.O. Box 1854, Monticello, KY 42633. In your Request for Reconsideration, please provide the following information:

1. Which allegation(s) you believe that ED incorrectly decided;

2. Why you believe that ED incorrectly decided your borrower defense to repayment application; and

3. Identify and provide any evidence that demonstrates why ED should approve your borrower defense to repayment claim under the applicable law set forth above.

ED will not accept any Request for Reconsideration that includes new allegations. If you wish to assert allegations that were not included in your application, please see the following section. Additionally, your loans will not be placed into forbearance unless your request for reconsideration is accepted and your case is reopened. Failure to begin or resume repayment will result in collection activity, including administrative wage garnishment, offset of state and federal payments you may be owed, and litigation. For more information about the reconsideration process, please contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. Eastern time (ET) on Monday through Friday.

**Can I apply for borrower defense if I have additional claims?**

If you wish to file a new application regarding acts or omissions by the school other than those described in borrower defense application [Case Number], please submit an application at StudentAid.gov/borrower-defense. In the new application, you should explain in the relevant section(s) the basis for any new borrower defense claim(s) and submit all supporting evidence.

**What should I do now?**

Because your borrower defense to repayment application was found to be ineligible, you are responsible for repayment of your loans. ED will notify your servicer(s) of the decision on your borrower defense to repayment application within the next 15 calendar days, and your servicer will contact you within the next 30 to 60 calendar days to inform you of your loan balance. Further, if any loan balance remains, the loans will return to their status prior to the submission of your application. If your loans were in forbearance as a result of your borrower defense to repayment application, the servicer will remove those loans from forbearance. **\*See COVID-19 Note below.**

If your loans are in default and are currently in stopped collections, your loans will be removed from stopped collections. Failure to begin or resume repayment could result in collection activity such as administrative wage garnishment, offset of state and federal payments that you may be owed, and litigation. **\*See COVID-19 Note below.**

While normally interest would not be waived for unsuccessful borrower defense applications, given the extended period of time it took ED to complete the review of this application, the Secretary is waiving any interest that accrued on your Direct Loans from the date of the filing of your borrower defense application to the date of this notification. Your servicer will provide additional information in the coming months regarding the specific amount of interest adjusted. **\*See COVID-19 Note below.**

**\*COVID-19 Note:** On March 27, 2020, the president signed the *CARES Act,* which, among other things, provides broad relief in response to the coronavirus disease 2019 (COVID-19) for federal student loan borrowers whose loans are owned by ED. For the period March 13, 2020, through September 30, 2020, the interest rate on the loans will be 0% and no payments will be required. During this same period for defaulted borrowers, all proactive collection activities, wage garnishments, and Treasury offsets will be stopped. Your federal loan servicer will answer any questions you have about your specific situation. In addition, Federal Student Aid's COVID-19 information page for students, borrowers, and parents is located at StudentAid.gov/coronavirus. Please visit the page regularly for updates.

**What if I have another pending borrower defense application?**

If you have additional pending borrower defense to repayment applications, this information applies to you:

- If your loans associated with an additional borrower defense to repayment application that is still pending are in forbearance or another status that does not require you to make payments, your loans will remain in forbearance or that other status. Similarly, if your loans associated with that borrower defense application are in default and you are currently in stopped collections, those loans will remain in stopped collections.

- If you are unsure if you have additional pending applications, or if you would like to check on the status of your loans associated with an additional application, contact our borrower defense hotline at 1-855-279-6207 from 8 a.m. to 8 p.m. ET on Monday through Friday.

ED offers a variety of loan repayment options, including the standard 10-year repayment plan, as well as extended repayment, graduated repayment, and income-driven repayment plans. For more information about student loan repayment options, visit StudentAid.gov/plans. If you have questions about the status of your loans or questions about repayment options, please contact your servicer(s). If you do not know the name of your federal loan servicer, you may go to StudentAid.gov to find your servicer and view your federal loan information.

Sincerely,

U.S. Department of Education
Federal Student Aid

JOSEPH JARAMILLO (SBN 178566)
jjaramillo@heraca.org
HOUSING & ECONOMIC RIGHTS
ADVOCATES
3950 Broadway, Suite 200
Oakland, California 94611
Tel.: (510) 271-8443
Fax: (510) 868-4521

EILEEN M. CONNOR (SBN 248856)
econnor@law.harvard.edu
REBECCA C. ELLIS *(pro hac vice)*
rellis@law.harvard.edu
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
Tel.: (617) 390-3003
Fax: (617) 522-0715

*Attorneys for Plaintiffs*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA

THERESA SWEET, ALICIA DAVIS, TRESA APODACA, CHENELLE ARCHIBALD, DANIEL DEEGAN, SAMUEL HOOD, and JESSICA JACOBSON on behalf of themselves and all others similarly situated,

     *Plaintiffs*,

     v.

MIGUEL CARDONA, in his official capacity as Secretary of the United States Department of Education, and

THE UNITED STATES DEPARTMENT OF EDUCATION,

     *Defendants*.

Case No.: 19-cv-03674-WHA

**PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT**

**HEARING DATE: July 28, 2022**

(Class Action)
(Administrative Procedure Act Case)

1

GovSER-034

# **TABLE OF CONTENTS**

NOTICE OF MOTION ................................................................................................ 1

RELIEF REQUESTED ............................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITY .................................................... 2

I. Introduction ............................................................................................................ 2

II. Statement of Facts ................................................................................................. 3

    A.    Statutory and Regulatory Framework .............................................. 3

    B.    The 'No Decisions' Policy: ED Abdicates Its Obligation to Decide Applications (Section 706(1) Claim) .......................................................... 3

    C.    The 'Presumption of Denial' Policy Jettisons BD Applications Regardless of Merit (Section 706(2) and Due Process Claims) ................................. 9

    D.    The Form Denial Notices: Operationalizing the Presumption of Denial (Section 555(e) and Due Process Claims) ........................................ 13

           1.    Content of the Form Denial Notices............................................. 14

           2.    The Massive Wave of Denials ...................................................... 14

    E.    Harm to the Class ............................................................................ 15

III. Procedural History .............................................................................................. 16

IV. Standard of Review............................................................................................. 17

V. Argument ............................................................................................................. 19

    A.    Defendants Have Unreasonably Delayed Decisions on BD Applications in Violation of APA § 706(1) ............................................................... 19

           1.    Defendants Have Failed to Perform a Discrete Agency Action ....... 20

           2.    Defendants' Failure to Fulfill Their Mandatory Duty Is Not Reasonable ........................................................................... 21

    B.    The 'Presumption of Denial' Policy Is Unlawful ............................... 23

           1.    The Policy Is Arbitrary, Capricious, an Abuse of Discretion, and Contrary to Law, in Violation of APA § 706(2) ............................. 23

                a)   The Policy Is a "Final Agency Action" Under Section 706(2) ... 24

                b)   The Policy Contravenes the 1994 and 2016 Regulations .......... 24

                c)   The Policy Is Arbitrary, Capricious, and Was Developed and Implemented in Bad Faith ...................................................... 26

           2.    The 'Presumption of Denial' Policy Deprives Class Members of Their Property Interests Without Due Process of Law .................. 28

i

**GovSER-035**

a) Class Members Have a Property Interest in Raising a Defense to Repayment of Their Federal Student Loans ................................. 28

b) ED Deprived Class Members of These Interests Without Due Process of Law ........................................................................ 29

C. The Form Denial Notices Are Unlawful ....................................…............. 30

1. The Notices Violate APA § 555(e) ............................................... 30

2. The Notices Violate the Due Process Clause ................................. 32

D. The Court Is Authorized to Grant the Relief that Plaintiffs Seek ...................…... 33

1. The HEA's Anti-Injunction Provision Does Not Foreclose Relief ................................................................................................ 34

2. Remand to ED Would Be Futile .................................................. 34

VI. Conclusion ................................................................................................................ 37

ii

GovSER-036

## TABLE OF AUTHORITIES

**Cases**

*Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130 (9th Cir. 2000) ........................ 15

*Air Line Pilots Ass'n, Intl. v. Civil Aeronautics Bd.*, 750 F.2d 81 (D.C. Cir. 1984).................... 20

*Al Otro Lado, Inc. v. Mayorkas*, No. 17-CV-02366-BAS-KSC, 2021 WL 3931890 (S.D. Cal. Sept. 2, 2021) ........................................................ 19, 33, 35

*Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343 (D.C. Cir. 2014) ........................ 31

*Armstrong v. Reynolds*, 22 F.4th 1058 (9th Cir. 2022)........................ 27

*Baystate Medical Center v. Leavitt*, 587 F. Supp. 2d 37 (D.D.C. 2008) ........................ 35

*Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564 (1972) ........................ 28

*Bennett v. Spear*, 520 U.S. 154 (1977) ........................ 23

*Boliero v. Holder*, 731 F.3d 32 (1st Cir. 2013)........................ 33

*Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281 (1974) ........................ 31

*Butte Cty., Cal. v. Hogen*, 613 F.3d 190 (D.C. Cir. 2010)........................ 29, 30

*Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077 (N.D. Cal. 2018) ........................ 3, 4

*Canterbury Career Sch., Inc. v. Riley*, 833 F. Supp. 1097 (D.N.J. 1993) ........................ 33

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ........................ 16

*Ciechon v. City of Chicago*, 686 F.2d 511 (7th Cir. 1982) ........................ 28

*Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ........................ 23

*City of Providence v. Barr*, 385 F. Supp. 3d 160 (D.R.I. 2019) ........................ 20

*Cobell v. Norton*, 240 F.3d 1081 (D.C. Cir. 2001) ........................ 22

*Conner v. City of Santa Ana*, 897 F.2d 1487 (9th Cir. 1990) ........................ 29

*Crossley v. California*, 479 F. Supp. 3d 901 (S.D. Cal. 2020) ........................ 32

*Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019) ........................ 22

*Dickson v. Secretary of Defense*, 68 F.3d 1396 (D.C. Cir. 1995)........................ 31

*Donovan ex rel. Anderson v. Stafford Constr. Co.*, 732 F.2d 954 (D.C. Cir. 1984).................... 34

*E.V. v. Robinson*, 906 F.3d 1082 (9th Cir. 2018)........................ 33

*Eldredge v. Carpenters 46*, 94 F.3d 1366 (9th Cir. 1996)........................ 34

iii

*Empire Health Found. v. Becerra*, No. cv 20-2149-JEB, 2022 WL 370559 (D.D.C. Feb. 8, 2022) ............................................................................................................................................. 35

*Filazapovich v. Dep't of State*, 560 F. Supp. 3d 203 (D.D.C. 2021) ............................................ 20

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985) ............................................................. 33

*Food & Water Watch v. U.S. Envtl. Protection Agency*, 20 F.4th 506 (9th Cir. 2021) .... 17, 22, 23

*Fouts v. Cnty. of Clark*, 76 F. App'x 825 (9th Cir. 2003) ........................................................... 29

*Friends of the Clearwater v. Dombeck*, 222 F.3d 552 (9th Cir. 2000) ......................................... 17

*Gearhart v. U.S. Dep't of Educ.*, No. 19-CV-00750-YGR, 2019 WL 5535798 (N.D. Cal. Oct. 25, 2019) .................................................................................................................................. 33

*George Hyman Const. Co. v. Brooks*, 963 F.2d 1532 (D.C. Cir. 1992) ........................................ 34

*Goldberg v. Kelly*, 397 U.S. 254 (1970) ........................................................................... 28, 31, 32

*Gonzalez v. Sullivan*, 914 F.2d 1197 (9th Cir. 1990) .................................................................. 32

*Higgins v. Spellings*, 663 F. Supp. 2d 788 (W.D. Mo. 2009) ................................................. 27, 30

*Home Box Office, Inc. v. Fed. Commc'ns Comm'n*, 567 F.2d 9 (D.C. Cir. 1977) ...................... 18

*In re A Cmty. Voice*, 878 F.3d 779 (9th Cir. 2017) .................................................................... 20

*In re Pesticide Action Network N. Am.*, 798 F.3d 809 (9th Cir. 2015) ................................. 17, 20

*Indep. Mining Co. v. Babbitt*, 105 F.3d 502 (9th Cir. 1997) ...................................................... 16

*Iraqi & Afghan Allies v. Pompeo*, Civ. A. No. 18-cv-01388 (TSC), 2019 WL 4575565 (D.D.C. Sept. 20, 2019) ......................................................................................................................... 21

*Islander East Pipeline Co. v. Conn. Dep't of Envt'l Protection*, 482 F.3d 79 (2d Cir. 2006)...... 26

*Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123 (1951)................................... 28

*Kapps v. Wing*, 404 F.3d 105 (2d Cir. 2005) ............................................................................. 31

*Lands Council v. Powell*, 395 F.3d 1019 (9th Cir. 2005) ........................................................... 17

*Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342 (11th Cir. 1994) ............................... 27

*Levenstein v. Salafsky*, 164 F.3d 345 (7th Cir. 1998) ................................................................ 28

*Marshall v. Jerrico, Inc.*, 446 U.S. 238 (1980) ......................................................................... 28

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).................................. 16

*MCI Telecomms. Corp. v. FCC*, 627 F.2d 322 (D.C. Cir. 1980) ............................................... 20

GovSER-038

*Meadville Master Antenna, Inc. v. F.C.C.*, 443 F.2d 282 (3d Cir. 1971) ...................................... 30

*Meina Xie v. Kerry*, 780 F.3d 405 (D.C. Cir. 2015) ......................................................... 35

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29 (1983) .....
........................................................................................................................... 17, 23, 25

*Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306 (1950) .................................... 32

*Muwekma Tribe v. Babbitt*, 133 F. Supp. 2d 30 (D.D.C. 2000) ........................................... 21

*N.L.R.B. v. Wyman-Gordon Co.*, 394 U.S. 759 (1969) ................................................ 33, 35

*Natural Resources Def. Council v. Train*, 510 F.2d 692 (D.C. Cir. 1975) ................................. 1

*Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) ............................................... 16, 18

*Nozzi v. Housing Auth. of Los Angeles*, 806 F.3d 1178 (9th Cir. 2015) ................................. 27

*Or. Nat'l Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977 (9th Cir. 2006) ............................. 23

*Orantes-Hernandez v. Thornburgh*, 919 F.2d 549 (9th Cir. 1990)....................................... 34

*Pacharne v. Dep't of Homeland Sec.*, No. 1:21-CV-115-SA-DAS, 2021 WL 4497481 (N.D.
   Miss. Sept. 30, 2021) ................................................................................................ 19, 20

*Portland Audubon Soc'y v. Endangered Species Cmte.*, 984 F. 2d 1534 (9th Cir. 1993) ........... 17

*Pub. Citizen Health Research Group v. Auchter*, 702 F.2d 1150 (D.C. Cir. 1983)..................... 20

*Rai v. Biden*, No. 21-CV-863-TSC, 2021 WL 4439074 (D.D.C. Sept. 27, 2021)...................... 19

*Ramirez v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 7 (D.D.C. 2018) .......................... 35

*San Francisco BayKeeper v. Whitman*, 297 F.3d 877 (9th Cir. 2002) .................................... 17

*Sierra Club v. Thomas*, 658 F. Supp. 165 (N.D. Cal. 1987)................................................. 1

*Simmons v. Smith*, 888 F.3d 994 (8th Cir. 2018) ............................................................ 27

*Singh v. Holder*, 558 F. App'x 76 (2d Cir. 2014) ........................................................... 33

*State of California v. U.S. Dep't of the Interior*, 381 F. Supp. 3d 1153 (N.D. Cal. 2019) ........... 31

*Steffel v. Thompson*, 415 U.S. 452 (1974) .................................................................... 32

*Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir 1984)................................ 16

*Tourus Records, Inc. v. Drug Enforcement Admin.*, 259 F.3d 731 (D.C. Cir. 2001) ............. 29, 31

*Vara v. DeVos*, No. CV 19-12175-LTS, 2020 WL 3489679 (D. Mass. June 25, 2020) ........ 27, 34

*Vargas v. Trainor*, 508 F.2d 485 (7th Cir. 1974)............................................................ 31

v

GovSER-039

*Vascular Imaging Prods., Inc. v. Digirad Corp.*, 401 F. Supp. 3d 1005 (S.D. Cal. 2019).......... 32

*Viet. Veterans of Am. v. Cent. Intelligence Agency*, 811 F.3d 1068 (9th Cir. 2016) ............. 16, 18

*Watson v. Geren* 569 F.3d 115 (2d Cir. 2009)..................................................................... 34

*Williams v. DeVos*, No. CV 16-11949-LTS, 2018 WL 5281741 (D. Mass. Oct. 24, 2018)........ 28

*Withrow v. Larkin*, 421 U.S. 35 (1975)................................................................................ 29

**Statutes**

5 U.S.C. § 551 *et seq.*.................................................................................... 16, 17, 30

**Other Authorities**

81 Fed. Reg. 75,926 (Nov. 1, 2016)......................................................................... 2, 19

83 Fed. Reg. 6,458, 6,467 (Feb. 14, 2018) ....................................................................... 6

84 Fed. Reg. 49788 (Sept. 23, 2019) ............................................................................... 2

**Regulations**

34 C.F.R. § 668.71 ...................................................................................................... 25

34 C.F.R. § 685.206 .............................................................................................. 2, 23

34 C.F.R. § 685.222 ..................................................................................... 25, 27, 28, 30

vi

GovSER-040

## NOTICE OF MOTION

PLEASE TAKE NOTICE that on July 28, 2022, at 8:00 am at the U.S. District Courthouse, 450 Golden Gate Avenue, San Francisco, before the Honorable Judge William H. Alsup, Plaintiffs will and hereby do move the Court pursuant to Federal Rule of Civil Procedure 56 for an Order granting summary judgment in their favor. Plaintiffs move for summary judgment on the ground that there is no genuine dispute as to any material fact and they are entitled to judgment as a matter of law. This Motion is supported by the pleadings and other papers filed in this case, the accompanying memorandum of points and authorities, oral argument, and any other matter of which this Court takes notice.

## RELIEF REQUESTED

Plaintiffs respectfully request that the Court:

1) Declare the Department of Education ("ED") has a mandatory duty to resolve on the merits the borrower defense ("BD") applications of the Named Plaintiffs and the Class, and that Defendants have failed to do so in violation of section 706(1) of the Administrative Procedure Act ("APA");

2) Declare Defendants' Form Denial Notices (as defined *infra*) violate section 555(e) of the APA and class members' rights to procedural due process, and therefore do not constitute lawful decisions on the merits of class members' BD applications;

3) Vacate each and every Form Denial Notice issued by ED, and reinstate the BD applications of all class members who received such a notice;

4) Declare the 'presumption of denial' policy adopted by ED (as defined *infra*) arbitrary, capricious, an abuse of discretion, and not in accordance with law, in violation of section 706(2) of the APA, and deprives class members of their constitutional right to procedural due process;

5) Vacate the 'presumption of denial' policy, including all guidance and/or procedures designed to implement that policy, and enjoin Defendants from applying that policy and associated procedures to evaluate any BD application, whether previously denied or yet to be decided;

6) Order Defendants to show cause, within thirty days of the Court's ruling on this Motion, why each and every class member's BD application should not be granted immediately;

7) Declare that, should Defendants show cause why any class member's application should be denied, Defendants have a legal obligation to provide that class member with an

1

adequate statement of the grounds for denial; and

8) Grant such further relief as may be just and proper.

<u>**MEMORANDUM AND POINTS OF AUTHORITY**</u>

**I.     INTRODUCTION**

For more than five years—since February 2017—the Department of Education ("ED") has failed to lawfully adjudicate borrower defense ("BD") applications submitted by federal student loan borrowers. For most of this time period, ED has simply refused to issue BD decisions. When, after this lawsuit was filed, ED did issue some decisions, it did so pursuant to unlawful policies that disregarded the merits of borrowers' claims, and via unlawful form notices that failed to explain the bases for ED's decisions—because in truth, those decisions lacked any valid bases. The vast majority of the class remains in limbo, with no end in sight.

This is the second time Plaintiffs have sought summary judgment. The first time, the sole issue was ED's blanket policy of delay. Since then, ED has engaged in an entirely new course of unlawful conduct—the use of the form denial notices—and discovery has sharpened the contours of ED's actual policies, which in many cases were quite different than ED publicly claimed them to be. Plaintiffs have raised new claims under Section 706(2) of the Administrative Procedure Act ("APA") and constitutional due process. New leadership has taken over at ED; although it has issued some BD decisions, these account for only a small fraction of the backlog, which has in fact *grown* since Betsy DeVos resigned as Secretary of Education. Hundreds of thousands of borrowers, including some who applied for BD up to *seven years ago*, are still laboring under ED's delay. ED has no timeline for when these applicants can expect decisions.

ED has not fulfilled its obligation to "in good faith employ[] the utmost diligence in discharging [its] statutory responsibilities." *Sierra Club v. Thomas*, 658 F. Supp. 165, 171 (N.D. Cal. 1987) (quoting *Natural Resources Def. Council v. Train*, 510 F.2d 692, 713 (D.C. Cir. 1975)). Rather, ED "has failed to demonstrate any diligence whatever . . . and has in fact ignored that duty for several years." *Id.* at 172. Plaintiffs are entitled to summary judgment, and seek an order to

2

show cause why each class member's BD application should not be granted immediately.

## II.     STATEMENT OF FACTS

### A.     Statutory and Regulatory Framework

Plaintiffs incorporate by reference the detailed background set out in their prior Opposition to Defendants' Motion and Cross Motion for Summary Judgment ("Pls.' 1st MSJ"), ECF 67, at 4-8. It suffices to note that the vast majority of class members' claims fall under the 1994 BD regulations, which set out a substantive standard based on state law, or the 2016 regulations, which created a federal misrepresentation standard. *See* 34 C.F.R. § 685.206 (state law standard); 81 Fed. Reg. 75,926 (Nov. 1, 2016) (2016 regulations). On July 1, 2020, yet another set of BD regulations went into effect, but these regulations apply only to federal student loans disbursed on or after July 1, 2020. *See* 84 Fed. Reg. 49788 (Sept. 23, 2019). To Plaintiffs' knowledge, ED has never adjudicated any BD applications under the 2020 regulations.

### B.     The 'No Decisions' Policy: ED Abdicates Its Obligation to Decide Applications (Section 706(1) Claim)

As soon as former Secretary of Education Betsy DeVos took office in February 2017, ED began adopting a series of policies that had a singular purpose: to delay, obstruct, and avoid the agency's duty to fairly and timely resolve BD applications. ED sought, and soon achieved, a complete halt to the process of even assessing, let alone granting, BD claims. Plaintiffs incorporate by reference their prior recitation of facts about these actions. *See* Pls.' 1st MSJ at 12-15.

Discovery has revealed a blanket policy ordering the cessation of BD decisions—the existence of which Defendants had denied.[1] In May 2017, DeVos signed a memorandum from James Manning, then the Acting Under Secretary, which recommended that ***no additional claims should be approved***. *See* Ex. 1 ("Manning Memo"). The Manning Memo stated that the BD

---

[1] *See* Class Certification Order, ECF 46 at 7 ("[Defendants] complain that plaintiffs do not allege any facts regarding some explicit order from on high . . . ."); Defs.' Opp. to Pls.' Mot. for Class Cert., ECF 38 at 10 (arguing Plaintiffs' claims were "erroneous speculation that the Department has made a universal decision not to grant or deny any pending borrower defense claims").

3

regulation had previously been "liberally applied in the light most favorable to the borrower," raising "significant concerns." *Id.* at DOE2145. The memo complained that "[f]lexible interpretations of state law most favorable to student borrowers also appear to have been used to circumvent any requirement that the claimant directly prove damages." *Id.* Thus, the memo recommended that, "[g]oing forward, [ED] should establish a balanced process with clear and objective standards that require strong evidence of harm or damages to the student." *Id.* Neither the Higher Education Act ("HEA") nor the BD regulations required a BD claimant to "directly prove damages" or meet a "strong evidence of harm or damages" standard.

The Manning Memo recommended that Federal Student Aid ("FSA") develop "interim procedures" to handle pending BD claims until new BD regulations were implemented. *Id.* at DOE2146. Manning asked DeVos to "direct no additional claims be approved until these interim procedures are finalized." *Id.* On May 4, 2017, the date of the Manning Memo, the Borrower Defense Unit within FSA (the "BDU") stopped adjudicating any BD claims. *See* Ex. 2 at AR512. **But no "interim procedures" were ever created**. *See* Joint Status Report at 2, ECF 194.

Pursuant to the Manning Memo, ED's Office of the Inspector General ("OIG") reviewed the BD process. Pending this review, the BDU was instructed to stop developing memoranda on whether additional categories of BD claims qualified for discharge. *See* Ex. 2 at AR512. The OIG Report, issued on December 8, 2017, recommended, among other things, that FSA "resume the review, approval, and discharge processes for claims qualifying under the seven established categories" for approval, and "resume consideration and determination of whether additional categories of claims with common facts qualify for discharge." *Id.* at AR517. **But ED did not follow OIG's recommendations.** Instead, with only a limited exception,[2] the 'no decisions' policy

---

[2] In December 2017, ED announced a "partial relief" methodology for a specific subset of claims relating to Corinthian Colleges, Inc. ("CCI"), and began issuing decisions using that methodology. *See Calvillo Manriquez v. DeVos*, 345 F. Supp. 3d 1077, 1090 (N.D. Cal. 2018). In May 2018, however, the Northern District of California issued an injunction that prevented ED from applying this methodology. *Id.* at 1110. The *Calvillo Manriquez* class is excluded from the instant class.

4

remained in place for 31 months, until December 2019. Then, for approximately 10 months, ED deviated from this policy in order to send its unlawful Form Denial Notices, detailed *infra*. Once Plaintiffs challenged those denials in court, the 'no decisions' policy resumed.

ED has put forward numerous excuses for its delay in issuing BD decisions, none of which is supported by the record:

- **Excuse:** ED could not adjudicate claims because of staffing shortages and technology challenges. *See* Defs.' Motion for Summary Judgment, ECF 63 ("Defs.' 1st MSJ") at 10-11; Ex. 3 (Brown Dep. 239:16-20).
- **Fact:** The staffing and resource shortages were self-inflicted and deliberate.
  - *See* Pls.' 1st MSJ at 14, 26-27.
  - Colleen Nevin, then-Director of the BDU, testified that ED repeatedly denied her requests to hire additional staff. Ex. 4 (Nevin Dep. 25:8–27:18, 141:16-25, 145:3-9). Nevin did not know the reasons for this refusal: "That's above my pay grade." *Id.*; *see also id.* at 224:10-14 (reason why decisions weren't being issued was "related to a decision up the food chain").
  - ED did not hire additional staff for the BDU until it was ready to implement the unlawful 'presumption of denial' policy, detailed below. *See* Ex. 5 at DOE9515.
  - ED avoided preparations for technological compliance with the 2016 regulations because it aimed, through a process of illegal delay, to never implement them. *See* Pls.' 1st MSJ at 25; Pls.' Reply in Support of Motion for Summary Judgment, ECF 77 ("Pls.' 1st MSJ Reply") at 9.
  - ED has never explained how or why the development of new technologies would have prevented the BDU's attorneys from performing their job to decide BD claims and issue decisions.

- **Excuse:** The *Calvillo Manriquez v. DeVos* litigation was holding up BD decisions and/or the creation of a new relief methodology. *See, e.g.*, Ex. 6 at DOE7213-7214.
- **Fact:** The *Calvillo Manriquez* injunction only ever applied to a limited subset of BD claims, and to a specific aspect of the relief methodology.
  - The *Calvillo Manriquez* class included *only* borrowers whose BD claims were based on CCI's misrepresentations about job placement rates at certain programs during certain periods of time, because those were the only borrowers subject to the "partial relief" methodology. *See Calvillo Manriquez*, 345 F. Supp. 3d at 1094.
  - Once ED had devised a new "partial relief" methodology, it acknowledged that "the injunction ***does not*** prevent the Department from utilizing the new methodology to process BD applications for borrowers that are not part of the class that has been certified

5

in *Calvillo Manriquez.*" Ex. 7 at DOE13648 (emphasis added); Ex. 4 (Nevin Dep. 149:23–150:1).

- **Excuse:** ED could not issue BD approvals until it created a new relief methodology. *See* Defs.' 1st MSJ at 9-10, 21.

- **Fact:** The legal obligation to resolve the merits of BD applications does not allow for an indefinite hiatus while the Secretary searches for means to reach a preferred outcome.
  - *See* Pls.' 1st MSJ at 19-20, 23-24; Pls.' 1st MSJ Reply at 8-10.
  - Nevin testified that ED could have issued BD approvals with 100% relief, but that was never even considered: As of December 9, 2020, Nevin could not recall *any* instances of 100% relief being granted on *any* application since the *Calvillo Manriquez* injunction went into effect. *See* Ex. 4 (Nevin Dep. 149:23–150:1, 160:23–161:5).
  - The current administration has rescinded the "partial relief" methodology,[3] so this is no longer a factor that can explain ED's continuing delay.

- **Excuse:** ED would not issue BD denials until it issued approvals under a new relief methodology, to avoid borrower confusion or a "chilling effect" on BD submissions. *See* Defs.' 1st MSJ at 12; Ex. 8 (Jones Dep. 173:23–174:7).

- **Fact:** It was, to a large extent, *true* that ED "would not be approving any claims." Jones Dep. 173:23–174:7. Borrowers would not have been "misinformed" to believe this.
  - As of October 2020, ED under DeVos had denied nearly 90% of all decided BD claims. *See* Order Denying Class Settlement, to Resume Discovery, and to Show Cause ("Disc. Order") at 5, ECF 146.
  - None of ED's witnesses could explain where this policy supposedly came from. *See* Ex. 4 (Nevin Dep. 147:12–148:3); Ex. 8 (Jones Dep. 174:5-19).
  - It is not credible that ED feared borrowers would be "chilled" by its issuing lawful decisions, but not "chilled" by the fact that ED officials were publicly denigrating BD applicants as seeking "free money" handouts. *See* Ex. 9 at 5:10 (DeVos remarks at Mackinac Conference, Sept. 2017); *see also* Ex. 10 at DOE7290 (Diane Auer Jones talking points describing "[m]any" BD claims as "'stab in the dark' efforts to get loans forgiven" and expressing hostility toward BD process); Ex. 1 at DOE2147 (DeVos signing off on approved BD claims "with extreme displeasure").

- **Excuse:** The pre-2017 BD process was "arbitrary and haphazard," and thus needed to be replaced. Defs.' 1st MSJ at 2.

---

[3] *See* Ex. 12. The Court may take judicial notice of information published on government websites. *See Mont. Green Party v. Jacobsen*, 17 F.4th 919, 927-28 (9th Cir. 2021).

6

GovSER-046

- **Fact:** That process was more efficient than anything that has happened since, and was supported by the OIG Report. *See* Disc. Order at 3 (pre-DeVos procedures had cleared 31,773 applications in approximately 6 months); Ex. 2 at AR517-18 (OIG recommending that FSA request approval to resume "the review, approval, and discharge processes" for qualifying claims under pre-DeVos standards and resume creation of new standards).
  - While the OIG Report found some deficiencies in the BDU's recordkeeping and organizational matters—including, notably, the need to establish timeframes for claim processing, *see id.* at AR517—it did not in any way suggest the BDU could not or should not continue deciding applications.

- **Excuse:** ED's resources were diverted and decisions were delayed by a shifting regulatory framework. *See* Defs.' 1st MSJ at 10, 19-20.
- **Fact:** The vast majority of the class falls under either the 1994 or 2016 regulations.
  - In claiming that its delay in implementing the 2016 BD regulations was in the public interest, ED stated it would continue to process pending BD applications under the 1994 regulations. *See* 83 Fed. Reg. 6,458, 6,467 (Feb. 14, 2018). This was not true.
  - ED also promised that "[e]fforts to improve the efficiency of claims processing are ongoing and are not contingent upon implementation of the 2016 final regulations[s]." *Id.* at 6,460.
  - ED has never explained why the development of new regulations prevented BDU's attorneys from deciding BD claims and issuing decisions. The BDU attorneys were not involved in policy matters. *See* Ex. 4 (Nevin Dep. 28:6-10).
  - Moreover, through at least 2020, the regulations' substantive standards were irrelevant to BD decisions. Nevin testified that, for BD applications subject to the 1994 regulations, the BDU did *not* analyze or apply state law in deciding whether an application stated a claim for relief. *See* Ex. 4 (Nevin Dep. 79:6-20); *see also* sources cited *in* Supplemental Class Action Complaint ("Supp. Compl.") ¶¶ 241–251 & 269–272, ECF 198. For applications subject to the 2016 regulations, the BDU likewise did *not* analyze or apply the "substantial misrepresentation" standard. *See* Supp. Compl. ¶¶ 254-255; Defs.' Answer to Supplemental Complaint ("Supp. Ans.") ¶¶ 254-255, ECF 206.

- **Excuse:** "The relevant regulatory framework entails a time-intensive analysis to determine whether a borrower defense application and any supporting evidence establishes the borrower's entitlement to a defense to repayment under the governing standard." Defs.' 1st MSJ at 2; *see also id.* at 18-19; Ex. 14 (talking points claiming that state law standard made BD evaluation "complicated").
- **Fact:** The Court has already found this reason was pretextual and offered in bad faith. *See* Disc. Order at 11-15.
  - Once ED did start issuing BD decisions using "perfunctory" denial notices, those decisions "b[ore] *no indication* of such 'time-consuming,' 'complex,' legal analysis of

7

both borrower-submitted and agency evidence, 'under applicable State law,' to 'reach considered results.'" Disc. Order at 13 (emphasis in original).

o In reality, ED was not performing a time-intensive analysis, but was instead applying the unlawful presumption of denial policy. *See infra* Section II.C.

- **Excuse:** This lawsuit prevents ED from issuing BD decisions, including but not limited to retracting the Form Denial Notices. *See* Plaintiffs' Response to Court's Order Dated Jan. 27, 2022, ECF 220 ("Pls.' Feb. 2022 Filing") at 12-13, Ex. C ¶¶ 15-17, Ex. F ¶¶ 8-9.

- **Fact:** The Department is free at any time to adjudicate BD applications on an individual or group basis, and/or to rescind any Form Denial Notice. The only thing the Department cannot do—by the Department's own voluntary agreement—is issue any more form denial letters to class members or enforce previously issued form denials against borrowers. *See* Defs.' Response to October 19, 2020 Order to Show Cause at 2-3, ECF 150.

Finally, Defendants will argue that because they have issued *some* BD decisions in the past year, the 'no decisions' policy is over. *See* Opp'n to Pls.' Motion for Summary Judgment and Reply in Support of Defs.' Motion for Summary Judgment, ECF 72 ("Defs.' 1st MSJ Reply") at 1, 3-4, 9-11. Yet ED's most recent publicly available data show that, as of December 31, 2021, there were 109,953 pending BD applications. *See* Ex. 15. This count does *not* include the approximately 128,000 borrowers who received Form Denial Notices.[4] As detailed *infra*, these borrowers' applications cannot be considered lawfully resolved. Moreover, the data show that ED has "adjudicated" 47,139 BD applications but has not yet informed applicants of those decisions. *See id.* ED has not provided any information about when these decisions were made, what criteria or processes were used to make them, what evidence was consulted, or why ED is withholding notice of them. *See* Pls.' Feb. 2022 Filing at 10. Regardless, from the perspective of borrowers, their applications are not resolved if they have not received notice of a decision. Thus, there are ***more than 280,000 borrowers*** who are still waiting for a lawful decision on their BD applications.

---

[4] Plaintiffs calculate the number of Form Denial Notices by subtracting the number of denials ED had issued as of September 30, 2019—the last report before ED began sending those Notices— from the total number of denials currently reported. *Compare* Ex. 15 (Dec. 2021 BD data listing 137,438 denied applications), *with* Ex. 20 (Sept. 2019 BD data listing 9,077 denied applications).

8

Under the current administration, some BD grants have indeed issued: between June 2021 and February 2022, ED announced three tranches of claim approvals, totaling approximately 14% of all unresolved BD applications. *See* Pls.' Feb. 2022 Filing at 13-14.[5] But the vast majority of the class is still being held in limbo, with no reason to expect their applications will be adjudicated within a reasonable time. *See* Pls.' Feb. 2022 Filing at 10, 14-15.[6] Applications that have languished for years do not appear to be getting priority in the decision-making queue. *See, e.g.*, *id.* at 3, 4, 6, 8 (describing four class members who applied for BD in 2016 and 2017).

In short, for the vast majority of BD applicants, the policy of non-adjudication continues. From February 2017 to today, a period of *over five years*, ED has approved just 39,900 BD applications presumptively belonging to members of the *Sweet* class,[7] and has not issued a single lawful denial, while the backlog of pending applications has ballooned. ED has not set a timeline for when it expects to issue any further decisions.

## C. The 'Presumption of Denial' Policy Jettisons BD Applications Regardless of Merit (Section 706(2) and Due Process Claims)

Plaintiffs filed their Complaint on June 25, 2019. *See* ECF 1. In an internal presentation dated August 21, 2019, ED reported that over 177,000 BD applications were awaiting adjudication. Ex. 5 at DOE9510. Around this time, ED adopted the 'presumption of denial' policy as a means

---

[5] For details on who received relief, *see* Exs. 16-18 (ED press releases). ED also recently announced that it would discharge certain loans associated with Marinello Schools of Beauty regardless of whether those borrowers had submitted BD applications, *see* Ex. 19; this action might affect additional class members.

[6] Very recently, on June 1, 2022, ED announced that it would discharge the loans of all CCI borrowers, regardless of whether they had submitted a BD application. *See* Ex. 21. While this decision will affect members of the *Sweet* class, it is not a borrower defense determination. Rather, it is a broader application of conclusions ED reached in 2015-2016 regarding CCI's wrongdoing. The decision also pertains in substantial part to the *Calvillo Manriquez* class, members of which are not part of the *Sweet* class.

[7] This calculation assumes that all applications approved in 2021-2022 belonged to *Sweet* class members, and adds to that total the 4,400 approvals ED reported to this Court in September 2020, *see* ECF 116.

9

of clearing the BD backlog. This policy established, in effect, a tiny and artificial cap on the number of BD applications ED would approve, and then reverse-engineered a process to deny nearly all other applications. This policy flew in the face of both ED's own regulations and the evidence before the agency at the time. The policy was deliberately kept hidden—from applicants, from the general public, and from the Plaintiffs in this case, who were attempting to negotiate a settlement while this policy was secretly at work behind the scenes.

The 'presumption of denial' policy was reflected in a series of sub-regulatory memoranda, procedures, and guidance documents. For example, in one 2019 memorandum, Nevin wrote that, although the historical BD approval rate for CCI borrowers making job placement rate claims was "about 67%," this was "dramatically higher than [BDU] expect[s] to see for all other claims." Ex. 22. She stated, "[o]ur data to date suggests that the approval rate . . . is likely to be approximately under 10%" for borrowers from "large volume" schools, and "under 5%" or perhaps "as low as 2-3%" for schools with less than 20 pending applications. *Id.* The memorandum does not, however, specify what this "data" consisted of. In fact, neither the administrative record nor documents produced in discovery in this case include any "data" supporting Nevin's assertion that less than 10% of BD claims meet the standards set out by the 1994 or 2016 Regulations.[8]

In another memorandum, dated August 18, 2019, Nevin wrote frankly that "[t]he majority of applications will be denied." Ex. 23 at DOE8842. She explained, "[t]he bar for new approvals is high": only three schools had *any* approvals, and all of these were "based on existing criteria" pre-dating February 2017. *Id.* BD reviewers were required to refer any potentially approvable applications to a senior attorney, who in turn had to submit any proposed approval to a vote of all senior BDU attorneys and the Director. *Id.* at DOE8842-43. By contrast, a senior BDU attorney

---

[8] To the contrary, the discovery record contains ample evidence that ED knew of wrongdoing by dozens of schools affecting tens of thousands of BD claims. *See* sources cited *in* Supp. Compl. ¶¶ 126-138, 167, 189-190, 198-220, 232, 245-246, 261-276, 280, 361-364, 369, 374, 383-386, 391, 396, 407.

Plaintiffs' Motion for Summary Judgment
Case No.: 19-cv-03674-WHA

could unilaterally approve any protocols for the *denial* of applications. *See* Ex. 24. In practice, these onerous procedures barred new approvals: as of December 9, 2020, the BDU had not issued a single new protocol for approving claims from a particular school.[9] Ex. 4 (Nevin Dep. 49:9-19).

Having thus established that "[t]he majority"—90% or more—of BD applications "will be denied," ED designed procedural and substantive guidelines to achieve that goal. For example:

- Contractors had to adjudicate a minimum of five BD applications per hour. *See* Ex. 26. Reviewers could spend no more than two hours on school-specific factual analysis, and were warned their work would be spot-checked for "over reporting hours spent on evidence review." Ex. 27 at DOE6327. Failure to meet quotas could result in termination. *Id.*

- The BDU adjudicated cases before completing the review of common evidence relating to a school, because they "were directed to move forward at a very accelerated pace," and this was "the only way to hit the metrics." Ex. 4 (Nevin Dep. 99:16–101:17).

- The BDU disregarded borrower allegations, even though each BD application was made under penalty of perjury. Nevin testified that a borrower's sworn statements alone will ***never*** be enough to warrant approving a BD application. *See* Ex. 4 (Nevin Dep. 95:24–96:4, 97:4-9). Reviewer training materials likewise reflected that statements made by borrowers in their applications did not constitute supporting "evidence." *See* Ex. 27 at DOE6399-6433; Ex. 28 at DOE6020; *see generally* sources cited *in* Supp. Compl. ¶¶ 125-149.

- The BDU applied rules to judge BD allegations that were not communicated to borrowers and could not have been anticipated by borrowers when they filled out their BD applications. For instance, whether an application "fails to state a legal claim" is secretly a threshold question. *See* Ex. 4 (Nevin Dep. 204:24–205:18); Ex. 30. But the BDU never informed borrowers how to successfully "state a legal claim," or that if they do not succeed in doing so their application will be denied and no evidence will ever be reviewed. *See generally* sources cited *in* Supp. Compl. ¶¶ 155-170.

- The BDU required borrowers to submit "supporting evidence" to be considered for approval, *see, e.g.*, Ex. 28 at DOE6020, even though this requirement does not appear on ED's own

---

[9] As of that date, the BDU had "just finished" extending one set of ITT Tech criteria, originally established in January 2017, to additional ITT campuses. Ex. 4 (Nevin Dep. 41:20-23, 42:18-25).

GovSER-051

BD application forms.[10] Neither the HEA nor BD regulations require borrowers to submit supporting evidence in order for their BD claims to be considered for approval.

- Even where "supporting evidence" existed, the BDU consistently disregarded, or chose not to look into, potential sources of evidence to support BD allegations, including (but not limited to) government investigations and legal findings or settlements—even investigations by ED itself. *See* sources cited *in* Supp. Compl. ¶¶ 198–233. Nevin justified the BDU's failure to pursue information directly from schools named in BD applications by claiming such requests "create[] additional burdens on the school." Ex. 35.

- As explained *supra*, the BDU did not analyze or apply either state law or the 2016 regulations' federal standard in deciding whether an application stated a claim for relief.

- The BDU denied thousands of applications from schools that, according to its own findings and evidence in its possession, had engaged in widespread misconduct; if applications did not meet exceedingly specific criteria for campuses, time periods, and nature of allegations, they would be denied. *See* sources cited *in* Supp. Compl. ¶¶ 259–266, 274–276.

- From the summer of 2019 through December 24, 2020, the BDU created at least 760 memoranda concerning allegations against specific schools or school groups. Of these, only *23* memoranda (3%) found that potential approval criteria were warranted for certain, often extremely narrow categories of claims. *See* Ex. 61.

As a result of the 'presumption of denial' policy, ED had not, as of December 9, 2020, approved a ***single*** individual BD application from any borrower who attended a school other than CCI or ITT. *See* Ex. 4 (Nevin Dep. 50:5-12). In total, the BD applications of class members adjudicated during DeVos's tenure had a 94.4% denial rate, *see* Disc. Order at 6 (citing ECF 116)—precisely in line with the numerical goal set out in Nevin's 2019 memorandum.

Since 2021, ED has not announced any policy changes with respect to the 'presumption of denial' policy. It has not retracted any of the guidelines or memoranda that constituted the policy.[11]

---

[10] One version of the form states that "you are not required to submit documentation with your application to be considered for discharge," Ex. 32, while another version states that "[y]ou *may* attach additional documents," Ex. 33 (emphasis added).

[11] This raises significant concerns about the approximately 47,000 BD applications that ED reports as "adjudicated, pending notification." *See supra* at 7. Because ED has not rescinded the

12

Nor has it rescinded any of the Form Denial Notices. It has not announced any new, replacement standards to make BD decisions, and has not issued any new guidelines that could help borrowers discern what kinds of allegations or evidence will be considered to support an approval decision. Colleen Nevin, the key architect of the policy, remains employed at the agency.

ED also appears to still be limiting BD approvals to applicants who made allegations of specific misstatements during specific periods of time, even if the evidence indicates the institution's misconduct was wide-ranging and widespread—a hallmark of the 'presumption of denial' policy.[12] Moreover, the majority of the applications approved by the new administration have been for borrowers from CCI or ITT, the two schools with approval criteria dating back to January 2017. *See* Feb. 2022 Filing at 13-14.

### D. The Form Denial Notices: Operationalizing the Presumption of Denial (Section 555(e) and Due Process Claims)

At some point in fall 2019—as the 'presumption of denial' policy was ramping up—individuals within ED were developing form letters to send to the many borrowers whose BD applications would be denied under this policy.[13] These efforts resulted in the Form Denial Notices: communications that failed to provide borrowers with any coherent reasons why their applications had been rejected, leaving them with no effective means to challenge the decisions. As this Court has recognized, after receiving a Form Denial Notice, a "borrower's path forward rings disturbingly Kafkaesque." Disc. Order at 8.

---

'presumption of denial' policy, it is reasonable to infer that the 'presumption of denial' may have been applied in making these decisions.

[12] *See, e.g.*, Ex. 16 (approving claims for ITT students who specifically claimed misrepresentation of employment prospects between 2005-2016 or misrepresentation regarding transfer of credits from January 2007 to October 2014).

[13] Defendants have declined to identify the individuals who drafted the Form Denial Notices; both Nevin and Jones denied that they did so. *See* Ex. 37 (supplemental response to Interrogatory No. 16); Ex. 4 (Nevin Dep. 85:21–86:25); Ex. 8 (Jones Dep. 201:13–202:17).

13

### 1. Content of the Form Denial Notices

ED developed four versions of the Form Denial Notices. *See* Defs.' Resp. to Aug. 31, 2020 Order, ECF 116 at 2 & Exs. A-D. Each version, however, was the same in certain key respects:

- All Form Denial Notices included a section titled "Applicable Law," but none actually identified any applicable state law for BD claims subject to the 1994 Regulations. *See* Suppl. Compl. ¶¶ 297–299; Supp. Ans. ¶¶ 297–299.

- Three of the four versions included a section titled "Why was my application determined to be ineligible?" (or similar), which led to a fill-in-the-blank template, filled in with one of four phrases: "Insufficient Evidence," "Failure to State a Legal Claim," "Other," or, in the case of certain CCI borrowers, "Outside coverage windows." No further explanation was provided. *See* Suppl. Compl. ¶¶ 304–305; Supp. Ans. ¶¶ 304–305.[14]

- Two of the four versions—those for schools with "common evidence"—included sections titled "What evidence was considered in determining my application's ineligibility?" ECF 116 at Exs. B, D. This section was filled in with vague descriptions such as "[State] Attorney General's Office"; "Evidence obtained by the Department in conjunction with its regular oversight activities"; and "Publicly available securities filings." *See, e.g.*, Ex. 13 (Sweet Aff. Ex. B); Ex. 25 (Wright Aff. Ex. B). Because ED never made its "common evidence" public, except to a limited extent in this lawsuit,[15] borrowers never had an opportunity to review this "common evidence" purportedly relied upon in denying their applications.

- Each Form Denial Notice included a section titled "What if I do not agree with this decision?," which informs the borrower: "you may ask ED to reconsider your application." ECF 116 at Exs. A-D. In fact, as of December 9, 2020, ED had no reconsideration process in place. Ex. 4 (Nevin Dep. 218:21–221:9); Supp. Ans. ¶ 313. None of the Form Denial Notices notify the borrower of their right to challenge the denial in federal court.

### 2. The Massive Wave of Denials

On December 10, 2019, ED announced a new "partial relief" methodology, replacing the one enjoined in *Calvillo Manriquez*. *See* Ex. 60. This opened the floodgates, and by January 9,

---

[14] Defendants deny Plaintiffs' allegation that the "Review Recommendation [denial] Reason" field was filled in with one of those four phrases. Supp. Ans. ¶ 305. However, the summary judgment record does not show that that field was ever filled in with any other phrase. There is thus no dispute of material fact.

[15] *See* Defs.' List of Schools, Attachment to Filing in Response to Judge's Inquiry, ECF 145-2.

Plaintiffs' Motion for Summary Judgment
Case No.: 19-cv-03674-WHA

GovSER-054

2020, ED had issued 15,256 denials and granted just 789 applications. *See* Disc. Order at 5. ED claimed it was prioritizing decisions on applications with "little or no relevant evidence." Ex. 29 (Brown Decl. ¶ 9); *see* Defs.' Opp. to Mot. to Enforce at 10, ECF 140. Between April 7, 2020—the date on which Plaintiffs signed a settlement agreement with Defendants—and August 24, 2020, ED issued approximately 78,400 BD decisions to class members; all but 4,400 were denials. *See* Disc. Order at 6. On July 24, 2020, Plaintiffs' counsel notified Defendants' counsel of their awareness that increasing numbers of class members were receiving Form Denial Notices. *See* Connor Decl. in Support of Mot. for Case Management Conf. at 6, ECF 108-2. This Court is familiar with what happened next. On October 19, 2020, the Court denied final approval of the settlement and issued an Order to Show Cause why the Secretary should not be enjoined from issuing any further denials until a ruling could be had on the legality of the Form Denial Notices. Disc. Order at 17. In response, Defendants agreed to voluntarily cease using the Form Denial Notices and hold all class members' loans in forbearance/stopped collection status during the pendency of this litigation. Defs.' Response to Order to Show Cause at 2-3, ECF 150.

### E. Harm to the Class

As this Court recognized nearly two years ago, "We don't enjoy the luxury of seeking simply to forestall harm—it descended upon the class long ago. Our borrowers live under the severe financial burden of their loans." Disc. Order at 15. The 'no decisions' policy, the 'presumption of denial' policy, and the Form Denial Letters have imposed serious harms on the class. Class members' professional and personal lives have been forced into limbo while they wait for a lawful BD decision. ED has exacerbated harm to borrowers' credit, perpetuated their untenable debt-to-income ratios, restricted their employment and education options, prevented opportunities for them to develop wealth, and interfered with their ability to provide for their families. *See, e.g.*, Ex. 31 ¶¶ 14-15; Ex. 34 ¶ 10; Ex. 36 ¶¶ 10-16; *see generally, e.g.*, Zoom Chat Transcript at 15, ECF 141 (two class members stating that they became homeless because of their loans). The continuing existence of these fraudulent debts and the threat of collection hangs over class members constantly and causes them serious mental and physical distress, even thoughts of

15

suicide. *See, e.g.*, Ex. 31 ¶¶ 16, 21; Ex. 34 ¶ 23; Ex. 36 ¶ 22. Class members have lost faith in their government. *See, e.g.*, Ex. 31 ¶ 17; Ex. 34 ¶¶ 22, 26; Ex. 36 ¶¶ 28, 32.

The Form Denial Notices, in particular, expose borrowers to the risk of collection on illegitimate loans, by purporting to conclude their BD cases without giving them a legally sufficient decision on the merits. As explained above, the Notices do not give borrowers adequate guidance on how to seek reconsideration or redress in court—and even if they had, discovery shows that ED's purported reconsideration process did not actually exist. *See supra* Section II.D.

## III.   PROCEDURAL HISTORY

Plaintiffs filed this lawsuit as a proposed class action on June 25, 2019. ECF 1. The class, which was certified on October 30, 2019, includes "[a]ll people who borrowed a Direct Loan or FFEL loan to pay for a program of higher education, who have asserted a borrower defense to repayment to [ED], whose borrower defense has not been granted or denied on the merits, and who is not a class member in *Calvillo Manriquez v. DeVos*." ECF 46 at 14.

ED answered the Complaint (ECF 55), submitted a certified administrative record (ECF 56), and moved for summary judgment (ECF 63). Plaintiffs opposed (ECF 67) and filed their own motion for summary judgment or, in the alternative, to order discovery (ECF 76). After these motions were argued and submitted (ECF 93), the parties notified the Court of their agreement in principle to settle the case (ECF 94).

The parties entered into a settlement agreement on April 7, 2020, and this Court granted preliminary approval on May 22, 2020. ECF 103. As detailed above, however, ED's decision to deny tens of thousands of BD applications under the presumption of denial policy, using the Form Denial Notices, undermined this agreement. This Court denied final approval of the settlement on October 19, 2020, finding there was "no meeting of the minds." Disc. Order at 10. The Court ordered the parties to conduct expedited discovery, because the case required "an updated record . . . to determine what is going on before we again attempt to resolve the merits." *Id.* at 11. The parties conducted discovery between November 2020 and spring 2021.

16

IV.     **STANDARD OF REVIEW**

Summary judgment is warranted where "there is no genuine dispute as to any material fact" and "the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Addisu v. Fred Meyer, Inc.*, 198 F.3d 1130, 1134 (9th Cir. 2000); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The moving party bears the burden of demonstrating that no genuine issue of material fact exists. *Celotex*, 477 U.S. at 322. The court must draw all reasonable inferences in favor of the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *see Indep. Mining Co. v. Babbitt*, 105 F.3d 502, 510 (9th Cir. 1997). The facts in this case are not disputed. To the contrary, they are drawn largely from Defendants' own documents, public statements, and the testimony of high-ranking ED employees. The parties dispute only the legal conclusions to be drawn from the facts, making this case ripe for summary judgment.

The APA governs judicial review of ED's actions with respect to the BD process. *See* 5 U.S.C. §§ 702, 704. Section 706(1) of the APA requires that a court "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1). "A court can compel agency action under this section when there is 'a specific, unequivocal command' placed on the agency to take a 'discrete agency action,' and the agency has failed to take that action." *Viet. Veterans of Am. v. Cent. Intelligence Agency*, 811 F.3d 1068, 1075 (9th Cir. 2016) (citing *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63-64 (2004) (*SUWA*)).[16] Although a statutory timeline may create an "unequivocal command" for agency action, one is not required for a court to find a section 706(1) violation. *See id.* at 1081.

If an agency has delayed fulfilling its duty to act, courts assess whether an "unreasonable

---

[16] The APA itself also requires that "each agency shall proceed to conclude a matter presented to it" "within a reasonable time," 5 U.S.C. § 555(b), and that "[p]rompt notice shall be given of the denial in whole or in part of a written application," 5 U.S.C. § 555(e). This has been interpreted to mean that "an agency has a duty to fully respond to matters that are presented to it under its internal processes." *In re A Cmty. Voice*, 878 F.3d 779, 784 (9th Cir. 2017) (citing *In re Am. Rivers & Idaho Rivers United*, 372 F.3d 413, 418 (D.C. Cir. 2004)).

17

delay" has occurred in violation of section 706(1) by weighing six factors first articulated in *Telecomms. Research & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir 1984) (*TRAC*): (1) "the time agencies take to make decisions," or the "rule of reason," (2) the existence of a statutory timeline, (3) whether "health and human welfare are at stake," (4) whether action will affect "agency activities of a higher or competing priority," (5) the "nature and the extent of injuries prejudiced by the delay," and (6) although not required, whether agency "impropriety [is] lurking behind agency lassitude." *In re Pesticide Action Network N. Am.*, 798 F.3d 809, 813 (9th Cir. 2015).

Section 706(2) of the APA provides that a court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). A court must set aside an agency's decision if it "has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Food & Water Watch v. U.S. Envtl. Protection Agency*, 20 F.4th 506, 513-14 (9th Cir. 2021) (quoting *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)). The agency cannot merely offer "post hoc rationalizations"; rather, "[i]t is well-established that an agency's action must be upheld, if at all, on the basis articulated by the agency itself." *State Farm*, 463 U.S. at 50.

Although APA cases typically rely on an administrative record, "when a court considers a claim that an agency has failed to act in violation of a legal obligation, review is not limited to the record as it existed at any single point in time, because there is no final agency action to demarcate the limits of the record." *San Francisco BayKeeper v. Whitman*, 297 F.3d 877, 886 (9th Cir. 2002) (quoting *Friends of the Clearwater v. Dombeck*, 222 F.3d 552, 560 (9th Cir. 2000)). Moreover, in this case the Court ordered supplemental discovery based on "a strong showing of agency pretext," Disc. Order at 15, and material produced in discovery is proper to consider on summary judgment, *see, e.g.*, *Lands Council v. Powell*, 395 F.3d 1019, 1030 (9th Cir. 2005) (courts may admit extra-record evidence in APA cases where, *inter alia*, such evidence is "necessary to determine whether

18

the agency has considered all relevant factors and has explained its decision," if "the agency has relied on documents not in the record," and "when plaintiffs make a showing of agency bad faith" (internal quotation marks omitted)). *Cf. Portland Audubon Soc'y v. Endangered Species Cmte.*, 984 F. 2d 1534, 1548 (9th Cir. 1993) ("An incomplete record must be viewed as a 'fictional account of the actual decisionmaking process.'" (quoting *Home Box Office, Inc. v. Fed. Commc'ns Comm'n*, 567 F.2d 9, 54 (D.C. Cir. 1977))).

## V.    ARGUMENT

Tens of thousands of members of this class have waited years for *any* correspondence from ED regarding their BD applications. This amount of delay in agency decision-making is facially unreasonable, and ED has offered no legitimate reason to explain its dilatory conduct. The class is entitled to judgment on its claim that ED has violated section 706(1) of the APA.

This case is not just about delay, however. As discovery has borne out, ED's treatment of BD applications was not a result of reasoned policy decisions or necessary allocations of agency resources, but rather of a blanket policy to halt all BD decision-making based on antipathy toward the very concept of borrower defense. When faced with this lawsuit, ED put in place a 'presumption of denial' policy that reasoned backward from a desired outcome of approving as few BD applications as possible. This policy deprives BD applicants of a neutral decision-maker, in violation of APA § 706(2) and class members' due process rights. The Form Denial Notices failed to satisfy both APA § 555(e) and due process requirements. As this Court saw, class members "have waited for relief, or at least decision, for eighteen months. Many have waited much longer; and many are still waiting." Disc. Order at 15. Those words remain true today. Plaintiffs are entitled to summary judgment and an adequate remedy.

### A.    Defendants Have Unreasonably Delayed Decisions on BD Applications in Violation of APA § 706(1)

Summary judgment for Plaintiffs on their unreasonable delay claim was appropriate when the parties first briefed this issue in 2019, and remains so now. ED has engaged in an ongoing policy of delay, leaving hundreds of thousands of borrowers waiting for up to seven years. Under

19

no conceivable interpretation of the law is this protracted delay "reasonable."

## 1. Defendants Have Failed to Perform a Discrete Agency Action

The threshold question in a section 706(1) case is whether the agency has failed to take a "discrete agency action." *SUWA*, 542 U.S. at 63; *see also Viet. Veterans*, 811 F.3d at 1068. Here, it is undisputed that ED has a mandatory duty to adjudicate BD applications in a timely manner. ED has repeatedly acknowledged this: "Because borrowers have a right to submit defense to repayment claims, the Department ***must*** set up a process to review and ***adjudicate them***." Ex. 38 at 3 (emphasis added); *see also id.* (ED "has a legal responsibility to timely provide" protection to "harmed borrowers"); 81 Fed. Reg. 75,926, 75,973 (Nov. 1, 2016) ("[B]y directing the Secretary to designate acts and omissions that constitute borrower defenses to repayment in section 455(h) of the HEA, Congress has explicitly charged the Department, under the current and new regulations, to adjudicate the merits of claims brought alleging such acts and omissions."); Defs.' 1st MSJ at 20. ED has not disputed—because it cannot—that this obligation exists.

But in early 2017, ED simply stopped. It refused to identify any new grounds for relief or to recommend any BD claim for discharge, pursuant to a directive issued at the top levels of the agency. *See supra* Section II.B. For reasons Plaintiffs have explained, this refusal on its own violated the APA. *See* Pls.' 1st MSJ at 19-21; Pls.' 1st MSJ Reply at 7-10. As the Southern District of California recently explained in granting summary judgment on a section 706(1) claim, the "aggregation of similar, discrete purported injuries—claims that many people were injured in similar ways by the same type of agency action"—constitutes a failure to take a discrete agency action "to which the court should compel compliance." *Al Otro Lado, Inc. v. Mayorkas*, No. 17-CV-02366-BAS-KSC, 2021 WL 3931890, at *5 (S.D. Cal. Sept. 2, 2021). On this basis alone, Plaintiffs are entitled to summary judgment on their section 706(1) claim.

Defendants cannot argue that the policy of delay has now ended, and so they win. When a delay has been "created and perpetuated by [the agency's] inefficiencies," and "has not been significantly reduced" under current policy, the agency retains a duty to rectify that delay. *Pacharne v. Dep't of Homeland Sec.*, No. 1:21-CV-115-SA-DAS, 2021 WL 4497481, at *12 (N.D.

20

Miss. Sept. 30, 2021); *cf. Rai v. Biden*, No. 21-CV-863-TSC, 2021 WL 4439074, at *7 (D.D.C. Sept. 27, 2021) (although the unlawful policy underlying plaintiffs' claims had been revoked, their claims were not moot because the effects of the resulting delay had not been "completely or irrevocably eradicated" (citation omitted)).

Moreover, there is no authority to support the position that "because an agency acts on some similarly situated applications, it cannot be sued for unreasonably delaying or unlawfully withholding other applications." *Filazapovich v. Dep't of State*, 560 F. Supp. 3d 203, 235 (D.D.C. 2021). In truth, for the vast majority of the class, ED's refusal to decide BD applications continues today. ED has not announced any standards or timelines to address these claims. It also apparently has made decisions on tens of thousands of applications but has declined to notify members of the class—presumably because it cannot figure out how to write a legally sufficient denial notice.

### 2. Defendants' Failure to Fulfill Their Mandatory Duty Is Not Reasonable

If the Court finds it necessary to engage in a balancing analysis, it still should grant summary judgment. Plaintiffs incorporate by reference their prior briefing on this topic. *See* Pls.' 1st MSJ at 22-29. Pursuant to the "*TRAC* factors," a court assesses whether an "unreasonable delay" has occurred in violation of section 706(1) by weighing six factors. *See In re Pesticide Action Network N. Am.*, 798 F.3d at 813. Defendants fail at each step.

***Factor 1: The delay is unreasonable by any measure.*** Although the HEA does not set a specific timeline for BD decision-making,[17] Congress could not have contemplated that ED would delay decisions for years with no end in sight. *See, e.g.*, *In re A Cmty. Voice*, 878 F.3d 779, 787 (9th Cir. 2017) ("[A] reasonable time for agency action is typically counted in weeks or months, not years."); *Pacharne*, 2021 WL 4497481, at *12 (eleven-month delay unreasonable); *City of Providence v. Barr*, 385 F. Supp. 3d 160, 165 (D.R.I. 2019) (one-year delay unreasonable); *Air Line Pilots Ass'n, Intl. v. Civil Aeronautics Bd.*, 750 F.2d 81, 86 (D.C. Cir. 1984) (five-year delay

---

[17] For this reason, the second *TRAC* factor, whether a statutory timeline exists, is neutral. *See Asmai v. Johnson*, 182 F. Supp. 3d 1086, 1096 (E.D. Cal. 2016).

GovSER-061

unreasonable); *Pub. Citizen Health Research Group v. Auchter*, 702 F.2d 1150, 1157-59 (D.C. Cir. 1983) (per curiam) (three-year delay unreasonable); *MCI Telecomms. Corp. v. FCC*, 627 F.2d 322, 324-25, 338-42 (D.C. Cir. 1980) (four-year delay unreasonable). Congress expects borrowers to pay back their Direct Loans within ten years; meanwhile, ED has sat on BD applications for up to seven years, with no timeline for future decisions.

ED's conduct since February 2017, up to and including its conduct to this day, does not "support the notion that resources are being dispatched in a manner consistent with mitigating unreasonable delay." *Muwekma Tribe v. Babbitt*, 133 F. Supp. 2d 30, 36 (D.D.C. 2000); *see also id.* (explaining agency's "noncommittal estimate coupled with the specific history of interaction between th[e] parties [gave] rise to a finding of 'unreasonable delay'"). The fact that there is no evidence that ED has **any** timeline for decisions for the class as a whole compounds the unreasonableness. *See, e.g.*, *Iraqi & Afghan Allies v. Pompeo*, Civ. A. No. 18-cv-01388 (TSC), 2019 WL 4575565, at *8 (D.D.C. Sept. 20, 2019) (finding first *TRAC* factor weighed in favor of plaintiffs where, *inter alia*, "Defendants have not proffered a time frame for when they expect to adjudicate Plaintiffs' applications"); *Muwekma Tribe*, 133 F. Supp. 2d at 39 (court did "not believe . . . Congress intended petitions to languish in the review process indefinitely.").

*Factors 3 and 5: Health and human welfare are at stake, and class members' injuries are profound.* The effect on human welfare and class members' interests weighs heavily in favor of the borrowers. *See supra* Section II.E (detailing harm to class members from delay and uncertainty in BD process); Pls.' 1st MSJ at 27-29 (same); ECF Nos. 151-159 (class member affidavits describing same). As this Court has recognized, the harm "descended upon the class long ago," and class members have been forced to "live under the severe financial burden of their loans." Disc. Order at 15.

*Factor 4: Claims of competing agency priorities have been false.* As explained *supra* at Section II.B, ED's purported reasons for its delay have been entirely pretextual. To review just a few examples: The *Calvillo Manriquez* injunction did not, factually or legally, prevent ED from adjudicating BD claims. ED's excuse that it did not issue any decisions for nearly two years

22

because it was afraid of creating the impression that no claims would be granted is laughable, because it was *true* that ED had no plans to adjudicate any claims favorably within any reasonable timeframe. ED kept the BDU understaffed, knowing additional staff was required to adjudicate claims. ED claimed it needed time to do complicated analyses of fact and law, yet its Form Denial Notices and evidence regarding the 'presumption of denial' policy show that it was not doing anything of the sort. Contrary to ED's recent statements to borrowers, this litigation is not what prevented ED from adjudicating claims and notifying class members of outcomes, either.

Even if Defendants' claims that the delay was due to resource allocation difficulties had been true—which they were not—"neither a lack of sufficient funds nor administrative complexity, in and of themselves, justify extensive delay, nor can the government claim it has become subject to unreasonable expectations," when officials have been "aware of their . . . obligations" for years and "yet little progress has been made in discharging those duties." *Cobell v. Norton*, 240 F.3d 1081, 1097 (D.C. Cir. 2001).

***Factor 6: Agency impropriety was, indeed, lurking behind agency lassitude.*** When "presented . . . with an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decision-making process," courts "cannot ignore the disconnect between the decision made and the explanation given." *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575 (2019) (cited in Disc. Order at 12). Just such a disconnect plagues all of ED's excuses. "Pretext is the paradigm of agency bad faith," Disc. Order at 12, and discovery in this case has borne out that pretext is all ED had to offer. *See supra* Sections II.B, II.C. As this Court suspected, "where there's smoke, there's fire." Disc. Order at 15. ED's delay was originally driven by bad faith, and its continuing delay is, at best, inexcusable neglect.

## B.     The 'Presumption of Denial' Policy Is Unlawful

### 1.     The Policy Is Arbitrary, Capricious, an Abuse of Discretion, and Contrary to Law, in Violation of APA § 706(2)

The 'presumption of denial' policy is not a lawful agency response to the BD application backlog. The uncontested facts establish no rational basis for the policy or its constituent

23

procedures and guidance. To begin, the policy directly contravenes both the 1994 and 2016 regulations, which require ED to apply state law or a federal misrepresentation standard, respectively, to resolve BD claims. The decision to cap the number of BD approvals also runs "counter to the evidence before the agency," *Food & Water Watch*, 20 F.4th at 513-14 (quoting *State Farm*, 463 U.S. at 43); that evidence provides no basis to assume that less than 10% of BD applications are meritorious. Rather, the evidence shows that dozens of schools have misled tens of thousands of students. Nor is the policy "a product of agency expertise.'" *Id.* To the contrary, the policy was developed in bad faith by an administration openly hostile to BD applicants.

### a)  The Policy Is a "Final Agency Action" Under Section 706(2)

The question of whether an agency action is "final" is "pragmatic and flexible," looking to its "practical and legal effects." *Or. Nat'l Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982 (9th Cir. 2006) (citation omitted). A "final agency action" is "one by which rights or obligations have been determined or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1977) (citations omitted). It cannot be disputed that legal consequences flowed from the 'presumption of denial' policy: thousands of BD applications were denied because the BDU put that policy into action. The fact that there is no single formal decision document setting out the reasons for ED's adoption of the policy does not prevent it from being a final agency action. *See, e.g.*, *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 417 (1971) (despite absence of formal findings, there was "no ambiguity" that "the Secretary ha[d] approved" a specific course of reviewable action). As detailed *infra*, the very reason there is no such document is that ED's reasons for adopting the policy were facially arbitrary, capricious, and in bad faith.

### b)  The Policy Contravenes the 1994 and 2016 Regulations

The 1994 regulations provide that "[a] borrower may assert as a defense against repayment, any act or omission of the school attended by the student that *would give rise to a cause of action against the school under applicable state law*." 34 C.F.R. § 685.206 (emphasis added). Simply, state law provides the standard by which ED is to determine whether a BD applicant is entitled to discharge of their federal student loans. Yet Colleen Nevin testified that BD applications

aren't being denied based on, you know, not being able to fulfill a specific element of a particular state law or a specific element of the 2016 regulation. . . . [T]he [denial] letters, so the ones that have gone out so far, we haven't issued any denials that were based on kind of an application of specific elements of, you know, state law where there could be a different answer in California versus Nebraska.

Ex. 4 (Nevin Dep. 79:6-20).[18]

Instead, the 'presumption of denial' policy mandated denial regardless of whether the borrower's school engaged in acts or omissions that give rise to a cause of action under applicable state law. As one example, the policy directed reviewers to disregard allegations of oral misrepresentations, without considering whether oral statements would support a claim under state law. *See* sources cited *in* Supp. Compl. ¶¶ 136-138. For another, the policy imposed a reliance requirement, regardless of whether applicable state law required the borrower to specifically allege reliance on a misrepresentation. *See* Ex. 4 (Nevin Dep. 85:8-20); Ex. 11 at 1-3; Ex. 40 (showing claims in "Flagged for Denial" status with "Decision Reason" listed as "Lack of Reliance"). The BDU rejected applications asserting a misleading omission if they didn't allege a duty to inform, again regardless of whether state law required such an allegation. Ex. 11 at 2. Often, the BDU's memoranda did not even *identify the state(s) where the school was located*, let alone the laws of those states.[19] *See, e.g.*, Ex. 41 (stating allegations "do not . . . violate[] state law" but not identifying states where school is located); Ex. 42 (same); Ex. 43 (same). Even where the state was identified, at least some memoranda applied standards *not* based on state law. *See, e.g.*, Ex. 44 (denying applications based on when the school was "on notice of the gravity of" an accreditor's investigation, without considering whether such "notice" was relevant under state law).

Indeed, as this Court observed, class member Yvette Colon received a Form Denial Notice

---

[18] Notably, one of the BDU's excuses for why front-line reviewers were not permitted to approve BD applications was that "[y]ou'd have to understand what the elements of the claim are, and that's dependent on the regulation and the state law." Ex. 4 (Nevin Dep. 206:11-22).

[19] Only one memorandum, out of many hundreds, engaged in a choice-of-law analysis. *See* Ex. 4 (Nevin Dep. 52:21–53:1).

GovSER-065

even though she had already received a restitution check from the New York Attorney General's lawsuit against her school. *See* Disc. Order at 7, 14. This Court asked, "why did a student who already qualified for relief based on her school's misconduct under state law not now qualify for relief based on a claim 'that would give rise to a cause of action against the school under applicable State law?'" *Id.* at 14. The 'presumption of denial' policy is why.

The policy's stance with respect to the 2016 regulations was identical. The 2016 regulations imposed a uniform federal standard, such that a BD applicant can assert as a defense to repayment that their school (or its agents) "made a substantial misrepresentation . . . that the borrower reasonably relied on to the borrower's detriment." 34 C.F.R. § 685.222(d)(1). The regulations define both "misrepresentation" and "substantial misrepresentation." 34 C.F.R. § 668.71(c). Yet those definitions—much less any analysis of how they might apply—never appear in the BDU's school-specific memoranda. Notably, the Regulations specifically mandate that oral misrepresentations can meet the "substantial misrepresentation" standard, *id.*, but as explained, the 'presumption of denial' policy required BD reviewers to disregard allegations of oral misrepresentations. The definition of "misrepresentation" also includes "any statement that omits information in such a way as to make the statement false, erroneous, or misleading," with no mention of a duty to disclose, *id.*—but the 'presumption of denial' policy regularly required applicants to allege that such a duty existed. Nevin admitted that BD denials were not being based on a borrower's inability to "fulfill . . . a specific element of the 2016 regulation." Ex. 4 (Nevin Dep. 79:6-20). Rather, the 'presumption of denial' policy mandated the denial of applications regardless of whether the borrower met the 2016 misrepresentation standard. It was openly, explicitly contrary to ED's own regulations, and violated section 706(2) of the APA.

### c)   The Policy Is Arbitrary, Capricious, and Was Developed and Implemented in Bad Faith

To survive "arbitrary and capricious" review, "the agency must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. The 'presumption of denial' policy

GovSER-066

was not based on "relevant data" and lacks any such "rational connection." *See id.*

To begin, discovery has not revealed *any* evidence to support ED's conclusion that less than 10% of BD applications outside of the CCI job placement rate category would satisfy the 1994 or 2016 regulations. *See* Ex. 22. To the contrary, internal documents show ED was aware of serious misconduct by dozens of schools which accounted for thousands of BD claims. *See, e.g.*, Exs. 46-58 (evidence of misconduct by ITT Technical Institute, CCI, EDMC, Anthem Education Group, Career Education Corp., DeVry/Keller Graduate School of Management, Empire Beauty School, Everglades University, Universal Technical Institute, Premier Education Group, and Florida Career College); ECF 145-2 (Defendants' "fraud list").

By the same token, there was no factual or legal support for ED's decision to establish a set of procedures by which "[t]he majority of [BD] applications will be denied." Ex. 23 at DOE8842. What ED did, instead, was reason backward from its leaders' belief that borrowers should not get "free money" from the BD program. Secretary DeVos and those who answered to her were clear about their intentions: they wanted to deny as many BD applications as they could. *See supra* Sections II.B, II.C. So they set up a process that would reach that result, regardless of whether it was supported by the evidence or comported with ED's own regulations.

In developing and applying the 'presumption of denial' policy, ED allowed its bias against BD applicants to infect the claims assessment process, thus depriving class members of a neutral decision-maker. This bias is apparent in ED's repeated rejection of applications from borrowers who attended schools ED *already knew* had misled students under applicable state law. The lead Plaintiff in this action, Theresa Sweet, is one example: she attended Brooks Institute of photography, a Career Education Corp. ("CEC") school, and received a Form Denial Notice in 2020. *See* Ex. 13 at 28-33; Supp. Ans. ¶ 354. Yet in 2019, CEC entered into an agreement with 48 states and the District of Columbia to address alleged violations of state laws on recruitment and enrollment, and forewent collection on nearly $500 million in student debts. *See* Ex. 59.

As the Second Circuit observed, "[a]ny effort by [an agency] to pursue a 'strategy' to justify a foreordained opposition" is "incompatible" with the agency's "mandate to use its expertise to

27

come to a reasoned decision supported by substantial evidence." *Islander East Pipeline Co. v. Conn. Dep't of Envt'l Protection*, 482 F.3d 79, 105 (2d Cir. 2006). Yet a "foreordained opposition" is exactly what ED pursued here. This type of bad faith conduct is the essence of arbitrary and capricious agency action. *See Latecoere Int'l, Inc. v. U.S. Dep't of Navy*, 19 F.3d 1342, 1356 (11th Cir. 1994) ("proof of subjective bad faith by [agency] officials," including evidence that officials "predetermin[ed]" an outcome or "harbor[ed] a prejudice against the plaintiff," will "generally constitute[] arbitrary and capricious action" (internal quotation marks omitted)); *see also, e.g.*, *Simmons v. Smith*, 888 F.3d 994, 1001 (8th Cir. 2018) ("Agencies may act arbitrarily and capriciously if . . . they act with bad faith.").

### 2. The 'Presumption of Denial' Policy Deprives Class Members of Their Property Interests Without Due Process of Law

The right to seek loan cancellation through the BD process is a property right. By refusing to decide BD applications on the merits and failing to provide a neutral decisionmaker, ED has deprived class members of their property interests without due process of law.

### a) Class Members Have a Property Interest in Raising a Defense to Repayment of Their Federal Student Loans

"Key to a property interest determination is whether the person alleging a due process violation has an entitlement to the benefit at issue, conferred through statute, regulation, contract, or established practice." *Armstrong v. Reynolds*, 22 F.4th 1058, 1067 (9th Cir. 2022). There are three relevant property interests in this matter. First, members of the class, like all federal student loan borrowers, have a right to seek cancellation of their loans because of school misconduct. *Cf. Higgins v. Spellings*, 663 F. Supp. 2d 788, 794-95 (W.D. Mo. 2009) (finding a property interest in discharge of federally guaranteed student loans). Second, Defendants have an obligation to consider those borrower defenses. *See* Class Cert. Order at 12, ECF 46 (referring to Defendants' "obligation to process borrower defense claims"); *Vara v. DeVos*, No. CV 19-12175-LTS, 2020 WL 3489679, at *26, *32 (D. Mass. June 25, 2020) (holding ED is required by law to render reasoned decisions on BD applications and to follow its own "settled course of adjudication" in

doing so). Third, Plaintiffs have a property interest in uninterrupted loan forbearance while waiting for a final decision on the merits of their BD applications. *See* 34 C.F.R. § 685.222(e)(2); *Nozzi v. Housing Auth. of Los Angeles*, 806 F.3d 1178, 1191 (9th Cir. 2015) ("[P]laintiffs have a property interest in Section 8 Benefits to which the procedural protections of due process apply . . . ."); *see also Bd. of Regents of State Colleges v. Roth,* 408 U.S. 564, 576 (1972) ("[A] person receiving . . . benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process."). While an application is pending, members of the class are also protected from collection. 34 C.F.R. § 685.222(e)(2) ("Upon receipt of a borrower's application," the Secretary "grants forbearance" and/or "suspends collection activity until the Secretary issues a decision on the borrower's claim"); *see also Williams v. DeVos*, No. CV 16-11949-LTS, 2018 WL 5281741, at *15 (D. Mass. Oct. 24, 2018) (vacating Secretary's certification of defaulted student loan debts for collection through Treasury offset while BD application pending).

**b)    ED Deprived Class Members of These Interests Without Due Process of Law**

Above and beyond violating the APA, ED's refusal to consider BD applications on their merits and its failure to provide a neutral decision-maker rendered its 'presumption of denial' policy unconstitutional.

When an administrative procedure is a "sham through and through, there has not been a constitutionally sufficient opportunity to respond." *Levenstein v. Salafsky*, 164 F.3d 345, 351 (7th Cir. 1998); *see also Ciechon v. City of Chicago*, 686 F.2d 511, 517 (7th Cir. 1982) ("Due process requires that a hearing 'must be a real one, not a sham or a pretense.'" (quoting *Joint Anti-Fascist Refugee Committee v. McGrath*, 341 U.S. 123, 164 (1951) (Frankfurter, J., concurring))). Here, ED created a sham process by which nearly every BD application would be first ignored, then denied. The BDU *began* its assessment of applications by concluding that 90% or more would be denied. As detailed above, adjudicators of BD claims relied on memoranda that presumptively denied claims even when the memoranda themselves noted extensive evidence of wrongdoing. Adjudicators checked boxes stating borrowers failed to state a claim under state law, even though

29

they hadn't consulted state law at all.

A neutral decision-maker—and the appearance of one—is "essential" to due process of law. *Goldberg*, 397 U.S. at 251; *see also Marshall v. Jerrico, Inc.*, 446 U.S. 238, 242 (1980) ("The neutrality requirement helps to guarantee that life, liberty, or property will not be taken on the basis of an erroneous or distorted conception of the facts or the law."). Although an agency may investigate the facts and institute proceedings, *see Withrow v. Larkin*, 421 U.S. 35, 53 (1975), that does not mean the process of adjudication may lead to a foregone conclusion. The crux of procedural due process is that individuals or groups petitioning the government have the opportunity to be heard. *See, e.g.*, *Fouts v. Cnty. of Clark*, 76 F. App'x 825, 826 (9th Cir. 2003) (quoting *Conner v. City of Santa Ana*, 897 F.2d 1487, 1492 (9th Cir. 1990)). BD applicants have not been heard. Thousands have been met with years of stony silence; thousands of others, after waiting patiently, found ED had closed its ears to them.

## C.    The Form Denial Notices Are Unlawful

As this Court has found, the "perfunctory" Form Denial Notices are "utterly devoid of meaningful explanation." Disc. Order at 15. They do not provide borrowers with a substantive reason for the denial, a description of the evidence considered, or any information to determine what additional evidence would aid in the reconsideration process. As a result, the Notices violate both the APA and the Due Process Clause. The class members who received them are still subject to an unlawful delay.

### 1.    The Notices Violate APA § 555(e)

APA section 555(e) requires an agency to give "[p]rompt notice . . . of the denial in whole or in part of a written application, petition, or other request," and that any such notice "shall be accompanied by a brief statement of the grounds for denial." 5 U.S.C. § 555(e). This "brief statement" requirement mandates the agency explain the reasons for the denial. *See Butte Cty., Cal. v. Hogen*, 613 F.3d 190, 194 (D.C. Cir. 2010) ("The agency's statement must be one of 'reasoning'; it must not be just a 'conclusion'; it must 'articulate a satisfactory explanation' for its action." (quoting *Tourus Records, Inc. v. Drug Enforcement Admin.*, 259 F.3d 731, 737 (D.C. Cir.

30

GovSER-070

2001))). The explanation must provide a "basis upon which [a court] could conclude that [the denial] was the product of reasoned decisionmaking." *Id.* at 195 (quoting *Tourus Records*, 259 F.3d at 737); *see also id.* ("Reasoned decisionmaking [under § 555(e)] is not a procedural requirement. It stems directly from § 706 of the APA." (citation omitted)).

ED's own regulations reflect its awareness of its obligations under section 555(e): the Secretary is required to "designate a Department official" to "resolve the [BD] claim through a fact-finding process," and in the event the official denies the claim, she must "notif[y] the borrower of the reasons for the denial, the evidence that was relied upon," and "inform[] the borrower of the opportunity to request reconsideration." 34 C.F.R. § 685.222(e)(3), (e)(4)(ii).

The Form Denial Notices do not meet these standards. To begin, the Notices fail to provide class members with an adequate explanation of the grounds for denial of their BD applications. In the section of the Notices that ostensibly provided the "Review Recommendation Reason," ED simply plugged in undefined, vague, conclusory, and boilerplate responses, including "Failure to State a Claim," "Insufficient Evidence," "Outside Coverage Date," and "Other." *See* Suppl. Compl. ¶¶ 304-305; Supp. Ans. ¶¶ 304-305. These cut-and-paste phrases are resolutely not self-explanatory. *See* 5 U.S.C. § 555(e) ("Except . . . when the denial is self-explanatory, the notice shall be accompanied by a brief statement of the grounds for the denial."). They are not "reasons," and they do not "articulate a satisfactory explanation." *Butte Cty.*, 613 F.3d at 194.

The Notices do not tell applicants *how* or *why* they have "failed to state a claim" or have provided "insufficient evidence." *See, e.g.*, Ex. 13 ¶¶ 7-10; Ex. 39 ¶¶ 6-18; Ex. 62 ¶¶ 6-9; Ex. 63 ¶¶ 9-15. Compounding the problem, borrowers are not able to access or even see a description of the evidence ED has supposedly consulted to deny their claims. *See* Ex. 4 (Nevin Dep. 183:7-22). These failures render the Form Denial Notices legally insufficient. *See, e.g.*, *Meadville Master Antenna, Inc. v. F.C.C.*, 443 F.2d 282, 290 (3d Cir. 1971) (agency "must state with specificity its objections to the showing made by petitioner and not rely on conclusory and undefined terms"); *Higgins v. Spellings*, 663 F. Supp. 2d 788, 797-98 (W.D. Mo. 2009) (finding notice of denial for "medical review failure" inadequate because "the term is not defined in the letter").

31

Further, the Form Denial Notices fail to identify the law ED applied. Although the Notices claim that certain applications were decided under state law, they do not state *which* state law ED used to evaluate the merits of the claim. *See* Supp. Compl. ¶¶ 297-299; Supp. Ans. ¶¶ 297-299. And, when pressed in discovery, Defendants admitted they did not actually apply state law at all. *See* Ex. 4 (Nevin Dep. 79:6-20). This is critical, because an agency response that "merely parrot[s] the language of the standard" of review is "not a statement of reasoning, but of conclusion[,]" and violates the APA. *See Amerijet Int'l, Inc. v. Pistole*, 753 F.3d 1343, 1350 (D.C. Cir. 2014) (cited in *State of California v. U.S. Dep't of the Interior*, 381 F. Supp. 3d 1153, 1169 (N.D. Cal. 2019)).

Bare-bones notices such as these have repeatedly been rejected by courts. For example, the D.C. Circuit held that a letter from an agency alerting a claimant that its application was "not adequately supported" was an insufficient legal conclusion, and not the required "statement" of the grounds for denial. *Tourus Records*, 259 F.3d at 737 ("[The denial] does not 'articulate a satisfactory explanation' for the agency's action . . . because it does not explain 'why' the [agency] regarded [the petition] as unsupported."). Similarly, that court rejected notices denying discharge upgrade requests using "boilerplate language" that made it "impossible to discern" any "rational connection between the facts found and the choice made." *Dickson v. Secretary of Defense*, 68 F.3d 1396, 1404-05 (D.C. Cir. 1995) (internal quotation marks omitted). So too here. The Form Denial Notices are unsupportable under the APA.

### 2.    The Notices Violate the Due Process Clause

As a guiding principle, "[i]n order to be constitutionally adequate, notice of benefits determinations must provide claimants with enough information to understand the reasons for the agency's action." *Kapps v. Wing*, 404 F.3d 105, 123 (2d Cir. 2005) (citing *Goldberg v. Kelly*, 397 U.S. 254, 267-68 (1970)). Here, as this Court has recognized, the perfunctory Form Denial Notices provide class members with no way of knowing why their claims were denied, or how to challenge the denials. *See* Disc. Order at 14. BD applicants "cannot know whether a challenge to an agency's action is warranted, much less formulate an effective challenge, if they are not provided with sufficient information to understand the basis for the agency's action." *Kapps*, 404 F.3d at 125

32

1    (citing *Vargas v. Trainor*, 508 F.2d 485, 490 (7th Cir. 1974)).

2        Plaintiffs are left with no real recourse to challenge the denials, but "[t]he Due Process

3    Clause forbids an agency to use evidence in a way that forecloses an opportunity to offer a contrary

4    presentation." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.,* 419 U.S. 281, 288 n.4 (1974);

5    *see Goldberg*, 397 U.S. at 270-71. "One of the fundamental requirements of procedural due

6    process is that a notice must be reasonably calculated to afford parties their right to present

7    objections." *Gonzalez v. Sullivan*, 914 F.2d 1197, 1203 (9th Cir. 1990) (citing *Mullane v. Central

8    Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950)). This requirement demands that notice

9    "accurately state how a claimant might appeal an initial burden," and not "introduce[] a high risk

10   of error into the . . . decision making process." *Id.* As this Court has already recognized, "the

11   borrower's path forward rings disturbingly Kafkaesque" after receiving a Form Denial Notice.

12   Disc. Order at 8. The Notice also completely omits the borrower's option to seek recourse in

13   federal court. The Form Denial Notices are thus fatally defective under the Due Process Clause.

14       **D.    The Court Is Authorized to Grant the Relief that Plaintiffs Seek**

15       If it finds summary judgment is warranted, Plaintiffs respectfully request the Court (i) issue

16   a declaratory judgment that the 'no decisions' policy and the 'presumption of denial' policy are

17   unlawful, and (ii) issue an order for Defendants to show cause why each and every class member's

18   BD application should not be granted immediately.

19       As to the declaratory judgment, the probability of future violations "is real and substantial"

20   without one, and the situation is "of sufficient immediacy and reality to warrant the issuance of a

21   declaratory judgment." *Crossley v. California*, 479 F. Supp. 3d 901, 920 (S.D. Cal. 2020) (quoting

22   *Steffel v. Thompson*, 415 U.S. 452, 460 (1974)). A declaratory judgment will "resolve uncertainties

23   or disputes that may result in future litigation" regarding BD processes. *Vascular Imaging Prods.,

24   Inc. v. Digirad Corp.*, 401 F. Supp. 3d 1005, 1010 (S.D. Cal. 2019).

25       As to the order to show cause, this remedy is proper because remand to the agency would

26   only prolong, rather than cure, the APA and due process violations against the class.

33

1.      **The HEA's Anti-Injunction Provision Does Not Foreclose Relief**

Defendants have previously argued that the HEA's anti-injunction provision forecloses any relief in this case. *See* Defs.' 1st MSJ at 15-16. Plaintiffs incorporate by references their previous responses. Pls.' 1st MSJ at 21-22; Pls.' 1st MSJ Reply at 6-7. Where, as here, plaintiffs seek "specific relief requiring the Secretary of Education to perform a duty imposed by law" and "the conduct alleged is determined to be beyond the statutory limits on the Secretary's power," courts may issue injunctive relief against the Department. *See Gearhart v. U.S. Dep't of Educ.*, No. 19-CV-00750-YGR, 2019 WL 5535798, at *2 (N.D. Cal. Oct. 25, 2019); *Canterbury Career Sch., Inc. v. Riley*, 833 F. Supp. 1097, 1102 (D.N.J. 1993). Defendants' contrary position would cut citizens off from any ability to hold ED accountable for *ultra vires* actions.

Additionally, since the prior summary judgment briefing, Plaintiffs have added a constitutional due process claim against the Secretary. *See* Supp. Compl. ¶¶ 448-455. "[U]ltra vires claims independent of the APA . . . can be brought against federal officers" who "violated the Constitution." *Al Otro Lado*, 2021 WL 3931890 at *7 (quoting *E.V. v. Robinson*, 906 F.3d 1082, 1090 (9th Cir. 2018)). Claims alleging constitutional violations by federal officers "are not 'against the government' for purposes of sovereign immunity." *E.V.*, 906 F.3d at 1098.

2.      **Remand to ED Would Be Futile**

Though "the proper way to handle an agency error in the ordinary circumstance is to remand to the agency for additional investigation or explanation," these are *not* ordinary circumstances. *Boliero v. Holder*, 731 F.3d 32, 38 (1st Cir. 2013) (describing the "ordinary remand rule"); *see also Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985); *N.L.R.B. v. Wyman-Gordon Co.*, 394 U.S. 759, 766 n.6 (1969) (holding there is no need to remand a matter to an agency when such a procedure "would be an idle and useless formality."). Courts are "not strictly bound to [the] ordinary remand rule when it is clear that remand would be futile." *Singh v. Holder*, 558 F. App'x 76, 81 (2d Cir. 2014). Remand here would be futile, because ED clearly has *no lawful process in place* to timely decide the backlog of BD applications, and, even if it did, it is wholly unable to produce *lawful denial notices*. Ordering Defendants to show cause why class

34

members should not receive immediate approvals of their BD applications is permissible, and vital.

First, the delay in this case has already been unreasonable, and the outcome of remand would be painfully foreseeable. Further delay and violations of section 706 are the likely outcomes because ED currently has no discernable process in place for deciding BD applications in a manner that comports with its obligations.

Second, remand would pose a significant risk of re-creating the same conditions that scuttled the earlier proposed settlement in this case. That is, after a remand, ED could very well unleash a mass of legally insufficient denial notices. Significantly, ED has ***never once*** provided a denial notice with a lawful explanation of its reasoning.

Under these circumstances, an order to show cause is an appropriate remedy, because it provides ED with an opportunity to place its best evidence on the record. If ED cannot provide any supportable reason for continuing to withhold decisions from class members, and cannot provide any concrete evidence that it is able to issue lawful decisions on pending claims within a reasonable period of time, then this Court will be justified in ordering ED to grant class members' applications as a form of relief. In that situation, "the record [will] contain[] no basis in fact for denial of [an] application," and thus remand to the agency would be futile. *Watson v. Geren* 569 F.3d 115, 134–35 (2d Cir. 2009); *see also Donovan ex rel. Anderson v. Stafford Const. Co.*, 732 F.2d 954, 961 (D.C. Cir. 1984) (remand is unnecessary where "only one conclusion would be supportable"); *George Hyman Const. Co. v. Brooks*, 963 F.2d 1532, 1539 (D.C. Cir. 1992) (same); *cf. Vara*, 2020 WL 3489679, at *30-31 (declining to remand group BD application to ED). In other words, if the record shows ED is incapable of honoring the class's legal rights, the only solution is to take matters out of its hands.[20] *See, e.g.*, *Eldredge v. Carpenters 46*, 94 F.3d 1366, 1371-72

---

[20] This Court also has broad authority to appoint a special master to remedy systemic government misconduct. *See* Fed. R. Civ. P. 53(a)(1); *Swann v. Charlotte-Mecklenburg Bd. of Educ.*, 402 U.S. 1, 15 (1971). If the Court opts for some form of remand, a master would be justified by ED's history of non-compliance with its legal obligations, the complexity of this litigation, and the potential complexity of compliance. *See, e.g.*, *Hook v. Ariz.*, 120 F.3d 921, 926 (9th Cir. 1997).

35

(9th Cir. 1996) (where defendant has displayed "recalcitrance and foot-dragging," prescriptive injunctive relief is appropriate); *Orantes-Hernandez v. Thornburgh*, 919 F.2d 549, 561-68 (9th Cir. 1990) (upholding permanent injunction based on persistent pattern of government misconduct that violated plaintiffs' rights).

Finally, Plaintiffs do not seek "broad programmatic improvements" of a federal program. *Ramirez v. U.S. Immigr. & Customs Enf't*, 310 F. Supp. 3d 7, 20 (D.D.C. 2018). Rather, Plaintiffs have identified a "discrete and particularized action by Defendants . . . in violation of their statutory obligations." *Al Otro Lado*, 2021 WL 3931890 at *8: ED's refusal to issue lawful decisions on BD applications. This "defeats any argument that the record reflects a 'broad programmatic attack' on agency action that is not permitted under § 706(1)." *Id.* at *9; *see also Ramirez*, 310 F. Supp. 3d at 20-21; *Meina Xie v. Kerry*, 780 F.3d 405, 408 (D.C. Cir. 2015). *Compare Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 890 n.2 (1990) (plaintiffs did not identify "some specific order or regulation," but rather made "a generic challenge to all aspects" of the program at issue). That ED's unlawful policy "span[ned] several years" and purportedly rested on a variety of "factual bases" does not change the result: "The fact that Defendants sought to [delay and deny BD applications] in different contexts does not transform Plaintiffs' claim into a programmatic attack." *Al Otro Lado*, 2021 WL 3931890 at *10.

APA review need not be "a ping-pong game." *Wyman-Gordon Co.*, 394 U.S. at 766 n.6. If ED is able to show cause why some BD applications should be denied, or cannot yet be decided, then a remand may be justified[21]; otherwise, class members deserve swift clarity. Nearly ***three hundred thousand borrowers***—more than at the end of the DeVos administration—are currently

---

[21] This Court's findings of bad faith by ED support retention of jurisdiction even in the event of remand. *See Empire Health Found. v. Becerra*, No. cv 20-2149 (JEB), 2022 WL 370559, at *5 (D.D.C. Feb. 8, 2022) (court "has the discretion to retain jurisdiction over a case pending completion of a remand" in cases involving "unreasonable delay of agency action . . . , or for cases involving a history of agency noncompliance with court orders or resistance to the fulfillment of legal duties" (quoting *Baystate Medical Center v. Leavitt*, 587 F. Supp. 2d 37, 41 (D.D.C. 2008))).

36

being harmed by ED's denial of their rights. The only reasonable remedy for the harm borrowers have suffered is an order to show cause why class members' applications should not be granted immediately.

## VI.   **CONCLUSION**

For the foregoing reasons, Plaintiffs respectfully request the Court grant summary judgment in their favor on all claims and order the relief that Plaintiffs seek.

Dated: June 9, 2022

/s/ *Eileen M. Connor*

EILEEN M. CONNOR (SBN 248856)
econnor@law.harvard.edu
REBECCA C. ELLIS *(pro hac vice)*
rellis@law.harvard.edu
LEGAL SERVICES CENTER OF
HARVARD LAW SCHOOL
122 Boylston Street
Jamaica Plain, MA 02130
Tel.: (617) 390-3003
Fax: (617) 522-0715

JOSEPH JARAMILLO (SBN 178566)
jjaramillo@heraca.org
HOUSING & ECONOMIC RIGHTS
ADVOCATES
3950 Broadway, Suite 200
Oakland, California 94611
Tel.: (510) 271-8443
Fax: (510) 868-4521

37

Plaintiffs' Motion for Summary Judgment
Case No.: 19-cv-03674-WHA

GovSER-077

BRIAN D. NETTER
Deputy Assistant Attorney General
STEPHANIE HINDS
United States Attorney
MARCIA BERMAN
Assistant Branch Director
R. CHARLIE MERRITT
STUART J. ROBINSON
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW
Washington, DC 20005
(202) 616-8098
E-mail: robert.c.merritt@usdoj.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THERESA SWEET, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>MIGUEL CARDONA, in his official capacity as Secretary of Education, and the UNITED STATES DEPARTMENT OF EDUCATION,<br><br>Defendants. | No. 3:19-cv-03674-WHA<br><br>**DEFENDANTS' CONSOLIDATED OPPOSITION TO MOTIONS FOR INTERVENTION**<br><br>Date: August 4, 2022<br>Time: 8:00 a.m.<br>Place: Courtroom 12, 19th Floor<br>Judge William Alsup |

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................................. 1

BACKGROUND ................................................................................................................... 3

I.     Statutory and Regulatory Background ................................................................ 3

II.    Procedural History .............................................................................................. 4

III.   The Settlement Agreement ................................................................................. 6

IV.   The Intervention Motions .................................................................................. 9

LEGAL STANDARDS ........................................................................................................ 10

ARGUMENT ........................................................................................................................ 11

I.     The Intervention Motions Are Premature And Should Be Held In Abeyance
Pending The Court's Preliminary Approval Determination. ............................. 11

II.    Movants Are Not Entitled To Intervene As Of Right. ....................................... 13

       A.    The Proposed Settlement Is a Valid Exercise of the Federal Government's
Settlement Authority, Not an Application of the Department's Borrower
Defense Regulations. ............................................................................. 13

       B.    Movants Lack Any Concrete Interest in the Proposed Settlement. ...... 15

       C.    The Interests Claimed in the Intervention Motions Would Not Be Impaired
Absent Intervention. .............................................................................. 19

III.   The Court Should Deny Permissive Intervention. ............................................. 20

CONCLUSION ..................................................................................................................... 21

GovSER-079

# TABLE OF AUTHORITIES

**CASES**

*Allen v. Bedolla*,
    787 F.3d 1218 (9th Cir. 2015) ................................................. 13, 21

*Ass'n of Private Sector Colls. & Univs. v. Duncan*,
    681 F.3d 427 (D.C. Cir. 2012) ..................................................... 3

*BB&T Co. v. Pahrump 194, LLC*,
    No. 2:12-cv-1462, 2015 WL 1877422 (D. Nev. Apr. 23, 2015) ............................. 12

*Bellinghausen v. Tractor Supply Co.*,
    306 F.R.D. 245 (N.D. Cal. 2015) ................................................. 21

*Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist.*,
    952 F.2d 1173 (9th Cir. 1992) ..................................................... 16

*Bova v. City of Medford*,
    564 F.3d 1093 (9th Cir. 2009) ..................................................... 17

*Brooks v. Life Care Ctrs. of Am., Inc.*,
    No. SACV 12-659, 2015 WL 13390031 (C.D. Cal. Mar. 3, 2015) ......................... 20

*Callahan v. Brookdale Senior Living Cmtys., Inc.*,
    38 F.4th 813 (9th Cir. 2022) ................................................. 10, 11, 20

*Casey v. Citibank, N.A.*,
    No. 5:12-cv-820, 2014 WL 3468188 (N.D.N.Y. Mar. 21, 2014) ........................... 12

*Chavez v. PVH Corp.*,
    No. C 13-01797, 2015 WL 12915109 (N.D. Cal. Aug. 6, 2015) ........................... 12

*Chi v. Univ. of S. Cal.*,
    No. 2:18-cv-4258, 2019 WL 3064457 (C.D. Cal. Apr. 18, 2019) .......................... 12

*Clapper v. Amnesty Int'l USA*,
    568 U.S. 398 (2013) ................................................................ 17

*Commodity Futures Trade Comm'n v. Heritage Cap. Advisory Servs., Ltd.*,
    736 F.2d 384 (7th Cir. 1984) ....................................................... 19

*Cooper v. Newsom*,
    13 F.4th 857 (9th Cir. 2021) ................................................. 10, 11, 20

*Dilks v. Aloha Airlines*,
    642 F.2d 1155 (9th Cir. 1981) ..................................................... 17

*FTC v. Apex Cap. Grp. LLC,*
No. CV 18-9573, 2022 WL 1060486 (C.D. Cal. Mar. 10, 2022) .......................................... 18

*Freedom from Religion Found., Inc. v. Geithner,*
644 F.3d 836 (9th Cir. 2011) ...................................................................................... 10

*Garza v. Cnty. of L.A.,*
918 F.2d 763 (9th Cir. 1990) ...................................................................................... 20

*Gould v. Alleco, Inc.,*
883 F.2d 281 (4th Cir. 1989) ...................................................................................... 13

*In re Novatel Wireless Secs. Litig.,*
No. 08CV1689, 2014 WL 2858518 (S.D. Cal. June 23, 2014) .......................................... 21

*In re Tableware Antitrust Litig.,*
484 F. Supp. 2d 1078 (N.D. Cal. 2007) ........................................................................ 11

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liability Litig.,*
229 F. Supp. 3d 1052 (N.D. Cal. 2017) ................................................................. 11, 12

*Lane v. Facebook, Inc.,*
No. C 08-3845, 2009 WL 3458198 (N.D. Cal. Oct. 23, 2009) .......................................... 12

*League of United Latin Am. Citizens v. Wilson,*
131 F.3d 1297 (9th Cir. 1997) .................................................................................... 20

*Moore v. Verizon Commc'ns Inc,*
No. C 09-1823, 2013 WL 450365 (N.D. Cal. Feb. 5, 2013) ............................................ 17

*Or. Prescription Drug Monitoring Program v. U.S. DEA,*
860 F.3d 1228 (9th Cir. 2017) .................................................................................... 10

*Raquedan v. Centerplate of Del. Inc.,*
376 F. Supp. 3d 1038 (N.D. Cal. 2019) ........................................................................ 20

*Shoshone Bannock Tribes v. Reno,*
56 F.3d 1476 (D.C. Cir. 1995) .................................................................................... 14

*Summers v. Earth Island Inst.,*
555 U.S. 488 (2009) ................................................................................................. 15

*Talavera v. Global Payments, Inc.,*
No. 21-cv-1585, 2021 WL 5331000 (S.D. Cal. Nov. 16, 2021) ....................................... 18

*Town of Chester, NY v. Laroe Estates, Inc.,*
137 S. Ct. 1645 (2017) .............................................................................................. 10

**GovSER-081**

*United States v. Aerojet Gen. Corp.*,
  606 F.3d 1142 (9th Cir. 2010) ............................................................. 19

*United States v. Alisal Water Corp.*,
  370 F.3d 915 (9th Cir. 2004) ............................................................... 20

*United States v. Carpenter*,
  526 F.3d 1237 (9th Cir. 2008) ............................................................. 14

*United States v. Hercules, Inc.*,
  961 F.2d 796 (8th Cir. 1992) .......................................................... 13, 14

*Util. Reform Project v. Bonneville Power Admin.*,
  869 F.2d 437 (9th Cir. 1989) ............................................................... 13

*Weingarten v. DeVos*,
  468 F. Supp. 3d 322 (D.D.C. 2020) ..................................................... 14

*Zepeda v. PayPal, Inc.*,
  No. 10-cv-2500, 2014 WL 1653246 (N.D. Cal. Apr. 23, 2014) ......................... 20, 21

**STATUTES**

20 U.S.C. § 1082 ........................................................................ 14

20 U.S.C. § 1087e ........................................................................ 3

28 U.S.C. §§ 516-519 .................................................................... 13

**RULES**

Fed. R. Civ. P. 24 .......................................................... 10, 13, 20, 21

**REGULATIONS**

28 C.F.R. §§ 0.160-0.172 ................................................................ 14

34 C.F.R. part 668, subpart G ..................................................... 3, 4, 16

34 C.F.R. part 668, subpart H ......................................................... 4, 16

34 C.F.R. § 668.84 ...................................................................... 4

34 C.F.R. § 668.85 ...................................................................... 4

34 C.F.R. § 668.86 ...................................................................... 4

34 C.F.R. § 668.87 ...................................................................... 4

34 C.F.R. § 668.89 ................................................................................................ 4

34 C.F.R. § 685.206 ............................................................................................. 3

34 C.F.R. § 685.222 ............................................................................................. 3

Notice of Proposed Rulemaking,
    87 Fed. Reg. 41,878 (July 13, 2022) ................................................................ 9

**OTHER AUTHORITIES**

Karishma Mehrotra, Two for-profit colleges settle lawsuit with attorney general for $2.3
    million, *Boston Globe* (July 30, 2015),
    https://www.bostonglobe.com/business/2015/07/30/two-for-profit-colleges-settle-
    lawsuit-with-attorney-general-for-million/PLtMSKNp9QxG19ZGXcXUZI/story.html .......... 18

Lucy Campbell, Students Win $11.2M Settlement in Chicago School of Psychology Fraud
    Lawsuit, *Lawyers & Settlements.com* (Sept. 22, 2016),
    https://www.lawyersandsettlements.com/settlements/19167/students-win-11-2m-
    settlement-in-chicago-school-of.html ................................................................ 18

Veronica Jean Seltzer, American National Univ. found guilty of violating KY Consumer
    Protection Act, *WVTQ* (June 18, 2019),
    https://www.wtvq.com/american-national-univ-found-guilty-violating-ky-consumer-
    protection-act/ ........................................................................................ 18

**INTRODUCTION**

This class action lawsuit presents a dispute between student loan borrowers and the U.S. Department of Education ("Department") regarding the Department's process for reviewing and adjudicating borrowers' applications for the Department to relieve them of their loan repayment obligations based on the alleged misconduct of the schools they attended. The lawsuit exclusively addresses the Department's obligations to borrowers; it has no potential to adjudicate any rights or obligations of those schools. After three years of litigation—which has now involved multiple rounds of summary judgment briefing, extensive discovery, and months of settlement negotiations—the parties have executed a settlement agreement to resolve this dispute without the expense, uncertainty, and delay of additional protracted litigation. As detailed in the parties' joint motion seeking the Court's preliminary approval, the agreement resolves the disputed issues in this case fairly and comprehensively for the class as a whole, taking due account of the complexities of this case and the relief Plaintiffs could potentially obtain if the parties were to proceed to judgment on the merits. Now, on the eve of the scheduled preliminary approval hearing, four institutions against whom class members have alleged misconduct and sought borrower defense relief seek to intervene to object to the settlement. But they have no interest whatsoever in this litigation—much less in the exercise of the Education Secretary's and the Attorney General's discretion, respectively, to compromise class members' federal student loan debts and settle litigation on terms that further the interests of the United States. The Court should deny the intervention motions.

To start, the proposed intervenors' motions are premature. Rule 23 provides an ordered process for the consideration of objections to a proposed class action settlement, and that occurs only after the Court first grants the agreement preliminary approval. No one, not even the class members whose interests the class action settlement approval process is designed to protect, have a right to object to *preliminary*, as opposed to final, approval of a proposed settlement. For that reason, the Court should, at a minimum, hold the motions in abeyance until it makes a determination whether to preliminarily approve the proposed settlement. Proceeding otherwise would elevate the concerns of the third-party intervenors over those of the class members who,

1  unlike the intervenors, have a right to submit objections prior to the Court's final approval of the

2  settlement.

3        If the Court does rule on the intervention motions now, it should deny them. The

4  Department's decision to resolve this case by, among other things, agreeing to provide up-front

5  settlement relief to class members who attended certain schools for which the Department believes

6  there exists a sufficient basis, for settlement purposes only, to warrant such relief has no

7  independent legal effect on the putative intervenor schools. The proposed settlement agreement

8  provides for the Department to afford this relief—not the schools. Any concrete consequences on

9  the schools—financial or otherwise—could be imposed only after the Department initiated a

10  separate, future proceeding, in accordance with regulations that require the Department to prove a

11  sufficient basis for liability and provide schools with notice and an opportunity to be heard. The

12  proposed settlement agreement is not, and does not purport to be, a substitution for those

13  proceedings; it will not be introduced as evidence in the event any such proceeding is initiated in

14  the future, and it creates no independent basis for action against the schools. Nor does the

15  settlement guarantee that future borrower defense claims by non-class member students of those

16  schools will be approved or have any effect on the Department's substantive adjudication of such

17  non-class member claims going forward. As such, the proposed intervenors do not meet Rule 24's

18  requirements for intervention of right, both because they fail to identify any concrete, protectable

19  interest, and because they fail to demonstrate that their participation in the closing stages of *this*

20  *action* (for the purpose of derailing a duly negotiated settlement that provides for an expeditious

21  resolution in a case about agency delay) is necessary to protect any such interest.

22        The Court should deny permissive intervention for the same reasons and in recognition of

23  the prejudice that would inevitably result from delaying resolution of this action at this late stage.

24  In its role as fiduciary for the class, the Court should reject the entreaties of institutions whose

25  actions gave rise to class members' borrower defense applications in the first place—and who have

26  no interest in the parties' negotiated resolution of this class action complaint—and deny

27  intervention.

28

## **BACKGROUND**

### I.    Statutory and Regulatory Background

Defendants have described the relevant legal framework in multiple filings throughout this case.  In short, through Title IV of the Higher Education Act of 1965 ("HEA"), "Congress provides billions of dollars through loan and grant programs to help students pay tuition for their postsecondary education." *Ass'n of Private Sector Colls. & Univs. v. Duncan*, 681 F.3d 427, 433 (D.C. Cir. 2012).  While student borrowers are generally required to repay their federal loans, Congress has granted the Education Secretary wide authority to "cancel a student federal loan repayment based on a school's misconduct."  Order Granting Mot. for Class Certification at 2, ECF No. 46 ("Class Cert. Order").  Specifically, the HEA authorizes the Secretary to "specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment."  20 U.S.C. § 1087e(h).

Pursuant to this authority, the Department has promulgated three sets of borrower defense regulations, with various standards and procedures that apply depending on the disbursement date of the relevant student loan underlying a given borrower defense claim.  *See* 34 C.F.R. §§ 685.206; 685.222.  In general, these regulations require the Department to initiate a factfinding process to adjudicate borrower defense applications.  *Id*. §§ 685.222(e); 685.206(e).  As part of that process, the Department considers all relevant information in its possession—including evidence submitted by applicants and the institutions they attended and evidence that is available from any other source—and issues a written decision resolving the claim.  *Id*. §§ 685.222(e)(3)-(4); 685.206(e)(9)-(11).

Separately, the regulations authorize the Secretary to "initiate a proceeding" to "collect from the school the amount of relief resulting from a borrower defense."  34 C.F.R. § 685.222(e)(7) (loans disbursed between July 1, 2017 and July 1, 2020); *see also id*. § 685.206(c)(3)-(4) (loans disbursed prior to July 1, 2017); *id*. § 685.206(e)(16) (loans disbursed after July 1, 2020). Regardless of when a loan was first disbursed, the Department can only seek to recoup amounts discharged for a granted borrower defense application in accordance with the procedures specified in regulations governing the Department's affirmative enforcement activities.  *See* 34 C.F.R. part

668, subpart G. To recover any losses incurred on the basis of institutional misconduct giving rise to a borrower defense, the Department must provide written notice to the relevant institution of its intent to do so. 34 C.F.R. § 668.87(a)(1). That notice must include "a statement of facts and law sufficient to show that the Department is entitled" both to grant the underlying borrower defense and to recover from the school any associated losses, and it must inform the institution of its right to submit a written response and request a hearing. *Id*. § 668.87(a)(1)(ii)-(iii). The written notice must also specify the date that the Department intends to take action to recover such losses, and inform the institution that the Department will "not take action to recover" the losses on that date if the institution provides a written response. *Id*. § 668.87(a)(1)(iii). If an institution requests a hearing, "[n]o liability shall be imposed on the institution prior to the hearing." *Id*. § 668.87(b)(2). The Department will not take action to recover from the institution until the institution's written response is considered or the hearing conducted and a decision issued. *Id.* §668.87(b).

Hearings are then conducted in accordance with the Department's general enforcement regulations, pursuant to which institutions have the opportunity to submit evidence, including expert evidence, and in some instances present oral argument. *See generally id*. § 668.89. At such a hearing, the Department carries "the burden of persuasion in a borrower defense and recovery action." *Id* § 668.89(b)(3)(iii). Similar procedures apply any time the Department seeks to take enforcement action against an institution based on its misconduct, including when it seeks to fine, suspend, limit, or terminate institutions from participating in Title IV programs, *see id*. § 668.84 (fine proceedings); *id*. § 668.85 (suspension proceedings); *id*. § 668.86 (limitation or termination proceedings), or when it pursues financial liabilities resulting from audits and program reviews of institutions, *see* 34 C.F.R. part 668, subpart H.

## II. Procedural History

Plaintiffs filed a class action complaint on June 25, 2019, challenging the Department's alleged delay in adjudicating borrower defense claims. *See* ECF No. 1. On October 30, 2019, the Court certified a class consisting of, with certain exceptions, "[a]ll people who borrowed a Direct Loan or FFEL loan to pay for a program of higher education, who have asserted a borrower defense to repayment to the U.S. Department of Education, [and] whose borrower defense has not been

granted or denied on the merits." Class Cert. Order at 14.

Defendants filed an answer and an administrative record, and the parties proceeded to brief cross-motions for summary judgment in December 2019 and January 2020. In their summary judgment briefing, Defendants contended, among other things, that the Court lacked jurisdiction because Plaintiffs' claims had become moot and that the Court lacked authority to issue any coercive relief against the Secretary. *See* Opp'n to Pls.' Mot. for Summ. J. & Reply in Supp. of Defs.' Mot. for Summ. J. at 2-7, ECF No. 72. Before the Court ruled on these motions, the parties executed a settlement agreement and submitted it for the Court's preliminary approval on April 10, 2020. ECF No. 97. The Court preliminarily approved the agreement on May 22, 2020, ECF No. 103 ("Prelim. Approval Order"), but ultimately, on October 19, 2020, denied final approval of the settlement because the parties had not reached a "meeting of the minds," Order Denying Class Settlement, to Resume Discovery, and to Show Cause at 10, ECF No. 146 at 10. This conclusion was based largely on concerns Plaintiffs raised about the Department's procedures for issuing decisions denying the claims of class members, including its issuance of "form denial letters," *id*. at 13, which the Court determined "hang[] borrowers out to dry," *id*. at 15. The Court also found a "strong showing of agency pretext," *id*.—which it characterized as "the paradigm of agency bad faith," *id*. at 12—based on the Court's conclusion that it was presented "with an explanation for agency action that is incongruent with what the record reveals about the agency's priorities and decisionmaking process." *Id*. (citation omitted).

Based on these findings, the Court authorized discovery to include inquiry into, among other things, the "development and use of the form denial letters" and the "extent to which the Secretary has denied applications of students who have attended schools subject to findings of misconduct by the Secretary or any other state or federal body or agency, and the rationale underlying those denials." *Id*. at 16. This discovery effectively expanded the case from one solely about the Department's delay to a far-reaching challenge to the Department's procedures for reviewing and adjudicating (and specifically denying) borrower defense applications.

Plaintiffs took extensive discovery and deposed multiple Department officials, eventually filing a supplemental complaint in May 2021. ECF No. 198 ("Suppl. Compl."). This complaint

added new claims alleging that the Department had "adopt[ed] a policy of near-automatic denial of borrower defense applications" and issued "unlawful denials of borrower defense applications." *Id*. ¶ 6. As part of Plaintiffs' overarching claim that the Department had inappropriately denied borrower defense applications, the complaint documented allegations and evidence of wrongdoing at several institutions. *E.g.*, *id*. ¶¶ 198-232 (describing "common evidence" of misconduct supporting borrower defense applications filed against several institutions, including Everglades University). When Plaintiffs moved for summary judgment on June 9, 2022, they requested, among other things, that the Court "[o]rder Defendants to show cause, within thirty days of the Court's ruling on this Motion, why each and every class member's BD application should not be granted immediately." Pls.' Mot. for Summ. J. at 1, ECF No. 245.

On June 22, 2022, the day before Defendants' opposition brief and cross-motion was due, the parties executed a settlement agreement and jointly submitted it to the Court for preliminary approval. *See* Joint Mot. for Prelim. Approval of Settlement, ECF No. 246 ("Prelim. Approval Mot."). Immediately thereafter, the parties' submitted a stipulated request to vacate the operative briefing schedule. ECF No. 247. When the Court did not rule on that request prior to Defendants' filing deadline,[1] Defendants filed a brief opposing Plaintiffs' summary judgment motion and cross-moving for summary judgment. *See* ECF No. 249.

## III.    The Settlement Agreement

Following discovery and after the change in presidential administration in January 2021, the parties began a new round of settlement negotiations in May 2021. These negotiations continued for more than a year, reflecting the tremendous complexity of this case and the Department's larger efforts to clear an ever-growing backlog of borrower defense applications that now numbers well over 200,000. The parties' joint motion for preliminary approval of the agreement, ultimately filed on June 22, 2022, aptly summarizes the terms of the agreement and its benefits to all parties. *See* Prelim. Approval Mot. Defendants highlight a few key provisions below.

---

[1] Pursuant to prior orders of the Court, that filing deadline was at Noon Pacific Time on June 23, 2022. *See* ECF No. 240; ECF No. 224 (providing that "[a]ll [summary judgment] filings are due at Noon").

The settlement agreement provides an overarching framework for the Department to eliminate the massive backlog of borrower defense applications—and resolve the claims of all class members—according to a schedule that is workable for the Department and fair to the class. To achieve that result, the settlement provides that class members who attended certain specified institutions will receive "Full Settlement Relief" within a year of the settlement's effective date. Proposed Settlement Agreement § IV.A.1, ECF No. 246-1 ("Agreement"). The institutions are listed on Exhibit C to the parties' proposed agreement. The parties' preliminary approval motion explained that "because the Department has identified common evidence of institutional misconduct by the schools, programs, and school groups identified in Exhibit C . . ., it has determined that every Class Member whose Relevant Loan Debt is associated with those schools should be provided presumptive relief under the settlement due to strong indicia regarding substantial misconduct by the listed schools, whether credibly alleged or in some instances proven, and the high rate of class members with applications related to the listed schools." Prelim. Approval. Mot. at 17-18.

The agreement makes clear that this relief is the result of the parties' negotiated settlement, not any borrower defense adjudication through the Department's regulatory process. *See, e.g.*, Agreement §§ II.O (defining "final decision" for purposes of the agreement as a decision "either approving or denying settlement relief to a borrower under the terms of this Agreement"); § IV.A (providing for class members who attended institutions on the Exhibit C list to receive "Full Settlement Relief"). An institution's inclusion on Exhibit C is not based on an official finding of misconduct or wrongdoing by the Department. *See* Decl. of Benjamin Miller ¶ 7 ("Miller Decl.") (attached hereto as Ex. A). Rather, it is the result of the parties' negotiated assessment that, for each school, there exists a sufficient threshold indication of wrongdoing to justify summary settlement relief for associated class members. By concentrating this kind of relief among the class members most likely (though in no sense guaranteed in every case) to obtain relief through the Department's ordinary borrower defense process—itself the subject of multiple claims in Plaintiffs' supplemental complaint—the agreement allows the Department to resolve a large volume of claims in a more rational way than if the Court awarded the kind of relief Plaintiffs have

1    demanded (*e.g.*, granting all borrower defense applications immediately) or imposed a shorter

2    schedule for resolving the backlog of claims that would force a more arbitrary resolution of those

3    claims as a whole.  It also allows the Department to issue decisions on a more expedited timeline

4    to the remaining class members than would otherwise be possible.

5        The remainder of class members (*i.e.*, those who did not attend a school on the Exhibit C

6    list) will receive decisions on their applications according to specified timelines, keyed to how

7    long their applications have been pending.  Agreement § IV.C.3.  In response to Plaintiffs'

8    allegations that the Department's prior methods for reviewing and adjudicating applications were

9    unlawfully weighted towards denying such applications, the agreement provides for the

10   Department to apply certain streamlined review procedures to class member applications.  *Id*.

11   § IV.C.1.  And to account for Plaintiffs' allegations about insufficient denial notices, the agreement

12   provides that the Department will not deny a class member's application without first providing

13   that class member an opportunity to revise and resubmit her application, and that any denial

14   decision will "explain the reasons the application was denied and apprise the recipient of his or

15   her right to seek review of the decision in federal district court." *Id*. § IV.C.2.  Any final decisions

16   issued through this process are not borrower defense decisions (and do not reflect adjudications

17   through the Department's borrower defense process) and will lead either to approval of an

18   application for settlement (not borrower defense) relief or to denial of that application.  *See, e.g.*,

19   *id*. § IV.C.2 (a "settlement relief decision" notifies a class member "that his or her borrower

20   defense application has been approved under the terms of this Settlement Agreement and that the

21   Class Member will receive Full Settlement Relief"); *see also* Miller Decl. ¶¶ 7-9.

22       The agreement provides that the Court will retain limited jurisdiction for the specific

23   purpose of enforcing specified breaches of the agreement, and it authorizes specified remedies in

24   the event of non-compliance.  *See generally* Agreement § V.  Otherwise, the agreement requires

25   the Court to "relinquish[] jurisdiction" over this action.  *Id*. § V.E & V.F.  The class members, in

26   turn, covenant not to sue in certain situations, *id*. § IX, and agree to waive all claims asserted in

27   this action, *id*. § VII, while Defendants remain free to assert any applicable res judicata defenses

28   in future actions involving Class Members, *id*.

The settlement class closed as of the date of the agreement's execution, June 22, 2022. *Id.* § III.D. However, the settlement agreement provides certain limited relief to "post-class applicants" who submit borrower defense applications between that date and the date the Court finally approves the agreement. *See id.* § IV.D. These individuals are entitled to a decision on their claims within 36 months of the agreement's effective date; if that deadline is missed, the post-class applicants will receive full settlement relief. *Id.* Those claims will be reviewed under normal borrower defense processes, and the post-class applicants are entitled to none of the streamlined processes specified in the agreement—including relief based on attendance at designated Exhibit C institutions. The proposed treatment of this limited set of "post-class applicants" is in line with the Department's proposals for handling borrower defense applications outside of the proposed settlement, beginning July 1, 2023. *See* Notice of Proposed Rulemaking, 87 Fed. Reg. 41,878, 42,008 (proposed section 685.406(f)) (July 13, 2022) (proposing that borrower defense decisions should be issued within three years of receipt of a materially complete application, and that the Department's failure to provide a decision on that timeframe will render the loan obligation unenforceable).

## IV. The Intervention Motions

On June 23, 2022, the Court vacated the remaining schedule for summary judgment briefing and scheduled a July 28, 2022 hearing on the parties' joint motion for preliminary approval of the settlement agreement. ECF No. 250. Approximately three weeks later, four institutions referenced in Exhibit C of the parties' settlement agreement filed a total of three intervention motions. *See* ECF No. 254 (American National University and Lincoln Education Services Corporation ("LESC") ("ANU Mot."); ECF No. 261 (Everglades College, Inc.) ("ECI Mot."); ECF No. 265 (The Chicago School of Professional Psychology) ("TCSPP Mot.") (collectively, "Movants"). The Movants frame their requests slightly differently, but all essentially seek to intervene for the purpose of objecting to the parties' proposed settlement agreement. *See* ANU Mot. at 1 (requesting "a seat at the table in the finalization and implementation of a settlement that affects their interests"); ECI Mot. at 3 (seeking intervention for the "limited purpose of protecting its rights and objecting to a 'settlement'"); TCSPP Mot. at 2 (requesting leave to "object to the

1    settlement and file an opposition to the proposed settlement").

2        The putative intervenors object to their inclusion on Exhibit C of the proposed settlement

3    agreement.   In their telling, such inclusion infringes their regulatory rights to "defend

4    [themselves]," *e.g.*, TCSPP Mot. at 2, raises the specter of "potential adverse consequences" at a

5    later date, *e.g.*, ANU Mot. at 2, and harms the schools' "reputation[s]," *e.g.*, ECI Mot. at 3; TCSPP

6    Mot. at 3.  All seek to intervene as of right pursuant to Federal Rule of Civil Procedure 24(a), as

7    well as permissive intervention under Rule 24(b).  Pursuant to the timeline set forth in the Court's

8    July 15, 2022 order, ECF No. 269, Defendants submit this consolidated opposition brief.

9                                    **LEGAL STANDARDS**

10       Federal Rule of Civil Procedure 24(a)(2) establishes four requirements for intervention as

11   of right: "(1) the motion must be timely; (2) the applicant must claim a 'significantly protectable'

12   interest relating to the property or transaction which is the subject of the action; (3) the applicant

13   must be so situated that the disposition of the action may as a practical matter impair or impede its

14   ability to protect that interest; and (4) the applicant's interest must be inadequately represented by

15   the parties to the action." *Callahan v. Brookdale Senior Living Cmtys., Inc.*, 38 F.4th 813, 820

16   (9th Cir. 2022) (citation omitted).  "Failure to satisfy any one of the requirements is fatal to the

17   application." *Freedom from Religion Found., Inc. v. Geithner*, 644 F.3d 836, 841 (9th Cir. 2011)

18   (citation omitted).  A would-be intervenor bears the burden of establishing that it meets each

19   requirement. *Id.*  Where, as here, a non-party seeks intervention to "pursue relief that is different

20   from that which is sought by a party with standing," the would-be intervenor "must have Article

21   III standing." *Town of Chester, NY v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1651 (2017); *see also*

22   *Or. Prescription Drug Monitoring Program v. U.S. DEA*, 860 F.3d 1228, 1234 (9th Cir. 2017)

23       Federal Rule of Civil Procedure 24(b)(1)(B) provides for permissive intervention.  "An

24   applicant who seeks permissive intervention must prove that it meets three threshold requirements:

25   (1) it shares a common question of law or fact with the main action; (2) its motion is timely; and

26   (3) the court has an independent basis for jurisdiction over the applicant's claims." *Cooper v.*

27   *Newsom*, 13 F.4th 857, 868 (9th Cir. 2021) (citation omitted).  The district court may deny

28   permissive intervention even where a movant has satisfied these threshold requirements. *Id.*  "In

**GovSER-093**

exercising its discretion, the district court must consider whether intervention will unduly delay the main action or will unfairly prejudice the existing parties." *Id.*; *see also Callahan*, 38 F.4th at 822 (identifying additional factors court may consider).

## ARGUMENT

### I. The Intervention Motions Are Premature And Should Be Held In Abeyance Pending The Court's Preliminary Approval Determination.

To begin, the putative intervenors are mistaken in their contention that the Court must decide their motions before making a determination whether to preliminarily approve the parties' proposed settlement. *See, e.g.*, ECF No. 265-1 (TCSPP's proposed motion to continue preliminary approval hearing until after a ruling on TCSPP's intervention motion); ECI Mot. at 11 (contending that "ECI should be granted intervention—prior to the Court's consideration of the Proposed Settlement (either preliminary or final)"). As described below, the institutions have no concrete interest in this litigation at all, and the Court should therefore deny their motions to intervene. But at a minimum, because the Movants have no role to play in the preliminary approval process, the Court should at least defer consideration of their motions unless and until it sets a schedule for class member objections to a preliminarily-approved agreement.

Approval of a class action settlement is "a two-step process." *See, e.g.*, *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liability Litig.*, 229 F. Supp. 3d 1052, 1062 (N.D. Cal. 2017). The court determines first "whether a proposed class action settlement deserves preliminary approval and then, after notice is given to class members, . . . the court entertains any of their objections . . . [and] determines whether the parties should be allowed to settle the class action pursuant to the agreed-upon terms." *Id.* (citations omitted). "Preliminary approval is appropriate if 'the proposed settlement appears to be the product of serious, informed, non-collusive negotiations, has no obvious deficiencies, does not improperly grant preferential treatment to class representatives or segments of the class, and falls within the range of possible approval.'" Prelim. Approval Order at 2 (quoting *In re Tableware Antitrust Litig.*, 484 F. Supp. 2d 1078, 1079 (N.D. Cal. 2007)).

In light of these standards,[2] there is no basis to allow the would-be intervenors to "object[] to preliminary approval of the settlement." ECI Mot. to Shorten Time for Briefing & Hearing Mot. to Intervene at 1, ECF No. 268. Instead, "it is premature under Rule 24 for objectors to intervene at the preliminary approval stage, as all objections to the settlement agreement are contemplated to be lodged after preliminary approval and before final approval." *Chi v. Univ. of S. Cal.*, No. 2:18-cv-4258, 2019 WL 3064457, at *6 (C.D. Cal. Apr. 18, 2019); *see also, e.g.*, *Lane v. Facebook, Inc.*, No. C 08-3845, 2009 WL 3458198, at *5 (N.D. Cal. Oct. 23, 2009) (denying leave to intervene "to advance the argument that the terms of the proposed settlement are contrary to public policy and are unfair, inadequate, and unreasonable" because the proposed intervenors "failed to establish that their rights to raise these issues are not adequately protected through the process for submitting objections that will follow upon preliminary approval of the settlement agreement"); *Casey v. Citibank, N.A.*, No. 5:12-cv-820, 2014 WL 3468188, at *1 (N.D.N.Y. Mar. 21, 2014) (intervention to "object to the proposed settlement agreement is inappropriate and premature" because the "proper time to present" such objections is "at the final approval hearing").

Indeed, not even putative class members are permitted "to file objections to a motion for preliminary approval." *Chavez v. PVH Corp.*, No. C 13-01797, 2015 WL 12915109, at *3 (N.D. Cal. Aug. 6, 2015). The would-be intervenors, then, seek to circumvent the ordinary class action settlement approval process and elevate their objections to the proposed settlement over the class members whose interests the approval process is designed to protect. *See, e.g.*, *In re Volkswagen*, 229 F. Supp. 3d at 1061 (noting that "the district court has a fiduciary duty to look after the interests of those absent class members" (citation omitted)). The Court should decline to do so. The

---

[2] ECI proclaims that that the parties "have colluded to impair . . . ECI's significant interests." ECI Mot. at 18. But it offers nothing in support of this assertion, which appears to be based solely on the fact the parties negotiated their settlement "in secret." *Id.* It should go without saying that there is nothing collusive about confidential settlement negotiations. *See, e.g.*, *BB&T Co. v. Pahrump 194, LLC*, No. 2:12-cv-1462, 2015 WL 1877422, at *2 (D. Nev. Apr. 23, 2015) ("Federal courts have long held that settlement negotiations should be kept secret."). And as explained in the parties' preliminary approval motion, the agreement here was the result of arms-length negotiation. *See* Prelim. Approval Mot. at 14 (noting that in the class action settlement context, collusion is typically limited to the situation where "attorneys' fees will be paid out of the settlement funds that would otherwise be distributed to class members").

**GovSER-095**

intervention motions should be denied, but at a minimum, the Court should hold them in abeyance until it has determined whether or not to grant preliminary approval.

## II. Movants Are Not Entitled To Intervene As Of Right.

Even if the intervention motions were appropriately considered now, there is no basis for the Court to grant them. "Cases involving non-class members' attempts to intervene and/or object to settlements are few, and the courts usually reject outsiders' attempts to enter the litigation during the settlement phase." *Gould v. Alleco, Inc.*, 883 F.2d 281, 285 (4th Cir. 1989). Here, intervention is inappropriate because the putative intervenors lack any concrete interest in the exercise of the Attorney General's and the Education Secretary's considerable discretion to settle claims. Accordingly, the Court should deny intervention under Rule 24(a).

### A. The Proposed Settlement Is a Valid Exercise of the Federal Government's Settlement Authority, Not an Application of the Department's Borrower Defense Regulations.

Movants' assertions of significant protectable interests are based on their misunderstanding of the nature of the proposed agreement. Contrary to Movants' allegations, the agreement is a litigation settlement, not a vehicle for the "resolution of borrower-defense claims . . . under the Department's regulations," ANU Mot. at 15, or a "finding of wrongdoing . . . against the schools," ECI Mot. at 14-15; *see also* TCSPP Mot. at 13 (contending that inclusion on Exhibit C reflects "an unadjudicated determination by the Department that TCSPP has committed substantial misconduct"). Because Movants' premise is incorrect, their arguments fail.

As a general matter, "the Attorney General has exclusive authority and plenary power to control the conduct of litigation in which the United States is involved." *United States v. Hercules, Inc.*, 961 F.2d 796, 798 (8th Cir. 1992); *see also* 28 U.S.C. §§ 516-519. That includes the authority, at issue here, to settle litigation involving the United States. In light of the strong public interest in settling such litigation, *see, e.g.*, *Util. Reform Project v. Bonneville Power Admin.*, 869 F.2d 437, 443 (9th Cir. 1989)—an interest that is only magnified by the "strong judicial policy" favoring the settlement of "complex class action litigation," *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) (citation omitted)—the Attorney General's settlement authority is given a broad construction. Indeed, "courts have long acknowledged that the Attorney General's authority to

**GovSER-096**

control the course of the federal government's litigation is presumptively immune from judicial review." *Shoshone Bannock Tribes v. Reno*, 56 F.3d 1476, 1480 (D.C. Cir. 1995); *accord United States v. Carpenter*, 526 F.3d 1237, 1241-42 (9th Cir. 2008) (recognizing that Attorney General's "plenary discretion" to "settle litigation to which the federal government is a party" is "committed to absolute agency discretion by law," and only reviewable in exceptional circumstances).

While Congress can place certain limits on the Attorney General's authority, which of course "stops at the walls of illegality," *Carpenter*, 526 F.3d at 1242 (citation omitted), "the statutory authority of the Attorney General to control litigation is not diminished without a clear and unambiguous directive from Congress," *Hercules*, 961 F.2d at 798. No such directive is at issue here, and the proposed intervenors do not argue otherwise. To the contrary, the settlement agreement provides for resolution of this lawsuit based on an exercise of the Education Secretary's considerable discretion under the HEA to compromise and settle claims arising out of the federal student loan programs. *See* 20 U.S.C. § 1082(a)(6). The Secretary's "compromise and settlement authority" includes the authority to compromise and release the student loan debts owed to him by federal student loans borrowers on terms determined by the Secretary. *See Weingarten v. DeVos*, 468 F. Supp. 3d 322, 338 (D.D.C. 2020) (finding that the Secretary's exercise of this authority is generally "not subject to judicial review" (citation omitted)).

The Attorney General's delegated settlement authority, *see* 28 C.F.R. §§ 0.160-0.172, and the Secretary's compromise and settlement authority were exercised to resolve the disputed claims at issue in this litigation. The proposed settlement sets forth procedures and a framework for the Secretary to exercise his statutory authority to provide settlement relief to class members in a comprehensive manner. In some cases, that is through the up-front discharge of loan obligations based on attendance at a specified list of schools; in others, it is through the further review of borrower defense applications through streamlined procedures specific to the parties' proposed settlement agreement. In either situation, the procedures specified in the settlement are distinct from what class members would "receive if their claims were adjudicated outside of [the] settlement." Prelim. Approval Mot. at 18. Indeed, the proposed agreement speaks only in terms of "settlement relief"—never borrower defense relief—and defines "final decision" in the context

of the agreement as a decision "either approving or denying settlement relief to a borrower under the terms of [the] Agreement." Agreement § II.O (Definitions); *see also supra* pp. 7-8. The settlement agreement does not provide for Defendants to exercise their authority under the Department's borrower defense regulations; nor does it mandate or even suggest that the relief class members will receive is in the form of borrower defense decisions issued through the regulatory process that would be applicable outside of this settlement.

### B. Movants Lack Any Concrete Interest in the Proposed Settlement.

With this context in mind, Movants' claims to intervention fall apart. While their motions are long on complaints about the settlement agreement in general, they are short on identifying any concrete, protectable interest that is impaired by the parties' settlement of disputed claims. For example, each of the proposed intervenors refers to its ability to receive notice of a pending borrower defense claim and an opportunity to respond before the Department issues a final decision resolving the borrower's application. *See, e.g.*, ANU Mot. at 16; ECI Mot. at 15-16; TCSPP Mot. at 14. But these procedures apply only when the Department is reviewing and adjudicating borrower defense applications in the ordinary course, which could lead to a recoupment claim against the school that is the subject of the application. They do not apply to the situation here, *i.e.*, an exercise of the Secretary's authority to settle the debts of federal student loan borrowers—in conjunction with the Attorney General's authority to settle litigation—outside the regulatory process for reviewing and adjudicating borrower defense applications.

In any event, even if the Department had announced an intention to issue final borrower defense decisions pursuant to its operative regulations (rather than the procedures set forth in the settlement agreement), Movants would still have no standing to object. At most, the schools object to a procedural deprivation in the Department's broader process of rendering decisions to borrowers on the merits of their applications. It is well established, however, that "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009). A school has no "concrete interest," *id.*, in the Department's determination

1  whether to approve or deny the borrower defense claim of a student who attended that school.[3]

2  *See, e.g.*, *Big Country Foods, Inc. v. Bd. of Educ. of Anchorage Sch. Dist.*, 952 F.2d 1173, 1176

3  (9th Cir. 1992) (party lacks standing to challenge the manner in which an agency exercises its

4  enforcement discretion against other parties). Any such interest is only implicated later, if and

5  when the Department decides to take further action against the school—either to recoup funds or

6  to impose other sanctions or penalties through regulatory processes for establishing institutional

7  misconduct. *See* 34 C.F.R., subparts G & H.

8        Movants, then, are left with the argument that they are concerned that the Department *may*

9  use inclusion on Exhibit C "as a precursor to further adverse action against the institution." ANU

10  Mot. at 16; *see also* TCSPP Mot. at 15 (expressing concern that the settlement may "provide the

11  Department with an avenue to seek adverse administrative actions against TCSPP"). But that is

12  incorrect. *See generally* Miller Decl. The fact that a school is included on the attachment to the

13  settlement agreement is not a formal finding of misconduct, establishes no institutional liability,

14  and does not provide an evidentiary basis on which the Department can take any action against the

15  school. *See id.* ¶¶ 7-14. Far from determining that "*every* school on the Exhibit C list has

16  committed wrongdoing as to *every* single borrower-defense applicant in the Class," ECI Mot. at

17  16, the settlement agreement merely states that "Defendants will effectuate Full Settlement Relief

18  for each and every Class Member whose Relevant Loan Debt is associated with the schools,

19  programs, and School Groups listed in Exhibit C hereto," without reference to wrongdoing by any

20  particular school. *See* Agreement § IV.A.1; *see also* Miller Decl. ¶ 14 ("The fact of an institution's

21  inclusion on Exhibit C will be used by the Department solely for purposes of effectuating its

22  obligations under the Settlement Agreement to award Full Settlement Relief to certain class

23  members."). And while Movants highlight the statement in the parties' preliminary approval

24  motion that in the context of the settlement the Department has identified common evidence of

25  institutional misconduct by the schools identified in Exhibit C and/or that there is a high rate of

26  ───────────────

27  [3] Were it otherwise, institutions would be able to challenge any decision approving a borrower defense claim in federal court, an unwarranted result that would be inconsistent with the regulatory scheme the Department has created. As described elsewhere in this brief, that scheme severs the process for holding institutions accountable from the initial decision—affecting only the applicant's rights—of whether to approve the claim.

28

GovSER-099

1   class members with borrower defense applications related to the listed schools, *see* ANU Mot. at

2   8; ECI Mot. at 2; TCSPP Mot. at 5 (all citing Prelim. Approval Mot. at 17-18), that document is

3   not an official finding of misconduct and has no more independent effect on the Department's

4   relationship with the Exhibit C institutions than the proposed settlement agreement itself.

5        Accordingly, present concerns about future administrative enforcement actions are purely

6   speculative.  *See, e.g.*, *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) ("[W]e have

7   repeatedly reiterated that threatened injury must be *certainly impending* to constitute injury in fact,

8   and that allegations of *possible* future injury are not sufficient." (cleaned up)); *Bova v. City of*

9   *Medford* 564 F.3d 1093, 1096-97 (9th Cir. 2009) (injury that "has not yet occurred," and is

10  contingent on the occurrence of future events, is not "concrete and particularized enough to survive

11  the standing/ripeness inquiry").  Any claimed injury is expressly "premised on a contingency that

12  may never materialize; namely, the initiation of a subsequent" recoupment or enforcement

13  proceeding by the Department (the outcome of which is not pre-determined in any event).  *See*

14  *Moore v. Verizon Commc'ns Inc*, No. C 09-1823, 2013 WL 450365, at *13 (N.D. Cal. Feb. 5,

15  2013).  As discussed above, the Department can recover discharged amounts from schools only

16  after providing those schools with notice and opportunity to respond to any assertions of

17  misconduct with precisely the same evidence they seek to submit here.  And an institution's

18  inclusion on the Exhibit C list "does not itself provide any evidentiary support or basis for initiating

19  any such action."  Miller Decl. ¶ 14.  Thus, Movants purely hypothetical fear of future adverse

20  actions does not constitute an interest that is "'direct, non-contingent, substantial and legally

21  protectable' to justify intervention."  *Moore*, 2013 WL 450365, at *13 (quoting *Dilks v. Aloha*

22  *Airlines*, 642 F.2d 1155, 1157 (9th Cir. 1981)).

23       The schools also claim that their inclusion on the Exhibit C attachment is already causing

24  them reputational harm.  *E.g.*, TCSPP Mot. at 13 (asserting "harm" from "being labeled by the

25  Department as an institution deemed to have engaged in substantial misconduct"); *accord* ANU

26  Mot. at 16-17; ECI Mot. at 10.  This contention is undermined by the fact that, as discussed above,

27  the exhibit is a basis for providing relief under the specific terms of the parties' settlement

28  agreement—not a broader determination that any school engaged in substantial misconduct.  *See,*

*e.g.*, *Talavera v. Global Payments, Inc.*, No. 21-cv-1585, 2021 WL 5331000, at *4 (S.D. Cal. Nov. 16, 2021) (party seeking to establish reputational harm "must produce *evidence* as opposed to 'platitudes'" (citation omitted)).  The schools are of course free to make this point to any current or prospective students.  In any case, inclusion on the settlement agreement list is not the first adverse publicity that the would-be intervenors (and/or their affiliates) have experienced.[4]

Ultimately, intervention must be based on "a particularized showing of . . . reputational harm" resulting from the proposed settlement.  *FTC v. Apex Cap. Grp. LLC*, No. CV 18-9573, 2022 WL 1060486, at *3 (C.D. Cal. Mar. 10, 2022) (rejecting intervention in the absence of such a showing or a showing that any claimed injury "could be redressed through intervention in this case").  But Movants' declarations consist largely of unsupported speculation and lack any specific assertions of concrete reputational harm.  Indeed, ECI's entire "showing" of harm reduces to the following conclusory assertion from an Assistant Vice Chancellor of Compliance: "It is my belief that the Department of Education's inclusion of ECI, Keiser, and Everglades on the Exhibit C List is already causing them reputational harm, as third parties are treating it like a finding of wrongdoing by the schools."  Decl. of Brandon Biederman ¶ 12, ECF No. 261-3; *see also* Decl. of Steven Cotton ("Cotton Decl.") ¶ 8, ECF No. 254-1 (ANU) (stating, without elaboration, that unidentified "individuals" "[o]n social media" are "falsely suggesting that [the schools listed on Exhibit C] have been subject to an adverse adjudication"); Decl. of Francis Giglio ("Giglio Decl.")

---

[4] *See, e.g.*, Veronica Jean Seltzer, American National Univ. found guilty of violating KY Consumer Protection Act, *WVTQ* (June 18, 2019), https://www.wtvq.com/american-national-univ-found-guilty-violating-ky-consumer-protection-act/; Karishma Mehrotra, Two for-profit colleges settle lawsuit with attorney general for $2.3 million, *Boston Globe* (July 30, 2015), https://www.bostonglobe.com/business/2015/07/30/two-for-profit-colleges-settle-lawsuit-with-attorney-general-for-million/PLtMSKNp9QxG19ZGXcXUZI/story.html (reporting that Lincoln Technical Institute, an affiliate of Movant LESC, settled a lawsuit accusing it of "using unfair recruiting tactics and inflating job placement numbers"); Lucy Campbell, Students Win $11.2M Settlement in Chicago School of Psychology Fraud Lawsuit, *Lawyers & Settlements.com* (Sept. 22, 2016) https://www.lawyersandsettlements.com/settlements/19167/students-win-11-2m-settlement-in-chicago-school-of.html (describing settlement in lawsuit brought by students who "wanted to study at the Chicago School of Professional Psychology," and "alleged they were provided with misleading information regarding the school's accreditation and their job prospects after completing their courses"); Suppl. Compl. ¶ 199 (describing settlement agreement between Everglades University and the state of Florida "over alleged violations of Florida's Unfair Trade Practices Act").

¶ 15, ECF No. 254-2 (Lincoln) (speculating, based on sporadic citations to "recent media coverage," that inclusion on the list "will erroneously associate Lincoln with allegedly *proven* wrongdoers"); Decl. of Ted Scholz ¶ 15, ECF No. 265-4 (TSCPP) (speculating that TCSPP's inclusion on the settlement agreement exhibit "will negatively affect TCSPP's reputation and ability to recruit and retain students and faculty," based on the fact that TCSPP has "received questions from current and prospective students" of unknown substance in an unidentified quantity). Absent a "particularized showing" of specific reputational harm resulting from the proposed settlement, the movants cannot base a claim to intervention on this type of harm.

Finally, to the extent the would-be intervenors assert that the proposed settlement will lead to additional borrower defense discharge applications being filed, or raise the prospect of future lawsuits by borrowers or enforcement actions from state regulators or accreditation boards, *see* Cotton Decl. ¶ 8; Giglio Decl. ¶¶ 17-19, such speculation about hypothetical future events (with only a tenuous, at best, connection to the proposed settlement agreement) is insufficient to confer standing to intervene for the reasons discussed above. In any event, Movants will have ample opportunity to defend themselves in any such future action (should it ever come to pass), rendering intervention here unnecessary.

## C. The Interests Claimed in the Intervention Motions Would Not Be Impaired Absent Intervention.

Even if the putative intervenors could claim some protectable interest in the parties' proposed settlement agreement, they cannot show that final approval of the settlement in this action would "impair or impede [their] ability to protect that interest." *United States v. Aerojet Gen. Corp.*, 606 F.3d 1142, 1148 (9th Cir. 2010) (citation omitted). This is because, as described above, additional proceedings are required before the Department could take any action—*e.g.*, seeking to recover funds discharged on the basis of institutional misconduct—that would affect any of the Movants' interests. *See, e.g.*, *Commodity Futures Trade Comm'n v. Heritage Cap. Advisory Servs., Ltd.*, 736 F.2d 384, 387 (7th Cir. 1984) (where proposed intervenors had alternative forum in which to protect the interest at issue in intervention motion, denial of intervention was appropriate because the interest "will not be impaired"); *Aerojet Gen. Corp.*, 606 F.3d at 1152

GovSER-102

(recognizing that "[p]roposed intervenors' interest might not be *impaired* if they have other means to protect them, even if the lawsuit would affect those interests" (citation omitted)). Movants will have a full opportunity to assert their "procedural rights" and defend against any "material adverse consequences," ANU Mot. at 18, by taking advantage of the procedures available to them should the Department actually choose to initiate the type of proceeding—*e.g.*, a recoupment action against the school, not the current settlement agreement or even the Department's first-level adjudication of a borrower defense application—that actually had the potential to impose such "adverse" consequences. *See United States v. Alisal Water Corp.*, 370 F.3d 915, 921 (9th Cir. 2004) (intervention denied where "other means" are available "by which [the putative intervenor] may protect its interests").

## III. The Court Should Deny Permissive Intervention.

For similar reasons, the Court should deny permissive intervention. More so than intervention of right, the "decision to grant or deny [permissive] intervention is discretionary, subject to considerations of equity and judicial economy." *Garza v. Cnty. of L.A.*, 918 F.2d 763, 777 (9th Cir. 1990). Even where Rule 24(b)'s threshold requirements are met, a court has discretion to deny intervention where, for example, "intervention will unduly delay the main action or will unfairly prejudice the existing parties." *Cooper*, 13 F.4th at 868 (citation omitted); *see also Callahan*, 38 F.4th at 822 (identifying additional factors court may consider). Notably, courts "analyze the timeliness element more strictly than [they] do for intervention as of right." *Raquedan v. Centerplate of Del. Inc.*, 376 F. Supp. 3d 1038, 1042 (N.D. Cal. 2019) (quoting *League of United Latin Am. Citizens v. Wilson*, 131 F.3d 1297, 1308 (9th Cir. 1997)).

Here, Movants seek intervention after years of complex litigation and on the eve of settlement. Even assuming the would-be intervenors moved in a timely fashion once the proposed settlement was publicly announced, it is undoubtedly the case that allowing intervention, for the stated purpose of undermining the parties' negotiated agreement, would "disrupt and delay the settlement proceedings and prejudice both the parties and the putative class members." *Brooks v. Life Care Ctrs. of Am., Inc.*, No. SACV 12-659, 2015 WL 13390031, at *3 (C.D. Cal. Mar. 3, 2015) (denying intervention); *see also Zepeda v. PayPal, Inc.*, No. 10-cv-2500, 2014 WL 1653246,

at *8-9 (N.D. Cal. Apr. 23, 2014) (finding intervention motion timely for Rule 24(a) purposes, but exercising "discretion" to deny permissive intervention because "at this stage—after extensive mediated settlement negotiations and when an amended motion for preliminary approval is to be filed soon—[intervention] would delay the potential resolution of this case" and cause prejudice); *Allen*, 787 F.3d at 1222 (affirming denial of intervention motion that was filed "on the eve of settlement[] and threatened to prejudice settling parties by potentially derailing settlement talks").

These considerations warrant denial of the putative intervenors' motions outright. At a minimum, they counsel limiting any intervention to submitting an objection to the settlement agreement—in the event that it receives preliminary approval—on the same schedule that the Court sets for class members to participate "through the normal objection process." *Id.*[5]

## **CONCLUSION**

For the foregoing reasons, the Court should deny the pending motions for intervention.

Dated: July 25, 2022

Respectfully submitted,

BRIAN D. NETTER
Deputy Assistant Attorney General

MARCIA BERMAN
Assistant Branch Director

*/s/ R. Charlie Merritt*
R. CHARLIE MERRITT (VA Bar # 89400)
STUART J. ROBINSON
Trial Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street NW

---

[5] If Movants are allowed to intervene to submit their objections to the proposed settlement, Defendants expect to establish at that time that the objections of these third parties are not relevant to the Court's consideration of whether to finally approve the agreement as "fair, adequate, and reasonable" to the class. *E.g.*, *Bellinghausen v. Tractor Supply Co.*, 306 F.R.D. 245, 254 (N.D. Cal. 2015) (listing the factors a "a court typically considers"); *see also In re Novatel Wireless Secs. Litig.*, No. 08CV1689, 2014 WL 2858518, at *7 (S.D. Cal. June 23, 2014) ("appreciat[ing]" the intervenors' position," but noting that "the Court's duty is ultimately to ensure a fair, reasonable, and adequate settlement *for the class*" and granting final approval (emphasis added)).

Washington, DC 20005
Telephone: (202) 616-8098
E-mail: robert.c.merritt@usdoj.gov

*Attorneys for Defendants*

**GovSER-105**

1  BRIAN D. NETTER
2  Deputy Assistant Attorney General
   STEPHANIE HINDS
3  United States Attorney
   MARCIA BERMAN
4  Assistant Branch Director
   R. CHARLIE MERRITT
5  STUART J. ROBINSON
   Attorneys
6  U.S. Department of Justice
   Civil Division, Federal Programs Branch
7  1100 L Street, N.W.
   Washington, DC 20005
8  Telephone: (415) 436-6635
   E-mail: stuart.j.robinson@usdoj.gov
9
10 *Attorneys for Defendants*
11
12
13
14          **UNITED STATES DISTRICT COURT**
15          **NORTHERN DISTRICT OF CALIFORNIA**

16 THERESA SWEET, ALICIA DAVIS, TRESA      Case No. 19-cv-03674-WHA
   APODACA, CHENELLE ARCHIBALD,
17 DANIEL DEEGAN, SAMUEL HOOD, and         **DEFENDANTS' OPPOSITION TO**
   JESSICA JACOBSON on behalf of themselves **INTERVENORS' MOTION FOR STAY**
18 and all others similarly situated,       **PENDING APPEAL**
19         *Plaintiffs*,                    **HEARING DATE: February 15, 2023**
20
21         v.                               (Class Action)
                                            (Administrative Procedure Act Case)
22 MIGUEL CARDONA, in his official capacity
   as Secretary of the United States Department of
23 Education, and
24 THE UNITED STATES DEPARTMENT OF
   EDUCATION,
25
26         *Defendants*.
27
28

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

STANDARD OF REVIEW .................................................................................. 1

DISCUSSION ...................................................................................................... 2

I.      INTERVENORS HAVE FAILED TO DEMONSTRATE A STRONG SHOWING OF
        LIKELY SUCCESS ON THE MERITS.......................................................... 2

        A.  The Settlement Does Not Exceed The Department's Authority................................. 2

        B.  The Settlement Does Not Violate the APA. ................................................ 5

        C.  The Settlement Agreement Accords with Due Process. ............................... 6

II.     INTERVENORS HAVE FAILED TO DEMONSTRATE IRREPARABLE HARM
        ABSENT A STAY.................................................................................. 7

III.    EVEN IF THE COURT CONSIDERS THE REMAINING FACTORS, THOSE
        FACTORS WEIGH HEAVILY AGAINST A STAY PENDING APPEAL ................... 10

Conclusion ......................................................................................................... 13

# TABLE OF AUTHORITIES

**Cases**

*Advanced Mgm't Tech., Inc. v. FAA*,
  211 F.3d 633 (D.C. Cir. 2000) ................................................................. 10

*Al Otro Lado v. Wolf*,
  952 F.3d 999 (9th Cir. 2020) ....................................................... 2, 7, 11

*Allen v. Bedolla*,
  787 F.3d 1218 (9th Cir. 2015) ................................................................. 11

*Am. Hosp. Ass'n v. Price*,
  867 F.3d 160 (D.C. Cir. 2017) ............................................................. 5, 6

*Ezzell Trucking, Inc v. Fed. Motor Carrier Safety Admin.*,
  309 F.3d 24 (D.C. Cir. 2002) ................................................................... 9

*Grae v. Corr. Corp. of Am.*,
  No. 3:16-cv-2267, 2019 WL 1746492 (M.D. Tenn. Apr. 18, 2019) ..................... 10

*Herb Reed Enterprises, LLC v. Fla. Ent. Mgmt., Inc.*,
  736 F.3d 1239 (9th Cir. 2013) ................................................................... 9

*Hernandez v. Williams, Zinman & Parham PC*,
  829 F.3d 1068 (9th Cir. 2016) ................................................................... 4

*Hindley v. Dep't of Health & Hum. Servs.*,
  No. 15-cv-01973-MEJ, 2017 WL 1398257 (N.D. Cal. Apr. 19, 2017) ................. 9

*In re Pike*,
  2008 WL 11336952 (C.D. Cal. Mar. 6, 2008) ........................................... 11

*In re Syncor ERISA Litig.*,
  516 F.3d 1095 (9th Cir. 2008) ................................................................... 6

*Jackson v. City & Cnty. of San Francisco*,
  829 F. Supp. 2d 867 (N.D. Cal. 2011) ...................................................... 2

*Lane v. Facebook, Inc.*,
  696 F.3d 811 (9th Cir. 2012) ..................................................................... 6

**GovSER-108**

*Manriquez v. DeVos*,
    No. 17-cv-07210-SK, 2018 WL 5316174 (N.D. Cal. Aug. 30, 2018) ...................... 12, 13, 14

*Nken v. Holder*,
    556 U.S. 418 (2009) .................................................................................. 2, 7, 8, 11

*Pa. Higher Educ. Assistance Agency v. Perez*,
    416 F. Supp. 3d 75 (D. Conn. 2019) ................................................................... 4

*Patriot, Inc. v. HUD*,
    963 F. Supp. 1 (D.D.C. 1997) ............................................................................ 10

*Or. Rest. & Lodging Ass'n v. Perez*,
    816 F.3d 1080 (9th Cir. 2016) ............................................................................ 4

*Senne v. Kansas City Royals Baseball Corp.*,
    No. 14-cv-00608-JCS, 2017 WL 5973487 (N.D. Cal. May 5, 2017) .................... 12

*Sierra Club v. Dombeck*,
    55 F. App'x 411 (9th Cir. 2002) ........................................................................ 2

*Soda Mountain Wilderness Council v. U.S. Bureau of Land Mgmt.*,
    No. 1:12-cv-01171, 2013 WL 12129602 (D. Or. Jan. 30, 2013) ......................... 11

*Stone v. Advance Am.*,
    278 F.R.D. 562 (S.D. Cal. 2011) ........................................................................ 2

*Weingarten v. DeVos*,
    468 F. Supp. 3d 322 (D.D.C. 2020) ................................................................ 3, 4

*West Virginia v. EPA*,
    142 S. Ct. 2587 (2022) ...................................................................................... 5

*Virginian Ry. Co. v. United States*,
    272 U.S. 658 (1926) .......................................................................................... 2

**Statutes**

20 U.S.C. § 1082 ............................................................................................. 3, 4, 5

20 U.S.C. § 1087e ................................................................................................. 3

28 U.S.C. §§ 516-519 ............................................................................................ 6

**Rules**

Fed. R. App. P. 4 ................................................................................................ 12

**GovSER-109**

Federal Rule of Civil Procedure 23 ........................................................... 1, 6

**Regulations**

34 C.F.R. § 668.89 ................................................................................ 8, 9

**Other**

87 Fed. Reg. 65,904 (Nov. 1, 2022) ........................................................ 5

U.S. Dep't of Educ., Office of the General Counsel, Memorandum re: *The Secretary's Legal Authority for Debt Cancellation*,

   (Aug. 23, 2022), https://perma.cc/LP87-NMCS) .................................. 6

Black's Law Dictionary (11th ed. 2019) ................................................ 3, 4

## **INTRODUCTION**

The Court properly granted the parties' joint motion for final approval of the settlement agreement pursuant to Federal Rule of Civil Procedure 23(e). ECF No. 345 ("Order"). In so doing, it rejected the objections and arguments raised by Intervenors and agreed with Plaintiffs and Defendants that the proposed settlement is fair. *See id.* After taking no action for 58 days, three of the Intervenors now seek a stay of the Court's judgment pending their appeals. ECF No. 350 ("Mot. to Stay"). But Intervenors cannot meet the standard for such a stay. Their recycled arguments about the statutory authority of the Secretary of Education ("Secretary"), the Administrative Procedure Act ("APA"), and due process—each of which has been found unpersuasive by the Court—do not demonstrate a strong likelihood of success on the merits. Similarly, Intervenors' conclusory arguments that they will suffer irreparable reputational harm absent a stay are untethered from the reality of the settlement agreement and the regulatory framework in which the Department makes its borrower defense decisions. Intervenors' contentions of reputational harm also ignore the Department's express disavowal that any part of the settlement's implementation for class members amounts to a misconduct finding or future evidence against a school. *See* Decl. of Benjamin Miller ¶ 11, ECF No. 288-1. In short, Intervenors suffer no harm, let alone irreparable harm, absent a stay. Finally, the public interest weighs heavily against a stay. The Court should not condone Intervenors' last-minute efforts to disrupt the carefully negotiated agreement reached after years of contentious litigation. Rather, the Court should again find that the settlement agreement is lawful and fairly accommodates the interests of both the Department and class members who are deserving of timely relief.

## **STANDARD OF REVIEW**

In determining whether to grant a motion for stay pending appeal, a court must evaluate "'(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.'" *Al Otro Lado v. Wolf*, 952 F.3d 999, 1006-07 (9th Cir. 2020) (quoting *Nken*

*v. Holder*, 556 U.S. 418, 434 (2009)). A court should consider the last two factors only after determining that the first two factors are satisfied. *Id.* at 1007. The sliding scale approach used in evaluating whether to grant a preliminary injunction is similarly applied in the context of a motion for stay pending appeal. *Id.* Nevertheless, "'[a] stay is not a matter of right, even if irreparable injury might otherwise result.'" *Id.* at 1006 (quoting *Virginian Ry. Co. v. United States*, 272 U.S. 658, 672 (1926)).

## DISCUSSION

## I. INTERVENORS HAVE FAILED TO DEMONSTRATE A STRONG SHOWING OF LIKELY SUCCESS ON THE MERITS[1]

As an initial matter, Intervenors are unlikely to succeed on the merits of their appeal because they have not demonstrated standing to pursue that appeal. *See Sierra Club v. Dombeck*, 55 F. App'x 411, 412 (9th Cir. 2002); *see also infra* Part II (discussing Intervenors' failure to demonstrate cognizable harm). Intervenors attempt to justify a stay by asserting arguments concerning the Department's authority, the APA, and constitutional due process. Mot. to Stay at 2-22. The Court has already considered and rejected these arguments, Order at 6-17, further indicating that Intervenors' success on the merits is highly unlikely.

### A. The Settlement Does Not Exceed The Department's Authority.

As Defendants have previously explained, and as the Court recognized, the settlement agreement is legally authorized under the Higher Education Act ("HEA") and the Attorney General's discretion to settle litigation against the United States. *See* ECF No. 246 ("Joint Mot.") at 21-24; ECF No. 332 ("Defs.' Reply") at 5-8; Order at 6-14. Intervenors generally do not engage with any of this analysis but continue to press meritless arguments concerning the Secretary's authority to enter into the settlement agreement.

---

[1] In accordance with their prior filings, *see* Defs.' Reply at 2 n.1, Defendants do not herein address those issues on which Plaintiffs bear the burden, including issues pertaining to the Court's subject-matter jurisdiction, *see Jackson v. City & Cnty. of San Francisco*, 829 F. Supp. 2d 867, 870 (N.D. Cal. 2011), and class certification, *see Stone v. Advance Am.*, 278 F.R.D. 562, 568 (S.D. Cal. 2011).

First, Intervenors note that the President has announced an initiative for student loan relief based on the Higher Education Relief Opportunities for Students Act of 2003 ("HEROES Act"). Mot. to Stay at 9. As the Court recognized, however, "[t]he instant settlement . . . is anchored in separate authority and is completely independent from the Biden plan"; accordingly, the President's authority under the HEROES Act has no bearing on whether the Secretary may enter into the "instant settlement, [which] involv[es] a narrower class and narrower relief[.]" Order at 19-20. For the same reason, neither that initiative nor judicial review of that initiative informs the Court's analysis of the so-called "major questions doctrine." *See* Mot. to Stay at 13; *see also infra* at 4.

Second, Intervenors disagree with the Department's and the Court's interpretation of 20 U.S.C. §§ 1082(a)(6) and 1087e(a)(1), which, when read together, permit the Secretary to settle claims against the Department arising from loans made under the Direct Loan Program. Joint Mot. at 21-24; Defs.' Reply at 6-7; Order at 7-8; *see* Mot. to Stay at 10-13. To reiterate, the HEA grants the Secretary the authority to "waive" or "release" his "right" to collect the federal student loan debts of certain class members in order to resolve class members' claims against the Department. *Id.* § 1082(a)(6). That authority is expressly provided in the statutory provision governing the FFEL program, *id.*, and likewise extends to Direct Loans because the HEA provides that Direct Loans "have the same terms, conditions, and benefits . . . as loans made" under the FFEL program, *id.* § 1087e(a)(1). *See Weingarten v. DeVos*, 468 F. Supp. 3d 322, 328 (D.D.C. 2020). That is, the Secretary's authority to collect—and his attendant authority to forgo collection—is plainly a "term" and "condition" of any federal student loan. Black's Law Dictionary (11th ed. 2019) (defining "terms" in part as "[p]rovisions that define an agreement's scope; conditions or stipulations"). Accordingly, in light of the HEA's "text itself, the specific context in which that text is used, and the broader context of the [HEA] as a whole[,]" *Hernandez v. Williams, Zinman & Parham PC*, 829 F.3d 1068, 1073 (9th Cir. 2016) (cleaned up and citation omitted), § 1082(a)(6) and § 1087e(a)(1) unambiguously authorize the settlement of claims arising from the Direct Loan program here. And even if there were some ambiguity in the HEA's text, the Court did not err in

deferring to the Department's longstanding and reasonable interpretation, particularly given the legislative history cited by the Court. Order at 8-9; *see also, e.g.*, *Or. Rest. & Lodging Ass'n v. Perez*, 816 F.3d 1080, 1089 (9th Cir. 2016) ("To determine whether the [agency's] interpretation is reasonable, 'we look to the plain and sensible meaning of the statute, the statutory provision in the context of the whole statute and case law, and to the legislative purpose and intent.'" (citation omitted)). The Court also already rejected Intervenors' reliance on *Pa. Higher Educ. Assistance Agency v. Perez*, 416 F. Supp. 3d 75, 96-97 (D. Conn. 2019), relying instead on *Weingarten*, 468 F. Supp. 3d at 328. Order at 8-9. *See* Mot. to Stay at 10 & n.7.[2]

Intervenors next argue that "[e]ven if subsection 1082(a)(6) is interpreted . . . to apply to Direct Loans, it does not provide authority for blanket, *en masse* debt cancellation." Mot. to Stay at 11. That assertion, however, confuses the issue before the Court, as Defendants are not seeking to justify "blanket, *en masse* debt cancellation." Rather, the pertinent issue involves a litigation settlement providing targeted relief to a specific group of plaintiffs, who have asserted legal claims against the Department related to the borrower defense program, unlike the student loan relief initiative under the HEROES Act. *See id.* at 12. Intervenors' argument that the settlement constitutes an injunction that is barred by 20 U.S.C. § 1082(a)(2), *id.*, was already rejected by the Court for reasons other than the one Intervenors seek to rebut. Order at 12.

Finally, Intervenors reiterate their argument that the settlement agreement violates the major questions doctrine, relying primarily on the dollar amount at issue. Mot. to Stay at 12-13. Defendants previously explained that the settlement does not implicate that doctrine, including because it is consistent with the HEA's grant of authority to compromise claims against the Department. Defs.' Reply at 8-10. The Court agreed, correctly observing that "[y]es, this settlement will discharge over six billion dollars in loans, but *West Virginia* [*v. EPA*, 142 S. Ct. 2587 (2022)] made clear that determining whether a case contains a major question is not merely

---

[2] Intervenors do not assert otherwise; they advance only the narrower argument that the HEA's text is unambiguous. *See* Mot. to Stay at 11-12.

OPPOSITION TO MOTION FOR STAY PENDING APPEAL
Case No: 19-cv-03674-WHA
4

**GovSER-114**

an exercise in checking the bottom line." Order at 9-11. Plaintiffs offer no reason for the Court to reach a different conclusion.

### B.  The Settlement Does Not Violate the APA.

Intervenors contend that the settlement agreement contravenes the APA in four respects. Mot. to Stay at 13-15. Intervenors have fallen well short of demonstrating a likelihood of success as to any of these theories, let alone a strong likelihood.

As an initial matter, Intervenors claim that, in entering into the settlement agreement, the Department has failed to abide by its regulations "for resolving BD claims." *Id.* at 13. But, as the Court found, Order at 12-13, the settlement constitutes an appropriate exercise of the Department's statutory authority to settle student loan debts of class members under 20 U.S.C. § 1082(a)(6), rather than its separate authority under the borrower defense regulations. *See, e.g.*, Defs.' Reply at 6; Joint Mot. at 21-24; ECF No. 300 at 2 ("Settlement relief does not constitute an approved or successful borrower defense claim . . ."). Nor can Intervenors advance their argument by suggesting that the Department will "as a practical matter . . . ignore[]" its regulations. Mot. to Stay at 14. To the contrary, the Department has recently promulgated a final borrower defense rule that will, in significant respects, mirror the provisions of the settlement agreement. *See* 87 Fed. Reg. 65,904, 66,071-72 (Nov. 1, 2022) (outlining timeframes for adjudication of borrower defense claims, and providing that if the Department fails to adjudicate a claim within the applicable timeframe, "loans, or portion of the loans . . . will not be enforceable by the Department against the borrower and the school will not be liable for the loan amount"). Further, *American Hospital Association v. Price*, on which Intervenors rely, Mot. to Stay at 14, is inapposite, because in that case the Secretary of Health and Human Services *disclaimed* the authority to enter into a settlement that would clear a backlog of Medicare reimbursement claims under timeframes mandated by statute. 867 F.3d 160, 167 (D.C. Cir. 2017) ("[T]he Secretary repeatedly insisted that the type of mass settlement necessary to comply with the Court's timetable would be illegal."). Here, of course, the Secretary of Education has explained that he is in fact authorized by statute to settle on the terms approved by the Court.

Second, according to Intervenors, the settlement agreement is arbitrary and capricious because it failed to (1) adequately explain the basis for including schools on the list contained in Exhibit C, (2) account for purportedly exculpatory evidence related to Intervenor Everglades College, Inc. ("ECI"), and (3) describe the reasons for rescinding a memorandum issued by the Department's then-Principal Deputy General Counsel.  Mot. to Stay at 14-15.   Once again, however, Intervenors offer no basis to shoehorn a traditional APA analysis into the Court's consideration of whether final settlement approval is warranted under Rule 23(e)(2), which aims "to protect the unnamed members of the class from unjust or unfair settlements affecting their rights."  *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1100 (9th Cir. 2008); *see also, e.g.*, *Lane v. Facebook, Inc.*, 696 F.3d 811, 818-19 (9th Cir. 2012) (when applying Rule 23(e), a court "must evaluate the fairness of a settlement as a whole, rather than assessing its individual components"). Intervenors have also mischaracterized the document concerning ECI, which presents only a preliminary conclusion based on partial evidence.  *See* Defs.' Reply at 12.  Moreover, Defendants have previously noted that the rescinded Department memo does not apply here, and that it "was issued in contravention of then-effective Department processes for issuing significant guidance" and was "not properly promulgated."  Joint Mot. at 23 n.13 (quoting U.S. Dep't of Educ., Office of the General Counsel, Memorandum re: *The Secretary's Legal Authority for Debt Cancellation* at 3 n. 5 (Aug. 23, 2022), https://perma.cc/LP87-NMCS).  And Intervenors have no response to Defendants' prior explanation that neither the HEA nor 28 U.S.C. §§ 516-519 require an in-depth analysis or rationale for compromising claims.  *See* Defs.' Reply at 11-12.

### C.    The Settlement Agreement Accords with Due Process.

Intervenors have likewise failed to establish a strong likelihood of success with respect to their argument that "the Settlement strips the schools of liberty and property interests without constitutionally adequate process."  Mot. to Stay at 16.  The Court has already considered and rejected each aspect of this theory.  Order at 15-16 (explaining that "[n]o liberty or property interest has been disturbed[,]" and "[a]ny hypothetical, future remedial action would proceed according to established regulations, which would provide the schools with full due process rights").

Intervenors do not meaningfully engage with this analysis. Mot. to Stay at 16-17. They similarly disregard the declaration submitted by the Department averring that "it does not consider inclusion on Exhibit C a finding of misconduct and that inclusion does not constitute evidence that could or would be considered in an action by the Department against a school." Miller Decl. ¶ 11. And to the extent Intervenors complain that the Department did not confer with them prior to entering into the settlement agreement, *see* Mot. to Stay at 17, that argument once again conflates the exercise of settlement authority with adjudication of borrower defense applications. Accordingly, Intervenors provide no reason for the Court to reconsider its prior conclusions.

## II. INTERVENORS HAVE FAILED TO DEMONSTRATE IRREPARABLE HARM ABSENT A STAY

"An applicant for a stay pending appeal must show that a stay is necessary to avoid likely irreparable injury to the applicant while the appeal is pending." *Al Otro Lado*, 952 F.3d at 1007 (citing *Nken*, 556 U.S. at 434). "'Simply showing some possibility of irreparable injury' is insufficient." *Id*. For the reasons explained below, Intervenors fail to show they will be injured, let alone irreparably injured, absent a stay.

First, Intervenors argue that "[f]or schools on Exhibit C, effecting the Settlement will eliminate an essential step of the administrative process" because there will no longer be borrower defense proceedings at the Department in which the schools can participate. Mot. to Stay at 18. Here too Intervenors misconstrue the nature of the settlement agreement. The settlement does not call for the Department to adjudicate the borrower defense applications of the group of class members to which Exhibit C applies, nor does the provision of full settlement relief to those class members constitute borrower defense decisions. Intervenors' complaints about lack of "participat[ion], "creat[ing] a decisional record," and receiving "a reasoned decision on each BD claim," *id.* at 18-19, are therefore misplaced. Similarly, in making these arguments, Intervenors ignore both the Miller Declaration and the protections in place for any hypothetical recoupment proceeding, including requiring the Department to carry the burden of persuasion in a borrower defense recovery action. *See* Order at 14-16; Defs.' Reply at 4-5; 34 C.F.R. § 668.89(b)(3)(iii).

Given these protections, Intervenors can only speculate about the potential of "'bureaucratic momentum' that will 'skew' future agency proceedings," Mot. to Stay at 20 (citation omitted), which would be subject to judicial review. Intervenors' argument also overlooks the detrimental effects to borrowers of allowing the continued delay associated with their borrower defense applications. *See* Order at 11, 23 (noting that, under current staffing levels, "it would take the Department *more than twenty-five years* to get through the backlog" of pending borrower defense applications, and "[t]he relief also furthers the Secretary's interest in resolving the backlog of claims"). And they do not explain how any "new claims of reliance and assertions of hardship if the Ninth Circuit reverses" would be directed against Intervenors and therefore constitute a likely source of irreparable harm suffered by them. *See* Mot. to Stay at 20.

Nor can Intervenors bolster their argument by relying on the settlement agreement's provision concerning the effective date. *See id.* Defendants and Plaintiffs disagree with Intervenors that the agreement "is best read to delay the Effective Date until the completion of Intervenors' appeals[.]" *Id.* at 20. The effective date is based on two potential events: when the Court's order "becomes non-appealable or, in the event of an appeal by a *Class Member* based upon a timely filed objection to this Agreement, upon the date of final resolution of said appeal." Joint Mot. Ex. 1 at 3 (emphasis added). Nothing in the settlement agreement contemplates delaying the effective date based on an appeal by a non-class member. *See id.* And for good reason, as this litigation concerns the rights of borrowers and the harm that attends delay in resolving their borrower defense claims; it does not, by contrast, concern the rights of schools or their reaction to a settlement to which they are not parties and that does not affect them. *See* Joint Mot. at 16 ("Ongoing litigation on the complicated matters presently before the Court, as well as the possibility of appeal, could extend the timeline for decisions on Class Members' applications well beyond these terms. To avoid the uncertainty of a judicial outcome and the delay of appeal—in a case that is fundamentally about avoiding delay—expeditious relief is the superior outcome for the Class."). Additionally, in filing their motion for a stay, Intervenors undermine their own

argument, since if their appeals were sufficient to delay the effective date, their motion would be unnecessary.

Intervenors next contend that "schools on Exhibit C will suffer irreparable harm to their reputations, goodwill, and standing with regulators if the Settlement takes effect." Mot. to Stay at 20. Insofar as this argument coincides with Intervenors' APA and due process theories, *see id.* at 21, it fails for the reasons previously set forth by the parties and the Court. Further, notwithstanding that the settlement was made public more than seven months ago, Intervenors have failed to provide sufficient evidence to establish "severe reputational harm[,]" Mot. to Stay at 16, 21. *See Herb Reed Enterprises, LLC v. Fla. Ent. Mgmt., Inc.*, 736 F.3d 1239, 1250 (9th Cir. 2013) ("It may be that HRE could establish the likelihood of irreparable harm. But missing from this record is any such evidence."); *accord Ezzell Trucking, Inc v. Fed. Motor Carrier Safety Admin.*, 309 F.3d 24, 26 (D.C. Cir. 2002) ("Ezzell claims injury to its reputation. To establish such a claim for purposes of Article III standing, Ezzell must produce evidence that such injury is concrete, not speculative."). *Cf. Hindley v. Dep't of Health & Hum. Servs.*, No. 15-cv-01973-MEJ, 2017 WL 1398257, at *10 (N.D. Cal. Apr. 19, 2017) ("But without evidence of reputational harm, a reasonable finder of fact cannot find Plaintiff suffered a deprivation of this liberty interest."). Rather, Intervenors cite only a statement from a non-profit organization regarding the Department's efforts "to hold the institutions [listed in Exhibit C] accountable[,]"[3] as well as a statement from Plaintiffs' counsel about the settlement generally—not Exhibit C or any specific school listed therein. *See* Mot. to Stay at 21; *see also, e.g., Advanced Mgm't Tech., Inc. v. FAA*, 211 F.3d 633, 636-37 (D.C. Cir. 2000) (rejecting claimed "reputational injury" based on alleged injured party's "vast exaggeration of [federal agency's] findings" and "no evidence that the [agency's] findings cast any shadow over its business activities").

---

[3] That document noted that "Lincoln [College of Technology] has been the subject of numerous law enforcement inquiries." ECF No. 350-1 at 6. Intervenors make no effort to explain why, in light of these inquiries, any reputational harm is attributable to the Department. Similarly, they do not explain why the Department's renewal of Lincoln's program participation agreement damages the institution's reputation. *See* ECF No. 50-1 at 9.

GovSER-119

Intervenors neglect to mention that schools are able to, and in fact have been, publicly advancing their own thoughts about the merits of the settlement agreement, including in the same article quoting Plaintiffs' counsel.  *See* ECF No. 325-4 at 6-7.  For example, the article quotes a memo from ECI's attorneys stating that "[t]his is a farce[.]"  *Id.* at 6.  The Chicago School of Professional Psychology is also quoted as "vigorously deny[ing] these accusations[.]"  *Id.* Intervenors are likewise able to communicate the limited purpose of Exhibit C with students and other stakeholders, as well as the fact that inclusion on the Exhibit C list "does not constitute evidence that can or will be considered by the Department" in any enforcement proceeding against any Intervenor school.  Miller Decl. ¶ 11.  Further, the cases cited by Intervenors, *id.* at 20-21, are inapposite: *Grae v. Corrections Corporation of America* involved a request to stay discovery based on a concern that discovery "might lead to the revelation of information that could lead to reputational harm," No. 3:16-cv-2267, 2019 WL 1746492, at *1 (M.D. Tenn. Apr. 18, 2019); and in *Patriot, Inc. v. HUD*, the plaintiffs "*demonstrated* irreparable harm in damage to their business reputation[,]" 963 F. Supp. 1, 5 (D.D.C. 1997) (emphasis added).  Finally, Intervenors do not explain how a stay pending appeal would prevent any of their asserted harms, which, according to them, occurred when the Department included them in Exhibit C.  Under these circumstances, there is no basis to find that denying the stay is likely to cause irreparable harm to Intervenors.

## III.   EVEN IF THE COURT CONSIDERS THE REMAINING FACTORS, THOSE FACTORS WEIGH HEAVILY AGAINST A STAY PENDING APPEAL

Because Intervenors have failed to establish a strong likelihood of success on the merits or irreparable harm, the Court's inquiry is at an end.  *See Al Otro Lado*, 952 F.3d at 1006-07.  Yet even if the Court were to reach the final two factors of the test for a stay pending appeal, it should conclude that Intervenors have failed to carry their burden with respect to those factors as well. *See Soda Mountain Wilderness Council v. U.S. Bureau of Land Mgmt.*, No. 1:12-cv-01171, 2013 WL 12129602, at *1 (D. Or. Jan. 30, 2013) ("When the government opposes a motion for stay pending appeal, the third and fourth factors of the test effectively merge." (citing *Nken*, 556 U.S. at 435)).

First, in claiming that "a stay in this case will merely maintain the status quo," Mot. to Stay at 22 (quoting *In re Pike*, 2008 WL 11336952, at *8 (C.D. Cal. Mar. 6, 2008)), Intervenors disregard the fact that the status quo before settlement—a massive, ever-expanding backlog of unresolved borrower defense claims—was the impetus of this lawsuit. And while the parties agreed to delay the effective date in the event a class member appealed the Court's order, *see id.* at 22, that provision only confirms the importance of taking into account borrowers' views and interests; as no class member has appealed, the public interest lies in granting timely relief to those borrowers in accordance with the settlement, *see, e.g.*, *Allen v. Bedolla*, 787 F.3d 1218, 1223 (9th Cir. 2015) (when reviewing class action settlement, court has a "fiduciary duty to look after the interests of . . . absent class members"). Even if the Court were to credit the marginal reputational harm Intervenors assert, it would not compel a different conclusion, particularly given the overall favorable response of the class.

Intervenors are also wrong in positing that the Department would benefit from a stay. *See* Mot. to Stay at 22. The Department has a strong interest in resolving this litigation and eliminating the backlog of borrower defense applications according to a schedule that is workable for the Department. The only case cited by Intervenors did not involve a federal agency or a settlement, and there the court's stay analysis reflects a desire to avoid harm caused by "devot[ing] very substantial time and resources on the litigation, particularly with respect to the completion of discovery, dispositive motions and trial preparation on class claims." *Senne v. Kansas City Royals Baseball Corp.*, No. 14-cv-00608-JCS, 2017 WL 5973487, at *3 (N.D. Cal. May 5, 2017). By contrast, the parties here have already devoted substantial resources to this matter and have reached a meeting of the minds on how to resolve it in a manner that is fair to the Department and the class.

Importantly, it is *Intervenors'* litigation strategy that has disrupted "the orderly administration of justice." *See* Mot. to Stay at 24. If Intervenors were truly "worr[ied] [about] upsetting reliance interests and injecting new harms into the case[,]" *id.*, they could have noticed their appeals and moved for a stay shortly after the Court entered its order, particularly given their lack of new arguments or evidence. In doing so, the Court could have had the benefit of full

briefing and a hearing before the effective date of the settlement, when class members would expect the Department to begin performing under the terms of the agreement. Instead, Intervenors noticed their appeals and filed their motion at the tail end of the 60-day window to appeal, *see* Fed. R. App. P. 4. Moreover, Intervenors did not move to shorten the briefing schedule or advance the hearing date for their stay motion, *see* L. Civ. R. 6-3, which again would have allowed the motion to have been resolved before the agreement's effective date and obviated the need for any administrative stay. *See* Tr. of Proceedings at 5, 15 (Jan. 26, 2023); Request for Suppl. Decl. and Reservation of Jurisdiction, ECF No. 357.

Equally unavailing are Intervenors' claims that the public interest favors a stay insofar as it "would protect the Ninth Circuit's appellate jurisdiction." *Id.* at 23-24. Intervenors cite no authority for the proposition that protecting appellate jurisdiction supports the public interest where the appellant has suffered no cognizable harm. *See id.* Nor is this a case seeking a stay pending interlocutory appeal, where "[j]udicial economy favors a stay [because] conducting further proceedings would require 'conducting a trial that may ultimately be unnecessary' because such proceedings could result in the unnecessary 'expenditure of judicial resources.'" *Manriquez v. DeVos*, No. 17-cv-07210-SK, 2018 WL 5316174, at *3 (N.D. Cal. Aug. 30, 2018) (citation and emphasis omitted).

Finally, Intervenors assert that "the public has no legitimate interest in constricting appellate review based on any alleged wrongdoing by Intervenors." Mot. to Stay at 25. This argument coincides with Intervenors' APA claims and should be rejected for the same reasons.[4]

---

[4] In accordance with the Court's Order, Defendants will submit a declaration on January 30, 2023, addressing the Department's ability "to hold off on discharging loans for class members who attended the appealing intervenor schools while proceeding in discharging loans for all other class members." ECF No. 357; *see also* Mot. to Stay at 25 (requesting, "in the alternative," that the Court "stay the judgment as to the appealing Intervenors").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## **CONCLUSION**

Defendants respectfully request that the Court deny Intervenors' motion for a stay pending appeal.

Dated: January 27, 2023                    Respectfully submitted,

BRIAN D. NETTER
Deputy Assistant Attorney General

STEPHANIE HINDS
United States Attorney

MARCIA BERMAN
Assistant Branch Director

*/s/Stuart J. Robinson*
R. CHARLIE MERRITT
STUART J. ROBINSON
Attorneys
U.S. Department of Justice
Civil Division, Federal Programs Branch
1100 L Street, N.W.
Washington, DC 20005
Telephone: (415) 436-6635
E-mail: stuart.j.robinson@usdoj.gov

*Attorneys for Defendants*

**GovSER-123**