EXHIBIT A

2024 WL 1461737

Only the Westlaw citation is currently available.

United States Court of Appeals, Fifth Circuit.

CAREER COLLEGES AND SCHOOLS

OF TEXAS, Plaintiff—Appellant,

v.

UNITED STATES DEPARTMENT OF EDUCATION;

Miguel Cardona, Secretary, U.S. Department
of Education, in his official capacity as the
Secretary of Education, Defendants—Appellees.

No. 23-50491
|
FILED April 4, 2024

Appeal from the United States District Court for the Western
District of Texas, USDC No. 1:23-CV-433, Robert L. Pitman,
U.S. District Judge

**Attorneys and Law Firms**

Stephen Blake Kinnaird (argued), Allyson B. Baker, Michael
F. Murray, Sameer P. Sheikh, Tor Tarantola, Attorney, Paul
Hastings, L.L.P., Washington, DC, Katherine Hancock, Philip
Avery Vickers, Cantey Hanger, L.L.P., Fort Worth, TX, for
Plaintiff-Appellant.

Jennifer Utrecht (argued), Cody T. Knapp, Joshua Marc
Salzman, U.S. Department of Justice, Civil Division,
Washington, DC, for Defendants-Appellees.

Adam R. Pulver, Esq., Public Citizen Litigation Group,
Washington, DC, for Amici Curiae Public Citizen, Project on
Predatory Student Lending.

David Kravitz, Office of the Attorney General for the State
of Massachusetts, Boston, MA, for Amici Curiae State of
Massachusetts, State of California, State of Colorado, State of
Connecticut, State of Delaware, District of Columbia, State of
Hawaii, State of Illinois, State of Maine, State of Maryland,
State of Minnesota, State of Nevada, New Jersey, State of
New Mexico, State of New York, State of North Carolina,
State of Oregon, State of Pennsylvania, State of Rhode Island,
State of Vermont, State of Washington, State of Wisconsin.

Before Jones, Duncan, and Wilson, Circuit Judges.

**Opinion**

Edith H. Jones, Circuit Judge:

**\*1** An association of Texas career colleges and schools
challenges the Department of Education's new regulations
that will significantly facilitate certain student loan discharges
while creating uncertainty, complexity and potentially huge
liability for the association's members. The Rule overturns
recent regulations issued by the previous Administration and
upends thirty years of regulatory practice. The district court
declined to issue a preliminary injunction against the Rule
solely on the basis that the plaintiffs had not shown irreparable
harm. Not only do we disagree with that finding, but we
assess a strong likelihood that the plaintiffs will succeed on
the merits in demonstrating the Rule's numerous statutory
and regulatory shortcomings. [1] Therefore, we REVERSE
the district court's order denying a preliminary injunction
and REMAND with instructions to enjoin and postpone the
effective date of the challenged provisions pending final
judgment. Our stay pending appeal remains in effect until
the district court imposes a preliminary injunction consistent
herewith.

## I. BACKGROUND

### A. The 2022 Rule

On November 1, 2022, the Department promulgated a final
rule that revamped various aspects of the federal student
loan program, including provisions governing student loan
discharges based on the acts, omissions, or closures of
higher education institutions. *See* Institutional Eligibility
Under the Higher Education Act of 1965, 87 Fed. Reg.
65,904 (Nov. 1, 2022) (final rule) ("Rule"). Appellant Career
Colleges and Schools of Texas ("CCST"), an association
of private postsecondary career schools in Texas, sued
the Department and Secretary Miguel Cardona, challenging
various provisions of the rule, including those relating to
borrower defenses against repayment and closed school loan
discharges.

### 1. Borrower-Defense Provision

Under the borrower-defense provision of the Rule, student
loan borrowers can apply to the Department for a full

discharge of their student debt [2] when they meet certain criteria. Borrowers with a balance due on their loans are eligible for full discharge if the Department concludes "by a preponderance of the evidence that the institution committed an actionable act or omission and, as a result, the borrower suffered detriment of a nature and degree warranting" full discharge. 34 C.F.R. § 685.401(b).

**\*2** The Rule identifies various categories of "actionable act[s] or omission[s]" that give rise to borrower discharge claims:

- A school's "substantial misrepresentation ... that misled the borrower in connection with the borrower's decision to attend, or to continue attending, the institution or the borrower's decision to take out a covered loan," or a "substantial omission of fact" by the school that had the same misleading effect on the borrower and was also connected "with the student's decision to attend or continue attending the school, or to take out a covered loan." 34 C.F.R. § 685.401(b)(1–2). [3]

- A school's "fail[ure] to perform its obligations under the terms of a contract with the student [if] such obligation was undertaken as consideration or in exchange for the borrower's decision to attend, or to continue attending, the institution, for the borrower's decision to take out a covered loan, or for funds disbursed in connection with a covered loan." Id. § 685.401(b)(3).

- A school's "engage[ment] in aggressive or deceptive recruitment conduct or tactics as defined in [34 C.F.R. §§ 668.500, .501] in connection with the borrower's decision to attend, or continue attending, the institution or the borrower's decision to take out a covered loan." Id. § 685.401(b)(4).

- A governmental agency's or the borrower's (as an individual or a member of a class) obtainment of a favorable judgment against the school on a state or federal law claim for an act or omission related to the borrower's loan or the educational services for which it was disbursed. Id. § 685.401(b)(5)(i).

- The Department's denial of the school's Title IV recertification or revocation of the school's program participation agreement due to "acts or omissions that could give rise to a borrower defense claim," for misrepresentation, omission, aggressive and deceptive recruitment tactics, or breach of contract. Id. § 685.401(b)(5)(ii).

If a borrower's discharge claim is successful in the administrative adjudication process established by the Rule (a process discussed at further length below), then the Department can seek recoupment from the school of the full amount discharged. Id. § 668.125, 685.409. In these proceedings, the school bears the burden of proof "to demonstrate that the decision to discharge the loans was incorrect or inconsistent with law and that the institution is not liable for the loan amounts discharged or reimbursed." Id. § 668.125(e)(2). Further, the only evidence parties may submit during recoupment proceedings consists of:

(i) Materials submitted to the Department during the process of adjudicating claims by borrowers relating to alleged acts or omissions of the institution, including materials submitted by the borrowers, the institution or any third parties;

(ii) Any material on which the Department relied in adjudicating claims by borrowers relating to alleged acts or omissions of the institution and provided by the Department to the institution; and

**\*3** (iii) The institution may submit any other relevant documentary evidence that relates to the bases cited by the Department in approving the borrower defense claims and pursuing recoupment from the institution.

Id. § 668.125(e).

The Rule also establishes an adjudication process for addressing borrower discharge claims, which can be brought by borrowers individually or as members of a group. Id. § 685.402–403. Under the group claims process, the 2022 Rule establishes "a rebuttable presumption that the act or omission giving rise to the borrower defense affected *each member of the group* in deciding to attend, or continue attending, the institution, and that such reliance was reasonable." Id. § 685.406(b)(2) (emphasis added). Thus, the Rule *presumes* damages. Schools are not provided with any discovery or cross-examination rights in either the borrower-defense or recoupment stage of the adjudication proceedings established by the Rule despite the fact that a successful borrower discharge claim would give rise to a presumption of liability against the schools in subsequent recoupment proceedings. Id. §§ 668.125(e)(2), 685.405, .406(b)–(c). Nor is there any requirement in the Rule that the Department official(s) in

charge of the borrower defense or recoupment adjudication proceedings have any legal training. *See id.* § 685.401(a) (defining "Department official").

### *2. Closed School Provision*

The Rule also ushers in multiple changes to the closed-school discharge provision of existing regulations, under which the Department will either cancel a Direct Loan or pay a federally insured loan on a borrower's behalf if the student was unable to complete his or her course of study due to a school's shutdown. *See id.* §§ 685.214 (Direct Loan), 674.33(g) (Federal Perkins Loan), 682.402(d) (Federal Family Education Loan ("FFEL")).

First, the new closed-school discharge provision redefines a location's "closure date":

> [T]he school's closure date is the earlier of: *the date, determined by the Secretary, that the school ceased to provide educational instruction in programs in which most students at the school were enrolled*, or a date determined by the Secretary that reflects when the school ceased to provide educational instruction for all of its students[.]

*Id.* § 685.214(a)(2)(i) (emphasis added).

Second, the Rule's new closed-school discharge provision substantially enlarges the scope of automatic discharges by expanding the types of borrowers who would be eligible for a closed school discharge without applying to the Department for such relief. Under the 2022 Rule, borrowers are eligible for an automatic discharge one year after *either* (1) the newly defined closure date if the student did not complete a program at another branch or location of the school or through a teach-out agreement at another school with the same accreditation and state authorization, *or* (2) the student's last date of attendance at that continuation program if he failed to complete the program for *any reason. Id.* § 685.214(c) (emphasis added).

Third, the Rule's closed-school discharge provision allows automatic discharges of all loans disbursed to students who withdrew up to 180 days before the newly defined "closure date," regardless of when the loans were disbursed. *Id.* § 685.214(d)(1)(i)(B).

**\*4** Fourth, the Rule also substantially narrows the class of borrowers ineligible for a closed school discharge. The 2022 Rule only renders a borrower ineligible only if he completes a program "at another branch or location of the school or through a teach-out agreement at another school, approved by the state's accrediting agency, and if applicable, the school's State authorizing agency." *Id.* § 685.214(d)(1)(i)(C). Thus, a student who completed a comparable but non-identical program, or who transferred credits outside a formal teach-out agreement approved by state regulators, would still be eligible for a full discharge under the Rule.

### B. Statutory and Regulatory History

To examine CCST's arguments properly, it is necessary to begin at the beginning of the regulatory structure governing federally assisted student loans.

The Department asserts its authority to promulgate the challenged provisions of the Rule under several sections of the Higher Education Act: 20 U.S.C. § 1087(c) (authorizing the Secretary to discharge loans for a student who "is unable to complete the program in which such student is enrolled due to the closure of the institution"); 20 U.S.C. § 1087e(h) (Section 455(h) of the Higher Education Act) (specifying that "the Secretary shall specify in regulations which acts or omissions of an institution of higher education a borrower may assert as a defense to repayment of a loan made under this part")[4]; and 20 U.S.C. § 1094(c)(3)(B) (authorizing the Secretary to impose a civil penalty for an institution that "has engaged in substantial misrepresentation of the nature of its educational program, its financial charges, and the employability of its graduates").[5]

In 1994, the Department promulgated initial implementing regulations for borrower-defenses under Section 455(h), which are consistent with the circumscribed statutory authorization of borrower defenses in collection proceedings:

Borrower defenses.

(1) In any proceeding to collect on a Direct Loan, the borrower *may assert as a defense against repayment, any act or omission* of the school attended by the student *that would give rise to a cause of action against the school under applicable State law.* These proceedings include, but are not limited to, the following:

**\*5** (i) Tax refund offset proceedings under 34 CFR 30.33.

(ii) Wage garnishment proceedings under section 488A of the Act.

(iii) Salary offset proceedings for Federal employees under 34 CFR Part 31.

(iv) Credit bureau reporting proceedings under 31 U.S.C. 3711(f).

William D. Ford Federal Direct Loan Program, 59 Fed. Reg. 61,664, 61,696 (Dec. 1, 1994) (final rule) (emphasis added). The Clinton Administration's subsequent Notice of Interpretation confirmed that the borrower defense provision of the 1994 Rule "does not provide a private right of action for a borrower and is not intended to create new Federal rights in this area." Office of Postsecondary Education, 60 Fed. Reg. 37,768, 37,769 (July 21, 1995).

The regulations governing borrower defense claims were "rarely used" from the 1990s until the mid-2010s. 87 Fed. Reg. at 65,979. In that era, the Department of Education played a limited role in student lending, principally by subsidizing and insuring student loans issued by other lenders. Things changed in 2010. That year, Congress completed the transition from loan insurance to the Direct Loan program and thus transformed the Department into the primary issuer of student loans in the United States. *See* Health Care and Reconciliation Act of 2010, Pub. L. 111-152, §§ 2201-13, 124 Stat. 1029, 1074-81.

The 2015 collapse of Corinthian Colleges (a proprietary institution) led to an influx of discharge claims from borrowers. *See* Student Assistance General Provisions, 81 Fed. Reg. 75,926, 76,047 (Nov. 1, 2016) (final rule). In response, the Obama Administration promulgated a new federal standard governing borrower defense and school closure claims, and it established a new adjudication regime for addressing borrower-defense claims. *Id.* at 75,927 (2016 Rule). Following protracted litigation brought by various borrowers, the Trump Administration promulgated its own

version of the Rule in 2019. *See* Student Assistance General Provisions, 84 Fed. Reg. 49,788 (Sept. 23, 2019) (final rule). [6]

While several Administrations evolved new regulations addressing borrower defenses, the Department's backlog of pending student loan discharge requests continued to mount. Eventually, in 2022, the Biden Administration's Department of Education agreed to a class action settlement affecting hundreds of thousands of pending borrower discharge claims.

*See*  *Sweet v. Cardona*, 641 F. Supp. 3d 814 (N.D. Cal. 2022) (approving settlement between borrowers and the Biden Administration and denying objections of intervenor schools); *Sweet v. Cardona*, 657 F. Supp. 3d 1260 (N.D. Cal. 2023) (denying intervenor schools a stay pending appeal). CCST asserts that according to a statistical analysis, it is virtually certain that at least one of its 54 participating schools is among the 4,000 schools (about 65 percent of the 6,200 Title IV participating institutions) that are subject to the 206,000 borrower defense claims filed between the *Sweet* settlement's execution and its approval. [7] *See Sweet*, 657 F. Supp. 3d at 1265. While the *Sweet* settlement agreement requires the Department to apply the 2016 "standard" to those 206,000 claims, CCST argues that the adjudication procedures promulgated by the 2022 Rule would still apply to those claims, as those claims are "pending with the Secretary on July 1, 2023." 34 C.F.R. § 685.401(b). The Department, however, criticizes these estimates as unfounded "speculation," because the settlement agreement allegedly provides both "substantive" and "procedural provisions" relevant to the settlement of those 206,000 claims.

**\*6** The Department's current version of the Rule, provisions of which have been briefly described above, became effective July 1, 2023. 87 Fed. Reg. at 65,904. As implied at the outset of this discussion, the new Rule dramatically alters the borrower discharge and closed school provisions that had been promulgated only three years previously. In contrast to the 2019 regulations, the 2022 Rule eliminates the Department's authority to issue partial loan discharges in favor of granting full discharge of entire loan balances. *See* 87 Fed. Reg. at 65,946. Additionally, under the 2022 Rule, there is no time limit within which borrowers must file an affirmative discharge claim so long as they maintain outstanding loans related to attendance at a school. *Id.* at 65,935. Indeed, the Department's final Rule explicitly rejected a bright-line three-year limitation that was consistent with the

2019 regulations and proposed by some commentators. *Id.*; *see* 34 C.F.R. § 685.206(e)(6). [8]

The 2022 Rule also worked a sea change in the treatment of closed school discharges. First, the 2019 Rule offered a more conventional definition of "closure date": "the date that the school ceases to provide educational instruction in all programs, as determined by the Secretary." *Id.* § 685.214(a)(2)(i) (July 1, 2020). Second, the 2019 Rule authorized automatic discharges in far more limited circumstances. As a result, borrowers could receive automatic discharges only *three years* after a location's closure date if (1) the student did not "subsequently re-enroll in any title IV-eligible institution" during those three years, *and* (2) if the closure date lay between November 1, 2013 and July 1, 2020. *Id.* § 685.214(c) (July 1, 2020). But under the 2022 Rule, borrowers are eligible for an automatic discharge *one year* after *either* (1) the newly defined closure date if the student did not complete a "program at another branch or location of the school or through a teach-out agreement at another school" with the same accreditation and state authorization, *or* (2) the student's last date of attendance at that continuation program if he failed to complete the program for *any reason. Id.* § 685.214(c). Third, the 2019 regulations only authorized closed school discharges for students who withdrew up to 120 days before the location's official closure date and had loans disbursed before July 1, 2020, or who withdrew up to 180 days before closure for loans disbursed after July 1, 2020. *Id.* § 685.214(c)(1)(i)(B), (c)(2)(i)(B) (July 1, 2020). Last, the 2019 Rule rendered a much broader class of borrowers ineligible for a closed school discharge. In essence, borrowers were ineligible for discharge if they "complete[d] the[ir] program of study through a teach-out agreement at another school or by transferring academic credits or hours earned at the closed school to another school" if their loans were disbursed prior to July 1, 2020. *Id.* § 685.214(c)(1)(i)(C) (July 1, 2020). For loans disbursed after that date, borrowers were ineligible to receive a closed school discharge if they completed the program of study "*or a comparable program* through a teach-out at another school or by transferring academic credits or hours earned at the closed school to another school[.]" *Id.* § 685.214(c)(2)(i)(C) (July 1, 2020) (emphasis added).

### C. Procedural History

CCST attacks the 2022 Rule's borrower defense provision, including its adjudication procedures, and the closed school provisions on multiple grounds, but it does not seek to postpone other provisions of the Rule.

As to the borrower-defense provision, CCST contends that Section 455(h) does not authorize the Department to create affirmative borrower "claims" against the United States or recoupment actions against schools and that the Rule's strict liability and full-discharge standards are unlawful under the Higher Education Act and the APA. CCST also challenges the Department's newly promulgated adjudication process and procedures because Congress did not authorize the Department to adjudicate borrower defense or recoupment claims against schools.

**\*7** CCST also charges that the closed school provisions are inconsistent with the Higher Education Act to the extent they allow a student to obtain a full loan discharge even if the school closure was not the reason the student failed to complete its program. *See id.* § 685.214. CCST also argues that it is arbitrary and capricious for the Department to equate a student's withdrawal any time up to 180 days before its newly defined "closure date" with its being caused by that closure. *See id.* § 685.214(a)(2)(i). Last, CCST argues that the statute is violated by the Rule's allowing automatic discharges for all borrowers (1) one year after the closure date if the student does not accept "a program at another branch or location of the school or through a teach-out agreement" at another comparable school, or (2) one year after the student's last attendance at a continuation program, without in either case requiring proof that the closure actually caused the students not to complete their program. *See id.* § 685.214(c).

In the district court, CCST sought a preliminary injunction to postpone the effective date of the challenged portions of the Rule under Section 705 of the Administrative Procedure Act ("APA"). 5 U.S.C. § 705. The district court held a hearing and denied the motion without addressing CCST's likelihood of success on the merits because it determined that CCST had not shown a likelihood of irreparable harm if the Rule were allowed to go into effect.

On appeal, this court granted a temporary administrative injunction limited to CCST and its members, and later approved a motion to postpone the Rule's effective date pending appeal without party limitation.

## II. DISCUSSION

This court reviews the denial of a preliminary injunction for abuse of discretion; underlying legal determinations are reviewed *de novo* and factual findings for clear error. *Topletz v. Skinner*, 7 F.4th 284, 293 (5th Cir. 2021) (citation omitted). "A district court by definition abuses its discretion when it makes an error of law." *Def. Distributed v. Bruck*, 30 F.4th 414, 427 (5th Cir. 2022) (quoting *Koon v. United States*, 518 U.S. 81, 100, 116 S. Ct. 2035, 2047, 135 L.Ed.2d 392 (1996)). In deciding a motion for a preliminary injunction, a court must consider four factors: (1) a substantial threat of irreparable harm to the movant absent the injunction, (2) the likelihood of the movant's ultimate success on the merits, (3) the balance of harms to the parties, and (4) the public interest. *Rest. L. Ctr. v. U.S. Dep't of Lab.*, 66 F.4th 593, 597 (5th Cir. 2023). The "first two factors of the traditional standard are the most critical." *Nken v. Holder*, 556 U.S. 418, 434, 129 S. Ct. 1749, 1761, 173 L.Ed.2d 550 (2009). And "[t]here is authority" that "likelihood of success on the merits ... is the most important of the preliminary injunction factors." *Mock v. Garland*, 75 F.4th 563, 587 n.60 (5th Cir. 2023); *see also Tesfamichael v. Gonzales*, 411 F.3d 169, 176 (5th Cir. 2005).

The APA also provides two relevant standards of review. Under Section 705, "the reviewing court, including the court to which a case may be taken on appeal ..., may issue all necessary and appropriate process to postpone the effective date of an agency action." 5 U.S.C. § 705. On the merits, we review final agency actions under Section 706, which allows the reviewing court to "hold unlawful and set aside agency action ... found to be ... arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). "An agency decision" runs afoul of this provision if it "applies an incorrect legal standard." *Gen. Land Off. v. United States Dep't of the Interior*, 947 F.3d 309, 320 (5th Cir. 2020) (citing *Koon*, 518 U.S. at 100, 116 S. Ct. at 2047).

### A. CCST Has Standing

"A preliminary injunction, like final relief, cannot be requested by a plaintiff who lacks standing to sue .... At the preliminary injunction stage, the movant must clearly show only that each element of standing is likely to obtain in the case at hand." *Speech First, Inc. v. Fenves*, 979 F.3d 319, 329–30 (5th Cir. 2020), as revised (Oct. 30, 2020). One way CCST can demonstrate standing is as a representative of its members ("associational standing"). *See Ctr. for Bio. Diversity v. EPA*, 937 F.3d 533, 536 (5th Cir. 2019). "Associational standing is a three-part test: (1) the association's members would independently meet the Article III standing requirements; (2) the interests the association seeks to protect are germane to the purpose of the organization; and (3) neither the claim asserted nor the relief requested requires participation of individual members." *Id.* (quoting *Tex. Democratic Party v. Benkiser*, 459 F.3d 582, 587 (5th Cir. 2006)). *See also Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343, 97 S. Ct. 2434, 2441, 53 L.Ed.2d 383 (1977). An individual member's standing is determined by the "familiar three-part test for Article III testing." *Gill v. Whitford*, 585 U.S. 48, 65, 138 S. Ct. 1916, 1929, 201 L.Ed.2d 313 (2018). That member must have "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." *Id.* (quotation marks and citation omitted).

**\*8** The district court had no trouble determining that CCST satisfied the requirements of Article III associational standing. *Career Colleges & Sch. of Texas v. United States Dep't of Educ.*, No. 1:23-CV-433-RP, ––– F. Supp. 3d ––––, –––– – ––––, 2023 WL 4291992, at \*4–\*5 (W.D. Tex. June 30, 2023). The Department, curiously, disagrees, and devotes nearly one third of its argument to insisting that the plaintiffs lack standing. This contention is more bewildering than persuasive.

"An increased regulatory burden typically satisfies the injury in fact requirement." *Texas v. EEOC*, 933 F.3d 433, 446 (5th Cir. 2019) (quoting *Contender Farms, L.L.P. v. U.S. Dep't of Agric.*, 779 F.3d 258, 266 (5th Cir. 2015)). Notwithstanding the Department's view, the challenged provisions of the Rule impose an immediate increase in regulatory burden on the plaintiffs, which is neither speculative nor contingent nor dependent on the independent actions of third parties. The district court correctly found that CCST had proven through evidence in the record that the Rule broadened the kinds of actions that

can give rise to a borrower defense claim against a school, and the new Rule requires "at least some degree of preparatory analysis, staff training, and reviews of existing compliance protocols." 🚩*Career Colleges,* ––– F. Supp. 3d at ––––, 2023 WL 4291992, at *5. These are precisely the types of concrete injuries that this court has consistently deemed adequate to provide standing in regulatory challenges. 🚩*Texas v. EEOC,* 933 F.3d at 446. [9] CCST has standing to sue.

## B. CCST Demonstrated Irreparable Harm

We move to consider the requirements for a preliminary injunction. Although the district court correctly determined that CCST showed real injuries in fact for purposes of Article III standing, it erred in concluding that CCST failed to show sufficient irreparable harm to justify a preliminary injunction. The record demonstrates that CCST's members would face irreparable harm stemming from the Rule's borrower defense and school closure provisions in the absence of preliminary relief delaying the Rule's effective date.

The district court characterized CCST's proof of financial and reputational injuries as "too remote," "speculation built upon further speculation," and "too conjectural to support preliminary injunctive relief." 🚩*Career Colleges,* ––– F. Supp. 3d at ––– – ––––, 2023 WL 4291992, at *6–7. But read *in toto,* the causal chain created by the Rule is not conjectural, but is highly integrated. For instance, borrowers who receive a closed school discharge of their debt must "cooperate with the Secretary in any judicial or administrative proceeding brought by the Secretary to recover amounts discharged or to take other enforcement action with respect to the conduct on which the discharge was based." 34 C.F.R. § 685.214(e)(1). Further, after a borrower's loan has been discharged because of a school's alleged actionable act or omission, the school must bear the burden to prove in recoupment proceedings that "the decision to discharge the loans was incorrect or inconsistent with the law and that the institution is not liable for the loan amounts discharged or reimbursed." *Id.* § 668.125(e)(2). Thus, under both the borrower defense and school closure provisions, a successful claim leads to full discharge of the borrower's loans, which leads to actions for recoupment from the schools. Combining this series of events with the greatly expanded number of claims and potential claimants, it is clear that the Rule contemplates the imposition of significant financial charges on CCST and its members.

**\*9** Three specific, immediate, and irreparable injuries developed by CCST's evidence satisfy the standard for a preliminary injunction. These include the increased costs of compliance, necessary alterations in operating procedures, and immediate threats of costly and unlawful adjudications of liability all inflicted by the Rule's new provisions.

### 1. Compelled Compliance and Compliance Costs

The Rule's new borrower-defense regulations expand the category of actionable misrepresentations, adopt strict liability, and remove any limitations period, leading to heightened compliance costs for CCST's member schools. The schools will be required to scale-up and redesign their defensive recordkeeping dramatically in order to protect against future borrower defense and recoupment proceedings. Contrary to the district court's finding, these harms are far from speculative.

### a. Expanded Recordkeeping Requirements

This circuit recently held that enhanced recordkeeping requirements inflict a kind of irreparable harm that warrants the issuance of a preliminary injunction. 🚩*Rest. Law Ctr.,* 66 F.4th at 598–99. The Rule's broad definitions of actionable misrepresentations and omissions apply to all communications between schools and their representatives with current or prospective students. Under the Rule, schools are liable for "false, erroneous, or misleading statements" about their "size, location, facilities, equipment, or institutionally-provided equipment, software technology, books, or supplies," the "number, availability, and qualifications, including the training and experience, of [their] faculty, instructors, and other personnel," and whether a former student's testimonial was unsolicited. 34 C.F.R. §§ 668.72(e)(1), (f), (h). Consequently, schools must begin to retain records of virtually *every* written or oral communication with a student, lest the Department later deem it actionable in discharge and recoupment proceedings. *See id.* §§ 668.71, 668.72, 668.75, 685.401(b)(1)–(2).

The Rule also imposes strict liability on "aggressive and deceptive recruitment standards or conduct," by schools, their representatives, and contractors. However, its list of such conduct is deliberately non-exhaustive and specifies no limitations period for enforcement actions by the Department.

*Id.* §§ 668.500, 668.501. Running afoul of these vague, brand-new standards that the Department intends to enforce retroactively is potentially catastrophic for schools, which could lose their Title IV certification, their ability to participate in federal student loan programs, and the majority of their income. *See id.* § 668.500(b).

Specific evidence in the record underscores the enormous burdens imposed by enhanced recordkeeping made necessary for self-preservation under the Rule. One affidavit was filed by Jeff Arthur, Vice President of Regulatory Affairs and Chief Information Officer at ECPI University, a member of CCST. Arthur stated that in anticipation of the Rule's July 1, 2023 effective date, ECPI "has already taken and continues to undertake significant efforts to comply with the Rule's requirements," including "[i]mplementing new record-keeping policies" and "[i]mplementing and dramatically expanding systems that monitor representations made by hundreds of staff both in recruiting processes and to our tens of thousands of students, including verbal and digital communications, including engaging in extensive legal reviews of the monitored content." Similarly, ECPI's President, Mark Dreyfus, testified that as a result of the Rule, ECPI had to make "sure that [its employees] are aware of every communication and know[ ] that they have to retain this information even for some kind of inadvertent claim —or statement ... and these claims from my opinion are *existential* because the bar is so much lower and we do have this opportunity of a group claim." [10]

**\*10** As Restaurant Law Center holds, it was error to discount these affidavits and continuing costs for purposes of establishing irreparable harm. 66 F.4th at 600. To the extent that the district court also categorized these descriptions of harms as "nebulous and conclusory," its analysis also conflicts with *Restaurant Law Center*, where the court advised that plaintiffs need not "convert each allegation of harm into a specific dollar amount." *Id.* Alleged compliance costs need only be "more than de minimis." *Id.* (quoting Louisiana v. Biden, 55 F.4th 1017, 1035 (5th Cir. 2022) and Enter. Int'l Inc v. Corporacion Estatal Petrolera Ecuatoriana, 762 F.2d 464, 472 (5th Cir. 1985)). Moreover, the ongoing costs of preserving and organizing virtually all communications between CCST's member institutions and students, which is amply substantiated and is traceable to the borrower defense

provision, readily satisfy the requirement that irreparable harms be "future or continuing." Aransas Project v. Shaw, 775 F.3d 641, 648 (5th Cir. 2014); In re Stewart, 647 F.3d 553, 557 (5th Cir. 2011).

### b. Expanded Staff Training

CCST has also provided specific evidence that its members have had to expend more time and resources to train their staff due to the Rule. Specifically, ECPI's President testified that his institution has had to "significantly ramp[ ] up" training for its staff by "a magnitude of ... two to three times." This training, according to ECPI's Vice President of Regulatory Affairs, is ongoing for hundreds of ECPI's employees, including approximately 60 staff members responsible for compliance, 95 staff members responsible for assisting students with obtaining Direct Loans, and 100 staff members responsible for new student engagement.

The Department's retort, like the district court opinion, is built on a mischaracterization of the record and relevant precedent. The fact that *some* of the compliance costs borne by CCST's members have already been realized does not change the fact that *some* of those costs are ongoing, and as such, are financially burdensome, irrecoverable and more than de minimis. For instance, *every* current and new staff member involved in compliance, new student engagement, or loan assistance will require substantially more training under the 2022 Rule than under the 2019 regulations. Those costs are ongoing, built on more than just "unfounded fear," and more than sufficient to satisfy the irreparable harm standard in this circuit. Louisiana v. Biden, 55 F.4th at 1034 (quoting Holland Am. Ins. Co. v. Succession of Roy, 777 F.2d 992, 997 (5th Cir. 1985)).

ECPI's President also testified that ECPI planned to hire additional compliance staff following the effective date of the Rule. That is a purely prospective financial injury of the type this court has previously recognized as an irreparable harm in the regulatory context. *See* Rest. L. Ctr., 66 F.4th at 599–600 (holding that the need to hire additional managers constituted an ongoing irreparable harm).

The fact that CCST members, including ECPI, already devoted significant resources to compliance under previous iterations of borrower-defense regulations does not

undermine their ability to obtain a preliminary injunction to delay the effective date of a new Rule that dramatically increases their regulatory burden. Parties who have made substantial efforts to comply with existing regulations and who operate in highly regulated industries do not face a heightened burden of showing irreparable harm compared to entities operating in previously unregulated fields and those that have previously under-resourced their compliance efforts.

*2. Altered Business Operations and Missed Opportunities*

By the Department's own admission, the closed-school provision of the Rule "will increase the number of borrowers who receive forgiveness." 87 Fed. Reg. at 65,962. This, in combination with the Department's view that the Higher Education Act *requires* it to pursue recoupment for discharges associated with school closures, exposes schools to enormous new liabilities when they consider straightforward operational decisions about whether to consolidate campuses or relocate programs—changes that can often benefit students. *Id.* at 65,968. Because the new closed-school provision defines a school closure as the school's ceasing instruction in programs in which a majority of a location's students are enrolled and provide for automatic discharge, ECPI's President testified that his institution was unable to consolidate campuses in Richmond, Virginia, despite student support for doing so.[11] At the same time, the increased financial liability associated with the Rule's school-closure and borrower-defense provisions have forced ECPI to abandon plans to open a location in Dallas. The district court's decision to ignore this specific evidence of injury in the record was clear error. So, too, was its dismissal of CCST's arguments about altered business operations and missed opportunities as too speculative or remote to support irreparable harm. ⚑ *Career Colleges,* —— F. Supp. 3d at ——, 2023 WL 4291992, at *7.

*3. Imminent Threats of Costly and Unlawful Adjudications*

**\*11** The new borrower-defense adjudication process applies to all applications received or *pending* with the Secretary on July 1, 2023, and as such includes the 206,000 applications pending with the Secretary from the *Sweet* settlement—which arise from 4,000 different schools. These new adjudication procedures are most likely substantively and procedurally unlawful.

As noted above, CCST's uncontroverted statistical evidence makes it virtually certain, to a probability of 99.999%, *see* fn. 7 *supra,* that at least one of its 545 member schools has discharge claims currently pending with the Department. Thus, at least one of its members will be subjected to the new adjudication procedures. The Department would dismiss this evidence as "probabilistic," and it went unacknowledged by the district court. A simple records search by the Department would have ascertained whether any of CCST's members is in fact caught in the aftermath of the *Sweet* settlement. But we conclude that, barring any challenge to the statistical accuracy, CCST has sufficiently proven at this stage the involvement of one or more members in upcoming adjudications under the challenged procedures. This evidence is far more probative than the vague and general assertions by the Sierra Club in ⚑ *Summers v. Earth Island Inst.,* 555 U.S. 488, 498-501, 129 S.Ct. 1142, 1152-53, 173 L.Ed.2d 1 (2009). In ⚑ *Summers,* there was no certainty that any of the club members would actually encounter the challenged foresting activities in hundreds of national parks managed by the U.S. Forest Service. ⚑ *Id.* Here, the settlement of over 200,000 student claims across 4,000 schools makes it virtually inevitable that at least one or more CCST members will have to abide by the new procedures.

If CCST's members have "an independent right to adjudication in a constitutionally proper forum," ⚑ *Thomas v. Union Carbide Agric. Prod. Co.,* 473 U.S. 568, 579–80, 105 S. Ct. 3325, 3332–3333, 87 L.Ed.2d 409 (1985), then subjecting them to costly and dubiously authorized administrative adjudications amounts to irreparable harm. *See* ⚑ *Texas v. EPA,* 829 F.3d 405, 433 (5th Cir. 2016) ("[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs.") (quoting ⚑ *Thunder Basin Coal Co. v. Reich,* 510 U.S. 200, 220–21, 114 S. Ct. 771, 783, 127 L.Ed.2d 29 (1994) (Scalia, J., concurring in part and in the judgment)). "When determining whether injury is irreparable, it is not so much the magnitude but the irreparability that counts." ⚑ *Id.* at 433–34 (internal quotation marks and citation omitted). The Department's counterarguments dwelling on notice and opportunity to respond cannot cure defects inherent in the Rule's adjudication procedures, nor do

**Career Colleges and Schools of Texas v. United States..., --- F.4th ---- (2024)**

they ameliorate the underlying injury from the threat of being subjected to such unauthorized procedures.

Finally, CCST members are likely to face substantial financial costs associated with unlawful adjudication procedures. The Department itself posits that defending each group claim will cost *each* school $17,611.02. [12]  The Department argues that CCST has not identified any possible or certainly impending group claims, but the rub is this: the Secretary has sole discretion to authorize borrowers to adjudicate their claims on a group basis. *See* 34 C.F.R. § 685.402. The Secretary cannot predict away his/her own discretion, and in any event, any group claims are also subject to unlawful adjudication procedures.

 **\*12**  The district court erred as a matter of law by ignoring the irreparable injury CCST's members will likely suffer from merely being subjected to such unlawful proceedings.

In all these respects, CCST has met its burden of showing irreparable harm from the failure to delay the effective date of the Rule.

### C. Likelihood of Success on the Merits

Although the district court did not examine the remaining factors required for injunctive relief, they are all based primarily on legal analysis, and we have no hesitation in concluding that CCST met its burden. The likelihood of success on the merits "is arguably the most important" of the remaining equitable factors required for injunctive relief. *Tesfamichael*, 411 F.3d at 176. We turn to that factor.

CCST's challenges to the merits are posed in three parts, each with subparts. First, we consider whether the Department lacked authority under  Section 455(h) to promulgate affirmative borrower rights against repayment; second, whether the Department had authority to adjudicate claims against lenders; and third, the scope of the new closed-school regulation.

### 1. Borrower-Defense Provision

Section 455(h) of the Higher Education Act authorizes the Department to promulgate defenses to repayment of student loans as follows:

**(h) Borrower defenses**

Notwithstanding any other provision of State or Federal law, the Secretary *shall specify in regulations* which acts or omissions of an institution of higher education a borrower may assert as a *defense to repayment of a loan* made under this part, except that in no event may a borrower recover from the Secretary, *in any action* arising from or relating to a loan made under this part, an amount in excess of the amount such borrower has repaid on such loan.

 20 U.S.C. § 1087e(h) (emphasis added). Three aspects of the Rule are within the purview of this statutory provision.

CCST contends that  Section 455(h) does not authorize the Department to define affirmative borrower defense "claims" against the United States or enable recoupment actions against schools. CCST also contends that the Rule does not lawfully permit full discharge of a student's loan if a borrower defense under the Rule is successfully invoked. Third, CCST argues that the Rule's prohibitions on "aggressive and deceptive recruitment tactics or conduct" and on "actionable omissions of information" are too vague to provide regulated entities with sufficient notice and inflict strict liability.

### a. "Affirmative" Borrower Claims for Full Discharge

As outlined more fully above, the 2022 Rule authorizes several types of affirmative "claims" for full borrower discharge. Very generally, these include misrepresentations or omissions in connection with loans or the decision to attend schools; a school's default in its contracts with the student; a school's use of aggressive or deceptive recruitment tactics; the result of an adverse judgment against a school; and the school's loss of Title IV certification based on the above misconduct. To note that these "defenses" are vague and broad is to understate their implications.

In deciding whether  Section 455(h) authorized the Department to recognize these affirmative borrower claims, "[w]e start where we always do: with the text of the statute." *Bartenwerfer v. Buckley*, 598 U.S. 69, 74, 143 S. Ct. 665, 671, 214 L.Ed.2d 434 (2023) (quoting *Van Buren v. United States*, 593 U.S. 374, 381, 141 S. Ct. 1648, 1654, 210 L.Ed.2d 26 (2021)). Other sources that are helpful in determining what Congress meant when it passed  Section 455(h) in 1993 [13] include contemporaneous dictionaries, related statutes, and past statements of the Department. We must also be conscious

of separation of powers issues raised by the Department's interpretation of the Rule, to the extent it may run afoul of the constitutional principle that "[o]nly Congress may create privately enforceable rights, and agencies are empowered only to enforce the rights Congress creates." *Chamber of Commerce v. Dep't of Labor*, 885 F.3d 360, 384 (5th Cir. 2018). The issue here is whether the Department could expand "defenses" to repayment of student loans into affirmative "claims" for relief.

**\*13** To begin, the Higher Education Act does not define the word "defense," but it has a well-established common law meaning. This "triggers the settled principle of interpretation that, absent other indication, 'Congress intends to incorporate the well-settled meaning of the common-law terms it uses.' " *Id.* at 369–70 (quoting *United States v. Castleman*, 572 U.S. 157, 162, 134 S. Ct. 1405, 1410, 188 L.Ed.2d 426 (2014) and *Sekhar v. United States*, 570 U.S. 729, 732, 133 S. Ct. 2720, 2724, 186 L.Ed.2d 794 (2013)). *See also* ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 320 (2012) ("A statute that uses a common-law term, without defining it, adopts its common law meaning.") Dictionaries are aids in ascertaining the common law meaning of "defense" as used in the statute. *United States v. Hildenbrand*, 527 F.3d 466, 476 (5th Cir. 2008). The leading definition in the contemporaneous edition of BLACK'S LAW DICTIONARY states: "[t]hat which is offered and alleged by the party proceeded against in an action or suit, as a reason in law or fact why the plaintiff should not recover or establish what he seeks. That which is put forward to diminish plaintiff's cause of action or defeat recovery." (6th ed. 1990). Concurrently, BALLENTINE'S LAW DICTIONARY defines "defense" as "protection against attack; a matter pleaded by a defendant in an action either to delay the action without destroying the cause or right of action or to defeat the action for all time." (3d ed. 1969).

Both dictionary definitions are consistent with the interpretation proffered by CCST: that Section 455(h) authorizes the Department to set out regulations governing borrower defenses to repayment *after* collection proceedings have been instituted—*i.e.*, when the borrower has stopped making his or her required payments. It does not authorize the Department to draft regulations spelling out affirmative "claims" that borrowers can assert against schools to avoid

their obligations. A "defense" is a reactive measure, not a proactive basis for a borrower's suit.

This reactive definition is also consistent with the language of other consumer protection statutes, in which Congress routinely distinguishes between the assertion of claims and defenses. *See, e.g.*, 15 U.S.C. § 1641 ("any person who purchases or is otherwise assigned a mortgage ... shall be subject to all *claims and defenses* with respect to that mortgage ..."); *id.* § 1666i(b) ("[t]he amount of *claims or defenses* asserted by the cardholder ...").

Even more probative is the contrast between other provisions of the Higher Education Act and Section 455(h)'s relatively modest statutory language about "defense[s] to repayment." Congress, after all, unambiguously authorized the Department to "cancel" or "discharge" student debt obligations in limited circumstances. *See, e.g.*, 20 U.S.C. § 1078-11(a)(2)(B) (authorizing the Department to "*cancel* a qualified loan amount" for individuals employed full time "in an area of national need") (emphasis added); *id.* § 1087e(m) (1) (stating that the Department "shall *cancel* the balance of interest and principal due" for borrowers employed in a public service job) (emphasis added); *id.* § 1087j(b) (directing the Department to "*cancel*[ ] the obligation to repay a qualified loan amount" for teachers) (emphasis added). We construe these comparative provisions as having distinct meanings, which would be blurred by treating a "defense" to repayment as a means to "cancel" a student loan.

The Department, in contrast to CCST and the Department's amici, makes no attempt to engage the plain text arguments urged by CCST. Instead, the Department rests entirely on how the Department has interpreted the statute over the last three decades. But although an agency's "longstanding practice... in implementing the relevant statutory authorities" is relevant to ascertaining the meaning of those relevant statutory authorities, it cannot be the *only* evidence used to evaluate an agency's power to act under a statute. *Biden v. Missouri*, 595 U.S. 87, 94, 142 S. Ct. 647, 652, 211 L.Ed.2d 433 (2022). To hold otherwise would greenlight the aggregation of Executive power "through adverse possession by engaging in a *consistent* and *unchallenged* practice over a long period of time." *N.L.R.B. v. Noel Canning*, 573 U.S. 513, 613–14, 134 S. Ct. 2550, 2617, 189 L.Ed.2d 538 (2014) (Scalia, J., concurring in judgment). The Department's near-exclusive reliance on agency custom is irreconcilable with

the judicial obligation to interpret the statute that Congress actually enacted.

**\*14** Regardless, the history of borrower defense regulations is more favorable to CCST than it is to the Department. Before 2016, the Department authorized borrowers to assert affirmative claims only in very limited circumstances, and it *never* previously asserted the broad statutory authority under 🚩 Section 455(h) that it now claims it has always possessed.

Before promulgating the 2016 Rule, the Department had recognized borrower claims covering fewer than 100 persons between 1998 and 2009. These involved highly unusual circumstances including unpaid refunds, litigation settlements, or factual stipulations in judgments that established a defense. [14] In the 2019 Rule, while acknowledging these outliers from before 2015, the Department explained that its "interpretation of the existing regulation has been that it was *meant to serve primarily as a means for a borrower to assert a defense to repayment during the course of a collection proceeding.*" 84 Fed. Reg. at 49,796 (emphasis added). This admission is consistent with the Department's longstanding positions expressed in the 1994 Rule and 1995 Notice of Interpretation. In the 1994 Rule [15], the Department outlined four non-exclusive types of "proceedings" in which borrowers could "assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law." 59 Fed. Reg. at 61,696. In 1995, the Department clarified that this reference to a "a cause of action under applicable State law" was of "limited scope," as "[t]he regulation does not provide a private right of action for a borrower and is not intended to create new Federal rights in this area." 60 Fed. Reg. at 37,769. The Notice of Interpretation included other limiting language, stating that any such state law cause of action must "directly relate[ ] to the loan or to the school's provision of educational services for which the loan was provided." *Id.*

The Department and its amici seek to turn this limited assertion of authority in the 1990s into a justification for the far-reaching scope of the 2022 Rule. That argument fails. The 1994 Rule confined the recognition of borrower defenses to the four delineated "proceedings," and in all of them, the student would be in a reactive or defensive posture. Tax refund offset proceedings under Section 30.33 of Title 34 of the Code of Federal Regulations are only initiated after a debt is past due. 34 C.F.R. § 30.33(b)(1). Wage garnishment

proceedings under Section 488A of the Higher Education Act can only be initiated against an individual "if he or she is not currently making required repayment." 20 U.S.C. § 1095a(a). Salary offset proceedings against federal employees can only be initiated after the Secretary sends written notice to the debtor demanding repayment in a pre-offset notice. 34 C.F.R. § 31.3. Although credit bureau proceedings could be commenced pre-default, there is no indication that this possibility was contemplated in the 1994 Rule. Ultimately, because "words grouped in a list should be given related meanings," the 1994 Rule clearly assumed that borrower defenses would only be invoked post-default; any pre-default proceedings, if they occurred, would be extremely rare. *Third Nat'l Bank in Nashville v. Impac Ltd.*, 432 U.S. 312, 322, 97 S. Ct. 2307, 2313, 53 L.Ed.2d 368 (1977).

**\*15** For these reasons, the promulgation of broad affirmative defenses to repayment in the Rule likely violate 🚩 Section 455(h).

### *b. Full Discharge of Outstanding Loan*

In connection with the broadened affirmative borrower claims, the Rule's authorization of full discharge also likely violates 🚩 Section 455(h). In providing that borrowers may assert their "defenses ... in any action arising from or relating to a loan," the statute implies a causal connection between the school's actionable misconduct and the loans to be discharged. Yet the Rule allows borrowers to receive full discharge of their *consolidated* loans if their discharge claims have been successfully adjudicated. 87 Fed. Reg. at 65,916. This would allow the Department to discharge loans without requiring the borrower to show causation. The Rule thus opens the door for a student to receive discharge for all four years of loans if he can show that injury by a school's misrepresentation or omission committed during his fourth year. In fact, because the Rule does not provide for partial discharges, a full discharge would be the *only* remedy available under the Rule.

The Department does not dispute that the Rule allows borrowers to consolidate all preexisting debt when obtaining a full discharge. Instead, it merely recites the Rule's purported requirement of a causal link between the new affirmative claims and remedial discharge. The Department ignores, however, that loan consolidation often will eliminate the need to show a causal link between the entirety of the debt and a discrete misrepresentation or omission that occurred at a discrete time during the student's enrollment. *See* 87 Fed. Reg. at 65,920, 65,922. By allowing students to discharge loans

that were disbursed before an actionable act or omission by a school, the Rule confers on students substantially greater benefits than necessary to compensate for any injuries. The combination of full discharge with the absence of a causation requirement essentially constitutes a punitive damage remedy arising from the borrower-defense provision. There is no basis for such outsize compensation under 🚩 Section 455(h).

In the end, the Rule's transformation of borrower defenses into affirmative borrower claims raises separation of powers concerns because it establishes new federal causes of action without clear congressional authorization. "[I]t is most certainly incorrect to say that language in a regulation can conjure up a private cause of action that has not been authorized by Congress. Agencies may play the sorcerer's apprentice but not the sorcerer himself." 🔖 *Alexander v. Sandoval,* 532 U.S. 275, 291, 121 S. Ct. 1511, 1522, 149 L.Ed.2d 517 (2001). *See also* 🔖 *Chamber of Commerce,* 885 F.3d at 384 ("Only Congress may create privately enforceable rights, and agencies are empowered only to enforce the rights Congress creates.") After all, "[a]gencies have only those powers given to them by Congress and enabling legislation is generally not an open book to which the agency may add pages and change the plot line." 🔖 *West Virginia v. EPA,* 597 U.S. 697, 723, 142 S. Ct. 2587, 2609, ––– L.Ed.2d ––– (2022) (internal quotation marks and citation omitted). By transforming defenses that may be asserted against student loan repayment into affirmative claims, and enabling full discharges and consolidated loan discharges that expand into a damages remedy, the Rule likely violates the limits placed on the Department in 🚩 Section 455(h).

### c. Insufficiently Specific Strict Liability Standards

**\*16** Even if the creation of new affirmative borrower-defense claims survives scrutiny when tested against the statute, another problem arises from the Rule's language articulating those claims. *See* 🚩 Section 455(h) requires the Department to "specify in regulations which acts or omissions an institution of higher education" can be asserted as borrower defenses to repayment. *See* 📑 20 U.S.C. § 1087e(h). The verb "specify" connotes specificity, which means a precise definition of the prohibited acts or omissions. *Specify,* WEBSTER'S NEW INTERNATIONAL DICTIONARY 2187 (3d ed. 1981) ("to mention or name in a specific or explicit manner: tell or state precisely or in detail ... ").[16]

The Rule's extremely broad definitions of actionable acts or omissions are deliberately nonspecific. The definitional defects are magnified because the Rule affixes strict liability on schools for undefined misconduct. As a result, CCST contends that these standards are contrary to law and arbitrary and capricious in violation of the APA. CCST is likely to succeed on the merits of its contentions.

The Rule defines actionable conduct as misrepresentations or omissions by any employee, representative or contractor of a school "in connection with the borrower's decision to attend, or continuing to attend ... [or] to take out a covered loan." 34 C.F.R. §§ 668.71, 668.75, 685.401(b)(1),(2). Potential liability runs the gamut of a student's interactions with the school, as it includes "but [is] not limited to" misrepresentations or omissions concerning educational programming, financial charges and assistance, and the employability of graduates. *Id.* §§ 668.72–668.74. Especially glaring are the prohibitions on "aggressive and deceptive recruitment tactics or conduct." 34 C.F.R. § 668.501. These prohibitions also "include but are not limited to" six enumerated categories of tactics or conduct," with many of the key terms left undefined.[17] For instance, a school may not "take *unreasonable advantage* of a student's or prospective student's lack of knowledge about, or experience with, postsecondary institutions, postsecondary programs, or financial aid to pressure the student into enrollment or borrowing funds to attend the institution." *Id.* § 668.501(2) (emphasis added). But there is no definition of what amounts to an "unreasonable advantage." The same goes for the Rule's prohibition on "us[ing] *threatening or abusive language or behavior* toward the student or prospective student," which does not define the key terms. *Id.* § 668.501(5) (emphasis added).

**\*17** We hold that the Rule's standards for actionable misrepresentations or omissions or aggressive or deceptive recruiting tactics most likely do not comply with the specificity requirement of 🚩 Section 455(h). The statute does not permit the Department to promulgate vague standards full of non-exclusive examples and undefined terms. The unbridled scope of these prohibitions enables the Department to hold schools liable for conduct that it defines only with future "guidance" documents or in the course of adjudication. Simply put, the statute does not permit the Department to

terrify first and clarify later. The vagueness of the Rule's liability standards is contrary to 🚩 Section 455(h) and thus likely violates the APA.

Further exacerbating the consequences of vague liability standards based on a promiscuously broad definition of covered personnel is the absence of any requirement of scienter or even negligence associated with the newly actionable violations. The Department acknowledges that "this rule removes the requirement that [it] conclude that the act or omission was made with knowledge of its false, misleading or deceptive nature, or with reckless disregard for the truth." *See* 87 Fed. Reg. at 66,014. Further, in this respect the Rule contrasts starkly with the 2019 regulations, governing loans disbursed on or after July 1, 2020, which require a student borrower to prove reckless or knowing misrepresentations or omissions "that directly and clearly relate to" enrollment, continuing enrollment, or educational services for which the loan was made. 34 C.F.R. § 668.206(e)(3) (July 1, 2020).

For several reasons, the strict liability standard established by the Rule almost surely cannot survive review under the APA. Obviously, imposing liability without any level of intent is in tension with the 🚩 Section 455(h) requirement of specificity in the definition of actionable acts or omissions. If the Department were to "specify" which acts or omissions were actionable, there would rarely be an occasion for inadvertent misconduct, and there would be no ground to hold schools liable for wholly innocent but actionable misconduct. Imposing strict liability may well conflict with the statute.

In addition, although the standard for setting aside agency actions as arbitrary and capricious may be "narrow and highly deferential," it is not toothless. 🚩 *Huawei Techs. USA, Inc. v. FCC*, 2 F.4th 421, 449 (5th Cir. 2021) (quotation marks and citation omitted). The strict liability standards, encompassing even *inadvertent* misrepresentations by a school's contractors not subject to its day-to-day supervision, open the door to arbitrary and inconsistent enforcement by agency officials unable or unwilling to distinguish between close calls and deranged ones. *See* 🚩 *Angel Bros. Enters. v. Walsh*, 18 F.4th 827, 834 (5th Cir. 2021) (Jones, J., dissenting).

The Department argues that "harmless and inadvertent errors" are "unlikely" to lead to the full discharge of a borrower's debt. *See* 87 Fed. Reg. at 65,921. This is wholly unpersuasive. As was explained above, by authorizing full discharge and

disallowing partial discharges of all loans—including loans disbursed to a borrower prior to any actionable act or omission by the school—the Rule eviscerates the need for a causal link between the school's conduct and a borrower's injury. Thus, the Department's contention that the Rule *requires* a causal link is simply erroneous. *See id.* at 65,920. This argument, founded on what is "unlikely," also implicitly concedes the unbounded, and illegal, enforcement discretion embedded in the Rule's failure to promulgate specific terms of actionable acts or omission.

Also arbitrary and capricious is the Department's inadequate explanation of its decision to eliminate an intent requirement that existed in previous regulations. The APA requires an agency to reach "reasonable and reasonably explained" decisions. *See* 🚩 5 U.S.C. § 706(2)(A); 🚩 *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423, 141 S. Ct. 1150, 1158, 209 L.Ed.2d 287 (2021). Here, however, the Department absurdly states that "[r]equiring intent would place too great a burden on an individual borrower." 87 Fed. Reg. at 65,921. But proof of intent is ubiquitously required throughout the law and can be proven through circumstantial evidence. *See Crowe v. Henry*, 115 F.3d 294, 297 (5th Cir. 1997). The Department's explanation of the Rule itself acknowledges that many state Unfair, Deceptive, or Abusive Practices ("UDAP") statutes, which continue to be relevant in borrower defense claims involving loans disbursed prior to July 1, 2017, "require proof of intent, knowledge, or recklessness—requirements that are not present in the Federal standard." 87 Fed. Reg. at 65,934.

**\*18** The Department's further rationale, that "if the action resulted in detriment to the borrower that warrants relief," then knowledge or intent are irrelevant, is equally unsatisfactory. *Id.* at 65,921. According to the Department's own estimates, in 30 to 80 percent of borrower-initiated cases, claims against proprietary schools will arise from the group claims process, in which the injury is presumed, rather than proven on an individual basis. *Id.* at 66,016; 34 C.F.R. § 685.406(b)(2). In other words, many borrowers who receive full discharges will be third-party beneficiaries of liability for misconduct that inflicted *no injury* on them. In sum, the Department's decision to eliminate mens rea from the Rule is not adequately justified or reasonably explained. The decision also conflicts with the Supreme Court's holding that agencies must offer a "reasoned explanation," rather than a mere "summary discussion" when they depart from a "longstanding earlier position." 🚩 *Encino Motorcars, LLC v.*

*Navarro*, 579 U.S. 211, 222–24, 136 S. Ct. 2117, 2126, 2127, 195 L.Ed.2d 382 (2016).

### 2. Agency Adjudication of Loan Discharge Claims

The Rule claims to authorize the Department to adjudicate (a) borrower claims for loan discharges and (b) recoupment claims against schools. The Department is the "party against which borrowers assert a defense to repayment." 87 Fed. Reg. at 65,923. Both individual and group adjudications may occur. 34 C.F.R. §§ 685.402, .403. The schools, which could face recoupment liability following discharge, *id.* § 685.409(a)(1), must respond to the borrower proceedings within 90 days or be deemed not to contest the borrower defense. *Id.* § 685.405(d). Because "claims" may be brought "at any time," there is no regulatory limitation of actions. *Id.* § 685.401(b). The evident goal of these adjudications is to shift student debt liability to the schools.

CCST protests that these procedures are *ultra vires* and violate due process. The organization is substantially likely to prevail.

### a. Administrative Adjudications for Borrowers and Recoupment

CCST is likely to succeed on the merits of its argument that the Higher Education Act does not allow the Department to adjudicate borrower defense claims or recoupment claims by the Department against schools. First, the text of Section 455(h) speaks only to the Secretary's power to promulgate *regulations*—not the power to *adjudicate* cases based on its regulations. The Supreme Court has repeatedly emphasized that "when Congress meant to confer adjudicatory authority ... it did so explicitly and set forth the relevant procedures in considerable detail." *Bank One Chi., N.A. v. Midwest Bank & Tr. Co.*, 516 U.S. 264, 274, 116 S. Ct. 637, 643, 133 L.Ed.2d 635 (1996) (quoting *Coit Indep. Joint Venture v. Fed. Sav. & Loan Ins. Corp*, 489 U.S. 561, 574, 109 S. Ct. 1361, 1369, 103 L.Ed.2d 602 (1989)); *see also Equitable Equip. Co. v. Dir., Off. of Worker's Comp. Programs*, 191 F.3d 630, 632–33 (5th Cir. 1999) (holding that the ALJ lacked jurisdiction to adjudicate a claim for attorney's fees because the statute only vested ALJ jurisdiction over "a claim for compensation"). As CCST correctly argues, this "run-of-the-mill grant of rulemaking authority" does not support "reading into [Section 455(h)] ... the authority

to adjudicate" borrower discharge claims. *RLC Indus. Co v. C.I.R.*, 58 F.3d 413, 418 (9th Cir. 1995). "[W]e find no secure signal here that Congress intended to assign to the [Department of Education] responsibility for the adjudication of private claims." *Bank One*, 516 U.S. at 274, 116 S. Ct. at 643. [18]

**\*19** Indeed, Section 455(h) essentially contradicts a grant of adjudicatory power in stating that borrower defenses can be asserted "in any *action* arising from or relating to a loan made under this part." 20 U.S.C. § 1087e(h) (emphasis added). The contemporaneous legal definition of "action" is "a lawsuit brought in a court," which is distinct from an adjudication brought in an administrative tribunal. *Action*, BLACK'S LAW DICTIONARY (6th ed. 1990). [19] The Department does not respond to this meaningful choice of language.

Regarding recoupment adjudications against schools based on borrower defense claim adjudications, the Department asserts authority under a provision requiring schools to accept "responsibility and financial liability" for breaching participation agreements *with the Department*, 20 U.S.C. § 1087d(a)(3). That this provision and related audit and liability functions are performed within the Department and are subject to administrative hearings is simply not the same as the adjudications authorized by the Rule for individual or group claims alleging violations of the newly created borrower defenses. The new claims function to shortcut conventional civil litigation between private parties, not to resolve schools' more general compliance under agreements with the Department that enabled federally backed student loans in the first place.

The Department attempts to rely on the "broader context" of the Higher Education Act in support of its newly crafted authority. *See* 20 U.S.C. §§ 1094(b), 1094(c), 1099c-1(a)(1)). In so doing, it principally relies on *Chauffeur's Training Sch., Inc v. Spellings*, 478 F.3d 117, 125–30 (2d Cir. 2007), which upheld the Department's implicit statutory authority to conduct an administrative proceeding that assessed liability against a school for loan program violations. *Chauffeur's* is distinguishable from this case. First, *Chauffeur's* did not turn on Section 455(h), the relevant statutory provision here. Second, the

Department, acting in *Chauffeur's*, had grafted additional remedies onto a statutorily authorized proceeding under Section 1094(c). *Id.* at 127. The *Chauffeur's* court did not review an adjudicatory regime created out of whole cloth and lacking any statutory basis. Moreover, under the Rule before us, schools facing recoupment proceedings are denied a hearing under Subpart G of Part 668 of its regulations, which implement Section 1094(c). *See* 87 Fed. Reg. at 65,949; 34 C.F.R. § 668.81–100. Third, the statutory interpretation in *Chauffeur's* relied on *Chevron* [20] deference to the Department; but the Department makes no *Chevron* argument here, and Section 455(h)'s plain statutory language belies deference to agency interpretation.

**\*20** The Department's "broader context" argument is far from compelling. Nothing in the text of Section 1094(c) or Section 1099(c)-1(a)(1) specifically mentions the Department's authority to adjudicate claims, much less the authority to adjudicate borrower-defense or recoupment claims. The closest the Department comes to identifying a provision in the Higher Education Act that authorizes it to adjudicate borrower-defense claims is Section 1094(b). But this provision only allows the Department to hold hearings concerning "final audit[s] or program review determination[s]" relevant to an institution's ability to participate in Title IV. The subject matter and structure of those proceedings is distinguishable from the borrower defense claims or recoupment claims at issue here.

### b. Constitutional Problems Surrounding Administrative Adjudications

Accepted principles of judicial restraint counsel against our deciding constitutional issues where, as here, the absence of statutory authority for the Department's assumption of adjudicatory authority and its violation of the APA are most likely to succeed. We note, however, inherent tension between the adjudication of "borrower defenses" to their loans insofar as a borrower's success will regularly lead to a *de facto transfer from the school to the borrower* following recoupment proceedings. The adjudication process resembles administrative decisions involving "private rights" rather than "public rights." The Supreme Court, however, has made clear that Congress may not withdraw adjudication of "private

rights" cases from Article III courts. *See* *Stern v. Marshall*, 564 U.S. 462, 482–95, 131 S. Ct. 2594, 2608–2615, 180 L.Ed.2d 475 (2011); *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. 272, 18 How. 272, 15 L.Ed. 372 (1855). Yet, especially where "borrower defense[s]" under the Rule include breaches of state law and contract rights, these are the very paradigm of private rights. *See* 34 C.F.R. § 685.401(b)(3) (establishing a borrower defense for state breach of contract claims), *id.* § 685.401(c) (allowing borrowers to seek discharge on the basis of other state law causes of action).

To be sure, the Department seeks to disaggregate the integrated process of borrower-defense and recoupment, and it focuses on recoupment against the school in favor of the Department as a quintessential "public right." But its adjudication procedures render the two proceedings dependent on each other, because the legal claims and facts that authorize the Department to discharge the borrower's debt under the Rule are *the same* as those underpinning the Department's authority to pursue recoupment against the school. *See* 34 C.F.R. § 668.125(e)(2) (the school bears the burden to prove that "the decision to discharge the loans was incorrect or inconsistent with the law and that the institution is not liable for the loan amounts discharged or reimbursed" in the subsequent recoupment proceedings), *id.* § 668.125(e)(3) (the only evidence that may be submitted in recoupment proceedings concerns the bases cited by the Department in adjudicating the borrower discharge claims and materials submitted to the Department or relied on in the borrower discharge proceedings). For practical purposes, as summarized by CCST, these procedures act to shift debt liability to schools.

The Department also contends that the loan discharge derives from the relationship between the borrower and the federal government, and a grant of administrative relief through its adjudicative process will not dispose of or otherwise affect any related claims or defenses that the borrower or the borrower's institution might assert in collateral litigation. We take no position on whether these propositions are correct, [21] but even so, they do not necessarily trump the Article III concerns by embracing the possibility of non-final administrative outcomes or duplicative proceedings.

### c. Rebuttable Presumptions and Group Claims Adjudications

**\*21** For group claims, the Rule establishes a rebuttable presumption that "the act or omission giving rise to the borrower defense affected each member of the group in deciding to attend, or continue attending, the institution, and that such reliance was reasonable." *Id.* § 685.406(b)(2). [22] This regulation embodies three "rebuttable" presumptions: that each member of the group *knew* about the particular claimed borrower defense; that each member *relied on* the representation, omission, or other act; and that each member's reliance was *reasonable. Id.* Further, related regulations largely undercut schools' ability to rebut the presumptions, as they have no independent right to probe these facts through discovery or witness examinations. *Id.* §§ 685.402–406, 668.125. Indeed, the Department explained that it need not share with a school related evidence in its possession. 87 Fed. Reg. at 65,912.

CCST is likely to prevail in its contentions that the Department has no statutory authority to create evidentiary requirements, that the presumptions are effectively unrebuttable, and that the Department cannot use evidentiary devices to achieve substantive results. The first argument concerning statutory authority would seem to follow as a necessary implication from our earlier conclusion that the Department lacks power to adjudicate claims. Further, we agree with CCST that it is unreasonable to presume that every borrower involved in a group claim is likely to satisfy all three presumptions. It suffices to take just one of them, that a challenged act or omission *affected* a student's decision to attend or continue attending an institution. 34 C.F.R. § 685.406(b)(2). Attendance decisions are highly fact-specific, and many of the actionable misrepresentations explicitly listed in the Rule, such as a faculty member's qualifications or whether a particular charge is customary, are too discrete to justify a universal presumption—particularly given that the only available remedy is full discharge of the loan. *Id.* §§ 668.72(h), 668.73(b).

The Rule's group claims process involves applying presumptions to matters requiring individualized proof and extrapolating them collectively. Thus, formulating a group under the Rule is far easier than the process required by Federal Rule of Civil Procedure 23. *See* 34 C.F.R. § 685.402. Rule 23 protects the integrity of civil class

actions for money damages by requiring, at a minimum, that the class representative's claim is "typical" of that of the class and that common questions of law and fact "predominate" in the case. FED. R. CIV. P. 23(a)(2), (b)(3). As a result, this court has repeatedly rejected certifying class actions, including for fraud, where damages and reliance issues are highly individualized. *See Castano v Am. Tobacco Co.*, 84 F.3d 734, 745 (5th Cir. 1996) ("[A] fraud class action cannot be certified when individual reliance will be an issue."); *McManus v. Fleetwood Enters. Inc.*, 320 F.3d 545, 550 (5th Cir. 2003) ("Reliance will vary from plaintiff to plaintiff."); *Patterson v. Mobil Oil Co.*, 241 F.3d 417, 419 (5th Cir. 2001) ("Claims for money damages in which individual reliance is an element are poor candidates for class treatment, at best."). Handling group claims under the Rule thus lacks due process protections available under the class action process.

The Department's defense of the rebuttable presumptions and the group claims process primarily reflects the Department's determination to resolve what it discretionarily decides are "virtually identical claims" on an aggregate basis. But the Department's explanation of its "reasonable" policy conclusions in the Federal Register commentary does not remedy the incompatibility of its procedures with standard civil litigation practice. As CCST notes, presumptions in the law result when "proof of one fact renders the existence of another fact so probable that it is sensible and timesaving to assume the truth of the inferred fact... until the adversary disproves it." *Chem. Mfrs. Ass'n. v. Dep't. of Transp.*, 105 F.3d 702, 705 (D.C. Cir. 1997) (quotation marks and citation omitted). The Department's attempt to substitute its unexplained "experience" regarding "widespread and pervasive" misstatements for proof justifying the presumptions is arbitrary and capricious. "[T]he argument for agency expertise and judgment does not get [the Department] very far," as "falling back on unexplained claims of agency expertise does not carry the [Department's] burden" under the APA. *El Paso Elec. Co. v. FERC*, 76 F.4th 352, 364 (5th Cir. 2023). Presumptions, especially in administrative proceedings that may generate institution-destroying liability, cannot be a matter of Department *ipse dixit*.

**\*22** Further evidence of incompatibility lies in the Rule's liability standard for both individual and group claims: totality of the circumstances. 34 C.F.R. § 685.401(e). What is the "totality of the circumstances," and how, if at all,

does it differ from "preponderance of the evidence"? This standard amounts to another loophole affording immense non-reviewable discretion to the Department.

The Department also contends that none of the presumptions change the burden of persuasion, which will still require proof by a preponderance of the evidence. 87 Fed. Reg. at 65,922. First, as just noted, the liability standard in the Rule is "totality of the circumstances," not "preponderance of the evidence." Second, that an affected school would still have a "full opportunity" to rebut a presumption, showing it to be "inappropriate" under the circumstances, does not remedy the harm associated with the erroneous requirement of any presumption. By its terms, a rebuttable presumption displaces the ordinary burden of proof and means that if the evidence is of equal weight between the parties, the school will lose because it has failed to rebut the presumption. Third, contrary to the Department's attempt to cabin presumptions for the sake of this approach, there is nothing in the text of the Rule to suggest that group claims involving minor misrepresentations are "unlikely" to be brought or that the rebuttable presumptions would be applied differently in those proceedings. Again, the Department urges this court to defer to commentary rather than the unlimited text of the Rule.

Ultimately, the evidentiary presumptions and group-claim procedures built into the Rule are not designed to further the truth-seeking process. Instead, these are policy-driven mechanisms designed to selectively target proprietary schools, as the Department expects that 75 percent of all borrower claims associated with proprietary schools will be group claims. *Id.* at 65,993. The Department has stated outright that it sees driving enrollment away from these schools to be a "benefit." *Id.* at. 65,996.

In sum, CCST is likely to succeed in challenging the rebuttable presumptions and group claims procedures as arbitrary and capricious. "Only the untaught layman or the charlatan lawyer can answer that procedures matter not. Procedural fairness and regularity are of the indispensable essence of liberty." 🚩 *Shaughnessy v. United States ex rel. Mezei*, 345 U.S. 206, 224, 73 S. Ct. 625, 635, 97 L.Ed. 956 (1953) (Jackson, J., joined by Frankfurter, J., dissenting).

### 3. Closed-School Provision
Not least in this pantheon of legal problems associated with the Rule is its closed-school provision, which is likely unlawful on several grounds. First, the closed-school provision exceeds the Department's statutory authority by re-defining a school closure to contradict the clear text of the statute. Second, the closed-school provision arbitrarily authorizes automatic, full discharges of debt *without proof of causation* (a) for students who withdrew from their programs up to 180 days prior to the Department's newly invented closure date, and (b) for borrowers who did not accept or complete "a program at another branch or location of the school or through a teach-out agreement" at another comparable school one year after the school "closure" or their last day of attendance at a continuation program. Borrowers are presumed to have withdrawn without needing to prove causation, and they are presumed to have suffered financial "detriment" as well.

### a. Redefinition of School "Closure"

**\*23** The authority for discharging student debt associated with school closures derives from 🚩20 U.S.C. § 1087(c), which states in pertinent part:

**(c) Discharge**

**(1) In general**

If ... the student borrower, or the student on whose behalf a parent borrowed, is *unable to complete the program in which such student is enrolled due to the closure of the institution ... then the Secretary shall discharge* the borrower's liability on the loan (including interest and collection fees) by repaying the amount owed on the loan and *shall subsequently pursue any claim available to such borrower against the institution and its affiliates and principals or settle the loan obligation ....*

**(2) Assignment**

A borrower whose loan has been discharged pursuant to this subsection shall be deemed to have assigned to the United States the right to a loan refund up to the amount discharged against the institution and its affiliates and principals.

(emphases added).

The Rule is a striking contrast, as it redefines a school or institutional "closure" as follows:

the school's closure date is the earlier of: *the date, determined by the Secretary, that the school ceased to provide educational instruction in programs in which most students at the school were enrolled*, or a date determined by the Secretary that reflects when the school ceased to provide educational instruction for all of its students[.]

34 C.F.R. § 685.214(a)(2)(i) (emphasis added).

"We start with the key statutory term: ["closure"]. As usual, our job is to interpret the words consistent with their ordinary meaning ... at the time Congress enacted the statute."

*Wisconsin Cent. Ltd. v. United States*, 585 U.S. 274, 277, 138 S. Ct. 2067, 2070, 201 L.Ed.2d 490 (2018) (internal quotation marks and citation omitted). There is nothing in the text or context of the statute to indicate that the word "closure" bears anything other than its ordinary meaning, which in relevant part provides that a closure is "a bringing of some activity to a stop: cessation of operations." *Closure*, WEBSTER'S NEW INTERNATIONAL DICTIONARY 428 (3d ed. 1981). [23]

Under the Rule's definition of "closure," the commonsense and dictionary meaning is at best an afterthought in the regulatory language. The most significant part of the Rule confers discretion on the Secretary to "determine" when the school "ceased to provide" "programs" in which "most students" were enrolled. Each of the additional terms is vague, subject to arbitrary and unequal enforcement, and potentially sweeping.

A straightforward hypothetical shows how the Rule's expanded definition of "closure" exposes a school to financial liability for actions that Congress clearly did not intend to cover. Consider a campus with one thousand students that previously offered two programs: a culinary program with 490 students and a cybersecurity program with 510 students. The school chooses to relocate the cybersecurity program to a new campus so that the original campus can be retrofitted to enhance culinary education. In doing so, the school has "closed" the original campus according to the Rule merely

by choosing to reorganize its operations. Under the statutory text of Section 1087(c), none of the cybersecurity students who had to relocate to other campuses would be eligible for discharge, and the school would not be exposed to any financial liability to the Department. But the newly minted Rule subjects the school [24] to enormous financial exposure [25] for "closing" even if it is still operates and educates 49 percent of the students who were enrolled at that location prior to the reorganization. Such an expansion in the Department's power and ability to impose liability on schools not only conflicts with the statute, but it also eviscerates schools' ability to reduce or relocate certain programing at certain locations in response to legitimate business and educational needs.

**\*24** In defense of this expanded definition of "closure," the Department argues first that the change is necessary to protect borrowers from a situation where they would be denied discharge after the school ceased to provide most programming but "intentionally ke[pt] a single, small program open long enough to avoid the [lookback] window." *See* 87 Fed. Reg. at 65,966. This argument, however, impermissibly substitutes a global presumption of dischargeability (again) for the statute's explicit requirement of proof that the student's inability to complete a program was "due to" the closure. 20 U.S.C. § 1087(c)(1). Second, the Department asserts, with no supporting citation, that the Rule does not expand the overall scope of which schools are considered "closed" because borrowers can obtain discharge only after a school has entirely ceased operations. The plain text of the Rule, as explained in the above hypothetical, contradicts that assertion.

For the same reasons that "[a] roof is not a floor," a school that is "open" is not "closed." *Diamond Roofing Co v. Occupational Safety & Health Rev. Comm'n*, 528 F.2d 645, 647 (5th Cir. 1976). We conclude that any challenge to the Department's statutory authority to promulgate 34 C.F.R. § 685.214(a)(2)(i) is likely to succeed on the merits.

### b. A School's Closure Must Be the Actual Reason for Withdrawal

The closed-school provision of the Rule provides for automatic discharges for students who "withdrew from the school not more than 180 calendar days before the school closed." *Id.* § 685.214(d)(1)(i)(B). In doing so, the Rule does not require borrowers to show that they were unable

to complete their program "*due to the closure* of the institution." 🚩 20 U.S.C. § 1087(c)(1) (emphasis added). Instead, the Rule allows the Secretary to discharge an eligible borrower's loan under the closed school provision without an application or any statement from the borrower 1 year after the institution's closure date [26] if the borrower did not complete the program at another branch or location of the school or through a teach-out agreement at another school. 34 C.F.R. § 685.214(c).

This substantial expansion in the number of borrowers eligible for discharge exceeds the agency's statutory authority because it eliminates the causation requirement Congress included in the statute in favor of an arbitrary temporal presumption. The closed-school provision provides automatic discharge to borrowers despite personal or financial or educational reasons completely unrelated to the school's decision to shut down or suspend instruction in certain locations or programs. *Id.*

The closed-school provision also automatically discharges the debt held by borrowers who did not complete a "program at another branch or location of the school or through a teach-out agreement" at another comparable school, or one year after their last day of attendance at a continuation program. 34 C.F.R. § 685.214(c). Again, no proof is required that the closure actually caused the students not to complete the program. This abandonment of the causation requirement, like the 180-day "inference," is overinclusive and exceeds the Department's statutory authority. The Department may not justify the Rule by stating that the Higher Education Act does not foreclose the Department's approach, or that CCST's policy preference is not a sufficient basis to invalidate the Rule. An agency's burden is to establish that its governing statute *enables* its regulations. The Department's burden here is insurmountable given the clarity of the relevant statutory provisions.

This adds yet another reason why CCST is likely to succeed on the merits of its challenge to the closed-school provisions.

### D. The Balance of Harms and the Public Interest

**\*25** The balance-of-harms and public-interest factors merge when the government opposes an injunction. *See* 🚩 *Nken*, 556 U.S. at 435, 129 S. Ct. at 1762; 🚩 *U.S. Navy Seals 1-26 v. Biden*, 27 F.4th 336, 353 (5th Cir. 2022).

First, the harms CCST and its members face by the failure to maintain the status quo are substantially more severe than those faced by the Department and borrowers with pending discharge claims. We are not convinced by the Department's arguments that the 2019 Rule provides an inadequate framework for its work administering and reviewing pending claims, or that borrowers with pending claims would be unfairly prejudiced or financially injured by the granting of a preliminary injunction pending final judgment.

The burden imposed on the public favors a stay as well. A failure to stay the borrower-defense and closed-school provisions of the Rule would immediately hit CCST's members (and other schools) with enormous and unrecoverable compliance costs—which would inevitably be passed on to students. Evidence CCST points to in the record shows that a failure to stay the Rule would significantly constrain schools' operations and prevent them from devoting resources to educating their students, upgrading facilities, and constructing new ones. The only alternative to incurring these costs is for the school to withdraw from Title IV entirely, which would be to the detriment of students who rely on the availability of Direct Loans. Such a consequence would harm the public at large.

We thus conclude that all the equitable factors favor the granting of a preliminary injunction.

### E. Relief Should Not Be Party Restricted

Section 705 of the APA authorizes a reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action" that is pending review. 🚩 5 U.S.C. § 705. Nothing in the text of 🚩 Section 705, nor of 🚩 Section 706, suggests that either preliminary or ultimate relief under the APA needs to be limited to CCST or its members. Instead, we conclude that the scope of preliminary relief under 🚩 Section 705 aligns with the scope of ultimate relief under 🚩 Section 706, which is not party-restricted and allows a court to "set aside" an unlawful agency action. *See Griffin v. HM Florida-ORL, LLC*, ––– U.S. ––––, 144 S. Ct. 1, 1 n.1, 217 L.Ed.2d 227 (Mem) (2023) (Kavanaugh, J., concurring in the denial of the application for stay); Mila Sohoni, *The Power to Vacate A Rule*, 88 GEO. WASH. L. REV. 1121, 1173 (2020)

("The term 'set aside' means invalidation—and an invalid rule may not be applied to anyone.") (footnote omitted); Jonathan Mitchell, *The Writ-of-Erasure Fallacy*, 104 VA. L. REV. 933, 1012–13 (2018) ("Unlike judicial review of statutes, in which courts enter judgments and decrees only against litigants, the APA ... go[es] further by empowering the judiciary to act directly against the challenged agency action. This statutory power to 'set aside' agency action is more than a mere non-enforcement remedy .... In these situations, the courts *do* hold the power to 'strike down' an agency's work, and the disapproved agency action is treated as though it had never happened.").

**\*26**  The almost certainly unlawful provisions of the Rule that CCST challenges apply to all Title IV participants and are thus almost certainly unlawful as to all Title IV participants. Thus, the stay provided here mirrors the relief granted by the Supreme Court in 2016, when it stayed the Clean Power Plan without party limitation, *West Virginia v. EPA*, 577 U.S. 1126, 136 S. Ct. 1000, 194 L.Ed.2d 17 (2016), and by this court in 2021, when it stayed OSHA's vaccine mandate without party limitation, *BST Holdings, L.L.C. v. OSHA*, 17 F.4th 604 (5th Cir. 2021). The Department's protests against nationwide relief are incoherent in light of its use of the Rule to prescribe uniform federal standards. "When a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated —not that their application to the individual petitioners is proscribed." *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989).

Against this backdrop of specific statutory text and longstanding administrative law principles, the Department's arguments that general equitable and constitutional principles require the panel to limit any relief to the named parties do not hold water. "Necessary and appropriate process" does not mean that the relief awarded under Section 705 can only be specific to the plaintiff. 5 U.S.C. § 705. Rather, it means, as the Department acknowledges in its own briefing, that the relief should only involve postponing the effective date of the portions of the Rule that CCST *actually challenges* and for which it has shown a likelihood of success on the merits. The Department's argument that it would be improper to enjoin portions of the Rule that are unchallenged or for which CCST has not shown a likelihood of success on the merits is correct. But it is also irrelevant, as the preliminary injunction sought by CCST, and granted in this opinion, does not affect portions of the Rule that do not relate to borrower-defenses, closed-schools, or adjudication procedures.

## III. CONCLUSION

CCST has met the criteria to satisfy a preliminary injunction, and the district court erred by concluding that CCST faced no irreparable harm. We REVERSE the district court's judgment, REMAND, and instruct the district court to postpone the effective date of the borrower-defense and closed-school discharge provisions of the Rule pending final judgment as specified above. The stay pending appeal remains in effect until the district court enters the preliminary injunction.

STAY PENDING APPEAL MAINTAINED PENDING ENTRY OF PRELIMINARY INJUNCTION, CASE REVERSED AND REMANDED.

### All Citations

--- F.4th ----, 2024 WL 1461737

## Footnotes

1    It is not this court's prerogative to assess regulatory motives. *Compare Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 n.18, 97 S. Ct. 555, 565 n.18, 50 L.Ed.2d 450 (1977)(judicial inquiries into legislative or executive motives are ordinarily disfavored) *with Dep't of Com. v. New York*, 588 U.S. ——, 139 S. Ct. 2551, 2575–76, 204 L.Ed.2d 978 (2019)(concluding that there was a "disconnect between the decision made and the explanation given" because the agency's purported reasoning "was more of a distraction" and pretextual. But given the manifest legal shortcomings of the challenged portions of this Rule, it seems to be of a piece with the Executive Branch's larger goal to sidestep, to the greatest extent possible,

the Supreme Court decision holding Presidential student loan discharges illegal in 🏴 *Biden v. Nebraska*, 600 U.S. ——, 143 S. Ct. 2355, 216 L.Ed.2d 1063 (2023). *See generally* Andrew Gillen, *The State of Student Loan Forgiveness: April 2024*, CATO Institute (April 1, 2024, 5:34 PM) (cataloguing various recent programs to forgive or significantly reduce billions in students' loan obligations).

2  This includes both a defense to repayment of all outstanding loan amounts owed to the Secretary as well as a reimbursement of all payments previously made on the Direct Loan or a loan repaid by the Direct Consolidation Loan. 34 C.F.R. § 685.401(a). Under the William D. Ford Direct Loan Program, eligible students and eligible parents of such students borrow funds directly from the U.S. Department of Education to facilitate enrollment at higher education institutions selected by the Secretary. *See* 🏴 20 U.S.C. § 1087a, *et seq.* Federal Direct Consolidation Loans allow borrowers to consolidate multiple federal student loan into one loan with a single monthly payment. *See id.* §§ 1087e(a)(2)(C), 1078–3.

3  The standards outlining covered "omissions of fact" and "misrepresentations" are defined in other parts of the Rule. 34 C.F.R. §§ 668.71–668.75.

4  Hereafter, we will refer to this provision as 🚩 Section 455(h)—consistent with its enumeration in the Higher Education Act. This provision was originally passed as part of the Student Loan Reform Act of 1993, Pub. L. 103–66, 107 Stat. 351.

5  The Department's statutory authority to discharge loans for students at closed schools and promulgate borrower defense regulations is distinct from its authority to "cancel" loan balances for other classes of borrowers. These include borrowers who are employed full time "in an area of national need," 🏴 20 U.S.C. § 1078-11(a)(2)(B); borrowers who are employed in a public service job, *id.* § 1087e(m)(1); and borrowers employed as teachers, *id.* § 1087j(b). Concurrently, Congress specified that loans issued under the FFEL program are eligible for discharge if the student is "unable to complete the program in which such student is enrolled due to the closure of the institution." *Id.* 🏴 § 1087(c)(1). The statute also directs the Secretary to "pursue any claims available to such borrower against the institution and its affiliates and principals" or settle the loan obligation with those financially responsible for the school. *Id.* This statutory language is also applicable to Direct Loans because Congress provided that such loans shall have the same "terms, conditions, and benefits" as FFEL loans. *Id.* §§ 1087a(b)(2), 1087e(a)(1).

6  Many provisions of the 1994, 2016, and 2019 Rules still apply depending on the disbursement date of the loan in question, which means that different borrowers seeking discharge have different remedies currently available to them. *See, e.g.*, 🏴 34 C.F.R. § 685.206(c) (borrower defense for repayment of loans first disbursed before July 1, 2017); 🏴 *id.* § 685.206(d) (borrower defense for repayment of loans disbursed after July 1, 2017, and before July 1, 2020); 🏴 *id.* § 685.206(e) (borrower defense for repayment of loans first disbursed after July 1, 2020, and before July 1, 2023).

7  CCST asserts that the probability that at least one of CCST's 54 participating schools is among the 4,000 schools with pending claims in the *Sweet* settlement is about 99.999 percent, or (1-(1-0.645)[54]).

8  The 2019 Rule's three-year limitations period for defensive, but not affirmative, borrower-defense claims was remanded to the Department, though not vacated, by the Southern District of New York in 🏴 *N.Y. Legal Assistance Grp. v. DeVos*, 527 F. Supp. 3d 593, 602–04 (S.D.N.Y. 2021).

9  Traceability of the injuries to the Rule and redressability through judicial action, the other two elements of Art. III standing, are not at issue.

10  As CCST notes, the expanded recordkeeping requirements and other compliance measures that its members must take on in order to avoid liability under the 2022 Rule's misstatements provisions contrast with the limited recordkeeping and compliance costs imposed by the 2019 Rule. *See* 34 C.F.R. § 685.206(e)(3). Under that Rule, schools were liable only for knowing and reckless misstatements and omissions and only to the extent the misstatement or omission caused the borrower financial harm. *Id.*

11  Although ECPI's San Antonio campus is a member of CCST, ECPI is a single entity and its San Antonio campus is not a legally separate person. Because ECPI's interests in this litigation are represented by CCST, we assume without deciding that for preliminary injunction purposes, an injury suffered by ECPI through any of its campuses constitutes an injury of a CCST member.

12  This figure is based on an estimate of 378 hours to "review and respond to the proposed group claim" with a cost estimate of $46.59 per hour. 87 Fed. Reg. at 66,030–31. The Department did not provide any estimate for how much each individual claim would cost to defend, and there is no reason to believe that the costs for responding to an individual claim would be significantly different. CCST also convincingly argues that this cost estimate is "wildly low," as "schools would likely retain counsel, who, in Texas, charge a median hourly fee of about $300." State Bar of Texas, *2019 Income and Hourly Rates* 3, available at https://www.texasbar.com/AM/Template.cfm?Section=Demographic_and_Economic_Trends&Template=/CM/ContentDisplay.cfm&ContentID=54237 (last visited April 4, 2024).

13  Student Loan Reform Act of 1993, Pub. L. 103–66, 107 Stat. 351.

14  *See* Project on Predatory Student Lending at the Legal Services Center of Harvard Law School, Comment Letter on Proposed Rule (Aug. 2, 2018), available at https://www.regulations.gov/comment/ED-2018-OPE-0027-0011 (attachments).

15  The full text of the relevant provision states:

   Borrower defenses.

   (1) In any proceeding to collect on a Direct Loan, the borrower may assert as a defense against repayment, any act or omission of the school attended by the student that would give rise to a cause of action against the school under applicable State law. These proceedings include, but are not limited to, the following:

   (i) Tax refund offset proceedings under 34 CFR 30.33.

   (ii) Wage garnishment proceedings under section 488A of the Act.

   (iii) Salary offset proceedings for Federal employees under 34 CFR Part 31.

   (iv) Credit bureau reporting proceedings under 31 U.S.C. 3711(f).

16  *See also* CAMBRIDGE DICTIONARY, available at https://dictionary.cambridge.org/us/dictionary/english/specify ("to explain or describe something clearly and exactly"); OXFORD ENGLISH DICTIONARY, available at https://www.oed.com/dictionary/specify_v?tab=meaning_and_use#21658843 ("to mention, speak of, or name (something) definitely or explicitly; to set down or state categorically or particularly; to relate in detail").

17    The full text of 34 C.F.R. § 668.501 states:

(a) Aggressive and deceptive recruitment tactics or conduct include but are not limited to actions by the institution, any of its representatives, or any institution, organization, or person with whom the institution has an agreement to provide educational programs, marketing, recruitment, or lead generation that:

(1) Demand or pressure the student or prospective student to make enrollment or loan-related decisions immediately, including falsely claiming that the student or prospective student would lose their opportunity to attend;

(2) Take unreasonable advantage of a student's or prospective student's lack of knowledge about, or experience with, postsecondary institutions, postsecondary programs, or financial aid to pressure the student into enrollment or borrowing funds to attend the institution;

(3) Discourage the student or prospective student from consulting an adviser, a family member, or other resource or individual prior to making enrollment or loan-related decisions;

(4) Obtain the student's or prospective student's contact information through websites or other means that:

(i) Falsely offer assistance to individuals seeking Federal, state or local benefits;

(ii) Falsely advertise employment opportunities; or,

(iii) Present false rankings of the institution or its programs;

(5) Use threatening or abusive language or behavior toward the student or prospective student; or,

(6) Repeatedly engage in unsolicited contact for the purpose of enrolling or reenrolling after the student or prospective student has requested not to be contacted further.

18    The Rule also purports to authorize administrative adjudications of borrower defense claims against the government. 87 Fed. Reg. at 65,910; 65,941; 65,945. Because such claims are, in the Department's view, analogous to claims for restitution or rescission, 87 Fed. Reg. 65,914, they are subject to sovereign immunity. *Edelman v. Jordan,* 415 U.S. 651, 668-69, 94 S. Ct. 1347, 1358, 39 L.Ed.2d 662 (1974). But Congress did not waive sovereign immunity for these claims.

19    BALLENTINE'S LAW DICTIONARY is consistent with this definition:

A judicial proceeding either in law or in equity, to obtain relief at the hands of a court. A judicial remedy for the enforcement or protection of a right, or a legal proceeding in which a plaintiff claims against a defendant or fund the enforcement of some obligation toward the plaintiff which is binding upon the defendant or the fund. A prosecution in a court by one party against another party for the enforcement or protection of a right, the redress or prevention of a wrong, or the punishment of a public offense, without regard to the particular form of the procedure.

(3d ed. 1969).

20    *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 843–45, 104 S. Ct. 2778, 2782–83, 81 L.Ed.2d 694 (1984).

21    Nonetheless, it is difficult to reconcile the Department's position that these administrative adjudications would not be dispositive in collateral litigation with the rest of the Rule. Indeed, if collateral estoppel would not attach to the outcome of any administrative adjudication under the Rule, then the adjudication regime established

by the Rule would open the door to potential double recovery for borrowers against schools after their loans have successfully been discharged, and rather than simplifying the process, would lead to duplication of proceedings. *See* 87 Fed. Reg. at 65,908 (stating that the Department sought to "strike[ ] a balance between providing transparency, clarity, and ease of administration while simultaneously giving adequate protections to borrowers, institutions, the Department, and the public monies that fund Federal student loans."). Moreover, once the borrower's debts have been discharged, it is difficult to see what the borrower's remaining potential damages for any subsequent civil suit governed by state law would be, especially for a borrower whose claims sounded in contract rather than tort law, as punitive damages are only available in the latter.

22    For closed schools, the Rule also establishes a rebuttable presumption that the actionable act or omission of the school that caused the borrower detriment "warrants relief" being afforded to the borrower. 34 C.F.R. § 685.401(e).

23    *See also* CAMBRIDGE DICTIONARY, available at https://dictionary.cambridge.org/us/dictionary/english/ closure?q=closure+ ("the fact of a business, organization, etc. stopping operating"); OXFORD ENGLISH DICTIONARY, available at https://www.oed.com/dictionary/closure_n?tab=meaning_and_use#9161981 ("the act of closing or shutting; closed condition; a bringing to a conclusion; end, close").

24    A "school" is defined in the closed-school discharge regulations as "a school's main campus or any location or branch of the main campus." 34 C.F.R. § 685.214(a)(2)(ii).

25    Under this hypothetical, all the cybersecurity students who did not complete the same program at another branch or location of the school, or through a teach-out agreement approved by the school's accrediting agency and, if applicable, the school's State authorizing agency, within one year of this reorganization (or their last date of attendance at a continuation program that they started but failed to complete), would be eligible for automatic discharge.

26    Borrowers who accepted but did not complete a continuation program are eligible for automatic discharge one year after their last date of attendance at the other branch or location or in the teach-out program. 34 C.F.R. § 685.214(c)(2).

---

**End of Document** © 2024 Thomson Reuters. No claim to original U.S. Government Works.