No. 23-15049

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

THERESA SWEET, et al.,
*Plaintiffs-Appellees*,
&
EVERGLADES COLLEGE, INC.,
*Intervenor-Appellant*,
v.
LINDA MCMAHON, Secretary of the United States Department of Education, and U.S. DEPARTMENT OF EDUCATION,
*Defendants-Appellees*.

On Appeal from the United States District Court
for the Northern District of California

**RESPONSE TO PETITION FOR REHEARING EN BANC**

YAAKOV M. ROTH
  *Acting Assistant Attorney General*

JOSHUA M. SALZMAN
SEAN R. JANDA
  *Attorneys, Appellate Staff*
  *Civil Division, Room 7260*
  *U.S. Department of Justice*
  *950 Pennsylvania Avenue NW*
  *Washington, DC 20530*
  *(202) 514-3388*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................1

STATEMENT .........................................................................................................2

ARGUMENT ..........................................................................................................7

CONCLUSION ..................................................................................................... 17

CERTIFICATE OF COMPLIANCE

**INTRODUCTION**

After years of litigation, the Department of Education settled a massive class action brought by student loan borrowers challenging the Department's processing of class members' applications for relief under a program that relieves borrowers of their repayment obligation when their school engaged in misconduct. Part of the settlement calls for the Department to grant full discharges to plaintiffs who borrowed to attend 151 specific schools. Although all parties to the underlying litigation are satisfied with this resolution, three of the 151 schools—whose students constitute less than 1% of the plaintiff class—intervened and appealed in an unsuccessful attempt to block the settlement. And now, one of the intervenors continues those efforts by seeking rehearing en banc.

As the panel properly determined, intervenors have no right to object to the settlement. The settlement binds only the Department and the plaintiff class, providing neither the Department nor plaintiffs with additional rights vis-à-vis intervenors. As settled precedent applied by the panel makes clear, "a non-settling defendant, in general, lacks standing to object to a" settlement "involving other parties to a lawsuit"—unless the non-settler can demonstrate "formal legal prejudice" from the settlement. *Waller v. Financial Corp. of Am.*, 828 F.2d 579, 582-83 (9th Cir. 1987). The panel correctly determined that intervenors in this case cannot meet that high bar.

Further review is unwarranted. Petitioner fails to identify any conflict with a prior decision of this Court, the Supreme Court, or another court of appeals. And petitioner does not even attempt to contend that the threshold issue decided by the panel represents the sort of exceptionally important question that could support en banc review; instead, petitioner argues only that the underlying settlement itself presents such a question. But petitioner fails to explain how it may properly leverage the importance of undecided issues—that the Court may not properly reach without resolving multiple threshold questions—into a basis for en banc review of the panel's fact-specific resolution of a threshold question. And, regardless, the relevant portions of the settlement have been almost wholly consummated at this point. The petition should be denied.

## STATEMENT

**1.** "Congress has allowed for the cancellation of federal student loans in certain cases of school misconduct" pursuant to a process known as borrower defense. *In re U.S. Dep't of Educ.*, 25 F.4th 692, 695 (9th Cir. 2022) (citing 20 U.S.C. § 1087e(h)). Borrowers may claim entitlement to borrower-defense relief if their institution engaged in actionable misconduct, such as by providing prospective students with materially false information to induce their attendance.

The Secretary of Education has repeatedly amended the regulations specifying the particular misconduct that can give rise to a borrower-defense claim and the relevant administrative procedures for adjudicating such claims; as a result, loans

disbursed at different times are subject to different procedures. *See* 59 Fed. Reg. 61,664 (Dec. 1, 1994); 81 Fed. Reg. 75,926 (Nov. 1, 2016); 84 Fed. Reg. 49,788 (Sept. 23, 2019); 87 Fed. Reg. 65,904 (Nov. 1, 2022).

At a high level of generality, however, the process generally works as follows: First, to raise a borrower-defense claim, a borrower submits an application to the Department. *E.g.*, 34 C.F.R. § 685.206(e)(8). In adjudicating that application, the Department is generally required first to determine whether the borrower has established that the institution engaged in actionable misconduct. In doing so, the Department reviews evidence submitted with the application and other available evidence. The Department also notifies the institution of the application and considers any evidence that the institution submits in response. *E.g.*, *id.* §§ 685.206(e)(8)-(10), 685.222(e)(3).

If the Department concludes that the borrower has established actionable misconduct, the Department determines what relief is appropriate. Such relief may include forgiving outstanding loan balances and reimbursing the borrower for loan payments already made to the Department. *E.g.*, 34 C.F.R. § 685.206(e)(12). In addition, if it grants a borrower-defense application, the Department may initiate a separate administrative proceeding to recoup discharged amounts from the school. If the Department undertakes such a proceeding, the school is entitled to a hearing and the opportunity to litigate the issue. *See id.* §§ 668.125, 685.308(a)(3); *see also id.* §§ 685.206(c)(3)-(4), 685.222(e)(7).

3

**2.** Beginning in 2015, there was an unprecedented surge in borrower-defense requests, which overwhelmed the Department and led to the Department's pausing adjudications while it worked to develop internal processes and infrastructure to allow the consistent and timely adjudication of claims. *See U.S. Dep't of Educ.*, 25 F.4th at 695-96.

By the time this suit was filed in June 2019, the Department's backlog had grown to more than 210,000 pending applications. *See U.S. Dep't of Educ.*, 25 F.4th at 696. Plaintiffs—a class of borrowers with pending borrower-defense applications— alleged that the Department had unlawfully withheld, or was unreasonably delaying, adjudications. After years of litigation—including a trip to this Court on mandamus to halt the deposition of the former Secretary, *see U.S. Dep't of Educ.*, 25 F.4th 692—the parties reached a settlement in June 2022. The settlement provides a framework for comprehensively addressing the backlog of hundreds of thousands of borrower-defense applications by dividing applicants into three groups.

Group One comprises the approximately 196,000 class members who received federal student loans to attend one of the 151 schools identified in the settlement's Exhibit C. *See* 3-ER-564. As explained to the district court, this provision of the settlement reflects the parties' determination that borrowers "associated with those schools should be provided presumptive relief under the settlement due to strong indicia regarding substantial misconduct by the listed schools, whether credibly alleged or in some instances proven, and the high rate of class members with applications

4

related to the listed schools." 3-ER-573-74. Under the settlement, these class members are entitled to both a discharge of their remaining student loans associated with the relevant school as well as a refund of amounts already paid to the Department toward those loans and credit reporting relief. *See* 3-ER-565.

Groups Two and Three consist of additional borrowers who did not attend an Exhibit C school (Group Two) or who submitted their applications after the settlement's execution (Group Three). The settlement provides that these Groups will have their claims adjudicated on a particular timetable, and it provides that Group Two class members will additionally receive a streamlined adjudication within set timeframes and with certain presumptions in the borrower's favor. *See* 3-ER-564-66, 3-ER-587. For both Groups, if an application is not adjudicated by the deadline in the settlement, the applicant will receive full relief. *Id.*

**3.** Four of the Exhibit C schools moved to intervene for purposes of opposing the settlement. *See* 1-ER-54. The schools objected to their inclusion on Exhibit C, which they claimed had caused them reputational harm. 1-ER-55. The district court concluded that the schools had not met the requirements to justify intervention as of right, but it granted the schools permissive intervention for the purpose of opposing the settlement. *See* 1-ER-54-55.

After a fairness hearing in which plaintiffs, the Department, and the intervening schools were heard, the district court rejected intervenors' arguments, approved the class-action settlement, and entered final judgment. *See* 1-ER-28.

5

**4.** Three of the intervenors appealed. The panel dismissed the appeal in relevant part, concluding that the intervenors could not properly challenge the settlement. At the outset, the panel explained that "an entity who is not a party to a settlement" is generally not permitted to "object[] to court approval of the settlement, either before the district court or on appeal." Op. 16 (citing *Waller v. Financial Corp. of Am.*, 828 F.2d 579, 582 (9th Cir. 1987)). Instead, to properly object, a non-settling entity must "demonstrate[] that it will 'sustain some formal legal prejudice as a result of the settlement.'" Op. 21 (quoting *Waller*, 828 F.2d at 583); *see also id.* (collecting cases "appl[ying] this rule to both parties and non-parties" in a variety of postures). And formal legal prejudice "exists only in those rare circumstances when, for example, the settlement agreement *formally* strips a non-settling party of a legal claim or cause of action, such as a cross-claim for contribution or indemnification, invalidates a non-settling party's contract rights, or the right to present relevant evidence at a trial." Op. 24 (quoting *Bhatia v. Piedrahita*, 756 F.3d 211, 218 (2d Cir. 2014)).

Applying those settled principles to intervenors' attempt to object to the settlement here, the panel concluded that intervenors had failed to demonstrate any formal legal prejudice from the settlement. The panel explained that intervenors failed to "identify any provision in the settlement agreement or settlement approval order that formally strips them of any legal claim or defense, or any contractual right." Op. 25. The settlement does not, for example, "compromise any of the [intervenors']

6

rights or impose any obligations or liabilities on them." *Id.* And indeed, although the Department may normally "initiate a separate proceeding against the school for recoupment" after it approves a borrower-defense application, *id.*, the Department has made clear that it does not believe it may "initiate recoupment proceedings against any Exhibit C schools as a result of the settlement," Op. 26; *see also* Op. 29-31 (explaining, in affirming the district court's denial of intervention as of right, that intervenors lacked any "significantly protectable interest" affected by the settlement). Finally, the panel concluded that intervenors' allegations that the settlement and related statements caused them "reputational harm" were not sufficient to show formal legal prejudice. Op. 26-27.

Judge Collins dissented. As relevant here, he would have concluded that the intervenors could properly raise objections to the settlement. Op. 32.

**5.** This en banc petition—from one of the three intervenor-appellants, Everglades College, Inc.—followed.

## ARGUMENT

The panel correctly concluded that Everglades (and the other intervenors) could not properly object to the settlement between plaintiffs and the government, and its decision does not conflict with any decision of the Supreme Court, this Court, or any other court of appeals. No further review is warranted.

**A.** At the outset, the panel properly concluded that Everglades could not object to the settlement unless it could demonstrate some formal legal prejudice from the

7

settlement. Settled precedent establishes "that a non-settling defendant, in general, lacks standing to object to a" settlement "involving other parties to a lawsuit." *Waller v. Financial Corp. of Am.*, 828 F.2d 579, 582-83 (9th Cir. 1987) (collecting cases from multiple courts of appeals articulating this view); *see also* Op. 21 (collecting cases applying this rule to non-settling entities in various postures). The one "exception to th[is] general principle" is that a non-settling party may "object where it can demonstrate that it will sustain some formal legal prejudice as a result of the settlement." *Waller*, 828 F.2d at 583.

Thus, for example, in *Waller*, the plaintiff class settled securities claims against a company, and the company's accounting firm—which was a co-defendant in related litigation—attempted to object to the settlement. 828 F.2d at 580. The accounting firm argued that the settlement, which required the settling company to cooperate with the plaintiffs in their suit against the firm, "virtually assure[d]" that the company would "disclose to the plaintiff classes privileged communications obtained from" the firm and would undermine the firm's joint defense agreement with the company. *Id.* at 583-84 (quotation omitted). This Court nonetheless held that the firm could not object to the settlement. This Court emphasized that the settlement did not formally "cut off or in anyway affect any of" the firm's claims but instead "only dispose[d] of the claims of the classes against" the company. *Id.* at 584. And although this Court recognized that the settlement might put the firm "at something of a tactical

8

disadvantage in the continuing litigation," it concluded that "[s]uch an injury does not constitute" the requisite formal legal prejudice. *Id.*

Similarly, in *Smith v. Arthur Andersen LLP*, 421 F.3d 989 (9th Cir. 2005), a bankruptcy trustee "commenced a number of lawsuits," all of which were consolidated, against various defendants and then attempted to settle claims "with three of the defendants." *Id.* at 996. Various other defendants then objected to that settlement. On appeal, this Court again articulated the relevant standard derived from *Waller*: a "non-settling defendant, in general, lacks standing to object to a partial settlement" unless "it can demonstrate that it will sustain some formal legal prejudice as a result of the settlement." *Id.* at 998 (quoting *Waller*, 828 F.2d at 582-83). On the facts, however, this Court held that the non-settling entities in *Smith* had suffered formal legal prejudice sufficient to permit their objections, because the settlement purported to "enjoin[]" them "from pursuing indemnification, contribution, and certain other claims." *Id.* at 998-99.

In evaluating Everglades's attempt to object to the settlement here, the panel correctly articulated the settled legal framework as reflected in cases like *Waller* and *Smith*. *See* Op. 21, 24-25. And in concluding that Everglades failed to establish any formal legal prejudice from the settlement, the panel properly applied that settled framework. As the panel explained, the settlement addresses and resolves only the claims that plaintiffs have asserted against the government; the settlement does not purport to "formally strip[]" Everglades (or the other Exhibit C schools) "of any legal

9

claim or defense" or any "contractual right" nor does it "impose any obligations or liabilities on" Everglades. Op. 25. On the contrary, the settlement provides no predicate for a recoupment action against Everglades and does not abrogate any of Everglades's procedural rights in the event that the Department were ever to attempt a recoupment action. Op. 25-26, 26 n.8.

**B. 1.** Everglades advances assorted arguments that the panel erred by applying this Court's settled framework for evaluating whether a non-settling entity may object to a settlement. None of those reasons is persuasive, and Everglades does not, in any event, persuasively suggest a conflict with another decision that could warrant further review.

At the outset, Everglades contends that the principles articulated in *Waller* do not apply to this case because those principles only "address[] when non-settling defendants may challenge voluntary dismissal" of settling parties and should not apply to "bar intervention and negate Rule 24." Pet. 7-8. That contention misunderstands the facts here and is unpersuasive on its own terms. First, as explained, the district court granted Everglades's motion for permissive intervention, *see* 1-ER-54-55, which means that at the time it attempted to press its objection to the settlement, Everglades was a "non-settling defendant," Pet. 7. Thus, even if *Waller* and its progeny were confined to the very situation Everglades posits, the panel properly applied them in this case to reject Everglades's objection to the settlement.

In any event, Everglades's attempt to confine those principles to circumstances where a non-settling defendant (and not some other entity) objects to a settlement finds no basis in law or logic. As the panel explained, courts have applied the principles reflected in *Waller* in a variety of procedural postures, including to evaluate objections by "non-settling defendants," "non-settling third-party defendants," "opted-out class members," and "non-class members." Op. 21. And that makes sense. Indeed, Everglades does not even attempt to provide a coherent theory on which non-parties who are strangers to a lawsuit and who seek to intervene for the sole purpose of objecting to the parties' settlement should have to clear a lower bar to raise their objections than would an actual non-settling party to the case.

Next, Everglades suggests that the panel erred by applying the doctrine developed in *Waller* because the panel referred to that doctrine as one of "standing." Everglades contends that "prudential-standing doctrines conflict" with the usual obligation to exercise jurisdiction where it exists and "must be restricted to the two limited categories of cases recognized by Supreme Court precedent." Pet. 8 (citing *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 572 U.S. 118, 126 (2014)).

But the panel properly anticipated this objection, explaining that "federal courts use many different terms to refer to a litigant's eligibility to bring a particular claim or appeal when the eligibility requirements stem from a statute or legal doctrine other than Article III." Op. 17 n.3. Although the panel recognized that "it might be better to ask whether a non-settling entity has a 'cause of action' to object to the settlement,

11

instead of asking whether the non-settling party has 'standing' to object," the panel explained that "because we, and our sister circuits, have predominantly referred to the *Waller* formal-legal-prejudice requirement as a 'standing' requirement, we continue to do so here." *Id.* The panel's decision to use the nomenclature reflected in this Court's earlier cases rather than to reframe the same analysis through the more modern cause-of-action lens hardly provides a firm reed to justify further review.

And although Everglades states that the limitation requiring a party to have a cause of action in order to press a claim is "the very prudential-standing principle *Lexmark* eliminated," Pet. 9, that is simply incorrect. *Lexmark* stated that it is a "misnomer" to refer to questions related to the cause-of-action analysis as ones of "prudential standing." 572 U.S. at 127 (quotation omitted). But at the same time, *Lexmark* reaffirmed that, to press a claim, a party must identify some "cause of action" and must "fall[] within the class" that is "authorized to sue" under that cause of action. *Id.* at 128. The principles that the panel applied to reject Everglades's attempt to press an objection to the settlement in this case thus survive *Lexmark*, even if—as the panel recognized—it might be more precise to refer to those principles using different language than did *Waller*.

Finally, Everglades contends that the rule articulated in *Waller* "should never apply to settlements that purport to alter federal-regulatory programs" because "a settlement requiring a federal agency to alter a regulatory program implicates the interests of regulated parties in ways that private settlements do not." Pet. 11. In so

12

arguing, Everglades again misapprehends the relevant facts and the law. The settlement here does not "alter" any federal regulatory program; instead, it resolves specific bilateral claims asserted by specific plaintiffs against the government. Thus, as the district court correctly explained, the settlement "has not altered the borrower-defense procedures at all. Those regulations remain in place." 1-ER-41. Correspondingly, Everglades is not regulated by the settlement. And regardless, Everglades's argument provides no basis for crafting a special framework to apply in the specific case of settlements involving the federal government. At most, the argument may suggest that, in the hypothetical case where a federal agency did purport to alter a regulatory program through settlement, a regulated entity with a sufficient legal interest in the program might be able to show the prejudice required under *Waller*.

    Moreover, Everglades barely makes any attempt to show that the panel's decision to apply *Waller*'s settled framework warrants further review. Instead, Everglades's argument that the panel's decision on this score conflicts with another decision of this Court is limited to a single page, where Everglades cites *United States v. Carpenter*, 526 F.3d 1237 (9th Cir. 2008), and *Portland General Electric Co. v. Bonneville Power Administration*, 501 F.3d 1009 (9th Cir. 2007), as cases where this Court assertedly allowed "intervenors to challenge settlement with no showing of formal prejudice." Pet. 10. But neither of those cases conflicts with the panel decision because, as Everglades does not contest, in neither case did the Court actually

13

consider the question and decide that the formal-legal-prejudice requirement was inapplicable.

**2.** Everglades fares no better in contending that the panel's case-specific conclusion that it had not shown formal legal prejudice sufficient to support its objection to the settlement "created intra- and inter-circuit conflict," Pet. 11, worthy of further review.

First, Everglades contends that the settlement "eliminates procedural and substantive defenses" to recoupment that it would otherwise enjoy under the borrower-defense regulations and that "[p]recedent holds that a settlement that abrogates such defenses causes formal legal prejudice." Pet. 11-12. But Everglades is again wrong on the facts. The panel properly recognized—in accordance with the precedent that Everglades cites—that a settlement that purported to preclude a non-settling entity from "asserting" any "defenses that may be available to them" in other proceedings would constitute formal legal prejudice. Op. 24 (quotation omitted). The problem for Everglades here is that the settlement does not "formally strip them of any legal claim or defense" to recoupment that Everglades might enjoy. Op. 25. To the contrary, as the Department has repeatedly made clear, it may not "initiate recoupment proceedings against any Exhibit C schools" like Everglades "as a result of the settlement." Op. 26.

Second, Everglades briefly suggests that the "reputational injury" it claims to suffer as a result of its inclusion on Exhibit C is "a real-world, ongoing injury" that

14

constitutes formal legal prejudice. Pet. 12-13. But Everglades cites no case holding that such "reputational injury" suffices to permit objection to a settlement. And its amorphous claims of reputational harm look nothing like the sort of injury that this Court has held to constitute formal legal prejudice—for example, the explicit enjoining of a non-settling party from pursuing certain legal claims that it might otherwise possess, *see Smith*, 421 F.3d at 998-99.

**C.** Everglades likewise cannot demonstrate that this case is one of "exceptional importance," Fed. R. App. P. 35(a)(2), that might warrant rehearing en banc.

Everglades does not even attempt to claim that the threshold issues actually decided by the panel are particularly important. Instead, Everglades claims that en banc review is warranted "so the critical merits issues, with nationwide ramifications, will be decided by an appellate court and not a lone district judge." Pet. 14. As the government explained in its response brief, Everglades is incorrect on each merits issue it presses. But even if there were doubt about that, Everglades's attempt to leverage the asserted importance of issues undecided by the panel into a basis for granting en banc review is unpersuasive.

As an initial matter, contrary to Everglades's characterization, the settlement does not reflect any "blanket loan cancellation." Pet. 14. Instead, the settlement is the compromise of specific claims that have been submitted to the Department pursuant to the statutorily authorized borrower-defense regulations, and which then became the subject of protracted litigation. The Department is not asserting any novel

15

authority that might give rise to an issue of exceptional importance; it is simply making a determination about how best to use its established authority so as to compromise and resolve long-running litigation, not involving intervenors, and to address a crippling backlog.

Moreover, at this point, little remains to do in implementing the relevant portion of the settlement. As explained, Everglades claims it is injured by the Department's actions in connection with Group One of the settlement, which provided relief to class members who attended one of 151 specified schools (including Everglades). But at this point, the parties have almost fully implemented the settlement with respect to Group One. *See* Dkt. 468, at 2 (Apr. 14, 2025) (stating that 99.8% of Group One class members have received discharges and 99.7% have been sent refunds). And Everglades does not claim in its petition that the Court could properly order the Department to unwind the already consummated settlement. There is thus no sound reason for the en banc Court to grant review.

Finally, even if the underlying issues in the case were sufficiently important to support en banc review in a vacuum, review would not be warranted here. Everglades cites no authority to support the proposition that the Court should grant en banc review on the basis of claims not addressed by the panel. And to reach those claims, the Court would first have to resolve numerous threshold issues in Everglades's favor, including not just the question resolved by the panel and presented by the en banc

petition but also the questions whether Everglades has Article III standing and whether, in light of the status of Group One discharges, its claims may be moot.

## CONCLUSION

For the foregoing reasons, the petition for rehearing en banc should be denied.

                    Respectfully submitted,

                    YAAKOV M. ROTH
                       *Acting Assistant Attorney General*

                    JOSHUA M. SALZMAN

                    *s/ Sean R. Janda*
                    SEAN R. JANDA
                       *Attorneys, Appellate Staff*
                       *Civil Division, Room 7260*
                       *U.S. Department of Justice*
                       *950 Pennsylvania Avenue NW*
                       *Washington, DC 20530*
                       *(202) 514-3388*
                       *sean.r.janda@usdoj.gov*

May 2025

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limit established in this Court's order of January 10, 2025, because it contains 3974 words. This brief also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in Garamond 14-point font, a proportionally spaced typeface.

*s/ Sean R. Janda*
Sean R. Janda